JAN 1 3 2003

F I L E D

JAN 1 0 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Credit Local de France, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 02 C 8288 |
| PETER G. ROGAN, ROGER EHMEN, BRADDOCK MANAGEMENT, L.P., a California Limited Partnership, BAINBRIDGE MANAGEMENT, L.P., f/k/a BRADDOCK MANAGEMENT, L.P., an Illinois Limited Partnership, BAINBRIDGE MANAGEMENT, INC., f/k/a BRADDOCK MANAGEMENT, INC., f/k/a WALDO POINT MANAGEMENT, VITAL COMMUNITY HEALTH SERVICES, INC., an Illinois not-for-profit corporation, ACCESS COMMUNITY HEALTH SERVICES, INC., an Illinois not-for-profit corporation, EDGEWATER PROPERTY COMPANY, an Illinois corporation, and PGR PROPERTIES, INC., an Illinois corporation. ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Marvin E. Aspen  Mag. Judge Sidney I. Schenkier |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Dexia Credit Local (formerly known as Dexia Public Finance Bank and Credit

Local *de* France) ("Dexia"), for its first amended complaint against Defendants Peter Rogan,

Roger Ehmen, Braddock Management, L.P., a California Limited Partnership, Bainbridge

Management, L.P., f/k/a Braddock Management, L.P., an Illinois Limited Partnership,

Bainbridge Management, Inc., f/k/a Braddock Management, Inc., f/k/a Waldo Point

Management, Vital Community Health Services, Inc., Access Community Health Services, Inc.,

1

Edgewater Property Company, and PGR Properties, Inc. (collectively "Defendants"), alleges as follows:

**Introduction**

1.    From at least in or about 1998 and continuing until at least in or about 2001, Defendant Peter Rogan knowingly, intentionally, and recklessly perpetrated a scheme and artifice to defraud Dexia and numerous other individuals in a wide variety of ways. The other Defendants worked with Defendant Rogan to accomplish this scheme, and to assist him to profit personally from it. Because of the conduct of Defendant Rogan and the other Defendants, Dexia has suffered injuries in excess of $56,000,000.00.

2.    Defendant Rogan and the other Defendants directly and through others knowingly, intentionally, and recklessly prepared and caused to be prepared false and fraudulent financial statements and other information relating to the finances of Northside Operating Co., which was doing business as Edgewater Medical Center ("Edgewater"). Defendant Rogan and the other Defendants knowingly, intentionally and recklessly caused Edgewater's financial statements and other financial information to fail to disclose that a portion of Edgewater's hospital revenue derived from various health care fraud schemes, thus rendering the financial statements and other financial information materially false and misleading.

3.    Defendant Rogan and the other Defendants knowingly, intentionally, and recklessly gave and caused to be given to Dexia the false and misleading financial statements and other information regarding Edgewater to induce Dexia to issue a letter of credit totaling approximately $55,000,000.00 for the benefit of Edgewater. Dexia reasonably relied upon these financial statements and other information regarding Edgewater in agreeing to issue the letter of credit. In particular, Dexia was aware that a substantial portion of Edgewater's revenues came

2

through the Medicare and Medicaid programs. If Defendants had provided Dexia with true and complete information on Edgewater, including disclosing that a portion of Edgewater's revenue derived from various fraud schemes against Medicare, Medicaid, and other entities, Dexia never would have agreed to issue and would never have issued the letter of credit.

4. After Dexia issued the letter of credit on behalf of Edgewater, Defendant Rogan and the other Defendants knowingly, intentionally, or recklessly lulled Dexia into a false sense of security and advanced their scheme to defraud by sending and causing to be sent to Dexia false and misleading financial statements and financial information regarding Edgewater's financial viability and prospects, and its operations. Defendant Rogan and the other Defendants sent Dexia these additional false and misleading financial statements and financial information to conceal the scheme to defraud, to induce Dexia to refrain from protecting itself by exercising its contractual rights under its reimbursement and credit agreements with Edgewater, and to allow the Defendants to pillage Edgewater of the collateral, Defendants had caused Edgewater to post to secure Dexia's letter of credit.

5. Had Defendants not engaged in this lulling and concealment, Dexia would have known and learned that the Edgewater financial statements, financial information and other operating information that Defendants provided Dexia was false. If Defendants had not concealed this information from Dexia, Dexia immediately would have acted to protect itself from that fraud scheme and reported the matter to the authorities, thus preventing Defendants from continuing their scheme to defraud. If Defendants had disclosed that even a portion of Edgewater's revenues had come through fraud against Medicare or Medicaid, Dexia would have immediately taken steps to protect its interests and limit its losses.

3

6.    Defendant Rogan along with other Defendants and individuals who were responsible for protecting the remaining assets of Edgewater, failed to do so. Defendant Rogan and other Defendants pillaged Edgewater of Dexia's collateral and squandered Edgewater's assets, including without limitation directly or indirectly diverting those assets to Defendant Rogan personally, to the other Defendants using Edgewater's revenue and assets for purposes other than maintaining the operations and financial health of Edgewater, and using Edgewater's assets to benefit Defendant Rogan and the other Defendants personally at the expense of Edgewater. These misapplications of Edgewater assets breached the fiduciary duty that Defendants Rogan, Access, Vital, Ehmen and other individuals owed to Edgewater and Dexia. This activity also caused the collateral supporting the letters of credit to waste away.

7.    Defendant Rogan and the other Defendants knowingly, intentionally, and recklessly orchestrated efforts to siphon money from Edgewater through a variety of fraudulent "management agreements," under which certain Defendants Rogan, Braddock and Bainbridge received exorbitant payments. These misapplications of Edgewater assets breached the fiduciary duty Defendants Rogan and Ehmen and other individuals owed to Edgewater and Dexia. This activity also caused the collateral on the letters of credit to waste away.

8.    Defendants Rogan, EPC and PGR and the other Defendants knowingly, intentionally, and recklessly coordinated efforts to funnel money out of Edgewater, decreasing the value of Edgewater's assets by, among other things, charging exorbitant amounts of rent for use of property Defendants Rogan, EPC and PGR owned, causing Edgewater to pay for property insurance and taxes on the Defendants' property, and causing Edgewater to make substantial, permanent improvements to the Defendants' property. Additionally, the Defendants caused Edgewater to fail to exercise its contractual right to purchase the Defendants' property, while

4

Defendants continued to benefit from Edgewater's payments. These misapplications of Edgewater assets breached the fiduciary duty Defendants Rogan and Ehmen and other individuals owed to Edgewater and Dexia and unjustly enriched Defendants Rogan, EPC and PGR. This activity also caused the assets of the Debtor to waste away.

9.      As a result of the foregoing frauds and breaches of fiduciary duty, Defendants left Edgewater insolvent, absent the revenue it received by fraud. Nevertheless, Defendant Rogan and the other Defendants continued their scheme to defraud and to siphon money from Edgewater.

10.      As a direct result of the foregoing frauds and breaches of fiduciary duty, Edgewater defaulted on the covenants in its letter of credit reimbursement agreement in or about May 2001.

11.      When the government finally discovered and revealed the fraudulent conduct perpetrated at Edgewater, Medicare/Medicaid ceased making payments to Edgewater, Edgewater stopped receiving revenue from Defendants' fraud schemes, and almost immediately Edgewater closed. This caused Dexia's letters of credit again to be drawn upon, requiring Dexia to pay approximately $55,000,000 on Edgewater's behalf. Dexia has been unable to recover virtually any of this money from the collateral that Defendant Rogan and the other Defendants originally posted as security for the letter of credit because Defendant Rogan and the other Defendants pillaged and squandered most of that collateral as part of their scheme to defraud and breaches of fiduciary duty.

## Jurisdiction and Venue

12.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332. The amount of the matter in controversy exceeds $75,000, the plaintiff is a foreign corporation, and the Defendants are citizens of Illinois, Indiana, and California.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a). Many of the Defendants reside in this judicial district and a substantial part of the events and omissions giving rise to the claims in this complaint occurred in this judicial district.

## Parties

14.     Plaintiff Dexia is a bank with its principal offices located in Paris, France, and is a specialized financial corporation organized under the laws of France. It conducts operations in the United States through its New York Agency, which is licensed under the laws of the State of New York as an unincorporated agency of Dexia.

15.     Defendant Peter Rogan ("Rogan") is a citizen and resident of the State of Indiana. During the events referenced in this Complaint, Defendant Rogan controlled directly and indirectly the management and operations of Edgewater, including all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of the hospital. Rogan did this by: his personal involvement in that management, his direct or indirect ownership control of the commercial entities that managed Edgewater, and his domination of the boards of directors of defendants Access and Vital.

16.     Defendant Roger Ehmen ("Ehmen") is a citizen and resident of the State of Illinois. During the period of the events referenced in this Complaint, Defendant Ehmen was the Senior Vice President of Marketing for Edgewater and was an employee of Defendants Braddock and Bainbridge. Defendant Ehmen has pled guilty to federal felony charges that he

6

and Defendant Rogan used Edgewater to operate a widespread scheme to defraud Medicare and Medicaid, which scheme added millions of dollars in fraudulent revenue to Edgewater. Defendant Ehmen is currently in federal prison serving a sentence on those charges.

17.     Defendant Braddock Management L.P. ("Braddock") is a California limited partnership. From approximately 1995 through March 2000, Braddock had management contracts with Edgewater. Defendant Rogan caused Edgewater to retain Braddock to act as the exclusive manager of the day-to-day operations of Edgewater. These contracts provided that Braddock would act as the exclusive manager of the day-to-day operations of Edgewater, and that Braddock would supervise and manage all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of the hospital. From approximately 1995 through in or about October 22, 1998, the general partner of Braddock was Waldo Point Management, which Peter Rogan controlled as its president. From approximately October 22, 1998 to at least in or about May 2002, Defendant Bainbridge Management, Inc. replaced Waldo Point Management as the general partner of Braddock.

18.     Defendant Bainbridge Management L.P. ("Bainbridge") is an Illinois limited partnership. From in or about March 2000 until in or about May 2001, Defendant Bainbridge had a management contract with Edgewater. Defendant Bainbridge bought out defendant Braddock's contract with Edgewater effective March 2000, which meant that defendant Bainbridge would act as the exclusive manager of the day-to-day operations of Edgewater, and would supervise and manage all billings, collections, cost reporting and other financial matters related to the day-to-day operations of the hospital. Upon information and belief, Defendant Rogan caused Edgewater to approve this transaction. During the events referenced in this

7

Complaint, Defendant Bainbridge Management, Inc. operated and controlled Bainbridge as its sole general partner.

19.    Defendant Bainbridge Management, Inc. ("Bainbridge Inc."), formerly known as Braddock Management, Inc., is an Illinois corporation. At all times relevant herein, Defendant Peter Rogan controlled Bainbridge Inc. as its president, secretary, and director. From October 22, 1998 to the present, Peter Rogan has been trustee for the Peter Rogan Revocable Trust, which is the sole shareholder of Bainbridge Management, Inc.

