# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 8288 | DATE | 10/10/2003 |
| CASE TITLE | Dexia Credit Local vs. Roban, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing re-set for 11/18/2003 at 10:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We grant EPC and PGR's motion to dismiss (16-1) with regard to Count III and deny it with regard to Counts V, VII, IX, and X. The in court hearing set for 11/6/03 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices |
| ✓ Notices mailed by judge's staff. | OCT 1 4 2003 date docketed |
| Notified counsel by telephone. | |
| Docketing to mail notices. | docketing deputy initials |
| Mail AO 450 form. | |
| Copy to judge/magistrate judge. | 10/10/2003 date mailed notice |
| GL courtroom deputy's initials | GL mailing deputy initials |
| | Date/time received in central Clerk's Office |

Document Number: 32

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Credit Local de France ) ) ) | | **DOCKETED** |
| Plaintiff, ) ) | | OCT 1 4 2003 |
| v. ) ) | | |
| PETER G. ROGAN, et al. ) ) ) | | |
| Defendants. ) ............................................................ ) ) | Case No. 02 C 8288 | |
| EDGEWATER PROPERTY COMPANY and PGR PROPERTIES, INC., ) ) ) | | |
| Counterplaintiffs ) ) | | |
| v. ) ) | | |
| DEXIA CREDIT LOCAL, ) ) | | |
| Counterdefendant. ) | | |

### MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Dexia Credit Local (hereinafter "Dexia"), filed a ten count complaint against eleven defendants, including Edgewater Property Company (EPC) and PGR Properties, Inc. (PGR). EPC and PGR responded with a Motion to Dismiss Counts III, V, VIII, IX, and X[1] as to EPC and PGR. For the

---

[1] The Amended Complaint labels this count as "Count IX" rather than "Count X." This is clearly a typographical error (plaintiffs labeled two consecutive counts as "Count IX"). Thus, we refer to claim of civil conspiracy as "Count X" in this opinion.

32

reasons set forth below, we grant EPC and PGR's motion with regard to Count III and deny it with regard to Counts V, VII, IX, and X.[2]

I. **BACKGROUND**

For the purpose of a motion to dismiss, we accept all well-pled allegations as true. *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995). We therefore recite the facts as Dexia presents them in its complaint.

In 1997, Dexia issued a letter of credit guaranteeing the repayment of a $55 million bond taken out by Edgewater Medical Center (hereinafter "Edgewater"). (Am. Compl. ¶ 110.) Before issuing the letter of credit, Dexia conducted an extensive review of Edgewater's financial statements and its overall financial health to ensure that Edgewater would be able to repay its obligations on the bond. (Am. Compl. ¶ 102.) Dexia also entered into a contract with Edgewater (hereinafter the "Reimbursement Agreement") in which Edgewater promised to satisfy certain financial covenants, including maintaining certain debt service ratios, capitalization levels, and levels of cash and investments on hand. (Am. Compl. ¶ 116.) Edgewater secured its debt to Dexia with collateral, including its unrestricted receivables, assignable general intangibles, and a perfected first mortgage security interest in the hospital facility, equipment and fixtures. (Am. Compl. ¶ 114.)

Despite Dexia's attempts to protect its investment, Edgewater defaulted on the financial covenants set forth in the Edgewater Reimbursement Agreement, and ultimately on the bonds. As a result, Dexia was obliged to pay the principal amount on the bonds of $55 million. (Am. Compl. ¶ 179.)

---

[2]This Court has original jurisdiction over this diversity action under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, Dexia, the plaintiff, is a foreign corporation, and the defendants are citizens of Illinois, Indiana, and California. The parties do not contest that Illinois law applies to each of the claims raised.

2

Dexia alleges that Edgewater's default was due to a complex scheme perpetrated by Peter Rogan, Roger Ehman, and several companies that they controlled. (Am. Compl. ¶1.) The schemes involved Medicare fraud as well as efforts to funnel money out of Edgewater for personal benefit.

Specifically, Dexia alleges that in 1994, Rogan sold most of his ownership interest in Edgewater Hospital to the Northside Operating Company, d/b/a Edgewater Medical Center, although he continued to directly manage and control Edgewater. (Am. Compl. ¶ 24-26.) At the same time, he set up the two companies that have brought the present motion to dismiss, Edgewater Property Company (hereinafter "EPC") and PGR Properties, Inc. (hereinafter "PGR"). (Am. Compl. ¶¶ 23-24.) Instead of selling off all of his property associated with the hospital, Rogan, through EPC and PGR, retained title to several buildings around Edgewater. (Am. Compl. ¶ 26, 135.) These properties are essential to the continued operation of Edgewater; thus, Rogan, EPC, and PGR obtained great leverage over Edgewater. (Am. Compl. ¶ 135).

