## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **DEXIA CRÉDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | **Civil Action No. 02 C 8288** |
| ) | |
| **PETER G. ROGAN,** ) | |
| **BRADDOCK MANAGEMENT, L.P.,** ) | **Honorable Mark Filip** |
| **a California Limited Partnership,** ) | |
| **BAINBRIDGE MANAGEMENT, L.P.,** ) | **Mag. Judge Sidney I. Schenkier** |
| **f/k/a BRADDOCK MANAGEMENT, L.P.,** ) | |
| **an Illinois Limited Partnership,** ) | |
| **BAINBRIDGE MANAGEMENT, INC.,** ) | |
| **f/k/a BRADDOCK MANAGEMENT, INC.,** ) | |
| **f/k/a WALDO POINT MANAGEMENT.** ) | |
| ) | |
| **Defendants.** ) | |

DOCKETED

NOV 1 5 2004

### SECOND AMENDED COMPLAINT

Plaintiff Dexia Crédit Local (formerly known as Dexia Public Finance Bank and

Crédit Local de France) ("Dexia"), for its second amended complaint against Defendants Peter

Rogan, Braddock Management, L.P., a California Limited Partnership ("Braddock"), Bainbridge

Management, L.P., f/k/a Braddock Management, L.P., an Illinois Limited Partnership

("Bainbridge"), Bainbridge Management, Inc. ("Bainbridge, Inc."), f/k/a Braddock Management,

Inc., f/k/a Waldo Point Management (collectively "Defendants"), alleges as follows:

### Introduction

1.    From at least in or about 1998 and continuing until at least in or about 2001,

Defendant Peter Rogan knowingly, intentionally, and recklessly participated in a scheme and

artifice to defraud Dexia by misleading Dexia as to the financial operations at Northside

Operating Company (d/b/a Edgewater Medical Center) ("Edgewater Medical Center" "EMC" or

"Edgewater"), to wit, leading Dexia and its employees to believe that Edgewater Medical

Center's revenues came from legitimate hospital operations, when in truth substantial portions of

Edgewater's revenues derived from a massive healthcare fraud scheme. The other Defendants,

together with others including Roger Ehmen ("Ehmen"), assisted Rogan to mislead Dexia and to

profit personally from the deception. Because of the conduct of Rogan, Ehmen, Braddock,

Bainbridge, and Bainbridge, Inc., Dexia has suffered injuries in excess of $56,000,000.

2.      Rogan, Braddock, Bainbridge, and Bainbridge, Inc. directly and through others

knowingly, intentionally, and recklessly prepared and caused to be prepared false and fraudulent

financial statements and other information relating to the finances of Edgewater Medical Center.

Rogan knew, should have known, or recklessly disregarded information that the Edgewater

financial statements and other financial information that Rogan and the Defendants provided and

caused to be provided to Dexia during the time period relevant to this case would be and were

materially false and misleading by failing to disclose that: (i) EMC's operations included a

massive healthcare fraud scheme against the Medicare and Medicaid programs and private

insurance companies; and (ii) over $13,000,000 of Edgewater's revenues derived from that

scheme to defraud the Medicare and Medicaid programs.

3.      In or about 2001 and 2002, Roger Ehmen and a number of doctors on the staff of

Edgewater Medical Center pled guilty to federal felony charges that, in conjunction with

Rogan's hospital management firms, Braddock and Bainbridge, Ehmen and the doctors

perpetrated a massive scheme to defraud Medicare and Medicaid through the operations of

Edgewater.

4.      On or about January 15, 2003, Braddock and Bainbridge pled guilty to federal

health care fraud charges of using Edgewater to operate a scheme to defraud Medicare and

2

Medicaid out of approximately $13,644,598. Upon information and belief, as President and sole owner (through the Peter G. Rogan Revocable Trust) of Bainbridge, Inc., Rogan caused Braddock and Bainbridge to enter into their respective plea agreements and to plead guilty.

5.     Rogan, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly gave and caused to be given to Dexia the false and misleading financial statements and other information regarding Edgewater to induce Dexia to issue a letter of credit totaling approximately $56,000,000.00 for the benefit of Edgewater. Dexia reasonably relied upon these financial statements and other information regarding Edgewater in agreeing to issue the letter of credit. In particular, Dexia was aware that a substantial portion of Edgewater's revenues came through the Medicare and Medicaid programs. If the aforementioned Defendants had provided Dexia with true and complete information on Edgewater, including disclosing that a portion of Edgewater's revenue derived from a fraud scheme against Medicare, Medicaid, and private insurance companies, Dexia never would have agreed to issue and would never have issued the letter of credit.

6.     After Dexia issued the letter of credit on behalf of Edgewater, Rogan, Braddock, Bainbridge, and Bainbridge, Inc. knowingly, intentionally, or recklessly advanced their scheme by acting to lull Dexia into a false sense of security, sending and causing to be sent to Dexia false and misleading financial statements and reports and other information regarding Edgewater's financial viability, prospects, and operations. For example, Defendants routinely provided Dexia financial statements that failed to disclose the ongoing fraud scheme against Medicare and Medicaid. Rogan, Braddock, Bainbridge, and Bainbridge, Inc. also omitted and concealed substantial material information to induce Dexia to refrain from protecting itself by exercising its contractual rights under its reimbursement and credit agreements with Edgewater, thereby

3

allowing Defendants to pillage Edgewater of the collateral Defendants had caused Edgewater to post to secure Dexia's letter of credit. For example, Defendants actively concealed from Dexia important information relating to the nature and scope of the federal grand jury investigation by inter alia the Federal Bureau of Investigation and the United States Attorney's Office of health care fraud at Edgewater, i.e., that Edgewater and the hospital's officers were targets of that investigation.

7.    Had Defendants not engaged in this lulling and concealment, Dexia would have learned that Edgewater, Defendants, and many doctors on the staff at Edgewater were the focus of the federal grand jury investigation. This information would have provided notice that it was quite possible that the Edgewater's financial statements, financial information and other operating information that Defendants provided Dexia were false and that Edgewater's operations may have been tainted by fraud against Medicaid and Medicare. If Defendants had not concealed this and other material information from Dexia, Dexia immediately would have acted to protect itself from that fraud scheme, reported the matter to the authorities, and prevented Defendants from continuing their scheme to defraud. If Defendants had disclosed that any portion of Edgewater's revenues had come through fraud against Medicare or Medicaid, Dexia would have immediately taken steps to protect its interests and avoid or limit its losses.

8.    Rogan and all of the other Defendants along with other individuals who were responsible for protecting and preserving the remaining assets of Edgewater, failed to do so. Rogan and Ehmen, Braddock, Bainbridge, and Bainbridge, Inc. pillaged and squandered Edgewater of assets consisting of Dexia's collateral. Defendants directly or indirectly diverted those assets to Rogan personally and to Braddock, Bainbridge, and Bainbridge, Inc. In so doing, Defendants used a substantial portion of Edgewater's resources to benefit Rogan, Braddock,

4

Bainbridge, and Bainbridge, Inc. at the expense of the operational and financial health of

Edgewater. These misapplications of Edgewater assets breached the fiduciary duty that Rogan,

Ehmen and other individuals owed to Edgewater and Dexia. This activity also caused the

collateral supporting the letters of credit to waste away.

     9.    Rogan with Braddock, Bainbridge, and Bainbridge, Inc. knowingly, intentionally,

and recklessly siphoned enormous portions of Edgewater's finances away from Edgewater by

causing Edgewater to enter into a variety of fraudulent "Management Agreements," with

Braddock and Bainbridge under which Edgewater paid Rogan, Braddock and Bainbridge

millions of dollars in fees.

     10.    Rogan, Braddock, Bainbridge and Bainbridge Inc. represented in the Management

Agreements that Braddock, and Bainbridge would operate as a fiduciary of Edgewater in the

execution of all of their duties under the Management Agreements.

     11.    At the time Rogan, Braddock, Bainbridge and Bainbridge Inc. knowingly,

intentionally, and recklessly entered into the foregoing Management Agreements, Rogan,

Braddock, Bainbridge and Bainbridge Inc. knew and had reason to know that those agreements

contained material misrepresentations including that Braddock, and Bainbridge would uphold a

fiduciary responsibility toward Edgewater. Rogan, Braddock, Bainbridge and Bainbridge Inc.

knew and had reason to know that Braddock, and Bainbridge would and did: (a) use Edgewater

to perpetrate a massive scheme to defraud Medicare and Medicaid of more than $13 million; and

(b) make (and provide to Dexia) numerous false and misleading financial records for Edgewater

and other representations which fraudulently failed to disclose the existence of the healthcare

fraud scheme referenced above.

12.     Rogan, Braddock, Bainbridge, and Bainbridge Inc. gave and caused to be given copies of each Management Agreement to Dexia, intending for Dexia to rely upon the terms therein, including the foregoing fiduciary representations. Defendants encouraged Dexia's employees to believe that Rogan, Braddock and Bainbridge were responsible for Dexia's financial success and that the continued presence and participation of those Defendants was essential to Edgewater's continued success. Defendants failed to disclose the fact that a substantial portion of Edgewater's success derived from the healthcare fraud scheme referenced above.

13.     At the time Rogan, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly provided copies of the foregoing Management Agreements to Dexia, those Defendants knew, had reason to know, or recklessly disregarded that Rogan, Braddock, and Bainbridge would not and did not fulfill their fiduciary responsibilities and many of their other responsibilities under the Management Agreements.

14.     By paying Braddock and Bainbridge millions of dollars in management fees and other compensation, Defendants advanced the healthcare fraud scheme to unjustly enrich Rogan, Braddock, Bainbridge, and Bainbridge Inc. at the expense of Edgewater and Dexia. This activity also caused the assets of Edgewater to waste away.

15.     After the government finally discovered and revealed the fraudulent conduct Braddock and Bainbridge perpetrated at Edgewater, Medicare/Medicaid suspended payments to Edgewater, cutting off this source of fraudulently-obtained revenue from Defendants, whereupon Edgewater almost immediately closed. This caused Dexia's letters of credit to be drawn upon, which required Dexia to pay approximately $56,000,000 on Edgewater's behalf. The collateral that Rogan, Braddock and Bainbridge Inc. caused Edgewater to post as security for the letter of

credit is greatly inadequate to reimburse Dexia for its loss, causing Dexia to lose tens of millions of dollars. Rogan and the other Defendants pillaged and squandered vast amounts of that collateral as part of their scheme to defraud.

## Jurisdiction and Venue

16.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332. The amount of the matter in controversy exceeds $75,000, the plaintiff is a foreign corporation, and the Defendants are citizens of Illinois, Indiana, and California.

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a). Many of the Defendants reside in this judicial district and a substantial part of the events and omissions giving rise to the claims in this complaint occurred in this judicial district.

## Parties

18.     Plaintiff Dexia is a bank with its principal offices located in Paris, France, and is a specialized financial corporation organized under the laws of France. It conducts operations in the United States through its New York Agency, which is licensed under the laws of the State of New York as an unincorporated agency of Dexia.

19.     Defendant Peter G. Rogan ("Rogan") is a citizen and resident of the State of Indiana. During the events referenced in this Complaint, Rogan controlled directly and indirectly the management and operations of Edgewater, including all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of the hospital. Rogan did this by: his personal involvement in that management, his direct or indirect ownership control of the commercial entities that managed Edgewater, and his domination of the boards of directors of Edgewater (f/k/a Northside Operating Company), Access Community Health Services, Inc., and Vital Community Health Services, Inc. Rogan held the position of Chief Executive Officer of Edgewater from 1994-1997, and after this time held himself out as a person

7

in control of Edgewater (e.g., signing documents as CEO or President of Edgewater). From on or about December 1997, Joanne A. Skvarek ("Skvarek"), acted as the Chief Executive Officer of Edgewater. Rogan directly and indirectly controlled Skvarek; Skvarek was an employee of Rogan's management companies, Braddock and Bainbridge, had worked for Rogan before he became involved with Edgewater, and has been an employee of Bainbridge Inc. from 2002-present. From December 2000, Clarence Nagelvoort ("Nagelvoort"), was the Chief Executive Officer of Edgewater. Rogan directly and indirectly controlled Nagelvoort, who was an employee of Rogan's management companies, Braddock and Bainbridge.

