# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | Sidney L Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8288 | **DATE** | 12/20/2004 |
| **CASE TITLE** | | Dexia Credit Local vs. Rogan, et al. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** For the reasons set forth in the attached Memorandum Opinion and Order, Peter Rogan's motion to compel the production of documents withheld under the attorney-client privilege (doc. # 122) is DENIED.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | DEC 2 1 2004 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | rbf | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | | | | |
| mm | courtroom deputy's initials | U.S. DISTRICT COURT 2004 DEC 20 AM 11:32 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

**DEC 3 1 2004**

DEXIA CREDIT LOCAL, f/k/a Dexia )
Public Finance Bank and Credit Local )
de France, )
           )
          Plaintiff, )
           )    No. 02 C 8288
vs. )    Judge Mark Filip
           )    Magistrate Judge Sidney I. Schenkier
PETER ROGAN, *et al.*, )
           )
          Defendants. )

## MEMORANDUM OPINION AND ORDER

Defendant, Peter Rogan ("Rogan"), has moved to compel the production of documents withheld under the attorney-client privilege ("privilege") by plaintiff, Dexia Credit Local ("Dexia), and non-party Edgewater Medical Center ("EMC") (doc. # 122). For the reasons that follow, this motion is denied.

### I.

In its Second Amended Complaint ("Complaint"), filed November 10, 2004, Dexia names as defendants Peter Rogan, formerly the owner and later CEO of Edgewater Hospital; Braddock Management, LP, which had a management contract with Edgewater Hospital between 1994 and 2000; Bainbridge Management, LP, which had a management contract with Edgewater Hospital from March 2000 to May 2001; and Bainbridge Management, Inc., which was the general partner of Bainbridge, LP. Dexia alleges that the defendants engaged in a wide-ranging scheme to defraud Edgewater that involved, among other things: (a) between 1995 and 2000, obtaining at least $13 million from the Medicare program and another $4 million from the Medicaid program through fraud (Compl. ¶ 118), and (b) improperly siphoning "enormous portions" of money, totaling millions of

dollars, from Edgewater through fraudulent management agreements (*Id.*, ¶¶ 9, 14). Dexia also alleges that the defendants concealed this fraud from Dexia in order to induce Dexia to issue letters of credit securing some $56 million in bond obligations of Edgewater Hospital in May 1998 (*Id.*, ¶ 158), and continued to conceal the alleged fraudulent activity to lull Dexia into believing that Edgewater was financially healthy, which enabled the plaintiffs to continue the alleged fraudulent scheme and looting of EMC (*Id.*, ¶¶ 178, 183).

In May 2001, a federal grand jury indicted Bainbridge, Roger Ehman (Rogan's direct assistant), and a series of doctors on EMC's staff for fraud, which resulted in a number of guilty pleas (*see* Compl., ¶¶ 81-90). When this indictment was returned in May 2001, Dexia "stridently urged EMC's board to terminate relations with Rogan and his management companies" – which it did do. Shortly thereafter, EMC replaced Mr. Rogan's personnel with managers from Cambio Health Solutions ("Cambio"). Dexia asserts that, at that time, a "common legal and litigation interest against Rogan and the management companies arose" between itself and EMC (Dexia Mem. at 1).

Dexia alleges that, as a result of the indictments, the Medicare and Medicaid programs ceased payments to EMC. Within a week, EMC's bondholders drew upon the letters of credit, which Dexia satisfied by paying some $56 million, only $500,000 of which has since been reimbursed (*Id.*, ¶¶ 197-99).

On February 25, 2002, the Circuit Court of Cook County dissolved EMC, and replaced EMC's board with Eugene Crane, a court-appointed custodian vested with the power to manage EMC's affairs (Dexia Mem., Ex. A). Mr. Crane thereafter filed a voluntary bankruptcy petition on behalf of EMC. *See In Re Edgewater Medical Center*, No. 02-7378 (N.D. Ill.). Dexia is the estate's

primary secured creditor and by far its largest unsecured creditor (*see* Dexia Mem. at 3 n.3 and Ex. D).

After the bankruptcy petition was filed, the bankruptcy court issued several orders in the pending bankruptcy proceeding that are relevant to the present motion. *First*, by an order dated July 31, 2002, the bankruptcy court confirmed that Mr. Crane, as custodian of EMC, had the authority "to control, exercise and/or waive the attorney-client privilege on behalf of" EMC (Dexia Mem., Ex. C). *Second*, in June 2003, the bankruptcy court entered an order authorizing EMC to enter into a post-petition funding agreement with Dexia, and to retain Sidley, Austin, Brown & Wood ("Sidley") as counsel under that funding agreement.

