# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Credit Local de France, ) ) ) ) | |
| | No. 02 C 8288 |
| Plaintiff, ) ) | |
| | District Judge Mark Filip |
| vs. ) ) | |
| | Magistrate Judge Sidney I. Schenkier |
| PETER ROGAN, *et al.*, ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In this opinion concerning discovery disputes, our fourth to date in this case,[1] we address Dexia's motion to compel production of documents from defendants Braddock Management LP, Brainbridge Management LP, Bainbridge Management, Inc. (collectively, "the Management Companies") and Peter G. Rogan (doc. # 208). The motion raises a number of issues concerning documents in the possession of John Tatooles and his law firm (collectively, "Tatooles") that defendants have withheld from production based on assertions of privilege. These documents are identified on what the parties label, and what we thus refer to, as the "Tatooles Firm's Privilege Log."

Dexia's motion identifies ten categories of dispute with respect to documents on the Tatooles Firm's Privilege Log. All or part of seven of those ten categories (*i.e.*, Categories 1-4, 6, 8, and 10) involve the same overarching dispute: whether Tatooles acted solely as the lawyer for the

---

[1] *See Dexia Credit Local v. Rogan*, No. 02 C 8288, 2005 WL 1185816 (N.D. Ill. May 13, 2005); *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2004 WL 3119026 (N.D. Ill. Dec. 21, 2004); *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2004 WL 2898044 (N.D. Ill. Dec. 13, 2004).

management companies; or, acted solely as the lawyer for Edgewater Medical Center ("EMC"); or, served both EMC and the Management Companies pursuant to a common legal interest.

For the reasons set forth below, the Court concludes that Tatooles acted on behalf of both EMC and the management companies, and that Dexia and the management companies may not assert that privilege against each other in this lawsuit. We first set forth the relevant factual background (Section I), and then explain the basis for our conclusion with respect to the Tatooles representation (Section II). We conclude by addressing the remaining privilege issues raised by the motion (Section III).

I.

Our prior three opinions in this case have set forth of the relevant history leading to this lawsuit, which we repeat here only insofar as necessary to understand the current motion. Between 1994 and 2000, Braddock Management, L.P. entered into three Hospital Management Agreements ("HMAs") with EMC. The HMAs were dated August 17, 1994, August 1, 1997, and March 1, 2000.[2] The other corporate defendants in this case, Bainbridge Management L.P. and Bainbridge Management, Inc. are related entities to Braddock, and all are alleged to be controlled directly or indirectly by defendant Peter Rogan.

By these HMAs, EMC engaged the Management Companies to be the "sole and exclusive manager of the day-to-day operations" of EMC (HMAs § 2.01).[3] The parties agreed that in connection with that engagement, the Management Companies "shall have a fiduciary responsibility"

---

[2] In the first two contracts, EMC was titled Northside Operating Co., d/b/a Edgewater Hospital and Medical Center. For convenience, we consistently refer to the hospital entity as EMC.

[3] Where there is no difference between any of the three HMAs, as is true with respect to the scope of the Management Companies' appointment, we simply cite to the relevant section. Where there is some difference between a relevant term of the various HMAs, we will so indicate.

to EMC (*Id.*). Pursuant to the HMAs, the Management Companies assigned certain employees to work at EMC as "administrative managers" (HMAs, § 3.01(a)). Over time, the administrators assigned by the Management Companies to EMC were Peter Rogan, Roger Ehmen, Henry Zeisel, Judy Lunde, and Joann Skvarek. These individuals, although assigned to EMC, were deemed to be employees of the Management Companies; however, EMC reimbursed the Management Companies for the compensation that the Management Companies paid to these administrative managers (*Id.*). Except for these assigned employees of the Management Companies, all other employees of EMC were deemed to be employees of EMC (*Id.*).

In the discharge of its responsibilities, the Management Companies were given broad authority and power. The Management Companies were given the authority to hire, supervise, discipline and counsel non-physician personnel at EMC, and to determine their compensation (HMAs, § 3.01(b)). The Management Companies were given authority to enter into contracts (*Id.*, § 3.05), as well as the "sole discretion, [to] defend, assert, settle, or otherwise dispose of any claims, litigation, judgments or liabilities in connection with" EMC (*Id.*, 3.06). The Management Companies were required to cause periodic safety checks to be performed and insurance requirements be reviewed, with necessary coverage to be obtained (1994 and 2000 HMA, § 3.13; 1997 HMA, § 3.14). The Management Companies also were required to provide certain general corporate services to EMC, including acting as liaison with counsel to EMC (1994 HMA, § 3.17(g); 1997 HMA, § 3.18(g)). The Management Companies were required to "protect the confidentiality of all records" of EMC, and to assist EMC in "complying with all applicable federal, state, and local laws and regulations" pertaining to hospital records (HMAs, § 3.11).

