1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3

4    DEXIA CREDIT LOCAL, f/k/a          )
     Dexia Public Finance Bank         )
5    and Credit Local de France,       )    Docket No. 02 C 8288
                                        )
6                  Plaintiff,           )
                                        )
7    vs.                                )    Chicago, Illinois
                                        )    October 31, 2008
8    PETER G. ROGAN, et al.,            )    11:45 a.m.
                                        )
9                  Defendants.          )

10                  TRANSCRIPT OF PROCEEDINGS
11    BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
     APPEARANCES:
13

14   For the Plaintiff:      HOWREY LLP
                              BY:  MR. SCOTT T. MENDELOFF
15                            321 North Clark Street, Suite 3400
                              Chicago, Illinois    60654
16

17

18
     For Fred Cuppy:         KELLEY, DRYE & WARREN, LLP.
19                           BY:  MR. MARK S. GREGORY
                                  MS. ERIN KREJCI
20                           400 Atlantic Street
                             Stamford, Connecticut    06901
21

22

23
                    LAURA M. BRENNAN - Official Court Reporter
24               219 South Dearborn Street - Room 2102
                    Chicago, Illinois    60604
25                      (312) 427-4393

1        (The following proceedings were had in open court:)

2              THE CLERK:   02 C 8288, Dexia v. Rogan.

3              THE COURT:   Good morning.

4              MR. GREGORY:   Good morning, your Honor.

5              MR. MENDELOFF:   Good morning, your Honor.

6              THE COURT:   Somebody has to say their name at some

7   point, so I'm just going to wait for you.

8              MR. GREGORY:   Mark Gregory for Mr. Cuppy.

9              MR. MENDELOFF:   Scott Mendeloff on behalf of Dexia.

10             THE COURT:   Okay, are we ready to go?

11             MR. MENDELOFF:   Yes.

12             THE COURT:   I think you were in your cross of Mr.

13  Cuppy.

14             Mr. Cuppy, come have a seat.   Make sure there is

15  still some water in here.   There is.

16             I've sworn you in already.   Do you understand you are

17  still under oath?

18             THE WITNESS:   Yes.

19             THE COURT:   Okay.

20    FREDERICK M. CUPPY, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

21                  CONTINUED CROSS EXAMINATION

22  BY MR. MENDELOFF:

23  Q   Mr. Cuppy, just to get us back to where we were, last time

24  I think you'll recall that we reviewed numerous financial

25  transfers between yourself and your company Dynamic Alliance,

Cuppy - cross

1    on one hand, and the various business entities you managed for
2    the Rogan -- the Rogan trusts, on the other.
3              Do you recall?
4    A    I remember testimony, yes.
5    Q    And you remember that we talked -- that testimony referred
6    to numerous financial transfers, transactions, between you and
7    your company, on one hand, and the Rogan trust entities that
8    you managed, on the other?  Do you recall that testimony?
9              THE COURT:    I tell you what, why don't you just kind
10   of pick up from there.   I think I kind of remember, and I'm
11   pretty sure Mr. Cuppy remembers.
12   BY MR. MENDELOFF:
13   Q    And your testimony was that the transfers that were going
14   to you were earned management fees or loan reimbursements for
15   the most part.
16             The transfers from the Rogan entities to you, the
17   money that you were causing to be transferred from the Rogan
18   entities to you were either management fees that you earned or
19   loan reimbursements of some sort?
20   A    Loan reimbursements, management fees, and the one loan the
21   DA has out.
22   Q    All right.
23             THE COURT:    DA, Dynamic Alliance?
24             THE WITNESS:   Dynamic Alliance.
25   BY MR. MENDELOFF:

1    Q    And you acknowledge that for the management fees, there
2    were no contracts at all providing for those fees?
3    A    No written contract, that's correct.
4    Q    And you agreed that for the loans, there were no signed
5    loan agreements or notes covering those transactions, correct?
6    A    I think that's correct.
7    Q    Now, the truth is, sir, that in all the transactions
8    between yourself and these entities, you drew money out of
9    these entities at your whim whenever you wanted to, isn't that
10   right?
11   A    No.  I drew a very reasonable compensation for the work
12   that I was doing for all of the entities that made several
13   million dollars for the various entities during about a
14   12-year period.
15   Q    And so your testimony is that the compensation you drew
16   out was not at your whim and was regular compensation to pay
17   you back for whatever work you were doing?
18   A    It was for compensation for all the work that I was doing
19   with these entities.
20   Q    Let's look at the transactions between yourself and --
21            THE COURT:   If you need to relocate so you can see,
22   feel free just to go over there.
23   BY MR. MENDELOFF:
24   Q    Can you see that?
25   A    Yes, I can see.

1  Q    Yourself and your companies, on the one hand, and let me
2  give --
3              MR. GREGORY:   Do you have a paper copy?
4              MR. MENDELOFF:   I was just looking for one.  I might.
5  BY MR. MENDELOFF:
6  Q    Yourself and your companies, on the one hand, and some of
7  the Rogan entities, on the other, in 2008.
8              Would you like to --
9              For purposes of this, we have marked a bunch, a
10  series, of document with Bates numbers on the right-hand side,
11  and some of those documents are in this exhibit book that I'm
12  handing you.
13              Your Honor?
14              THE COURT:   Thanks.  Don't try to walk through there.
15  It's a disaster waiting to happen.
16              MR. MENDELOFF:   I'm sorry.
17  BY MR. MENDELOFF:
18  Q    Now, first, let's look at the first line, and the first
19  line reflects a check deposited into Dynamic Alliance's 693
20  account.   When I say 693, that refers to Dynamic Alliance's
21  Chase account ending in the number 693, for $30,000 from CFMT
22  of Florida.
23              If you look at Exhibit 668 in the binder --
24              THE COURT:   DA 693 is a Dynamic Alliance account?
25              MR. MENDELOFF:   Yes, Dynamic Alliance account at

1  Chase.

2          THE COURT:   6 how many?

3          MR. MENDELOFF:   668.

4          THE COURT:   Idiot.  Pardon me.

5      (Brief interruption.)

6          MR. MENDELOFF:   Your Honor, I can't tell you how much

7  grief I have to put up with from my colleagues for doing

8  exactly that thing.

9          THE COURT:   I wasn't calling anybody other than

10  myself an idiot.

11          MR. MENDELOFF:   No, no, but I do it every day at

12  lunch, and I get grief constantly.

13  BY MR. MENDELOFF:

14  Q   Sir, go ahead.  Do you see Exhibit 668?

15  A   Yes.

16  Q   Do you see in that exhibit, there is a deposit ticket from

17  Dynamic Alliance into that account, and that attached to the

18  ticket is a check for $30,000 from CFMT of Florida?

19  A   I see that.

20  Q   You see also on that deposit ticket, on the 7th of

21  January, that there is a deposit for $30,000 -- a check for

22  $30,000 from HCCP?

23  A   Yes.

24  Q   Now, if you look at Exhibit 667 --

25          THE COURT:   HCCP again is what?

Cuppy - cross

1    MR. MENDELOFF:  Hoover.

2    THE COURT:  Hoover Creek.

3    MR. MENDELOFF:  Hoover Creek Condo Partners.

4    BY MR. MENDELOFF:

5    Q   667 is the account statement for account 693 for that time

6    period.

7       Do you see on the first page of 667 under Deposits,

8    the reflection of the deposit of that $60,000 on the 7th of

9    January?

10   A   Yes, I see it.

11   Q   And, sir, then if you will turn to the next page, two

12   pages further, to exhibit -- to page 2158?

13   A   Okay.

14   Q   I believe you will see that the money then went out of the

15   account.  The money came in on the 7th.  Money went out of the

16   account to a variety of places, looking at the electronic

17   withdrawals.  On the 9th there's a phone payment of

18   $18,481.19.

19       Do you see that?

20   A   Yes.

21   Q   And that was --

22       Do you recognize that number as the number for the

23   Dynamic Alliance line of credit?

24   A   Yes.

25   Q   And then there's two other transfers right after that on

1    the 10th and the 15th to the Ameritrade account?

2    A    Yes.

3    Q    Do you see that?

4         And so the total of those, the $61,481 showing the

5    way the $60,000 that was deposited was expended; do you see

6    that?

7    A    I see 60,000 came in for that year, yes.

8    Q    It came in and it went out to those various places right

9    afterwards.  Do you see that?

10   A    Yes.  I see that there was expenditures from this account,

11   that's correct.

12   Q    Now, so we have got you receiving payment on the 7th of

13   January from CFMT of Florida and HCCP, correct?

14   A    Yes.

15   Q    Now, by the middle of the year, you receive additional

16   money from those two entities, don't you?

17   A    If that's accurate, yes, $5,000.

18   Q    We can go through these or you can accept my --

19   A    I assume that 5,000 is correct.

20   Q    All right.  So the documents referenced, and just for

21   counsel's benefit, they are Exhibits 670 and 671 and 672 are

22   the three documents referenced in relation to those

23   transactions.

24        THE COURT:  671, 672?

25        MR. MENDELOFF:  670, 671, and 672.

1          THE COURT:   Thanks.

2    BY MR. MENDELOFF:

3    Q    -- show $5,000 coming in from CFMT of Florida and $5,000

4    coming in from HCCP on the 23rd of 2008?

5          THE COURT:   July 23rd.

6          MR. MENDELOFF:   Right.

7    BY MR. MENDELOFF:

8    Q    Right, July 23rd, 2008.

9          Now, let me show you the reason that we have two

10   dates there.

11         Please look at Exhibit 671.

12         671, you will see, is the deposit ticket for those

13   deposits, and you will see that the deposit ticket has the

14   date of July 23rd, '08, on it.

15   A    I see that.

16   Q    Then if you look at 670, you will see that it's actually

17   booked into the account, the deposit on 7/28?

18         Do you see that?

19   A    No.

20   Q    At 670 at the bottom under Deposits, you will see $10,000

21   getting deposited?

22   A    Yes, I see that.

23   Q    So the reason we have two numbers, so it's clear, is the

24   top number is what was on the ticket, and the bottom number is

25   when the account credited, right?

1    A    Okay.

2    Q    Then looking at transactions following right after 7/28,

3    on Exhibit 670 --

4         (Brief interruption.)

5              MR. MENDELOFF:  Unfortunately, your Honor, for some

6    reason, I don't think -- at least in my book, the checks did

7    not get --

8              THE COURT:  No, they are in 672.  I was trying to

9    find them, too, but the checks --

10             I'm sorry.  I saw them somewhere.  Maybe they were

11   671.

12             MR. MENDELOFF:  They are in 672.  And what happened

13   -- now I remember.

14             What happened is it gets deposited at the end of the

15   month.

16             THE COURT:  The checks showed up in the next month.

17             MR. MENDELOFF:  The checks showed up in the next

18   month.

19   BY MR. MENDELOFF:

20   Q    So in 670 you will see that there is a transfer of that

21   $10,000 on page 1059, transfer of that $10,000 from the 693

22   account to the 375 account.

23             Do you see that?

24   A    What am I supposed to be looking at, what page?

25   Q    I'm sorry.  Page 1059.

Cuppy - cross

1      MR. GREGORY:   What exhibit are you on?

2      MR. MENDELOFF:   670.

3   (Brief interruption.)

4      THE WITNESS:   Yes, I see two transfers.

5   BY MR. MENDELOFF:

6   Q   There is a transfer of $10,000, which is the amount of

7   that deposit, on 10 -- 7/31, two days after it's credited to

8   the account.   And the transfer goes to account 6 -- 375?

