# APPENDIX A

# STATEMENTS NOT FOR THE TRUTH

## I. 11/10/08 TESTIMONY

### A. Denial of Cuppy's Involvement Opening Judy's account at Oceanic

19
21  Q.   Was Mr. Cuppy involved?  Do you know
22  Mr. Cuppy?
23    A.   I know Mr. Cuppy.
24    Q.   Was he involved in opening the account

20
1  with you or for you at Oceanic Bank & Trust in the
2  Bahamas?
3    A.   In response to your question, I hereby
4  invoke my Fifth Amendment privilege against self
5  incrimination because the answer to your question
6  may incriminate me.  Actually, the answer to that
7  last question was not to my knowledge.
8    Q.   The last question if Mr. Cuppy was
9  involved?
10    A.   Not to my knowledge.
11    Q.   Do you know who, if anyone, was involved
12  in opening an account for you on your behalf at
13  Oceanic Bank & Trust in the Bahamas?
14    A.   No.

### B. Allegation that Judy Only Received Money from the PGR Bahamas Trust on One Occasion

32
Q.   Who else have you spoken with whenever
13  you've gotten money from the Peter G. Rogan
14  Irrevocable Trust, and when I say "who else you have
15  spoken with," I'm talking about before you received
16  the funds and after?  In other words, any time there
17  has been a transfer, who have you talked with about
18  it?
19    MR. GOUVEIA:  Any time you -- (inaudible.)
20  BY THE WITNESS:
21    A.   …. I believe I only got money once.[1] …

---

[1] Dexia offers the balance of this response for the truth under Rule 804(b)(3).

C. <u>Allegation as to reason Judy asked Hepburn (Oceanic) in Ex. 705 not to send her a confirmation when she wrote him for money to be transferred</u>

66
14  Q.  You noticed that in this letter [Ex. 705],[2] you say
15  that you don't want confirmation of the transfer?
16     A.  Right.
17     Q.  Why didn't you want confirmation of the
18  transfer?
19     A.  Too many people at my house to have faxes
20  and things.

D. <u>Allegations that:
Peter did not discuss with Judy his plan to live in Canada,
Judy would have to guess at the reason Peter is not in the U.S., and
Judy signed the lease in Canada because she visits the condo</u>

45
21  Q.  Were you involved in your husband's
22  decision to live in Canada?
23     A.  No.
24     Q.  Did he discuss with you the planning

46
1  related to his decision to live in Canada?
2     A.  No.

46
7  Q.  Do you know why your husband is not in
8  the United States?
9     A.  That would be a guess.

47
5  Q.  Why did you sign the lease for this
6  Vancouver condo if you don't reside there?
7     A.  I visit.

E. <u>Allegation that:
Money from sale of Longboat Key property went into Judy's bank account,
Judy used part of the money to purchase 55 E. Erie</u>

60
21  Q.  Below, you list a sale in 2005 of a -- it
22  looks like some sort of dwelling in Longboat Key,

---

[2] Ex. 705 is the same as Ex. 40.

23  Florida?
24     A.   It was a lot.

61
1    Q.   It was a lot?  It was an empty lot?
2    A.   Yes.
3    Q.   And when did you acquire that lot?
4    A.   I think maybe 1990ish, '91, '92 early.
5    Q.   And you sold the lot in 2005?
6    A.   Yes.
7    Q.   What did you do with the money from the
8  sale of that lot?
9    A.   It went into my bank account.
10    Q.   And after you put it into your bank
11  accounts, did the money go anywhere else?
12    A.   Not that I know of.
13    Q.   Did you then give some of the money to
14  your husband?
15    A.   I may have.  I did, yes.[3]  I believe I
16  used part of that to buy my condo downtown.
17    Q.   Are you sure about that?
18    A.   I'm not sure.  I believe I did.  I
19  believe I did.
20    Q.   And what was the --
21    A.   It's about the same time.

