## APPENDIX B

## STATEMENTS AGAINST INTEREST

### I.     11/10/08 TESTIMONY

A.  Admissions that
Judy has had no source of funds other than Peter since 1978,
Judy's previous source of funds as her salary as a teacher,
Judy has no independent source of money,
Peter was the original source of all of the funds Judy has,
Money to purchase, develop and live in Wexford came from Peter
Money to purchase Longboat Key property came from Peter


50
13  Q.   Do you recall a few moments ago we
14  discussed the escrow account that has the proceeds
15  of the sale of your Wexford home?
16      A.   Yes.
17      Q.   Did you pay any money to buy the land
18  that that house was built on?
19      A.   Yes.
20      Q.   Where did you get that money?
21      A.   My husband gave me money.

51
3   Q.   So your husband gave you money to buy
4   that land?
5       A.   Yes.
6       Q.   And then for some years, the land was
7   without anything on it, right?
8       A.   Several years.
9       Q.   Eventually, you built a house?
10      A.   Yes.
11      Q.   And where did you get the money or what
12  was the source of the money for the construction of
13  the home?
14      A.   It was a combination of my husband and
15  me, I assume.  He gave me money, or it was a gift to
16  me.  The house was a gift to me.
17      Q.   Okay.  So you had -- other than your
18  husband, you had no independent source of funds?
19      A.   No.
20      Q.   And when you lived in that house, there
21  were various expenses, I assume, associated with the

22  house, correct?
23     A.   Right.
24     Q.   Utilities, correct?

                              52
1      A.   Yes.
2      Q.   And taxes?
3      A.   Yes.
4      Q.   And you did decorating of the home?
5      A.   Yes.
6      Q.   Am I correct that the source of the funds
7  for those types of expenses was ultimately your
8  husband's?
9      A.   The original source.  I had accounts and
10  things back then, but yes, the original source.

                              61
22  Q.   What was the source of the funds for the
23  acquisition of that lot in Longboat Key, Florida,
24  from your husband?

                              62
1      A.   That was from my husband, yes, or from my
2  account.  I'm not sure which exactly.
3      Q.   If it was in your account, ultimately,
4  the source was your husband?
5      A.   Ultimately, the source was my husband.  I
6  think I bought it for $400,000.

                              91
1      Q.   You have not gotten a paycheck?  Okay.
2  Let's assume you got a paycheck today, when was the
3  last time prior to today that you received a
4  paycheck?
5      A.   1974.
6      Q.   And it was a paycheck for what?
7      A.   I was a teacher.  I can't remember what I
8  made.
9      Q.   So do I assume correctly that the last
10  time you worked as a teacher was 1974?
11     A.   No, 1978.  Sorry.
12     Q.   That was the last time you received a
13  salary or a wage?
14     A.   Yes.  There may have been some small
15  things in the middle, but yes.

91

17      Did you receive any inheritance from your
18  father?
19      A.   No.
20      Q.   What about from your mother?
21      A.   She's alive.
22      Q.   She's alive?  Okay.  Has your mom gifted
23  you any money?
24      A.   No.

92

1      Q.   Besides your mother --
2      A.   Other than --
3      MR. GOUVEIA:  She's been living with her.
4  BY THE WITNESS:
5      A.   She's supporting me right now on her
6  Social Security.
7  BY MR. STEWART:
8      Q.   Okay.  I'm talking about -- besides your
9  mom then and besides Peter, has anybody else given
10  you any property over the last five years?
11      A.   No.
12      Q.   So is it safe to say that since 1978, the
13  only property that you have received you received
14  from Peter?
15      A.   Yes.

B.  <u>Admission that:</u>
<u>Judy had an account at Oceanic Bank from 2004-2007,</u>

63

19  Q.   Is that an account statement for an
20  account you had at Oceanic Bank?
21      A.   Yes.  I don't recognize it.
22      Q.   Did you have an account at Oceanic Bank?
23      A.   I don't know.  Is this -- let me see.  I
24  guess I did.  Yes, I did, 2004, 2007.

64

1      Q.   Do you recognize this as the account
2  statement for your account at Oceanic Bank?
3      A.   I don't recognize the statement, but I
4  believe I did have an account there, yes.

## C.  Admissions that:
### Judy has received money from the PGR Bahamas Trust,
### When she has received money from this trust, Judy has discussed the matter with Peter,
### Judy has also spoken with Cuppy before or after she has received money from the trust,
### Judy spoke to Cuppy about how to go about getting money,
### Went to Cuppy because he is longtime family lawyer and "agent" for the trust

29

18  Q.   And the next item you list is the Peter
19  G. Rogan Irrevocable Trust?
20     A.   Yes.

30

20     Q.   You've gotten money from the trust
21  before, haven't you?
22     A.   Yes.

31

19  Q.   When you've gotten money from the Peter
20  G. Rogan Irrevocable Trust, have you had
21  conversations with your husband about that?  I'm not
22  asking for the content of this conversation.  I'm
23  just asking whether or not you have spoken with him
24  about it.