20.    Defendant Vital Community Health Services, Inc. ("Vital") is an Illinois not-for-profit corporation. In or about March 2000, Defendant Vital became the sole corporate member of Edgewater. During the events referenced in this Complaint, Defendant Vital had a management agreement with Defendants Bainbridge and Braddock.

21.    Defendant Access Community Health Services, Inc. ("Access") is an Illinois not-for-profit corporation. Defendant Access was the sole corporate member of Defendant Vital. During the events referenced in this Complaint, Defendant Access had a management agreement with Defendants Bainbridge and Braddock.

22.    Defendant Edgewater Property Company ("EPC") is an Illinois corporation. At all times relevant herein, Defendant Rogan controlled and continues to control Defendant EPC as its President and Secretary. Upon information and belief, Defendant Rogan owns all of or a controlling interest in Defendant EPC. At all times relevant herein, Defendant EPC owned and continues to own certain real property which was used in the operation of Edgewater, and which real property is attached in various ways to real property Edgewater owns.

23.    Defendant PGR Properties, Inc. ("PGR") is an Illinois corporation. At all times relevant herein, Defendant Rogan controlled and continues to control Defendant PGR as its

President and Secretary. Upon information and belief, Defendant Rogan owns all of or a controlling interest in Defendant PGR. At all times relevant herein, Defendant PGR owned and continues to own certain real property which was used in the operation of Edgewater, which real property consists of parking lots that are attached or in close proximity to real property Edgewater owns and Edgewater's employees, patients, and visitors used.

### Non-Parties

### The Hospitals

24.     Founded in 1929, Edgewater Hospital was a family-owned hospital until 1989, when Defendant Rogan purchased it for $1 million plus the assumption of the Hospital's debts. Defendant Rogan was, through his wholly-owned entity, Edgewater Operating Company, the beneficial owner and operator of Edgewater Hospital from 1989 until he purported to sell the hospital to Northside Operating Company (Edgewater) in 1994 for approximately $53.5 million.

25.     Edgewater Medical Center ("Edgewater"), d/b/a Northside Operating Company, is an Illinois not-for-profit corporation, organized and operated exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code.

26.     Although Defendant Rogan agreed to sell all assets comprising Edgewater Hospital at the time he sold Edgewater Hospital to Northside Operating Co., Defendant Rogan retained title to several buildings around Edgewater Hospital that are essential to Edgewater's operations. At all times referenced in this Complaint, Defendant Rogan directly and indirectly managed, controlled, dominated, and operated Edgewater. As described below, since 1994, Rogan has directly and indirectly entered into myriad lucrative management contracts with Edgewater and other related entities to siphon large sums of money from Edgewater and control the hospital's operations. Defendant Rogan achieved these ends by using a wide array of

9

different forms and organizations to attempt to insulate himself from responsibility for the misconduct he perpetrated and caused to be perpetrated at and through Edgewater. Defendant Rogan achieved significant financial benefits by causing the board of directors at Edgewater to instigate or approve various actions benefiting him. Significantly, the board of directors of Edgewater consisted primarily of Rogan's personal friends, long-time business associates and others under Rogan's control.

### The Doctors

27.    Throughout the time relevant to this case, Ravi Barnabas, M.D. ("Dr. Barnabas") was a licensed internist who admitted patients to Edgewater and acted as an attending physician for patients at Edgewater. Dr. Barnabas had contracts with Edgewater for a medical directorship as well as physician recruitment, both of which Ehmen signed.

28.    Throughout the time relevant to this case, Sheshiqiri Rao Vavilikolanu, M.D. ("Dr. Rao") was a licensed internist and anesthesiologist who operated a clinic on the south side of Chicago and who referred patients to Edgewater. Two companies Dr. Rao owned – Rao M.D., S.C. and Florascribe, Inc. – had service agreements with Edgewater. Defendant Ehmen signed those service agreements on behalf of Edgewater.

29.    Throughout the time relevant to this case, Kumar Kaliana, M.D. ("Dr. Kumar") was a licensed internist who referred patients to Edgewater.

30.    Throughout the time relevant to this case, Andrew Cubria, M.D. ("Dr. Cubria") was a licensed cardiologist who had a medical clinic at Edgewater.

### Legal Framework

31.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is

10

based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395c-1395l-4.

32.     HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

33.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

34.     As detailed below, defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

35.     To assist in the administration of Medicare Part A., CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.

36.     Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

37.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a From UB-92.

11

38.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

39.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

40.     At all times relevant to this Complaint, Medicare rules and regulations required Edgewater Hospital to submit annually a hospital cost report to the fiscal intermediary.

41.     During the relevant time period, Medicare payments for hospital services were determined by the claims the provider submitted for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments Medicare made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

42.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit Edgewater's cost reports and financial

representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right included the right to make retroactive adjustments to hospital cost reports that a provider previously submitted if any overpayments have been made. 42 C.F.R. § 413.64(f).

43.    Every hospital cost report contains a "Certification" that the provider's chief administrator or responsible designee must sign.

44.    At all times relevant to this complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

45.    At all times relevant to this complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

46.    Thus, the provider had to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) compliant with the Stark Statute and not infected by kickbacks in relation to the services referenced in the cost report.

13

47.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever...having knowledge of the occurrence of any event affecting (a) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a...concealment or failure...be guilty of a felony.

48.     Edgewater Hospital submitted cost reports at all times material to this Complaint. Defendants Rogan and Bainbridge caused Kenneth W. Huff, vice president of finance to submit and sign the cost reports, which attested, among other things, to the certification quoted above.

49.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching fluids and ensuring that states comply with minimum standards in the administration of the program.

50.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

51.     Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

52.     In Illinois, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Illinois Department of Public Aid for payment.

14

## The Fraud upon Medicare, Medicaid, and Private Insurance Companies

53.     Defendants Rogan, Ehmen, Bainbridge, and Braddock, along with the above-referenced physicians and others, knowingly, intentionally and recklessly defrauded the federal government and the State of Illinois, through the Medicare and Medicaid programs, by submitting and causing to be submitted false and fraudulent claims for reimbursement and cost reports.

54.     At all times relevant to this case, Defendant Peter Rogan controlled Defendants Braddock and Bainbridge.

55.     Beginning before 1995 and continuing until in or after May 2001, Defendants devised a scheme to defraud by which they falsely and fraudulently generated revenue for Edgewater by:

> a)     giving, and causing others to give, kickbacks and bribes in the form of money and other remuneration and incentives to certain doctors, patient recruiters, and other individuals, in exchange for patient referrals, (the "kickbacks");
>
> b)     fraudulently disguising, and causing others to fraudulently disguise, the payment of kickbacks so that those payments appeared to be legitimate payments for services, to avoid discovery of the scheme;
>
> c)     hospitalizing patients, and causing others to hospitalize patients, knowing that these patients did not require hospital treatment and did not meet the Medicare or Medicaid criteria for hospitalization;
>
> d)     performing, and causing others to perform, medically unnecessary procedures and testing on patients, including but not limited to heart

15

catheterizations, angioplasties, other angiographic and cardiac-related tests and procedures, ultrasounds, CAT scans, blood tests, and x-rays;

e)   admitting, and causing others to admit, patients to Edgewater for reasons other than illness, including: giving patients cash or other benefits, coaching patients to lie about their physical condition, promising that hospital services would cost the patients nothing, and falsely representing to certain patients that they needed to be hospitalized, knowing that these patients did not need hospitalization;

f)   creating, and causing others to create, false records to justify and support claims submitted to insurers, including false medical records and false business records;

g)   concealing, and causing others to conceal, from certain patients material information concerning the payment of kickbacks in exchange for admissions, including the fact that those kickbacks were intended to and did improperly influence the medical decisions of doctors; and

h)   submitting, and causing others to submit, false and fraudulent claims for payment to Medicare, Medicaid, and private health insurers, which included claims relating to medically unnecessary admissions, services, procedures, and testing, and for services rendered to patients who were referred to the hospital in exchange for kickbacks.

56.   To help facilitate the scheme to defraud and to skim additional money from Edgewater, beginning no later than in or about 1995, Defendant Peter Rogan caused Edgewater

16

to enter into management contracts with Defendant Braddock and, later, with Defendant Bainbridge.

57.     The management contracts that Defendant Rogan caused Edgewater to enter into with Defendants Braddock and Bainbridge provided that Defendants Braddock and Bainbridge would act as the exclusive manager of the day-to-day operations of Edgewater, which management responsibilities included the submission of claims to Medicare, Medicaid, and private health insurers for services rendered to patients. The management contracts also called for Defendants Braddock and Bainbridge to create a quality control system at Edgewater. As their scheme to defraud unfolded, this quality control system became one means by which the Defendants fraudulently generated revenues for Edgewater by encouraging and concealing medically unnecessary admissions, tests, and other procedures.

58.     Under the management contracts that Defendant Rogan caused Edgewater to enter into with Defendants Braddock and Bainbridge, Edgewater compensated Defendants Braddock and Bainbridge with a percentage of the hospital's fraudulently obtained revenues.

### Kickbacks to Doctors, including Drs. Rao and Kumar

59.     In or about the early 1990s, Dr. Barnabas observed Defendants Peter Rogan and Roger Ehmen solicit another doctor to come to Edgewater, by agreeing to pay that doctor for his patients.

60.     Among other things, in or about October 1996, Defendant Rogan met with Drs. Rao and Barnabas to offer to pay them money for referring patients to Edgewater.

61.     In or about October 1996, Defendant Peter Rogan met with Dr. Rao and set-up an arrangement by which Defendant Rogan would cause Dr. Rao to be paid for the patients he admitted to Edgewater and for Dr. Rao to provide anesthesia services at Edgewater. In return,

17

Dr. Rao agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment or for detoxification treatment.

62.     In or about October 1996, Defendant Roger Ehmen met with Dr. Rao to put together contract terms covering a portion of that arrangement.

63.     In or about April 1997, Defendants gave or caused others to give Dr. Rao's company, Rao, M.D., S.C., a contract that enabled him to bill for all anesthesia services provided at the hospital, in return for patient admissions by Dr. Rao to Edgewater.

64.     Between in or about May 1997 and in or about May 1998, Defendants paid and caused others to pay Rao, M.D., S.C. approximately $15,000 per month, for a total of more than $200,000, in exchange for Dr. Rao referring patients for admission to Edgewater. Dr. Rao used $156,000 of those funds to pay Dr. Kumar for patients Dr. Kumar sent to Edgewater. Between in or about May 1997 and in or about June 1998, Dr. Kumar referred approximately 20 to 30 patients per month to Edgewater. Dr. Rao also paid patient recruiters to refer patients to Edgewater and sent patients from his clinic to Edgewater.