Access Community Health Services (hereinafter "Access") and Vital Community Health Services (hereinafter "Vital") are both Illinois not-for-profits that have controlled Edgewater since 2000. Access is the sole corporate member of Vital; Vital is the sole corporate member of Edgewater. (Am. Compl. ¶ 20-21.) Both Access and Vital are controlled by Rogan. (Am. Compl. ¶154.) After setting up EPC and PGR, Rogan, in conjunction with Access and Vital, "approved and caused the Edgewater board of directors to approve construction projects and building developments designed intentionally to make the operation of Edgewater highly dependant upon the buildings and other real property adjacent to Edgewater which Defendant Rogan owned through EPC and PGR." (Am. Compl. ¶ 136.) These improvements included installing air conditioning and telephone facilities for Edgewater on EPC and PGR's property.

In 1996, Rogan, Access and Vital caused Edgewater's board of directors to approve a ten year lease agreement between Edgewater and EPC under which rent payments were "exorbitant relative to the fair market value and the rental value of the EPC property." (Am. Compl. ¶ 137-38.) Rogan, Access, and Vital also caused Edgewater to approve payments to PGR for the use of two parking lots and to pay the property taxes and other expenses related to the parking lots. (Am. Compl. ¶139.)

In 1994, PGR executed an option agreement with Edgewater which granted Edgewater an exclusive option to purchase PGR's property. (Am. Compl. ¶ 140.) In 1998, Rogan, Access and Vital "caused the Edgewater board to fail to exercise the Option" even though they knew that the failure to do so would "financially disadvantage Edgewater and its creditors, including Dexia." (Am. Compl. ¶ 141.) Since the date that the option expired, Edgewater has paid at least $116, 750 in rental payments to PGR. (Am. Compl. ¶ 145.)

The purpose of all of these transactions with EPC and PGR was to funnel money out of Edgewater. (Am. Compl. ¶ 135.)

## II. ANALYSIS

We are presented here with a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)). In considering a motion to dismiss, we must accept all well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Id.* at 1520-21; *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995), *aff'd* 161 F.3d 443 (7th Cir. 1998), *cert. denied* 528 U.S. 810 (1999). Therefore, a complaint should not be dismissed "unless it appears

beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

A complaint is required to provide only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(e)(2), unless the pleading avers fraud or mistake. In the case of fraud or mistake, the complaint must state the circumstances constituting the fraud or mistake with particularity. Fed R. Civ. P. 9(b).

## A. Count III: Tortious Interference with an Existing Contract

Dexia alleges that EPC and PGR tortiously interfered with the Edgewater Reimbursement Agreement in which Edgewater pledged to maintain certain financial standards in its operations. To state a claim for tortious interference, plaintiff must allege: 1) the existence of a valid and enforceable contract; 2) defendant was aware of the contract; 3) defendant intentionally and unjustifiably induced a breach; 4) the breach was caused by defendant's wrongful conduct; and 5) damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (citations omitted).

The complaint fails on the first element because of the rule that one cannot interfere with a contract that does not exist. *Flint v. Court Appointed Special Advocates of DuPage County*, 674 N.E.2d 831, 840-41 (Ill. App. Ct. 1996) (granting summary judgment on a tortious interference with an existing contract claim where the underlying contract was held to be invalid). Dexia does allege that there was a valid and enforceable contract entered into on or about May 1, 1998, when Dexia and Edgewater agreed upon a reimbursement agreement in connection with the letter of credit that Dexia issued on Edgewater's behalf. (Compl. ¶¶ 114-16.) This contract came into existence, however, two years *after* the contracts between EPC, PGR and Edgewater. Thus, even if we accept Dexia's allegation that EPC and PGR's intent in charging high rent payments and forcing Edgewater to pay for expenses on the

property was to funnel money out of Edgewater, we cannot find the two companies liable for tortious interference with a contract claim. Even if *Edgewater* breached its contractual promises to Dexia to maintain its financial standing by paying too much money to EPC and PGR, we cannot find EPC and PGR liable. It is simply not possible to tortiously interfere with a contract that does not exist.