20. Defendant Braddock Management L.P. ("Braddock") is a California limited partnership that from on or before August 17, 1994 and continuing until in or about March 2000 had management contracts with Edgewater. These contracts provided not only that Defendant Braddock would act as the exclusive manager of the day-to-day operations of Edgewater, but also that Defendant Braddock would supervise and manage all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of Edgewater. Rogan controlled Braddock as it President. From in or about August 17, 1994 through on or about October 1998, the general partner of Braddock was Waldo Point Management, which Rogan controlled as its President and through a power of attorney. On or about October 22, 1998, Bainbridge Management, Inc. (f/k/a Braddock Management, Inc.) replaced Waldo Point Management as the general partner of Braddock through a purchase of all of Waldo Point's stock and continued in that capacity until at least in or about May 2002. During the events referenced in this Complaint, (a) Bainbridge Management, Inc., which owns 1% of Braddock and is its sole general partner, operated, controlled, and had full, exclusive, and complete discretion in the management and control of the business and affairs of Braddock and made all decisions affecting

8

Braddock's business and affairs; and (b) Boulevard Management Limited, which owns 99% of

Braddock, was Braddock's sole limited partner. Rogan controlled all of these entities.

21.     Defendant Bainbridge Management L.P. ("Bainbridge"), f/k/a Braddock

Management L.P. (Illinois), is an Illinois limited partnership that from in or about March 2000

and continuing until in or about May 2001 had management contracts with Edgewater.

Bainbridge bought out Braddock's contract with Edgewater effective in or about March 2000,

resulting in Bainbridge acting as the exclusive manager of the day-to-day operations of

Edgewater, and Defendant Bainbridge supervising and managing all billings, collections, cost

reporting and other financial matters related to the day-to-day operations of Edgewater. In

March 2000, Rogan controlled both Braddock and Bainbridge. During the events referenced in

this Complaint, (a) Bainbridge Management, Inc., which owns 1% of Bainbridge and is its sole

general partner, operated, controlled, and had full, exclusive, and complete discretion in the

management and control of the business and affairs of Bainbridge and made all decisions

affecting Bainbridge's business and affairs; and (b) Boulevard Investors Limited, which owns

99% of Bainbridge, was Bainbridge's sole limited partner and had no control over Bainbridge's

business.

22.     Defendant Bainbridge Management, Inc. ("Bainbridge Inc."), formerly known as

Braddock Management, Inc., is an Illinois corporation that, at all times relevant herein, Rogan

controlled as its president and sole director. The Peter G. Rogan Revocable Trust is the sole

owner of Bainbridge Inc. Rogan possesses sole control and is the sole trustee of the Peter G.

Rogan Revocable Trust.

23.     During the events referenced in this Complaint, Rogan controlled directly and

indirectly Braddock, Bainbridge, and Bainbridge Inc. There was such a unity of interest and

ownership between and among these entities and between Rogan and these entities that as a practical matter separateness no longer existed between them. These entities functioned as alter egos of each other and of Rogan. Rogan and each of these entities should be held liable for any judgment in this case because Rogan created and caused to be created and manipulated these entities and their assets for his own personal uses.

### Non-Parties

24.     Roger Ehmen ("Ehmen") is a citizen of the State of Illinois and a resident of the Oxford FCI Federal prison in Grand Marsh, Wisconsin. During the period of the events referenced in this Complaint, Ehmen was a Senior Vice President of Edgewater. Rogan directly and indirectly controlled Ehmen, who was an employee of Rogan's management companies, Braddock (1995-9/30/00) and Bainbridge (9/30/00-2001), and had worked for Rogan when Rogan owned Edgewater. Having pled guilty to healthcare fraud charges for using Edgewater to operate a widespread scheme to defraud Medicare and Medicaid, Ehmen is currently in federal prison serving a sentence on those charges. On June 7, 2004, the Court in this action entered a default judgment against Ehmen.

Defendant Rogan's Control and Domination of Edgewater Hospital

25.     Founded in 1929, Edgewater Hospital was a family-owned hospital in 1989, when Rogan purchased it for $1 million plus the assumption of the hospital's debts. As part of his plan to acquire the hospital in 1989, Rogan created a corporation called Edgewater Operating Company ("EOC") to operate the hospital, and a corporation called Edgewater Property Company ("EPC") to acquire the hospital's real property consisting of nine buildings, a parking structure, and several vacant or partially vacant lots. Following EPC's 1989 acquisition of the

hospital facility and certain contiguous and proximate properties, EPC leased these properties to EOC.

26.     Rogan was, through his wholly-owned entities, EOC and EPC, the beneficial owner and operator of Edgewater Hospital from 1989 until he purported to sell the hospital to Northside Operating Company ("Northside") (d/b/a Edgewater Medical Center) in 1994 for approximately $34 million.

27.     Rogan effected this purported sale through a multi-step process. First, Rogan caused EPC to separate off certain assets EPC had acquired in Rogan's original hospital purchase in 1989, i.e., three hospital buildings (and underground passageways) and a parking structure, and caused that property to be sent (via several intermediary steps) to EOC. This was the property that Rogan then caused EOC to sell to Northside, which thus became the Edgewater-owned portion of the Hospital (hereinafter the "Edgewater Property"). Then, after EPC transferred away the "Edgewater Property," Rogan sent one building – the Kane Building – and the vacant lots to another Rogan-controlled entity, PGR Properties, Inc. ("PGR"), which property became the PGR-owned portion of the hospital property (hereinafter the "PGR Property"). EPC retained and continues to own four of the buildings from Rogan's 1989 original hospital purchase (hereinafter the "EPC Property").

28.     On November 19, 1993, as President of both EOC and EPC, Rogan entered into an Agreement of Merger with Northside. EOC merged into Edgewater, thus completing the conveyance of the Edgewater Property to Edgewater. Rogan agreed to be bound in his personal capacity to several of the provisions in the Agreement of Merger. In particular, Rogan explicitly agreed to cooperate with Northside to enable Northside to procure tax-exempt financing of the

11

transactions set forth in the Agreement of Merger, so that Rogan and his entities could get paid for the purported sale of the Hospital to Northside.

29.     Edgewater Medical Center, d/b/a Northside Operating Company, is an Illinois not-for-profit corporation, organized and operated exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code.

30.     From in or about 1994 until in or about October 1998, Permian Health Care Inc., a Colorado not-for-profit corporation, was the parent holding company of Edgewater. Edgewater's Articles of Incorporation before October 1998 provided that Permian was Edgewater's sole member, and had such powers as set forth in Edgewater's bylaws. The Articles of Incorporation also stated that Edgewater's directors made up a majority of the board of directors of Permian. Edgewater's bylaws at the time provided that Permian had the right to vote only to elect and remove Edgewater's directors. The bylaws provided no other member voting rights for Permian. Upon information and belief, from in or about 1994 until in or about October 1998, Rogan controlled directly or indirectly the Board of Edgewater and the operations at Edgewater.

31.     In or about October 1998, Rogan caused Edgewater's Board to amend its bylaws to become a self-perpetuating entity, separate from Permian. Pursuant to Edgewater's amended bylaws, all policymaking powers for Edgewater were then vested in Edgewater's board, including responsibility, control and management over all the policies, properties, affairs and funds of the corporation.

32.     In or about at the latest mid-1999, Rogan learned of the existence of the substantial federal grand jury investigation referenced earlier in this Second Amended Complaint.

33.    In or about February 2000, Rogan caused Edgewater to undertake a corporate reorganization pursuant to which Edgewater became part of a parent holding company structure. The sole corporate member of Edgewater became Vital Community Health Services, Inc. ("Vital"). The sole corporate member of Vital became Access Community Health Services, Inc. ("Access"). Upon information and belief, Rogan instituted this two-level corporate governing structure in part in an attempt to insulate himself from exposure under the grand jury investigation.

34.    Following the 2000 corporate reorganization, Edgewater retained a local, advisory Board of Directors. As a practical matter, this board had no significant authority, bearing limited powers as to matters such as relating to credentialing. The corporate organization ostensibly provided decision-making authority over all significant matters pertaining to Edgewater to the Board of Directors of Vital and Access. These powers purported to include all major decisions on behalf of Edgewater, including, among other things, appointing its directors, amending its corporate documents, approving budgets, strategic plans and construction projects, approving major corporate transactions such as mergers, sale or dissolution, approving the compensation of Edgewater's managers, authorizing real estate purchases and sales, and making determinations as to whether litigation should be pursued on behalf of Edgewater. Decision-making authority regarding financial matters purported to be reserved in the Finance Committee of Access, who exercised that power on behalf of Edgewater.

35.    Although the Access, Vital, and Edgewater boards purported to be separate corporate entities, at no time following the 2000 corporate reorganization did the Access, Vital and Edgewater boards observe the requisite corporate formalities. By way of illustration, rarely – if ever – did the Access, Vital and Edgewater boards meet separately. Non-director members

of the Access Finance Committee also attended all meetings of the Access board as if they were actual directors of Access. Individual directors of Access and Vital were frequently unaware of which boards they were serving on and on behalf of which they were taking action.

36. Moreover, notwithstanding the corporate reorganization, Access and Vital and their committees did not exercise ultimate control over Edgewater. From the time Access and Vital were formed until at the earliest in or about 2001, Rogan directly and indirectly controlled, dominated, and operated Access, Vital and Edgewater. Rogan's personal attorney, John Tatooles, attended each of the meetings of the boards of Access and Vital, and kept the minutes, rather than such records being created and maintained by an officer or agent of Access, Vital, or Edgewater.

37. After the sale of Edgewater to Northside in 1994, Rogan directly and indirectly caused Edgewater and other related entities to enter into myriad lucrative management contracts with Braddock and Bainbridge (the terms of the Management Agreements are discussed in greater detail below), through which Rogan dominated the hospital's operations and siphoned millions of dollars from Edgewater, the vast majority of which consisted of the proceeds of the healthcare fraud scheme against Medicare and Medicaid.

38. Using a wide array of different forms, organizations and stratagems, Rogan attempted to create the appearance that Edgewater operated independently via the Edgewater Board of Directors from 1994-early 2000, and via Vital and Access from early 2000-2001. In reality, Rogan managed, operated, controlled, and dominated Edgewater and the Edgewater Board of Directors from 1994-early 2000, and Vital and Access and their Boards of Directors from early 2000-April 2001. Rogan also used these different forms, organizations, and stratagems to attempt to insulate himself from responsibility for the misconduct he knew was,

14

had reason to know was, or recklessly disregarded being perpetrated at and through Edgewater, and otherwise engaged in such conduct in conscious disregard of and indifference to the risk that such misconduct was being perpetrated at and through Edgewater.

39.     The boards of directors (and/or finance committees) of Edgewater, Vital, and Access consisted primarily of persons including: Wessel Bengston, B. Macon Brewer, George Chapas, Fred Cuppy, William Fruland, Roger Mays, John Mullen, David Shanahan, and George Thoma. Significantly, as described in the paragraphs below, these persons did not exercise independence from Rogan. These persons were in fact Rogan's personal friends, long-time business associates, and/or had other relationships with Rogan. As a result of the foregoing, Rogan exercised control and domination of Edgewater's board, Vital, Access and the finance committee of Access.

40.     Wessel Bengston ("Bengston"). Upon information and belief, Wessel Bengston is a long-time friend and business associate of Rogan. Bengston received substantial compensation for performing accounting services and other work for Rogan, including preparation of tax returns, administration of trust accounts associated with Rogan and his family, and via administration or business services for various Rogan-affiliated business entities. Upon information and belief, Rogan continues to refer accounting work to Bengston's son, who manages Bengston & Co., Ltd, the accounting firm with which Bengston was affiliated before he retired. Upon information and belief, Rogan caused EPC to allow Bengston personal, day-to-day use of several EPC-owned automobiles. Upon information and belief, Bengston received directors' fees, lavish trips and other perquisites for service on the board of directors for numerous other entities affiliated with EMC and Rogan, including Edgewater Grant Property Company, Edgewater Foundation, and the Chicagoland Services Foundation.

15

41. <u>B. Macon Brewer</u> ("Brewer"). Upon information and belief, B. Macon Brewer and Rogan have been friends and business associates for at least 15 years. Since 1988, Brewer has served as contingent co-trustee for the Peter Rogan Revocable Trust. Upon information and belief, the Peter Rogan Revocable Trust has received numerous transfers of funds that originated at EMC and were paid as fees to Braddock and Bainbridge. Brewer also serves as contingent co-trustee for Rogan's children's' trusts, which have received approximately 99% of the revenues EMC paid to the management companies. The Rogan children also hold ownership interests in PGR Properties, Inc, a Rogan-controlled entity. Upon information and belief, Brewer has had additional business dealings and ventures with Rogan or companies affiliated with Rogan.