The funding agreement was premised on the view that EMC possessed claims against Mr. Rogan, Bainbridge, Braddock and others as a result of certain allegations of fraud (which include those that Dexia makes against those entities in the case pending in this Court); that pursuit of those claims would "maximize the assets of [EMC's] estate;" that EMC lacked the resources to pursue those claims, and that no entity other than Dexia was willing to provide the resources necessary to do so; and that engagement of Sidley would be beneficial to EMC because "through their representation of Dexia and joint litigation with [EMC], the members of Sidley have become uniquely and thoroughly familiar with [EMC] and the complicated facts from which the various claims of the estate arise" (Dexia Mem., Ex. B: Motion for Authority to Enter into Post-Petition Funding Agreement and to Employ Sidley, ¶¶ 12, 13, 15 and 18). The funding agreement provided, among other things, that if Dexia achieved a recovery on claims pursued on behalf of EMC, then – after deduction of certain expenses – Dexia would retain eighty-five percent of the recovery and the remaining fifteen percent would be distributed to EMC for remittance to other creditors (*Id.*: Funding Agreement, ¶ III(a)).

By an order dated August 8, 2003, Chief Judge Kocoras denied leave to appeal the bankruptcy court order authorizing EMC to enter into the funding agreement and to retain Sidley (Dexia Mem., Ex. F). In that ruling, Chief Judge Kocoras noted that the eighty-five/fifteen percent allocation of proceeds recovered through pursuit of EMC's claims reflected the fact that roughly eighty-five percent of EMC's liabilities are owed to Dexia, with the remaining fifteen percent owed to other creditors (Ex. F: 08/08/03 Mem. Op. and Order, at 2 n.1). Chief Judge Kocoras also specifically ruled that there was "no actual conflict of interest in Sidley's dual representation of Dexia and [EMC]" (*Id.* at 4).

In the motion now before us, Mr. Rogan seeks production of documents he subpoenaed from EMC on July 9, 2004, as well as those that EMC (or the Bankruptcy Trustee in *In re Edgewater Medical Center*) received from EMC's former counsel, McDermott, Will & Emery ("McDermott"), in response to a subpoena issued in December 2003 by EMC. Mr. Rogan also seeks documents produced to Dexia by third parties Foley & Lardner ("Foley") and the Baudino Law Firm (EMC's former lawyers), and Cambio. Dexia has received and reviewed documents responsive to the subpoenas, and has indicated that it would withhold a substantial number of the responsive documents from production to Mr. Rogan on the assertion of EMC's privilege. For some of these documents, privilege logs have been produced; for others, logs will be produced later this month or next month.

Both parties have asked the Court to address the applicability of certain legal doctrines for the purpose of narrowing specific document disputes that may exist. Thus, our ruling does not address whether any particular document is protected by the attorney-client privilege or work-product doctrine. What we address instead are Mr. Rogan's over-arching arguments that whole

4

categories of documents must be produced, because Sidley has no basis upon which to assert the privilege on behalf of Dexia or EMC. Mr. Rogan's arguments are based on four rationales: (1) that the "common interest" doctrine does not protect privileged EMC documents that EMC shared with Dexia; (2) that any privilege in the EMC documents has been waived under the "at-issue" doctrine; (3) that Mr. Rogan is entitled to see privileged EMC documents, even absent any waiver of privilege, due to his former membership in the EMC "control group"; and (4) that equitable considerations require that Mr. Rogan have access to the documents.

The present motion deals largely with assertion of the attorney-client privilege and exceptions to it, so we will begin the analysis with a review of the controlling legal principles governing the privilege.[1] From there, we move to an analysis of the exceptions to the privilege asserted by Mr. Rogan: the common interest doctrine; the "at-issue" doctrine; Mr. Rogan's former "control group" status; and equitable considerations.

## II.

Because this Court has jurisdiction over this case based on diversity of citizenship, and the claims in the underlying complaint all arise under Illinois law, the claims of attorney-client privilege are also governed by Illinois law. *See* Fed.R.Evid. 501; *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 152 F.R.D. 132, 139 (N.D. Ill. 1993). It is well-established in Illinois that the attorney-client privilege serves the important policy of fostering "full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Waste Management, Inc.*

---

[1] The only time Mr. Rogan raises the issue of work product is in connection with his control group argument. We address that point below (*see* note 5, *infra*).