3

In order to discharge their wide-ranging responsibilities, the Management Companies were authorized to "hire or retain any consultants, accounts, attorneys or other professional personnel ... necessary and appropriate to assist" the Management Companies (HMA, § 3.02). The HMAs provided that the costs of those consultants – including attorneys – would be included in "costs of operation" (*Id.*), which meant that those costs would be borne by EMC (*see Id.*, § 10.01(i)).

During the period of the HMAs, Tatooles was outside counsel for the Management Companies. EMC had its own outside counsel – various attorneys of the firm of McDermott, Will & Emery ("MWE"). Documents submitted in connection with Dexia's motion show that during the course of the HMAs, Tatooles performed legal work that had a dual purpose: (1) as contemplated by Section 3.02 of the HMAs, Tatooles performed work to assist the Management Companies in carrying out their duties and responsibilities under the management agreements, and (2) in so doing, Tatooles was performing work for the benefit of EMC.[4] In performing this work, Tatooles had written communications that fall into three categories: (1) communications with EMC employees; (2) communications with administrative managers assigned by the Management Companies to EMC; and (3) communications with attorneys at MWE, outside counsel for EMC.

In the course of this work, in 1997 and 1998, Tatooles submitted letters to EMC's auditors, acknowledging that, in the prior year, Tatooles had represented EMC in connection with certain matters (Dexia's Mot., Ex. D). Tatooles also made recommendations concerning the entry by EMC into contracts; gave EMC advice concerning its rights under certain agreements; drafted documents

---

[4]The parties agree that during this time period, Tatooles also performed work that was exclusively for the benefit of the Management Companies (for example, advising the Management Companies on contract negotiations with EMC). Dexia does not contest the assertion of privilege or work product falling within this category, as to those communications, and those documents are not the subject of this motion.

4

for EMC to use in responding to complaints and for getting into agreements; and commented on (or directed) legal work done for EMC by MWE (*Id.*).

In the summer of 1996, EMC asked Tatooles to become its outside general counsel. Tatooles declined the offer in a letter dated August 8, 1996, reciting to potential, actual or perceived conflict that might result from its "direct representation" of EMC as its outside general counsel. However, in that letter, Tatooles acknowledged that in its capacity as "counsel to Braddock and under the auspices of its management contract with Edgewater, we have been delighted to provide services on behalf of Edgewater." Tatooles wrote that despite rejecting the offer to become outside general counsel, "it is appropriate that we continue to work on behalf of Edgewater in our capacity as counsel to Braddock with respect to Braddock's responsibilities as manager [of] the operations of Edgewater. I hope that you and I shall continue to both consult and correspond with each other as the respective counsels of Edgewater and Braddock on Edgewater related matters. I look forward to continuing to work with you on behalf of Edgewater (08/08/96 Letter, John J. Tatooles to Michael Olsen, EMC's General Counsel).

## II.

Because jurisdiction of this matter is based on diversity of citizenship and the claims all arise under Illinois law, the claims of privilege are also governed by Illinois law. *See* FED. R. EVID. 501; *Dexia*, 2004 WL 3119026, *3. Moreover, application of Illinois law is consistent with the HMAs, which provides that the interpretation, construction and application will be governed by Illinois law (HMAs, § 9.04).

We begin our analysis with the overarching issue of who controls the attorney/client privilege with respect to the documents on the Tatooles Firm's Privilege Log. Dexia claims that

EMC has the sole right to exercise the privilege with respect to Tatooles's communications with EMC employees, administrative managers assigned by the Management Companies to EMC, and EMC's outside counsel, MWE. Dexia argues that, as a result of Dexia's relationship with EMC, Dexia – and not the Management Companies – controls the privilege. Dexia seeks not only production of the Tatooles documents that have been withheld, but further seeks to deprive the Management Companies of any use of or access to the documents.