9      Do you see that?

10  A   Yes.

11  Q   And account 375 is your personal account at Chase?

12  A   I believe that's correct.

13  Q   And if you look at Exhibit 672, that is the account

14  statement for your personal account at Chase, and on the first

15  page of 672, it reflects a deposit of that $10,000 on 7/31.

16  Do you see that?

17  A   I see that.

18  Q   Then if you look at -- if you go to pages 682 and 683, I

19  think you will see that from 731 on, this is --

20      The way we have noted here in the column --

21  designated how expended out of Cuppy 375, it describes how

22  $10,000 was then spent.

23      There is $10,215 of transactions that come

24  immediately after the deposit of that money and basically eat

25  up all the money.

1          Just tell us the Chevy Chase bank account deposit is
2    for what?
3    A    It's a mortgage.
4    Q    Mortgage for what?
5    A    A mortgage on a condo that either I own -- or I think that
6    is mine, obviously, if that's in my personal account.
7    Q    And the condo is where?
8    A    Jacksonville.
9    Q    Is there any Rogan money used either directly or as a loan
10   in purchasing that condo?
11   A    Absolutely not.
12   Q    And then $120 to Florida Power and Light, $52 to AT&T,
13   2,290 City Card; $2,256 to Kelley Herman.
14          Who is Kelley Herman?
15   A    One of my attorneys.
16   Q    What does Kelley Herman do, generally do, for you?
17   A    Just represents me.
18   Q    Represents you in relation to what, without getting into
19   any communications with him?
20   A    He represents me on matters that I have pending.
21   Q    In relation to what, sir?
22   A    Condos, anything that I need representation for.
23   Q    And that representation is your personal representation?
24   A    Some of them, yes, some of them.
25   Q    And you are paying them here out of your personal account

1   for your personal representation?

2   A  I paid that out of my personal account, I certainly did.

3   Q  That was a payment for them representing you personally?

4   A  I can't tell.

5       THE COURT:  You mean personally as opposed to some

6   other capacity, I take it.

7       MR. MENDELOFF:  Exactly.

8       THE COURT:  Do they represent you in some capacity

9   other than just personal stuff?

10       THE WITNESS:  Yes, they have done some of the

11   business items and stuff for me, too.

12   BY MR. MENDELOFF:

13   Q  If you are paying it out of your personal account, isn't

14   it your testimony that this would be payment for work they did

15   for you personally?

16   A  Not necessarily.  Sometimes I have had to pay business

17   things out of my personal account.

18   Q  You had a Dynamic Alliance account, didn't you?

19   A  Yes.

20   Q  You had a checking account out of Dynamic Alliance, didn't

21   you?

22   A  That's correct.

23   Q  And you could easily have transferred the money back into

24   Dynamic Alliance and paid it out of the Dynamic Alliance

25   account, couldn't you?

1  A   Well, if it's a Dynamic bill, yes.

2  Q   What happens if it's a bill for --

3        What other business do you run that you would be

4  paying for?

5        MR. GREGORY:  Excuse me, your Honor.  I think we are

6  just getting so far afield.

7        MR. MENDELOFF:  It's not --

8        THE COURT:  So that's an objection?

9        MR. GREGORY:  Yes.

10       THE COURT:  So "excuse me, your Honor, I think we are

11 getting so far afield," let's kind of skip through all that.

12 What's the objection?

13       MR. GREGORY:  Relevance, your Honor.

14       THE COURT:  Overruled.

15 BY MR. MENDELOFF:

16 Q   Go ahead, sir.

17 A   I'm sorry.

18 Q   The question is:  What other business matters would you be

19 paying out of your personal account for other than Dynamic

20 Alliance matters?

21 A   I would have paid them for RPP's work.

22 Q   Why would you pay them out of your personal account for

23 work for the RPP Trust?

24 A   Because I don't have an account now for RPP's Trust.  So

25 for a bill, I would have had to pay it out of my account

1  personally.

2          You know, it's just like the Jacksonville condos that

3  now need to be paid, some of the utility bills, which I'm not

4  being able to pay, but I'm trying to just keep these entities

5  operating properly while we go through this.

6  Q   Well, this was before --

7          THE COURT:   This was before any of the restraining

8  order.

9          THE WITNESS:   No, this is in August.

10 BY MR. MENDELOFF:

11 Q   Yes, the restraining order wasn't entered until September.

12 A   RPP doesn't have any accounts.  So I had to pay it out of

13 my personal account.

14 Q   RPP has a trustee, doesn't it?

15 A   Yes.

16 Q   Why would you be doing this?

17 A   Because it's in receivership in the Bahamas, as you will

18 recall, RPP.  So I'm paying it personally.

19 Q   All right, let me just ask you this.

20          You know very well as you are sitting there, that

21 that charge was a payment for RPP, wasn't it?

22 A   Yes.

23 Q   What did that payment relate to?

24 A   It related to a deposit on a condo that's defaulted and I

25 have -- we have a judgment down there that won't be collected

1    because of the fact that the default, the builders have

2    defaulted and no one is closing on it, it doesn't appraise.

3    So we have a judgment.  There's a judgment pending in Florida

4    on that condo.

5    Q    A judgment in favor of who?

6    A    Myself as trustee for RPP.

7    Q    Do you identify yourself as trustee for RPP in that

8    judgment, or is it just you personally?

9    A    No, I think that's -- I think it's Fred Cuppy as trustee.

10   Q    Where is that condo?  What is the address?

11   A    That condo is in Fort Lauderdale.

12   Q    What is the address?

13   A    I can't tell you that, but you have probably got the

14   documents on it.

15   Q    Sir, why didn't you produce this in discovery?

16        We have received nothing relating to this in

17   discovery.

18   A    I don't think that's correct, and the judgment was, I

19   think, just entered recently, the last couple of months or

20   something.

21   Q    Why didn't you produce the information regarding this

22   asset in discovery?

23   A    I gave you -- here we go again.

24        I gave you the initial complaint that was filed many

25   weeks ago in connection with that.  The judgment has just

1    recently been entered, and I got a bill.

2          In fact, I just got another bill which I will have to

3    pay personally because there is no -- there is no way to

4    collect it.  The unit is going to be foreclosed by the first

5    mortgage holders and second mortgage holders, and we are just

6    going to not -- never get anything.  So I end up having to pay

7    the bill.

8    Q    Has the judgment --

9          Have you produced to us a copy of the judgment?

10   A    No.

11   Q    You understand that the TRO in this case required you to

12   identify all assets and produce all records relating to those

13   assets?

14   A    Well, if there is something missing like that judgment

15   that was just entered in the last month or so, I've missed it,

16   that's all, but there is nothing hidden about it, obviously.

17   You know that.

18   Q    And you will be more than happy to produce us a copy?

19   A    Absolutely.  I wish we could collect it.

20   Q    Now, sir, this isn't the first time that you interspersed

21   your personal affairs with RPP, is it?

22   A    I don't -- you mean, where I pay the bills for RPP?  I

23   don't understand what you are asking.

24   Q    Well, we saw last time a substantial amount of

25   transactions going back and forth between your company and DA

Cuppy - cross

1   or yourself and RPP, didn't we?

2   A   I have had loans to RPP.  I've made loans back and forth.

3   I've paid them back.

4   Q   You have gotten --

5   A   And I've got distributions, and I've got paid for services

6   for RPP Trust, that's correct, over the many years, and you

7   have had those returns.

8   Q   Now, sir, in addition, it wasn't just that simple, was it,

9   because, in fact, you set up RPP to conceal to the outside

10  world that RPP existed and put yourself in the place of RPP,

11  didn't you?

12          THE COURT:   You might want to rephrase that question.

13  You said you set up RPP and concealed that RPP existed.

14          MR. MENDELOFF:   I'm sorry.  I will withdraw.

15  BY MR. MENDELOFF:

16  Q   You took steps to conceal to the outside world the fact

17  that RPP even existed, didn't you?

18  A   No.   We filed tax returns and everything every year on it.

19  Q   Well, isn't it true, sir, that when you set up the

20  checking account for RPP at Smith Barney and Legg Mason that

21  you did not put RPP on the -- as the holder of the check on

22  those checks and instead just put your own name?

23  A   No, that's the way they set it up.

24          The account was in that name, and they set the

25  names -- the names up.  I didn't have anything to do with it.

1       It's like a credit card that's a corporate account

2    card and yet you have your own name on it.  They set it up

3    that way.  It wasn't done anything to hide anything.

4    Q    All right, let's look at Exhibit 635.

5    A    635?

6    Q    635.

7         You will see that 635 is the Legg Mason account

8    statement for RPP, correct?

9    A    Yes, RPP Finance Limited.

10   Q    And it says -- it doesn't say "Fred Cuppy;" it says "RPP,"

11   right?

12   A    It says "RPP Finance Limited, attention Fred Cuppy."

13   Q    So they were able to put -- make the account in the name

14   of RPP perfectly easily, correct?

15   A    Well, they set it up.

16   Q    Okay.  Now, let's turn to exhibit -- what we have termed

17   as Exhibit 635-A, which is the A behind that 635.  Turn the

18   page.

19             THE COURT:  Just the next page?

20             MR. MENDELOFF:  No, it's the A.

21             THE COURT:  Oh, there's a little tab of A at the top

22   up there.  All right.

23             THE WITNESS:  Okay.

24   BY MR. MENDELOFF:

25   Q    Sir, these are the checks that were issued out of Legg

1  Mason for that account, isn't that correct?

2  A    Well, this one is, yes.

3  Q    That one is?

4  A    It looks like it, right.

5  Q    That one is -- that one has your name on it?

6  A    Yes, Legg Mason account check the way they sent the

7  checks.

8  Q    And those are the -- that's the way they sent all the

9  checks for all of the years that you ran RPP, isn't that

10  correct?

11  A    I don't know.  They sent the checks for the account, and

12  that's the way they sent the checks.

13  Q    Do you see any indication on Exhibit 635-A, any indication

14  at all that that's for RPP?

15  A    The check itself?

16  Q    Yes.

17  A    No.  I don't see anything on there that says the check

18  itself.

19  Q    If somebody looked at that check, all they would glean is

20  that that was a check from Fred M. Cuppy, isn't that right?

21  A    No.  They would look at the account number and say, what's

22  the account number, who is that.

23       I mean, we're not beginners in this business.

24  Somebody would look at the account number and say, whose

25  account is it.

1    Q   Let's look at the next exhibit, Exhibit 636.   That is

2    RPP -- RPP's year-end summary for 2003, correct?

3    A   2003, that's correct.

4    Q   Again, the account, they had no problem listing RPP

5    Finance Limited as the name on the account, did they?

6    A   They have "RPP Finance Limited, attention Fred Cuppy",

7    that's correct.

8    Q   Let's look at A.   This is two years after the first check

9    we looked at.

10            Will you agree with me, paging through all the checks

11   in Exhibit A, that all the checks have Fred M. Cuppy as the

12   account holder and none of them list RPP?

13   A   I will agree with you that the name says Fred M. Cuppy.   I

14   will not agree with you that these are Fred M. Cuppy account

15   checks.   They are drawn on the RPP account.

16   Q   Now, sir, you could easily have contacted --

17            Assuming that what you say is true for purposes of

18   this question, you could easily have contacted Legg Mason and

19   said, look, you have got the wrong name on these accounts;

20   this should be RPP; this is not my account; couldn't you have?