## II.    2/20/09 TESTIMONY

### A.    Original Creation of Account in her Name at Oceanic

133
9  Q.  I'm asking you a different question.  Did you ever have an
10     account at Oceanic Bank in the Bahamas?
11  A.  I believe I did.
12  Q.  Okay.  And did you establish that account?
13  A.  I don't know how that account was established, but I know I
14     had an account.
15  Q.  But you don't know how it came to be?
16  A.  No, I don't, to tell you the truth.
17  Q.  And you never got account statements for your bank account
18     in the Bahamas?
133
20  Q.  Okay.
21  A.  I believe that a gentleman --

---

[3] Dexia offers the first two sentences of line 15 for the truth under Rule 804(b)(3).

22  Q. You don't --
23  A. I believe a gentleman --
24     MR. GOUVEIA: Wait a minute. Wait a minute. You need
25     to let her answer the question.

134

1  A. I believe a gentleman called me up.
2  BY MR. AIZENBERG: (Continuing)
3  Q. Say that again.
4  A. I believe a gentleman called me up and told me I was going
5     to get a distribution from the trust and would -- first of
6     all, I thought he might be a prank caller, you know. I
7     didn't pay much attention to it at the time. And he asked
8     me if I would like him to open an account and I said sure.
9     So I assume that's how this came about.

B.  <u>Attempt to Contest Source of 11/4/05 $1.5M Transfer to Judy's Scudder Account from Judy's Oceanic Account and PGR Bahamas Trust</u>

23  Q. Mrs. Rogan, I've handed you what's been marked as Exhibit
24     233. Is this an account statement of yours from Scudder?
25  A. Again, it could be. Do I recognize this specific document?

132

1     No.
2  Q. Well, did you get account statements from Scudder?
3  A. Yes.
4  Q. Okay. So does this look like an account statement from
5     Scudder that you received?
6  A. Again, a little bit different form, but, yeah, it could have
7     been back then. Yeah.

13  Q. But you had an account at Scudder; isn't that right?
14  A. Yes. Yes. I still have. Yes.
15  Q. And you see that on 11/4/05 it shows a wire transfer in for
16     about 1.5 million? Do you see that?
17  A. Yes.
18  Q. Okay. And do you see that a few days later, on 11/9/05, it
19     shows a wire transfer out for about $775,000?
20  A. Yes.
21  Q. Okay. And the wire transfer in that came from the Peter G.
22     Rogan Irrevocable Trust in the Bahamas; isn't that right?
23  A. I don't know. Does it say that?
24  Q. I'm asking you, do you remember?
25  A. I don't remember, no. I asked for money at some point from

133
1  the trust, but this may have come from my revocable trust
2  too. I don't know. My revocable trust. I don't know.

### C. Denial of Participation in Evasive Tactics

148
7  Q. I'm reading from page 6 of this, it says here, Ms. Rogan
8     engaged in no such evasive tactics in the case at issue.
9     [As read.] They're talking about trying to evade creditors
10    and whatnot. That's your statement, that you didn't try
11    to -- that you didn't employ any evasive tactics; isn't that
12    correct?
13 A. That's correct.

### D. Explanation for Numerous Transfers from Scudder to First National Valpo

155
12 Q. Now you were shown a number of exhibits by Mr. Aizenberg
13    starting with Exhibit 455. I'm not gonna try to -- I want
14    to try to summarize those exhibits. Now they show a
15    considerable amount of money going in and out of your
16    accounts; is that correct?
17 A. That's correct.
18 Q. Now do you have any knowledge -- maybe you're better off
19    looking at those documents and trying to give an
20    explanation. We haven't seen these documents at all until
21    today, as you know. Do you have any recollection as to
22    where this money was coming from and where it was going to
23    as reflected in these documents?
24 A. Well, money from my -- I believe, as it turned out, and
25    maybe David Miller did this too, most of -- all of my money

156
1  eventually got dumped into the Valparaiso bank because I
2  could only transfer from -- all the money from the trust, I
3  think, got dumped into Scudder, as it turned out.
4  Q. And you had -- the bank account you're talking about is the
5     First National Bank account?
6  A. Right. And then in order to -- I had -- the only place that
7     Scudder could move money to was First National Bank.
8     Everything --
9  Q. So you also had the Scudder investment account.
10 A. Yes.
11 Q. And what was the source of that money? Where did the money
12    come from in Scudder?