32

1     A.   Let me think.
2     MR. GOUVEIA:  Can you repeat the question
3  again?
4  BY MR. AIZENBERG:
5     Q.   When you have -- when you have gotten
6  money from the Peter G. Rogan Irrevocable -- strike
7  that.
8        In connection with your receipt of funds
9  from the Peter G. Rogan Irrevocable Trust, have you
10  ever discussed that topic with your husband?
11     A.   Vaguely, I would say.  Yes.
12     Q.   Who else have you spoken with whenever
13  you've gotten money from the Peter G. Rogan
14  Irrevocable Trust, and when I say "who else you have
15  spoken with," I'm talking about before you received
16  the funds and after?  In other words, any time there
17  has been a transfer, who have you talked with about
18  it?
19     MR. GOUVEIA:  Any time you -- (inaudible.)
20  BY THE WITNESS:

4

21      A.   I believe -- well, I talked to Fred
22   Cuppy.  I believe I only got money once.[1]  But I
23   talked to Fred Cuppy.  I called and asked how I
24   would go about it.

33

1   BY MR. AIZENBERG:
2      Q.   Why did you turn to Mr. Cuppy, as opposed
3   to anyone else?
4      A.   He's the -- he's my family lawyer, a
5   longtime family lawyer.  He is also an officer in
6   some way, the agent, or I don't really understand
7   trust, but he's like the agent of the trust, so –

D.  Admissions that:
Judy sent Ex. 705 to Hepburn at Oceanic on May 5, 2005,
Judy's signature on letter and handwriting on cover sheet,
Judy requested a transfer of $1.2M to Winston from Oceanic,
Made transfer for Peter,
Acted at Peter's request,
On another occasion, Hepburn called Judy to tell her money was going into her account

65

2      Q.   Handing you what's been marked as Exhibit
3   705.  This is a letter that you sent to Mr. Charles
4   Hepburn at Oceanic Bank & Trust?
5      MR. GOUVEIA:  Is that a question?
6      MR. AIZENBERG:  Yes.
7   BY THE WITNESS:
8      A.   Yes.
9   BY MR. AIZENBERG:
10     Q.   And why did you make -- why did you make
11   this request to wire $1.2 million to Winston &
12   Strawn?
13     A.   It was for my husband.
14     Q.   It was for your husband?
15     A.   Yes.
16     Q.   Do you know why your husband didn't make
17   the request himself?
18     A.   No.
19     Q.   How did you know that Winston & Strawn
20   needed money?
21     A.   I knew that they represented him, and he
22   may have asked me.  I don't remember.
23     Q.   Say that again.

---

[1] Dexia offers this sentence not for the truth.

24     A.   He may have asked.  I don't remember.


                          66
1     Q.   Did you have any communications with
2  Mr. Hepburn about this particular transfer?
3     MR. GOUVEIA:  Are you talking about --
4     MR. AIZENBERG:  About the $1.2 million.
5  BY THE WITNESS:
6     A.   Other than this?
7  BY MR. AIZENBERG:
8     Q.   Yes.  Other than that, other than the
9  letter, did you communicate with Mr. Hepburn?
10     A.   I believe he called me, and he said there
11  was money going into my account.
12     Q.   Do you know how he learned?
13     A.   I don't.


                          67
17  Q.   And this is -- if you turn to the second
18  page of Exhibit 705, this is a fax cover sheet.
19     A.   Yes.
20     Q.   And you have completed this?  This is
21  your handwriting on it?
22     A.   It's hard to tell.  It could be, could
23  not.  It's kind of the way I write.
24     Q.   Do you have any reason to think someone


                          68
1  else would have faxed something to Mr. Hepburn on
2  your behalf?
3     A.   No, no, no.
4     Q.   And do you see that it's dated 5/5/05?
5     A.   Yes.
6     Q.   So do you agree that you probably sent
7  this letter on or about that date?
8     A.   Probably.

E.  Admissions that:
Judy sent Ex. 277 (request for transfer of funds to HSBC) to Oceanic
on or about October 23, 2006
Judy signed letter and wrote fax cover page

                          24
16  Q.   Handing you what's been marked as Exhibit
17  No. 277.  This is a letter, the first page, is this
18  a letter that you sent to someone named Melanie

19  Mobsey at Oceanic Bank on or about October 23rd,
20  2006?
21      A.   Yes.
22      Q.   And that's your signature on the first
23  page?
24      A.   It appears to be.  It's a bad copy, but

25

1  it appears to be.