65.     In or about October 1996, Defendant Peter Rogan met with Dr. Barnabas and set-up an arrangement by which Defendant Rogan would cause Dr. Barnabas to be paid for the patients he admitted to Edgewater. In return, Dr. Barnabas agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment.

66.     In or about October 1996, Defendant Roger Ehmen met with Dr. Barnabas to put together contract terms covering a portion of that arrangement.

67.     On or about November 14, 1997, Defendants, working with Dr. Barnabas, gave and caused others to give a sham contract to Dr. Rao's company, Florascribe, to conceal Edgewater's payments to Dr. Rao for patient referrals and admissions. The contract stated that

18

Florascribe would provide services for Edgewater's detoxification program, including marketing and coordination of the aftercare treatment. In fact, Florascribe provided no legitimate marketing or aftercare services.

68.    Between in or about May 1997 and in or about April 1998, Defendants paid and caused others to pay Florascribe in excess of $200,000 in exchange for patient admissions. Dr. Rao used some of those funds to recruit patients to be admitted for detoxification treatment at Edgewater. Dr. Rao also referred such patients from his own clinic at Edgewater.

69.    Defendants Rogan and Ehmen were directly involved in the payment of kickbacks to the aforementioned doctors and others.

70.    After the contracts were arranged, Defendant Ehmen had repeated contacts with Dr. Rao and Dr. Kumar to advance this part of the scheme. In or about April 1998, for example, Defendant Ehmen told Drs. Rao and Barnabas that Defendant Rogan would not tolerate anything less than 25 admissions a month, as they had agreed to provide in return of the payments Defendant Rogan had agreed to make to them.

### "Recruiting" Patients

71.    Defendants fraudulently "recruited" and caused others to "recruit" homeless individuals, substance abusers, and others to seek hospitalization at Edgewater Hospital.

72.    Defendants knowingly, intentionally, and recklessly admitted and caused others to admit individuals who did not meet the Medicare and Medicaid criteria for hospital admission.

73.    Defendants gave and caused others to give certain individuals cash, cigarettes, and food in order to induce them to seek admission as patients at Edgewater, knowing that these people did not require hospitalization.

19

74.     Defendants coached and caused others to coach these individuals to complain of chest pain, dizziness, abdominal pain, and other symptoms that would justify admission, knowing full well that these people did not have those symptoms.

75.     On or about April 10, 1998 and at other times, Defendant Roger Ehmen repeatedly instructed Drs. Rao and Barnabas to tell Dr. Kumar that he should educate the individuals recruited to be patients as to what they should say to state a condition that would merit hospitalization. Defendant Roger Ehmen also instructed Drs. Rao and Barnabas to coach the individuals themselves.

76.     When doctors failed to admit sufficient numbers of patients, Defendants Rogan and Ehmen, directly and indirectly, communicated to the doctors that they had to increase the number or patient admissions. If the doctors did not do this, Defendants Rogan and Ehmen fired the doctors or caused them to be fired.

77.     Defendants knowingly, intentionally and recklessly waived and caused others to waive Medicare and Medicaid co-payments for patients and failed to make any good faith effort to collect such co-payments or deductibles, repeatedly misrepresented to Medicare and Medicaid that they had made such payments, made a good faith effort to obtain such payment, and concealed that they had not done so. Defendants Rogan and Ehmen participated in this activity with Drs. Cubria, Rao, and Barnabas, among others.

### Medically Unnecessary Procedures

78.     For the purpose of fraudulently generating revenue for Edgewater, Defendants lied and caused physicians and others to lie to patients who were legitimately admitted to Edgewater, falsely telling the patients that they needed to be hospitalized and that they needed certain tests and procedures due to medical problems, when in fact, Defendants, physicians and

20

others knew full well that the patients did not need hospitalization or the specified tests or
procedures.

79.     Defendants caused physicians, including Dr. Cubria, to perform medical
procedures on these patients, without regard to whether these procedures were medically
necessary, for the purpose of fraudulently submitting bills to insurance providers, including
Medicare and Medicaid, without regard to the patients' true needs. Defendants paid these
physicians hundreds of thousands of dollars in kickbacks to cause the physicians to perform
these procedures upon patients, without regard to the patients' true needs.

80.     Defendants Rogan and Ehmen, directly and indirectly, caused Barnabas and other
doctors to use Dr. Cubria on all cardiac consultations, knowing that Dr. Cubria would and did
perform unnecessary cardiac catherizations (angioplastics) to generate millions of dollars in
fraudulent revenue for Edgewater.

81.     Defendants Peter Rogan and Roger Ehmen, directly and indirectly, hired and
caused others to hire personnel to obtain patients for various hospital programs, including a
home visitation process, and knew or had reason to know that the programs were admitting
patients that did not need hospitalization.

82.     In or about January 1999 and April 2000, during the course of two of these
procedures, both wholly unnecessary cardiac catherizations (angioplasties), two patients died as
a result of complications from the procedures.

83.     On numerous occasions, hospital personnel, including without limitation doctors
responsible for medical quality control, complained to Defendant Roger Ehmen that Dr. Cubria
and others were performing unnecessary procedures or admitting patients that did not need
hospitalization. On several occasions, Defendant Ehmen responded to these complaints by

21

stating that he had raised the matter with Defendant Peter Rogan and that, "he's not going to do anything about it."

### The Submission of False Claims, Cost, and Other Information to Medicare, Medicaid, and Other Insurers

84.    Defendants, along with the doctors referenced earlier in this Complaint and others, knowingly, intentionally, and recklessly submitted, and caused others to submit false claims to Medicare and Medicaid for payment, including:

a)    claims in violation of the Stark Statute, 42 U.S.C. § 1395nn;

b)    false and fraudulent cost reports to Medicare;

c)    falsely representing that various medical services were medically necessary;

d)    false and fraudulent claims for medically unnecessary admissions, services, procedures, and testing to Medicare, Medicaid, and private health care insurers;

e)    concealing the fact that certain admissions and procedures were medically unnecessary, that certain costs were not properly incurred; and that various co-payments had been waived, knowing that the disclosure of any of the foregoing would have resulted in the denial of those claims;

f)    creating myriad false records in furtherance of their scheme, including without limitation medical records containing false entries, false diagnoses, and other false information; business records that contained false information to create the appearance that Edgewater had made efforts to collect the co-payments or deductibles when, in fact, the intention all along was to waive those payments in order to get patient admissions; and

22

g) fraudulent claims for services rendered to patients who were recruited for hospitalization at Edgewater Hospital (in exchange for kickbacks) to Medicare, Medicaid, and private health care insurers.

85. Defendants submitted, and caused others to submit false claims to Medicare for the years 1995, 1996, 1997, 1998, and 1999 with supporting documents and certifications in order to obtain payments from Medicare knowing that those documents included false representations including:

a) The cost reports for 1995, 1996, 1997, 1998 and 1999 each included a certification falsely representing that the hospital provided services in compliance with pertinent laws and regulations when in fact, defendants knew that they had violated various laws and regulations, including those pertaining to kickbacks, providing medically necessary services, and the waiver of co-payments and deductibles; and

b) The cost reports for 1997 and 1998 each included a provider cost report reimbursement questionnaire which contained the false representation that there had been no waivers of Medicare co-payments or deductibles during calendar year 1997 and 1998, when in fact defendants and others had waived and caused to be waived co-payments in order to induce patients in order to induce patients to be admitted to Edgewater.

86. From in or about 1995 through in or about 2000, Defendants submitted and caused to be submitted fraudulent claims to Medicare and Medicaid that: caused Medicare to pay Edgewater at least $13,000,000 in Medicare funds, and caused Medicaid to pay Edgewater at least $4,000,000. Defendants submitted and caused these claims to be submitted with actual

23

knowledge that the claims were false or in deliberate ignorance and reckless disregard that such claims were false and fraudulent.

87. Defendants Peter Rogan and Roger Ehmen, directly and indirectly, instructed and caused others to instruct hospital personnel to falsify hospital administrative records to advance and conceal the fraud scheme, including but not limited to time sheets.

### Payments to Dr. Cubria

88. For a period of years through at least in or about December 2000, Defendants paid or caused to be paid monies exceeding $1,000,000 for television advertising that generated patients for Dr. Cubria's medical practice. Defendants paid these amounts and caused them to be paid so that Dr. Cubria would maintain and/or increase the number of patients he admitted to Edgewater and to encourage Dr. Cubria to help increase its revenues.

89. From approximately in or about 1998 and through at least in or about December 2000, Defendants contracted with Dr. Cubria to act as medical director for the Edgewater Cardiac Rehabilitation Program, paying Dr. Cubria of approximately $48,000 per year. Dr. Cubria performed little or no work under the contract. Defendants paid these amounts and other substantial amounts and caused them to be paid to Dr. Cubria to incent Dr. Cubria to maintain and increase the number of patients he admitted to Edgewater, to increase Edgewater's revenues by fraud.

### Concealment of the Fraud Scheme

90. Throughout the time relevant to this case, Defendants actively concealed their fraudulent activities from the federal government, the State of Illinois, and Dexia.

91. Defendant Rogan instructed his employees to create Medicare time studies that would contain false information about the hours certain doctors worked. In doing so, Defendant

24

Rogan instructed his employees to use different colored pens to make the false reports look more legitimate. Defendant Rogan submitted these false forms and caused them to be submitted to Medicare on an annual basis.

### Defendants Fraudulently Induced Dexia to Issue the Edgewater Letter of Credit

92.     In or about 1994, Defendant Rogan created and caused to be created a not-for-profit entity called Northside Operating Company. Defendant Rogan served as Chairman of the Board of Northside Operating Co.

93.     In or about 1994, Defendant Rogan, through Edgewater Operating Company, sold Edgewater to Northside Operating for approximately $31,100,000.

94.     To finance Northside Operating Company's purchase of Edgewater, Defendant Rogan caused the Illinois Health Facilities Authority ("IHFA") to issue bonds, the proceeds of which Northside used to purchase Edgewater from Edgewater Operating Company and Defendant Rogan and to provide capital for the operation and renovation of Edgewater, and to set-up debt service reserve fund with respect to ongoing payment of the bond debt, and to pay for various costs associated with the bond issuance.

95.     The total amount of the 1994 bond issuance was approximately $41,000,000.

96.     After the IHFA issued the bonds, it became the obligation of Northside Operating Company to repay the bondholders at the interest rate set in the bonds.

97.     Through Defendants Braddock and Bainbridge, Defendants Rogan and Ehmen operated Edgewater on a daily basis from in or about 1994 until in or about May 2001.

98.     In or about 1997, Defendants sought to arrange a new tax-exempt bond offering to refinance Edgewater's then-existing bond debt to obtain a lower interest rate and to raise additional funds.