Dexia responds that EPC and PGR tortiously interfered by continuing to accept rent, tax, and improvement payments even after Edgewater and Dexia entered into the reimbursement agreement. Dexia can only cite one case to support its position, and that case is easily distinguishable. In *Hi-Lite Prods. v. Am. Home Prods. Corp.*, the Seventh Circuit held that the statute of limitations in tortious interference cases begins to run each time a contract is breached. 11 F.3d 1402, 1410 n.2 (7th Cir. 1993) ("If the contract interfered with is a continuing contract, it is possible for a defendant to cause that contract to be breached on more than one occasion. In this situation, a tortious interference claim accrues with each separate breach."). Dexia argues that, under *Hi-Lite*, PGR and EPC could be liable for tortious interference each time Edgewater made an unreasonable payment to the companies after the formation of the Edgewater/Dexia agreement. Yet in *Hi-Lite*, the contract that was breached was already in existence at the time when the first allegation of tortious interference occurred. Here, there was no contract between Dexia and Edgewater at the time when the payments began. Dexia can point to no case, nor can we find any, in which a party was successful on a tortious interference with a contract claim where the contract allegedly interfered with came into existence *after* the behavior constituting tortious interference began. The lack of such case law, coupled with the clear rule that a contract must exist in order to state a claim for tortious interference, suggests that Dexia stretches the tort too far by attempting to apply it to the facts of this case.

This position is made even stronger in light of the fact that Dexia *knew* of the contracts between EPC, PGR, and Edgewater at the time it entered into its contract with Edgewater. Dexia states in its

6

Amended Complaint that it conducted an extended review of Edgewater's finances prior to issuing the letter of credit. There is no allegation in the complaint that Dexia objected to the amounts of payments being made to EPC and PGR at the time it entered into the Reimbursement Agreement. If Dexia itself did not object to the payments, it is difficult to comprehend how such acts could later be found not only objectionable, but actionable.

Dexia further alleges that EPC and PGR tortiously interfered by causing Edgewater to fail to exercise an option to purchase the PGR properties. This argument does not suffer from the same shortcomings of timing as Dexia's previous arguments because the failure to exercise the option occurred after the Reimbursement Agreement contract was finalized. Nonetheless, Dexia still fails to state a claim of tortious interference with regard to the option. The situation is somewhat confused by the fact that Peter Rogan, who allegedly controlled Edgewater, EPC, and PGR, engaged in all of the acts alleged, including failing to exercise the option, on behalf of the companies. It is true that the actions of a director can be imputed to a corporation, but only to the extent that those acts are taken in the scope of the control and management of the corporation. *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992). We must therefore separate those acts that Rogan took as director of EPC and PGR from those acts he took as director of Edgewater. The decision to enter into an option agreement was one made by both EPC and PGR and Edgewater. EPC and PGR had some hand in the terms of the original option agreement. Once that agreement was in place, however, it was entirely Edgewater's choice whether or not to exercise the option. Dexia failed to make any allegation of what role EPC and PGR played in convincing Edgewater not to exercise the option. Unlike the other claims, there is no suggestion that Edgewater was forced to fail to exercise the option by its dependence on the properties surrounding the hospital. Rogan may have caused *Edgewater* to fail to exercise the option, and that may have been a breach of his fiduciary duty as director, but there is no evidence of any actions taken by

Rogan in his capacity as director of EPC or PGR that constituted an intentional interference with the contract between Edgewater and Dexia. Thus, none of Rogan's acts in failing to exercise the option may be imputed to EPC or PGR. For these reasons, we dismiss the tortious interference with an existing contract claim as to EPC and PGR.

## B. Counts V & VIII: Breach of Fiduciary Duty Claims

Dexia next alleges that EPC and PGR colluded with Access and Vital (Count V) and with Peter Rogan and Roger Ehmen (Count VIII) in breaching their respective of fiduciary duties. EPC and PGR respond that Dexia lacks standing to sue for breach of fiduciary duty[3] because the fiduciary duty allegedly breached in this case is one that runs to all creditors rather than to any single creditor standing alone. Thus, EPC and PGR assert that only a bankruptcy trustee acting on behalf of all creditors has standing to bring the breach of fiduciary duty claim alleged herein.