42. <u>George Chapas</u> ("Chapas"). Upon information and belief, George Chapas and Rogan have been good friends and business associates for more than 20 years. Chapas has had a long-standing business relationship and economic dependence upon Peter Rogan. Upon information and belief, Chapas lived on Bainbridge Street in Schaumburg, Illinois, at the same time Rogan lived on that street. Upon information and belief, Chapas and Rogan currently own homes in Valparaiso, Indiana, where both now reside, that are located approximately 2000 feet apart. Peter Rogan invited George Chapas to serve on the Edgewater boards because of "common interests" and "common ownership interests in many entities." As a member of the Vital and Access Boards, Chapas was so subservient to Rogan as to cause witnesses to refer to him as Rogan's "puppet" on those Boards. Upon information and belief, Rogan has referred business to Chapas' company, Instructional Design Associates. Upon information and belief, Chapas' has received business revenue from and through Rogan or companies affiliated with Rogan.

43.   Fred Cuppy ("Cuppy").  Upon information and belief, Fred Cuppy co-owns residential property in Valparaiso, Indiana with Roger Mays, that is located approximately 7000 feet from Rogan's residence, and within 5000 feet of Chapas' residence.  Cuppy has received significant compensation for performing substantial legal work for Rogan and for trust accounts associated with Rogan and/or Rogan's children.  Upon information and belief, Cuppy also received significant compensation for performing legal work to create certain off-shore trusts and accounts at Rogan's request, to which a substantial quantity of EMC's funds have been transferred.  In addition, as of December 1996, Cuppy received at least one substantial personal loan from Rogan for $100,000.  Upon information and belief, Cuppy has participated in other joint business ventures with Rogan (either directly, or indirectly through individuals who are affiliated with Peter Rogan, such as Rogan's assistant, David Miller).  These ventures include, but are not limited to, Diagnostic Equipment, Inc., Computersmarts.net and certain real estate investments in Savannah, Georgia.  Cuppy serves as the Managing Director of Boulevard Investors, Ltd., Belize corporation and limited partner in the Rogan-controlled management company, Defendant Bainbridge.  On information and belief, Cuppy also is the trustee of three Belize trusts in the names of Rogan's children – Sara Caitlan Rogan, Brian Peter Rogan, and Robert Cashman Rogan – which are the sole shareholders of Boulevard Investors, Ltd.  Cuppy also is the Trustee for the Sara Caitlan Rogan Trust, the Brian Peter Rogan Trust, and the Robert Cashman Rogan Trust.  These trusts, which were created for the benefit of Rogan's children, received substantial portions of the revenues EMC paid to its Rogan-controlled management companies.  Cuppy also is named as a contingent co-trustee for the Peter Rogan Revocable Trust which received, upon information and belief, numerous transfers of funds EMC paid to the Rogan-controlled management companies.

44.  William Fruland ("Fruland").  Upon information and belief, William Fruland has been a friend and business associate of Rogan for more than 20 years.  Fruland resided in Schaumburg, Illinois, on Bainbridge Street at a time Rogan also lived there.  Upon information and belief, Fruland has had additional business dealings with Rogan or companies affiliated with Rogan.  Upon information and belief, Fruland also received directors' fees, lavish trips and other perquisites for service on the Board of Directors for other entities affiliated with EMC and Rogan, including the Chicagoland Services Support Foundation and Hope Community Health Services, Inc.

45.  Roger Mays ("Mays").  Upon information and belief, Roger Mays currently resides in Valparaiso, as do Rogan and George Chapas.  Upon information and belief, Mays co-owns residential property in Valparaiso with Cuppy, which is approximately 7000 feet from Rogan's residence, and within 5000 feet of Chapas' residence.  Rogan has paid fees to Mays in connection with "consulting" work Mays purportedly has performed on behalf of, upon information belief, a company owned by a relative of Rogan and in which Rogan owns or has owned 99% of the Class A stock, i.e., Knowlton Machine Company.  Upon information and belief, as of June 2002, Mays was employed as the Supervisor in the Service and Maintenance Department in the Burns Harbor, Indiana Division of Bethlehem Steel, and was selected for Board service not based on his qualifications, but solely because of his personal loyalty to Rogan and his willingness to vote in accordance with Rogan's wishes.  In 2000, Mays spoke on behalf of and acted for the interests of Rogan and the Rogan-controlled management companies in negotiations with Dexia.

46.  John Mullen ("Mullen").  Upon information and belief, John Mullen has received substantial compensation for real estate consulting services provided to Rogan and/or Rogan-

affiliated companies, including work relating to the development of properties next to EMC, through which Mullen stood to profit handsomely. Upon information and belief, Mullen has other business dealings with Rogan or companies affiliated with Rogan. Upon information and belief, Mullen also received directors' fees, lavish trips and other perquisites for service on the Board of Directors for numerous other entities affiliated with EMC and Rogan, including the Edgewater Foundation, the Chicagoland Services Support Foundation, the Chicagoland Services Foundation, and Hope Community Health Services, Inc.

47.     David Shanahan ("Shanahan"). Upon information and belief, David Shanahan and Rogan have been friends and business associates for more than 20 years. Shanahan owns residential property in Longboat Key, Florida, which upon information and belief, is located less than 15 miles from Rogan's property there. Shanahan worked at Ernst & Young with Rogan early in his career.

48.     Shanahan was vice president of finance at Valuation Counselors, a company that Rogan regularly employed to provide valuation reports of EMC's equipment and other assets. Upon information and belief, Shanahan received substantial compensation for this work. In or about 1994, Valuation Counselors performed a valuation of EMC which helped Rogan get a $7 million loss on sale rebate from the government related to Medicare. At the time Rogan purported to sell EMC to Northside, Valuation Counselors also provided the valuation of the properties Rogan owned through Edgewater Property Company and PGR Properties, Inc., which were part of and essential to the EMC's operations, at the request of Rogan. Valuation Counselors also provided the valuation report of Dr. Andrew Cubria's medical practice at a time when Rogan and/or Ehmen proposed to the EMC's board that Cubria's practice be bought out. Upon information and belief, the proposed purchase of Dr. Cubria's medical practice was part of

19

an effort by the Rogan-controlled management companies and Rogan to conceal the nature of the relationship between Cubria and the management companies as part of the Medicare fraud they were then perpetrating.

49.     Shanahan's willingness to act at Rogan's direction and instruction continued even after the boards received legal advice that indictment was imminent, and that EMC should terminate the management companies. After receiving that advice, Shanahan continued to act to benefit Rogan at the expense of EMC.

50.     On repeated occasions, Shanahan called EMC personnel, minutes after speaking with Rogan, to demand that Rogan's management companies receive immediate payment of hundreds of thousands of dollars in supposedly outstanding management fees. Such orders were contrary to the best interests of EMC, which was then in increasing financial peril.

51.     In or about October 2001, Shanahan instructed EMC employees to withhold information from McDermott, Will & Emory, EMC's attorneys at the time, and excluded counsel from board of directors' meetings. At or about that time, McDermott resigned.

52.     Upon information and belief, Shanahan received almost $36,000 in direct payments from EMC in the timeframe between March 2001 to November 2001 alone. Upon information and belief, Shanahan has other business dealings with Rogan or companies affiliated with Rogan. Upon information and belief, Shanahan also received directors' fees, lavish trips and other perquisites for service on the board of directors for numerous other entities affiliated with EMC and Rogan, including Edgewater Grant Property Company, the Edgewater Foundation, and the Chicagoland Services Support Foundation.

53.     George Thoma ("Thoma"). Upon information and belief, George Thoma and Rogan have been friends and business associates for over 10 years. Thoma worked with Rogan,

and served on the board of EMC with Rogan before Rogan's purported 1994 sale of EMC to

Northside Operating Co. Thoma served as President of Chicagoland Medical Associates, PC,

which borrowed money from the Rogan-controlled management companies, and had a

Management Agreement with the Rogan-controlled management companies until the company's

voluntary dissolution in or about September 2001. Upon information and belief, Thoma also

received directors' fees, lavish trips and other perquisites for service on the board of directors for

numerous other entities affiliated with EMC and Rogan, including the Edgewater Foundation,

the Chicagoland Services Support Foundation, the Chicagoland Services Foundation, and Hope

Community Health Services, Inc.

      54.     Rogan finally lost control of Edgewater in 2001, only as a result of supreme

pressure being placed upon the individuals Rogan had earlier hand-selected to serve on the Board

of Directors of Vital and Access. At or about that time, the federal grand jury investigation into

the operations at Edgewater led to notification that the United States Attorney's Office was

seriously considering asking the grand jury to indict Edgewater. Furthermore, also at or about

that time, Edgewater's primary secured creditor, Dexia, notified Edgewater that events of default

had occurred in relation to Edgewater's financial performance. As a result of these events,

among others, representatives from Dexia met with the Board of Directors of Access and Vital

and demanded Rogan's ouster.

## The Doctors

      55.     Throughout the time relevant to this case, Ravi Barnabas, M.D. ("Dr. Barnabas")

was a licensed internist who admitted patients to Edgewater and acted as an attending physician

for patients at Edgewater. Dr. Barnabas had contracts with Edgewater for a medical directorship

as well as physician recruitment, both of which Ehmen signed.

21

56.     Throughout the time relevant to this case, Sheshiqiri Rao Vavilikolanu, M.D. ("Dr. Rao") was a licensed internist and anesthesiologist who operated a clinic on the south side of Chicago and who referred patients to Edgewater. Two companies Dr. Rao owned - Rao M.D., S.C. and Florascribe, Inc. – had service agreements with Edgewater. Acting in concert with the other Defendants in this case, Ehmen signed those service agreements on behalf of Edgewater.

57.     Throughout the time relevant to this case, Kumar Kaliana, M.D. ("Dr. Kumar") was a licensed internist who referred patients to Edgewater.

58.     Throughout the time relevant to this case, Andrew Cubria, M.D. ("Dr. Cubria") was a licensed cardiologist who had a medical clinic at Edgewater.

## The Fraud upon Medicare, Medicaid, and Private Insurance Companies

## Legal Framework

59.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395c-1395I-4.

60.     HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

61.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

62. As detailed below, Defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

63. To assist in the administration of Medicare Part A., CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.

64. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

65. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a From UB-92.

66. As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

67. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(l). Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

68. At all times relevant to this Complaint, Medicare rules and regulations required Edgewater Hospital to submit annually a hospital cost report to the fiscal intermediary.

69. During the relevant time period, Medicare payments for hospital services were determined by the claims the provider submitted for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments Medicare made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

70. Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit Edgewater's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right included the right to make retroactive adjustments to hospital cost reports that a provider previously submitted if any overpayments have been made. 42 C.F.R. § 413.64(f).

71. Every hospital cost report contains a "Certification" that the provider's chief administrator or responsible designee must sign.

72. At all times relevant to this complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

73.   At all times relevant to this complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

74.   Thus, the provider had to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider, and (4) compliant with the Stark Statute and not infected by kickbacks in relation to the services referenced in the cost report.

75.   A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever...having knowledge of the occurrence of any event affecting (a) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a...concealment or failure...be guilty of a felony.

76.   Edgewater Hospital submitted cost reports at all times material to this Complaint. Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Kenneth W. Huff, vice president of finance to submit and sign the cost reports, which attested, among other things, to the certification quoted above.

25

77.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching fluids and ensuring that states comply with minimum standards in the administration of the program.

78.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

79.     Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

80.     In Illinois, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Illinois Department of Public Aid for payment.

### The Healthcare Fraud

81.     Rogan, Ehmen, Braddock, Bainbridge, and Bainbridge Inc., along with the above-referenced physicians and others, knowingly, intentionally and recklessly defrauded the federal government and the State of Illinois, through the Medicare and Medicaid programs, by submitting and causing to be submitted false and fraudulent claims for reimbursement and cost reports.

82.     On or about May 17, 2001, a federal grand jury indicted Braddock, Bainbridge, and Ehmen for, among other things, "devising and participating in a scheme to defraud healthcare providers ... in violation of 18 U.S.C. §§ 1341 and 1347."

83.     On or about January 15, 2003, Braddock and Bainbridge pled guilty to federal felony charges that they used Edgewater to operate a scheme to defraud Medicare and Medicaid out of approximately $13,644,598. Upon information and belief, as President and sole owner

(through the Peter G. Rogan Revocable Trust) of Bainbridge, Inc., Rogan caused Braddock and Bainbridge to enter into their respective plea agreements and to plead guilty.