*v. International Surplus Lines Ins. Co.,* 579 N.E.2d 322 (Ill. 1991). The Illinois Supreme Court has set forth the elements of the privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*People v. Simms,* 192 Ill.2d 348, 381 (Ill. 2000). The Illinois Supreme Court has also stated that it "is the [attorney-client] privilege, not the duty to disclose, that is the exception" and, therefore, "the privilege ought to be strictly confined within its narrowest possible limits." *Waste Management,* 579 N.E.2d at 327. Consequently, Illinois courts "adhere to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Id.*

## A.

Like other privileges, the attorney-client privilege may be waived: for example, the attorney-client privilege is generally waived when documents are disclosed to third parties. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.,* 703 N.E.2d 634, 636-37 (Ill. App. 1998). However, while disclosure to a third party typically waives the privilege, that is not the case where the parties are linked by a common interest. *Id.* at 638. Under the common interest doctrine (also sometimes called the joint defense privilege):

> [w]here two or more persons jointly consult an attorney concerning a mutual concern, "their confidential communications with the attorney, although known to each other, will of course be privileged in the controversy of either or both of the clients with the outside world. . . ." (citations omitted). Moreover, the joint defense privilege cannot be waived without the consent of all parties to the defense, except in the situation where one of the joint defendants becomes an adverse party in a litigation. (citation omitted).

6

*Ohio-Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 21, 29 (N.D. Ill. 1980). The legal principles governing application of the common interest doctrine appear to be the same under Illinois and federal law. We therefore briefly summarize those principles (also articulated in *Beneficial Franchise Co., Inc. v. Bank One, N.A.,* 205 F.R.D. 212 (N.D. Ill. 2001)).

The purpose of the common interest doctrine is to "foster communication" between parties that share a common interest and to "protect the confidentiality of communications . . . where a joint . . . effort or strategy has been decided upon or undertaken by the parties and their respective counsel." *Evans,* 113 F.3d at 1467. The determination of whether a privileged document falls within a common interest depends upon the reason for disclosure and not when the document was created. *See Tenneco Packg'g Specialty & Consumer Prod., Inc. v. S.C. Johnson & Son, Inc.,* No. 98 C 2679, 1999 WL 754748 (N.D. Ill. Sept. 14, 1999). Like the assertion of the attorney-client privilege, a common interest must be established by the parties asserting it; and, it is limited to those documents that fall within that interest, and thus must be asserted on a document-by-document basis.

While often arising in the context of a joint defense, the common interest doctrine more generally applies to any parties who have a "common interest" in current or potential litigation, either as actual or potential plaintiffs or defendants. *Beneficial,* 205 F.R.D. at 216. To maintain the privilege, the common interest must relate to a litigation interest, and not merely a common business interest. *Id.* If there is some or even substantial overlap between the litigation and business interests, the common interest doctrine still applies so long as a "community of interest" can be established with respect to the documents. *See Strougo,* 199 F.R.D. at 520. "It is the commonality of interests which creates the exception, not the conduct of the litigation." *Waste Management,* 579 N.E.2d at 329. Thus, "where persons confer with counsel for the purpose of advancing their joint defense, the

7

conference is sealed from outside view." *In re Quantum Chemical/Lummus Crest*, No. 90 C 778, 1992 U.S. Dist. LEXIS 5448 (N.D. Ill. March 27, 1992) (applying Illinois law).

The common interest rule "is not limited to parties who are perfectly aligned on the same side of a single litigation." *Cadillac Ins. Co. v. American Nat. Bank of Schiller Pk.*, 89 C 3267, 1992 WL 58786, at *5 (N.D. Ill. March 12, 1992). Rather, the parties who assert a common interest as the basis for their assertion of privilege (where otherwise it would not exist due to the shared communications), must simply demonstrate "actual cooperation toward a common legal goal" with respect to the documents they seek to withhold. *See Strougo v. BEA Assoc.*, 199 F.R.D. 515, 520 (S.D.N.Y. 2001). This shared interest must be identical, not simply similar. *Allendale*, 152 F.R.D. at 140; *Strougo*, 199 F.R.D. at 525. The parties asserting the common interest may demonstrate an identity of interest, however, by showing that the sharing of these documents was for the purpose of cooperating in pursuit of "a common legal goal." *United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir. 1997) (so long as communication of privileged materials is made in connection with or in furtherance of a common interest, no waiver of privilege occurs). In some cases, this common goal includes pursuit of litigation against a common adversary. *See Allendale*, 152 F.R.D. at 139-40.