For their part, the Management Companies claim that there is no privilege in any of the communications between Tatooles and EMC's outside counsel or employees; and, as to Tatooles's communications with the administrative managers assigned by the Management Companies to EMC, defendants assert that they – and not Dexia – are the exclusive holders of the attorney/client privilege. As to any documents in which EMC may have had a privilege, defendants argue that the privilege has been waived or, if not waived, cannot be asserted by Dexia/EMC against these defendants.

In order to sort through these issues, we address in turn the following points: (a) whether EMC had an implied attorney/client privilege with Tatooles; (b) if so, whether the communications stemming from that relationship were privileged solely as to EMC, or whether they were subject to a common interest privilege involving both EMC and the Management Companies; and (c) if so, whether any of the parties here may assert that privilege against the other in this litigation.

### A.

Under Illinois law, an implied attorney/client relationship, and the privilege flowing from it, may arise "when the lay party submits confidential information to the law party with the reasonable belief that the latter is acting as the former's attorney . . ." *Westinghouse Electric Corp. v. Kerr-*

*McGee Corp.*, 580 F.2d 1311, 1319-20 (7th Cir.), *cert. denied*, 439 U.S. 955 (1978). The reasonableness of the lay party's belief can be shown by evidence of "any relatively clear indication by the potential client to the attorney that he believed he was being . . . represented," or "some finding that the potential client's subjective belief is minimally reasonable." *United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997).

Under this standard, we find that EMC had an implied attorney/client relationship with Tatooles. We find this to be the case irrespective of whether the communications were between Tatooles and employees or outside counsel of EMC, or between Tatooles and Management Companies' employees assigned to EMC under the HMAs.

### 1.

With respect to communications between Tatooles and EMC's employees and outside counsel, we find that EMC had a belief that Tatooles was acting as its counsel in connection with hospital matters, and this that belief was "minimally reasonable." The HMAs entrusted the Management Companies with broad authority to run the hospital: the Management Companies had the authority to hire, manage, and fire non-physician staff, and had sole discretion to enter into contracts and to pursue, defend or settle litigation. The HMAs further provided that the Management Companies owed a fiduciary duty to EMC in discharging these powers. The HMAs provided that defendants could hire attorneys to assist them in performing the work for EMC, and that the Management Companies would act as liaison with EMC's outside counsel. The management agreements provided that the attorneys' fees incurred by counsel hired by the Management Companies to perform services under the management agreements would be reimbursed by EMC. Given the structure of these agreements, we conclude that it was reasonable for EMC to conclude

that Tatooles – who was chosen by the Management Companies to perform work for EMC in connection with the HMAs – was acting as EMC's counsel.

This is further borne out by correspondence and other documents that Dexia attached to its motion (Dexia's Mot., Ex. D), which show that EMC treated Tatooles as an attorney representing its interests in hospital affairs. These documents also show the reasonableness of EMC's subjective belief that Tatooles was acting in the capacity of their attorney. The reasonableness of that belief is perhaps best illustrated by the fact that Tatooles, in furnishing information to EMC's auditors, acknowledged that it had represented EMC in connection with specific matters. Defendants have offered no response to this evidence[5] The arguments that defendants do raise to dispute the implied attorney/client privilege are unpersuasive.

*First*, defendants argue that Dexia's conduct in this litigation is inconsistent with the assertion that EMC believed Tatooles acted as its counsel. Having reviewed the arguments and counterarguments, we are unconvinced that there is any such inconsistency. Moreover, we do not think that Dexia's litigation conduct in 2004 and 2005 speaks to whether there was an implied attorney/client relationship between EMC and Tatooles between 1994 and 2001. Certainly, any such inconsistency alleged here does not overcome the proof that Dexia has offered that EMC reasonably believed that Tatooles was acting as EMC's attorney.

*Second*, defendants argue that EMC had no expectation of confidentiality in the communications its employees or outside counsel (MWE) had with Tatooles. Put another way, defendants argue that EMC could not have had an expectation of confidentiality in the

---

[5]Defendants have failed to do so in their written submissions. They also failed to do so when given the opportunity to speak to these documents during a proceeding in open court on April 21, 2005.

communications because EMC knew that Tatooles was not its attorney. But that argument merely assumes that Tatooles was not EMC's attorney; that assumption is not evidence, much less evidence sufficient to overcome the evidence Dexia has submitted of an implied attorney/client relationship.