21   A   Well, I guess I could have.   I didn't think it was that

22   big a deal.

23   Q   So you didn't intentionally conceal RPP.   It just happened

24   when you let it go.   Is that what you are saying?

25   A   They send the checks out to use on the account, and that's

1  what I used on the account.

2  Q   You didn't answer my question, sir.

3         Is it your testimony that you didn't intentionally

4  conceal RPP; they just sent the checks out this way and you

5  just didn't bother contacting them to tell them, hey, this is

6  not my account, these are not my assets, this is RPP's assets?

7  A   I did not contact them about the checks, that's correct.

8  I used the checks that they sent.

9  Q   And so we are clear, again, I will ask my question.

10        You did not -- your testimony is you did not

11  intentionally conceal RPP by setting up these checks this way?

12  That's your testimony?

13  A   I already answered the question twice.

14  Q   No, you didn't answer my question.

15        Did you intentionally conceal RPP?

16  A   I said I did not intentionally conceal RPP for these

17  checks.   These are the checks they sent me.   These are the

18  checks we used for all the years that we had RPP.

19  Q   All right.

20  A   And as you will notice, over the years, there's not that

21  many checks that were written.   Well, there's a few.

22  Q   Well, in fact, every year there are a number of checks,

23  and in some instances, the checks are for a great deal of

24  money, isn't that correct?

25  A   Yes.   They dealt with trans -- I took --

1        I managed the account and made money, several million

2   dollars, over the few years of the account, both in security

3   transactions, condo purchases, condo sales, yes.

4   Q    In some years the transactions were very large, weren't

5   they?

6   A    Well, I don't know what you mean by very large.  They were

7   large to the extent when we buy condos then, yes.

8   Q    Look at Exhibit 665-A.

9        THE COURT:   6?

10       MR. MENDELOFF:   665-A.

11       THE WITNESS:   665-A, okay.

12  BY MR. MENDELOFF:

13  Q    That's a check off of that account for $500,000?

14  A    All right.

15  Q    Correct?

16  A    That's correct.

17  Q    You wrote the check payable to yourself, signing it to

18  yourself -- signing it by yourself, correct?

19  A    That's correct.

20  Q    And would you agree that the check for $500,000 is very

21  substantial?

22  A    Yes, that's a substantial check.

23  Q    Turn to Exhibit 666-A.

24  A    66 --

25  Q    666-A.

1    A    All right.

2    Q    Another check off of that account for a million dollars?

3    A    That was Darby Bank, a CD deposit, yes.

4    Q    You purchased a CD at Darby Bank using a million dollars

5    of the money, of RPP's money, correct?

6    A    Yes, because I managed the trust and made millions for the

7    account.  That was part of my job, managing the trust.

8    Q    Now, going back to where we were.  So in 2008 we had seen

9    that there was a -- there were the two $30,000 deposits, and

10   then six months later, there's two $5,000 deposits from those

11   same entities, correct?

12   A    Yes.

13   Q    We saw that you transferred that money into your 375

14   account, and, with the exception of the Kelley Herman check,

15   spent it on your own expenditures for yourself, correct?

16   A    Well, there were bills that I paid through my own account

17   through the company that I get paid for DA, and DA owes me

18   money, and, yes, it gets accounted for that way when I

19   transfer funds from DA to my personal account.

20   Q    Now, at the end of August, there was another check from

21   CFMT of Florida.  This is the third check that year in eight

22   months from CFMT of Florida, this one for $5,000?

23   A    Okay.

24   Q    It gets deposited into the DA 673 -- 693 account that you

25   then transfer to the Cuppy 375 account?

1    A    All right.

2    Q    Then you spent that money from August 27th to

3    September 3rd on a number of different matters which we see

4    listed here.

5              Most of those are your --

6              Most or all of those are our own personal

7    expenditures, isn't that correct?

8    A    The things that are in my account there that's mentioned

9    are my expenditures.

10   Q    So is it your testimony that even though you're getting a

11   $30,000 payment in the beginning of the year and then month to

12   month $5,000 payments from CFMT which you then turn around and

13   spent as you will, you are not using CFMT as your own private

14   piggy bank, is that correct?

15   A    No.

16   Q    You earned this money?

17   A    I earned that money.

18             I'm running at that point a $30 million project,

19   doing accounting, doing the taxes, traveling to Savannah,

20   doing marketing, dealing with actually more than that, 285

21   units on Hoover Creek alone, Palmetto another 70-unit project.

22             I was working every single day managing my two or

23   three million in CFMT accounts, in the security accounts

24   trades options.  Yes, I was spending a lot of time managing

25   these trusts; and for the little bit of money that I have been

1    paid through the year, that was very reasonable compensation.

2    Q    Sir, now, let me just ask you, we have seen here the money

3    that goes in, and at least with the last two payments, that

4    money was expended.

5              Now, let's explore some of the money that you

6    received that is still in your possession.  Let's start

7    with -- when I say money received, money received from the

8    Rogan trusts.

9              Let's start with the amount of money that is due to

10   the Rogan trusts that you admit is due from Dynamic Alliance,

11   all right.

12             Let's look at Exhibit 613.

13   A    Okay, that is the 305,000 that Dynamic Alliance owes at

14   this time.

15   Q    Right.

16   A    To RPP Trust.

17             THE COURT:    You said 613?

18             MR. MENDELOFF:    613, your Honor.

19             THE COURT:    I don't see any 305,000.   Oh, you are

20   talking about the note payable.

21             THE WITNESS:    It's the note payable to RPP Trust.

22             THE COURT:    Thank you.  I got it.

23   BY MR. MENDELOFF:

24   Q    This trial balance is in 2006, but even now, at the end of

25   2008, that money is still due?

1   A   It's still due and I'm willing to pay it back.

2   Q   Is that money gaining any interest?

3   A   No.

4   Q   So that's an interest free loan?

5   A   Because on the distribution, I'm a beneficiary.  I just

6   owe the money but not any interest.

7   Q   So an interest free loan?

8   A   Yes.

9   Q   Now, is that money invested in any particular property?

10  A   Yes.  It's part of a condo which I'm selling so that I can

11  repay RPP or pay the receiver that I think the judge has

12  appointed because I want to get it paid back, so I'm going to

13  pay it back within the next 90 days.

14  Q   Is it a coincidence that you decided you wanted to sell it

15  in this down market simply because now we have a receiver

16  appointed?

17  A   No, because I want to get out of this situation totally.

18  It's costing me problems with my marriage.  I owe the 305.  DA

19  owes the 305.  I want to get it done and get it finished.

20          It's been acknowledged that we have -- that Dynamic

21  owes the 305.  I'm just going to get it paid, and then I don't

22  have to mess with this anymore.

23  Q   Can you identify for the Court the property that you say

24  is associated with this 305?

25  A   It's the Lauderdale Tower Condo Association.

1   Q   Specifically what is the name or the location -- the name

2   and location of the property?

3   A   It's in Fort Lauderdale.

4   Q   What is the name and location of the property?

5   A   I don't have an exact location.   It's in Fort Lauderdale,

6   Florida.

7   Q   You own this property and pay expenses on it all the time,

8   don't you?

9   A   Yes.

10  Q   And you can't give us the name of the property?

11  A   I just did.   Lauderdale Tower.

12          THE COURT:   He said it was the Lauderdale Condo

13  Association.

14  BY MR. MENDELOFF:

15  Q   That's the name of the property?

16  A   Yes.

17  Q   What is the unit number?

18  A   2 Mary.

19  Q   2M?

20  A   2M.

21  Q   Now, what is the equity that Dynamic Alliance has in this

22  property?

23  A   The equity, well, let's see.

24          Dynamic has 200 -- oh, I'm sorry.   Dynamic has 330

25  and some thousand, as I recall the balance sheet, in it, and

1   we want to sell it for 290 because of this depressed market.

2              However, because the market in Ford Lauderdale is

3   still going down, it's better to get rid of it today and take

4   the loss than to wait because, even after I contracted for it,

5   I found out that a nicer unit in the same building went for

6   20,000 even less than I had.

7              And being in the real estate business for 40-some

8   years, I know if I don't sell it now, I will lose even more

9   money in the next year in the Florida market because the

10  Florida real estate market has not stabilized.   That's why

11  I've decided it's time to liquidate and get this debt repaid

12  and be done with it.

13  Q   So you don't know whether you are even going to get 294?

14  A   Yes, I do.   I've got it under contract for 290.

15  Q   So you have it under contract?

16  A   Yes.

17  Q   You would be willing, I assume, to produce that contract

18  to the Court?

19  A   I can, but why should I?

20  Q   Well, because you owe 305, and this is the collateral you

21  say you are going to use to pay it back, and that's not 305?

22  A   No.   DA has assets.

23             My point is what's this got to do with the fact

24  whether I owe Rogans money?  This isn't Rogans' money to start

25  with.   It is an RPP trust loan that I owe, and I'm going to

1    pay that back.

2    Q    You are aware, sir, that the TRO and preliminary

3    injunction that have been entered apply to RPP, don't you --

4    aren't you?

5    A    I don't want to argue with you.  I'm going to pay this

6    loan back.  Is that the question?

7    Q    All right.

8              Now, let's look at more money that you have in your

9    possession of the trusts.

10             Going back to the chart we looked at earlier, the

11   transfers into your name from CFMT and HCCP on January 7th,

12   2008, led you, as we saw, to make transfers to the Ameritrade

13   account of $14,000 and $29,000 on the 10th and 15th of that

14   month.

15             Do you remember that testimony and reviewing those

16   documents?

17   A    DA has a checking account.  DA has an Ameritrade

18   investment account.  Transfers were made back and forth

19   between checking for bills and managed money into the

20   investment account.

21             Whether it came from this 30,000 or from its normal

22   flow of cash coming in, I agree that money went from checking

23   account to investment and investment back to checking.  That's

24   the way it works.

25   Q    We will see that in a second.

1       But all I'm asking you to recall is the transfer of

2   30,000 came in and the 43 -- or the 60,000 came in, the

3   43,000 went out to Ameritrade.  Do you remember that?

4    (Brief interruption.)

5       THE REPORTER:  Was that a yes?

6       THE WITNESS:  I haven't answered.

7   BY MR. MENDELOFF:

8   Q   Let's look at what happened to that money and the

9   transfers back and forth that you are talking about.

10       This next chart shows on the top line the amount

11  deposited into 693 on the 7th of January 2008.  Let's go back

12  to exhibit --

13       THE COURT:  Is this a different chart?

14       MR. MENDELOFF:  It's the next chart.

15       Let's go back to exhibit --

16       I probably could put the chart over there, your

17  Honor.

18       THE COURT:  It's fine.  It's not a problem.

19  BY MR. MENDELOFF:

20  Q   Let's go back to Exhibit 667.

21       What I want to do is quickly just review what -- try

22  to figure out what the balance was in that account, the 693

23  account, when the 60,000 came in, all right.

24       So 60,000 gets credited into the account on

25  January 7th.  In the beginning of that month, you will see, in

1    the first page of 667, there was $8,804 in the account,

2    beginning balance.

3              Do you see that?

4    A    Yes, I see that.

5    Q    All right.  And then there is a deposit of 775 on the 3rd;

6    do you see that?