13  A.  I had that. That account is longstanding. It was
14      longstanding from investments that I had made a long time
15      ago. David Miller handled that for me for years. And he
16      set all these things up with safety measures. Everything
17      had to eventually dump into the Valpo account so that I
18      could keep track of it, what little track I kept of it.

157

19  Q.  Is that Plaintiff's Exhibit 214?
20  A.  Yes.
21  Q.  So that's the money -- the statement that -- you never saw
22      this document before today?
23  A.  I never saw it. But it -- I believe David Miller set my
24      accounts up somewhat circuitously so that all the
25      accounts -- Scudder could only deposit into my First

158

1       National account.
2   Q.  You said that.
3   A.  And apparently this, I think most of the money came from
4       this Exhibit 214. I believe it went into Scudder. It could
5       only go to Scudder. He had things set up so there was some
6       checks and balances because he was uncomfortable being the
7       only one who ever saw my statements. So in order to get
8       money out, I had to move it from one account to the other to
9       the next. It was kind of a laborious process sometimes, but
10      at least everything dumped into my Valpo account.
11  Q.  But without carefully tracking any of this, you wouldn't be
12      able to testify today what moneys came from the Bahamian
13      trust --
14  A.  No.
15  Q.  -- into your accounts?
16  A.  No. No.

      E.    <u>Allegation that used Wexford property mortgage proceeds
to repay "loan" from PGR Properties</u>

118

21  Q.  Okay. And the mortgage you took was in 2006; right?
22  A.  It could have been. It could have been.
23  Q.  The mortgage on the Wexford property was in 2006?
24  A.  Again, it could have been.
25  Q.  Okay. And what you're saying in your testimony today is

119

1       that the money for -- that you got from the mortgage on the

```
 2      Wexford property was used to repay the Erie property loan
 3      you took from PGR?
 4   A. No.
 5   Q. Oh, okay.
 6   A. No. I took out the loan. I paid the mortgage for a while.
 7      No, no. Let's go back. Let's see. I closed the property.
 8   Q. Which one?
 9   A. The Erie property.
10   Q. Yes.
11   A. With a loan from PGR Properties.
12   Q. Okay.
13   A. And then I took out the mortgage on the 476 property to
14      repay that loan. So that would have been in 2005 or 2006 to
15      repay that.
16   Q. So the Wexford mortgage proceeds, your testimony is, were
17      used to pay off the loan that you took out from PGR to buy
18      the Erie property?
19   A. No. I repaid the mortgage with those. I repaid the --
20   Q. The mortgage on Erie?
21   A. No.
22   Q. Oh, okay.
23   A. I repaid the mortgage company with -- when I sold the house.
24   Q. Which house?
25   A. The 476, the only one I sold lately.
```

```
                                 120
 1   Q. Okay.
 2   A. Okay. I took that money -- I had a $600,000 mortgage --
 3   Q. Right.
 4   A. -- which I had taken out in order to -- I had taken that out
 5      to repay the company. So the company was repaid already.
 6   Q. Which company?
 7   A. PGR. I took the loan from them earlier on, and then I just
 8      paid off the mortgage when I sold the house. I wasn't
 9      paying back the company then. I was paying back -- I paid
10      back the mortgage.
11   Q. Okay. I'm -- I want to make sure I understand, so let's try
12      to do this --
13   A. Okay.
14   Q. I'll try to do this slowly.
15   A. I'm not very good at explaining.
16   Q. No, that's fine. So to buy --
17   A. To buy Erie.
18   Q. To buy Erie, you borrowed about $600,000 --
19   A. Yes.
20   Q. -- from PGR Properties; correct?
```

21  A.  Correct.
22  Q.  Okay.  So you owe $600,000?
23  A.  Correct.
24  Q.  Okay.  So then later on you take out a mortgage on Wexford;
25      correct?