26

1  Q.   I just want to go to the second page of
2  Exhibit 277.  Is this your handwriting on the second
3  page?
4      A.   Yes.
5      Q.   Okay.  So you wrote by hand this fax
6  cover sheet?

F.  Admissions that:
Judy opened HSBC accounts in Vancouver in October 2006
Judy does not receive account statements
Judy knew that in November 2006, her HSBC account held $2.152 M

13

2  Q.   Let's move on to the next page, which is
3  Schedule B, which is Exhibit 702.  You list several
4  checking accounts.  Do you see that under Item 2?
5      A.   Yes.
6      Q.   Okay.  The first one is at First Source
7  Bank, and the next two are an HSBC in Vancouver,
8  Canada?
9      A.   Yes.
10     Q.   Okay.  And when did you open the account,
11  the first account that's listed HSBC Vancouver, B.C.
12  Canada, Canadian.  When did you open that?
13     A.   October of 2006.

14

22  Q.   Okay.  I will follow up with some
23  specific questions on this.
24          When did you open the HSBC Vancouver

15

1  B.C., Canada, account in U.S. dollars?  When did you
2  open that?
3      A.   Same day.

4    Q.   Okay.  Also in October 2006?
5    A.   Also October 2006.

16
8   Q.   Okay.  Do you receive account statements
9   for HSBC account in Canada?
10    A.   No.

16
16   Q.   Okay.  Did you know that in November of
17   2006, an HSB account bearing your name had $2.152
18   million in it?
19    A.   Yes.
20    Q.   You did know that?
21    A.   Yes.

G.  Admission that:
Judy knew $1.5M moved from her Oceanic account to her HSBC account
on November 3, 2006

64
1    Q.   Do you recognize this as the account
2   statement for your account at Oceanic Bank?
3    A.   I don't recognize the statement, but I
4   believe I did have an account there, yes.
5    Q.   If you look at the first page of Exhibit
6   704, it shows that on November 3rd, 2006,
7   distribution from the Peter Rogan Trust, do you see
8   that, for one $1.5 million?
9    A.   Yes.
10    Q.   And then it says that there is a --
11   thereafter chose further transactions, do you see
12   that?
13    A.   Yes.
14    Q.   Do you recall these particular
15   transactions?
16    A.   I recall the $1.5 million.
17    Q.   And what happened to that money?
18    A.   It went to Canada, I believe.
19    Q.   It went to your Canadian account at HSBC?
20    A.   Yes.

H.  Admissions that:
Ex. 272 are documents Judy completed to open her HSBC accounts,
Judy's signature appears on the signature card,
Judy opened accounts on October 17, 2008
As of July 9, 2007, account had $1.7M
Now Judy reports that only $532K remains in that account,
No money left in Judy's account at Oceanic

21

11   Q.   Handing you what's been marked as Exhibit
12   272.  Can you identify this document, Mrs. Rogan?
13      A.   Yes, it's the opening statements for my
14   bank account in Canada.
15      MR. GOUVEIA:  Are you referring to specific
16   page when you say that?
17      MR. AIZENBERG:  No.
18      MR. GOUVEIA:  I'm talking to the witness.  Are
19   you referring to a specific page?
20      THE WITNESS:  I was referring to the first
21   page.
22      MR. GOUVEIA:  The first page?
23      THE WITNESS:  Yes, the signature, the signature
24   page.

22

1      MR. GOUVEIA:  Well, the first page is this
2   page.  The first page is Page 1.  The second page,
3   is that the page?
4      THE WITNESS:  The signature page, yes.
5   BY MR. AIZENBERG:
6      Q.   So the second page of Exhibit 272, you
7   recognize as a signature page for opening an account
8   at HSBC Canada?
9      A.   Yes.
10      Q.   And that's your signature on the second
11   page?
12      A.   Yes.
13      Q.   And the next page is your signature on a
14   tax ID number certification?
15      A.   It appears to be correct.
16      MR. GOUVEIA:  That's your signature?
17      THE WITNESS:  It appears to be, yes.
18   BY MR. AIZENBERG:
19      Q.   And you see at the top of the second page
20   of Exhibit 272, which is your account opening
21   signature card, it shows October 17th, 2006, as the

22   account opening date.  Do you see that?  It says
23   17th, October, 2006.
24       A.   Yes, I said it was in October, yes.