25

99.     In order to get a lower interest rate on the new tax-exempt bond financing,
Defendants sought to obtain a letter of credit from a financial institution to guaranty repayment
of the bonds.  The letter of credit would guaranty payment of the purchase price of any tendered
bonds.  By getting a financial institution to issue a letter of credit to back a new tax-exempt bond
offering, Edgewater would receive a higher credit rating (based upon the credit rating of the
financial institution), which in turn would reduce the overall interest rate Edgewater would have
to pay on the new bonds.  In return for the letter of credit, Edgewater would pay a fee to the
financial institution.  If the letter of credit were ever drawn down, the financial institution would
be forced to pay the amount drawn, which would then automatically convert to a loan from the
financial institution to Edgewater at a pre-negotiated rate.

100.    In or about 1997, Defendants approached Cain Brothers ("Cain Bros."), an
investment banking firm, to assist Defendants to locate a financial institution willing to provide a
letter of credit to back Edgewater's bond refinancing.  Eventually, Cain Bros. contacted Dexia
and provided Dexia with financial statements and other financial information for Edgewater,
which Cain Bros. had obtained from Defendants.

101.    Under the terms of management agreements Defendant Rogan caused Edgewater
to enter into with Defendants Bainbridge and Braddock, Defendants Bainbridge and Braddock
and their employees, including Defendants Rogan and Ehmen, prepared or caused to be prepared
all of Edgewater's financial statements and other financial information.

102.    After reviewing the financial statements and other financial information
Defendants prepared and caused to be prepared, Dexia personnel undertook a more expansive
due diligence review of the deal, which included asking Edgewater to provide substantial

26

additional financial information, traveling to Chicago to meet with Defendant Rogan and others about the operation at Edgewater, and other steps.

103.    In providing the Edgewater financial statements and other financial and operating records and information to Cain Bros. and Dexia, Defendants knowingly, intentionally and recklessly omitted information, which Defendants knew and had reason to know would be material to any complete assessment of the finances and operation of Edgewater, including most significantly that Edgewater's operations and finances were involved with and inflated by revenues obtained by fraud. Defendants knew and intended that their omissions and material misrepresentations cause Dexia to decide to provide the letter of credit.

104.    Throughout Dexia's due diligence process, none of the Defendants or their employees ever disclosed to Dexia: (a) the existence of the Medicare/Medicaid fraud scheme at Edgewater; (b) the fact that Edgewater's financial records were inflated by substantial revenues obtained by fraud; or (c) that the basic viability of Dexia as an institution was dependent upon revenues generated by Medicare/Medicaid fraud and upon Defendants' ability to conceal that fraud from the federal and state authorities.

105.    To induce Dexia to provide the letter of credit, Defendants knowingly, intentionally, and recklessly made the following statements to Dexia and caused them to be made:

      a)    **Materially False and Misleading Audited Financial Statements, Unaudited Financial Statements and Projections.** On or about October 16, 1997, Defendants provided a document containing materially false projections for fiscal years 1997 through 2000, audited financial statements from 1994 through 1996, unaudited financial statements from

January 1 through January 30, 1997, and for 1996, and other information,
to Cain Brothers and directed Cain Brothers to send these misleading
documents from Chicago, IL to Dexia in New York, NY by United States
mail or by an interstate courier service.

b) **Mailed/Courierred Materially False and Misleading Financial
Statements for 1995, 1996 and 1997.** On or about February 10, 1998,
Defendants caused materially false financial statements for 1995, 1996,
and 1997 to be sent from Chicago, IL to Dexia in New York, NY by
United States mail or an interstate courier service.

c) **Faxed Materially False and Misleading March 25, 1998, Facsimile.**
On or about March 25, 1998, Defendants caused an eight-page document
detailing Edgewater's balance sheets for 1996 and 1997, as well as a
balance sheet, operating statement and statement of cash flow dated
February 28, 1998, to be sent by facsimile from Chicago, IL to Dexia in
New York, NY.

d) **Other False and Misleading Statements.** Defendants also sent and
caused to be sent a variety of other false and misleading statements to
Dexia.

106. The documents that Defendants sent or caused to be sent to Dexia were false and
misleading in two critical respects. First, the income, revenue, and financial projections
represented in these documents were falsely inflated by Medicare, Medicaid, and private health
insurance revenue obtained by fraud including kickbacks, Medicare fraud, and Medicaid fraud.
Second, these documents materially misrepresented Edgewater's operating expenses with respect

28

to, among other things, the hundreds of thousands of dollars that Defendants paid out in kickbacks in connection with the health care frauds.

107.    Defendants knew and had reason to know that the financial materials they gave or caused to be given to Dexia were false and misleading, in that, when the Medicare/Medicaid fraud schemes were discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States.

108.    Defendants knew and intended that, in deciding whether to issue the Edgewater letter of credit, Dexia would rely upon the false and fraudulent financial materials Defendants provided and caused to be provided to Dexia and that Dexia would assume that Defendants' financial materials and representations regarding Edgewater were truthful and accurate.

109.    In deciding to issue the Edgewater letter of credit, Dexia reasonably believed that the false and fraudulent financial statements and financial information Defendants provided and caused to be provided to Dexia were true and accurate. As Defendants knew and intended, Dexia reasonably relied upon the false and misleading information Defendants had provided Dexia and incorporated the information into its analyses and underwriting of the proposed credit enhancement transaction.

110.    In reliance upon its review of Defendants' false and fraudulent financial statements and information for Edgewater, Dexia agreed to issue the letter of credit in the amount of approximately $55,000,000.00.

111.    If Defendants had disclosed the truth that Edgewater's operations were in any way involved with health care fraud, Dexia would not have issued the letter of credit to Edgewater.

112.    The IHFA issued the new bonds in two series: Series A in the aggregate principal amount of $44,475,000 and Series B in the aggregate principal amount of $10,525,000 (Series B

taken together with Series A referred to as "the Edgewater Bonds"). The bond documents and agreements provided that the proceeds of the Series A Bonds, along with other funds, would be used to payoff the 1994 Edgewater Bonds. The bond documents and agreements specified that the Series B Bond proceeds would be used to renovate Edgewater Hospital's patient rooms, nursing units, the lobby and exterior façade of Edgewater Hospital's main building, and to help pay for significant additions and enhancements to Edgewater Hospital's information system.

113. The Series A Bonds carried a fixed rate of 4.7% per annum through June 30, 2004. The Series B Bonds carried a weekly variable rate. If Defendants had not obtained letter of credit support, Edgewater would never have been able to obtain these interest rates and would have incurred a much higher interest charge on the new bonds.

114. Edgewater secured the letter of credit with collateral of its unrestricted receivables, assignable general intangibles and a perfected first mortgage and security interest in the hospital facility, equipment and fixtures.

115. On or about May 1, 1998, Defendants caused Edgewater to agree upon, execute, and deliver a reimbursement agreement with Dexia, in relation to and in consideration for Dexia's issuance of the Edgewater letter of credit.

116. On or about May 1, 1999, Defendants caused Edgewater to agree upon, execute, and deliver the Edgewater Reimbursement Agreement, which amended and restated the 1998 reimbursement agreement with Dexia. The Edgewater Reimbursement Agreement contained various financial covenants that Edgewater was obligated to satisfy, including the maintenance of certain debt service ratios, capitalization levels, and maintenance of unrestricted cash and investments on hand. Under the Edgewater Reimbursement Agreement, a breach of these financial covenants would constitute an automatic "Event of Default".

30

117.    To provide Dexia security under the letter of credit, Defendant Rogan caused

Edgewater to represent that Edgewater's operations would meet minimal financial standards set

forth in covenants to the Edgewater Reimbursement Agreement ("covenants"). Moreover,

Defendants further agreed that if Edgewater's financial performance ever dipped below any of

these minimum financial standards, Dexia would be entitled to declare an "Event of Default"

under the reimbursement agreement. An Event of Default would entitle Dexia to exercise certain

rights and remedies to protect its investment, including without limitation its right to declare all

obligations of Edgewater to be immediately due and payable, to take whatever actions were

necessary to collect the amounts due, and/or to take other action to enforce Dexia's rights under

the credit agreements. In short, if it ever appeared that Edgewater was in financial trouble, Dexia

could rush in to take steps to protect its investment and the collateral Defendants posted as

security for the letter of credit.

### Defendants' Lulling and Concealment to Advance the Scheme to Defraud

118.    To allow Dexia to keep watch over its investment and to permit Dexia to protect

itself from loss, the agreements underlying the letter of credit required Defendants to provide

Dexia with truthful monthly financial reports on the operations of Edgewater. Among other

things, Dexia substantially relied upon these monthly financial reports to gauge whether

Edgewater was continuing to operate effectively and/or whether Edgewater's financial position

was deteriorating.

119.    In order to mislead Dexia into believing that Edgewater was satisfying these

financial covenants, Defendants knowingly, intentionally, and recklessly sent and caused to be

sent false financial reports from Chicago, Illinois to Dexia in New York, New York by United

States mail or intrastate courier on numerous occasions, including but not limited to on or about

31

the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) November 5, 1998; (d) March 8, 1999; (e) May 12, 1999; (f) July 30, 1999; (g) November 15, 1999; (h) February 15, 1999; and (i) May 5, 2000. Defendants also sent and caused to be sent false financial statements and other financial information from Chicago, Illinois to Dexia in New York, New York by facsimile on numerous occasions, including but not limited to on or about the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) May 7, 1999; (d) June 16, 2000; (e) February 27, 2001; (f) March 1, 2001; and (g) March 16, 2001.

120.    These financial statements included statements of revenue and assets that Defendants knew or had reason to know were materially misstated for the reasons detailed above.

121.    Defendants provided these false financial statements and other financial information to Dexia to lull Dexia into a false sense of security regarding Edgewater's financial health and the legitimacy of Edgewater's operations. Defendants knew and intended that Dexia would believe the false and fraudulent financial statements and other financial information were there and accurate, thus lulling Dexia to believe that Edgewater's was financially healthy and was operating wholly legitimately.

122.    Defendants also sent these false and fraudulent financial statements and other financial information to Dexia and caused them to be sent to prevent Dexia from discovering that, but for its fraudulent revenues, Edgewater could not meet its financial covenants, and was perilously close to or in Default on its covenants.

123.    By virtue of these false and fraudulent financial reports of Edgewater's operations, Defendants hid from Dexia crucial information, which would have permitted Dexia

32

to take steps to protect its investment. Defendants well knew or should have known that their scheme to defraud would collapse if Dexia declared an Event of Default.

124. In knowingly, intentionally and recklessly sending and causing to be sent to Dexia false and fraudulent financial statements and other financial information that concealed the Medicare and Medicaid fraud at Edgewater, Defendants knew and had reason to know that when the fraud underlying the false financial statement was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois.

125. By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Defendants enabled the continued operation of their fraud scheme.

126. By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Defendants gave themselves time to loot and dissipate substantial portions of the collateral Defendant Rogan caused Edgewater to post as security for Dexia's letter of credit.