As a general matter, Article III of the United States Constitution requires that a plaintiff must have standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). In assessing standing in the context of a motion to dismiss, "general factual allegations of injury resulting from the defendants' conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support a claim.'" *Id.* at 561 (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

---

[3] Dexia alleges that we should not consider the issue of standing because PGR and EPC did not raise it in their motion to dismiss but instead raised it for the first time in their reply. Indeed, it is generally improper for a party to raise a new argument in a reply because it does not give an adversary adequate opportunity to respond. *Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir. 2002) (noting that it is generally inappropriate for a party to raise a standing argument in a reply brief). The rule is inapplicable in this case, however, because we granted Dexia's request to file a Surreply for the specific purpose of responding to the standing argument. *Id.* In any case, Dexia is not prejudiced by our discussion of the standing issue because we conclude that Dexia has standing.

8

There is no clear rule in Illinois regarding when a corporation's creditor may assert a claim for breach of special circumstance fiduciary duty.[4] EPC and PGR assert that an individual creditor *never* has standing to sue on a claim of a special circumstance breach of fiduciary duty because the claim is one that runs to all creditors alike rather to any individual creditor. At least one Illinois case supports that argument. *Prime Leasing v. Kendig*, 773 N.E.2d 84, 97 (Ill. App. Ct. 2002) ("[b]ecause the special-circumstance fiduciary duty is owed to the entire corporate constituency, only the corporation or its representative in bankruptcy can maintain a claim for an alleged breach of this duty."). We decline to follow the holding of *Prime Leasing* for several reasons.

First, *Prime Leasing* specifically states that its interpretation of the fiduciary duty claim is based on Delaware, not Illinois, law.[5] *Id.* at 96 n.1. Second, although the Illinois Supreme Court has not spoken plainly on this issue, we believe that the Illinois Supreme Court would assess standing in special circumstance fiduciary duty claims on a case-by-case basis rather than adopting the blanket rule stated in *Prime Leasing*. *See Technic Eng'g, Ltd., v. Basic Envirotech, Inc.*, 53 F.Supp.2d 1007, 1010 (noting that where the Illinois Supreme Court has not spoken plainly on an issue, the job of a federal court applying Illinois law is to predict how the state supreme court would decide the issue). Notwithstanding the decision in *Prime Leasing*, there are several Illinois Appellate Court decisions that have allowed individual creditors to sue alleging a breach of special circumstance fiduciary duty. *See, e.g., O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1185 (Ill. App. Ct. 1986) ("When an officer breaches his fiduciary duty by wrongfully converting or misappropriating funds and thereby adversely affecting the relation

---

[4]As discussed below, this case deals with so-called "special-circumstance" fiduciary duty because it involves the claim of a corporation's creditor against that of a corporation's director.

[5]State law governs the issue of which causes of action may be asserted by creditors and which may be asserted by trustees. *Koch Ref. v. Farmers' Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987).

9

between the corporation and its creditors, a creditor can maintain an action against the officer personally); *Circle Security Agency, Inc.*, 99 N.E.2d 1111, 1286 (Ill. App. Ct. 1981) (same). Likewise, there numerous decisions of the Northern District of Illinois that have allowed a creditor to maintain an action for breach of special circumstance fiduciary duty. *See Worldcom Network Serv., Inc. v. Jenkins*, 2000 WL 1154622, *2 (N.D. Ill. 2000); *NPF WL, Inc. v. Sotka*, 2000 WL 574527 (N.D. Ill. 2000); *Technic Eng'g, Ltd. v. Basic Envirotech*, 53 F.Supp.2d 1007 (N.D. Ill. 1999); *Continental Illinois Nat'l Bank v. Premier Sys., Inc.*, 1989 WL 106677, *2 (N.D. Ill. 1989). The weight of precedent is thus heavily on the side of allowing creditors to maintain actions for breach of special circumstance fiduciary duty.

Instead of adopting a per se rule either way, we follow the Seventh Circuit in holding that the question of standing in fiduciary duty cases hinges upon whether or not the alleged injury is personal to the individual creditor or one that affects all creditors alike. *Steinberg v. Buczynski*, 40 F.3d 890, 892 (7th Cir. 1994) ("[T]here is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct – not derivative – claim against the third party, which only the creditor himself can enforce."); *Koch Ref. v. Farmers' Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987). This determination should be made on a case by case basis. "A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause." *Koch Ref.*, 831 F.2d at 1348. "The equally valid mirror-image principle is that a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner." *Id.* at 1349. Thus, the question of whether Dexia has standing to sue in this matter hinges upon the question of whether the harm allegedly done to Dexia was of a personal or general nature.