84.    In pleading guilty to the federal felony charges, i.e., health care fraud in violation of 18 U.S.C. § 1347, Braddock and Bainbridge (upon Rogan's direction) admitted that, from in or about 1995 and continuing until approximately in or about December 2000, Braddock and Bainbridge, in conjunction with Ehmen and others, devised and intended to devise and participate in a scheme to defraud and obtain money and property from Medicare, Medicaid and private insurance companies by means of materially false and fraudulent pretenses, representations and promises, including without limitation the following:

a)    causing Edgewater to make payments and kickbacks to certain doctors and other individuals in exchange for patient referrals and concealing these payments and kickbacks by creating contracts and other instrumentalities that created the false impression that the payments and kickbacks were for legitimate services;

b)    concealing and causing others to conceal from Edgewater that doctors receiving the payments and kickbacks were recruiting patients by giving patients cash and/or other benefits and promising these patients that hospital services would cost the patients nothing;

c)    coaching and causing others to coach patients to lie about their physical condition;

d)    lying and causing others to lie to patients regarding their need for hospitalization;

e)    admitting and causing others to admit patients to Edgewater who did not need to be admitted to Edgewater for any medically necessary reason;

f)    performing and causing others to perform medically unnecessary procedures and testing on certain patients;

g)    creating and causing others to create false records to justify and support claims submitted to insurers, including false medical and business records;

h)    submitting and causing others to submit false and fraudulent claims to Medicare, Medicaid, and private health insurers fraudulently seeking compensation for medically unnecessary admissions, services, procedures and testing, and for services rendered to patients who were referred to Edgewater in exchange for kickbacks; and

i)    submitting and causing others to submit cost reports to Medicare that falsely represented that services provided by Edgewater were provided in compliance with the laws and regulations regarding the provision of health care services.

85.     By the scheme described above, Braddock and Bainbridge have admitted that they caused Medicare and CMS to be fraudulently billed and to lose approximately $13,644,598.

86.     On or about October 1, 2001, Ehmen pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. At his sentencing, Ehmen admitted directly and through his attorney that he was in fact guilty and that he was responsible for working with Rogan and a number of doctors to perpetrate a scheme to defraud Medicare, Medicaid, and other insurers. Ehmen, through his attorney, stated unequivocally that Rogan was the chief leader and organizer of the scheme, and that Ehmen served merely as a manager carrying out the orders of Rogan. Among the ways in which he and Rogan perpetrated this scheme, Rogan and Ehmen directly and indirectly: submitted and caused others to submit false and fraudulent billing information to Medicare, Medicaid, and other insurers; caused doctors to perform a large number of medically unnecessary procedures to generate fees for Edgewater; and paid and caused others to pay bribes and kickbacks to doctors to cause them to admit patients to Edgewater irrespective of the patients' need for medical care. Through his lawyer, Ehmen stated that in the cases of two Edgewater doctors, i.e., Drs. Barnabas and Rao, Rogan finalized the contours of the kickback arrangements with those doctors and then sent them to Ehmen to get contracts drafted. On November 28, 2001, Ehmen was sentenced to 78 months' incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

87.     On May 24, 2001, Dr. Kumar pled guilty to Counts One and Nine of the indictment relating to the doctor's acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid. In so doing, Dr. Kumar admitted that from no later than October 1996 and continuing at least until September 1998, he: (a) and Braddock, Ehmen, Dr. Barnabas and Dr. Rao devised and participated in a scheme to

28

defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, and by means of material omissions, and to deprive patients of the intangible right of honest services; and (b) knowingly and willfully executed and attempted to execute a scheme to defraud healthcare benefit programs, including Medicare, Medicaid, and private insurance plans. Specifically, Dr. Kumar admitted that he: (a) received cash kickbacks from Ehmen, Braddock, and Drs. Rao and Branabas in exchange for sending patients to Edgewater; (b) along with Ehmen, Braddock, and Dr. Rao caused patients to Edgewater for admission, knowing that those patients did not need hospitalization; and (c) arranging to have the cash kickbacks paid to family members in order to conceal the payments. On October 10, 2001, Dr. Kumar was sentenced to 16 months' incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $1,156,000 to Medicare and Medicaid.

88.     On May 24, 2001, Dr. Rao pled guilty to Count 57 of the indictment, on racketeering under 18 U.S.C. § 1962. In his guilty plea, Dr. Rao admitted that he, along with Braddock and Bainbridge, Ehmen, Drs. Barnabas and Kumar, and others, were members an associated of an enterprise that engaged in a scheme to defraud Medicare, Medicaid, and certain private insurers and to deprive Edgewater patients of their doctors' honest services by inter alia: (a) hospitalizing and causing others to hospitalize patients that did not need hospitalization; (b) performing and causing others to perform medically unnecessary procedures; (c) giving and causing others to give kickbacks to doctors and others in exchange for patient admissions; (d) creating and causing others to create false records to support claims submitted to insurers; and (e) submitting and causing others to submit Cost Reports to Medicare knowing that the reports contained false statements. On October 10, 2001, Dr. Rao was sentenced to 35 months of

29

incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $6 million to Medicare and Medicaid.

89.     On October 1, 2001, Dr. Barnabas pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962, as a result of his participation in the scheme to use Edgewater to defraud Medicare and Medicaid. On November 28, 2001, Dr. Barnabas was sentenced to 52 months' incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $100,000 to Medicare and Medicaid. On March 27, 2003, Dr. Barnabas sentence was reduced to 46 months' incarceration.

90.     On February 8, 2002, Dr. Cubria pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty, Dr. Cubria admitted that he was guilty of racketeering, which included that he and others engaged in a pattern of racketeering activity made up of a pattern of acts of mail and wire fraud, that were separate and continuous through an enterprise engaged in interstate commerce. More specifically, Dr. Cubria admitted that he took numerous actions to increase Edgewater's revenues by obtaining revenues from Medicare, Medicaid and other insurers through a scheme and artifice to defraud and obtain money through false and fraudulent pretenses representations, and promises. In this respect, Dr. Cubria admitted that he acted in conjunction with a number of individuals, including Ehmen, Defendants Braddock, Bainbridge and Bainbridge Inc., Drs. Barnabas, Rao, and Kumar, and an individual identified only as "Person A." On information and belief, "Person A" is Defendant Rogan. Dr. Cubria also admitted that the false and fraudulent activities of himself, Ehmen, and "Person A" (on information and belief, Rogan) included obtaining revenues from Medicare, Medicaid and other insurers by: (i) performing hundreds of medically unnecessary tests and procedures (at least half of the procedures he performed) to generate fees for Edgewater and himself; (ii) in

30

January 1999 and April 2000, performing medically unnecessary angioplasties upon two patients, each of whom died as a result of the unnecessary procedures, after which Dr. Cubria specifically admitted that Ehmen and "Person A" (on information and belief, Rogan) encouraged him to continue to perform additional unnecessary angioplasties despite the two patients' deaths; (iii) receiving financial payments and benefits from Edgewater ("kickbacks and bribes") to exchange for patient admissions, many of which involved patients that did not need medical treatment; and (iv) making false entries on medical records and bills and on submissions to Medicare, Medicaid, and other insurers either to obtain revenue for Edgewater, himself, and others or to conceal the foregoing racketeering activity. Dr. Cubria admitted that he and others did these things so as to conduct the affairs of Edgewater through a pattern of racketeering activity. On June 28, 2002, a federal district judge in Chicago sentenced Dr. Cubria to 12 ½ years' incarceration and, thereafter, two years of supervised release, and ordered him to pay restitution of $14,362,499 million to Medicare and Medicaid.

### Kickbacks to Doctors, including Drs. Rao and Kumar

91. In or about the early 1990s, Dr. Barnabas observed Rogan and Ehmen solicit another doctor to come to Edgewater by agreeing to compensate that doctor for admitting patients at Edgewater.

92. Among other things, in or about October 1996, Rogan met with Drs. Rao and Barnabas to offer to pay them money for admitting patients at Edgewater.

93. In or about October 1996, Rogan met with Dr. Rao and set-up an arrangement by which Rogan would cause Dr. Rao to be paid for the patients he admitted to Edgewater and for Dr. Rao to provide anesthesia services at Edgewater. In return, Dr. Rao agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment or for detoxification treatment.

31

94.     In or about October 1996, Roger Ehmen met with Dr. Rao to put together contract terms covering a portion of that arrangement.

95.     In or about April 1997, Rogan, Ehmen, Braddock gave or caused others to give Dr. Rao's company, Rao, M.D., S.C., a contract that enabled him to bill for all anesthesia services provided at the hospital, in return for patient admissions by Dr. Rao to Edgewater.

96.     Between in or about May 1997 and in or about May 1998, Rogan, Ehmen, Braddock and Bainbridge Inc. paid and caused others to pay Rao, M.D., S.C. approximately $15,000 per month, for a total of more than $200,000, in exchange for Dr. Rao causing patients to be admitted to Edgewater.  Dr. Rao used $156,000 of those funds to pay Dr. Kumar for patients Dr. Kumar sent to Edgewater.  Between in or about May 1997 and in or about June 1998, Dr. Kumar referred approximately 20 to 30 patients per month to Edgewater.  Dr. Rao also paid patient recruiters to refer patients to Edgewater and sent patients from his clinic to Edgewater.

97.     In or about October 1996, Rogan met with Dr. Barnabas and set-up an arrangement by which Rogan would cause Dr. Barnabas to be paid for the patients he admitted to Edgewater.  In return, Dr. Barnabas agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment.

98.     In or about October 1996, Ehmen met with Dr. Barnabas to put together contract terms covering a portion of that arrangement.

99.     On or about November 14, 1997, Rogan, Ehmen, Braddock and Bainbridge Inc., working with Dr. Barnabas, gave and caused others to give a sham contract to Dr. Rao's company, Florascribe, to conceal Edgewater's payments to Dr. Rao for patient referrals and admissions.  The contract stated that Florascribe would provide services for Edgewater's

32

detoxification program, including marketing and coordination of the aftercare treatment. In fact, Florascribe provided no legitimate marketing or aftercare services.

100.    Between in or about May 1997 and in or about April 1998, Rogan, Braddock, Bainbridge Inc. and Ehmen paid and caused others to pay Florascribe in excess of $200,000 in exchange for patient admissions. Dr. Rao used some of those funds to recruit patients to be admitted for detoxification treatment at Edgewater. Dr. Rao also referred such patients from his own clinic at Edgewater.

101.    Rogan and Ehmen were directly involved in the payment of kickbacks to the aforementioned doctors and others.

102.    After the contracts were arranged, Ehmen had repeated contacts with Dr. Rao and Dr. Kumar to advance this part of the scheme. In or about April 1998, for example, Ehmen told Drs. Rao and Barnabas that Rogan would not tolerate anything less than 25 admissions a month, as they had agreed to provide in return of the payments Rogan had agreed to make to them.

### "Recruiting" Patients

103.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. fraudulently "recruited" and caused others to "recruit" homeless individuals, substance abusers, and others to seek hospitalization at Edgewater Hospital.

104.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly admitted and caused others to admit individuals who did not meet the Medicare and Medicaid criteria for hospital admission.

105.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. gave and caused others to give certain individuals cash, cigarettes, and food in order to induce them to seek admission as patients at Edgewater, knowing that these people did not require hospitalization.

33

106.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. coached and caused others to coach these individuals to complain of chest pain, dizziness, abdominal pain, and other symptoms that would justify admission, knowing full well that these people did not have those symptoms.

107.    On or about April 10, 1998 and at other times, Ehmen repeatedly instructed Drs. Rao and Barnabas to tell Dr. Kumar that he should educate the individuals recruited to be patients as to what they should say to state a condition that would merit hospitalization. Ehmen also instructed Drs. Rao and Barnabas to coach the individuals themselves.

108.    When doctors failed to admit sufficient numbers of patients, Rogan and Ehmen, directly and indirectly, communicated to the doctors that they had to increase the number or patient admissions. If the doctors did not do this, Rogan and Ehmen fired the doctors or caused them to be fired.

109.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally and recklessly waived and caused others to waive Medicare and Medicaid co-payments for patients and failed to make any good faith effort to collect such co-payments or deductibles, repeatedly misrepresented to Medicare and Medicaid that they had made such payments, made a good faith effort to obtain such payment, and concealed that they had not done so. Rogan and Ehmen participated in this activity with Drs. Cubria, Rao, and Barnabas, among others.

### Medically Unnecessary Procedures

110.    For the purpose of fraudulently generating revenue for Edgewater, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. lied and caused physicians and others to lie to patients who were legitimately admitted to Edgewater, falsely telling the patients that they needed to be hospitalized and that they needed certain tests and procedures due to medical

34

problems, when in fact, Rogan, Ehmen, Braddock, Bainbridge, Bainbridge Inc., physicians and others knew full well that the patients did not need hospitalization or the specified tests or procedures.