Of course, to assert the common interest doctrine as a shield to production, the parties asserting it must first establish that the underlying documents or communications withheld were otherwise privileged before the common interest arose. *Allendale*, 152 F.R.D. at 139-40. Thus, if a document is not already shielded from production by a privilege, then the common interest doctrine does not apply. And, if a privilege is waived as to certain documents before the common interest arose, then those documents cannot be shielded by the common interest doctrine. On the other hand, if a privilege attached to documents at the time the common interest arose, the party to whom the

8

privilege belongs cannot waive that privilege unilaterally; both parties that share the interest must agree to waive the privilege or it is not waived, unless one of the parties sharing the interest becomes an adversary. *Whitehall,* 1999 WL 617842, at *3.[2]

Under these principles, we find that Dexia and EMC share a common interest in pursuing a common legal goal: that is, establishing that the defendants in this case (Mr. Rogan, Braddock and Bainbridge) along with other related persons and entities engage in a course of fraudulent conduct that led to the losses claimed by Dexia and by EMC. Indeed, Mr. Rogan acknowledges that the common interest doctrine "provides that parties with a shared interest in litigation against a common adversary may share privileged information without waiving the privilege" (Rogan Reply at 2).

Mr. Rogan nonetheless argues that the common interest doctrine does not apply because these interests are not identical, given that EMC and Dexia are separate parties, "bringing two sets of claims in two separate courts of law" (Rogan Reply at 3). In our judgment, this argument ignores several factors which point to the identity of legal interests between EMC and Dexia, with respect to Mr. Rogan and the other defendants in this lawsuit.

*First,* the causes of action that Dexia is asserting in this case, and that under the funding agreement Dexia has the right to assert for EMC in the bankruptcy action, all have their basis in the underlying fraud that the defendants here allegedly perpetrated against Edgewater. The alleged fraud that defendants here perpetrated against Edgewater involved illegally obtaining Medicare and Medicaid funds, which constituted a large portion of the monies that the defendants allegedly

---

[2]Mr. Rogan argues that "documents . . . created prior to the institution of litigation against Rogan surely do not relate to the . . . common interest" that Dexia and EMC assert, and that the date documents were created is a relevant factor "militating against the application of the common interest doctrine" (Rogan Reply at 5). Documents created prior to formation of the common interest still may be protected by that interest; it is the purpose for which the documents were disclosed, and not whether they predated or post-dated the inception of the common interest, that determines whether the common interest doctrine applies. *See Tenneco Packg'g,* 1999 WL 754748, at *2.

improperly siphoned from Edgewater. That alleged conduct forms the basis of Dexia's claim in this case that the defendants fraudulently induced Dexia to issue a letter of credit, by concealing the alleged Medicare and Medicaid fraud and by improper siphoning money from Edgewater. Thus, Edgewater and Dexia have an identity of interest in proving precisely that same underlying fraud by these defendants, both in this Court and in the bankruptcy proceeding.[3]

*Second*, Mr. Rogan fails to address the significance of the funding agreement between Edgewater and Dexia. In our view, this funding agreement further reflects the common interests that Edgewater and Dexia have in "cooperation toward a common legal goal," *Strougo*, 199 F.R.D. at 520: that is, establishing liability on the part of these defendants for fraud that they allegedly perpetrated against both Dexia and Edgewater, to maximize the recovery that each may achieve. While Dexia also wears the hat of a creditor of Edgewater, there already has been a judicial finding that there is no conflict in Sidley representing both Dexia and Edgewater (Dexia Mem. Ex. F: 08/08/03 Mem. Op. and Order, at 4), which is a further reflection of the practical reality that both Dexia and Edgewater share a common litigation interest in pursuing claims against the defendants.

Accordingly, we find that Dexia and EMC fall within the common interest doctrine, such that EMC does not waive the attorney-client privilege by sharing with Dexia documents that fall within that common interest. We reiterate that, in so ruling, we make no finding as to whether any

---

[3]Mr. Rogan argues that Dexia, in opposing a motion to withdraw the reference of adversary proceedings in the bankruptcy court, has argued that "little if any commonality exists between Dexia's Second Amended Complaint in the district court and the various adversary proceedings in Bankruptcy Court," and that this constitutes evidence that the common interest does not apply (Rogan Reply at 3 n.3 and Ex. A). We disagree. Mr. Rogan has cited no authority that the standards are the same for establishing, on the one hand, a common interest for purposes of the attorney-client privilege doctrine and, on the other hand, for determining whether adversary cases in a bankruptcy proceeding are sufficiently common with a proceeding in the district court, so that the interests of judicial economy and cost reduction would be advanced by withdrawal of the reference. Indeed, we doubt that the standards are the same, since a common interest for purposes of the privilege "is not limited to parties who are perfectly aligned on the same side of a single litigation." *Cadillac Ins. Co.*, 1992 WL 58786 at *5.