*Third*, defendants argue that EMC could not have had a reasonable belief that Tatooles was its counsel after Tatooles declined EMC's invitation in 1996 for Tatooles to become its outside general counsel. We disagree. In that response, Tatooles declined to accept the broad responsibility of being EMC's general outside counsel, but did not deny Tatooles had done legal work for EMC in the past – and did not disavow an intent to do so in the future. Indeed, even after declining to become EMC's general outside counsel in 1996, Tatooles provided EMC's auditors with responses in which Tatooles identified itself as having performed the legal work for EMC on specific matters in 1997 and 1998.

## 2.

We also conclude that this implied attorney/client relationship existed with respect to communications between Tatooles and Management Companies' employees who were assigned, under the HMAs, to serve as administrative managers at EMC. Those administrative managers occupied the highest positions at the hospital, and thus were within EMC's control group. *See Dexia*, 2004 WL 3119026, *8 (under Illinois law, the control group includes employees "whose advisory role to top management in a particular area is such that a decision would not normally be made without [their] advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority") (quoting *Hayes v. Burlington Northern and Santa Fe Railway Co.*, 752 N.E.2d 470, 473 (Ill. App. 2001)). Indeed, in an earlier motion before this Court, defendants here took the position that both Mr. Rogan and the Management Companies were within

9

the EMC control group during the time period in question (*see* Defendants' 10/21/04 Mem., at 2, 3 n.2, and 4 n.3). Accordingly, we conclude that the Management Companies' employees assigned to EMC as administrative managers occupied a position at EMC that brought them within the implied attorney/client privilege between EMC and Tatooles.

We are unpersuaded by defendants' argument that the Management Companies alone hold the privilege in these communications. The Management Companies base their argument on the contention that both Tatooles and the administrative managers, who were employees of the Management Companies, reasonably believed that their communications with each other would be confidential. That argument is inconsistent with the roles that Tatooles and the administrative managers occupied with respect to the operations of EMC, and the structure of the HMAs. Indeed, in pleadings submitted in the bankruptcy proceedings between EMC and Management Companies, the Management Companies acknowledged that an assigned manager (specifically, Mr. Ehmen), was a "dual agent," responsible to both the Management Companies and EMC. *See In Re Edgewater Medical Center (Edgewater Medical Center v. Rogan, et al.)*, Bankruptcy No. 02 B 7378, Adversary Case No. 04 A 2327, Slip.Op. at 12 (N.D. Ill. Apr. 6, 2005).

The Management Companies thus acknowledged the practical reality that, like Tatooles, administrative managers served more than one master. Under the HMAs, both the administrative managers and Tatooles were employees or agents of the Management Companies, and were paid by the Management Companies. But, under the HMAs, administrative managers were assigned to the most senior positions at EMC, and their pay was reimbursed by EMC – as was the case with Tatooles. In these circumstances, whatever Tatooles and the administrative managers might have

subjectively believed, they could not have reasonably believed that their communications made in furtherance of EMC's affairs would be kept confidential from EMC.[6]

**B.**

Having found that communications between Tatooles and EMC's employees, assigned employees, and outside counsel fall within an implied attorney/client privilege, we consider next Dexia's argument that this privilege belongs to EMC alone, and is not shared by the Management Companies. To resolve that argument, we must consider whether the communications fall within the common interest doctrine.

As we previously have explained, "[w]here two or more persons jointly consult an attorney concerning a mutual concern, 'their confidential communications with the attorney, although known to each other, will of course be privileged in the controversy of either or both of the clients with the outside world.'" *Dexia*, 2004 WL 3119026, at *4 (*quoting Ohio-Sealy Mattress Manufacturing Co. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980)). The common interest doctrine interest extends to "those communications made in the course of an ongoing common enterprise and intended to further the enterprise." *Evans*, 113 F.3d at 1467 (*quoting United States v. Schwimmer*, 892 F.2d 237, 243-44 (2nd Cir. 1989)). The interests must involve a "common legal goal," as opposed to a mere business interest. *Evans*, 113 F.3d at 1467; *Dexia*, 2004 WL 3119026 at *5. In addition, the common interest "must be identical, not simply similar." *Dexia, Id.* However, the identity of interest may be established by showing that the sharing of documents was for the purpose of cooperating in pursuit of a common legal goal. *Id.*

---

[6] We have considered defendants' argument that Dexia's litigation conduct is inconsistent with the assertion of an implied attorney/client privilege, but find it unconvincing.