7              THE COURT:  The better way to look at this is the

8    third page gives the date and ending balance.  That is the one

9    where you can see that there was 8,300 on January the 4th, the

10   money goes in, and then by January the 23rd, it's all gone.

11             MR. MENDELOFF:  But what I'm going to show you, your

12   Honor, is actually between the 4th and the 7th, all that money

13   was expended.

14             THE COURT:  Oh, okay.

15   BY MR. MENDELOFF:

16   Q    So looking on -- well, it doesn't matter.  It's close

17   enough.

18             So let's look at what the Judge referenced.

19             So on the 4th, the balance is 8,339, and then on the

20   7th, the $60,000 gets deposited.  And some other money also

21   gets deposited on that day, and the balance goes up to 72,000,

22   correct?  Correct?

23   A    I don't know.  What page are we looking at?

24   Q    Look at page 2158.

25   A    72, I don't see a figure of 72.

1    Q    There's a balance.

2             THE COURT:    It's under daily ending balance on 2158.

3    If you look at January the 7th, it has a daily ending balance

4    of 72,000 --

5             THE WITNESS:    I see, okay.

6             THE COURT:    -- 954 --

7             THE WITNESS:    I see, okay, 1772.    I see the figure

8    now.

9    BY MR. MENDELOFF:

10   Q    We saw the withdrawals coming out right after that, the 14

11   and 29, going to the Ameritrade account, right?

12   A    I see that.

13   Q    Now, let's look at Exhibit 677.

14   A    Okay.

15   Q    This is the Ameritrade account statement for that month?

16   A    All right.

17   Q    And you will see that on the bottom left-hand side, funds

18   deposited current $43,000?

19   A    Okay.

20   Q    And then if we turn to page 3646 --

21   A    I'm sorry.    Turn now where?

22   Q    Turn to page 3646.

23             THE COURT:    Two pages later, in other words.

24             THE WITNESS:    Okay.

25   BY MR. MENDELOFF:

1  Q    You will see where they reference the money coming in on

2  the 10th, settle date, 14,000 coming in, and on the 15th,

3  settle date, 29,000 coming in?

4  A    Yes, I see that.

5  Q    All right.  Now, you will note that as of that day, as of

6  that month, it says funds disbursed, nothing; correct?

7  A    I'm sorry?  What --

8  Q    First page, I'm sorry.  The first page of the exhibit,

9  677.

10  A    Okay, first page on --

11  Q    On 677, bottom left-hand side, cash activity summary,

12  funds disbursed zero?

13  A    Okay, fine.  I see it now.

1  Q  So at least as of that month no money -- you're talking

2  about money going back and forth from the other accounts to

3  the Ameritrade account, but at least as of that month money

4  didn't go back and forth, it just came in, right?

5  A  I didn't see anything disbursed there, right.

6  Q  Now, let's look at Exhibit 678.  And I'll represent for

7  you that Exhibit 678 is the last account statement we received

8  for the Ameritrade account.  You'll note it's September of

9  '08, and that's the month where the freeze went into effect.

10  I think we can presume that there wasn't any other activity.

11        Look at the bottom left-hand corner, funds deposited

12  year to date, $43,000.

13  A  I see that.

14  Q  Funds disbursed, zero.

15  A  Okay.

16  Q  That indicates, doesn't it, that $43,000 came in and did

17  not go out and no other money went out either that -- until --

18  for the year 2008, correct?

19  A  Well, I agree that no money was disbursed this way for

20  '08, I guess, for year-to-date, if that's what you're asking

21  me, and I agree that 43,000 came in from probably DA's

22  checking accounts.

23        MR. GREGORY:  I'm going to object just to the extent

24  that, as everybody knows, there was some allowance made since

25  the freeze order for some moneys to come out of the

1  Ameritrade.

2       MR. MENDELOFF:  I'm not talking about that.

3       THE COURT:  Yes.  I think he's just trying to

4  establish where money is and isn't right now.  I understand

5  your point, though.

6       MR. MENDELOFF:  We know that.

7  BY MR. MENDELOFF:

8  Q   I appreciate the clarification for the record, but I'm

9  talking about before the court ordered anything.

10      And the point here is that this $43,000 that came

11  into the Ameritrade account, at least as of the date the

12  freeze went into effect was still there, correct?

13  A   I assume, because the statement on September 30 shows that

14  43,000 in there.

15  Q   All right.  Now, on this next chart we're going to look at

16  some more money that came in to you from the trusts.  Let's

17  look at Exhibit 679, please.  And 679 is an account statement

18  for your personal account at Chase, correct, the 375 account?

19  A   That's correct.

20  Q   And you see that on January 3rd the account reflects a

21  wire transfer into the account for Ecosse of $78,000?

22      THE COURT:  I'm sorry.  This is a Dynamic Alliance

23  account?

24      THE WITNESS:  No.  This is my personal account.

25      MR. MENDELOFF:  No.  This is his personal account.

1    375 is his personal account.  693 is his Dynamic Alliance

2    account.

3            THE WITNESS:  Right.

4    BY MR. MENDELOFF:

5    Q    Do you see that on the first page of that exhibit there's

6    a wire transfer into that account of $78,000 from Ecosse?

7    A    That's correct.

8    Q    And Ecosse is the trustee of the Rogan trust, correct?

9    A    No.  The trustees are separate.  I Ecosse is, I think, one

10   of the management companies that makes the distributions to

11   beneficiaries and pays expenses, correct.

12   Q    This was a distribution to you from one of the -- from the

13   trustees of one of the Rogan trusts, presumably RPP?

14   A    RPP Finance is where it came from.

15   Q    So this is a distribution to you from RPP?

16   A    That is correct, because of Section 679 requiring me to

17   pay the taxes for RPP for 007, and this is a partial

18   distribution that they made to me even though I think I picked

19   up over a hundred thousand of income on the return even though

20   they only gave me a 78 distribution.

21   Q    All right.  Well, we'll explore that in a minute.

22           At the same time, on the same day, you also wrote

23   checks to yourself from the Rogan children's trusts for

24   $15,000, right?

25   A    5,000 per child I think.

1  Q    Right.

2  A    Per individual domestic trust, that's correct.

3  Q    All right.  Now, if you look at exhibits -- or pages 2460,

4  61 and 62 and 63 at the end of this exhibit, I think you'll

5  see that -- you can see the deposit ticket for those checks --

6  A    Yeah, these --

7  Q    -- and the three checks?

8  A    Yeah, these are the three domestic trusts for fees for the

9  year that each -- I managed over a million dollars or so in

10  trading accounts for all of these trusts too, right.

11  Q    And you wrote checks to yourself on January 3rd.  All

12  those checks were signed by you to you, correct?

13  A    That's correct.

14  Q    Okay.  And, now, the reason we have two dates here on the

15  chart is because the date of the deposit ticket is January 3rd

16  and the date on the checks is -- excuse me, the date on the

17  account statement is January 7th, okay?

18  A    Okay.

19  Q    All right.  Now, we can see that on the 25th of that

20  month -- first of all, we can see on -- let's look at the

21  first page of 679.  There are only three other small deposits

22  that month, correct?

23  A    There were some deposits, including 502, 2195.

24  Q    No.  On the 7th there was another deposit of 19 --

25  A    Oh, yeah.

Cuppy - cross

1    Q    -- thousand dollars?

2    A    Right.

3    Q    On the 10th, a small five hundred dollar --

4    A    Right.

5    Q    Okay.  So there's three other small deposits that month?

6    A    That's correct.

7    Q    Right.

8         And between the date that the $78,000 came in and the

9    date that it went out on the 25th, we see a series of other

10   transactions totaling roughly about 17, $16,000, correct?

11   A    Are you referring to the electronic withdrawals --

12   Q    Yes.

13   A    -- on the checks paid?

14   Q    Yes.

15   A    Well, that looks like 21,000 or so.

16   Q    21,000?

17   A    Well, 19, 278 --

18   Q    Well, the 19 -- but look at -- there's three checks that

19   come on the 31st of January, which is before, right?

20   A    Oh, I see.  I'm sorry, I'm missing your question.

21   Q    My point is simply that there's roughly $20,000 that comes

22   out before you transfer the -- transfer money out of that

23   account -- sorry, before the end of the month, by the end of

24   the month there's $20,000 that comes out, right?

25   A    How --

1    Q    You put in 78 at the beginning, and 15 more, and then by

2    the end of the month there's about 20,000 that comes out, end

3    of the statement period.

4    A    Whatever the statements show.

5    Q    All right.

6    A    I mean, I assume you may be correct.  I don't know.  I'm

7    not following you on that.

8    Q    Okay.  Now, if you'll turn to the next exhibit, Exhibit

9    680.  And turn within 680 to page 3191.  On the upper

10   right-hand side you'll see that there is a transfer from that

11   account, 375, into the Smith Barney -- your Smith Barney

12   account for $40,000 on the 25th of January.  Do you see that?

13   A    I see that money transfer, yes.

14   Q    Now, as of the end of that month, the balance in that

15   Smith Barney account is $551,000, correct?  Look at the first

16   page.

17   A    Ending total net value, it says 551.

18   Q    Right.  And look at the next page, 3182.  As of the end of

19   that month, the total deposits, 42,000, total checks written

20   to date were $3400 worth of checks, okay?  Do you see that?

21   A    Okay, deposits 42,183, I saw that.

22   Q    Yeah.

23   A    Checks written of 3432.

24   Q    3432, right?

25   A    That's what it says, yes.

Cuppy - cross

1    Q    Now go back to page 3191, please.  And you'll see that --

2    tell me when you're there.

3    A    31 --

4    Q    Are you there at 3191?

5    A    Yeah, I'm there.

6    Q    Now, if you look at where it says checks written, you'll

7    see that the check that's referenced -- or the check that was

8    written at the beginning of the month and so it was not drawn

9    against that $40,000.  Do you see that?

10   A    I saw a check that was written there for 3432.

11   Q    And it says date written, 1/3; date cleared, 1/7?

12   A    I see that.

13   Q    So it came in and was paid before the $40,000 hit the

14   account, right?

15   A    That would be correct if the money transfer came in on

16   1/25, right.

17   Q    Now, then go to Exhibit 681.  And on 681 you'll see it's

18   the account statement for that account for April 1st to 30th,

19   2008, correct?

20   A    That's correct.

21   Q    And you see that there's withdrawals there of 380 dollars,

22   correct?

23   A    I see that.

24   Q    And checks written of 10,000, right?

25   A    Yes.

1    Q   All right. Now, if you turn to page 1-107, 1-0107?

2    A   I'm sorry.

3        THE COURT: The last page of the exhibit.

4        THE WITNESS: Oh, last page?

5        THE COURT: Yeah.

6        THE WITNESS: Okay, I'm there.

7    BY MR. MENDELOFF:

8    Q   Do you see that 380, it was some sort of a brokerage

9    charge that Chase charged you for something?

10        THE COURT: You're talking about the --

11        THE WITNESS: Oh, you mean the 380 dollars?

12    BY MR. MENDELOFF:

13    Q   Yeah.

14    A   Chase. Those are balances where you get a dividend early

15    on an account or on one of the securities and then you got to

16    pay it back because there's something that goes back and

17    forth.

18    Q   All right. But the point is, that's not money you took

19    out; Chase took it out of your account, right?

20    A   That's correct.

21    Q   All right. And the check that was written was a check to

22    the United States Treasury, right, $10,000?