121

1  A.  Correct.
2  Q.  And --
3  A.  And I repaid PGR Properties.
4  Q.  With the mortgage funds?
5  A.  Yes.
6  Q.  Okay.  So you used the -- so your testimony is that the
7      funds from the Wexford mortgage that you took out were used
8      to repay the PGR debt that you owed?
9  A.  Correct.  Yes.  Correct.
10 Q.  Okay.  Are you sure that that's how it happened?
11 A.  That's the best of my recollection, yes.

123

14 Q.  Mrs. Rogan, is this the document that evidences the loan you
15     took out on your Wexford property for about $650,000?
16 A.  I believe it is.
17 Q.  Okay.  Thank you.  And it shows -- correct me if I'm wrong,
18     but that the date is June 23rd, 2006?
19 A.  Uh-huh.
20 Q.  Yes?
21 A.  Yes.
22 Q.  And it's $650,000; right?
23 A.  Yes.
24 Q.  Does that fit with your recollection as to the amount of the
25     mortgage?

124

1  A.  Yes, of the note.
2  Q.  Of the note, I should say.  Sorry.
3          I'm handing you what's been marked as Exhibit 243.
4      Mrs. Rogan, this is an account statement for your bank
5      account at First National Bank of Valparaiso, statement date
6      7/3/06; is that right?
7  A.  Yes.
8  Q.  And you still have an account at First National Bank?  It's
9      now First Source; isn't that right?
10 A.  Yes.
11 Q.  How long did you bank with that bank?
12 A.  Probably since 1973 --

13  Q.  A long time?
14  A.  -- when I moved here, or '74.
15  Q.  And do you see on the first page it shows under deposits --
16  A.  Uh-huh.  Yes, I do.
17  Q.  -- it shows a deposit of $632,707.37, do you see that?
18  A.  Yes.
19  Q.  Okay.  And just given the proximity in time to the date of
20     the note, does that seem to be the same set of funds?
21  A.  It could be but I'm not sure if that money went into my
22     Scudder account for the note.
23  Q.  Well, did you have any other -- in or about the end of June
24     of 2006, were you getting six hundred plus thousand dollars
25     from any other source?

125

1  A.  Well, not that I remember.  But I could have been moving
2     money.  I don't know the answer to that.  But let me see.
3  Q.  Okay.  Now turn to the back of the last page of exhibit
4     243.
5  A.  Uh-huh.
6  Q.  Okay.  There are checks written here to your husband.  Do
7     you see those?
8  A.  Yes.
9  Q.  Okay.  And so there's a check dated 6/13/06 from you to Mr.
10     Rogan, do you see that, for $150,000?
11  A.  Yes.
12  Q.  Okay.  And then there's a check dated 6/29/06 to Mr. Rogan
13     for $400,000.
14  A.  Yes.
15  Q.  Right?  And that's right after June 23rd, '06; right?  Six
16     days later?
17  A.  Yes.
18  Q.  Okay.  And then there's a check to Mr. Rogan on 6/21/06 for
19     a hundred thousand dollars.  Do you see that?
20  A.  Yes.
21  Q.  Okay.  And there's a check to Mr. Rogan for $10,000 on
22     6/26/06.  Do you see that?
23  A.  Yes.
24  Q.  Okay.  And there's a check, another check, to Mr. Rogan for
25     $40,000 on 6/26/06?