                              23
1       Q.   So does that sound right, as far as the
2   date you opened it?
3       A.   Yes.
4       Q.   Okay.  Handing you what's been marked as
5   Exhibit 274.  This is a document that you produced
6   in connection with the citation proceeding in the
7   Northern District of Illinois.  Do you recognize
8   this document?
9       A.   Yes.
10       Q.   Can you tell me what it is?
11       A.   It's my statement of the daily rollover
12   account U.S. dollars off the internet.
13       Q.   And what's the date of this?
14       A.   July 9th, 2007.
15       Q.   And the account balance at that time was
16   $1.7 million or so?
17       A.   Yes, correct.
18       Q.   Where is -- is that the same, if you look
19   at your Schedule B, which is in Exhibit 702, is that
20   the same U.S. dollar account that you list in your
21   Schedule B as having $532,000 in it?
22       A.   The account number is not on this.
23       Q.   Did you have more than one -- have you
24   had more than one U.S. dollar account at HSBC?

                              24
1       A.   No, but -- no, I don't.
2       Q.   Okay.  So would logic dictate, then, that
3   this is the same account?
4       MR. GOUVEIA:  If you know.
5   BY THE WITNESS:
6       A.   I would assume it's the same account.  It
7   looks to be about right.

                              67
9   Q.   What happened to your Oceanic Bank
10   account?
11       A.   I think it might be empty.  I don't know.

I.  Admissions that:
Judy is paying for lease on a Vancouver condo where Peter lives,
Judy co-signed lease with Peter

42
16   Q.   I understand.  Let's turn to Schedule G,
17   just the following page in Exhibit 702.  The first
18   item do you see Unique Accommodations?
19       A.   Yes.
20       Q.   Tell me what that is?
21       A.   It's a lease on a condo in Vancouver,
22   British Columbia.
23       Q.   Does anyone live in that condo?
24       A.   My husband lives in that condo.

43
14   Q.   I'm handing you what's been marked as
15   273.  This is a lease addendum that you signed in or
16   about November 5th of 2007?
17       A.   Yes.
18       Q.   That's your signature there at the
19   bottom?
20       A.   It appears to be, yes.
21       Q.   And is that your husband's signature
22   under it?
23       A.   It appears to be.
24       Q.   And this is -- is this the same lease

44
1   that's referred to in your Schedule G?
2       A.   Actually, the Schedule G, and the rent is
3   a little bit lower.  This is an older lease.
4       Q.   But it's the same place?
5       A.   The same place.
6       Q.   Is this a penthouse apartment?
7       A.   It's a top floor of a loft, of a
8   warehouse.
9       Q.   This is the top floor of a warehouse?
10       A.   Yes.
11       Q.   And your husband lives there?
12       A.   Yes, he does.
48
19   Q.   Do you pay the rent on the Vancouver
20   apartment?
21       A.   Sometimes, yes.

DM_US:22093578_1

57

16  Q.   Okay.  A few moments ago you told me that
17  you sometimes pay the rent.  Now, in the Schedule J,
18  you're saying you're going to be paying the rent on
19  a regular basis?
20     A.   I'm not going to pay it twice.  Okay.  My
21  husband is frozen too, as you know, so if it's
22  listed on his statement, somebody has to pay it.  So
23  we are not going to pay it twice.
24     Q.   But that's the monthly rent, $4,250?

58

1     A.   Yes, that's what it is now, yes.

J.  <u>Admission that:</u>
<u>Judy bought the Longboat Key property in 1991 or 1992</u>
<u>Judy sold the Longboat Key in 2005,</u>
<u>Judy gave some of the money from the sale of Longboat Key to Peter</u>

60

21  Q.   Below, you list a sale in 2005 of a -- it
22  looks like some sort of dwelling in Longboat Key,
23  Florida?
24     A.   It was a lot.

61

1     Q.   It was a lot?  It was an empty lot?
2     A.   Yes.
3     Q.   And when did you acquire that lot?
4     A.   I think maybe 1990ish, '91, '92 early.
5     Q.   And you sold the lot in 2005?
6     A.   Yes.
7     Q.   What did you do with the money from the
8  sale of that lot?
9     A.   It went into my bank account.
10     Q.   And after you put it into your bank
11  accounts, did the money go anywhere else?
12     A.   Not that I know of.
13     Q.   Did you then give some of the money to
14  your husband?
15     A.   I may have.  I did, yes.

K.   Admission that:
Judy still receiving advice and consultation from Cuppy
in relation to freeze and related Dexia suit
Judy says owes Cuppy legal fees but has not been billed

39

16  Q.   Turn to the next page in Schedule F. Do
17  you see at the bottom it shows legal fees to Fred
18  Cuppy?
19      A.   Yes.
20      Q.   What's that for?
21      A.   Because as all of this was getting going,
22  he was advising me, helping me as my longtime
23  attorney, consulting occasionally.
24      Q.   And when you say "all this," please

40

1  elaborate a little bit as to what you mean?
2      A.   All the freezing and the suits and all of
3  this got going.
4      MR. GOUVEIA:  You are referring to the actions
5  by Dexia and the United States government freezing
6  your accounts and the lawsuits that were filed
7  against you?
8    THE WITNESS:  Yes, yes.
9  BY MR. AIZENBERG:
10      Q.   So you are paying -- you say you owe him
11  legal fees personally?
12      A.   Yes.
13      Q.   Do you have any bills from him?
14      A.   No, not right now.  I called and asked,
15  and he gave me an approximation.