## Fraudulent Management Agreements

127. Defendant Rogan caused the Edgewater board to enter into management agreements with Defendant Braddock, and later, Defendant Bainbridge, to exclusively manage the day-to-day operations of Edgewater Hospital. Defendant Rogan controlled Bainbridge and Braddock. The management agreements provided Defendants Bainbridge and Braddock (and thus Defendant Rogan) with enormous control over the affairs of Edgewater. The management agreements permitted Defendants Bainbridge and Braddock (and thus Defendant Rogan): to appoint and salary "senior administrative managers," including Defendants Rogan and Ehmen; to hire, supervise, and terminate all personnel; to supervise all purchasing, billing, collections,

payables, accounting, and cost reporting for Edgewater; to oversee the preparation of yearly financial statements and monthly financial statements for Edgewater; and to serve as the exclusive provider of certain corporate services and special projects for Edgewater.

128.    Pursuant to these management agreements, Defendant Rogan and others fraudulently and in breach of their fiduciary duty to Edgewater and Edgewater's creditors, including Dexia, drained from Edgewater in excess of $25 million in management "fees," benefit and salary reimbursements, and other expenditures.

129.    Defendants also used their exclusive contract for corporate services to siphon additional funds from Edgewater. For example, in or about October 1999, Edgewater paid Defendant Bainbridge over $1.1 million for corporate services in connection with a purported reorganization. Over eight months in 1999, Defendants caused Edgewater to pay them $180,000 per month for the investigation of potential acquisitions that never actually occurred. Also in 1999, Defendants obtained over $1.5 million for "success" and "consulting" fees in connection with the acquisition of Grant Hospital, even though Defendants did not provide any services in connection with that acquisition.

130.    On or about March 1, 2000, Defendant Rogan caused other entities, including Defendants Access and Vital, to enter into management agreements with Defendants Bainbridge and Braddock for the improper purpose of transferring substantial portions of Edgewater's revenues and other assets to those entities, and from them ultimately, to Defendants Rogan and Ehmen. Under such agreements, both Defendant Access and Defendant Vital agreed to pay $36,000 per year for certain purported management services to Defendants Bainbridge and Braddock.

34

131.    Neither Defendant Access nor Defendant Vital had any independent operations that required management. In fact, other than their membership interest in Edgewater, Grant, and another organization, Hope Community Health Services, Inc. ("Hope"), Defendants Access and Vital had no discernable purpose. By virtue of their membership interests, Defendants Access and Vital received all of their income from Edgewater, Grant, and Hope, and used that income to pay the purported management fees to Defendants Bainbridge and Braddock.

132.    Defendants Rogan, Ehmen, Access and Vital further caused Defendant Bainbridge to enter into management agreements with various non-profit corporations that were affiliated with Edgewater and also were under Defendant Rogan's control. These non-profit corporations included Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF") and Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF"). For example, Defendants caused the board of directors of Edgewater to transfer a $3 million gift to CSSF. Upon information and belief, none of these payments had any legitimate purpose.

133.    The boards of directors of Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF") and Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF") entities consisted of persons under Rogan's control, including David Shanahan, John Mullen, and Wessel Bengston.

134.    On or about June 5, 1997, Defendant Rogan caused the board of directors of Edgewater to loan and gift nearly $10 million to Vista Hospital Systems ("Vista"). The loan terms were extraordinarily unfavorable to Edgewater, e.g., the loan subordinated Edgewater's right to recovery on the loan behind the recovery rights of other creditors without containing an interest rate or other terms justifying that risk. Vista was affiliated with Permian Health Care,

Inc. ("Permian"), a corporation controlled by a business associate of Rogan and one of his former partners. In return, Edgewater received a note for $9,085,627 from Vista. On or about October 6, 1998, at Defendant Rogan's direction, the board of directors of Edgewater reduced the note (and Vista's obligation to Edgewater) to $4 million, and forgave all accrued interest, even though Vista still owed Edgewater $4 million on the outstanding note. On the same day, the board of directors of Edgewater entered into a consulting agreement that paid $3 million to Permian.

### Improper Payments and Benefits to Defendants EPC and PGR

135.  Defendant Rogan owned Edgewater and converted it into a non-profit organization in 1994. At the time Defendant Rogan sold Edgewater in 1994, Defendant Rogan retained after the sale and continues to own a significant portion of the real estate Edgewater used as an active hospital. Through companies Defendant Rogan owned – Defendants EPC and PGR – Defendant Rogan retained and continues to own this real estate Edgewater used to operate the hospital. In doing so, Defendant Rogan caused Edgewater to be dependent upon Defendants EPC and PGR for Edgewater's operation as a hospital. Through this dependence, the Defendants funneled money out of Edgewater to develop Defendant Rogan's properties and provided Defendant Rogan additional leverage over Edgewater.

136.  Defendants Rogan, Access and Vital approved and caused the Edgewater board of directors to approve construction projects and building developments designed intentionally to make the operation of Edgewater highly dependent upon the buildings and other real property adjacent to Edgewater which Defendant Rogan owned through Defendants EPC and PGR. For example, Defendants Access and Vital allowed air conditioning and telephone facilities for Edgewater to be installed on or in the nearby buildings, in which Defendants Rogan and EPC

36

held a personal interest. Defendants also caused Edgewater to fund improvements to parking lots Defendants Rogan and PGR owned and attached or in close proximity to Edgewater's buildings. Defendants Rogan, Access and Vital did this to increase the future value of the real property Defendants Rogan, EPC and PGR owned, all to the detriment of the financial value, health and well-being of Edgewater and its creditors, including Dexia.

137.     Defendants Rogan, EPC and PGR allowed Edgewater to use the property Defendants Rogan, EPC and PGR owned rent-free from the time of the sale in 1994, until Defendants Rogan, Access and Vital approved and caused the Edgewater board of directors to approve a lease agreement between Edgewater and Defendant EPC dated January 1, 1996. The term of the lease is ten years, beginning January 1, 1996, for Edgewater's use of the following property (collectively, the "EPC Property"):

a.     The real property commonly known as the Medical Office Building and legally described as follows: Lot 1, in Edgewater Property One Subdivision, being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Also described as: East 73.31 feet of Lots 1 and 2, and the East 73.31 feet of the North 6.13 feet of Lot 3 (except that part taken for widening of North Ashland Avenue by Deeds recorded as Document Numbers 9225033, 9225054, 9225056 and 9225057), also all of Lots 54 to 61, both inclusive in Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Section 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois;

b.     The real property commonly known as the Stern Building and legally described as follows: Lot 2, in Edgewater Property One Subdivision, being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois;

c.    The real property commonly known as the Connecting Tunnel Building and legally described as follows: Lot 3, in Edgewater Property One Subdivision, being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois;

d.    The real property commonly known as the Titus Haffa Building and legally described as follows: Lot 4, in Edgewater Property One Subdivision, being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois; and

e.    The real property commonly known as the Kadin Building and legally described as follows: Lot 5, in Edgewater Property One Subdivision, being a Resubdivision of part of Block 4, in Ashland Avenue and Clark Street Addition to Edgewater, being a Subdivision in parts of Sections 5 and 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Under the lease, the base rent began at $954,000 the first year and was subject to a 4% to 10% increase each subsequent calendar year. The lease also required Edgewater to pay the property taxes and insurance on Defendant EPC's real property. In addition to rent for the period of use after the execution of the lease, the lease required Edgewater to back pay rent in the amount of $288,000 for the period that occurred between the sale of the hospital until the effective date of the lease.

138.    The rents Edgewater paid to Defendants Rogan and EPC, and other expenses Edgewater incurred, pursuant to the lease for Edgewater's use of the EPC Property were exorbitant relative to the fair market value and the rental value of the EPC Property.

139.    In or about 1996, Defendants Rogan, Access and Vital approved and caused the Edgewater board of directors to approve payments by Edgewater to Defendant PGR for use of two parking lots Defendants Rogan and PGR owned which are attached to or in close proximity to Edgewater's buildings. Defendants caused these payments to be made without any written agreement between Edgewater and Defendant PGR. Defendants caused Edgewater to pay approximately $4,864.60 per month for use of the following parking lots (collectively, the PGR Property"):

a.    West Rosehill Drive and North Clark Street Parking Lot ("Rosehill Parking Lot"): Lots 8, 9, and 10 (except that part conveyed to the City of Chicago for widening streets by deeds recorded as Document Numbers 9225038 and 9225039) and Lots 11, 12, 13, 14, and 15 and the vacated alley lying East and adjoining Lot 11 and West and adjoining Lots 8 through 10 in the Resubdivision of Block 7 in Barrett and Galloway's Resubdivision of Blocks 7, 8 and 9 in Henry Town in the East ½ of the Southeast ¼ of Section 6, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

b.    West Edgewater Avenue and North Ashland Avenue Parking Lot ("Edgewater Parking Lot"): PARCEL 1: The south 100 feet of the North 278.52 feet of the East 246.95 feet of the Southeast ¼ of the Southeast ¼ of Section 6, Township 40 North, Range 14 East of the Third Principal Meridian (except alleys and that part taken for widening of North Clark Street), in Cook County, Illinois.

39

PARCEL 2: Lots 1, 2, 3, 4 and 5 (except that part taken by or

conveyed to the City of Chicago for Street Purposes) in Block 3 in

Ashland Avenue and Clark Street Addition to Edgewater, being a

Subdivision in parts of Section 5 and 6 Township 40 North, Range

14 East of the Third Principal Meridian, in Cook County, Illinois.

Defendants Rogan, Access and Vital caused Edgewater to pay the property taxes and other

expenses related to Defendant PGR's real property.

**Failure to Exercise Option to Purchase**

140.    On or about August 17, 1994, Defendant Rogan, as President of EPC, and

Defendant EPC executed an exclusive option agreement and right of first refusal (the "Option")

with Edgewater. The Option gave Edgewater a contractual right to purchase the EPC Property

Defendants Rogan and EPC owned, and described in paragraph 137 above, at any time before

5:00 p.m. on December 31, 1998 at a price agreed upon by the parties or set by a qualified

appraiser. The Option also granted Edgewater the right of first refusal to purchase the EPC

property, if at any time before the Option expired Defendant EPC wished to accept a bona fide

offer to purchase the property from a third party. This Option was reiterated in the 1996 lease

between Edgewater and Defendant EPC.

141.    On or before December 31, 1998, Defendants Rogan, Access and Vital caused the

Edgewater board to fail to exercise the Option. In doing so, Defendants Rogan, Access and Vital

knew and had reason to know that their action would financially disadvantage Edgewater and its

creditors, including Dexia, while personally benefiting Defendant Rogan and enterprises in

which Defendant Rogan held a personal interest.