For purposes of a motion to dismiss, Dexia has made an adequate showing that its claims are personal and distinct from that of other creditors such that it may maintain its own action for breach of fiduciary duty. Dexia concedes that the scheme allegedly put in place by defendants in this case was built to defraud creditors generally; however, it also contends that there was "tremendous injury specifically perpetrated upon Dexia and Dexia alone." (Complaint ¶¶ 92-126.) Indeed, the amount of money that Dexia allegedly lost from this scheme was $55 million, an amount (if proved) that would be sufficient to confer standing upon Dexia. *See Ashland Oil v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (finding that a creditor could maintain an action for breach of fiduciary duty where the defendants had taken "exceptionally large quantities of fuel" from the creditor). We thus find that Dexia has asserted sufficient personal injuries to withstand EPC and PGR's standing challenge.

We next turn to the merits of the two breach of fiduciary duty claims. Dexia asserts that EPC and PGR should be held liable for colluding with: 1) Access and Vital to breach Access and Vital's fiduciary duty toward Dexia; and 2) Rogan and Ehmen to breach Rogan and Ehman's fiduciary duties toward Dexia. To successfully allege a breach of fiduciary duty Dexia must demonstrate that: 1) Access/Vital and Rogan/Ehmen owed fiduciary duties to Dexia; 2) these entities breached their fiduciary duties; and 3) PGR and EPC colluded with these entities in breaching their fiduciary duties. We address each of these issues in turn.

Generally, corporate officers and directors do not owe fiduciary duties to a corporation's creditors. *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994). There are two exceptions to this rule that are important here.[6] First, when a corporate officer or director breaches his fiduciary duty by misappropriating funds and thus damages the relationship between the corporation and

---

[6]These exceptions are referred to as "special circumstance" fiduciary duty.

11

its creditors, the creditor can maintain a personal suit against the director or officer. *O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1185 (Ill. App. Ct. 1986). Second, officers and directors have a fiduciary duty to creditors once the corporation becomes insolvent. *Technic Eng'g Ltd. v. Basic Envirotech*, 53 F.Supp.2d 1007, 1011 (N.D. Ill. 1999). Dexia alleges that Access, Vital, Rogan, and Ehmen owed fiduciary duties to Dexia because they misappropriated funds from Edgewater, thereby cheating Edgewater's creditors. Dexia also alleges that the parties owed fiduciary duties to Edgewater's creditors once Edgewater became insolvent. Both of these claims are sufficient to demonstrate a duty owed by those who controlled Edgewater to Edgewater's creditors.

EPC and PGR argue that special circumstance fiduciary duty only extends to officers and directors of a corporation and not to the corporation's controlling shareholders or members. Thus, EPC and PGR claim that, as mere members of Edgewater, Access and Vital cannot be held liable for breach of special circumstance fiduciary duty. We disagree. It is clearly established that controlling members owe fiduciary duties to their corporations and other shareholders. *Anest v. Audino*, 773 N.E.2d 202, 208 (Ill.App. 2002). This rule exists because of the great power that controlling members can wield over the corporation. Especially in the context of closely held corporations, members and shareholders should owe special circumstance fiduciary duties to creditors to the same extent as officers and directors. Dexia alleges that Access was Vital's sole corporate member, that Vital was Edgewater's sole corporate member beginning in March of 2000, and that both Access and Vital controlled Edgewater. The complaint also alleges that, as controlling entities, they participated in misappropriating funds from Edgewater, both before and after the corporation became insolvent. Thus, the complaint sufficiently alleges that Access and Vital[7] owed a fiduciary duty to Dexia.

---

[7]Of course, neither Access nor Vital's fiduciary duty began until they took control of Edgewater.

12

Turning to the issue of whether EPC and PGR can somehow be held liable for Rogan, Ehmen, Access and Vital's breach of fiduciary duty, we observe that under Illinois law, it is possible for one to bring an action against a person or entity that colludes in or induces a breach of fiduciary duty. *Appley v. West*, 832 F.2d 1021, 1030 (7th Cir. 1987); *In re John Dawson & Assocs., Inc.*, 271 B.R. 270, 272 (N.D. Ill. 2001). "One participates in a fiduciary's breach if he or she affirmatively assists or helps conceal the breach or, by virtue of failing to act when required to do so, enables it to proceed." *White v. Kenneth Warren & Son, Ltd.*, 2000 WL 91920, *8 (N.D. Ill. 2000). Dexia's allegations in its amended complaint were sufficient, for purposes of a motion to dismiss, to show that EPC and PGR may have colluded in the alleged breaches of fiduciary duty by Access, Vital, Rogan, and Ehmen.