111.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. caused physicians, including Dr. Cubria, to perform medical procedures on these patients, without regard to whether these procedures were medically necessary, for the purpose of fraudulently submitting bills to insurance providers, including Medicare and Medicaid, without regard to the patients' true needs. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these physicians hundreds of thousands of dollars in kickbacks to cause the physicians to perform these procedures upon patients, without regard to the patients' true needs.

112.    Rogan and Ehmen, directly and indirectly, caused Barnabas and other doctors to use Dr. Cubria on all cardiac consultations, knowing that Dr. Cubria would and did perform unnecessary cardiac catheterizations (angioplasties) to generate millions of dollars in fraudulent revenue for Edgewater.

113.    Rogan and Ehmen, directly and indirectly, hired and caused others to hire personnel to obtain patients for various hospital programs, including a home visitation process, and knew or had reason to know that the programs were admitting patients that did not need hospitalization.

114.    In or about January 1999 and April 2000, during the course of two of these procedures, both wholly unnecessary cardiac catheterizations (angioplasties), two patients died as a result of complications from the procedures.

115.    On numerous occasions, hospital personnel, including without limitation doctors responsible for medical quality control, complained to Ehmen that Dr. Cubria and others were

performing unnecessary procedures or admitting patients that did not need hospitalization. On several occasions, Ehmen responded to these complaints by stating that he had raised the matter with Rogan and that, "he's not going to do anything about it."

### The Submission of False Claims, Cost, and Other Information to Medicare, Medicaid, and Other Insurers

116. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc., along with the doctors referenced earlier in this Complaint and others, knowingly, intentionally, and recklessly submitted, and caused others to submit false claims to Medicare and Medicaid for payment, including:

a) claims in violation of the Stark Statute, 42 U.S.C. § 1395nn;

b) false and fraudulent cost reports to Medicare;

c) falsely representing that various medical services were medically necessary;

d) false and fraudulent claims for medically unnecessary admissions, services, procedures, and testing to Medicare, Medicaid, and private health care insurers;

e) concealing the fact that certain admissions and procedures were medically unnecessary, that certain costs were not properly incurred; and that various co-payments had been waived, knowing that the disclosure of any of the foregoing would have resulted in the denial of those claims;

f) creating myriad false records in furtherance of their scheme, including without limitation medical records containing false entries, false diagnoses, and other false information; business records that contained false information to create the appearance that Edgewater had made efforts to collect the co-payments or deductibles when, in fact, the intention all along was to waive those payments in order to get patient admissions; and

36

g)      fraudulent claims for services rendered to patients who were recruited for

hospitalization at Edgewater Hospital (in exchange for kickbacks) to Medicare,

Medicaid, and private health care insurers.

117.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. submitted, and caused

others to submit false claims to Medicare for the years 1995, 1996, 1997, 1998, and 1999 with

supporting documents and certifications in order to obtain payments from Medicare knowing that

those documents included false representations including:

a)      The cost reports for 1995, 1996, 1997, 1998 and 1999 each included a

certification falsely representing that the hospital provided services in compliance

with pertinent laws and regulations when in fact, Defendants knew that they had

violated various laws and regulations, including those pertaining to kickbacks,

providing medically necessary services, and the waiver of co-payments and

deductibles; and

b)      The cost reports for 1997 and 1998 each included a provider cost report

reimbursement questionnaire which contained the false representation that there

had been no waivers of Medicare co-payments or deductibles during calendar

year 1997 and 1998, when in fact Defendants and others had waived and caused

to be waived co-payments in order to induce patients in order to induce patients to

be admitted to Edgewater.

118.    From in or about 1995 through in or about 2000, Rogan, Ehmen, Braddock,

Bainbridge and Bainbridge Inc. submitted and caused to be submitted fraudulent claims to

Medicare and Medicaid that: caused Medicare to pay Edgewater at least $13,000,000 in

Medicare funds, and caused Medicaid to pay Edgewater at least $4,000,000. Rogan, Ehmen,

Braddock, Bainbridge and Bainbridge Inc. submitted and caused these claims to be submitted with actual knowledge that the claims were false or in deliberate ignorance and reckless disregard that such claims were false and fraudulent.

119. Rogan and Ehmen, directly and indirectly, instructed and caused others to instruct hospital personnel to falsify hospital administrative records to advance and conceal the fraud scheme, including but not limited to time sheets.

### Payments to Dr. Cubria

120. For a period of years through at least in or about December 2000, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid or caused to be paid monies exceeding $1,000,000 for television advertising that generated patients for Dr. Cubria's medical practice. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these amounts and caused them to be paid so that Dr. Cubria would maintain and/or increase the number of patients he admitted to Edgewater and to encourage Dr. Cubria to help increase its revenues.

121. From approximately in or about 1998 and through at least in or about December 2000, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. contracted with Dr. Cubria to act as medical director for the Edgewater Cardiac Rehabilitation Program, paying Dr. Cubria approximately $48,000 per year. Dr. Cubria performed little or no work under the contract. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these amounts and other substantial amounts and caused them to be paid to Dr. Cubria to incent Dr. Cubria to maintain and increase the number of patients he admitted to Edgewater, to increase Edgewater's revenues by fraud.

122. In addition, Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Edgewater to pay Dr. Cubria $15,000 per month to serve as the administrator of an organization called the Latino Cardiology Institute.

## Concealment of the Fraud Scheme

123.    Throughout the time relevant to this case, Rogan, Ehmen, Braddock, Bainbridge,

and Bainbridge Inc. actively concealed their fraudulent activities from the federal government,

the State of Illinois, and Dexia.  For example, Rogan instructed his employees to create Medicare

time studies that would contain false information about the hours certain doctors worked.  In

doing so, Rogan instructed his employees to use different colored pens and to ensure that the

hours varied to make the false reports look more legitimate and not appear as if the doctors

signed the forms all at one time.  Rogan submitted these false forms and caused them to be

submitted to Medicare on an annual basis.

## The Management Agreements

124.    To facilitate the scheme to defraud Dexia as detailed elsewhere in this Second

Amended Complaint by providing a means of siphoning money from Edgewater, beginning no

later than in or about 1994, Rogan caused Edgewater to enter into a series of Hospital

Management Agreements (the "Management Agreements") with Braddock and, later, with

Bainbridge  The first agreement was entered into on or about August 17, 1994.  The second

agreement was entered into on or about August 1, 1997.  The third agreement was entered into

on or about March 1, 2000.  In or about March 2000, Bainbridge succeeded Braddock in

Braddock's Management Agreement with the Edgewater.  Though not identical, the

Management Agreements contain substantially the same terms and conditions.

125.    Expansive Powers.  As the sole and exclusive manager of Edgewater, Braddock

and Bainbridge (and thus Rogan) were given expansive control over virtually all aspects of

Edgewater's affairs.  Among other things, Braddock and Bainbridge were given:

      a)      sole authority for the day-to-day operations of Edgewater, including the power to
            appoint and salary "senior administrative managers," including Rogan and
            Ehmen;

b)  responsibility for supervising Edgewater personnel and authority to take any actions with respect to Edgewater personnel that Braddock and Bainbridge, in their sole discretion, deemed necessary to manage Edgewater in accordance with the management agreements, including all hiring, counseling, disciplinary and termination decisions;

c)  authority to hire or retain any consultants, accountants, attorneys or other professional personnel that Braddock and Bainbridge, in their sole discretion, deemed necessary or appropriate to assist it in carrying out its duties and responsibilities in accordance with the terms of the management agreements;

d)  responsibility for supervising and managing all purchasing, billings, collections, payables, data processing, accounting, cost reporting and other financial matters related to the day-to-day operation of Edgewater;

e)  authority to make or direct to be made deposits in Edgewater's bank accounts of all receipts and moneys arising from the operation of Edgewater;

f)  authority to make disbursements from Edgewater's bank accounts on behalf of Edgewater in such amounts and at such times as required;

g)  responsibility for the negotiation and preparation of service and all other contracts determined by Braddock and, Bainbridge, in their sole discretion, to be necessary or desirable in connection with the operation of Edgewater in the usual course of business;

h)  responsibility for the execution of all physician agreements, medical director agreements, joint venture agreements and provider agreements necessary and appropriate to obtain and maintain facility status as a reimbursable provider of services under Medicare and Medicaid;

i)  responsibility for the performance of all acts reasonably necessary or required in connection with the operation of Edgewater in accordance with Edgewater's approved annual capital and operating budgets and standards and policies established or to be established by Braddock and Bainbridge;

j)  responsibility to create, implement and review annual budgets for Edgewater, and to take all actions determined by Braddock and Bainbridge, in their sole discretion, to be necessary to implement such budgets;

k)  responsibility for processing all payroll checks;

l)  authority to enter into, modify, discharge, make any settlements with respect to or terminate contracts in the name of Edgewater with vendors, physicians, or any other persons or entities as necessary and appropriate to manage and operate Edgewater pursuant to the management agreements;

m)  authority to make withdrawals from and use Edgewater accounts for the purpose of operating Edgewater, as well as for the purpose of paying itself management fees and reimbursements under the management agreement; and

n) authority to take any other actions necessary and appropriate, in its sole discretion, to manage Edgewater, provided that such action was under the authority of Braddock and Bainbridge.

126. <u>Other Promises</u>. Braddock and Bainbridge also made several material promises and representations to Edgewater in the Management Agreements. In particular, Braddock and Bainbridge promised that they would:

a) perform their duties under the Management Agreements in accordance with all applicable laws, rules, and regulations issued or adopted by any Federal, state or local agency having jurisdiction over Edgewater or any of its operations or properties;

b) use their best efforts and all due diligence to ensure that Edgewater complied with all applicable laws, rules, and regulations or orders of any governmental or regulatory body having jurisdiction over Edgewater, including all licensure laws, and that Edgewater maintained in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for its ongoing operations;

c) execute all physician agreements, medical director agreements, joint venture agreements and provider agreements necessary and appropriate to obtain and maintain facility status as a reimbursable provider of services under Medicare and Medicaid;

d) cause the preparation and filing of all federal and state cost reports necessary for reimbursement of Edgewater;

e) refrain from acting in any manner which could adversely affect the licensure of Edgewater by the State of Illinois as an acute care hospital or the accreditation of Edgewater by the Joint Commission on the Accreditation of Healthcare Organizations;

f) supervise and manage the business affairs of Edgewater to ensure that funds were collected and expended for and on behalf of Edgewater and in accordance with the terms of the Management Agreements;

g) maintain all books, documents, and records of Braddock and, later, Bainbridge as they pertained to Braddock's and, alter, Bainbridge's actual cost of providing services under the Management Agreements and make such documents available to the Secretary of the United States Department of Health and Human Services, the Comptroller General of the United States Government, or any of their duly authorized representatives; and

h) maintain a quality control program at Edgewater designed to provide for quality patient care at Edgewater.

127.    Special Projects.  In addition to receiving money from Edgewater under the Management Agreement, Braddock and Bainbridge also received substantial additional compensation from Edgewater for providing assistance and advice with regard to the planning, coordination, and development of special projects for Edgewater.

128.    To facilitate the scheme to defraud by providing an additional means of siphoning money from Edgewater, Edgewater entered into two special projects agreements with Braddock (the "Corporate Services Agreements").

129.    On May 5, 1999, Braddock and Edgewater entered into an Agreement for Exclusive Corporate Services for the Corporate Reorganization of Northside Operating Co. in connection with a purported reorganization which had occurred in October 1998.  This agreement required Edgewater to pay Braddock $1,131,337.98 plus any purported out-of-pocket expenses.

130.    On May 5, 1999, Braddock and Edgewater entered into an Agreement for Exclusive Corporate Services for the Acquisition of Grant Hospital in connection with Edgewater's acquisition of Grant Hospital, which already had been agreed to under an asset purchase agreement between Edgewater and Grant Hospital's seller on March 5, 1999.  This agreement required Edgewater to pay Braddock, inter alia, a "transaction manager's fee" of $100,000 per month beginning in December 1998 and ending the month immediately following the closing of the asset purchase agreement, an "acquisition success fee" of $750,000 if the deal closed, any purported out-of pocket expenses (including legal fees and expenses of Braddock's counsel).

131. Over eight months in 1999, Rogan, Braddock and Bainbridge Inc. caused Edgewater to pay them $180,000 per month for the investigation of potential acquisitions that never actually occurred.

132. On the strength of the Management Agreements, Edgewater's business affairs were entrusted to its fiduciaries, Braddock and Bainbridge, from whom Edgewater was entitled to: (i) actions and decisions in the sole and exclusive best interests of Edgewater; and (ii) receive absolute loyalty including without limitation the absence of any self-dealing by Braddock, Bainbridge or their principals.