10

particular document that EMC shared with Dexia was privileged *ab initio*, or falls within the scope of the common interest that we today recognize.

**B.**

The "at-issue" doctrine is Mr. Rogan's second rationale for waiver. This Court previously addressed the at-issue waiver doctrine in *Beneficial Franchise Co., Inc. v. Bank One*, 205 F.R.D. 212 (N.D. Ill. 2001). In that case, which arose under federal law, the Court held that a waiver of the attorney-client privilege does not occur simply by the assertion of a claim or defense; rather, to waive the privilege, the party to whom the privilege belongs must affirmatively put at issue the specific communication, document or information to which the privilege attaches. *Id.* at 216-17. Under that decision, the at-issue waiver doctrine does not apply here, as Dexia has not sought to use any of the documents for which it asserts privilege.

Mr. Rogan asserts that the rule is different under Illinois law, which applies to the claims asserted in this case. According to Mr. Rogan, in Illinois "a party impliedly waives the attorney-client privilege when the party asserting the privilege places protected information at issue through some affirmative act" such as filing suit, making the information relevant to the case, or shielding information that is "vital to" Mr. Rogan's defense of the claims made by Dexia in this case (Rogan's Reply at 10). In support of this assertion, Mr. Rogan cites *Pyramid Controls v. Siemens Indus. Automations*, 176 F.R.D. 269, 272 (N.D. Ill. 1997).

At the outset, we observe that *Pyramid*, itself, is a federal district court case, and not an Illinois state court decision case. More importantly, *Pyramid* does not cite any Illinois decision addressing the at-issue waiver doctrine, and to the contrary, specifically states there was none at the time of the decision:

11

neither the parties nor the court were able to find Illinois state court precedent directly addressing whether Illinois law on the attorney-client privilege recognizes the at-issue waiver. Indeed, in the recent case of *Waste Management, Inc. v. International Surplus Lines Insurance Co.,* the Supreme Court of Illinois declined to rule on the "at-issue exception" to the attorney-client privilege. 144 Ill.2d 178 (1991).

*Pyramid,* 176 F.R.D. at 272. The district court then quoted, at length, dicta from the Illinois Supreme Court's decision in *Waste Management,* and from this dicta, predicted that the Illinois courts would find that "by placing a matter in issue, the party has waived the attorney-client privilege with respect to the specific issue raised." *Id.* at 272.

Since the *Pyramid* decision, Illinois appellate decisions have charted a different course, and one that is consistent with *Beneficial.* In *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.,* 703 N.E.2d 634 (Ill. App. 1998), the court held, in reliance on the Illinois Supreme Court's dicta in *Waste Management,* that an at-issue waiver occurs only where "the sought-after material is either the basis of the lawsuit or the defense thereof." *Id.* at 340-41(quoting *Waste Management,* 144 Ill. 2d at 199-200). That holding was adopted in *Hayes v. Burlington No. and Santa Fe Railway Co.,* 752 N.E.2d 470, 476 (Ill. App. 2001). In that case, the court rejected the argument that the privilege should yield "when evidence contained in defendant's documents may help plaintiff to rebut an issue raised by defendant." *Id.* The court held that to allow a party to have access to privileged documents merely because they are relevant to a claim the opponent has raised would "unnecessarily undermine the purpose of the attorney-client privilege to encourage full and frank communication between attorneys and their clients." *Id.*

In determining the Illinois law on the at-issue waiver, we are required to decide what the Illinois Supreme Court would do if it were presented with the issue. *Allen v. Transamerica Insurance Co.,* 128 F.3d 462, 466 (7th Cir. 1997). In the absence of authoritative Illinois Supreme

12

Court rulings, "decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Id.* In this case, we see no persuasive reason to believe that the Illinois Supreme Court would view the at-issue waiver doctrine differently than did the courts in *Fischel* and *Hayes*. These Illinois appellate decisions reflect an application of the at-issue doctrine that, as we explained in *Beneficial*, properly balances the principle that "waivers of the attorney-client privilege are to be narrowly construed, . . . and the principle that a party should not be able to selectively disclose privileged information that it believes works to that party's advantage while concealing the rest." *Beneficial*, 205 F.R.D. at 216. In this case, Dexia has not attempted to selectively disclose privileged information; thus, at this time, we find that there is no at-issue waiver.