11

We note that the common interest doctrine typically applies when an attorney has provided joint or simultaneous representation of the parties. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 579 N.E.2d 322, 328 (Ill. 1991). However, the absence of a formal representation agreement is not essential to the existence of the common interest privilege. The Illinois Supreme Court has held that "the doctrine may properly be applied where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer." *Waste Management*, 579 N.E.2d at 329.

Dexia argues that the communications at issue here do not fall within a common interest privilege because Tatooles provided advice to EMC, and when the assigned administrative managers sought the advice for EMC, they did so solely wearing the EMC hat. Dexia thus argues that legal advice was sought and rendered only in connection with EMC's legal interest, and that the Management Companies' legal interests were not implicated.

Dexia's argument takes too narrow a view of the relationship between the Management Companies and EMC pursuant to the HMAs. Under the HMAs, the Management Companies and EMC were "joined at the hip" in connection with the management of the hospital. The HMAs vested broad managerial authority in the Management Companies, which included the provision of senior management employees to EMC. The HMAs imposed correspondingly broad responsibilities on the Management Companies, including a fiduciary responsibility to EMC in the manner in which the Management Companies fulfilled the contractual obligations. The relationship created between the Management Companies and EMC under the HMAs constituted an "ongoing business enterprise," as that term was used by the Seventh Circuit in *Evans*.

We agree with Dexia that the common enterprise between the Management Companies and EMC included a common business interest. But, as is typically the case in the business world, the implementation of that common business interest required legal advice; were it not so, there would be no reason for Tatooles to have been involved at all (and, if he was involved, then his communications would not be for the purpose of legal advice and thus would not be privileged as to either EMC or the Management Companies). The HMAs contemplated that the Management Companies would provide the services of counsel in connection with discharging their responsibilities under HMAs. The HMAs authorized the Management Companies to hire attorneys "to assist [the Management Companies] in carrying out [their] duties and responsibilities in accordance with this Agreement" (HMAs, § 3.02). Certainly, the HMAs thus contemplated the use of counsel by the Management Companies in exercising their authority under the HMAs to enter into contracts (HMAs, § 3.05), to defend, assert, settle or otherwise dispose of litigation involving EMC (*Id.*, § 3.06), and to serve as liaison with EMC's counsel (1994 HMA, § 3.17(g); 1997 HMA, § 3.18(q)).

Dexia recognizes this point, as indeed it must for Dexia to claim that the communications at issue are privileged. Therefore, Dexia grounds its opposition to the application of the common interest doctrine on the proposition that while the communications at issue pertain to EMC's legal interest, the Management Companies did not share in that interest. We disagree. The Management Companies and EMC had an identical interest in the privileged communications, albeit from different perspectives. For EMC, the legal advice was important so that EMC could make decisions on contractual engagements, litigation matters, and tax or other regulatory matters. The Management Companies had an interest in that legal advice (which they were providing through counsel that the

13

Management Companies chose pursuant to the HMAs): namely, to insure that the Management Companies were fulfilling their fiduciary and other obligations under the HMAs. Thus, EMC and the Management Companies had the identical interest that the legal advice Tatooles gave was sound, so that each could rely upon it. The fact that EMC and the Management Companies had different business reasons for relying on the advice does not undermine that they had the identical interest in the legal advice itself. And, it is the common legal interest, not business interest, that is central to application of the common interest doctrine.

The cases upon which Dexia places principal reliance do not suggest a contrary result here. In *Tenneco Packing Specialty and Consumer Products, Inc. v. S.C. Johnson & Son, Inc.*, No. 98 C 2679, 1999 WL 754748 (N.D. Ill. Sept. 14, 1999), the court applied the common interest doctrine to shield from production a patent opinion obtained by DowBrands in 1997, which DowBrands later shared with S.C. Johnson as part of due diligence for an asset purchase agreement in which S.C. Johnson acquired the rights in the patent. The fact that S.C. Johnson and DowBrands approached the significance of the legal opinion from different business perspectives did not undermine their common interest in the legal advice concerning validity of the patent.

Similarly, in *Baxter Travenol Laboratories, Inc. v. Abbott Laboratories*, No. 84 C 5103, 1987 WL 12919 (N.D. Ill. June 19, 1987), the court found that Baxter and two individuals, Popovich and Moncrief, had a common legal interest in communications with Baxter's attorneys about patent development. The court reasoned that "[a] community of legal interests may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain greatest protection and in exploiting the patents." *Id.* at *1. The Court concluded that while each of the parties had a somewhat different business interest stemming from their differing interests that

would result from the issuance of patents (Popovich and Moncrief would own any patents, and Baxter would have the right to an exclusive license), they all shared common interest in the advice concerning the patents.