23    A   Is it on the same page here?

24        THE COURT: Yeah, farther down.

25        THE WITNESS: Okay. Let me look, make sure.

1          Yeah, I see a 10,000 Treasury and, of course, the

2    Social Security payment checks coming --

3    BY MR. MENDELOFF:

4    Q   All right.  Now, let's look at the next exhibit, Exhibit

5    682.

6          THE COURT:  After we do this one we're going to

7    break.

8          MR. MENDELOFF:  Okay.

9          THE WITNESS:  Okay.

10   BY MR. MENDELOFF:

11   Q   And this is the last account statement we have for --

12   A   August.

13   Q   -- for this account.  We have not gotten a September

14   account statement.  This came right before the freeze.

15         If you'll look at deposits -- sorry, if you look at

16   withdrawals, you'll see as of that time the only money coming

17   out is that 380, correct?

18   A   Okay.  I see the withdrawal.

19   Q   It says this year withdrawals, 380, the 380 we looked at,

20   right?

21   A   I see the 380.

22   Q   And checks written, the 13,432, that's the 10,000 plus the

23   3,432 that came before the 40,000 came into the account in

24   January.

25   A   Okay, I see that.

Cuppy - cross

1   Q   So you'll agree, won't you, that between -- that as of at

2   least the end of this statement the $40,000 that you put into

3   this account in September -- I'm sorry -- on January 25th,

4   2008, is still there?

5   A   I guess I will.

6           THE COURT:  Okay.  We're going to break right here.

7   1:45.  See you then.

8           (Said hearing was recessed from 12:30 p.m. until 1:45

9   p.m.)

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3
     DEXIA CREDIT LOCAL, f/k/a Dexia      )
4    Public Finance Bank and Credit       )    No. 02 C 8288
     Local de France,                     )
5                                         )    Chicago, Illinois
                         Plaintiff,       )    October 31, 2008
6                                         )    1:45 p.m.
                                          )
7        v.                               )
                                          )
     PETER G. ROGAN, et al.,              )
8                                         )
                         Defendants.      )
9
                    TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12   For the Plaintiff:       HOWREY LLP, by
                              MR. SCOTT T. MENDELOFF
13                            321 North Clark Street - Suite 3400
                              Chicago, Illinois 60654
14
     For Fred Cuppy:          KELLEY DRYE & WARREN LLP, by
15                            MR. MARK S. GREGORY
                              MS. ERIN KREJCI
16                            400 Atlantic Street
                              Stamford, Connecticut 06901
17

18

19

20                    Valarie M. Ramsey, CSR, RMR
                              P.O. Box 16
21                    Hazel Crest, Illinois 60604
                              (708) 860-8482
22

23

24

25

1  THE COURT:  We're ready to resume.  You can proceed.

2  FRED CUPPY, PREVIOUSLY SWORN

3  CROSS EXAMINATION (Resumed)

4  BY MR. MENDELOFF:

5  Q  Mr. Cuppy, a couple of questions about Dynamic Alliance.

6  I covered this a little bit last time, but I just want to make

7  sure it's on the record, that all these questions are on the

8  record.

9  You testified last time that you own -- at this time

10  you own one hundred percent of Dynamic Alliance?

11  A  At this time, that's correct.

12  Q  And are you the sole officer?

13  A  No.

14  Q  And who are the -- any other officers in the company?

15  A  Yes.

16  Q  Who are they?

17  A  Roger Mays is a director also and a secretary treasurer.

18  Q  Okay.  And you're president?

19  A  I'm president.

20  Q  And does Dynamic Alliance have any employees?

21  A  No, just contract people.

22  Q  Now, sir, your testimony was that the Legg Mason account

23  did -- let me just ask you, is there an entity called Crab

24  Ridge that RPP is invested in?

25  THE COURT:  Caribe.

1      THE WITNESS:  No, you're referring to Coral Ridge --

2    BY MR. MENDELOFF:

3    Q    Well, let me --

4    A    -- No. 10.

5    Q    -- ask you to look at Exhibit 683.

6    A    Right.  683 is that condo that we have a judgment on now,

7    which is the one that dealt with the personal check that I

8    paid the attorneys for.  This is RPP.  And as you notice in

9    that exhibit, I see they sent out checks that has RPP as of

10   2006 now.

11   Q    And they could have done it years earlier if you'd just

12   asked, right?

13   A    No.  They send me the checks and I use them, but I just

14   happened to have looked at this exhibit, and it's over two

15   years ago, and it does have RPP, but this is the condo that

16   the judgment is that we just referred to earlier today.

17            THE COURT:  That says Coral Ridge down there in the

18   corner?

19            THE WITNESS:  Yes.  No, it's Coral Ridge No. 10.

20            THE COURT:  Okay.

21   BY MR. MENDELOFF:

22   Q    I thought you had given us a different name for the

23   development.  Didn't you say 2 M?  What was the 2 M?

24   A    That's the Lauderdale tower.

25   Q    Okay.  That's not the entity that you're invested in?

1    THE COURT:  Those are two different things, right?

2    THE WITNESS:  Yes, they're two different things.

3  BY MR. MENDELOFF:

4  Q    And so RPP is invested in the tower, and this Coral Ridge

5  is the investment that you own that you say you owe RPP money

6  on?

7  A    No.  You have it totally confused.  Let me explain once

8  more.

9    First of all, Two Mary is owned by Dynamic Alliance,

10  Inc.  It is not owned whatsoever by RPP.  RPP -- we owe RPP

11  305, as I said before, that's reflected on our financial

12  statements.  It's strictly a debt, but it's owned by Dynamic

13  Alliance, period.

14  Q    Okay?

15  A    Now, Coral Ridge 10 here, as you'll notice, this check was

16  written from RPP.  It was a down payment on a contract on a

17  condo project, this particular unit, which didn't go through

18  or hadn't closed, won't close, and we wanted our money back

19  because they breached the contracts.  I had to sue them.  We

20  got an $89,000 judgment of last month or two ago.  And that's

21  what I paid the fees out of my personal payment for, but I

22  don't think we'll ever get this money because there's a first

23  and second mortgage on these units, and I think the first and

24  second mortgage people are going to foreclose and we'll be

25  washed out, so we're just going to sit on it with a judgment

1    and see if we just washed out.

2    Q    All right.  Fine.  Thank you.  That clarifies it.

3              Now let me just ask you a couple of more questions

4    and --

5              THE COURT:  While you're there, what's the 82,000

6    for?

7              THE WITNESS:  That was the deposit on the contract to

8    start with.

9              THE COURT:  Got it.  Okay.

10   BY MR. MENDELOFF:

11   Q    Please turn to Exhibit 624.

12   A    1624?

13   Q    624.

14   A    624.

15             Okay.

16   Q    Now, these are checks off of your personal account,

17   account 375 at Chase, right?

18   A    That's correct.

19   Q    Can you tell us why you're paying J.S. Archibald 650

20   dollars in September of '06.

21   A    That was an annual fee.  Apparently I never had the money

22   from the kids' trusts, and I just paid it out of my own

23   account.

24             I've been paid fees, and so occasionally if I don't

25   have something of a bill, I'll pay it personally and get

1    reimbursed later.  And at this particular time I can't tell

2    you why, but I did pay it out of my own account.

3    Q    J.S. Archibald is the individual that you hired to be the

4    -- or to create the protector for the Peter Rogan Irrevocable

5    Trust, correct?

6    A    They're a protector for the kids' trusts.  There isn't any

7    protector for, as I understand it, for Peter Rogan's trust.

8    Q    Well, originally there was and they resigned, right?

9    A    Originally.

10   Q    And they resigned, right?

11   A    Yes.

12   Q    And they resigned in September of 2004?

13   A    I don't know when they resigned.

14   Q    And so this payment was a payment to Archibald for the

15   annual fee to be the protector of the children's trusts?

16   A    Well, they are a protector of the children's trusts.

17   Q    And that's what this payment was for?

18   A    Well, I'm guessing because I think that's what it's for.

19   Q    Can you tell us why it is that --

20        Okay.  Well, then let's look at the next exhibit,

21   Exhibit 625.

22   A    625?

23   Q    Right.

24        And that's another check for 650 dollars for the year

25   earlier, so that would be the annual fee for the year before

Cuppy - redirect

1    that?

2    A    I assume so, yes.

3    Q    And the trust -- these are for the trusts, which

4    children's trusts, the Belizean trusts?

5    A    The Belize trust, not the domestic trust.

6    Q    And didn't you testify when we were here last that the

7    Belize trust basically has no business dealings anymore?

8    A    What I said to you is the Belize trusts have never had any

9    distributions or anything offshore whatsoever.  It's always in

10   the corporation of Boulevard Investors, LLC, Indiana, which is

11   where everything is kept for the business and the investments

12   for them.

13   Q    Nothing offshore?

14   A    Nothing's offshore.

15   Q    Tell us where J.S. Archibald is located?

16   A    I think -- as I recall, it's been a lot of years, but I

17   think they're in the Virgin Islands.

18   Q    That's offshore, isn't it?

19   A    Yeah.  Yes.

20            MR. MENDELOFF:  Nothing further, Your Honor.

21            THE COURT:  Mr. Gregory.

22                      REDIRECT EXAMINATION

23   BY MR. GREGORY:

24   Q    Mr. Cuppy, can I ask you to turn to Exhibit 665 and then

25   to tab A?

1   A   Okay.

2   Q   This is a check that Mr. Mendeloff showed you this morning

3   in the amount of $500,000.  Do you see that?

4   A   Yes, I do.

5   Q   Did you keep that $500,000 personally?

6   A   No.  This would be the same thing that we explained to

7   counsel on one other transaction, it was like about 490 some

8   thousand, where we would have taken the money in and then

9   closed a particular transaction, and then the money would have

10  been reported on RPP's tax return.  And that's also shown --

11  this check, for example, is in '02.  And so if I would have

12  had any of this money, it would have shown on the tax returns

13  that would have been turned over as compensation to me, and

14  that would never have been because I never had compensation

15  like that.  So this is one of those transactions where we put

16  it into an account just for clearing it, to close it out or to

17  close the transaction out and finish it up.

18          And this was seven years ago.  I can't tell you what

19  particular investment that was at this point, but it didn't

20  really go to me.

21  Q   Now, this morning Mr. Mendeloff had one of the charts up

22  here, and he directed your attention to January of 2008 and a

23  deposit into Dynamic Alliance's account of $30,000 from CFMT

24  of Florida.  What was the reason why that $30,000 was

25  transferred to you, DA?

1    A    Those are management fees for continuing to work.  I would

2    be in Savannah every month, and also CFMT, I managed their

3    investments of a million and a half a month on accounts and

4    puts and options and calls as well as doing the accounting and

5    the tax work for both CFMT, which owned the two Hoover Creek

6    condo projects and the Palmetto projects in South Carolina.

7    Those are just simple management fees.

8    Q    Fees for services rendered?

9    A    Fees for services.

10   Q    And he directed your attention likewise to January 2008 to

11   a $30,000 deposit into Dynamic Alliance's account in Hoover

12   Creek?

13   A    That's correct.

14   Q    What was that $30,000 for?

15   A    That was services rendered for Hoover Creek, which is,

16   again, the accounting, tax, all of the problems in handling a

17   40 million dollar project.

18   Q    And --

19   A    And because Dynamic Alliance is a -- Dynamic Alliance is

20   the manager.