126

1  A.  Yes.
2  Q.  Okay.  And these are all checks that you wrote?  That's your
3     signature on the checks?
4  A.  My signature but CaraLinda wrote these checks.  She was our

```
 5      secretary.  My husband's secretary really.
 6   Q. But these checks were written on your behalf; isn't that
 7      right?
 8           MR. GOUVEIA:  Wait until she's done answering the
 9      question.
10   BY MR. AIZENBERG:  (Continuing)
11   Q. I thought you were done.  I'm sorry.
12   A. She wrote them.  I asked her to write things.  She may not
13      have stubbed them correctly; and as I said, these may not be
14      the -- what I repaid the loan with.  But I did use that
15      money to repay the loan.  I'm not sure if it came out of my
16      Scudder account.  John Foley, who's my accountant, would
17      know.  Okay?  He has every piece of paper that I've touched
18      so...
19   Q. Okay.
20   A. But that is what I did with the money.
21   Q. Well, let me ask you something.
22   A. Yes.
23   Q. Go to the first page of -- well, let me back up first.
24   A. Uh-huh.
25   Q. The checks, they were written on your behalf; isn't that
```

127
```
 1      right?
 2   A. Yes.  Correct.  And I did ask CaraLinda to write them.  She
 3      may not -- these may or may not have gone to his company.
 4      She may or may not have stubbed them -- I mean written them
 5      on the little memo correctly --
 6   Q. Okay.
 7   A. -- because she would have been depositing them also.
 8   Q. But if you look at the checks, you'd agree with me, it
 9      doesn't -- the checks are written to your husband
10      personally; isn't that right?
11   A. Yes.  Yes.
12   Q. Okay.  It doesn't have any reference to a company?
13   A. No.  But as I said, she would have been depositing them
14      directly to the PGR account or whatever.  She would have
15      been doing that.
```

158
```
17   Q. Now you testified earlier that the money to pay off the loan
18      that you obtained to buy the Erie property in Chicago came
19      from a company owned by your husband?
20   A. Yes.
21   Q. And you also testified that you took out a mortgage on your
22      house in Wexford Court in Valpo.
```

23  A.  Yes.
24  Q.  And you used that mortgage money to pay off the company
25      loan.

159

1  A.  Yes.
2  Q.  Is that correct?
3  A.  That's correct.  If it wasn't --
4  Q.  Is that still your testimony?
5  A.  It's still my testimony.  If it wasn't immediate, it was --
6      you know, if I spent the first money on something else, I
7      can't answer that.  I'm telling you that's what I thought I
8      did.

161

16  Q.  So, in other words, the money that you received as a result
17      of the adjustable rate note dated June 23rd, 2006, as
18      Exhibit 455, could not have been any of the funds that were
19      deposited in your account reflected by Exhibits 233, 231,
20      230, 243, and 425, because those, the dates of those
21      exhibits all predate the note.
22  A.  That would be correct.
23  Q.  Do you recall what you did with any of the funds represented
24      by Exhibit 455, which is the adjustable rate note?
25  A.  It was my recollection -- and I believe this is on my taxes,

162

1      but I would have to look them up.  I know you have copies of
2      them.  This is what I believe I paid off the loan to PGR
3      Properties with.  But, again, John Foley –

162

12  Q.  Mrs. Rogan, turn to Exhibit 231.
13  A.  Okay.  The last one.  I have it.
14  Q.  Turn to the last page.  We looked at this a few minutes
15      ago.  That's a check you wrote to PGR Properties for five
16      hundred and seventy-two thousand; correct?
17  A.  That's correct.
18  Q.  And that repaid the loan, didn't it?
19          MR. GOUVEIA:  Objection, your Honor.  That's already
20      been asked and answered on his previous examination and she
21      testified that that -- that she thought that that was
22      another loan from the company and had nothing to do with the
23      loan that she obtained for the property.
24          THE COURT:  And on redirect you went into a line of
25      questioning that establishes apparently a different

163
1     recollection so it's overruled. He's now crossing on your
2     redirect.
3 A. I don't have an explanation for it. Okay? I -- maybe I put
4     the money in and didn't pay it for a while. I don't have
5     any idea. That was my intent. I believe John -- as I said,
6     John Foley handles all of my things.
7 BY MR. AIZENBERG: (Continuing)
8 Q. Can you think of any other reason you'd be writing PGR
9     Properties a check for more than half a million dollars?
10 A. No, but I'm just telling you that was my recollection.