## II.   2/20/09 TESTIMONY

### A.   Admission of Receipt of $650,000 Loan Against Wexford Property and Transfered Proceeds to Peter Rogan

121

22  Q.  I'm gonna hand you what we've marked as Plaintiff's Exhibit
23     455.
24  A.  Sure.
25  Q.  And we're just using the same -- this is numbering we had in

122

1    other proceedings so rather than having mixed up numbers --
2         THE COURT:  Oh, okay.
3         MR. AIZENBERG:  Okay?
4         THE COURT:  Yeah.
5  BY MR. AIZENBERG:  (Continuing)
6  Q.  Mrs. Rogan, is this a copy of the mortgage on the Wexford
7     property?
8         (The witness reviews the document.)
9  Q.  I'll note for the record that it bears the Bates number of
10    JR, which means -- you may be able to accept my
11    representation that this was produced by you.  That's why it
12    has the JR Bates number.  But does this look like the
13    mortgage?
14  A.  Yeah, but I don't see the company name on here.  It was sold
15     to IndyMac but it was originally Market Street Mortgage.
16  Q.  I think IndyMac shows up in the back.
17  A.  They took it over.  Yeah, Market Street Mortgage was who I
18     originally made the mortgage with.
19  Q.  Okay.  So this appears to be the mortgage?
20  A.  It appears to be.
21         MS. MOLNAR-BONCELA:  Your Honor, I'm going to object to
22     the characterization of an adjustable rate note as the
23     mortgage.
24         MR. AIZENBERG:  She already testified that it appears
25     to be the mortgage so...

                                        123
1  A.  It was a note.  I'm sorry.
2         MS. MOLNAR-BONCELA:  Well, your Honor --
3         THE COURT:  Okay.  Let's put it this way:  It is what
4     it is.  It states it's a note.  Okay?
5         MS. MOLNAR-BONCELA:  Yes, your Honor.
6         THE COURT:  She's not an attorney.
7         MR. AIZENBERG:  That's fine, your Honor.
8         THE COURT:  You're not contending that this was
9     recorded as a security instrument as a mortgage, are you?
10         MR. AIZENBERG:  No.  It's just -- you know what?  I'll
11     ask the question a different way.
12         THE COURT:  Yeah.
13  BY MR. AIZENBERG:  (Continuing)
14  Q.  Mrs. Rogan, is this the document that evidences the loan you
15     took out on your Wexford property for about $650,000?
16  A.  I believe it is.
17  Q.  Okay.  Thank you.  And it shows -- correct me if I'm wrong,
18     but that the date is June 23rd, 2006?
19  A.  Uh-huh.

DM_US:22093578_1

20  Q.  Yes?
21  A.  Yes.
22  Q.  And it's $650,000; right?
23  A.  Yes.
24  Q.  Does that fit with your recollection as to the amount of the
25      mortgage?

124

1  A.  Yes, of the note.
2  Q.   Of the note, I should say.  Sorry.
3          I'm handing you what's been marked as Exhibit 243.
4      Mrs. Rogan, this is an account statement for your bank
5      account at First National Bank of Valparaiso, statement date
6      7/3/06; is that right?
7  A.  Yes.
8  Q.  And you still have an account at First National Bank?  It's
9      now First Source; isn't that right?
10  A.  Yes.
11  Q.  How long did you bank with that bank?
12  A.  Probably since 1973 --
13  Q.  A long time?
14  A.  -- when I moved here, or '74.
15  Q.  And do you see on the first page it shows under deposits --
16  A.  Uh-huh.  Yes, I do.
17  Q.  -- it shows a deposit of $632,707.37, do you see that?
18  A.  Yes.
19  Q.  Okay.  And just given the proximity in time to the date of
20      the note, does that seem to be the same set of funds?
21  A.  It could be but I'm not sure if that money went into my
22      Scudder account for the note.
23  Q.  Well, did you have any other -- in or about the end of June
24      of 2006, were you getting six hundred plus thousand dollars
25      from any other source?

125

1  A.  Well, not that I remember.  But I could have been moving
2      money.  I don't know the answer to that.  But let me see.
3  Q.  Okay.  Now turn to the back of the last page of exhibit
4      243.
5  A.  Uh-huh.
6  Q.  Okay.  There are checks written here to your husband.  Do
7      you see those?
8  A.  Yes.
9  Q.  Okay.  And so there's a check dated 6/13/06 from you to Mr.
10      Rogan, do you see that, for $150,000?
11  A.  Yes.