40

142.    In or about December 1995, within the Option period and immediately prior to the commencement of the lease, Edgewater caused qualified appraisers to perform two appraisals on the EPC property. According the appraisals, the EPC property had a value between $5,620,000 and $5,745,000. By the time the Option expired, just two years after the lease became effective, Edgewater had already paid more than $3,150,000 to Defendants Rogan and EPC in rent, not including real estate taxes, capital improvements, and other payments Edgewater made for the benefit of the EPC Property. Despite the fact that Edgewater had adequate capital to purchase the EPC Property at a fair market price which was substantially less than Edgewater would have paid under the lease, Defendants Rogan, Access and Vital caused the Edgewater board to fail to exercise the Option to the detriment of Edgewater and to the personal benefit of Defendants Rogan and EPC.

143.    Defendants caused Edgewater to enter into various agreements, including the property leases, and to fail to exercise the Option, which Defendants knew and had reason to know were not arm's length transactions, were highly inflated to benefit Defendant Rogan personally and enterprises in which Defendant Rogan held a personal interest, and would drain Edgewater of cash, thus injuring Edgewater financially.

144.    Since the date of the expiration of the Option, on or about December 31, 1998, Edgewater has paid at least $2,067,000 in rental payments to Defendants Rogan and EPC for use of the EPC Property, plus taxes, capital improvements, and other expenses related to the EPC Property. Additionally, in compliance with a court order in an action for forcible entry and detainer brought by Defendant EPC, Edgewater paid $435,008 to the Clerk of the Circuit Court of Cook County, Illinois (the "Clerk") for use of the EPC Property to be held by the court until the resolution of issues related to Edgewater's interest in the EPC Property. Subsequently, the

41

Bankruptcy Court ordered the Clerk to turnover the $435,008 to the custodian of Edgewater to be held in a separate account until the resolution of the remaining issues.

145. Since the date of the expiration of the Option, on or about December 31, 1998, Edgewater has paid at least $116,750.40 in rental payments to Defendants Rogan and PGR for use of the PGR Property, plus taxes, capital improvements, and other expenses related to the PGR Property.

## THE GRANT ACQUISITION

146. In or about 1999, Defendants Rogan, Access and Vital caused Edgewater to take steps to acquire Grant Hospital ("Grant") from Doctor's Hospital. To finance the acquisition of Grant, Defendants Rogan, Access and Vital planned to raise an additional $20 million through a tax exempt hospital bond issuance, similar to but wholly independent from the earlier Edgewater bond issuances in 1994 and 1998. Like the 1998 hospital bond issuance, Defendants Rogan, Access and Vital wished to secure a lower interest rate for the Grant bonds via a credit enhancement through a letter of credit to back Edgewater.

147. In or about 1999, Defendants Rogan, Access and Vital approached Dexia and caused Edgewater to approach Dexia to obtain a letter of credit to help finance Edgewater's planned acquisition of Grant. This request was wholly independent of the earlier Edgewater transaction and Dexia had no obligation to provide this additional letter of credit.

148. As of this time, Edgewater had made all payments due on the 1998 letter of credit in a complete and timely fashion and, due to the lulling and concealment outlined above, Defendants had misled Dexia to believe that Edgewater was financially healthy and operating a wholly legitimate business.

42

149.    As part of their effort to convince Dexia to provide the Grant letter of credit, Defendants directly and through Edgewater presented Dexia with false financial statements, Edgewater. Defendants Bainbridge and Braddock and their employees, including Defendants Rogan and Ehmen, prepared and caused to be prepared all of Edgewater's financial statements, financial projections, and other financial information knowingly, intentionally and recklessly failing to disclose that the financial statements were false.

150.    In knowingly, intentionally and recklessly sending and causing them to be sent, false and fraudulent financial statements and other financial information to Dexia, Defendants knew and had reason to know that when the fraud underlying the false financial materials was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois.

151.    Defendants sent and caused them to be sent these false financial statements and financial information to Dexia in order to induce Dexia to provide the letter of credit for Grant. Defendants knew and intended that Dexia would rely upon the truth and accuracy of these financial statements and other financial information in agreeing to issue the Grant letter of credit.

152.    Dexia reasonably relied on the truth and accuracy of these statements in issuing the Grant letter of credit. If not for these false and misleading statements made by and through Defendants, Dexia would not have issued the letter of credit to Grant. Dexia incorporated the false and misleading information into its analyses and underwriting of the proposed credit enhancement transaction, and in reliance on this false and misleading information, Dexia agreed to issue the Grant letter of credit.

153.    At the time of Edgewater's acquisition of Grant, it was clear that the financial position of Grant was poor and that Grant would to operate at a loss for some time following

43

Edgewater's acquisition of Grant. Due to Defendants' fraudulent misrepresentations to Dexia regarding Edgewater's financial health and operational legitimacy, Dexia required that the Grant financing be dependent upon the financial resources of Edgewater. As a condition of providing this for the Grant acquisition letter of credit, Dexia required Edgewater to guarantee the obligations of Grant and secure the guarantee with Edgewater's assets.

### The Insolvency of Grant and Edgewater

154.    Upon information and belief, throughout the time relevant to this case, Edgewater would have been insolvent without the revenues Defendants obtained by fraud or if the fact of that fraud was discovered by Medicare and Medicaid. Despite the insolvency, however, Edgewater still had numerous valuable assets, including millions of dollars in cash, real estate, uncollected loans, accounts receivable, and potential legal claims. These assets largely constituted the remaining collateral for Dexia's letter of credit.

155.    In or about March 2000, Edgewater and Grant came under the direct control of Defendants Access (the sole corporate member of Defendant Vital), Vital (the sole corporate member of Edgewater and Grant), and the directors of Defendants Access and Vital (including Bengston, Mullen, and Shanahan). Defendant Rogan ultimately controlled Defendants Access and Vital.

156.    Defendant Vital had the power to appoint or remove members of the board of directors of Edgewater, to appoint or remove officers of Edgewater and to approve any management contracts Edgewater made. Accordingly, Defendants Access and Vital had direct control over Edgewater and Grant.

157.    Once Edgewater became insolvent, Defendants Rogan, Access and Vital failed to protect the assets of Edgewater and, in fact, acted to weaken further Edgewater's financial

44

position. Defendants Access and Vital took these actions at the direction of Defendant Rogan. Defendants Rogan, Access and Vital knowingly, intentionally, and recklessly substantially depleted Dexia's collateral.

158.    As noted above, in or about 1997, Edgewater loaned nearly $10 million to Vista, an affiliate of a company that one of Defendant Rogan's former business associates owned/controlled. Although Edgewater forgave nearly $6 million of this loan in 1998, Vista still owes Edgewater $4 million in the form of an existing note. Throughout the time relevant to this case, Defendants Rogan, Access and Vital never took steps to pursue this $4 million claim. In taking each of the actions outlined in this paragraph, Defendants Rogan, Access and Vista knowingly, intentionally and recklessly acted contrary to the financial health and welfare of Edgewater and depleted the value of Edgewater's collateral. Defendants Access and Vital have made no effort at all to pursue repayment of this $4 million note.

159.    As noted above, Defendants Rogan, Access and Vital caused Edgewater to give a $3 million "gift" to CSSF. Defendants Access and Vital have failed to seek any repayment. Upon information and belief, CSSF has retained approximately $2 million in cash from this initial transfer. Upon information and belief, CSSF did little to perform its original mission prior to Edgewater's insolvency. Thus, CSSF did not spend the money transferred to it in any way that benefited Edgewater. Defendants Rogan, Access and Vital made no effort to recover any funds from CSSF.

160.    Upon information and belief, Defendants Rogan, Access and Vital have also failed to seek repayment for funds transferred to other affiliated entities, including CMA, and Hispanic Physicians Network.

45

161. Defendants Access and Vital also failed to initiate any claims against the other Defendants for the health care frauds, as detailed in this Complaint. The Bainbridge and Braddock management agreements each contain an indemnification clause requiring Bainbridge and Braddock to indemnify Defendants Access and Vital and Edgewater for damage done to Defendants Access and Vital. However, Defendants Access and Vital took no action to seek indemnification from the other Defendants for the millions of dollars of damage done to Edgewater. Defendants Access and Vital have not even filed counterclaims in any of the multiple actions that have commenced against Edgewater, Grant, and other affiliated entities for payment of management fees and lease payments for land Defendant Rogan owns directly and through entities in which Rogan held a personal ownership interest, including without limitation Edgewater Property Co., Inc. and PGR Properties, Inc. ("Rogan-owned enterprises").

162. The reason Defendants Access and Vital did not take any legal actions against Defendants Bainbridge and Braddock is that Defendant Peter Rogan entirely controlled Defendants Access and Vital as well as Defendants Bainbridge and Braddock. Thus, upon information and belief, the reason Defendant Rogan did not cause Defendants Access and Vital to take legal action against Defendants Bainbridge and Braddock on behalf of Edgewater was because such action would benefit only Edgewater and its creditors, including Dexia, and not Defendant Rogan.

### Concealment in Relation to
### the Federal Criminal Investigation

163. In or about early 1999, Defendants Rogan, Ehmen, and the other Defendants learned that the U.S. Department of Justice had initiated a federal grand jury investigation of possible Medicare/Medicaid fraud at Edgewater.

46

164. In or about early 1999, Defendants Rogan and Ehmen learned that the investigation extended beyond fraud by medical personnel to fraud by the Defendants themselves.

165. On information and belief, in or about early 1999, Defendants Rogan and Ehmen learned that Dr. Cubria was one of the targets of the federal grand jury investigation. Given the corrupt relationship that existed between Defendants Rogan and Ehmen and Dr. Cubria as detailed above, Defendant Rogan knew or had reason to know that any proof the federal government might gather against Dr. Cubria might well also implicate Defendant Rogan and the other Defendants.

166. In or about December 2000, Defendant Rogan met with Dr. Cubria and wrote on a piece of paper that Dr. Cubria should destroy all memos and notes that he had written to Defendant Rogan. Defendant Rogan also wrote to Dr. Cubria that he should not inform his attorney of these actions, because the actions constituted obstruction of justice. Defendant Rogan wrote to Dr. Cubria, instead of speaking to him, because he feared that federal law enforcement authorities had bugged his office.

167. In January 2001, Defendant Rogan advised Dr. Cubria to retain a criminal attorney.

168. In or about 2001, a Dexia employee confronted Defendant Rogan about the federal grand jury investigation. In response to questioning, Defendant Rogan lulled Dexia into a false sense of confidence by telling the Dexia employee that the criminal investigation was routine, related only to physicians, and did not relate to Edgewater itself. Defendant Rogan described the criminal investigation as "blip."

169.    Defendant Rogan knew that the investigation was not a "blip" and that his representations to Dexia were completely false. Defendant Rogan knowingly, intentionally, and recklessly made those representations to induce Dexia not to investigate further and declare an Event of Default under the Edgewater Reimbursement Agreement relating to the Edgewater letter of credit.