The complaint states that EPC and PGR had knowledge, through Rogan, that the transactions involving payment of rent and other sums were designed to funnel money out of Edgewater. The complaint also alleges that EPC and PGR continued in these activities once Edgewater entered insolvency. EPC and PGR respond that the receipt of rent and other payments were merely "business as usual" and thus do not constitute any sort of misappropriation. (EPC & PGR's Reply in Support of Mot. to Dismiss at 10.) A person or entity can be held liable for colluding in a breach of fiduciary duty, however, by engaging in activities that are perfectly usual and legal as long as those activities are done with the requisite knowledge or intent. For example, the Seventh Circuit has found that a bank may be liable for cashing checks and allowing a fiduciary to make repeated withdrawals where there was evidence suggesting that the bank knew these activities were improper. *Appley v. West*, 832 F.2d 1021, 1030 (7th Cir. 1987) (applying Illinois law); *see also Chabraja v. Martwick*, 618 N.E.2d 800, 803 (Ill. App. Ct. 1993) (finding that a bank was not liable for merely accepting deposits where there was no allegation that the bank knew of potential fraud). The key in alleging collusion is knowledge, and Dexia has sufficiently alleged that PGR and EPC knew of Rogan, Ehmen, Access and Vital's misconduct to

13

state a claim for breach of fiduciary duty. We therefore deny EPC and PGR's motion to dismiss with regard to counts V and VIII.

### C. Count IX: Unjust Enrichment

Dexia further alleges that EPC and PGR knowingly accepted exorbitant rents and payments from Edgewater, that these funds should have been used to repay Dexia, and therefore that EPC and PGR were unjustly enriched through their dealings with Edgewater. In general, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience. *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (citations omitted). Where a party receives payments from a third party, rather than from the plaintiff directly, the retention of the benefit is unjust if: 1) the benefit should have been given to the plaintiff, but it was mistakenly given to the defendant instead; 2) the defendant obtained the benefit from the third party by wrongful conduct; or 3) the plaintiff has a superior claim to the benefit than the defendant. *Id.* (citations omitted). Because this case involves an alleged transfer from a third party (Edgewater), Dexia states a claim for unjust enrichment if it meets any of these three factors.

Dexia sufficiently alleges that EPC and PGR obtained a benefit from Edgewater by wrongful conduct. The rent and other payments made to EPC and PGR were allegedly exorbitant and were accepted as a part of a scheme to funnel money out of Edgewater. These facts are sufficient to allege that the payments were wrongful. Furthermore, based on the facts alleged, Dexia's claim to the funds are superior to that of EPC or PGR's because EPC and PGR have no right to funds obtained wrongfully.

EPC and PGR argue that they cannot be held liable for unjust enrichment because the payments made to EPC and PGR were made pursuant to a valid contract with Edgewater. Generally, where an

14

enrichment is innocently conferred by a third party according to a contractual or legal obligation, an enrichment is not unjust. *See Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill.App.Ct. 1995). The contract in this case was purportedly part of a scheme to defraud and thus any assets transferred pursuant to the contract could not be "innocent." For this reason and because Dexia sufficiently alleges two of the factors laid out in *HPI Health Care Servs.*, EPC and PGR's motion to dismiss with respect to Count IX is denied.[8]

### D. Count X: Civil Conspiracy

Finally, Dexia alleges that EPC and PGR conspired with the other defendants to defraud Dexia. To state a claim for civil conspiracy under Illinois law, Dexia must plead "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565, 571 (Ill. 1998) (citations omitted). Because the claim involves fraud, Dexia must have alleged its claim "with particularity" to survive a motion to dismiss. Fed. R. Civ. P. 9(b).