133. As the principal, the person in control, and agent of Braddock and Bainbridge, Rogan also had a fiduciary responsibility toward Edgewater.

134. Edgewater (and, later, Dexia) would rely upon the promises and representations in the Management Agreements, including the fiduciary responsibility representation.

135. As discussed in greater detail elsewhere in this Second Amended Complaint, Braddock, Bainbridge, Bainbridge Inc. and Rogan betrayed Edgewater's and Dexia's trust and confidence and breached their fiduciary duties to Edgewater and Dexia under the Management Agreements and otherwise by committing, or failing to disclose the existence of, massive Medicare and Medicaid fraud and siphoning money from Edgewater through management fees, consulting fees, the Corporate Services Agreements and other improper payments. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded information that the foregoing business arrangements would be and were not in the best financial interests of Edgewater.

136. On or about March 1, 2000, Defendant Rogan caused other entities, including Access and Vital, to enter into Management Agreements with Defendants Braddock and

Bainbridge for the improper purpose of transferring substantial portions of Edgewater's revenues and other assets to those entities, and from them ultimately, to Rogan. Under these agreements, both Access and Vital agreed to pay $36,000 per year for certain purported management services to Defendants Braddock and Bainbridge.

137.     Neither Access nor Vital had any independent operations that required management. In fact, other than their membership interest in Edgewater, Grant, and another organization, Hope Community Health Services, Inc. ("Hope"), Access and Vital had no discernable purpose. By virtue of their membership interests, Access and Vital received all of their income from Edgewater, Grant, and Hope, and used that income to pay the purported management fees to Braddock and Bainbridge.

138.     Rogan further caused Braddock and Bainbridge to enter into management agreements with various entities that were affiliated with Edgewater and also were under Defendant Rogan's control. These entities included Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF"), Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF"). Upon information and belief, none of these payments were not used or intended to be used for a legitimate purpose.

139.     The boards of directors of Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF") and Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF") entities consisted of persons under Rogan's control, including David Shanahan, John Mullen, and Wessel Bengston.

**Defendants Fraudulently Induced Dexia to Issue the Edgewater Letter of Credit**

140.     As explained above, in or about 1994, Rogan (a) caused Northside to be created; and (b) through EOC, sold Edgewater to Northside. To finance Northside Operating Company's purchase of Edgewater, Rogan and Edgewater caused the Illinois Health Facilities Authority

44

("IHFA") to issue bonds, the proceeds of which Northside used: to purchase Edgewater from EOC and Rogan; to provide capital for the operation and renovation of Edgewater; to set-up a debt service reserve fund with respect to ongoing payment of the bond debt; and to pay for various costs associated with the bond issuance. The total amount of the 1994 bond issuance was approximately $41,000,000.

141. After the IHFA issued the bonds, it became the obligation of Northside to repay the bondholders at the interest rate set in the bonds.

142. In or about 1997, Rogan, Braddock and Bainbridge Inc. arranged and caused the arrangement of a new tax-exempt bond offering to refinance its then-existing bond debt to obtain a lower interest rate and to raise additional funds.

143. Rogan, Braddock and Bainbridge Inc. were intimately involved and spearheaded the effort to secure the refinancing. Rogan, Braddock and Bainbridge Inc. investigated various avenues for refinancing, selected an investment bank to aid in the process, selected the bank – Dexia – to guarantee repayment on the bonds, negotiated – directly and through others including Henry Zeisel, a Braddock employee – the terms of the deal with Dexia. Rogan had to and did approve the material terms of the transaction with Dexia.

144. In order to get a lower interest rate on the new tax-exempt bond financing, Rogan, Braddock and Bainbridge Inc. sought and spearheaded the effort to obtain a letter of credit from a financial institution to guaranty repayment of the bonds. The letter of credit would guaranty payment of the purchase price of any tendered bonds. By getting a financial institution to issue a letter of credit to back a new tax-exempt bond offering, Edgewater would receive a higher credit rating (based upon the credit rating of the financial institution), which in turn would reduce the overall interest rate Edgewater would have to pay on the new bonds. In return for the letter of

45

credit, Edgewater would pay a fee to the financial institution. If the letter of credit were ever drawn down, the financial institution would be forced to pay the amount drawn, which would then automatically convert to a loan from the financial institution to Edgewater at a pre-negotiated rate.

145. In or about 1997, Rogan, Braddock and Bainbridge Inc. approached Cain Brothers ("Cain Bros."), an investment banking firm, to assist in locating a financial institution willing to provide a letter of credit to back Edgewater's bond refinancing. Eventually, Cain Bros. contacted Dexia and provided Dexia with financial statements and other financial information for Edgewater, which Cain Bros. had obtained from Rogan, Braddock and Bainbridge Inc.

146. On January 30, 1998, Rogan executed an "Indication of Interest Proposal" on behalf of Edgewater outlining the terms and conditions of the deal between Dexia and Edgewater. Under his signature, Rogan wrote that his title was "CEO." Similarly, the distribution list for the 1998 bond refinancing lists Rogan as "CEO" of Edgewater.

147. Under the terms of Management Agreements, Rogan caused Edgewater to enter into with Braddock and Bainbridge, Braddock and Bainbridge and their employees, including Rogan and Ehmen, prepared or caused to be prepared all of Edgewater's financial statements and other financial information.

148. After reviewing the financial statements and other financial information Rogan, Braddock and Bainbridge Inc. prepared and caused to be prepared, Dexia personnel undertook a more expansive due diligence review of the deal, which included asking Edgewater to provide substantial additional financial information, traveling to Chicago to meet with Rogan and others about the operation at Edgewater, and other steps.

149.    In providing the Edgewater financial statements and other financial and operating records and information to Cain Bros. and Dexia, Rogan, Braddock and Bainbridge Inc. knowingly, intentionally and recklessly omitted information, which they knew and had reason to know would be material to any complete assessment of the finances and operation of Edgewater, including most significantly that: (a) Edgewater's operations and finances included substantial revenues obtained by fraud against Medicare and Medicaid; and (b) Braddock perpetrated that fraud. Rogan, Braddock and Bainbridge Inc. knew, should have known, or recklessly disregarded the fact that but for their omissions and material misrepresentations, Dexia never have or would have provided the letter of credit.

150.    Throughout Dexia's due diligence process, none of the Defendants or their employees ever disclosed to Dexia: (a) the existence of the Medicare/Medicaid fraud scheme at Edgewater; (b) the fact that Edgewater's financial records included substantial revenues obtained by fraud against Medicare and Medicaid; (c) that because the basic viability of Edgewater as an institution was dependent upon revenues generated by Medicare/Medicaid fraud, the continued viability of Edgewater depended upon the ability of Rogan, Ehmen, Braddock and Bainbridge Inc. to conceal that fraud from the federal and state authorities; and (d) that Braddock perpetrated that fraud.

151.    To induce Dexia to provide the letter of credit, Rogan, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly made the following statements to Dexia and caused them to be made:

a)    **Materially False and Misleading Audited Financial Statements, Unaudited Financial Statements and Projections.** On or about October 16, 1997, Defendants provided a document containing materially false projections for fiscal

years 1997 through 2000, audited financial statements from 1994 through 1996, unaudited financial statements from January 1 through June 30, 1997, and for 1996, and other information, to Cain Brothers and directed Cain Brothers to send these misleading documents from Chicago, IL to Dexia in New York, NY by United States mail or by an interstate courier service.

b) **Mailed/Couriered Materially False and Misleading Financial Statements for 1995, 1996 and 1997.** On or about February 10, 1998, Defendants caused materially false financial statements for 1995, 1996, and 1997 to be sent from Chicago, IL to Dexia in New York, NY by United States mail or an interstate courier service.

c) **Faxed Materially False and Misleading March 25,1998, Facsimile.** On or about March 25, 1998, Defendants caused an eight-page document detailing Edgewater's balance sheets for 1996 and 1997, as well as a balance sheet, operating statement and statement of cash flow dated February 28, 1998, to be sent by facsimile from Chicago, IL to Dexia in New York, NY.

d) **Other False and Misleading Statements.** Defendants also sent and caused to be sent a variety of other false and misleading statements and information to Dexia, including a copy of the Braddock-Edgewater Management Agreement. In the Management Agreement, Braddock made various material promises and representations described in paragraphs 124 - 139. Braddock knew and had reason to know that these promises and representations would be and were false when made.

152.    The documents that Rogan, Braddock and Bainbridge Inc. sent or caused to be sent to Dexia were false and misleading in several critical respects.  First, the income, revenue, and financial projections represented in these documents failed to disclose that they included substantial amounts of Medicare, Medicaid, and private health insurance revenue obtained by fraud including kickbacks, Medicare fraud, and Medicaid fraud.  Second, these documents materially misrepresented Edgewater's operating expenses with respect to, among other things, the hundreds of thousands of dollars that Rogan, Ehmen, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly paid out or caused to be paid out in kickbacks in connection with the healthcare frauds.  Third, the documents omitted material information by failing to disclose the role that Braddock, Ehmen, numerous doctors in the Edgewater staff, and others played in the healthcare frauds.

153.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that the financial materials they gave or caused to be given to Dexia were false and misleading, in that, when the Medicare/Medicaid fraud schemes were discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States.

154.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded knowledge of the breach of various promises and representations in the Management Agreement by either committing the healthcare frauds, facilitating that misconduct, or failing to take steps to prevent or stop it (including notifying Dexia of the possibility that such misconduct was occurring.)

155.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that in deciding whether to issue the Edgewater letter of credit, Dexia would rely

49

upon financial and other materials Rogan, Braddock and Bainbridge Inc. provided and caused to be provided to Dexia and that Dexia would assume that the financial materials and representations regarding Edgewater and the Management Agreement did not contain intentional misrepresentations or omissions.

156.    In deciding to issue the Edgewater letter of credit, Dexia reasonably believed that the financial statements and financial and other information Rogan, Braddock and Bainbridge Inc. provided and caused to be provided to Dexia were true and accurate. As Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded, Dexia reasonably relied upon the information Rogan, Braddock and Bainbridge Inc. had provided and caused to be provided to Dexia and incorporated the information into its analyses and underwriting of the proposed credit enhancement transaction.

157.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that a typical due diligence effort by a banking institution like Dexia would not likely discover a Medicare/Medicaid fraud scheme involving illegal kickbacks to doctors to cause them to admit healthy patients or to perform unnecessary procedures because a hospital's financial records would not disclose sufficient information to discover such details.

158.    In reliance upon its review of Rogan, Braddock and Bainbridge Inc.'s false and fraudulent financial statements and financial and other information, Dexia agreed to issue the letter of credit in the amount of approximately $56,000,000.

159.    Rogan, Braddock and Bainbridge Inc. knew or had reason to know that if Dexia had been informed that Edgewater's operations were in any way involved with healthcare fraud or that Braddock was committing this healthcare fraud, Dexia would not have issued the letter of credit to Edgewater.

50

160.    The IHFA issued the new bonds in two series:  Series A in the aggregate principal amount of $44,475,000 and Series B in the aggregate principal amount of $10,525,000 (Series B taken together with Series A referred to as "the Edgewater Bonds").  The bond documents and agreements provided that the proceeds of the Series A Bonds, along with other funds, would be used to payoff the 1994 Edgewater Bonds.  The bond documents and agreements specified that the Series B Bond proceeds would be used to renovate Edgewater Hospital's patient rooms, nursing units, the lobby and exterior facade of Edgewater Hospital's main building, and to help pay for significant additions and enhancements to Edgewater Hospital's information system.

161.    The Series A Bonds carried a fixed rate of 4.7% per annum through June 30, 2004.  The Series B Bonds carried a weekly variable rate.  If Rogan, Braddock and Bainbridge Inc. had not obtained letter of credit support, Edgewater would never have been able to obtain these interest rates and would have incurred a much higher interest charge on the new bonds.

162.    Edgewater secured the letter of credit with collateral of its unrestricted receivables, assignable general intangibles and a perfected first mortgage and security interest in the hospital facility, equipment and fixtures.

163.    On or about May 1, 1998, Rogan, Braddock and Bainbridge Inc. caused Edgewater to agree upon, execute, and deliver a reimbursement agreement with Dexia, in relation to and in consideration for Dexia's issuance of the Edgewater letter of credit.

164.    On or about May 1, 1999, Rogan, Braddock and Bainbridge Inc. caused Edgewater to agree upon, execute, and deliver the Edgewater Reimbursement Agreement, which amended and restated the 1998 reimbursement agreement with Dexia.  The Edgewater Reimbursement Agreement contained various financial covenants that Edgewater was obligated to satisfy, including the maintenance of certain debt service ratios, capitalization levels, and

51

maintenance of unrestricted cash and investments on hand. Under the Edgewater

Reimbursement Agreement, a breach of these financial covenants would constitute an automatic

"Event of Default."