## C.

We now turn to Mr. Rogan's "control group" argument. Mr. Rogan asserts that many of the documents that Sidley seeks to withhold on the basis of EMC privilege were accessible to Mr. Rogan and/or authored by him while he was in the "control group" at EMC (*i.e.*, "within the class of persons who would receive communications and work product from counsel"). Mr. Rogan argues that it therefore makes no sense to shield those documents from him now, since he already has had access to the confidential communications. Mr. Rogan reasons that the communications are not confidential as to him because he has already seen them, and thus it does not advance the purpose of the privilege to maintain the confidentiality of those documents as to him (Rogan Mem. at 12).

In Illinois, the term "control group" has been defined as including employees "whose advisory role to top management in a particular area is such that a decision would not normally be made without [their] advice or opinion, and whose opinion in fact forms the basis of any final

decision by those with actual authority." *Hayes v. Burlington No. and Santa Fe Railway Co.,* 752 N.E.2d 470, 473 (Ill. App. 2001). The parties do not dispute, for purposes of the present motion, that Mr. Rogan was a member of the EMC control group prior to the formation of a common interest between EMC and Dexia (Dexia Mem. at 5). As originally presented, Mr. Rogan's control group argument was based on one case: *Gottlieb v. Wiles,* 143 F.R.D. 241 (D.C. Colo. 1992). In his reply, Mr. Rogan for the first time argued that this is the rule under Illinois law as well, citing *SPSS, Inc. v. Carnahan,* 641 N.E.2d 984 (Ill. App. 1994) (Rogan Reply at 12). We conclude that *Gottlieb* does not reflect a correct application of the law of corporate privilege, and that there are "persuasive indications" that the Illinois Supreme Court – contrary to *SPSS* – would not adopt the view espoused in *Gottlieb*.

The purpose of the attorney-client privilege is to encourage and foster candid communications between a client and counsel for the purpose of obtaining legal advice, by removing the fear of compelled disclosure of information. *Waste Management,* 579 N.E.22d at 326-27. In the context of a corporation, the "client" may encompass many different people and/or entities who share in the confidentiality inherent in a privileged communication. Members in a "control group" of a corporate client are just such people. A corporation acts through its agents, and thus, although the corporation is the client, the agents are the people who seek counsel for the corporation.

That said, the privilege does not belong to the individual agents of the corporation seeking the advice; the privilege belongs to the corporation, because the corporation is the client. That is the rule in federal courts, *see CFTC v. Weintraub,* 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. . . . Displaced managers may not assert the privilege over the wishes

of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties"), and it is also the rule in Illinois. *Hayes*, 752 N.E.2d at 478 (in corporate context, court held that "[t]he attorney-client privilege belongs to and can only be waived by the client"). Although an agent may be on the "inside" at the time the confidential communications were made between the corporation (on whose behalf the agent was acting) and counsel, once this agent leaves the corporation's employ, the privilege, and the legal rights associated with it, do not leave with this agent. Rather, the privilege remains with the corporation, because it belongs to the corporation.

Thus, once Mr. Rogan's control group status terminated, so too did his right of access to privileged documents of the corporation. A contrary rule – such as that set forth in *Gottlieb* and *SPSS* – would undermine the privilege. People may come and go within a control group, but a corporation has a legitimate expectation that a person who leaves the control group no longer will be privy to privileged information. To rule otherwise would defeat that expectation, and could chill the willingness of control group members to speak candidly on paper (or, these days, in electronic media) about privileged matters, knowing that some day one of their number may leave the control group and become adverse (whether through litigation or business activity) to the corporation.

The rationale offered by *Gottlieb* (and adopted without explanation in *SPSS*) for allowing a former control group member to have access to documents he or she saw, or could have seen, while in the control group is – in this Court's view, as well as in the view of many other federal courts – unpersuasive.[4] We offer several reasons for that conclusion.