The *Tenneco* and *Baxter* analyses support application of the common interest doctrine here. EMC and the Management Companies may have had different business reasons for wanting Tatooles to provide advice, but they had a common interest in Tatooles providing advice on which they could rely: to further the ongoing enterprise created by the HMAs. Tatooles acted for the mutual benefit of EMC (by providing legal advice for EMC to use in conducting its affairs) and the Management Companies (by helping the Management Companies discharge their fiduciary and contractual obligations to EMC). We conclude that communications between Tatooles and EMC's employees, assigned administrative managers and outside counsel that were "made in the course of [this] ongoing enterprise and intended to further the enterprise," *Evans*, 113 F.3d at 1467, are protected under the common interest doctrine.[7]

## C.

When communications are protected by the common interest, they will be "privileged in a controversy of either or both of the clients with the outside world." *Dexia*, 2004 WL 3119026, at *4. And, typically, that privilege cannot be waived without the consent of all the parties to the common interest. *Id.*

An exception to the assertion of the common interest privilege exists when the participants in the common interest become adverse to each other in litigation. *Dexia*, 2004 WL 3119026, at *4;

---

[7]In light of our ruling, we have no occasion to pass on Dexia's argument that, even if the privilege in the documents ran solely between Tatooles and the Management Companies, Dexia is entitled to the Tatooles firm's documents based on the fiduciary duty exception to the attorney/client privilege.

15

*Waste Management*, 579 N.E.2d at 328. Thus, if EMC were the plaintiff against the Management Companies in this lawsuit, there would be no question but that neither side could assert the common interest privilege in this case with respect to the documents on the Tatooles Firm's Privilege Log. But, the named plaintiff in this case is Dexia, not EMC; and, on that basis, Dexia asserts that EMC and the Management Companies are not adverse in this litigation.

Dexia's argument glosses, in a footnote, a point that Dexia made with great vigor when it opposed Mr. Rogan's efforts to obtain documents that Dexia asserted were privileged: that is, that EMC and Dexia have a common legal interest with respect to Mr. Rogan and the other defendants in this lawsuit. At that time, Dexia explained that pursuant to that common interest, EMC disclosed privileged documents to Dexia "to aid their joint effort – in this case [and others] – to prosecute the claims against Rogan, Braddock, Bainbridge, EPC, PGR, EMC's former parents, and EMC's former directors" (doc. # 140: Edgewater and Dexia's Joint Mem., at 8). And, the Court found that EMC and Dexia have a common interest with respect to pursuing Mr. Rogan and the other defendants in this lawsuit. *Dexia*, 2004 WL 3119026, at *12.

Dexia offers no explanation whatsoever as to why, for purposes of analyzing whether the adverse party exception to the common interest privilege applies here, Dexia should not be considered as standing in the "adverse party" shoes of EMC. Dexia has argued (successfully) that it shares an identical legal interest with EMC: prosecuting claims against the defendants here. Put another way, the manifestation of EMC's and Dexia's common legal interest is their common legal adversity to the defendants in this case. In these circumstances, we think it would be a misuse of the privilege to allow Dexia, for purposes of the current motion to now distance itself from EMC. It would be tantamount to allowing Dexia to use its common interest with EMC both as a shield (to

protect privileged documents it received from EMC, from disclosure) and as a sword (to prevent defendants from using the communications arising out of a common interest with EMC). We conclude that the adversity between the Management Companies and Dexia (with whom EMC shares a common interest) precludes either Dexia, EMC or the Management Companies from asserting the common interest privilege concerning the Tatooles documents in this lawsuit.[8]

### III.

Dexia's motion identified ten categories of disputes for the Court to resolve. The foregoing discussion resolves (or explains why it is unnecessary to resolve) Categories 1 through 4, 6 and 8 in their entirety, and portions of category 10. The motion further disclosed that the parties have resolved their disputes concerning Category 5 (the Management Companies' designation of certain documents as work product) and 9 (the Management Companies' identification of previously "unknown individuals"). We now address the remaining categories of dispute.