21   Q    And likewise he directed your attention to three different

22   $5,000 deposits over the course of July and August of this

23   year from CFMT and Hoover Creek.  What was the purpose of

24   those?

25   A    Those $5,000 were just, again, services for the companies

1    for the year again.  Like I said, I work on it every -- used

2    to work on it every day.

3    Q    And did you receive any money in 2008 from the RPP trust?

4    A    Yes.  I received that one distribution in January for the

5    income for '07 that the trustees gave to me as a distribution,

6    although it wasn't enough to cover the tax.

7    Q    And that $78,000 distribution, when it was made, whose

8    money was it?

9    A    It was mine.  It's been made to me as a distribution of

10   that trust.

11   Q    How much approximately is currently in the Ameritrade

12   investment account owned by Dynamic Alliance?

13   A    Approximately $50,000.

14   Q    How much approximately is currently in the Smith Barney

15   account, the investment account that you own?

16   A    That account now is approximately $250,000 with the

17   wonderful market we've had in September and October.

18              THE COURT:  It's up today.

19              THE WITNESS:  Oh, thank God.

20              THE COURT:  Not much, but it's up.

21              MR. GREGORY:  Well, as Mr. Cuppy knows, it's all a

22   matter of who gets to ring the closing bell.  I had the

23   privilege and honor.

24              THE COURT:  You rang the closing bell?

25              MR. GREGORY:  On Tuesday, the day that we were way

Cuppy - redirect

1    up.

2              THE COURT:  So it's all up to you.

3              THE CLERK:  Well, if you excuse me, I have business

4    to attend to in New York, I guess.

5    BY MR. GREGORY:

6    Q    Mr. Cuppy, in your Smith Barney account, in your Chase

7    account, in Dynamic Alliance's Ameritrade account and its

8    Chase account, are there any moneys belonging to Peter Rogan?

9    A    None.

10             MR. GREGORY:  No other questions, Your Honor.

11             THE COURT:  Mr. Mendeloff, anything else?

12             MR. MENDELOFF:  No.

13             THE COURT:  All right.  Mr. Cuppy you can step down.

14               (Witness excused.)

15             THE COURT:  Are there other witnesses that you're

16   planning to call?

17             MR. MENDELOFF:  No.

18             THE COURT:  Mr. Gregory.

19             MR. GREGORY:  No, Your Honor.

20             THE COURT:  Any other exhibits other than the ones

21   that have already been dealt with here?

22             MR. MENDELOFF:  The only thing that we can -- I was

23   going to offer, Your Honor, if you're interested, is on these

24   charts, we can give you --

25             THE COURT:  You can give me the small versions.

1    MR. MENDELOFF:  -- the small versions, and what we'll

2  do is, and we'll give it to counsel too, is we did those last

3  night and --

4         THE COURT:  Put the exhibit numbers on them.

5         MR. MENDELOFF:  Exactly.

6         THE COURT:  Yes, that would be helpful.

7         So here's what I'd like to do.  Why don't we take

8  about ten minutes.  Everybody can collect their thoughts.  I'd

9  like to hear argument.  I'm not going to rule on the spot

10  because I also have to sort of re-synthesize stuff that I

11  dealt with literally a month ago.  But my plan is to rule

12  sometime next week, just so you know.  I think it's important

13  to get this done expeditiously.  But I'd like to hear argument

14  from you because it will help me to kind of synthesize

15  everything.

16         So we'll take ten minutes, may fifteen, so you can

17  collect your thoughts, and then we'll talk.

18         MR. MENDELOFF:  Okay.

19         (Recess taken.)

20         THE COURT:  I assume you go first, Mr. Mendeloff, but

21  I'm not sure.

22         MR. MENDELOFF:  I think so.

23         THE COURT:  Okay.  Go ahead.

24         MR. MENDELOFF:  Your Honor, let me start out with --

25  let me start at the end.  It's our position that independent

1  of the values of these entities or these holdings that we just

2  sort of -- which we haven't confirmed, that the freeze amount

3  that should be covered by assets should be $388,000, 305,000

4  for the amount that's owed by Dynamic Alliance that Mr. Cuppy

5  admits to and 83,000 in relation to the moneys that we showed

6  today, the moneys he had received and still retains from Rogan

7  related entities.

8          I note that that 305,000 is an interest-free loan,

9  which itself is odd even with the caveman-type bookkeeping

10  that we've seen in connection with this.  One of the things

11  that is notable is that frequently at least they book interest

12  payments, interest due on some of these loans when they do

13  maintain their books, so the notion that that 305,000 should

14  be interest-free I think is a little odd.

15          I think that it does demonstrate still again, in

16  addition to all the other evidence that Your Honor has heard,

17  that this is far from an arm's length relationship.  This

18  management relationship is not arm's length.  In fact,

19  Mr. Cuppy commingles his funds, uses these funds as if they

20  are his own, maintains no -- inadequate records, and I think

21  that's all very relevant to the $83,000 freeze that I will get

22  to in a minute.

23          As to the 305,000, you've already heard Mr. Cuppy

24  admit that he owes that.  I think it's significant to note

25  that that 305,000 debt is not securitized.  Mr. Cuppy says

1  that he's going to pay it back with the money that he hopes to

2  get from the sale of this property, but there's no security

3  supporting that 305,000.  And, accordingly, there's no reason

4  for the court to hold off requiring Mr. Cuppy to post

5  something to protect the trust and the interest that we have

6  in the trust on that score.

7            THE COURT:  That's RPP, right? .

8            MR. MENDELOFF:  That's RPP, yes.

9            Mr. Cuppy says that he's got a contract for $290,000.

10  And that's nice.  We haven't seen it.  But it should not be

11  the burden of RPP and the court to risk what happens with that

12  transaction.

13            THE COURT:  I need you to walk back a couple of steps

14  here.

15            MR. MENDELOFF:  Sure.

16            THE COURT:  I need to make sure I have a handle on,

17  okay, so let's -- your argument on that is that he owes

18  $305,000 to RPP, and since RPP is part of what's currently

19  among the assets that are available to satisfy the judgment --

20            MR. MENDELOFF:  Yes.

21            THE COURT:  -- then that asset that RPP has

22  essentially, which is the receivable from Mr. Cuppy, ought to

23  be collateralized in some way by him.

24            MR. MENDELOFF:  Exactly.

25            THE COURT:  Okay.  And RPP -- remind me exactly where

1   RPP fits in in terms of the whole collection process that
2   you're trying to go through.

3           MR. MENDELOFF:  Yes.  RPP is the trust that Mr. Rogan
4   and Mr. Cuppy created in 1995 naming as beneficiaries
5   Mr. Rogan's children and their issue, Mr. Rogan, Mr. Cuppy,
6   and Mr. Brewer.

7           And by the way, we have spoken to counsel and to
8   Mr. Brewer, and Mr. Brewer is waiving any interest in that
9   property -- in that trust, and we can provide that.

10          THE COURT:  So those are the beneficiaries?

11          MR. MENDELOFF:  Those are the beneficiaries.

12          THE COURT:  Is that part of what was funded by the
13  proceeds from the sale of the entity that owned Edgewater?

14          MR. MENDELOFF:  Yes.

15          THE COURT:  Okay.

16          MR. MENDELOFF:  And Mr. Rogan wholly funded that
17  originally.  Mr. Cuppy alleged that he had put in some money,
18  but there's been absolutely no proof of that contribution, and
19  Mr. Cuppy said he had no proof of it other than his word, so
20  we don't have any evidence as to how much he says he put in or
21  of what he put it in, and we have seen no proof that he ever
22  put it in.

23          THE COURT:  Okay.  All right.  You can go back to
24  where you were.  I just wanted to make sure I understood where
25  this fit in.

1    MR. MENDELOFF:  So, the point of this is I'm happy

2    that Mr. Cuppy thinks he's going to get $290,000 in the sale,

3    but that's not our problem, and until that sale happens, it's

4    our position that other assets should be posted to protect the

5    interests of the court and RPP in getting paid back on that

6    money that was taken without any kind of documentation at all

7    other than the one bookkeeping entry that Your Honor has seen.

8    Now, as to the 83,000, as Your Honor knows, there

9    were two transactions that made up that 83,000, the $40,000

10   that was the proceeds of the $78,000 "distribution" from the

11   RPP trustee in the Bahamas and the $43,000 in allegedly earned

12   income.

13   Let's start with the $40,000 distribution.  It's our

14   position that that distribution is a fraudulent transfer.

15   THE COURT:  This is the CFMT distribution?

16   MR. MENDELOFF:  This is the RPP trust distribution to

17   Mr. Cuppy as a beneficiary.

18   It's our position that that's a fraudulent transfer,

19   but it's unquestionably proceeds of the trust, the corpus of

20   which is not Mr. Cuppy's to receive and should have been

21   available to the creditors and should have been preserved.

22   Mr. Cuppy takes the position in his testimony that he

23   used that money to pay taxes.  There is absolutely no proof

24   that he did that.  It's only his word.  And, frankly, on the

25   record that Your Honor has before you, I think that

1  Mr. Cuppy's word should be inadequate to support any
2  proposition.
3        I'm not going to go into -- because it's an argument
4  to the court, I don't think it's necessary for me to go into
5  why that is.  If Your Honor feels that you want to hear a
6  review of all that evidence I can, but I think --
7        THE COURT:  You do whatever you want to do.  I'll
8  leave it up to you.
9        MR. MENDELOFF:  Well, Your Honor has seen repeatedly
10 in connection with this case a degree of misconduct by
11 Mr. Cuppy that is to my mind shocking.  What Mr. Cuppy did in
12 connection with the 2004 events in front of Judge Schenkier in
13 which he knowingly went around the order of the court to
14 permit -- to prevent the court from -- excuse me -- to prevent
15 Mr. Rogan's lawyers at Winston from obtaining critical
16 discovery in connection in this case would be shocking for a
17 layperson to do, but for a lawyer to do it, and the named
18 partner of the law firm, a law firm in northern Indiana no
19 less, who has been practicing for as many years as Mr. Cuppy
20 has, is frankly conduct that I think speaks very badly of
21 Mr. Cuppy's credibility.
22        But it doesn't stop there.  At the time that those
23 hearings were ongoing, one of the pieces of evidence that
24 Dexia was emphasizing greatly was the proof that we had, and
25 it was just a sliver of proof at the time, but the proof that

1   we had that Mr. Rogan himself had been receiving direct

2   transfers from the Peter G. Rogan Irrevocable Trust in the

3   Bahamas.  It turned out, when we finally got discovery years

4   later, that he had received many million of dollars in

5   transfers, but at the time we had only found one sliver of

6   evidence as a result of the third party subpoena that

7   indicated that he was not only receiving transfers, but

8   controlling the transfers he was receiving.  That was pounded

9   on by Dexia repeatedly in front of Judge Schenkier, the proof

10  that Mr. Rogan controlled this trust, and we can tell he

11  controlled the trust because he obviously controlled the

12  distribution of this one transfer that we had found.

13          It is not coincidental that after Mr. Cuppy went

14  around the order of the magistrate to prevent the trustee from

15  producing those records that he then orchestrated a scheme

16  whereby all the rest of the distributions that came in after

17  that did not go through Mr. Rogan and instead went through

18  Mr. Rogan's wife, obviously to avoid turning over -- prevent

19  us from discovering additional transfers to Mr. Rogan.  So now

20  what do they do?  They put Mrs. Rogan up there and send the

21  money through her.  Obviously, that's Mr. Cuppy attempting to

22  evade evidence, to avoid the production of evidence in this

23  case.