12  Q.  Okay.  And then there's a check dated 6/29/06 to Mr. Rogan
13      for $400,000.
14  A.  Yes.
15  Q.  Right?  And that's right after June 23rd, '06; right?  Six
16      days later?
17  A.  Yes.
18  Q.  Okay.  And then there's a check to Mr. Rogan on 6/21/06 for
19      a hundred thousand dollars.  Do you see that?
20  A.  Yes.
21  Q.  Okay.  And there's a check to Mr. Rogan for $10,000 on
22      6/26/06.  Do you see that?
23  A.  Yes.
24  Q.  Okay.  And there's a check, another check, to Mr. Rogan for
25      $40,000 on 6/26/06?

126

1  A.  Yes.

B.  <u>Admission that:</u>
<u>Judy Signed the Several Checks Written to Peter</u>
<u>Peter's Secretary Wrote Out the Checks that Judy Signed, and</u>
<u>Peter's Secretary Deposited the Checks</u>

126

2  Q.  Okay.  And these are all checks that you wrote?  That's your
3      signature on the checks?
4  A.  My signature but CaraLinda wrote these checks.  She was our
5      secretary.  My husband's secretary really.
6  Q.  But these checks were written on your behalf; isn't that
7      right?
8         MR. GOUVEIA:  Wait until she's done answering the
9      question.
10  BY MR. AIZENBERG:  (Continuing)
11  Q.  I thought you were done.  I'm sorry.
12  A.  She wrote them.  I asked her to write things.  She may not
13      have stubbed them correctly; and as I said, these may not be
14      the -- what I repaid the loan with.  But I did use that
15      money to repay the loan.  I'm not sure if it came out of my
16      Scudder account.  John Foley, who's my accountant, would
17      know.  Okay?  He has every piece of paper that I've touched
18      so...
19  Q.  Okay.
20  A.  But that is what I did with the money.
21  Q.  Well, let me ask you something.
22  A.  Yes.

23  Q.  Go to the first page of -- well, let me back up first.
24  A.  Uh-huh.
25  Q.  The checks, they were written on your behalf; isn't that

127

1      right?
2  A.  Yes.  Correct.  And I did ask CaraLinda to write them.  She
3      may not -- these may or may not have gone to his company.
4      She may or may not have stubbed them -- I mean written them
5      on the little memo correctly --
6  Q.  Okay.
7  A.  -- because she would have been depositing them also.
8  Q.  But if you look at the checks, you'd agree with me, it
9      doesn't -- the checks are written to your husband
10      personally; isn't that right?
11  A.  Yes.  Yes.

C.  Admissions that:
Scudder Account is Hers and
Ex. 233 is a Statement for that Account

131

23  Q.  Mrs. Rogan, I've handed you what's been marked as Exhibit
24      233.  Is this an account statement of yours from Scudder?
25  A.  Again, it could be.  Do I recognize this specific document?

132

1      No.
2  Q.  Well, did you get account statements from Scudder?
3  A.  Yes.
4  Q.  Okay.  So does this look like an account statement from
5      Scudder that you received?
6  A.  Again, a little bit different form, but, yeah, it could have
7      been back then.  Yeah.

13  Q.  But you had an account at Scudder; isn't that right?
14  A.  Yes.  Yes.  I still have.  Yes.

D.  Admission that:
Money transferred from the PGR Bahamas Trust
to Judy's Account at Scudder or to her Accounts at HSBC in Canada

156

19  Q.  Now there did come a time when moneys came from the Bahamian
20      trust.
21  A.  Yes.

22  Q.  And what account did those moneys, to the best of your
23      recollection, come into from the Bahamian trust?  Do you
24      know?  Did they come to First National Bank or did they come
25      to Scudder?

### 157

1  A.  I believe they came to Scudder, unless they were wired to
2      Canada.

E.  <u>Admissions that:</u>
<u>Judy had an account at Oceanic,</u>
<u>Judy Never Received an Account Statement from that Account,</u>
<u>Judy did not Know who did Receive Those Statements, and</u>
<u>the 11/4/05 $1.5M Transfer to Judy's Scudder Account Came from her Oceanic Account</u>

15  Q.  And you see that on 11/4/05 it shows a wire transfer in for
16      about 1.5 million?  Do you see that?
17  A.  Yes.
18  Q.  Okay.  And do you see that a few days later, on 11/9/05, it
19      shows a wire transfer out for about $775,000?
20  A.  Yes.
21  Q.  Okay.  And the wire transfer in that came from the Peter G.
22      Rogan Irrevocable Trust in the Bahamas; isn't that right?
23  A.  I don't know.  Does it say that?
24  Q.  I'm asking you, do you remember?
25  A.  I don't remember, no.  I asked for money at some point from

### 133

1      the trust, but this may have come from my revocable trust
2      too.  I don't know.  My revocable trust.  I don't know.
3  Q.  I've just handed you what's been marked as Exhibit 214.  Is
4      this an account statement of yours at Oceanic Bank in the
5      Bahamas?
6  A.  I never got account statements from them.
7  Q.  You had an account at Oceanic Bank in the Bahamas?
8  A.  I never got a statement from them.
9  Q.  I'm asking you a different question.  Did you ever have an
10      account at Oceanic Bank in the Bahamas?
11  A.  I believe I did.
17  Q.  And you never got account statements for your bank account
18      in the Bahamas?
19  A.  No.