170.    During the course of the government investigation of Edgewater, Defendants did not disclose to Dexia that Defendants Rogan and Ehmen had learned that the government was investigating Edgewater's management including Defendants Rogan and Ehmen for fraudulently inflating the revenues at Edgewater. Nor did Defendants disclose to Dexia that Edgewater's precipitous financial decline after 2000 resulted from the hospital's loss of revenues attributable to Defendants' fraud scheme. Instead, Defendants continued to report to Dexia that such decline was temporary and correctable.

171.    Upon information and belief, Defendant Rogan knowingly, intentionally, and recklessly concealed the truth regarding the government investigation to permit Defendants to continue to misappropriate assets of Edgewater and/or squander them on other business ventures and in an attempt to prevent Dexia from discovering the fraud and breaches of fiduciary duty Defendants had committed.

### The Criminal Indictments

172.    On May 17, 2001, a federal grand jury indicted Defendants Bainbridge, and Ehmen, and Drs. Barnabas, Kumar, and Rao, for, among other things, "devising and participating in a scheme to defraud healthcare providers and to obtain money and property by means of false and fraudulent pretenses and to deprive certain individuals of the intangible right of the defendant's honest services in violation of 18 U.S.C. §§ 1341 and 1347."

48

173.    On May 24, 2001, Dr. Kumar pled guilty to Counts One and Nine of the indictment relating to the doctor's acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid. On October 10, 2001, Dr. Kumar was sentenced to 16 months' incarceration and ordered to pay restitution of $1,156,000 to Medicare and Medicaid.

174.    On May 24, 2001, Dr. Rao pled guilty to Count 57 of the indictment, on racketeering under 18 U.S.C. § 1962. On October 10, 2001, Dr. Rao was sentenced to 35 months of incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

175.    On October 1, 2001, Defendant Ehmen pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty and again at his sentencing, Defendant Ehmen admitted directly and through his attorney that he was in fact guilty and that he was responsible for working with Defendant Peter Rogan and a number of doctors to perpetrate a scheme to defraud Medicare, Medicaid, and other insurers. Defendant Ehmen, through his attorney, stated unequivocally that Defendant Peter Rogan was the chief leader and organizer of the scheme and that Defendant Ehmen served merely as a manager, carrying out the orders of Defendant Peter Rogan. Defendant Ehmen admitted that among the ways in which he and Defendant Rogan perpetrated this scheme, Defendants Rogan and Ehmen directly and indirectly: submitted and caused others to submit false and fraudulent billing information to Medicare, Medicaid, and other insurers; caused doctors to perform a large number of medically unnecessary procedures to generate fees for Edgewater; and paid and caused others to pay bribes and kickbacks to doctors to cause them to admit patients to Edgewater irrespective of the patients' need for medical care. Through his lawyer, Defendant Ehmen stated that in the cases of Drs. Barnabas and Rao, Defendant Peter Rogan finalized the contours of the kickback

49

arrangements with those doctors and then sent them to Defendant Ehmen to get contracts drafted. Defendant Ehmen admitted that he and Defendant Rogan perpetrated this scheme to falsely inflate the revenues of Edgewater. On November 28, 2001, Defendant Ehmen was sentenced to 78 months' incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

176. On October 1, 2001, Dr. Barnabas pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. On November 28, 2001, Dr. Barnabas was sentenced to 52 months' incarceration and ordered to pay restitution of $100,000 to Medicare and Medicaid.

177. On October 4, 2001, a federal grand jury returned a superseding indictment against Defendant Bainbridge and also charged Defendant Bainbridge, Inc. and Dr. Cubria. The complaint charged Dr. Cubria with acting to defraud Medicare and Medicaid by billing those entities for invasive medical procedures that were not medically necessary. The medically unnecessary invasive procedures the indictment referenced included cardiac catherizations and angioplasties.

178. On February 8, 2002, Dr. Cubria pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty, Dr. Cubria admitted that he was guilty of racketeering, which included that he and others engaged in a pattern of racketeering activity made up of a pattern of acts of mail and wire fraud, that were separate and continuous through an enterprise engaged in interstate commerce. More specifically, Dr. Cubria admitted that he took numerous actions to increase Edgewater's revenues by obtaining revenues from Medicare, Medicaid and other insurers through a scheme and artifice to defraud and obtain money through false and fraudulent pretenses representations, and promises. In this respect, Dr. Cubria admitted that he acted in conjunction with a number of individuals, including Defendant Roger Ehmen,

50

and an individual identified only as "Person A." On information and belief, "Person A" is Defendant Peter Rogan. Dr. Cubria also admitted that the false and fraudulent activities of himself, Defendant Ehmen, and "Person A" (on information and belief, Defendant Peter Rogan) included obtaining revenues from Medicare, Medicaid and other insurers by: (i) performing hundreds of medically unnecessary tests and procedures (at least half of the procedures he performed) to generate fees for Edgewater and himself; (ii) in January 1999 and April 2000, performing medically unnecessary angioplasties upon two patients, each of whom died as a result of the unnecessary procedures, after which Dr. Cubria specifically admitted that Defendant Ehmen and "Person A" (on information and belief, Defendant Peter Rogan) encouraged him to continue to perform additional unnecessary angioplasties despite the two patients' deaths; (iii) receiving financial payments and benefits from Edgewater ("kickbacks and bribes") in exchange for patient admissions, many of which involved patients that did not need medical treatment; and (iv) making false entries on medical records and bills and on submissions to Medicare, Medicaid, and other insurers either to obtain revenue for Edgewater, himself, and others or to conceal the foregoing racketeering activity. Dr. Cubria admitted that he and others did these things so as to conduct the affairs of Edgewater through a pattern of racketeering activity. On April 25, 2002, a federal district judge in Chicago sentenced Dr. Cubria to 12½ years' incarceration and ordered him to pay restitution of $14 M to Medicare and Medicaid.

## THE POST-INDICTMENT COLLAPSE

179.    The several indictments of Edgewater personnel and most significantly of Defendants Ehmen and Bainbridge led Medicare and Medicaid to freeze payments to Edgewater. This led directly Edgewater's default on certain financial covenants set forth in the Edgewater Reimbursement Agreement. Among the numerous defaults that have occurred under the

51

Edgewater Reimbursement Agreement, and other credit enhancement documents to date, Edgewater has failed to comply with the debt service coverage ratio requirements under § 6.10 of the Edgewater Reimbursement Agreement as of March 31, 2000 and has failed to comply with the reporting requirements of § 6.01 of the Edgewater Reimbursement Agreement.

180.    By on or about November 6, 2001, Edgewater bondholders tendered bonds with an approximate aggregate principal amount of $55,000,000 million. Under the terms of the letter of credit, Dexia was obliged to pay and did pay the purchase price of the tendered bonds, that is, a total of approximately $55,000,000 million.

181.    As of the date of this Complaint, Edgewater is in bankruptcy and Dexia has received back only $500,000 as a result of liquidation of collateral.

## Count I

## Fraudulent Inducement

## (Defendants Bainbridge, Braddock, Bainbridge, Inc., Rogan, and Ehmen)

182.    Dexia restates and realleges paragraphs 1 to 181 as if fully set forth herein.

183.    Defendants made numerous false and misleading statements of material fact to Dexia regarding the true financial condition of Edgewater, including omitting the fact that a portion of Edgewater's revenues were derived from illegal activities.

184.    Defendants knew and had reason to know that these representations were not true.

185.    Defendants made these representations recklessly and with the intention of inducing Dexia to issue a letter of credit in the amount of approximately $56,384,100.

186.    Defendants knowingly, intentionally and recklessly sought for Dexia to rely upon the truth of these representations.

187.    Dexia reasonably relied upon the truth of these representations, and but for these statements, Dexia would not have issued the Edgewater letter of credit.

188.    On or about June 8, 1998, Dexia issued the Edgewater letter of credit.

189.    As a result of its reasonable reliance upon the Rogan Defendants' fraudulent statements and inducements, Dexia has suffered substantial financial damages.

## Count II

## Fraudulent Concealment

### (Defendants Bainbridge, Braddock, Bainbridge, Inc., Rogan, and Ehmen)

190.    Dexia restates and realleges paragraphs 1 through 190 as if fully stated herein.

191.    Defendants the false sense of security knowingly, intentionally and recklessly made numerous false and misleading statements of material fact to Dexia regarding the true financial condition of Edgewater and Grant, including the fact that a portion of Edgewater's revenues came from illegal activities. Defendants the false sense of security knowingly, intentionally and recklessly made numerous false and misleading statements that lulled Dexia into the false sense of security Edgewater's operations were entirely legitimate and more stable than in fact they were.

192.    Defendants knew and had reason to know that these representations were not true and omitted material facts.

193.    Defendants made these representations recklessly and with the intention of lulling Dexia into a false sense of security regarding the safety of its investment and concealing material facts, including without limitation that, but for the revenues derived from illegal activities, Edgewater would not have maintained the minimum financial standards required in the

53

Edgewater Reimbursement Agreement, would have violated its financial covenants, and an Event of Default would have occurred on the Edgewater letters of credit.

194. Defendants took the foregoing steps to forestall Dexia from protecting itself financially, which Defendants knew and had reason to know would have terminated their scheme to defraud and ability to loot Edgewater of the collateral Defendants posted to induce Dexia to issue the letter of credit.

195. Dexia reasonably relied upon the truth of these representations, and but for these statements, Dexia would have taken steps to protect its collateral and to recover the money Edgewater owed it .

196. As a result of its reasonable reliance on the Management Defendants' fraudulent statements and inducements, Dexia has suffered substantial financial damages.

## Count III

### Tortious Interference with an Existing Contract

### (All Defendants)

197. Dexia restates and realleges paragraphs 1 through 196 as if fully stated herein.

198. Dexia and Edgewater entered into a contract on or about June 8, 1998, in connection with a letter of credit Dexia issued for the benefit of Edgewater.

199. Defendants knew that this contact existed and intentionally and maliciously induced Edgewater to breach its obligations under the contract.

200. Defendants' wrongful conduct caused Edgewater to breach its contract.

201. As a result of Defendants' interference with the contract between Dexia and Edgewater, Dexia has suffered substantial financial damages.

## Count IV

### Breach of Fiduciary Duty

### (Defendants Rogan, Access and Vital)

202.    Dexia restates and realleges paragraphs 1 through 190 as if fully stated herein.

203.    Once Edgewater entered the zone of insolvency, Defendants Rogan, Access and Vital owed fiduciary duties to Dexia, which was Edgewater's largest secured creditor.

204.    After in or about March 1, 2000, Defendants Rogan, Access and Vital owed fiduciary duties to Edgewater.

205.    Defendants Rogan, Access and Vital knowingly engaged in a variety of conduct that furthered their interests and themselves and that was also detrimental to Dexia's interests.