The parties debate how much information is required to satisfy the federal pleading requirements of Rule 9(b). Dexia points to two recent cases which held that there is no need to allege overt acts or particular facts satisfying the elements of conspiracy to withstand a motion to dismiss. *See Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002); *Hoskins v. Polestra*, 320 F.3d 761, 764 (7th Cir. 2003). Neither of those cases involved conspiracy to defraud. *Walker* dealt with a conspiracy to keep prisoners in jail beyond their mandatory release dates. 288 F.3d at 1007. *Hoskins* dealt with a conspiracy by state actors to violate the plaintiff's rights. 320 F.3d at 763. These cases are inapplicable here because

---

[8] EPC and PGR assert without authority that we should ignore Dexia's unjust enrichment claim and instead treat is as a claim for fraudulent conveyance. We decline to do so.

15

neither deals with the more stringent pleading requirements of Rule 9(b) and thus do not overrule a much longer line of cases that require more particularized pleading in conspiracy to defraud cases. *See, e.g., Dugan v. Terzakis*, --F.Supp.2d--, 2003 WL 21780968 (N.D. Ill. 2003).

Nonetheless, Dexia's pleadings are sufficient, even under 9(b), to state a claim for conspiracy to defraud. Although Rule 9(b) is more stringent than the general pleading requirements of Rule 8 (which requires only that the defendant be given notice of the nature of the claims), it is to be read liberally and only requires "slightly more" than notice pleading. *Tomera v. Gault*, 511 F.2d 504, 508 (7th Cir. 1975). The plaintiff need only provide a brief sketch of the "who, what, when, where, and how" of the fraudulent scheme. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

The recent case of *Dugan v. Terzakis* provides guidance on 9(b)'s requirements in the context of a conspiracy claim. There the court cited three reasons for its decision that the plaintiff had satisfied 9(b)'s more stringent pleading standard. --F.Supp.2d--, 2003 WL 21780968, *3-4 (N.D. Ill. 2003). First, the court found that the plaintiffs had sufficiently alleged the defendant's role in the alleged fraudulent scheme. *Id.* at *3. Here, Dexia alleges that EPC and PGR, under the control of Rogan, served as a conduit to funnel money out of Edgewater. Dexia provides details about when and how EPC and PGR accepted rent payments with the knowledge that they were exorbitant, and how and when it coerced Edgewater to pay for property taxes and land improvements.[9] These allegations provide a sufficient indication of EPC and PGR's role in a fraudulent scheme.

---

[9]We are less clear on what role EPC and PGR played in forcing Edgewater to decline to exercise its option to purchase PGR. In order to prevail on the theory that EPC and PGR conspired to cause Edgewater to fail to exercise the option, Dexia will need to allege more sufficient facts of EPC and PGR's role in this scheme. Since EPC and PGR have made sufficient allegations regarding the rent payments, however, this failure regarding the options does not lead us to dismiss the conspiracy claim.

16

Second, the court in *Dugan* concluded that the plaintiff's complaint complied with the overall purposes of Rule 9(b), which are to protect defendants from the harm of false accusations, minimize "fishing expeditions," and provide defendants with adequate notice. *Id.* at *3. The court pointed to the fact that the complaint made over one hundred factual allegations and that it provided evidence of a "sufficient preliminary investigation" to ensure that the plaintiff's claims were meritorious. *Id.* Likewise, Dexia has provided us with a 60 page complaint detailing EPC and PGR's corporate structure, the dates of its dealings with the other defendants, and information about an elaborate scheme to take money out of Edgewater. This is more than adequate information for us to ensure that Dexia is not simply trying to harm the reputation of EPC and PGR or engage in a fishing expedition.

Finally, the *Dugan* court noted that even though the complaint in that case lumped multiple defendants together, the plaintiff had alleged "substantial overlapping ownership among the entities" to overcome the general requirement that a complaint must make allegations about each defendant separately. *Id.* at *4. Similarly, EPC and PGR argue that the complaint is insufficient because Dexia lumps all of the defendants together and does not specify what role EPC and PGR played in the conspiracy. Yet the crux of Dexia's complaint is that all of the entities involved in this case are owned and controlled by one defendant, Rogan, and that they are in essence all one entity under his complete dominance. If we assume that to be true (which, for the purposes of a motion to dismiss we must), then it is virtually impossible for Dexia to plead separate acts of each of the defendants, for a corporation may only act through the people who control it.

Thus, accepting the reasoning of the *Dugan* case, we find that Dexia has sufficiently alleged that EPC and PGR were involved in a civil conspiracy. We therefore deny EPC and PGR's motion to dismiss with respect to Count X.

## III. CONCLUSION

For the foregoing reasons, we grant EPC and PGR's motion with regard to Count III and deny it with regard to Counts V, VII, IX, and X. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 10/10/03