165.    To provide Dexia security under the letter of credit, Rogan, Braddock and

Bainbridge Inc. caused Edgewater to represent that Edgewater's operations would meet minimal

financial standards set forth in covenants to the Edgewater Reimbursement Agreement

("covenants"). Moreover, Rogan, Braddock and Bainbridge Inc. further caused Edgewater to

agreed that if Edgewater's financial performance ever dipped below any of these minimum

financial standards, Dexia would be entitled to declare an "Event of Default" under the

reimbursement agreement. An Event of Default would entitle Dexia to exercise certain rights

and remedies to protect its investment, including without limitation its right to declare all

obligations of Edgewater to be immediately due and payable, to take whatever actions were

necessary to collect the amounts due, and/or to take other action to enforce Dexia's rights under

the credit agreements. In short, if it ever appeared that Edgewater was in financial trouble, Dexia

could rush in to take steps to protect its investment and the collateral Rogan, Braddock and

Bainbridge Inc. posted and caused to be posted as security for the letter of credit.

### The Grant Acquisition

166.    In or about 1999, Rogan caused Edgewater to take steps to acquire Grant Hospital

("Grant") from Doctor's Hospital. To finance the acquisition of Grant, Defendants Rogan,

Access and Vital planned to raise an additional $20 million through a tax exempt hospital bond

issuance, similar to but wholly independent from the earlier Edgewater bond issuances in 1994

and 1998. Like the 1998 hospital bond issuance, Rogan wished to secure a lower interest rate for

the Grant bonds via a credit enhancement through a letter of credit to back Edgewater.

167.    In or about 1999, Rogan approached Dexia and caused Edgewater to approach Dexia to obtain Dexia's approval for Edgewater's planned acquisition of Grant and to obtain a letter of credit to help finance the acquisition. This request was wholly independent of the earlier Edgewater transaction and Dexia had no obligation to provide this additional letter of credit.

168.    As of this time, Edgewater had made all payments due on the 1998 letter of credit in a complete and timely fashion and, due to the lulling and concealment outlined above, Defendants had misled Dexia to believe that Edgewater was financially healthy and operating a wholly legitimate business.

169.    As part of their effort to convince Dexia to approve the transaction involving Edgewater assets and provide the Grant letter of credit, Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. directly and through Edgewater presented and caused to be presented false Edgewater financial statements to Dexia. Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. and their employees prepared and caused to be prepared all of Edgewater's financial statements, financial projections, and other financial information knowingly, intentionally and recklessly failing to disclose that the financial statements were false because they included substantial revenues from Medicare and Medicaid procured by fraud.

170.    In knowingly, intentionally and recklessly sending false and fraudulent financial statements and other financial information to Dexia and causing them to be sent, Defendants knew, had reason to know, or recklessly disregarded that when the fraud underlying the false financial materials was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois. Defendants knew, had reason to know, or recklessly disregarded that if this occurred, Edgewater

would be severely disadvantaged by the use of significant financial resources to obtain and operate Grant.

171.     Defendants sent these false financial statements and financial information to Dexia and caused them to be sent in order to convince Dexia to approve the transaction involving Edgewater assets and to induce Dexia to provide the letter of credit for Grant. Defendants knew, had reason to know, or recklessly disregarded that Dexia would rely upon the truth and accuracy of these financial statements and other financial information in agreeing to issue the Grant letter of credit.

172.     At the time of Edgewater's proposed acquisition of Grant, it was clear that the financial position of Grant was poor and that Grant would to operate at a loss for some time following Edgewater's acquisition of Grant. It also was clear that Grant would be financially dependent upon Edgewater for some time. Due to Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc.'s fraudulent misrepresentations to Dexia regarding Edgewater's financial health and operational legitimacy, Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Dexia to believe that Edgewater was financially healthy enough to fulfill that role. As a result, Dexia required Edgewater to guarantee the obligations of Grant and to secure the guarantee with Edgewater's assets.

173.     Dexia reasonably relied on the truth and accuracy of these statements in approving Edgewater's acquisition of Grant and in issuing the Grant letter of credit. If not for these false and misleading statements made by and through Defendants, Dexia would not have approved Edgewater's participation in the transaction or issued the letter of credit to Grant. Dexia incorporated the false and misleading information into its analyses of the acquisition of Grant, and in reliance upon this false and misleading information, Dexia:  (i) approved

Edgewater's participation in the transaction, including without limitation of Edgewater's

contribution of $10,000,000 in capital to Grant and agreement to provide additional financial

assistance to Grant; and (ii) agreed to issue the Grant letter of credit.

### The Insolvency of Edgewater

174.    Upon information and belief, throughout the time relevant to this case, Edgewater

would have been insolvent without the revenues Defendants obtained by fraud or if the fact of

that fraud was discovered by Medicare and Medicaid.  Upon information and belief, Edgewater

would not have been able to continue operating as a going concern had it been known or

discovered that Defendants had used Edgewater to commit their fraud scheme.  Indeed, shortly

after the fraud was discovered, Edgewater ceased its operations.  Despite the insolvency,

however, Edgewater still had numerous valuable assets, including millions of dollars in cash, real

estate, uncollected loans, accounts receivable, and potential legal claims.  These assets largely

constituted the remaining collateral for Dexia's letter of credit.

### Defendants' Lulling and Concealment to Advance the Scheme to Defraud

175.    To allow Dexia to keep watch over its investment and to permit Dexia to protect

itself from loss, the agreements underlying the letter of credit required Edgewater to provide

Dexia with truthful quarterly (and later monthly) financial reports on the operations of

Edgewater.  Rogan, Braddock, Bainbridge and Bainbridge Inc.  knew and had reason to know of

these financial reporting requirements and their purpose.  Among other things, Dexia

substantially relied upon these financial reports to gauge whether Edgewater was continuing to

operate effectively and/or whether Edgewater's financial position was deteriorating.

176.    In order to mislead Dexia into believing that Edgewater was satisfying these

financial covenants, Rogan, Braddock, Bainbridge and Bainbridge Inc.  knowingly, intentionally,

and recklessly sent and caused to be sent false financial reports from Chicago, Illinois to Dexia

in New York, New York by United States mail or intrastate courier on numerous occasions, including but not limited to on or about the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) November 5, 1998; (d) March 8, 1999; (e) May 12, 1999; (f) July 30, 1999; (g) November 15, 1999; (h) February 15, 2000; and (i) April 7, 2000. Defendants also sent and caused to be sent false financial statements and other financial information from Chicago, Illinois to Dexia in New York, New York by facsimile on numerous occasions, including but not limited to on or about the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) May 7, 1999; (d) June 16, 2000; (e) February 27, 2001; (f) March 1, 2001; and (g) March 16, 2001.

177.    These financial statements included statements of revenue and assets that Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded were materially misstated for the reasons detailed above.

178.    Rogan, Braddock, Bainbridge and Bainbridge Inc. provided these false financial statements and other financial information to Dexia to lull Dexia into a false sense of security regarding Edgewater's financial health and the legitimacy of Edgewater's operations. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that Dexia would believe the false and fraudulent financial statements and other financial information were there and accurate, thus lulling Dexia to believe that Edgewater's was financially healthy and was operating wholly legitimately.

179.    Rogan, Braddock, Bainbridge and Bainbridge Inc. also sent these false and fraudulent financial statements and other financial information to Dexia, and caused them to be sent, to prevent Dexia from discovering that, but for its fraudulent revenues, Edgewater could not meet its financial covenants, and was perilously close to or in default on its covenants.

180.     By virtue of these false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. concealed crucial information from Dexia, which would have permitted Dexia to take steps to protect its investment. Rogan, Braddock, Bainbridge and Bainbridge Inc. well knew, should have known, or recklessly disregarded that their scheme to defraud would collapse if Dexia declared an Event of Default.

181.     In sending and causing to be sent to Dexia financial statements and other financial information that concealed the Medicare and Medicaid fraud at Edgewater, Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that when the fraud underlying the false financial statement was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois.

182.     By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. enabled the continued operation of their fraud scheme.

183.     By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. gave themselves time to loot and dissipate substantial portions of the collateral Rogan, Braddock and Bainbridge Inc. caused Edgewater to post as security for Dexia's letter of credit.

184.     On or about September 17, 1998, the U.S. Department of Justice served a subpoena duces tecum upon Edgewater seeking the production of medical files of patients treated at Edgewater. The subpoena stated that these documents were related to an investigation of "federal health care offenses as defined in 18 U.S.C. § 24(a)." The subpoena was addressed to

Peter Rogan, President, Edgewater Hospital. The subpoena sought patient medical records of approximately 87 Medicaid patients.

185. In or about early 1999, Rogan, Ehmen, and the other Defendants learned that the U.S. Department of Justice had initiated a federal grand jury investigation of possible Medicare/Medicaid fraud at Edgewater.

186. In or about early 1999, Rogan and Ehmen learned that the investigation extended beyond fraud by medical personnel to fraud by the Defendants themselves.

187. On information and belief, in or about early 1999, Rogan and Ehmen learned that Dr. Cubria was one of the targets of the federal grand jury investigation. Given the corrupt relationship that existed between Rogan and Ehmen and Dr. Cubria as detailed above. Rogan knew or had reason to know that any proof the federal government might gather against Dr. Cubria might well also implicate Rogan and the other Defendants.

188. In November 1999, Rogan, Ehmen, and the other Defendants caused Edgewater to enter into a Corporate Integrity Agreement with the Office of Inspector General ("OIG") of the Department of Health and Human Services, following an investigation by OIG into systemic overpayments being made to the Hospital as the result of "upcoding" of certain patient conditions (i.e., billing Medicare at higher reimbursement codes than actually treated). Rogan, Ehmen, and the other Defendants failed to disclose the OIG investigation and Corporate Integrity Agreement to Dexia.

189. In 2000 and 2001, the government served additional grand jury subpoenas upon Edgewater (some of which inter alia sought documents related to Rogan, Ehmen, and Drs. Rao, Kumar, and Barnabas) and served such grand jury subpoenas upon Rogan's management

58

companies, Braddock and Bainbridge, seeking information inter alia about these entities' tax records, records of payments, records of ownership, and records related to Edgewater.

190.    In or about December 2000, Rogan met with Dr. Cubria and wrote on a piece of paper that Dr. Cubria should destroy all memos and notes that he had written to Rogan. Rogan also wrote to Dr. Cubria that he should not inform his attorney of these actions, because the actions constituted obstruction of justice. Rogan wrote to Dr. Cubria, instead of speaking to him, because he feared that federal law enforcement authorities had bugged his office.

191.    In January 2001, Rogan advised Dr. Cubria to retain a criminal attorney.

192.    Rogan also told Cubria to destroy his computer. In addition, in or about February 2001, Rogan caused approximately $9,8000 to be given to Cubria.

193.    In or about 2001, a Dexia employee confronted Rogan about the federal grand jury investigation. In response to questioning, Rogan lulled Dexia into a false sense of confidence by telling the Dexia employee that the criminal investigation was routine, related only to physicians, and did not relate to Edgewater itself.

194.    Rogan knew that the investigation was not "routine" and that his representations to Dexia were completely false. Rogan knowingly, intentionally, and recklessly made those representations to induce Dexia not to investigate further and declare an Event of Default under the Edgewater Reimbursement Agreement relating to the Edgewater letter of credit.

195.    From late 1998 through the first-half of 2001, Rogan, Braddock, Bainbridge and Bainbridge Inc. did not disclose to Dexia that Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. had learned that the government was investigating Edgewater's management including Rogan and Ehmen for fraudulently inflating the revenues at Edgewater. Nor did Defendants disclose to Dexia that Edgewater's precipitous financial decline after 2000, upon

information and belief, resulted from the hospital's loss of revenues attributable to Defendants' fraud scheme. Instead, Defendants continued to report to Dexia that such decline was temporary and correctable.

196.    Upon information and belief, Rogan knowingly, intentionally, and recklessly concealed the truth regarding the government investigation to permit Defendants to continue to misappropriate assets of Edgewater and/or squander them on other business ventures and in an attempt to prevent Dexia from discovering the fraud and breaches of fiduciary duty Defendants had committed.

**The Criminal Indictments**

**THE POST-INDICTMENT COLLAPSE**

197.    The several indictments of Edgewater personnel and most significantly of Ehmen, Braddock, and Bainbridge led Medicare and Medicaid to suspend payments to Edgewater. This led directly Edgewater's default on certain financial covenants set forth in the Edgewater Reimbursement Agreement. Among the numerous defaults that have occurred under the Edgewater Reimbursement Agreement and other credit enhancement documents to date, Edgewater has failed to comply with the debt service coverage ratio requirements under § 6.10 of the Edgewater Reimbursement Agreement as of March 31, 2000 and has failed to comply with the reporting requirements of § 6.01 of the Edgewater Reimbursement Agreement.