---

[4] *See, e.g., Stopka v. Alliance of American Ins.*, No. 95 C 7487, U.S. Dist. LEXIS 5466 (N.D. Ill., Apr. 23, 1996) (applying federal and Illinois law, rejecting invitation to adopt *Gottlieb*); *Milroy v. Hanson*, 875 F. Supp. 646 (D. Neb. 1995) (stating that *Gottlieb* makes "a fundamental error" in holding that a "dissident director" can "pierce or otherwise

*First*, the *Gottlieb* court suggested that "the fact that former officers and directors lack the power to waive the corporate privilege does not resolve the question of whether they themselves are precluded by the attorney-client privilege or work-product doctrine from inspecting documents generated during their tenure." *Gottlieb*, 143 F.R.D. at 247. However, we believe that the *Gottlieb* court reached the wrong answer by starting with the wrong question. The *Gottlieb* court failed to address the fact that the reason former control group members may not waive the corporate privilege is because the privilege was never theirs in the first place – either when they were control group members, or when they left that capacity. At all times, the privilege resided in the corporation, and not in the individual officers or directors who at any given time comprised the control group. Unlike a situation where an individual client is no longer represented by an attorney, but nonetheless retains a continuing privilege in privileged attorney-client communications that occurred during their relationship, *United States v. White*, 970 F.2d 328 (7th Cir. 1992) ("Once the attorney-client privilege attaches to a communication, the communication retains the protection of the privilege even after termination of the attorney-client relationship"), there was no attorney-client privilege between attorneys and control group members personally, and thus no continuing right to exercise a privilege once they were no longer control group members.

That being the case, we believe the proper question to ask is whether there is any legal principle that gives a former control member a right to access a privileged document to which he or

---

frustrate the attorney-client privilege" held solely by the corporation, as client). *See also Finova Cap. Corp. v. Lawrence*, 2001 U.S. Dist. LEXIS 2087, at *7-8 (N.D. Tex. 2001); *Bushnell v. Vis Corp.*, No. C-95-04256, 1996 U.S. Dist. LEXIS 22572 (N.D. Cal. Aug. 29, 1996); *Hutchins v. Fordyce Bank & Trust Co.*, FBT, 216 B.R. 11, 15-16 (Bankr. E.D. Ark. 1997); *Lane v. Sharp Packg'g Sys., Inc.*, 640 N.W.2d 788 (Wis. 2002); *Genova v. Longs Peak Emergency*, 72 P.3d 454, 462-63 (Colo. App. 2003); *In re Marketing Invest. Corp.*, 80 S.W. 3d 44, 50 (Tex. App. Ct. 1998); *Tail of the Pup, Inc. v. Webb*, 528 So.2d 506 (Fla. Dist Ct. App. 1988); *Hoiles v. Superior Ct.*, 157 Cal. App. 3d 1192, 1198 (Cal. App. Ct. 1984).

she had access while in the control group. Put another way, the question presented is whether there is any legal basis to permit a former control group member to invade the corporate privilege, when he or she no longer is a member of the control group and has no personal claim of privilege in the documents at issue. We believe the answer to that question is no.

*Second,* the *Gottlieb* court found that access should be permitted by analogizing to two situations, both of which we find to be inapposite. The *Gottlieb* court first pointed out that when parties to a common interest retain a single attorney and later become adverse, neither party is permitted to assert an attorney-client privilege as to communications occurring during the period of common interest. *Gottlieb,* 143 F.R.D. at 247. The reason for this rule in the context of the common interest doctrine is that all parties to the common interest personally share in the attorney-client relationship during the period of that common interest; as a result, there would be no principled basis on which to allow one party to assert a superior attorney-client interest to other parties if they later become adverse, so as to allow some (but not all) of the parties access to the common interest information. That model does not fit here, because during the time that he was in the control group, Mr. Rogan had no personal attorney-client privilege or relationship; that relationship rested solely in the corporation.

The *Gottlieb* court also found support for its ruling in the proposition that an attorney may not withhold work product from a client. *Gottlieb,* 143 F.R.D. at 247. Once again, that analogy fails to account for the point that the former control group member never was the client; the client always was the corporation. Thus, when a corporation seeks to withhold privileged material from the former control group member, it is not depriving a "client" of information. Rather, the corporation is preserving the corporation's privilege by refusing to share privileged information with a former

17

control group member, who no longer has any legal right to it by virtue of current association with the corporation, and – in this case – is in fact antagonistic to the corporation.[5]

*Third*, the *Gottlieb* court observed that the policy underlying the work-product doctrine (and, presumably, attorney-client privilege) "would not be advanced by now denying [the former director] access to documents which he could have seen – or had access to – upon request at the time they were generated." *Gottlieb*, 143 F.R.D. at 247. Although the *Gottlieb* court does not elaborate on this comment, we surmise that the comment reflects the view that the privilege would not be advanced by denying access because the former director already has seen (or at least had access to) the documents in issue, and thus no expectation of confidentiality would be defeated. If that was the analysis of the *Gottlieb* court, we disagree with it. As we explained above, we believe that a corporation has a legitimate expectation that a control group member will not have access to privileged materials once his or her membership in the control group ceases.