### A.

Category 7 of Dexia's motion deals with three specific documents on the Tatooles Firm's Privilege Log: one lists the client as PGR Properties, Inc., (TF0007287) another lists the client as Mr. Rogan (TF0009734-9739), and a third lists the client as Edgewater Property Company (TF014309-14316). In response to a question by Dexia concerning the identity of the clients referred to in the Tatooles Firm's Privilege Log, the Management Companies indicated that the word "client"

---

[8]Dexia further argues that the adversity exception to the common interest doctrine bars the Management Companies from waiving the privilege in order to use the Tatooles documents in separate litigation between the United States and Mr. Rogan under the federal False Claims Act. *See United States v. Rogan*, No. 02 C 3310 (N.D. Ill.). There currently is pending a motion that will be decided by the presiding district judge in that case concerning the ability of Mr. Rogan to use those documents in the False Claims Act case. In this opinion, therefore, we express no view on that question. We hold only that, *in this litigation*, the adversity between Dexia (which has a common interest with EMC) and the Management Companies precludes either party from asserting the privilege as to the Tatooles firm's documents in which they have a common interest privilege.

17

was intended to refer to Braddock Management, L.P., Bainbridge Management L.P. and/or Bainbridge Management, Inc. (Dexia Motion, Ex. C, 04/12/05 Letter at 3). Based on that explanation, Dexia argues that any privilege has been waived for these three documents that list some other client, on the ground that the Management Companies possess the documents and disclosure to the Management Companies waives any privilege that other entities had in the documents (Dexia Mot., at 13).

In response, the Management Companies deny that they have had access to these documents. They assert that the documents were in the Tatooles client matter files, "and are not shared with anyone – *i.e.*, Braddock's files are not shared with PGR Properties, Inc., and so on" (Dexia Mot., at 14). Since Dexia does not contest the underlying privileged nature of the documents, but only claims that the privilege is waived, it is Dexia's burden to prove waiver. *U.S. v. Evans*, 113 F.3d at 1461. Dexia has failed to rebut defendants' explanation, and we thus deny the motion to compel production of these three documents.

### B.

In Category 10 of the motion, Dexia raises what it calls "miscellaneous specific issues" with respect to six documents. The dispute has been resolved as to two of the documents (TF0009052-9053 and TF0009705-9707), and our foregoing discussion resolves the issue with respect to two others (TF0009697-9704 and TF0009708-9717). As for the two remaining documents, we deny the motion to compel production.

TF0008089-8092 is a document sent by Tatooles to Mr. Rogan, "c/o JKR Business." Dexia asserts that by sending the letter to a third party (JKR Business), Tatooles destroyed the privilege between Tatooles and Mr. Rogan (Dexia Mot., at 15). However, defendants claim that the document

18

was never sent to anyone other than Mr. Rogan, and it was sent to him at the JKR Business – it was not sent to JKR Business for its review. Dexia does not dispute that the communication would be privileged as between Tatooles and Mr. Rogan. And, Dexia has offered no proof that the communication, in fact, was provided to a third party outside the Tatooles-Rogan relationship. Thus, Dexia has failed to show a waiver of privilege.

Document TF0017079 is a letter from Tatooles to Mr. Rogan. In correspondence concerning the privilege log, the Management Companies describe the document as "clearly [within] Braddock's privilege." Defendants state that they misspoke (or mis-wrote) in asserting that the privilege was held by Braddock (Dexia Mot. at 16). And, Dexia seems to accept that explanation, as Dexia does not dispute that the document provided privileged communication between Tatooles and Mr. Rogan; instead, Dexia claims that there was a waiver of the privilege when the document was provided to Braddock (*Id.*). Defendants deny that the document was ever provided to Braddock (*Id.*). Again, since Dexia does not challenge the underlying claim of privilege, but rather asserts that the privilege has been waived, it was Dexia's burden to prove the waiver. It has failed to do so.

## CONCLUSION

For the foregoing reasons, Dexia's motion to compel (doc. # 208) is granted in part and denied in part, in line with the Court's rulings herein. To the extent that they have not already been produced, all documents on the Tatooles Firm's Privilege Log that are subject to the common interest privilege shall be produced to Dexia by June 7, 2005. Neither Dexia, EMC, nor the defendants in this case may assert the common interest privilege to prevent the other from using the Tatooles

firm's documents in this lawsuit. We express no view as to the use of the Tatooles firm's documents at issue here in any other litigation.

                          **ENTER:**

                          **SIDNEY I. SCHENKIER**
                          **United States Magistrate Judge**

**Dated: May 31, 2005**