24          As bad as that is, in addition to the conduct that he

25  engaged in with respect to the Oceanic documents, Mr. Cuppy

1  engaged in similar conduct with the RPP trust.  A significant

2  portion of -- we devote several pages of the TRO brief to this

3  very issue, and you'll find it at pages 117 to roughly 122.

4          THE COURT:  117 to 122 of which brief now?

5          MR. MENDELOFF:  Of the TRO brief, the original brief.

6          THE COURT:  Oh, okay.

7          MR. MENDELOFF:  The statement of facts.

8          In that statement of facts we lay out five different

9  provisions in the subpoena that was served on Mr. Cuppy that

10  all would require the production of the -- of proof regarding

11  the RPP trust.  Mr. Cuppy received a subpoena for the

12  production of that evidence early on in this case.

13  Specifically, that's Exhibit 157, Your Honor.

14          THE COURT:  Okay.

15          MR. MENDELOFF:  And he received that subpoena on

16  March 23rd, 2004, at the early portion of the discovery in

17  this case, right at the beginning.  Five different provisions

18  in that subpoena, as laid out in our statement of facts, would

19  have required Mr. Cuppy to produce RPP records.

20          Not only that, but after we didn't get any production

21  from Mr. Cuppy on a whole variety of things, we went into

22  court on a motion to compel, and Judge Schenkier entered the

23  motion to compel against Mr. Cuppy on December 9th, 2004,

24  requiring the production of records under a variety of

25  different provisions of that subpoena.  The provisions of that

1   subpoena on which Mr. Cuppy was ordered to make production are
2   the ones -- include the ones that are listed on the pages --
3   in the pages of our brief 117 to 120.   Notwithstanding that,
4   having now received an order of the court to produce records
5   that included the RPP subpoena, Mr. Cuppy didn't -- that
6   included RPP documents, Mr. Cuppy did not produce any such
7   documents, and we did not even know of the existence of the
8   RPP entity until, by dint of our own investigation, we
9   discovered that entity on our own and started making inquiry
10  of people associated with Mr. Rogan and Mr. Cuppy about that
11  entity.   It was only after we started making inquiry of people
12  associated with Mr. Rogan and Mr. Cuppy that finally in 2006,
13  I believe, Mr. Rogan finally identified -- and this is all in
14  the brief, but Mr. Rogan finally --

15              THE COURT:   Mr. Rogan you say?

16              MR. MENDELOFF:   Mr. Rogan, through his lawyer in
17  Canada -- must have been at the end of 2006 because that's
18  when he left, and the dates are in the brief -- finally agreed
19  that this entity existed.   Mr. Cuppy still at that point did
20  not agree that that entity -- did not produce any documents.
21  And it wasn't for a year, until Mr. Cuppy had received not
22  just the order of the court, not just the subpoena, but now a
23  citation to discover assets, that Mr. Cuppy finally started
24  producing RPP records.

25              Furthermore, the entire structure, which we have seen

1  here -- and I'm showing you the board with the -- extracted

2  from Exhibit 84.

3  THE COURT:  Right, from the other day.

4  MR. MENDELOFF:  Mr. Cuppy is the schemer at the heart

5  of this entire structure.  We introduced an exhibit in the

6  statement of facts that shows Mr. Cuppy's role throughout.

7  Mr. Cuppy was aware at the very latest in 2001 -- 2003, excuse

8  me, that there were allegations by the United States

9  government and Dexia that Mr. Rogan was personally involved in

10  a scheme to defraud Dexia and the U.S. government.  In January

11  of 2003, Mr. Rogan's entities pled guilty, his management

12  companies pled guilty to a massive fraud scheme against the

13  United States government.  Mr. Cuppy, who had been on

14  committees associated with the board of directors of those

15  entities of the hospital and dealt with those entities, was

16  well aware that those entities had received large amounts,

17  millions and millions of dollars in fees from Edgewater.

18  Accordingly, there is no question that for everything that

19  occurred after January of 2003 Mr. Cuppy was aware that the

20  assets that Mr. Rogan possessed absolutely included proceeds

21  of unlawful activity.

22  At one point during the course of this investigation

23  I almost sent Mr. Cuppy a letter notifying him of the nature

24  and terms of the money laundering statute.  I didn't do it

25  because I thought in a civil case it was just too heavy

1   handed.  But the conduct here, even after the disclosure of
2   all -- of the sources of those proceeds, is absolutely
3   shocking and reflects a complete lack of credibility for
4   Mr. Cuppy.

5          Now, Mr. Cuppy would have us believe that the $43,000
6   that he received -- that the $43,000 that he took out of the
7   60,000 he received, the 43,000 that ended up and still is in
8   the Ameritrade account, is all earned money and should not be
9   considered proceeds that this court needs to protect.  For the
10  court to believe that, the court has to accept Mr. Cuppy's
11  word that the 30,000 that he's getting -- the two $30,000
12  payments that he's getting are earned income, that he earned
13  them.  But there is absolutely no proof presented as to what
14  Mr. Cuppy did to earn that.  We have Mr. Cuppy making broad
15  allegations that he handled all these management activities,
16  but not a single document presented, not a single piece of
17  corroborating testimony offered to indicate that that was
18  really earned.  Furthermore, there was no contract here at
19  all.

20         Mr. Cuppy is a -- unquestionably a sophisticated
21  businessman, the named partner of a law firm of 20 lawyers, an
22  individual who's been involved in the real estate business and
23  in litigation in courts for his entire career, somebody who is
24  well aware of the requirements of a well-run business and a
25  business that has proper documentation.  Mr. Cuppy chose to

1  operate these businesses the way he did.  He chose not to have

2  adequate documentation.  He chose not to have contracts.  He

3  chose not to have any kind of agreements, any kind of

4  documentation of these alleged loans between himself and his

5  entities and these businesses.

6        I agree that whatever happened before is maybe for a

7  turnover hearing if we make allegations that the moneys that

8  Mr. Cuppy received at one time or another were fraudulent

9  transfers, and right now we're focused only on what's in his

10  possession, but I think Your Honor has to accept his position

11  that these are validly earned moneys, this $60,000 that he

12  got, to accept that that 43,000 shouldn't be frozen.  And I

13  certainly think that what we saw with respect to the

14  additional funds that he gave himself for those two entities

15  draws real serious question as to exactly what's going on

16  here.

17        The transfers in July and August look to me like it's

18  taking money when he needs the money.  There's 10,000, comes

19  in, goes out, and he spends it on a variety of things,

20  including his own personal real estate holdings.  Another

21  5,000, he needs 5,000 more, comes in, goes out.  And who knows

22  what would have happened if the freeze hadn't come into

23  effect.  But it certainly suggests to me that an attitude

24  towards this money that this is money he can commingle, he can

25  take, when he wants to pay it back, he can pay it back, and

1 that should not be protected.

2      It's our position that if there is only $300,000 of

3 assets in these two accounts that is available to be frozen

4 that the court should freeze those assets and in addition

5 order liens to be placed on the property that Mr. Cuppy is

6 going to sell for the additional $88,000 so that the interests

7 of the court and the RPP trust is protected.

8      Thank you.

9      THE COURT:  Thanks.

10      Mr. Gregory.

11      MR. GREGORY:  Thank you, Your Honor.

12      If this were a trial before a jury, I would have been

13 on my feet objecting to all the argument about evidence that's

14 not in this record, evidence about what Mr. Mendeloff was

15 thinking of doing at various times.

16      THE COURT:  Yeah, well, honestly, I can ignore the

17 stuff about what he was thinking of doing, but let me make

18 sure I have a handle on what you're referring to when you say

19 not in this record.  Is there anything other than that?  So,

20 in other words, he also referred to documents that were part

21 of the original TRO motion.

22      MR. GREGORY:  And if the court will recall, when we

23 started all of this I indicated, and I believe the court

24 indicated some concurrence with me, that these are documents

25 that -- for which there was no evidentiary basis.

1    THE COURT:  I don't recall the specific comment or

2    its context, but I would be surprised if I said something like

3    that that applied to everything of the hundreds and hundreds

4    of exhibits that were in there.  I mean, some of what was in

5    there are court records and affidavits and things like that,

6    and so maybe I ought to be asking Mr. Mendeloff to be a little

7    bit more specific, but maybe I ought to go pull out some of

8    this stuff, but, you know, and then there's -- well, but when

9    you -- if you want to tell me that you think that certain

10   things I shouldn't consider, I think you need to be specific

11   about what you're telling me I shouldn't consider so I can

12   deal with it.

13   MR. GREGORY:  Well, there was quite a bit of argument

14   about proceedings that apparently were held before Judge

15   Schenkier, things like that, that certainly we didn't talk

16   about here.  We didn't hear any evidence about it here.

17   The mountains of documents that were submitted to the

18   court on the ex parte basis came with an affidavit from

19   Mr. Mendeloff.  There was no further authenticity or

20   authentication.  There was no further evidence that really

21   brought them before the court.

22   So what really is before the court, certainly there

23   was a lot of argument, and I would certainly request that the

24   court go back and review our memorandum in opposition to the

25   injunction for the standards.  And what's interesting is when

1    the mountain of evidence came in, there was nothing.  There

2    was nothing about Mr. Cuppy's assets.  That came in in that

3    supplemental memorandum just before we started our hearing.

4    And we walked our way through with Mr. Cuppy all the different

5    transactions that were addressed in that supplemental

6    memorandum, and we indicated the evidence is one-sided that,

7    you know, the property that's in Mr. Cuppy's accounts, the

8    property that is in Dynamic Alliance's accounts belong to him.

9              The entire basis of the evidence -- and, remember,

10   Dexia has the burden on this; it's a preliminary injunction;

11   it is a high burden -- is don't believe him, you know, don't

12   believe anything he has to say, and therefore we've made out

13   our burden of proof and we're satisfied.  That's not enough.

14             You've had the opportunity to see and observe

15   Mr. Cuppy and hear his testimony, and obviously the court has

16   heard lots of witnesses and can make its own determination as

17   to his credibility.

18             The court observed I believe it was the last time

19   that we were here that freezing assets is the second most

20   severe thing it can do.  And certainly preliminary injunctive

21   relief is an appropriate remedy only when a very high level of

22   burden is established.  We just haven't seen that evidence.

23   And what Dexia has really asked us to do is to prove the

24   negative proposition, that none of Peter Rogan's moneys are in

25   Mr. Cuppy's or Dynamic Alliance's accounts.  I believe we've

1   done that.  I believe that there has been a lack of evidence
2   on Dexia's part to prove that Mr. Rogan's assets are indeed in
3   Mr. Cuppy's accounts.

4        Even if we accepted that Dexia had questions about
5   what's in his accounts, even if we accepted the
6   appropriateness of a shoot first, ask questions later
7   approach, no questions remain now.  Mr. Cuppy has laid himself
8   bare before Dexia, before the court.  He's turned over
9   thousands and thousands of pages of documents, of account
10  statements, of checks, of deposit tickets, of wire transfer
11  documentations, tax records, real estate records, laid himself
12  out there bare, and yet we still don't have any evidence of
13  Peter Rogan's money in any of these accounts.

14       The freeze order went into effect September 4th, I
15  believe it was.  Today is Halloween, October 31st.  And I
16  think the court can certainly surmise from the fact that it's
17  taken us -- our first hearing on this was in mid September.  I
18  believe it was the 18th.