### 134

10  Q.  Now you had an account at Oceanic Bank but you didn't

DM_US:22093578_1

11    receive account statements?
12  A.  I never had a statement.
13  Q.  Do you know who received account statements?
14  A.  No.
15  Q.  Well, do you see on Exhibit 214 it shows that on November
16    1st, there's a -- November 3rd, there's a distribution to
17    Judy Rogan for $1.5 million?
18  A.  I'm sorry.  Say the date again.  November --
19  Q.  November 3rd, 2005.
20  A.  Yes.
21  Q.  That's the same date -- we just looked at the Scudder
22    account.  That's the same date that there's a wire transfer
23    into the Scudder account that we just looked at; is that
24    right?
25  A.  Yes.

135

1  Q.  So do you have any -- is it -- does this -- you said you
2    didn't remember where the money came into the Scudder
3    account.  Does looking at this Oceanic statement refresh
4    your recollection that it came from the Oceanic Bank
5    account?
6  A.  I assume it did from this.  I mean, everything came into my
7    Scudder -- I mean, I -- I'm sorry.

F.  Admission that:
Ex. 230 and 231 are Statements for Judy's 1st National Valpo Account,
The Account Received $775,000,
Judy Wrote a Check off of these Funds for $572,000 to PGR Properties,
Judy Wrote Another Check off of these Funds to Peter for $190,000,
the $190,000 check was for Peter's Attorney's Fees, and
these Checks are in Judy's Handwriting

137

21  Q.  Okay.  Mrs. Rogan, Exhibit 230, this is an account statement
22    of yours at First National Bank of Valparaiso; isn't that
23    right?
24  A.  It appears to be, yes.
25  Q.  Okay.  And it's a statement dated 12/2/05?

138

1  A.  Yes.
2  Q.  Okay.  Do you see that it shows a wire transfer in for
3    $775,000?
4  A.  Yes.

5   Q.   Okay.  And do you see that the -- if you look at the --
6       where it shows the opening balance was $27,000; correct?
7   A.   Correct.
8   Q.   Twenty-seven plus, correct?
9   A.   Yes.
10  Q.   Okay.  And then it gets increased substantially with
11      $775,000?
12  A.   Yes.
13  Q.   You agree with that?
14  A.   Yes.  That it came in, yes.
15  Q.   Okay.  I'm handing you what's been marked as Exhibit 231.
16      This is the following month's account statement of yours at
17      First National Bank of Valparaiso; isn't that right?
18  A.   Yes.
19  Q.   Okay.  And so the statement date is 1/3/06?
20  A.   Yes.
21  Q.   Okay.  And you see that -- hold Exhibit 230 next to you as
22      well.
23  A.   Yes.
24  Q.   Okay.  Do you see the closing balance for Exhibit 230 is
25      about seven hundred and sixty-two thousand plus dollars?

139

1   A.   Yes.
2   Q.   Okay.  And the opening balance the next month is the same;
3      right?
4   A.   Yes.
5   Q.   Okay.  And then if you look down, there's -- under checks
6      and other debits, there's a check on 12/21/05 for $572,000.
7      Do you see that?  Just in the first page under checks and
8      debits.
9   A.   I can see better on the back page.  My eyes aren't so great.
10  Q.   Oh, that's fine.  Okay.  So let's turn to the back page.
11      Okay.  This is the last page of Exhibit 231.
12  A.   Yes.
13  Q.   You see that there's a check written there by you to PGR
14      Properties?
15  A.   Yes, I do.
16  Q.   Okay.  And that's for $572,000?
17  A.   Yes.

140

5   Q.   Mrs. Rogan, the note that we discussed is dated June 23rd,
6      2006.
7   A.   I understand what you're saying.
8   Q.   Do you agree with me?

9  A.  Yes.

10  Q.  Okay.  And do you see that the repayment -- it appears that

11     repayment, the check you wrote, is dated 12/16/05?

12  A.  It appears that way, yes.

13  Q.  Okay.  You don't dispute that you wrote this check or that

14     someone signed it on your behalf?