206.    As a result of this breach of fiduciary duty, Dexia suffered substantial financial damages.

## Count V

### Breach of Fiduciary Duty

### (All Defendants)

207.    Dexia restates and realleges paragraphs 1 through 206 as if fully stated herein.

208.    Defendants knowingly colluded with and caused the Defendants Access and Vital Defendants to breach of their fiduciary duty to Dexia.

209.    As a result of this breach of fiduciary duty, Dexia has suffered substantial financial damages.

## Count VI

### Breach of Fiduciary Duty

### (Defendants Rogan and Ehmen)

210.    Dexia restates and realleges paragraphs 1 through 209 as if fully stated herein.

211.    Because Defendants Rogan and Ehmen were corporate officers of Edgewater, they owed fiduciary duties to their creditors, including Dexia.

212.    Defendants Rogan and Ehmen caused Edgewater to be operated in a reckless and illegal manner for their own personal benefit, including without limitations their own financial benefit.

213.    Defendants Rogan and Ehmen misappropriated funds from Edgewater.

214.    Defendants Rogan and Ehmen caused Edgewater to make business decisions which defendants Rogan and Ehmen knew, should have known and recklessly ignored would and did financially injured Edgewater, and thus imperiled Dexia's interests, including its investment in Edgewater.

215.    Defendants Rogan and Ehmen knowingly engaged in a variety of conduct that furthered their own interests and was also detrimental to Dexia's interests, including its investment in Edgewater.

216.    As a result of this breach of fiduciary duty, Dexia has suffered substantial financial damages.

## Count VII

### Willful Conversion

### (Defendants Bainbridge, Braddock, Bainbridge, Inc., Rogan, and Ehmen)

217.    Dexia restates and realleges paragraphs 1 through 216 as if fully stated herein.

56

218.    Defendants directly, indirectly and without authorization, knowingly wrongfully obtained from Dexia and caused Dexia to pay approximately $56,000,000 on Edgewater's behalf to satisfy Edgewater's debt to the bondholders when Edgewater defaulted on those bonds and on the letter of credit.

219.    Dexia has an absolute and unconditional right to immediate possession of those funds totaling approximately $56,000,000, because Defendants wrongfully knowingly obtained from Dexia and caused Dexia to pay those funds on Edgewater's behalf.

220.    As a result of this conversion, Dexia has suffered substantial financial damages.

## Count VIII

## Breach of Fiduciary Duty

## (Rogan, Ehmen, EPC and PGR)

221.    Dexia restates and realleges paragraphs 1 through 220 as if fully stated herein.

222.    Defendants Rogan and Ehmen were corporate officers of Edgewater and they owed a fiduciary duty to Edgewater.

223.    Under Illinois law, the board of directors and Corporate Officers of Edgewater owed a fiduciary duty to Edgewater's creditors, including Dexia, under two separate and independent circumstances:   (a)  while Edgewater was insolvent, and (b) during the course of all insider transactions.

224.    Because Defendant Rogan had a direct ownership interest in Defendants EPC and PGR, direct control over Edgewater as a corporate officer, and indirect control over the board of directors of Edgewater, the transactions between Edgewater and Defendants EPC and PGR are

insider transactions. Defendants Rogan and Ehmen owed a fiduciary duty to the creditors of Edgewater, including Dexia, in relation to the transactions.

225. The exercise of the Option would have benefited Edgewater directly by allowing Edgewater control over all buildings used in the operation of the hospital and by eliminating the requirement of Edgewater to pay rent to Defendant EPC.

226. By failing to exercise the Option, Defendants Rogan and Ehman breached the fiduciary duty they owed to the creditors of Edgewater, including Dexia.

227. Failure to exercise the Option amounted to a fraudulent conveyance of Edgewater's property and was not fair to Edgewater at the time of the transaction.

228. The lease between Defendant EPC and Edgewater for Edgewater's use of the EPC Property was an insider transaction.

229. Any lease or license between Defendant PGR and Edgewater for Edgewater's use of the PGR Properties was an insider transaction.

230. Payments Edgewater made to, or on behalf of, Defendants EPC and PGR for use of the EPC Property and PGR Property, taxes, insurance, expenses, and capital improvements upon such property were insider transactions.

231. Payments Edgewater made to EPC and PGR were not fair to Edgewater at the time of the transactions.

232. Defendants Rogan and Ehman breached the fiduciary duty they owed to the creditors of Edgewater, including Dexia, by making rent payments under the leases and/or license and expending funds to benefit of EPC and PGR.

233. Defendants Rogan and Ehmen caused Edgewater to make business decisions which defendants Rogan and Ehmen knew, should have known, and recklessly ignored, would

and did financially injured Edgewater, and thus imperiled Dexia's interests, including its investment in Edgewater.

234.    Defendants Rogan, EPC and PGR directly benefited from the breach of fiduciary duty of Defendants Rogan and Ehman.

235.    Defendant Rogan caused Defendants EPC and PGR to act in concert with Defendants Rogan and Ehmen to accomplish the acts constituting breach of fiduciary duty alleged in this count.

236.    As a result of this breach of fiduciary duty, Dexia has suffered substantial financial damages.

## Count IX

### Unjust Enrichment

### (All Defendants)

237.    Dexia restates and realleges paragraphs 1 through 232 as if fully stated herein.

238.    Defendants EPC and PGR are insiders to Edgewater, because Defendant Rogan owned and controlled Defendants EPC and PGR.

239.    Upon information and belief, Defendants Bainbridge, Braddock, Bainbridge, Inc., and Vital are insiders to Edgewater, because Defendant Rogan owned and/or controlled Defendants Bainbridge, Braddock, Bainbridge, Inc., and Vital.

240.    Defendant Rogan used insider entities, such as Defendants EPC and PGR, to transfer assets from Edgewater to such insider entities, to the detriment of Edgewater's creditors, including Dexia.

59

241.    Defendants EPC and PGR conspired with Defendant Rogan and other Defendants to unfairly receive funds from Edgewater to the detriment of Edgewater's creditors, including Dexia.

242.    Defendants Rogan, EPC and PGR knowingly, willfully, and intentionally retained a benefit of transfers from Edgewater, including Edgewater's failure to exercise its Option and payments Edgewater made to EPC and PGR for use of real property, taxes, insurance and expenses related to such property, and capital improvements upon such property.

243.    Upon information and belief, Defendants Rogan used Defendants Bainbridge, Braddock, Bainbridge, Inc., and Vital and other insider or related entities to transfer assets from Edgewater to such insider entities, to the detriment of Edgewater's creditors, including Dexia.

244.    Defendants Rogan, EPC and PGR unjustly retained a benefit, to the detriment of Dexia as a creditor of Edgewater, as a result of their own wrongful conduct and in violation of fundamental principles of justice, equity, and good conscience.

### Count IX

### Civil Conspiracy

### (All Defendants)

245.    Dexia restates and realleges paragraphs 1 through 244 as if fully stated herein.

246.    At all relevant times herein, Defendants, directly and indirectly, individually and collectively, controlled or owned by them, acted in concert and conspired to defraud Dexia.

247.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, defendants knowingly, intentionally, and recklessly combined, conspired, and agreed to defraud Dexia by virtue of the schemes and actions alleged in this Complaint.

60

248. Throughout the time relevant to this Complaint, Defendants knowingly, intentionally, and recklessly conspired to make false and misleading statements to Dexia as to the veracity and accuracy of the financial records, reports, and statements for Edgewater.

249. Throughout the time relevant to this Complaint, Defendants knowingly, intentionally, and recklessly conspired to provide to Dexia false and misleading financial records, reports, and statements for Edgewater.

250. Throughout the time relevant to this Complaint, Defendants Rogan, Ehmen, Bainbridge, and Braddock knowingly, intentionally, or recklessly conspired to lull Dexia into a false sense of security and to defraud Dexia by sending and causing to be sent to Dexia false and misleading financial statements and financial information to conceal the Defendants' scheme to defraud, to induce Dexia to refrain from protecting itself by exercising its contractual rights under its reimbursement and credit agreements with Edgewater, and to allow the Defendants to pillage Edgewater of the collateral, Defendants had caused Edgewater to post to secure Dexia's letter of credit.

251. Throughout the time relevant to this Complaint, Defendants conspired to pillage Edgewater of Dexia's collateral and to squandered Edgewater's assets, including without limitation, directly or indirectly diverting those assets to Defendant Rogan personally and to other Defendants using Edgewater's revenue and assets for purposes other than maintaining the operations and financial health of Edgewater, and using Edgewater's assets to benefit Defendant Rogan and the other Defendants personally at the expense of Edgewater.

252. Throughout the time relevant to this Complaint, Defendants knowingly, intentionally, and recklessly coordinated efforts to funnel money out of Edgewater, decreasing the value of Edgewater's assets.

61

253. Throughout the time relevant to this Complaint, Defendant Rogan and the other Defendants knowingly, intentionally, and recklessly conspired to siphon money from Edgewater in a variety of ways, including through a variety of fraudulent "management agreements," under which certain Defendants Rogan, Braddock and Bainbridge received exorbitant payments. These misapplications of Edgewater assets caused the collateral on the letters of credit to waste away.

254. Throughout the time relevant to this Complaint, Defendants Rogan, EPC and PGR and the other Defendants knowingly, intentionally, and recklessly conspired and agreed to funnel money out of Edgewater, decreasing the value of Edgewater's assets by, among other things, charging exorbitant amounts of rent for use of property Defendants Rogan, EPC and PGR owned, causing Edgewater to pay for property insurance and taxes on the Defendants' property, and causing Edgewater to make substantial, permanent improvements to the Defendants' property. Additionally, the Defendants conspired to caused Edgewater to fail to exercise its contractual right to purchase the Defendants' property, while Defendants continued to benefit from Edgewater's payments. This activity also caused the assets of the Debtor to waste away.

255. Throughout the time relevant to this Complaint, Defendants conspired and agreed to conceal, suppress and hide the foregoing misrepresentations and material omissions from Dexia. Defendants' concealment, suppression and omission of these material facts prevented Dexia from taking steps to limit the damage to Dexia as a result of Defendants' scheme.

256. The wrongful acts alleged herein constitute some of the acts Defendants took in furtherance of the conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dexia hereby demands judgment against Defendants,

including:

a) Money damages to be proven at trial, but not less than $55 million;

b) Punitive damages for fraudulent conduct;

c) Equitable relief in the form of an order for specific performance requiring EPC to allow Edgewater to exercise its option to purchase and right of first refusal under the Option;

d) An equitable lien in favor of Dexia on property owned by EPC and PGR equal to the value of improvements to such property funded by Edgewater;

e) All costs and attorney's fees Dexia incurred; and

f) Such further relief as the Court deems appropriate and just.

## JURY TRIAL DEMANDED

Plaintiff Dexia demands a trial by jury.

Date: January 10, 2003

_Scott Mendeloff_

One of the Attorneys for Plaintiff
Dexia Credit Local

Scott T. Mendeloff
Colleen M. Kenney
SIDLEY AUSTIN BROWN & WOOD
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000