198.    By on or about November 6, 2001, Edgewater bondholders tendered bonds with an approximate aggregate principal amount of $56,000,000 million. Under the terms of the letter of credit, Dexia was obliged to pay and did pay the purchase price of the tendered bonds, that is, a total of approximately $56,000,000 million.

199.    As of the date of this Complaint, Edgewater is in bankruptcy and Dexia has received back only $500,000 as a result of liquidation of collateral. The collateral posted to

60

support Edgewater's debt to Dexia is wholly insufficient to even begin to provide Dexia

adequate security for its loss.   Dexia stands to lose tons of millions of dollars as a result of

Defendants' fraud scheme.

## Count I

### Fraudulent Inducement

### (Defendants Rogan, Bainbridge, Braddock, and Bainbridge, Inc.)

200.   Dexia restates and realleges the preceding paragraphs as if fully set forth herein.

201.   Defendants made numerous false and misleading statements of material fact to

Dexia regarding the true financial condition of Edgewater, including repeatedly providing Dexia

with financial reports and information that failed to disclose that Edgewater was involved in a

massive fraud scheme against Medicare and Medicaid and that a substantial portion of

Edgewater's revenues derived from that scheme.

202.   Defendants knew, had reason to know, or recklessly disregarded that these

representations were not true, and omitted material information.

203.   Defendants made these representations with the intention of inducing Dexia to

issue a letter of credit in the amount of approximately $56,384,100.

204.   Defendants knowingly, intentionally and recklessly acted to cause Dexia to rely

upon the truth of these representations.

205.   Dexia reasonably relied upon the truth of these representations, and but for these

statements, Dexia would not have issued the Edgewater letter of credit.

206.   On or about June 8, 1998, Dexia issued the Edgewater letter of credit.

207.   As a result of its reasonable reliance upon the Rogan Defendants' fraudulent

statements and inducements, Dexia has suffered substantial financial damages.

## Count II

### Fraudulent Concealment

### (Defendants Rogan, Bainbridge, Braddock, and Bainbridge, Inc.)

208.     Dexia restates and realleges the preceding paragraphs as if fully set forth herein.

209.     After Dexia issued the Edgewater letter of credit, Defendants provided numerous financial statements and reports and other information regarding Edgewater and its operations on a regular basis to permit Dexia to attend to its investment in Edgewater.

210.     In these regular financial statements, reports and presentations of information, Defendants knowingly, intentionally and recklessly made numerous false and misleading statements of material fact to Dexia regarding the true financial condition and operations of Edgewater, including repeatedly providing Dexia with financial statements, reports and other information that failed to disclose that Edgewater was involved in a massive fraud scheme against Medicare and Medicaid and that a substantial portion of Edgewater's revenues derived from that scheme.

211.     The statements, reports, and presentations of information represented acts in furtherance of Defendants fraud scheme against Dexia and Defendants' numerous false and misleading statements lulled Dexia into the false sense of security regarding the continuing safety of its investment so as to lead Dexia to the false belief: that Edgewater's operations were entirely legitimate, that Edgewater's financial statements and reports included information from legitimate operations; that Edgewater was more stable than in fact it was; and that but for the revenues derived from illegal activities, Edgewater would not have maintained the minimum financial standards required in the Edgewater Reimbursement Agreement and would have violated its financial covenants, causing Events of Default to occur much earlier than they did on the Edgewater letters of credit.

212. Defendants knew, had reason to know, or recklessly disregarded that these statements, reports and other information representations were not in fact true and omitted material facts.

213. Dexia reasonably relied upon the truth of Defendants' representations, and but for those representations, Dexia would have taken steps to protect its collateral and to recover the money Edgewater owed it.

214. Defendants took the foregoing steps to forestall Dexia from protecting itself financially, which Defendants knew and had reason to know would have terminated their scheme to defraud and ability to loot Edgewater of the collateral Defendants posted to induce Dexia to issue the letter of credit.

215. As a result of Defendants' fraudulent statements, misrepresentations, omissions and lulling, Dexia suffered substantial financial damages.

## Count III

### Tortious Interference with an Existing Contract

### (Defendants Rogan, Bainbridge, Braddock, Bainbridge, Inc.)

216. Dexia restates and realleges the preceding paragraphs as if fully stated herein.

217. Dexia and Edgewater entered into a valid contract on or about June 8, 1998, in connection with a letter of credit Dexia issued for the benefit of Edgewater.

218. Defendants knew that this contact existed and intentionally and maliciously induced Edgewater to breach its obligations under the contract.

219. Defendants' wrongful conduct caused Edgewater to breach its contract.

220. As a result of Defendants' interference with the contract between Dexia and Edgewater, Dexia has suffered substantial financial damages.

## Count V

## Breach of Fiduciary Duty

## (All Defendants)

221.      Dexia restates and realleges the preceding paragraphs as if fully stated herein.

222.

223.      Because Defendant Rogan was a corporate officer of, held himself out as a corporate officer of, and/or exercised control over Edgewater, he owed fiduciary duties to Edgewater creditors, including Dexia.

224.      Because Defendants Braddock and Bainbridge controlled Edgewater under the terms of the Management Agreements and through employees and agents that acted as Edgewater's officers (e.g., Rogan, Ehmen, Joanne Skvarek, Clarence Nagelvoort), Braddock and Bainbridge owed fiduciary duties to Edgewater creditors, including Dexia.

225.      Defendants Rogan, Braddock, and Bainbridge also owed fiduciary duties to Edgewater's creditors once Edgewater became insolvent.

226.      Defendants Rogan, Braddock, and Bainbridge caused Edgewater to be operated in a reckless and illegal manner for their own personal benefit, including without limitation their own financial benefit.

227.      Defendants Rogan, Braddock, and Bainbridge caused Edgewater to make business decisions which they knew, should have known, and recklessly disregarded would and did financially injure Edgewater, and thus imperiled Dexia's interests, including its investment in Edgewater.

64

228.     Defendants Rogan, Braddock, and Bainbridge knowingly engaged in a variety of conduct that furthered their own interests and was also detrimental to Dexia's interests, including its investment in Edgewater.

229.     Defendants Rogan, Braddock, and Bainbridge knowingly colluded with each other in breaching their fiduciary duties to Dexia.

As a result of this breach of fiduciary duty, Dexia has suffered substantial financial damages.

## Count VII

### Willful Conversion

### (All Defendants)

230.     Dexia restates and realleges the preceding paragraphs as if fully stated herein.

231.     Defendants directly, indirectly and without authorization, knowingly wrongfully obtained from Dexia and caused Dexia to pay approximately $56,000,000 on Edgewater's behalf to satisfy Edgewater's debt to the bondholders when Edgewater defaulted on those bonds and on the letter of credit.

232.     Dexia has an absolute and unconditional right to immediate possession of those funds totaling approximately $56,000,000, because Defendants wrongfully knowingly obtained the funds from Dexia and caused Dexia to pay those funds on Edgewater's behalf.

233.     As a result of this conversion, Dexia has suffered substantial financial damages.

## Count X

### Civil Conspiracy

### (All Defendants)

234.     Dexia restates and realleges the preceding paragraphs as if fully stated herein.

235.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants, directly and indirectly, individually and collectively, controlled or owned by them, acted in concert knowingly, intentionally, and recklessly to conspire among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to defraud Dexia.

236.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly combined, conspired, and agreed among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to defraud Dexia by virtue of the schemes and actions alleged in this Complaint.

237.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to make false and misleading statements to Dexia as to the veracity and accuracy of the financial records, reports, and statements for Edgewater.

238.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to provide to Dexia false and misleading financial records, reports, and statements for Edgewater, and to conceal material information from Dexia regarding the fraud scheme against Medicare and Medicaid detailed elsewhere in this Complaint.

239.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Rogan, Ehmen, Bainbridge, Braddock and Bainbridge Inc. knowingly, intentionally,

or recklessly conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to lull Dexia into a false sense of security and to defraud Dexia by sending and causing to be sent to Dexia false and misleading financial statements and financial information that concealed the existence of Defendants' scheme to defraud Dexia as well as their scheme to defraud Medicare and Medicaid so as to forestall Dexia from protecting itself by exercising its contractual rights under its reimbursement and credit agreements with Edgewater, and to allow the Defendants to pillage Edgewater of the collateral Edgewater had posted to secure Dexia's letter of credit.

240.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to pillage Edgewater of Dexia's collateral and to squandered Edgewater's assets, including without limitation, directly or indirectly diverting those assets to Rogan personally and to other Defendants using Edgewater's revenue and assets for purposes other than maintaining the operations and financial health of Edgewater, and using Edgewater's assets to benefit Rogan and the other Defendants personally at the expense of Edgewater.

241.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly coordinated efforts among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to funnel money out of Edgewater, decreasing the value of Edgewater's assets.

242.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Rogan and the other Defendants knowingly, intentionally, and recklessly conspired

among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to siphon the proceeds of Defendants' scheme to defraud Medicare and Medicaid from Edgewater in a variety of ways, including through a variety of Management Agreements and Corporate Services Agreements, and otherwise.

243.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants conspired and agreed among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to conceal, suppress and hide the foregoing misrepresentations and material omissions from Dexia. Defendants' concealment, suppression and omission of these material facts prevented Dexia from taking steps to limit the damage to Dexia as a result of Defendants' scheme.

244.    The wrongful acts alleged herein constitute some of the overt acts Defendants took in furtherance of the conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dexia hereby demands judgment against Defendants, including:

a)    Money damages to be proven at trial, but not less than $56 million;

b)    Punitive damages for fraudulent conduct;

c)    All costs and attorney's fees Dexia incurred; and

d)    Such further relief as the Court deems appropriate and just.

## JURY TRIAL DEMANDED

Plaintiff Dexia demands a trial by jury.

Date: November 9, 2004

One of the Attorneys for Plaintiff
Dexia Crédit Local

Scott Mendeloff
Rene Pengra
Gabriel Aizenberg
Eric Pruitt
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

CHI 2960894v2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEXIA CRÉDIT LOCAL, f/k/a Dexia     )
Public Finance Bank and Crédit Local de     )
France,     )
    )
       **Plaintiff,**     )
    )
       **v.**     )    **No. 02 C 8288**
    )
    )    **Hon. Mark Filip**
    )
    )    **Mag. Sideny I. S**████████
PETER G. ROGAN, et al.     )
    )
       **Defendants.**     )

## NOTICE OF FILING

To:    Attached Service List

PLEASE TAKE NOTICE that on November 9, 2004, we filed with the Clerk of

the U.S. District Couurt for the Northern District of Illinois, Eastern Division, Plaintiff Dexia

Crédit Local's **Second Amended Complaint,** a copy of which is attached hereto and hereby

served upon you.

**Dated: November 9, 2004**           SIDLEY AUSTIN BROWN & WOOD LLP

                                         *Eric S. Pruitt*

                                    Scott T. Mendeloff
                                    Gabriel Aizenberg
                                    Eric S. Pruitt
                                    10 South Dearborn Street
                                    Chicago, Illinois 60603
                                    (312) 853-7000

                                    *Attorneys for Plaintiff Dexia Crédit Local*

DOCKETED

NOV 1 5 2004

## CERTIFICATE OF SERVICE

I, Eric S. Pruitt, an attorney, do hereby certify that on this 9th day of November 2004, I caused a true and correct copy of the attached document to be served pursuant to agreement of the parties by electronic mail upon the attorneys listed below.

_Eric S. Pruitt_

Eric S. Pruitt

| | |
|---|---|
| Howard Pearl | Phillip S. Reed |
| Neil Holmen | John Touhy |
| Neil Murphy | Debra Bogo-Ernst |
| Monika Blacha | Diane R. Sabol |
| Melissa Lee Benzon | Sean P. Dailey |
| Chris Stathopolous | MAYER, BROWN, ROWE & MAW LLP |
| WINSTON & STRAWN LLP | 190 South LaSalle Street |
| 35 West Wacker Drive | Chicago, Illinois 60603 |
| Chicago, Illinois 60601 | (312) 782-0600 |
| (312) 558-7422 | (312) 701-7711 (facsimile) |
| (312) 558-5700 (facsimile) | |

**Counsel for Defendant Peter G. Rogan**

**Counsel for Defendants Bainbridge Management, LP, Bainbridge Management, Inc., and Braddock Management, LP**

2