Indeed, from a practical perspective, once documents are disclosed to the former agent or officer, that disclosure may force a waiver of the corporation's privilege as to all people, not just the former control group member. In this case, Mr. Rogan surely seeks access to the documents not merely for their historic value, but for the practical reason that he wants to see if he can use anything in them to aid his defense. In short, he seeks the documents so he can make use of them. Forcing

---

[5]We note that in making his control group argument, Mr. Rogan suggests that he should also have access to documents protected by the work product doctrine, given his undisputed "control group" status at EMC. *See* Rogan Mem. at 8, n.6; 14, n.10. This is the only portion of Mr. Rogan's submissions that address work product. In opposition, counsel for Dexia and EMC argued that these suggestions, without supporting authority, constitute a mere skeletal argument that the Seventh Circuit categorizes as a mere assertion that is insufficient to preserve a claim (Dexia's Mem. at 11)(citing *U.S. v. Dunkel*, 927 F.2d 955, 956 (7ᵗʰ Cir. 1991) (per curiam)). Given our ruling rejecting Mr. Rogan's control group argument, we need not address the waiver point.

production of the documents thus inevitably will risk further disclosure to persons other than Mr. Rogan, which plainly would undermine the purposes of the privilege.[6]

For all of the foregoing reasons, this Court disagrees with *Gottlieb*. Notwithstanding that disagreement, we would be bound to apply *Gottlieb* if we were confident that the Illinois Supreme Court would do so. And, under *Allen*, we are bound to follow *SPSS*, which applied *Gottlieb*, "unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Allen*, 128 F.3d at 466. In this case, we believe there are persuasive reasons for believing (as we do) that the Illinois Supreme Court would not follow the decision in *SPSS*: (1) *SPSS* merely stated a conclusory adoption of *Gottlieb*, without explanation or analysis; (2) for the reasons we described above, *SPSS* (by adopting *Gottlieb*) endorses a view of the law that is inconsistent with the Illinois rule that, in a corporate setting, the privilege resides with the corporation, as the client, and not in the individuals who are in the control group at any given time; and (3) the *Gottlieb* decision has not been followed by any other federal or state court, and has been consistently rejected (*see* note 4, *supra*). For these reasons, we conclude that Mr. Rogan's status as a former control group member of EMC does not entitle him to see privileged documents that he saw, or to which he had access, during the time he was in the control group.[7]

---

[6]For example, if Mr. Rogan gets the documents, what happens if the other defendants demand inspection? If Mr. Rogan uses the documents to prepare for deposition, what happens when a party moves under Fed. R. Evid. 612 for their production? What if Mr. Rogan wishes to use such a document to cross examine some other control group member – may he do that, and if so, is there any basis to exclude the other defendants from listening?

[7]Mr. Rogan also asserts that Dexia is seeking to withhold as privileged certain documents that Mr. Rogan, himself, produced to Dexia, without objection from EMC, and that this waives any EMC privilege in those documents (Rogan Mot. ¶ 7, at 4; Rogan Mem., at 9-10; Rogan Reply at 5). Because this Opinion does not address whether any particular documents are privileged, this argument is premature; we therefore do not address it at this time.

**D.**

Finally, we have considered – and we now reject – Mr. Rogan's equitable arguments. Mr. Rogan has cited no authority to support the proposition that privileged documents that are subject to a common interest doctrine, that have not been placed at issue, and that he has no right to see as a former control group member nonetheless must be produced to him for "equitable reasons." To the extent that Mr. Rogan feels at a disadvantage because Sidley represents both EMC and Dexia, that is a disadvantage created by a funding agreement approved in the bankruptcy court, and that Chief Judge Kocoras declined to undo. That disadvantage is not a basis to deprive EMC and Dexia of a common interest privilege they otherwise possess.

## CONCLUSION

Accordingly, the Court DENIES Mr. Rogan's motion to compel (doc. # 122).

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: December 20, 2004**