19            THE COURT:  Right.

20            MR. GREGORY:  And we've gone through -- we've had
21  several conference calls where the court inquired what's the
22  status, and we're getting evidence, we're getting evidence,
23  we're getting evidence.  I think the court can surmise from
24  all that --

25            THE COURT:  Wait a second.  You just told me a minute

1   ago I shouldn't rely on something Mr. Mendeloff thought he was

2   going to do.  You're now telling me that I should rely on

3   something that was said at a scheduling conference about, you

4   know, whether people were going to settle or not?

5        You can't have it both ways.  I mean, you may not be

6   right on the first point, but I'm sure you're not right on the

7   second point.

8        MR. GREGORY:  The fact that we are here October 31st,

9   some seven weeks later, eight weeks after the freeze order

10  went into effect, I think the court can surmise from that that

11  even Dexia recognized that it didn't have the evidence to make

12  out its case earlier.

13       As we've been in the court and on the record, counsel

14  has stood here earlier at the beginning of these proceedings

15  and indicated, Judge, we're not interested in money that

16  Mr. Cuppy earned as a trustee, we're not interested in his

17  management fees.  Counsel stood here and said to the court as

18  soon as we get documentation on these accounts, we'll unfreeze

19  them.  Everything has been provided.  No further questions

20  have been raised.  There's no reason why anything should

21  remain frozen.  There's no hidden accounts.  We see no

22  transfers to Peter Rogan.  We see no transfers from Peter

23  Rogan.

24       The court has observed previously in court and on the

25  record the view that Mr. Cuppy's position is a little

1  different from the position of the Rogan children.  Mr. Cuppy
2  is a -- mostly retired, probably prefers to have been more
3  than mostly retired at this point.  His assets reflect a
4  lifetime of work, a lifetime of hard work for a number of
5  clients, not just for, you know, the Rogan family.  What Dexia
6  is asking is that the court freeze essentially all of these
7  investment accounts, all of the money that Mr. Cuppy has.

8          Can Mr. Mendeloff trace money that's currently in the
9  accounts back to I guess what we call the Rogan entities, the
10 definition that's been adopted in this case?  Of course he
11 can't.  Of course he can't.  And what really can't be
12 established is that that isn't money that Mr. Cuppy earned.
13 As he indicated, he has managed multi-million dollar projects.
14 If Dexia is ultimately successful in its turnover efforts, I
15 think that Dexia will be the beneficiary of the millions of
16 dollars that Mr. Cuppy's management of those projects has
17 generated.

18         Has he received funds that belong to him?  Yes, he
19 has.  Has he received funds that don't belong to him?  No, he
20 hasn't.  Is this the time or the place to argue whether the
21 fees that he charged were too high, too low, just right?  No,
22 this is not the time or place to argue about that because the
23 only evidence, the only evidence is that these are fees that
24 he earned for services rendered.

25         Mr. Cuppy -- I'm sorry.  Dynamic Alliance borrowed

1    money, okay.  Dynamic Alliance right on Mr. Cuppy's direct

2    examination indicated it owes $305,000 to the RPP trust.

3    Obviously the RPP trust, which Mr. Mendeloff just indicated to

4    you was formed in 1995, suggests that Mr. Cuppy's first

5    knowledge that there may have been something untoward came I

6    think he indicated in the early 2000s, 2001, 2002.  But in any

7    event, what RPP has is the ability to demand that Mr. Cuppy,

8    through Dynamic Alliance, pay the debt.  And the demand is

9    made for that payment.  If payment isn't made, well, Dynamic

10   Alliance will be liable for it.  Where is the irreparable harm

11   that would require securitization of that debt at this point?

12   The liability is there.  The liability has been admitted,

13   conceded under oath in court.  It would be a very simple

14   proposition if the demand were made, payment were not made, to

15   enforce that obligation.

16         Again, who has the burden here?  Dexia has the

17   burden.  It's asking the court for truly extraordinary relief

18   in freezing an individual -- obviously Dexia doesn't like

19   Mr. Cuppy.  We haven't gotten into all that, but it's asking

20   the court to freeze all of the remaining assets, liquid

21   assets, that a gentleman who's been working his entire life to

22   earn, freeze them for some indeterminate period of time.

23   These moneys have been frozen now for nearly two months.

24         We appreciate that the court has given us the

25   opportunity to address the situation.  We appreciate that the

1    court will render its decision near term, as you indicated.

2    And we believe that for all of these reasons the motion for

3    preliminary injunction should be denied and the citation

4    proceedings that have been hanging over Mr. Cuppy for some --

5    over a year, 13 or 14 months, that have caused him to produce

6    tens of thousands of documents should be dismissed, and that

7    again we appreciate the court's attention.

8            THE COURT:  Thanks.

9            Mr. Mendeloff, any rebuttal?

10           MR. MENDELOFF:  Yes, Your Honor.

11           THE COURT:  I would like you to address this

12   question, I suppose, of whether it's appropriate or

13   inappropriate for me to consider the other materials that were

14   in the TRO submission.

15           MR. MENDELOFF:  Your Honor, it's of record in this

16   case, and we were not aware that there was an extraction of

17   any evidence that was already presented.  The submission that

18   we gave to the court on Mr. Cuppy was termed a supplemental

19   filing.

20           THE COURT:  Right.  Yeah, I recall that.

21           MR. MENDELOFF:  And the original filing was a filing

22   against Mr. Cuppy and the other people.  So I really don't see

23   the argument at all that somehow the filing that we made to

24   support our motion against Mr. Cuppy and the evidence that was

25   presented there somehow doesn't apply to this proceeding.  It

1   doesn't make any sense to me.  The motion for preliminary
2   injunction specifically relies on that evidence.

3           Furthermore, the lack of evidentiary basis, the case
4   law is absolutely clear that in a preliminary injunction
5   hearing hearsay is admissible.  And the evidence that we
6   presented in the vast majority of cases are business records
7   of the entities of Mr. Cuppy, Mr. Cuppy was managing, or bank
8   accounts from those entities, or e-mails that Mr. Cuppy sent
9   or received.  So the notion that there's somehow an
10  authentication problem strikes me as quite odd.

11          Your Honor is aware, and I'll say it for the record,
12  that the affidavit that was presented, and we keep hearing
13  about this in all these proceedings, but the affidavit that
14  was presented by me, signed by me as required by rule, and is
15  there only to support the ex parte nature of the submission,
16  and that's the only basis for it, and Your Honor found the
17  affidavit was adequate, the ex parte submission was
18  appropriate, and it's over.  So this business of that
19  affidavit supporting anything is really beside the point
20  completely.  And in fact the affidavit, all the affidavit did
21  was reiterate the evidence that was presented in the case.

22          A couple of other minor things.  The fact that we
23  have waited until now to finish the proceedings and the
24  allegation that somehow Dexia lacked the proof to proceed
25  going forward initially is to me sort of surprising as well

1   considering that the reason that we were waiting is because
2   Mr. Cuppy had not produced the records he was bound to
3   produce.  We were waiting on Mr. Cuppy.  As it turned out, we
4   ended up having to approach the banks themselves in many
5   instances to get the records we needed.

6          And you'll note, for example, on the RPP records that
7   we -- checks that we went through today that have Mr. Cuppy's
8   name on them, those were produced by Citibank.  They were not
9   produced by Mr. Cuppy.  We've had to in many instances use the
10  orders that the court entered to force these institutions to
11  get us what we've needed.  And, by the, way it's been quite
12  harrowing.  It's amazing how many instances these institutions
13  don't keep records they're supposed to.

14         The final point that I wanted to make is this
15  argument about where's the irreparable harm.  I think that's
16  self-evident.  Dynamic Alliance has $50,000 in its account.
17  It owes $305,000.  Mr. Cuppy is the sole owner of Dynamic
18  Alliance and the president of it.  It has no employees.
19  There's no reason in the world why RPP or Dexia or this court
20  should take the risk that Dynamic Alliance doesn't eventually
21  pay what it owes.

22         We've got assets here now, and it's our view that
23  those assets should be held onto to make sure that that debt
24  gets paid.  So for all those reasons we ask Your Honor to
25  impose the relief we requested.

1    THE COURT:  Okay.  As I said, my intention is to try
2    to rule on this within the next week, in other words, by next
3    Friday.  It's taken under advisement.

4         I think I've got all the documents that I need.  I
5    went back through everything, and I'm pretty sure I've got
6    everybody's memoranda in here, but let me just be certain of
7    that.

8         Obviously I have all the original TRO stuff.  I've
9    got the supplemental memorandum from Dexia.  I've got
10   Mr. Gregory's memorandum in opposition to the motion for
11   preliminary injunction.  There was an affidavit submitted
12   along with that.  Obviously I've got all the exhibits that
13   have been dealt with here.  And I think that's pretty much
14   everything there is.

15        MR. MENDELOFF:  There's two affidavits from
16   Mr. Cuppy, Your Honor.

17        THE COURT:  Well, I do have two affidavits.  One is
18   entitled Declaration in Opposition to Motion For Preliminary
19   Injunction.  The other is entitled Declaration Regarding
20   September 4, 2008, Temporary Restraining Order.

21        MR. MENDELOFF:  Yes, Your Honor.

22        THE COURT:  Those are the two I'm supposed to have.

23        MR. MENDELOFF:  Yes.

24        THE COURT:  I've got them.

25        All right.  Thanks a lot.

1    MR. GREGORY:  Your Honor, may I make one point in

2    response?

3    THE COURT:  Sure.

4    MR. GREGORY:  Dynamic Alliance, who I indicated has

5    $50,000 liquid assets, we've seen a number of different assets

6    that Dynamic has, other properties, so to suggest that

7    securitization is required --

8    THE COURT:  You got to focus me in on what.  What

9    other properties?

10    MR. GREGORY:  Well, may I have just a moment, Your

11    Honor?

12    THE COURT:  Yes.

13    MR. GREGORY:  The Jacksonville condos would be one

14    example.

15    THE COURT:  The thing that Mr. Cuppy testified to

16    earlier today that he was hoping to sell in order to satisfy

17    the obligation to RPP.

18    MR. GREGORY:  That's one of them, yes.

19    THE COURT:  Okay.

20    MR. GREGORY:  There are others, as he indicated as

21    well.

22    MR. MENDELOFF:  And, of course, there's no -- with

23    the exception of what we extracted on cross, there's no proof

24    of what those entities are or what kind of collateral is in

25    those entities.

1       THE COURT:  That was about to be my question to

2  Mr. Gregory.  I mean, do I have -- and it's entirely possible

3  that I do in the mass of stuff that I have.  Do I have any

4  documents that reflect anything about, you know, other assets

5  and the value of them?  Obviously I've got Mr. Cuppy's

6  testimony about, you know, whatever he's testified about.

7       MR. GREGORY:  You have his testimony is the

8  predominant place where you'll find that evidence.

9       THE COURT:  Okay.  All right.  Thanks very much.

10       (Said hearing was adjourned at 3:00 p.m.)

11

12

13            *    *    *    *    *    *    *

14                 C E R T I F I C A T E

15

16

17       I hereby certify that the foregoing is a true and

18  correct transcript of the above-entitled matter.

19

20  /s/ Laura M. Brennan                     11/03/2008

21  _____          _____
   Laura M. Brennan                        Date
22  Official Court Reporter
   Northern District of Illinois
23

24

25