15  A.  No, I wrote that.

16  Q.  Okay.  That's your handwriting?

17  A.  That's my handwriting.

18  Q.  Okay.  Do you see also that on 12 -- it looks like 12/21 of

19     '05, you wrote a check to Peter Rogan also for $190,000.

20  A.  Yes.  I believe that was for one of his attorney bills.

21  Q.  Say that again.

22  A.  I believe that was for an attorney bill.

23  Q.  You were paying his attorney bills?

24  A.  Occasionally.  I believe.  I'm not sure what that was for.

25  Q.  But the check is written to your husband?

141

1  A.  Yes.  But I'm not sure what it was for.  But that's what I

2     was doing with those sums of money.

G.  <u>Admission that:</u>

<u>Judy Repaid the "Loan" from PGR Properties for the Purchase of 55 E. Erie</u>
<u>with Check Issued on December 16, 2005</u>

162

12  Q.  Mrs. Rogan, turn to Exhibit 231.

13  A.  Okay.  The last one.  I have it.

14  Q.  Turn to the last page.  We looked at this a few minutes

15     ago.  That's a check you wrote to PGR Properties for five

16     hundred and seventy-two thousand; correct?

17  A.  That's correct.

18  Q.  And that repaid the loan, didn't it?

19       MR. GOUVEIA:  Objection, your Honor.  That's already

20     been asked and answered on his previous examination and she

21     testified that that -- that she thought that that was

22     another loan from the company and had nothing to do with the

23     loan that she obtained for the property.

24       THE COURT:  And on redirect you went into a line of

25     questioning that establishes apparently a different

163

1     recollection so it's overruled.  He's now crossing on your

2     redirect.

3  A.  I don't have an explanation for it.  Okay?  I -- maybe I put

4     the money in and didn't pay it for a while.  I don't have
5     any idea.  That was my intent.  I believe John -- as I said,
6     John Foley handles all of my things.
7  BY MR. AIZENBERG:  (Continuing)
8  Q.  Can you think of any other reason you'd be writing PGR
9     Properties a check for more than half a million dollars?
10  A.  No, but I'm just telling you that was my recollection.


## H.  Admissions that:
### Judy Left the U.S. with Peter in October 2006 a Week After Judge Darrah's Ruling
### Very Soon Thereafter Judy Set-Up Accounts at HSBC
### The Source of the Money that Went into the HSBC Account was Either from the PGR
### Bahamas Trust or Judy's Domestic Revocable Trust


151
21  Q.  After Judge Darrah entered a judgment against your husband
22     in October of 2006, you and he went to Canada; isn't that
23     correct?
24  A.  No.  A week or so later.
25  Q.  And then very soon after that you set up accounts in Canada?


152
1  A.  Yes.
2  Q.  The HSBC account --
3  A.  Yes.
4  Q.  -- you were discussing before?
5  A.  Yes.
6  Q.  Now the source of that money was the Peter Rogan revocable
7     trust in the Bahamas; isn't that correct?
8  A.  The source of that money was -- I'm not sure if it came from
9     that bank account, from Oceanic, or it came from the -- is
10     there a revocable trust in the Bahamas?  I don't know.
11     There's an irrevocable trust, I believe, in the Bahamas.
12     The family trust, that's an irrevocable trust.


## I.  Admissions that:
### Judy Rented an Apartment in Canada Using Money from the PGR Bahamas Trust
### Judy also Deposited Funds from the PGR Bahamas Trust into her Canadian Accounts
### Judy Set-Up the Canadian Bank Accounts in October 2006


159
9  Q.  Now did there also come a time when you invested in property
10     in Canada?
11  A.  I rented a place.  I have a rental up there.

DM_US:22093578_1

12　Q.　And did you take funds -- did funds come to you through the
13　　　Bahamian trust that you used to rent property in Canada?
14　A.　Yes.  I believe those are in my revocable trust, I believe,
15　　　but I'm not sure.
16　Q.　And did you also put money from the Bahamian trust into bank
17　　　accounts in Canada?
18　A.　In Canada you have to -- in order to transfer money, you
19　　　have to have three -- at least three accounts.  You have to
20　　　have a U.S. dollars account where they hold the U.S.
21　　　dollars.  You have to have a Canada savings account where
22　　　then you would just transfer.  And then you have to have --
23　　　I have a checking account there which I use to pay the rent.
24　Q.　How did you learn that?
25　A.　First, I went to the bank.  I couldn't open just one

160

1　　　account.  I had to open all these accounts in order to be
2　　　able to handle the exchange.
3　Q.　So this statement, 214 --
4　A.　Uh-huh.
5　Q.　-- would reflect moneys taken out of the -- out of the
6　　　Bahamian trust through November 2006.  Do you recall when
7　　　you set up those accounts in Canada?
8　A.　It would have been October, my first trip up there.
9　Q.　October what?
10　A.　2006.