THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 NORTHERN DISTRICT OF INDIANA

3                     HAMMOND DIVISION

4

5    IN RE:                    )

6    JUDITH K. ROGAN          ) CASE NO. 08-23221-JPK

7           Debtor.           ) CHAPTER 13

8                             )Judge J. Philip Klingeberger

9

10           THE AUDIO TRANSCRIPTION OF PROCEEDINGS had

11   in the above-entitled cause on the 10th of November,

12   A.D. 2008.

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF'S
EXHIBIT

853

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 2

1　PRESENT:
2
3　　MR. GORDON E. GOUVEIA,
4　　(433 West 84th Drive,
5　　Merrillville, Indiana 46410,
6　　219-736-6020),
7　　　appeared on behalf of the Debtor;
8
9　UNITED STATES TRUSTEE,
10　(100 East Wayne Street, Suite 555,
11　South Bend, Indiana 46601) by:
12　MS. NANCY J. GARGULA,
13　　appeared on behalf of the United States
14　　Trustee;
15
16　HOWREY LLP,
17　(321 North Clark Street, Suite 3400,
18　Chicago, Illinois 60654,
19　312-846-5650), by:
20　MR. GABRIEL AIZENBERG,
21　　appeared on behalf of Dexia Credit Local;
22
23
24

Page 3

1　PRESENT:
2
3
4　　UNITED STATES ATTORNEY'S OFFICE,
5　　(219 South Dearborn Street, Suite 500,
6　　Chicago, Illinois 60604,
7　　312-469-6008), by:
8　　MR. JOSEPH A. STEWART,
9　　　appeared on behalf of The United States.
10
11
12
13
14　REPORTED BY: MIGDALIA MONTERO, C.S.R.
15　　Certificate No. 84-4383.
16
17
18
19
20
21
22
23
24

Page 4

1　　MALE SPEAKER: We are back on the record on the
2　case of Judith Rogan, 08-23221. We began this
3　meeting of creditors on October 30th. You were
4　sworn in and identified your appropriate paperwork
5　to say who you are. You are still under oath. Do
6　you acknowledge that?
7　　THE WITNESS: Yes, I do.
8　　MALE SPEAKER: All right. And I was pretty
9　much done with my questioning. We continued this
10　over because we had creditors that wanted to come
11　examine you. And I don't think, since I was here, I
12　have any other questions. So we'll go ahead, if you
13　gentleman are ready. I'm going to let you go ahead.
14　We have John Stewart from --
15　　MR. STEWART: Joe Stewart.
16　　MALE SPEAKER: Joe Stewart, I'm sorry, from the
17　U.S. Attorney's Office. And I'm sorry. Your name
18　was?
19　　MR. AIZENBERG: My name is Gabriel Aizenberg.
20　It's spelled A-i-z-e-n-b-e-r-g, on behalf of Dexia.
21　　MALE SPEAKER: And who wants to -- who's going
22　to examine?
23　　MR. STEWART: Mr. Aizenberg is going to do the
24　questioning, and I will follow up.

Page 5

1　　MR. AIZENBERG: Just one second to get
2　organized here.
3　　MALE SPEAKER: That's fine.
4　　MR. AIZENBERG: You mentioned that there's an
5　address that we can or someone where we can get the
6　transcript.
7　　MALE SPEAKER: I send the disks -- I have to
8　send the original to the United States Trustee's
9　Office in South Bend. And do you want their number?
10　　MR. AIZENBERG: Sure.
11　　MALE SPEAKER: It's (574)236-8105. And they're
12　the official keepers of the original record, and
13　they can make a digital copy and send it to your
14　office. I don't think they do transcripts. I think
15　they just send digital copies, whatever I've got.
16　They may. I don't know what their procedure is for
17　sure.
18　　　JUDITH K. ROGAN
19　called as a witness herein, was examined and
20　testified as follows:
21　　　EXAMINATION
22　BY MR. AIZENBERG:
23　　Q. Okay, Ms. Rogan. We have marked some of
24　these documents as exhibits in advance to help us

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 6

1  identify them. I'm handing you what we've been
2  marked as Exhibit 698.
3      Can you just identify this, Mrs. Rogan?
4      A.  Yes.
5      Q.  Tell me what it is please?
6      A.  It's the amendment to my schedule.
7      Q.  And you looked -- if you look at the
8  second page, is that your signature?
9      A.  Yes.
10     Q.  And so you verify that the list of
11 creditors that's attached to it under oath?
12     A.  To the best of my knowledge, yes.
13     Q.  And the names and locations where these
14 creditors are located is accurate to the best of
15 your knowledge?
16     A.  To the best of my knowledge.
17     MR. STEWART:  If I may interject, in the last
18 page, United States of America is listed as a
19 creditor of yours; is that right?
20     MR. GOUVEIA:  Well, I'm going to object to both
21 of you asking questions at the same time. If you
22 want to ask questions of the debtor, let's do it in
23 some sequence, so that we can figure out whether or
24 not we have any objections to it, if you don't mind.

Page 7

1  It's a little bit easier for the record. Thank you.
2      MR. AIZENBERG:  Fair enough.
3  BY MR. AIZENBERG:
4      Q.  I'm going to hand you the next document.
5  This is marked as Exhibit 700.
6      MR. AIZENBERG:  Do you want a copy as well?
7      MR. STEWART:  No, that's fine.
8  BY MR. AIZENBERG:
9      Q.  Is this a summary of your schedule,
10 Mrs. Rogan, the amended one?
11     MR. GOUVEIA:  You can take your time and
12 compare it to your Schedule C.
13 BY THE WITNESS:
14     A.  Yes, I believe so.
15     MR. GOUVEIA:  We object to the --
16     MR. AIZENBERG:  You know what, I have an idea.
17     MR. GOUVEIA:  We'll object to the schedule --
18     MR. AIZENBERG:  Tear it out.
19     MR. GOUVEIA:  Let's place Exhibit 700. It was
20 attached to that Exhibit D. Credit counseling
21 requirement that, to the best of our knowledge, it
22 was never changed.
23     MR. AIZENBERG:  Let's tear it out. I think
24 there was --

Page 8

1      MR. GOUVEIA:  It was your exhibit.
2      MR. AIZENBERG:  I know. I'm going to tear it
3  out. It was attached to inadvertently. I didn't
4  realize it. Let's try that again.
5  BY MR. AIZENBERG:
6      Q.  I'm handing you what's been marked as
7  Exhibit 700.
8      MR. GOUVEIA:  That would consist of the summary
9  of schedules marked "Amended" consisting of two
10 pages?
11     MR. AIZENBERG:  Correct.
12 BY MR. AIZENBERG:
13     Q.  Is that your amended summary of
14 schedules, Mrs. Rogan?
15     A.  Yes, I think so.
16     Q.  And you list total assets as
17 approximately $3.7 million?
18     MR. GOUVEIA:  The document speaks for itself.
19     MR. AIZENBERG:  I'm entitled to ask her the
20 question.
21 BY MR. AIZENBERG:
22     Q.  You list your assets as $3.7 million,
23 Mrs. Rogan?
24     MR. GOUVEIA:  I object. The document speaks

Page 9

1  for itself. Whatever the document says is what it
2  is.
3  BY MR. AIZENBERG:
4      Q.  You can answer the question.
5      MALE SPEAKER:  He can ask questions about the
6  value, I mean. The document is what it says.
7      MR. GOUVEIA:  What's the question?
8  BY MR. AIZENBERG:
9      Q.  Your assets, you are listing your assets
10 as approximately $3.7 million; is that right?
11     MR. GOUVEIA:  You are asking her if that's what
12 it says not what that meant?
13     MR. AIZENBERG:  I'm asking her is that
14 accurate.
15 BY THE WITNESS:
16     A.  I believe it's accurate.
17 BY MR. AIZENBERG:
18     Q.  Okay. And you are listing your
19 liabilities as a little more than $184 million; is
20 that accurate?
21     MR. GOUVEIA:  The liabilities that are listed
22 are disputed liabilities, so with the qualification
23 that she has listed $184,000 as disputed
24 liabilities, you can answer that.

3 (Pages 6 to 9)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

---

Page 10

1  BY THE WITNESS:
2      A.   Yes.
3  BY MR. AIZENBERG:
4      Q.   Okay.  Mrs. Rogan, I'm handing you what's
5  been marked as Exhibit 702.  This consists of
6  several of the schedules that you filed in
7  connection with your bankruptcy; is that accurate?
8      A.   They look to be exact comparison as I can
9  make it.  They are correct.
10     Q.   And these are schedules -- if you look,
11 there are Schedules A through J, and the last page
12 of the schedules, you signed it?
13     A.   Correct.
14     Q.   Okay.  And so you declared under penalty
15 of perjury that these are correct to the best of
16 your knowledge?
17     A.   To the best of my knowledge, yes, sir.
18     Q.   So let's start at the very beginning.
19 The first item listed is a condo at 55 East Erie?
20     A.   Yes.
21     MR. GOUVEIA:  What exhibit are you referring
22 to?
23     MR. AIZENBERG:  Schedule A in Exhibit 702, the
24 first page.

---

Page 11

1  BY MR. AIZENBERG:
2      Q.   You have it in front of you, too.
3      A.   Okay.  Yes.
4      Q.   The first item, this is real property in
5  Chicago?
6      A.   Yes.
7      Q.   Does anyone currently live in this
8  condominium?
9      A.   Yes.
10     Q.   Who lives there?
11     A.   My son and his wife and my daughter.
12     Q.   Okay.  Do they pay any sort of expenses
13 in connection with this condo?
14     A.   They pay utilities.
15     Q.   Okay.
16     A.   All the utilities, and they pay the
17 assessments.
18     Q.   So the monthly assessment to the
19 building?
20     A.   Yes.
21     Q.   How much is that?
22     A.   About $1100.
23     Q.   That's the total?  Okay.
24     A.   Not of the utilities.  I don't think the

---

Page 12

1  utilities are --
2      Q.   I'm sorry.
3      A.   The assessments.
4      Q.   The total assessment per month at the
5  condo is about $1100?
6      A.   Yes.
7      Q.   Okay.  And who -- which of your children
8  pays that?
9      A.   Well, right now, whoever has the money.
10     Q.   Okay.  And which of the children live
11 there; is it Brian and Sarah?
12     A.   Brian and his wife and Sarah.
13     Q.   Okay.  And so is there -- are there any
14 other expenses related to the condo besides
15 utilities and assessments.
16     A.   Taxes.
17     Q.   Taxes.  Is there a mortgage on the condo?
18 Do you know what the taxes are on a yearly basis?
19     A.   They are due $7800.  About almost $14,000
20 due in December, half of it.
21     Q.   And you would be responsible for that?
22     A.   Yes.
23     Q.   You need to answer yes or no because the
24 tape recorder doesn't catch you.

---

Page 13

1      A.   Yes.
2      Q.   Let's move on to the next page, which is
3  Schedule B, which is Exhibit 702.  You list several
4  checking accounts.  Do you see that under Item 2?
5      A.   Yes.
6      Q.   Okay.  The first one is at First Source
7  Bank, and the next two are an HSBC in Vancouver,
8  Canada?
9      A.   Yes.
10     Q.   Okay.  And when did you open the account,
11 the first account that's listed HSBC Vancouver, B.C.
12 Canada, Canadian.  When did you open that?
13     A.   October of 2006.
14     Q.   And why did you open an account in
15 Vancouver, Canada?
16     A.   In response to your question, I hereby
17 invoke my Fifth Amendment privilege against self
18 incrimination because the answer to your question
19 may incriminate me.
20     Q.   Okay.  Will you answer any questions
21 about your accounts at -- in Canada?
22     MR. GOUVEIA:  Is that a question?
23     MR. AIZENBERG:  Yes.
24

---

4 (Pages 10 to 13)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 14

BY MR. AIZENBERG:
1
2    Q.   Will you answer any questions about your
3 accounts in Canada?
4    A.   I answered one.
5    MR. GOUVEIA: She's already answered questions
6 about that.  You asked her when she opened it, so
7 she's already answered that.
8    MR. AIZENBERG: Okay.
9    MR. GOUVEIA: Absent when she opened it, I
10 think her answer to that would be no.
11   MR. AIZENBERG: That's what I want to know.
12 BY MR. AIZENBERG:
13   Q.   Other than the date of the account
14 opening, will you answer any questions about your
15 bank accounts in Canada?
16   A.   No.
17   Q.   For the same reason?
18   A.   For the same reason.
19   Q.   Because you are pleading the Fifth
20 Amendment?
21   A.   Yes.
22   Q.   Okay.  I will follow up with some
23 specific questions on this.
24        When did you open the HSBC Vancouver

Page 15

1 B.C., Canada, account in U.S. dollars?  When did you
2 open that?
3    A.   Same day.
4    Q.   Okay.  Also in October 2006?
5    A.   Also October 2006.
6    Q.   Okay.  And why did you open that?
7    A.   In response to your question, I hereby
8 invoke my Fifth Amendment privilege against self
9 incrimination because the answer to your question
10 may incriminate me.
11   Q.   Okay.  Handing you a document that's
12 marked as Exhibit 713.  Can you identify this
13 document, Mrs. Rogan?
14   MR. GOUVEIA: Have you ever seen this document
15 before?
16   THE WITNESS:  No.
17   MR. GOUVEIA:  That's your answer.
18 BY MR. AIZENBERG:
19   Q.   You can't identify this document?
20   MR. GOUVEIA:  Is your question is does she know
21 what this document is?
22   MR. AIZENBERG:  Yes.
23   MR. GOUVEIA:  Or has she ever seen it before?
24

Page 16

BY MR. AIZENBERG:
1
2    Q.   Do you know what this document is?
3    A.   It appears to be a statement from IHSBC
4 Bank in Canada.
5    MR. GOUVEIA:  Do you know that?
6    THE WITNESS:  No, I've never seen it before.
7 BY MR. AIZENBERG:
8    Q.   Okay.  Do you receive account statements
9 for HSBC account in Canada?
10   A.   No.
11   Q.   Who receives the account statements?
12   A.   In response to your question, I hereby
13 invoke my Fifth Amendment privilege against self
14 incrimination because the answer to your question
15 may incriminate me.
16   Q.   Okay.  Did you know that in November of
17 2006, an HSB account bearing your name had $2.152
18 million in it?
19   A.   Yes.
20   Q.   You did know that?
21   A.   Yes.
22   Q.   Okay.  Do you know where the money is now
23 in that account?
24   A.   In response to your question, I hereby

Page 17

1 invoke my Fifth Amendment privilege against self
2 incrimination because the answer to your question
3 may incriminate me.
4    Q.   Do you know how the money, how the $2.152
5 million got into the account?
6    A.   In response to your question, I hereby
7 invoke my Fifth Amendment privilege against self
8 incrimination because the answer to your question
9 may incriminate me.
10   Q.   Do you know the source of the funds for
11 that account?
12   A.   In response to your question, I hereby
13 invoke my Fifth Amendment privilege against self
14 incrimination because the answer to your question
15 may incriminate me.
16   Q.   Directing you back to Exhibit 713.  Do
17 you see that at the top left, it appears to say that
18 it's an account statement for you.  Do you see that
19 it appears to show that?  Yes?
20   A.   Yes.
21   Q.   And if you turn to the second page --
22 strike that.
23        If you turn to the third page of this
24 statement, it says Page 3, do you see where it says

5 (Pages 14 to 17)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 18

1  Page 3?
2      A.  Yes.
3      Q.  Do you see that it shows at the very top
4  that on November 3rd of 2006, there was a wire
5  transfer from Oceanic Bank & Trust, the Bahamas, for
6  about $1,499,000.  Do you see that?
7      A.  Yes.
8      Q.  Were you involved in directing that
9  transfer from Oceanic Bank & Trust into this
10  account?
11      A.  In response to your question, I hereby
12  invoke my Fifth Amendment privilege against self
13  incrimination because the answer to your question
14  may incriminate me.  Excuse me.  Can I just grab my
15  purse?
16      Q.  Was your husband involved in helping you
17  open this account?
18      A.  In response to your question, I hereby
19  invoke the marital privilege because the question
20  requires the disclosure of confidential marital
21  communications or requests testimony that might have
22  an adversary affect on my spouse.
23      Q.  I didn't ask for anything privileged.  I
24  asked was your husband involved.  I didn't ask you

Page 19

1  what he said or when he --
2      A.  No, he was not.
3      Q.  He was not involved?  Who was involved in
4  getting this account open?
5      A.  Me.
6      Q.  Anyone else?
7      A.  No.
8      Q.  Okay.  When you opened this account, did
9  you expect that funds would come in from the Oceanic
10  Bank & Trust in the Bahamas?
11      A.  In response to your question, I hereby
12  invoke my Fifth Amendment privilege against self
13  incrimination because the answer to your question
14  may incriminate me.
15      Q.  Did you have an account at Oceanic Bank &
16  Trust in the Bahamas at any time?
17      A.  In response to your question, I hereby
18  invoke my Fifth Amendment privilege against self
19  incrimination because the answer to your question
20  may incriminate me.
21      Q.  Was Mr. Cuppy involved?  Do you know
22  Mr. Cuppy?
23      A.  I know Mr. Cuppy.
24      Q.  Was he involved in opening the account

Page 20

1  with you or for you at Oceanic Bank & Trust in the
2  Bahamas?
3      A.  In response to your question, I hereby
4  invoke my Fifth Amendment privilege against self
5  incrimination because the answer to your question
6  may incriminate me.  Actually, the answer to that
7  last question was not to my knowledge.
8      Q.  The last question if Mr. Cuppy was
9  involved?
10      A.  Not to my knowledge.
11      Q.  Do you know who, if anyone, was involved
12  in opening an account for you on your behalf at
13  Oceanic Bank & Trust in the Bahamas?
14      A.  No.
15      Q.  Do you have any bank accounts at J.P.
16  Morgan Chase or any sort of account at J.P. Morgan
17  Chase?
18      A.  A charge account at Chase.  I mean, I
19  have a credit card.
20      Q.  That's the only account that you --
21      A.  Other than I have my escrow account.
22      Q.  Your escrow for the --
23      A.  For the house.
24      Q.  -- for the house at Wexford is at J.P.

Page 21

1  Morgan Chase?
2      A.  I believe so, yes.
3      Q.  Do you have some sort of insurance policy
4  with MetLife?
5      A.  Yes.
6      Q.  Do you know what the value of that
7  insurance policy is?
8      A.  It's a $10,000 policy years ago.  It's
9  paid up.  It's probably maybe $15,000 now.  Yes,
10  it's in there.
11      Q.  Handing you what's been marked as Exhibit
12  272.  Can you identify this document, Mrs. Rogan?
13      A.  Yes, it's the opening statements for my
14  bank account in Canada.
15      MR. GOUVEIA:  Are you referring to specific
16  page when you say that?
17      MR. AIZENBERG:  No.
18      MR. GOUVEIA:  I'm talking to the witness.  Are
19  you referring to a specific page?
20      THE WITNESS:  I was referring to the first
21  page.
22      MR. GOUVEIA:  The first page?
23      THE WITNESS:  Yes, the signature, the signature
24  page.

6 (Pages 18 to 21)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 22

1    MR. GOUVEIA: Well, the first page is this
2 page. The first page is Page 1. The second page,
3 is that the page?
4    THE WITNESS: The signature page, yes.
5 BY MR. AIZENBERG:
6    Q. So the second page of Exhibit 272, you
7 recognize as a signature page for opening an account
8 at HSBC Canada?
9    A. Yes.
10    Q. And that's your signature on the second
11 page?
12    A. Yes.
13    Q. And the next page is your signature on a
14 tax ID number certification?
15    A. It appears to be correct.
16    MR. GOUVEIA: That's your signature?
17    THE WITNESS: It appears to be, yes.
18 BY MR. AIZENBERG:
19    Q. And you see at the top of the second page
20 of Exhibit 272, which is your account opening
21 signature card, it shows October 17th, 2006, as the
22 account opening date. Do you see that? It says
23 17th, October, 2006.
24    A. Yes, I said it was in October, yes.

Page 23

1    Q. So does that sound right, as far as the
2 date you opened it?
3    A. Yes.
4    Q. Okay. Handing you what's been marked as
5 Exhibit 274. This is a document that you produced
6 in connection with the citation proceeding in the
7 Northern District of Illinois. Do you recognize
8 this document?
9    A. Yes.
10    Q. Can you tell me what it is?
11    A. It's my statement of the daily rollover
12 account U.S. dollars off the internet.
13    Q. And what's the date of this?
14    A. July 9th, 2007.
15    Q. And the account balance at that time was
16 $1.7 million or so?
17    A. Yes, correct.
18    Q. Where is -- is that the same, if you look
19 at your Schedule B, which is in Exhibit 702, is that
20 the same U.S. dollar account that you list in your
21 Schedule B as having $532,000 in it?
22    A. The account number is not on this.
23    Q. Did you have more than one -- have you
24 had more than one U.S. dollar account at HSBC?

Page 24

1    A. No, but -- no, I don't.
2    Q. Okay. So would logic dictate, then, that
3 this is the same account?
4    MR. GOUVEIA: If you know.
5 BY THE WITNESS:
6    A. I would assume it's the same account. It
7 looks to be about right.
8 BY MR. AIZENBERG:
9    Q. Do you know what happened to the rest of
10 the money since you're only showing about $500,000
11 in it now?
12    A. In response to your question, I hereby
13 invoke my Fifth Amendment privilege against self
14 incrimination because the answer to your question
15 may incriminate me.
16    Q. Handing you what's been marked as Exhibit
17 No. 277. This is a letter, the first page, is this
18 a letter that you sent to someone named Melanie
19 Mobsey at Oceanic Bank on or about October 23rd,
20 2006?
21    A. Yes.
22    Q. And that's your signature on the first
23 page?
24    A. It appears to be. It's a bad copy, but

Page 25

1 it appears to be.
2    Q. Okay. And here, you are requesting
3 that Ms. Mobsey direct that $1.5 million be sent to
4 an HSBC account in Vancouver; is that right?
5    A. In response to your question, I hereby
6 invoke my Fifth Amendment privilege against self
7 incrimination because the answer to your question
8 may incriminate me.
9    Q. Do you see in the first line of your
10 letter, you say that you're currently completing
11 plans to reside in Canada. Was that accurate when
12 you said it; were you planning to reside in Canada?
13    A. In response to your question, I hereby
14 invoke my Fifth Amendment privilege against self
15 incrimination because the answer to your question
16 may incriminate me.
17    Q. Where do you currently reside?
18    A. In Indiana.
19    Q. Do you have any plans to reside in
20 Canada?
21    A. In response to your question, I hereby
22 invoke my Fifth Amendment privilege against self
23 incrimination because the answer to your question
24 may incriminate me.

7 (Pages 22 to 25)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS,  NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 26

1    Q.  I just want to go to the second page of
2 Exhibit 277.  Is this your handwriting on the second
3 page?
4    A.  Yes.
5    Q.  Okay.  So you wrote by hand this fax
6 cover sheet?
7    A.  Yes.
8    Q.  I'm looking now at your Schedule B, which
9 is third page of Exhibit 702.  Do you see listed
10 there, it says, "John Rogan note and mortgage"?
11    A.  Yes.
12    Q.  Can you tell me what that's about?
13    A.  It was a note I purchased from my
14 husband.  He had lent his brother money and had the
15 note for a house, a lake house, so I purchased it
16 from him.
17    Q.  When did you purchase it from your
18 husband?
19    A.  I don't recall.
20    Q.  Why did you purchase it from your
21 husband?
22    A.  I believe he needed money to pay his
23 attorneys.
24    MR. AIZENBERG:  I just want to note for the

Page 27

1 record -- I just want to note for the record that
2 prior to Ms. Rogan answering that question, she
3 looked toward her attorney and then invoked her
4 Fifth Amendment.  I just want to note that for the
5 record.
6    THE WITNESS:  I just answered.
7    MR. GOUVEIA:  She answered.
8    MS. GARGULA:  She answered the question.
9 BY MR. AIZENBERG:
10    Q.  So the reason you bought the note from
11 your husband is so that your husband would have
12 money to pay lawyers?
13    A.  Yes.
14    Q.  And why didn't your husband just use his
15 own money?
16    A.  In response to your question, I invoke
17 the marital privilege because the question requests
18 disclosure of confidential marital communications or
19 requests testimony that might have an adverse affect
20 on my spouse.
21    Q.  I'll ask you a different question.
22    Do you know why -- so I'm not asking you
23 to actually tell me why.  Do you know why your
24 husband needed to get the money from you and

Page 28

1 couldn't just use his own money?
2    A.  No.
3    Q.  And why did you agree to buy this note?
4    MR. GOUVEIA:  Asked and answered.  She said her
5 husband needed money to pay attorneys.
6 BY MR. AIZENBERG:
7    Q.  Just trying to help out your husband?
8    MR. GOUVEIA:  You asked her.  She has answered
9 that question.  You asked her why she bought the
10 note, and she said that her husband needed money to
11 pay his attorneys.  Any questions as to anything
12 different would involve conversations or
13 communication between her and her husband and would
14 be privileged.
15 BY MR. AIZENBERG:
16    Q.  Did your husband give you -- in exchange
17 for money, he gave you the note; he assigned the
18 note to you?
19    A.  Yes.
20    Q.  And did you do any sort of analysis as to
21 whether this was a good buy?
22    A.  I have been there.
23    Q.  Okay.  So you think it was?
24    A.  Yes.

Page 29

1    Q.  And now, is there any litigation pending
2 related to this note?
3    A.  Yes.
4    Q.  Tell me about that litigation?
5    A.  Trying to foreclose.
6    Q.  What's going on with that at the moment?
7    A.  Nothing because I don't have money to pay
8 the attorney.
9    Q.  Okay.  Let's turn to the fourth page of
10 Exhibit 702, which is Item 19 -- I mean, Item 20, I
11 want to go to in your Schedule B, Personal Property.
12 The first item as listed is the escrow proceeds from
13 the sale of 476 Wexford; do you see that?
14    A.  Yes.
15    Q.  And that's the money that's at the J.P.
16 Morgan Chase?
17    A.  Yes.
18    Q.  And the next item you list is the Peter
19 G. Rogan Irrevocable Trust?
20    A.  Yes.
21    Q.  Okay.  Tell me, were you involved in
22 getting that trust started, in other words, in
23 creating the trust?
24    A.  No.

8 (Pages 26 to 29)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS,  NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 30

1    Q.    When did you first learn about the trust?
2    A.    I would say in the mid '90s, middle,
3  early to mid '90s.
4    Q.    It shows in your Schedule B, your
5  writing, that the trust was established in January
6  of '96. Did you learn about it before it was
7  established or after?
8    A.    No, after.
9    Q.    Okay. Do you know how much after you
10 learned about it?
11    A.    I don't recall.
12    Q.    Do you have an understanding as to what
13 the purpose is of this trust?
14    A.    Yes.
15    Q.    Can you tell me what that understanding
16 is?
17    A.    As far as I'm concerned, I'm a
18 discretionary -- I couldn't come up with the word,
19 discretionary beneficiary of the trust.
20    Q.    You've gotten money from the trust
21 before, haven't you?
22    A.    Yes.
23    Q.    And tell me how many times you have
24 gotten money from the Peter G. Rogan Irrevocable

Page 31

1  Trust?
2    A.    In response to your question, I hereby
3  invoke my Fifth Amendment privilege against self
4  incrimination because the answer to your question
5  may incriminate me.
6    Q.    Tell me how much money in total you have
7  received from the Peter G. Rogan Irrevocable Trust?
8    A.    I don't really recall, but in response to
9  your question, I hereby invoke my Fifth Amendment
10 privilege against self incrimination because the
11 answer to your question may incriminate me.
12    Q.    When you've gotten money from the trust,
13 how did you go about getting it? What steps did you
14 take to get it?
15    A.    In response to your question, I hereby
16 invoke my Fifth Amendment privilege against self
17 incrimination because the answer to your question
18 may incriminate me.
19    Q.    When you've gotten money from the Peter
20 G. Rogan Irrevocable Trust, have you had
21 conversations with your husband about that? I'm not
22 asking for the content of this conversation. I'm
23 just asking whether or not you have spoken with him
24 about it.

Page 32

1    A.    Let me think.
2    MR. GOUVEIA: Can you repeat the question
3  again?
4  BY MR. AIZENBERG:
5    Q.    When you have -- when you have gotten
6  money from the Peter G. Rogan Irrevocable -- strike
7  that.
8       In connection with your receipt of funds
9  from the Peter G. Rogan Irrevocable Trust, have you
10 ever discussed that topic with your husband?
11    A.    Vaguely, I would say. Yes.
12    Q.    Who else have you spoken with whenever
13 you've gotten money from the Peter G. Rogan
14 Irrevocable Trust, and when I say "who else you have
15 spoken with," I'm talking about before you received
16 the funds and after? In other words, any time there
17 has been a transfer, who have you talked with about
18 it?
19    MR. GOUVEIA: Any time you -- (inaudible.)
20 BY THE WITNESS:
21    A.    I believe -- well, I talked to Fred
22 Cuppy. I believe I only got money once. But I
23 talked to Fred Cuppy. I called and asked how I
24 would go about it.

Page 33

1  BY MR. AIZENBERG:
2    Q.    Why did you turn to Mr. Cuppy, as opposed
3  to anyone else?
4    A.    He's the -- he's my family lawyer, a
5  longtime family lawyer. He is also an officer in
6  some way, the agent, or I don't really understand
7  trust, but he's like the agent of the trust, so --
8    Q.    How did you learn that he was -- I'm
9  using your term -- the agent of the trust?
10    A.    It's on my tax return in 2005.
11    Q.    How did you first learn about the Peter
12 G. Rogan Irrevocable Trust?
13    MR. GOUVEIA: You've asked that question, and
14 she's answered it, that she first learned shortly
15 after its --
16    MR. AIZENBERG: That's when. That's when, and
17 now I'm asking how.
18 BY THE WITNESS:
19    A.    My husband told me that he had set up a
20 trust. We had estate issues going on. He was
21 working on our estate planning, and I think we did a
22 new will maybe in '89, '88, '89, and he was making a
23 lot of money, and at some point in the early '90s,
24 he told me we had some estate issues, and he told me

9 (Pages 30 to 33)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 34

1   after he had done the trust that he set up a trust.
2   BY MR. AIZENBERG:
3       Q.   Did he give you any other details about
4   this trust?
5       A.   None.
6       Q.   Do you see in Item 20, in Schedule B, you
7   wrote that the current value is unknown.
8       A.   My current value is unknown.
9       Q.   Okay.  So that's what you mean; you don't
10  know what you are entitled to?
11      A.   I have no idea.
12      Q.   Okay.  Have you thought about how that
13  would be determined?
14      A.   No.
15      Q.   Do you see in Item 25, you list three, it
16  appears.  I'm assuming they're cars?
17      A.   Yes.
18      Q.   Where are these cars located?
19      A.   Two of them are located at my 206 address
20  in Valparaiso, and one of them is located at the 55
21  East Erie Condo.  My daughter is driving one.
22      Q.   Which one is she driving?
23      A.   Normally, she drives the 1992, but this
24  week she has the other one because it might have

Page 35

1   snowed on her going back, and it doesn't drive in
2   the snow.
3       Q.   The other Lexus, you mean?
4       A.   She has the truck, yes, 470, but I'll
5   exchange that with her this weekend.
6       Q.   Okay.  And you list under boats, motors,
7   and accessories, Item 26, in Schedule B, an outboard
8   motor.  Where is that kept?
9       A.   It's in storage at Captain's Water Ski.
10      Q.   Item 35 in Schedule B --
11      A.   Yes.
12      Q.   -- you list a joint account with your
13  mother at First Source Bank?
14      A.   I have signatory powers on her account.
15  She's 85.
16      Q.   Do you have any other accounts in which
17  you have signatory authority or joint accounts?
18      A.   I don't think so.  I did with my son, but
19  I believe that account is closed.
20      Q.   Do you have any with your daughter?
21      A.   No.
22      Q.   If you could turn to Schedule D in
23  Exhibit 702.  The first item you list there, you
24  list as creditor holding secured claims as Dexia; do

Page 36

1   you see that?
2       A.   Yes.
3       Q.   And tell me why -- let me do this
4   differently.
5           What sort of claims, is it your
6   understanding, that Dexia has against you
7   personally?
8       MR. GOUVEIA:  I'm going to object to the form
9   of the question.
10  BY MR. AIZENBERG:
11      Q.   Go ahead.
12      MR. GOUVEIA:  You can answer, if you know.
13  BY THE WITNESS:
14      A.   There is a judgment against my husband,
15  and I believe Dexia is trying to take my assets.
16  BY MR. AIZENBERG:
17      Q.   Do you think Dexia is trying to take all
18  your assets?
19      A.   Yes, sir.
20      Q.   You are aware that Dexia has filed a
21  judgment lien that relates to the Wexford property,
22  right?
23      A.   Yes.
24      Q.   Okay.  And you are aware that Dexia has

Page 37

1   filed a judgment lien that relates to the Erie
2   property, right?  Yes?
3       A.   Yes.
4       Q.   Are you aware of any other property of
5   yours that Dexia has claimed?
6       A.   I believe they have claimed my bank
7   accounts or at least it's frozen, all my bank
8   accounts, all my trading accounts, my IRAs,
9   everything.
10      Q.   And is it your understanding that Dexia's
11  theory is that these funds are really Peter's and
12  not yours?
13      A.   I understand that's their theory.
14      Q.   Turn to Schedule E.  Actually, before we
15  turn to Schedule E specifically, the basis for your
16  asserting that Dexia is a creditor of yours is based
17  on these two judgment liens and the fact that your
18  accounts have been frozen?
19      A.   And the fact that I have liens on my
20  homes and everything, yes.
21      Q.   That's what I mean.  You're basis is two
22  liens on homes, and the fact that everything else is
23  frozen?
24      A.   Right.  Correct.

10 (Pages 34 to 37)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 38

1    Q.   And with respect to -- I'll let you do
2  that.
3        Now, let's turn to Schedule E. The first
4  item you list here is David Talshow; do you see
5  that?
6    A.   Yes.
7    Q.   Who is that?
8    A.   He's an employee of mine for my little
9  decorative services company.
10   Q.   Tell me about this company.
11   A.   It was a small company I set up, was just
12 going to do a little decorating, but didn't because
13 all of this started to blow up, so basically I just
14 told him one month's wages.
15   Q.   So he was an employee of Decorative
16 Services?
17   A.   Yes.
18   Q.   And Decorative Services is an Illinois
19 corporation?
20   A.   Yes.
21   Q.   Now, turn to Schedule F, please. The
22 second item you list there is Burke Costanza &
23 Cuppy, do you see that?
24   A.   Yes.

Page 39

1    Q.   Okay. What are these legal fees owed
2  for?
3    A.   Let me see. Let me see which one. This
4  would be --
5    Q.   It shows you owe about a little more than
6  $3,000. What is that before?
7    A.   I believe that was for Paul in
8  testifying, doing research on testifying in front of
9  Judge Kennelly.
10   Q.   The next item is Captain Orders; do you
11 see that?
12   A.   Yes.
13   Q.   Okay. And that's for storage of that
14 boat we just looked at?
15   A.   Yes.
16   Q.   Turn to the next page in Schedule F. Do
17 you see at the bottom it shows legal fees to Fred
18 Cuppy?
19   A.   Yes.
20   Q.   What's that for?
21   A.   Because as all of this was getting going,
22 he was advising me, helping me as my longtime
23 attorney, consulting occasionally.
24   Q.   And when you say "all this," please

Page 40

1  elaborate a little bit as to what you mean?
2    A.   All the freezing and the suits and all of
3  this got going.
4    MR. GOUVEIA: You are referring to the actions
5  by Dexia and the United States government freezing
6  your accounts and the lawsuits that were filed
7  against you?
8    THE WITNESS: Yes, yes.
9  BY MR. AIZENBERG:
10   Q.   So you are paying -- you say you owe him
11 legal fees personally?
12   A.   Yes.
13   Q.   Do you have any bills from him?
14   A.   No, not right now. I called and asked,
15 and he gave me an approximation.
16   Q.   The next page of your Schedule F shows
17 legal fees owed to O'Rourke & Moody. Do you see
18 that?
19   A.   Yes.
20   Q.   What are the legal fees for?
21   A.   They are for the suits that have been
22 ongoing with the government. It started several
23 years when I sold my house, so it's been ongoing.
24 I've paid him an enormous amount of money already.

Page 41

1    Q.   Do you have any bills from O'Rourke &
2  Moody?
3    A.   Yes, I have new bills.
4    Q.   Turn to the next page in Schedule F, do
5  you see the top item is Tatooles, Foley &
6  Associates?
7    A.   Yes.
8    Q.   And it shows that you owe them $5,000?
9    A.   Yes.
10   Q.   What's that for?
11   A.   It's for accounting. My taxes aren't
12 filed until October. So he does accounting all year
13 and legal. He's an attorney.
14   Q.   When you say "he," who are you referring
15 to?
16   A.   John Foley.
17   Q.   Okay. The next item is the 55 East Erie
18 Condo Association; do you see that?
19   A.   Yes.
20   Q.   It shows that $13,000 are owed?
21   A.   Yes.
22   Q.   These are back due association dues?
23   A.   No, no.
24   Q.   So why is it $13,000?

11 (Pages 38 to 41)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 42

1      A.   Yearly.
2      Q.   So you're listing for the year?
3      A.   Yes.
4      Q.   Are you aware that your case in
5   connection with the Dexia proceeding filed expense
6   reports?
7      A.   Yes.
8      Q.   Are you aware that I believe that Brian
9   and Sarah both said that they are paying condo
10  association fees?
11     A.   Well, they are, but I normally pay them,
12  but I couldn't because I'm frozen.  So we are not
13  going to pay them twice.
14     Q.   Okay.
15     A.   So they have to be on someone's schedule.
16     Q.   I understand.  Let's turn to Schedule G,
17  just the following page in Exhibit 702.  The first
18  item do you see Unique Accommodations?
19     A.   Yes.
20     Q.   Tell me what that is?
21     A.   It's a lease on a condo in Vancouver,
22  British Columbia.
23     Q.   Does anyone live in that condo?
24     A.   My husband lives in that condo.

Page 43

1      Q.   Why does he live in a condo in Vancouver?
2      A.   In response to your question, I hereby
3   invoke the marital privilege because the question
4   requests disclosure of confidential marital
5   communications or requests testimony that might have
6   an adverse affect on my spouse.
7      Q.   Why do you find yourself obligated to pay
8   for the lease for a condo in Vancouver?
9      A.   In response to your question, I hereby
10  invoke the marital privilege because the question
11  requests disclosure of confidential marital
12  communications or requests testimony that might have
13  an adverse affect on my spouse.
14     Q.   I'm handing you what's been marked as
15  273.  This is a lease addendum that you signed in or
16  about November 5th of 2007?
17     A.   Yes.
18     Q.   That's your signature there at the
19  bottom?
20     A.   It appears to be, yes.
21     Q.   And is that your husband's signature
22  under it?
23     A.   It appears to be.
24     Q.   And this is -- is this the same lease

Page 44

1   that's referred to in your Schedule G?
2      A.   Actually, the Schedule G, and the rent is
3   a little bit lower.  This is an older lease.
4      Q.   But it's the same place?
5      A.   The same place.
6      Q.   Is this a penthouse apartment?
7      A.   It's a top floor of a loft, of a
8   warehouse.
9      Q.   This is the top floor of a warehouse?
10     A.   Yes.
11     Q.   And your husband lives there?
12     A.   Yes, he does.
13     Q.   Do you know why he lives there?  I'm
14  asking do you know why; yes or no?
15     A.   In response to your question, I hereby
16  invoke the marital privilege because the question
17  requests disclosure of confidential marital
18  communications or requests testimony that would have
19  an adverse affect on my spouse.
20     MR. AIZENBERG:  I don't agree with that.  I'm
21  just asking whether she has knowledge as to why --
22  the answer is either going to be yes or no.  I'm not
23  asking you what the reason is.  I'm asking you do
24  you know why.

Page 45

1      MR. GOUVEIA:  She has invoked the privilege.
2      MR. AIZENBERG:  And I'm telling you, as her
3   lawyer, that I think it's an improper invocation of
4   the privilege.  So I'm asking you if you would
5   instruct her to answer the question because I'm not
6   asking her to disclose anything, except what her
7   state of mind is.
8      MR. GOUVEIA:  I'm not going to -- I think she
9   should invoke the Fifth, but I'm not going to advise
10  her on what she thinks may or may not incriminate
11  her.  She thinks the communication with her husband
12  is necessary to answer that question, and I think
13  that's an adequate response.  I don't know how she
14  can answer it without communication with her
15  husband, to be honest with you.
16  BY THE WITNESS:
17     A.   It would be a guess.
18  BY MR. AIZENBERG:
19     Q.   Okay.
20     A.   It would be a guess.
21     Q.   Were you involved in your husband's
22  decision to live in Canada?
23     A.   No.
24     Q.   Did he discuss with you the planning

12 (Pages 42 to 45)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 46

1  related to his decision to live in Canada?
2      A.   No.
3      Q.   Do you visit him in Canada?
4      A.   Yes.
5      Q.   How often do you visit him?
6      A.   I haven't been there since August.
7      Q.   Do you know why your husband is not in
8  the United States?
9      A.   That would be a guess.
10     Q.   You are telling me your husband lives in
11 another country, and you have to guess as to why
12 he's not here?
13     MR. GOUVEIA:  Are you arguing with her answer?
14     MR. AIZENBERG:  No, I'm expressing a little
15 disbelief.  I'm not arguing.
16     MR. GOUVEIA:  That's argumentative.  We would
17 object to the form of the question.
18 BY MR. AIZENBERG:
19     Q.   Is that your testimony?
20     A.   He does not discuss any of those things
21 with me.
22     Q.   Have you asked him?
23     A.   I'm going to invoke the marital
24 privilege.  In response to your question, I hereby

Page 47

1  invoke the marital privilege because the question
2  requests disclosure of confidential marital
3  communications or requests testimony that might have
4  an adverse affect on my spouse.
5      Q.   Why did you sign the lease for this
6  Vancouver condo if you don't reside there?
7      A.   I visit.
8      Q.   So?  You visit hotels too; you don't have
9  ownership interest or lease interest --
10     MR. GOUVEIA:  I object to the form of the
11 question.  You're arguing with her.
12     MR. AIZENBERG:  You're right.
13 BY MR. AIZENBERG:
14     Q.   Let me ask the question a different way.
15 Are you saying that the reason you signed the lease
16 is because you were going to visit the apartment; is
17 that your testimony?
18     A.   Yes.
19     Q.   Okay.  Did your husband ask you to sign
20 the lease?
21     A.   No.
22     Q.   You just volunteered to do it?
23     A.   Yes.
24     Q.   Okay.  Does Schedule G also show a lease

Page 48

1  on 206 Scarborough Court; do you see that?
2      A.   Yes.
3      Q.   How did you find this particular place?
4      A.   A friend of a friend of mine is a
5  realtor, and he helped me to -- we looked at
6  several rentals in Valpo, and this one came up.  We
7  just rented it.  It happened to be in the same
8  neighborhood.
9      Q.   Why doesn't your husband come live with
10 you in Valpo?
11     A.   You would have to ask him.
12     Q.   You have no idea?
13     A.   I have no idea.
14     Q.   Do you live with anyone?  Does anyone
15 else live at 206 Scarborough Court?
16     A.   My mother.
17     Q.   So you pay the rent on that too?
18     A.   Yes.
19     Q.   Do you pay the rent on the Vancouver
20 apartment?
21     A.   Sometimes, yes.
22     Q.   Turn please to Schedule H.  Actually, I
23 want to go back for a moment.  Do you remember we
24 talked about your debt to the O'Rourke firm?

Page 49

1      A.   Yes.
2      Q.   Okay.  When was the last payment that you
3  made to the O'Rourke firm?
4      A.   Probably August, right before I was
5  frozen.
6      Q.   Have you made any -- Have you made any
7  payments to them since then?
8      A.   No.
9      Q.   They have made a filing in the bankrupt
10 court saying that they got $10,000 from you.  Do you
11 know what that's about?
12     A.   Yes.  Never mind.  Yes.  That was -- it
13 was a loan.  Actually, it didn't come from me.  It
14 came from a friend of mine --
15     Q.   Who paid it?
16     A.   -- to engage them.  Dr. DuSchants to
17 engage them for the bankruptcy.
18     Q.   So Dr. DuSchants paid them $10,000 on
19 your behalf that you have an obligation to repay?
20     A.   Yes, correct.
21     Q.   Do you have some sort of a loan agreement
22 with him, or is this just done informally?
23     A.   Informally.
24     Q.   With respect to the lease of the

13 (Pages 46 to 49)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 50

1 Vancouver condo or Vancouver apartment, how do you
2 pay that rent, from which account?
3     A.   In response to your question, I hereby
4 invoke my Fifth Amendment privilege against self
5 incrimination because the answer to your question
6 may incriminate me.
7     Q.   When was the last payment that you made
8 for the rent for the Vancouver apartment?
9     A.   In response to your question, I hereby
10 invoke my Fifth Amendment privilege against self
11 incrimination because the answer to your question
12 may incriminate me.
13     Q.   Do you recall a few moments ago we
14 discussed the escrow account that has the proceeds
15 of the sale of your Wexford home?
16     A.   Yes.
17     Q.   Did you pay any money to buy the land
18 that that house was built on?
19     A.   Yes.
20     Q.   Where did you get that money?
21     A.   My husband gave me money. I was deciding
22 whether or not to go back to work in 1989. In '88,
23 my daughter was five. My dad died when I was eight,
24 and I wanted things in my own name. I wanted

Page 51

1 property and wanted accounts and things in my own
2 name.
3     Q.   So your husband gave you money to buy
4 that land?
5     A.   Yes.
6     Q.   And then for some years, the land was
7 without anything on it, right?
8     A.   Several years.
9     Q.   Eventually, you built a house?
10     A.   Yes.
11     Q.   And where did you get the money or what
12 was the source of the money for the construction of
13 the home?
14     A.   It was a combination of my husband and
15 me, I assume. He gave me money, or it was a gift to
16 me. The house was a gift to me.
17     Q.   Okay. So you had -- other than your
18 husband, you had no independent source of funds?
19     A.   No.
20     Q.   And when you lived in that house, there
21 were various expenses, I assume, associated with the
22 house, correct?
23     A.   Right.
24     Q.   Utilities, correct?

Page 52

1     A.   Yes.
2     Q.   And taxes?
3     A.   Yes.
4     Q.   And you did decorating of the home?
5     A.   Yes.
6     Q.   Am I correct that the source of the funds
7 for those types of expenses was ultimately your
8 husband's?
9     A.   The original source. I had accounts and
10 things back then, but yes, the original source.
11     Q.   A few moments ago, you recall mentioning
12 a company called Decorative Services?
13     A.   Yes.
14     Q.   Do you also have a business called JKR
15 Business?
16     A.   I set up that business on the same basis
17 that I set up this one. I set it up, and it never
18 went anywhere.
19     Q.   What was JKR Business intended to be in
20 your mind?
21     A.   It was going to be kind of the same
22 thing, a decorating business. My husband and I
23 thought we would share an office, and I would do
24 decorating out of it and do consulting.

Page 53

1     Q.   Did the business ever take off?
2     A.   No, not that I know of. I didn't --
3     Q.   Are you aware that your husband used the
4 name JKR Business in connection with some of his
5 business interests?
6     A.   Yes.
7     Q.   Do you know why he did that?
8     A.   It was already on the marquee, so --
9     Q.   Are you aware that, for example, he
10 listed JKR Business as the contract manager for a
11 lease that Edgewater Medical Center had with his
12 company, Edgewater Property Company?
13     A.   No.
14     Q.   Do you know where JKR Business -- if JKR
15 Business had any bank accounts?
16     A.   Not to my knowledge, but it could have.
17 It was many years ago.
18     MR. GOUVEIA:   When you say many years ago, do
19 you know how long ago you are talking about?
20     THE WITNESS:   No, I think it was the mid '90s.
21 It may have. I can't remember.
22 BY MR. AIZENBERG:
23     Q.   If you could now turn to Schedule J in
24 Exhibit 702. Actually, let's back up. Let's go to

14 (Pages 50 to 53)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 54

1 Schedule I first, please. This is your schedule of
2 current income?
3    A. Yes.
4    Q. And according to this, no current income
5 for you and your husband, right?
6    A. Well, none for me. This is mine.
7    Q. It says spouse next to it.
8    A. Oh, yes. Unknown. It says spouse
9 unknown.
10    Q. I see. That's why you listed zero?
11    A. Right.
12    Q. And then under Item 9 in Schedule I under
13 Interest and Dividends, it says $40,000. Can you
14 tell me what that is?
15    A. This is what I normally would have
16 gotten. I got more than that last year. I just --
17    Q. From whom or from what?
18    A. I would say from my bank accounts and
19 from my investment accounts.
20    Q. So the $40,000 is the amount of money you
21 got from accounts in your name?
22    A. It was more than that last year, but I
23 don't know what it would be this year. I have no
24 idea. That was just an estimate.

Page 55

1    Q. Now, let's turn to Schedule J.
2    MR. GOUVEIA: Before we do, there is an
3 asterisk beside that. Isn't that true?
4    THE WITNESS: Yes.
5    MR. GOUVEIA: What does it say below that?
6    THE WITNESS: "Debtor has been enjoined by
7 court order from obtaining possession of her
8 interest in dividends," so that's why it's not
9 carried over.
10 BY MR. AIZENBERG:
11    Q. Okay. Let's turn to Schedule J. I want
12 to turn you to the second page of Schedule J, which
13 is the detailed expense attachment. Do you see
14 that?
15    A. Yes.
16    Q. For the utility expenditures, where are
17 these -- where are these utilities expended, which
18 residence, because you have listed three residences
19 that you are involved with? You have Scarborough;
20 you have Erie; and you have Vancouver.
21    A. Yes.
22    Q. So which residence is this for? Look at
23 the very top.
24    A. Where are you?

Page 56

1    Q. The very top.
2    A. Garbage? That is 206. That's 206.
3    Q. Where is the Direct TV that you have --
4    A. 206.
5    Q. Internet and land line too? Yes?
6    A. Yes.
7    Q. And then under other installment
8 payments, it says "condo property," do you see that?
9    A. Yes.
10    Q. Now, what condo property are you
11 referring to here?
12    A. That might be -- what might that be?
13    MR. GOUVEIA: That's your condo in Chicago,
14 isn't it?
15    THE WITNESS: Yes, but the association dues are
16 here.
17 BY THE WITNESS:
18    A. That might have been -- I believe that
19 is maybe taxes. There was some division of the
20 taxes.
21 BY MR. AIZENBERG:
22    Q. Can you explain, elaborate on what you
23 mean by that?
24    A. I'm not sure how we listed this. I had

Page 57

1 my tax bills, and they were divided up in some way.
2 I'm not sure. I mean, my taxes are what they are,
3 you know.
4    Q. So your belief is this is some portion of
5 your taxes on the Erie condo?
6    A. I believe so.
7    Q. And the next one, when you say condo
8 association dues that's --
9    A. That's the monthly assessment.
10    Q. For the Erie condo?
11    A. Yes.
12    Q. And the lease on the Canada residence,
13 you're saying that this is monthly expenses of yours
14 now?
15    A. Yes.
16    Q. Okay. A few moments ago you told me that
17 you sometimes pay the rent. Now, in the Schedule J,
18 you're saying you're going to be paying the rent on
19 a regular basis?
20    A. I'm not going to pay it twice. Okay. My
21 husband is frozen too, as you know, so if it's
22 listed on his statement, somebody has to pay it. So
23 we are not going to pay it twice.
24    Q. But that's the monthly rent, $4,250?

15 (Pages 54 to 57)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 58

1    A.   Yes, that's what it is now, yes.
2    Q.   And then do you see under Other
3  Expenditures, it says employee insurance?
4    A.   Yes.
5    Q.   What's that?
6    A.   That's my employee -- that's his FICA,
7  things like that, which I don't have anymore.
8    Q.   This is for Mr. Talshow?
9    A.   Yes.
10    Q.   So this is not going to be an expenditure
11  anymore?
12    A.   No.
13    Q.   Okay.  What is the Union Lee Club?  Is
14  that meant to be the Union League Club?
15    A.   Yes, yes.
16    Q.   Under Additional Attorney's Fees, what is
17  that supposed to be?
18    A.   I believe that was an addition of what
19  other things I have coming in.  I have multiple
20  bills. I'm not sure where those figures came from.
21  It might not be correct now.  They were correct when
22  I filled this out.  I had bills for all of those.
23    Q.   What you did is looked at attorneys' fee
24  bills that you had and you added them up, and it

Page 59

1  added up to about $27,000?
2    A.   Right.
3    Q.   And Captain Orders, again, this is for
4  that outboard motor boat that you have?
5    A.   Yes.
6    Q.   And then it says Burke.  Is that the
7  Cuppy firm?
8    A.   I guess.  That was probably the bill that
9  I had then, which is now it's $3500 or something.
10    Q.   And the last item you list is travel
11  expenses to Canada?
12    A.   Right.  I have to see my attorney up
13  there now.
14    Q.   So you're saying that these are what you
15  expect to be your monthly travel expenses to Canada?
16    A.   Yes.
17    Q.   You expect to go there every month?
18    A.   Yes.
19    Q.   Why do you need to go to Canada?
20    A.   Because you have frozen my assets up
21  there. I have to have an attorney to fight it up
22  there.
23    Q.   I haven't frozen anything.
24    A.   Yes, I know.

Page 60

1    Q.   And when you go to Canada, you will stay
2  with your husband?
3    A.   Yes.  Stay at my condo where my husband
4  lives, yes.
5  BY MR. AIZENBERG:
6    Q.   Turn, if you could, to your statement of
7  financial affairs, which is also part of the same
8  exhibit, Exhibit 702.  Specifically, I want to
9  direct you to Page 5.
10    MS. GARGULA:  What section?
11  BY MR. AIZENBERG:
12    Q.   Item 9, payments related to debt
13  counseling and bankruptcy; do you see that?
14    A.   Yes.
15    Q.   And so that $10,000 to O'Rourke & Moody,
16  this debt was through the loan from your friend?
17    A.   Yes.
18    Q.   And what was the source of the money for
19  the $10,000 to your counsel here?
20    A.   Same source.
21    Q.   Below, you list a sale in 2005 of a -- it
22  looks like some sort of dwelling in Longboat Key,
23  Florida?
24    A.   It was a lot.

Page 61

1    Q.   It was a lot?  It was an empty lot?
2    A.   Yes.
3    Q.   And when did you acquire that lot?
4    A.   I think maybe 1990ish, '91, '92 early.
5    Q.   And you sold the lot in 2005?
6    A.   Yes.
7    Q.   What did you do with the money from the
8  sale of that lot?
9    A.   It went into my bank account.
10    Q.   And after you put it into your bank
11  accounts, did the money go anywhere else?
12    A.   Not that I know of.
13    Q.   Did you then give some of the money to
14  your husband?
15    A.   I may have.  I did, yes.  I believe I
16  used part of that to buy my condo downtown.
17    Q.   Are you sure about that?
18    A.   I'm not sure.  I believe I did.  I
19  believe I did.
20    Q.   And what was the --
21    A.   It's about the same time.
22    Q.   What was the source of the funds for the
23  acquisition of that lot in Longboat Key, Florida,
24  from your husband?

16 (Pages 58 to 61)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 62

1    A.   That was from my husband, yes, or from my
2 account.  I'm not sure which exactly.
3    Q.   If it was in your account, ultimately,
4 the source was your husband?
5    A.   Ultimately, the source was my husband.  I
6 think I bought it for $400,000.
7    Q.   And this statement of financial affairs,
8 if you turn to the last page of it, is that your
9 signature there attesting to the truthfulness of
10 this statement under penalty of perjury, the very
11 last page of the exhibit?
12    A.   Yes.
13    Q.   Did you own a Cartier watch?
14    A.   Yes.
15    Q.   Is that listed on your schedules as far
16 as jewelry?
17    A.   I believe it's part of the -- yes.
18    Q.   Do you know what the value of that is?
19    A.   No.
20    Q.   When you sold the Wexford property, where
21 did all its contents go?
22    MR. GOUVEIA:  I'm sorry.  What was that
23 question?
24 BY MR. AIZENBERG:

Page 63

1    Q.   When you sold the Wexford Property, where
2 did all the contents of the house go?
3    A.   Into -- well, I gave away a lot of things
4 because I didn't have room for them, rooms of
5 furniture I gave away.  And what's left is in my
6 house now.
7    MR. GOUVEIA:  You mean Scarborough?
8    THE WITNESS:  Scarborough.
9 BY MR. AIZENBERG:
10    Q.   I'm handing you what's been marked as
11 Exhibit 704.  This is a document that you produced
12 in the citation proceeding in Chicago or your
13 Counsel produced on your behalf.  Do you recognize
14 this document?
15    A.   I'm not sure that I have seen this.
16 Maybe I have.  I don't recognize it.
17    Q.   You don't recognize it?
18    A.   No.
19    Q.   Is that an account statement for an
20 account you had at Oceanic Bank?
21    A.   Yes.  I believe so.
22    Q.   Did you have an account at Oceanic Bank?
23    A.   I don't know.  Is this -- let me see.  I
24 guess I did.  Yes, I did, 2004, 2007.

Page 64

1    Q.   Do you recognize this as the account
2 statement for your account at Oceanic Bank?
3    A.   I don't recognize the statement, but I
4 believe I did have an account there, yes.
5    Q.   If you look at the first page of Exhibit
6 704, it shows that on November 3rd, 2006,
7 distribution from the Peter Rogan Trust, do you see
8 that, for one $1.5 million?
9    A.   Yes.
10    Q.   And then it says that there is a --
11 thereafter chose further transactions, do you see
12 that?
13    A.   Yes.
14    Q.   Do you recall these particular
15 transactions?
16    A.   I recall the $1.5 million.
17    Q.   And what happened to that money?
18    A.   It went to Canada, I believe.
19    Q.   It went to your Canadian account at HSBC?
20    A.   Yes.
21    Q.   What happened to the money there?
22    A.   In response to your question, I hereby
23 invoke my Fifth Amendment privilege against self
24 incrimination because the answer to your question

Page 65

1 may incriminate me.
2    Q.   Handing you what's been marked as Exhibit
3 705.  This is a letter that you sent to Mr. Charles
4 Hepburn at Oceanic Bank & Trust?
5    MR. GOUVEIA:  Is that a question?
6    MR. AIZENBERG:  Yes.
7 BY THE WITNESS:
8    A.   Yes.
9 BY MR. AIZENBERG:
10    Q.   And why did you make -- why did you make
11 this request to wire $1.2 million to Winston &
12 Strawn?
13    A.   It was for my husband.
14    Q.   It was for your husband?
15    A.   Yes.
16    Q.   Do you know why your husband didn't make
17 the request himself?
18    A.   No.
19    Q.   How did you know that Winston & Strawn
20 needed money?
21    A.   I knew that they represented him, and he
22 may have asked me.  I don't remember.
23    Q.   Say that again.
24    A.   He may have asked.  I don't remember.

17 (Pages 62 to 65)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 66

1    Q.   Did you have any communications with
2 Mr. Hepburn about this particular transfer?
3    MR. GOUVEIA: Are you talking about --
4    MR. AIZENBERG: About the $1.2 million.
5 BY THE WITNESS:
6    A.   Other than this?
7 BY MR. AIZENBERG:
8    Q.   Yes. Other than that, other than the
9 letter, did you communicate with Mr. Hepburn?
10    A.   I believe he called me, and he said there
11 was money going into my account.
12    Q.   Do you know how he learned?
13    A.   I don't.
14    Q.   You noticed that in this letter, you say
15 that you don't want confirmation of the transfer?
16    A.   Right.
17    Q.   Why didn't you want confirmation of the
18 transfer?
19    A.   Too many people at my house to have faxes
20 and things.
21    Q.   Do you see toward the end of this letter
22 that you sent to Mr. Hepburn, which is Exhibit 705,
23 it says you're anticipating in opening an account in
24 an Italian bank, if necessary; do you see that?

Page 67

1    A.   Yes.
2    Q.   Have you opened any accounts in Italy?
3    A.   No.
4    Q.   Other than the accounts that you have
5 identified in your schedules, which are in the
6 United States or Canada, do you have any other
7 accounts in any other country?
8    A.   No.
9    Q.   What happened to your Oceanic Bank
10 account?
11    A.   I think it might be empty. I don't know.
12    Q.   Do you see that the letter said that you
13 planned to travel to Italy; do you see that?
14    A.   Yes.
15    Q.   Did you travel to Italy, then?
16    A.   No.
17    Q.   And this is -- if you turn to the second
18 page of Exhibit 705, this is a fax cover sheet.
19    A.   Yes.
20    Q.   And you have completed this? This is
21 your handwriting on it?
22    A.   It's hard to tell. It could be, could
23 not. It's kind of the way I write.
24    Q.   Do you have any reason to think someone

Page 68

1 else would have faxed something to Mr. Hepburn on
2 your behalf?
3    A.   No, no, no.
4    Q.   And do you see that it's dated 5/5/05?
5    A.   Yes.
6    Q.   So do you agree that you probably sent
7 this letter on or about that date?
8    A.   Probably.
9    Q.   Handing you what has been marked as
10 Exhibit 703. Do you see that? Turn to the last
11 page of Exhibit 703.
12    A.   Yes.
13    Q.   That's your signature there?
14    A.   Yes.
15    Q.   And by signing this, you verify that your
16 statement of current monthly income and calculation
17 of commitment period and disposable income is true
18 under penalty of perjury?
19    MR. GOUVEIA: The last page where you signed
20 it. That's what he is referring to.
21 BY THE WITNESS:
22    A.   Yes, to the best of my knowledge.
23 BY MR. AIZENBERG:
24    Q.   If you could, turn to the second page of

Page 69

1 703?
2    A.   If you discount the things that are
3 changing.
4    Q.   What's changing?
5    A.   My employee and things like that.
6    Q.   What do you mean?
7    A.   Health insurance for my employee and
8 things like that.
9    Q.   I see. Okay. You see on the second page
10 under Item 9, do you see that $40,000?
11    A.   Yes.
12    Q.   Do you see that you wrote interest from
13 trusts? What trusts are you referring to when you
14 say interest from trusts? When you write --
15 presumably, you are saying that the source of these
16 $40,000 is interest from trusts, and I want to know
17 what trusts are you referring to?
18    A.   I think that was everything. That was
19 all my interest.
20    Q.   What do you mean?
21    A.   From all my accounts.
22    Q.   What's the reference to trusts? What
23 trusts are you referring to?
24    A.   I think that was just all of my accounts.

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 70

1    Q.  So you used the word --
2    MR. GOUVEIA: Are you talking about your
3  investment accounts?
4    THE WITNESS: My investment accounts.
5    MR. GOUVEIA: Do you know of any trusts that
6  would be giving you any money?
7    THE WITNESS: No. I get no interest from any
8  trust that I know of.
9    MR. GOUVEIA: So if trust is on there, would
10  you really have been any investment accounts?
11    THE WITNESS: I think he added everything in
12  the investment accounts.
13  BY MR. AIZENBERG:
14    Q.  The word trust is an error?
15    A.  Probably, yes. Maybe there wasn't a
16  better place to put it.
17    MR. GOUVEIA: Just for a point of
18  clarification, is that the same $40,000 that you
19  referred to on Schedule I of your schedules?
20    THE WITNESS: It was an estimate.
21  BY MR. AIZENBERG:
22    Q.  Do you know whether your husband has
23  plans to come back to the United States?
24    A.  In response to your question, I hereby

Page 71

1  invoke the marital privilege because the question
2  requests the disclosure of confidential -- marital
3  communications or requests testimony that might have
4  an adverse affect on my spouse.
5    Q.  You mentioned that you need to fly to
6  Canada because of some attorney there?
7    A.  Yes.
8    Q.  Who is the attorney that you are
9  referring to?
10    A.  I'm in the middle of engaging him. I
11  don't know that I have to tell you his name. You
12  don't in Canada. His first name is Jeffery.
13    Q.  What's his last name.
14    A.  Dabbs.
15    Q.  And what are you engaging him for?
16    A.  To take care of the proceedings in
17  Canada.
18    Q.  And this relates to the injunction that
19  is pending in Canada?
20    A.  Correct.
21    Q.  Do you plan to engage your own attorney
22  for that?
23    A.  Yes.
24    Q.  Have you already engaged him?

Page 72

1    A.  Yes. Well, we are in the process. I
2  talked to my husband's attorney, and she recommended
3  this gentleman.
4    MR. AIZENBERG: I don't have anything further
5  right now. My colleague may have.
6        EXAMINATION
7  BY MR. STEWART:
8    Q.  For the record, Mrs. Rogan, I just want
9  to introduced myself again. My name is Joseph
10  Stewart. I'm an assistant United States attorney,
11  and I'm here on behalf of the United States. We, I
12  believe, are a creditor of yours, but I'd like to
13  get into that and clarify that.
14    But just starting out, as far as personal
15  property is concerned, Mr. Aizenberg asked you about
16  that house on Wexford. You lived there for how many
17  year?
18    A.  13, 14.
19    Q.  And prior to Wexford, you lived in that
20  same community?
21    A.  Yes.
22    Q.  You had a big house there too? No?
23    A.  It's not that big.
24    Q.  Okay. Wexford was a pretty large size

Page 73

1  house, right?
2    A.  Yes.
3    Q.  Okay. And the contents of that house
4  were moved by moving trucks; isn't that correct?
5    A.  Partially by moving truck and partially
6  by a couple of people that worked for me, yes.
7    Q.  And where did those moving trucks take
8  that furniture?
9    A.  To 206, and as I said, people -- two
10  people brought trucks to take things from my house
11  because I moved into a much smaller house.
12    Q.  Who are those people?
13    A.  Friends of mine.
14    Q.  What are their names?
15    A.  Deborah Miller.
16    Q.  Any the other?
17    A.  Sue Campbell.
18    Q.  Sue Campbell?
19    A.  Yes.
20    Q.  And did they pay you for the things that
21  you gave them?
22    A.  No, I gave it to them.
23    Q.  Just gave it to them?
24    A.  It was old furniture, 15-year-old

19 (Pages 70 to 73)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 74

1  furniture.
2  Q.  Did you not put anything into a storage
3  locker?
4  A.  No.
5  Q.  Did you and your husband ever have a wine
6  collection?
7  MR. GOUVEIA: I'm sorry.  What was the
8  question?
9  BY MR. STEWART:
10  Q.  Did you or your husband ever have a wine
11  collection?
12  A.  Yes.
13  Q.  Okay.  And where is that wine collection
14  now?
15  A.  Rotting.  It's mostly gone.
16  Q.  Where is it located?
17  A.  What's left of it is located in the 206
18  house, and it's rotting.  It's not very good
19  anymore.
20  Q.  Was any of that wine collection given
21  away?
22  A.  No.
23  Q.  And was that wine collection listed in
24  the value of personal property that's on your

Page 75

1  schedule, your bankruptcy schedules?
2  A.  No, I don't think it's much of a
3  collection now.
4  Q.  Did you have it appraised recently?
5  A.  It's not that -- the wine is not that
6  good.  Okay?  We bought drinkable wine.  It was not
7  expensive wine, and it's been sitting there now for
8  years, and it was all meant to have been drunk by
9  now because it's not been replenished, so I would
10  not say that it's worth anything because most of
11  those bottles are bad.
12  Q.  Are you a wine expert?
13  A.  No, but I know when a bottle is bad.  I
14  know when it tastes like vinegar and when it
15  doesn't.
16  Q.  All right.  With regard -- still on
17  personal property, your husband, Peter, to your
18  knowledge, does he have any personal property?
19  A.  No, he has a watch or two.
20  Q.  And are you safekeeping any personal
21  property for Peter?
22  A.  No, cufflinks.
23  Q.  So when he went to Canada, he took all of
24  his possessions with him, his personal possessions?

Page 76

1  A.  Clothing.
2  Q.  Just clothing?
3  A.  Yes.
4  Q.  As a matter of fact, it was as early as
5  October, he bought two tickets for you and he to
6  Vancouver; isn't that correct?
7  A.  Correct.
8  Q.  Two round-trip tickets?
9  A.  Yes.
10  Q.  And you left early October.  You were
11  supposed to return in late October; isn't that
12  correct?
13  A.  Correct.
14  Q.  But you didn't return in late October,
15  did you?
16  A.  I did.
17  Q.  You returned in mid October, didn't you?
18  You changed the flight to the 15th or the 16th of
19  October?
20  A.  I don't believe I changed the flight.
21  Q.  You didn't come back in the end of
22  October, did you?
23  A.  I didn't come back on the 15th either.  I
24  believe I was there two weeks.  I left on about the

Page 77

1  11th maybe.
2  MR. GOUVEIA: What year are we talking about?
3  MR. STEWART: 2006.
4  MR. GOUVEIA: What year are we talking about?
5  THE WITNESS: 2006.  I can't remember.
6  BY MR. STEWART:
7  Q.  Is there a reason why you changed your
8  flight plans?
9  A.  He may have made them for the wrong week.
10  He did that frequently.  I don't know.  I can't
11  remember, honestly.
12  Q.  There is no event that stands out in your
13  mind as to why you might have changed those plans?
14  A.  No, I know I stayed two weeks.
15  Q.  Now, not listed amongst -- you had listed
16  a lot of litigation in your schedules, right?  Are
17  you aware of the fact -- you must be aware of the
18  fact that the United States has sued you personally;
19  isn't that correct?
20  A.  No, I thought -- trust me, I thought
21  these were all of my suits.
22  Q.  You are not familiar with the fact that
23  United States sued you, has sued you, and has a suit
24  pending for five-and-a-half million dollars,

20 (Pages 74 to 77)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 78

1  fraudulent transfer suit?
2      A.  Oh, yes, I guess.  Yes, I assumed it was
3  listed here as part of this.
4      Q.  Okay.  Well, it's not.  Is there some
5  reason for that?
6      A.  No, there is no reason for it other
7  than --
8      Q.  Are you going to amend your schedules to
9  include that suit?
10     A.  Yes, we will.
11     Q.  Okay.
12     MR. GOUVEIA:  Well, Mr. Stewart, rather than --
13  what lawsuit are you talking about that was --
14     MR. STEWART:  There is a supplemental
15  proceeding.
16     MR. GOUVEIA:  You obviously aren't surprised by
17  the fact that there is a lawsuit pending by the U.S.
18  government against her?
19     MR. STEWART:  Sorry?
20     MR. GOUVEIA:  You are not surprised by that?
21  The fact that she didn't put it on there, did it
22  surprise you?  You're aware of the lawsuit?
23     MR. STEWART:  Yes.  I'm not a debtor, though,
24  being questioned.

Page 79

1      MR. GOUVEIA:  Where is it pending?
2      MR. STEWART:  In the Northern District of
3  Illinois.
4      MR. GOUVEIA:  Is that not one of the lawsuits
5  listed on the schedules?
6      MR. STEWART:  It is not listed on the
7  schedules.  It's a supplementary proceeding to the
8  case that was brought against Peter Rogan.  Citation
9  to discovery assets was served on Mrs. Rogan.  In
10  the context of those citation proceedings, we sued
11  her for five-and-a-half million dollars.
12     THE WITNESS:  Honestly, I don't --
13  BY MR. STEWART:
14     Q.  You don't know anything about that?
15     A.  I mean, really, truly, they all run
16  together to me.  Okay.  So --
17     MR. GOUVEIA:  Is Mr. O'Rourke's firm
18  representing her in that lawsuit?
19     MR. STEWART:  Yes, as far as I know.  Although,
20  there is that motion to withdraw that's been filed.
21     MR. GOUVEIA:  You filed a motion to withdraw?
22     MR. STEWART:  Mr. O'Rourke did, yes.
23     MR. GOUVEIA:  Motion to withdraw.
24     MALE SPEAKER:  Do you have the cause number on

Page 80

1  that?
2      MR. STEWART:  That would be 0 C 3310.
3      MR. GOUVEIA:  0 C 3310?
4      MR. STEWART:  In the Northern District of
5  Illinois, and that would have been the main suit
6  against Peter, and then in the context of that
7  case --
8      MR. GOUVEIA:  That's listed United States v.
9  Peter.
10     MR. STEWART:  Right, but these are other
11  supplementary proceedings brought against Judith
12  individually.
13     MR. GOUVEIA:  So in federal court, that's a
14  separate lawsuit.
15     MR. STEWART:  Well, it's a lawsuit
16  supplementary proceedings.
17     MR. GOUVEIA:  I understand that's part of the
18  same lawsuit.
19     MR. STEWART:  Well, it is.  Well, it is
20  regarded as legal matters as a separate suit.
21  BY MR. STEWART:
22     Q.  Now, Mr. Aizenberg mentioned too that
23  Maine mortgage and the note; is that correct?
24     A.  Yes.

Page 81

1      Q.  And you are aware of the fact that I
2  wrote -- when we became aware of the possession of
3  that Maine mortgage and note several months ago, I
4  wrote to your attorney, Michael O'Rourke, and asked
5  for proof of what funds you used to purchase that
6  mortgage and note?
7      A.  Yes, I'm aware of that.
8      Q.  And you are aware of the fact that he
9  couldn't supply us with any evidence of that?
10     MR. GOUVEIA:  I think any questions about what
11  her attorney, Mr. O'Rourke, has done would be
12  privileged.
13  BY MR. STEWART:
14     Q.  Let me to get to this.  You are aware of
15  the fact that we have alleged to your attorney that
16  your possession of that Maine mortgage and note is
17  from a fraudulent transfer?
18     A.  No, I'm not aware of that, and I did pay
19  my husband for it.
20     MR. GOUVEIA:  And is that in the same lawsuit
21  she referred to?
22     MR. STEWART:  No, we have not filed anything
23  with regard to that property yet.
24

21 (Pages 78 to 81)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 82

BY MR. STEWART:
1 Q. What money did you pay your husband for
2 the Maine mortgage and note?
3 A. It came out of my accounts. I do not --
4 Q. You don't know which one?
5 A. No, I had a Skutter account that had
6 quite a bit of money in it years go. I drained
7 that. So I don't know.
8 Q. And wasn't the ultimate source of that
9 money Peter's money?
10 A. It would have been. I would have been a
11 long time ago, yes.
12 Q. I was a bit confused going over your
13 schedules. Before we get into the property and
14 things, do you understand that we have sued you
15 individually? The United States has sued you
16 individually for five-and-a-half million dollars?
17 A. I guess I do. I thought that -- I mean,
18 I didn't realize it was individually, but --
19 Q. We have also -- we had sued your husband
20 before, and we took a judgment against him for
21 $64 million. Now, there has been these other
22 proceedings that have gone on. One of the
23 foreclosure case you mentioned in your schedule --

Page 83

1 A. Yes.
2 Q. -- where we're seeking a foreclose
3 judgment lien on two pieces of property; the Wexford
4 property or now the proceeds of the Wexford
5 property, and then 55 East Erie condominium. You
6 are aware of that?
7 A. Yes.
8 Q. And you are aware of the critical issues
9 of both those properties as to who the properties
10 belongs to, are you not?
11 MR. GOUVEIA: I would object to the form of the
12 question. I don't think -- I would object to the
13 form of the question.
14 MR. STEWART: Well --
15 BY THE WITNESS:
16 A. Would you repeat the question?
17 BY MR. STEWART:
18 Q. In that foreclosure suit, we are seeking
19 to foreclose our judgment liens on the Erie property
20 and on the Wexford property?
21 A. Yes.
22 Q. And the critical issue in those cases is
23 who that property belongs to.
24 A. Yes.

Page 84

1 Q. Do you understand that to be true?
2 A. Yes.
3 Q. So if the Court should find that that
4 property belongs to you; that is, let's say the Erie
5 property, that it belongs to Judith Rogan and Peter
6 Rogan has no interest in it, that our judgment liens
7 will not attach to that property; do you
8 understand that to be true?
9 MR. GOUVEIA: Again, I object to the form of
10 the question. I think it asks for a legal
11 conclusion on her behalf, and I don't know that --
12 I'm not sure if too many lawyers can answer that,
13 much less her. So I object to the form.
14 MR. STEWART: It's very simple. It's the
15 critical issue of the foreclosure case --
16 MR. GOUVEIA: You have a law degree and you are
17 a practicing lawyer for a number of years, and I'm
18 sure to you it's a relatively easy question to
19 answer, but --
20 BY MR. STEWART:
21 Q. What I'm trying to clarify here is
22 that --
23 MR. GOUVEIA: Form. It calls for a legal
24 conclusion.

Page 85

1 BY MR. STEWART:
2 Q. If the district court should find that
3 that property belongs to you, then the United States
4 judgment against your husband won't mean nothing to
5 you because you could walk away with that property
6 at 55 East Erie; isn't that correct?
7 A. That would be correct, I guess. I
8 believe.
9 Q. So the judgment that we have against your
10 husband is not a liability against you personally;
11 isn't that correct?
12 A. It seems to be. From my experience, it
13 seems to be.
14 Q. I just wanted to clarify that.
15 MR. GOUVEIA: Well, she thinks it's a lien on
16 her property, which is what you --
17 BY THE WITNESS:
18 A. It's a lien on my property.
19 MR. STEWART: We can only lien property that
20 belongs to a judgment debtor.
21 MR. GOUVEIA: You filed a lien against her
22 property. You maintain that there is a lien on
23 the --
24 MR. STEWART: We have maintained that Mrs.

22 (Pages 82 to 85)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 86

1  Rogan is holding the property as a nominee of Peter
2  Rogan.
3      MR. GOUVEIA: I think what you said as far as a
4  legal conclusion, I agree with. You are asking a
5  nonlawyer to answer questions about what the
6  consequences of what you are doing is.
7      MR. STEWART: I'm just also trying to clarify
8  the schedules here because there is $184 million in
9  liabilities that are listed that I think is a
10  mischaracterization.
11      MALE SPEAKER: Well, that is liability on a
12  claim under the bankruptcy code. If you have a
13  claim on these assets, then it's a debt for purposes
14  of the bankruptcy code. I mean, they are not
15  recourse debt. There is a debt in a bankruptcy. So
16  I don't -- I'm the last guy here that knows
17  anything about what's going on. Trust me, but
18  anytime --
19      THE WITNESS: You would all be in front of me.
20      MALE SPEAKER: Because I get in my ordinary
21  Chapter 13 cases, I get debtors all the time that
22  have assumed a property, they don't take title to
23  it, and their lien files it in, and they are not
24  liability on it, and it's considered a debt for

Page 87

1  purposes of bankruptcy.
2      MR. AIZENBERG: It seems like --
3      MR. GOUVEIA: Let me say this for the record,
4  because when clients in bankruptcy ask about how you
5  put matters on the bankruptcy schedules, the
6  attorneys, and we certainly did with Mrs. Rogan, try
7  to represent what we felt was the best
8  representation of the debt. Now, I will agree with
9  you that none of this debt is Judy Rogan's. It's
10  debt that you claim because you claim your judgment
11  is against Peter Rogan. But you have leaned
12  property that belongs to Judy Rogan.
13      MR. STEWART: That's a conclusion.
14      MR. GOUVEIA: I'm sorry?
15      MR. STEWART: It's a legal conclusion that that
16  property belongs to Judith.
17      MR. GOUVEIA: No, no. The property that you
18  have leaned is in Judy Rogan's name. It is listed
19  as her property. It's always been in her name.
20  It's never been in anybody else's name. Your
21  argument is that the money that she got to buy that
22  property came from her husband. Therefore, it's his
23  property. That's your argument. That's a legal
24  argument.

Page 88

1      MR. STEWART: Right.
2      MR. GOUVEIA: But having listed it, you're
3  right, having listed that full amount as a debt
4  because of the way the government has proceeded with
5  putting a lien on her property, you have created the
6  impression that that amount is what's owed on the
7  property. Now, the value of the property may go up
8  and down. The amount that you placed against that
9  property is constant, and that's what Mr. Chales
10  experience and mine is.
11      MR. STEWART: I just wanted to make sure
12  everybody was clear about the situation.
13      MR. GOUVEIA: Yes, I think we are. I think we
14  are. But that's why we did it the way we did it.
15  We did think about it.
16  BY MR. STEWART:
17      Q. Let's say that going on with this more,
18  say the Erie property is declared by the district
19  court judge in Chicago to be Peter's property and
20  not yours, okay, just assume that for a moment, do
21  you believe that if that court decided that, that
22  you would still have an interest in the Erie
23  property by virtue of your marriage to Peter?
24      MR. GOUVEIA: I'm going to object to the form

Page 89

1  of the question again because it calls for a legal
2  conclusion.
3      MR. STEWART: I just want to know her
4  understanding. I'm not asking for a legal
5  conclusion. I just want to know whether Ms. Rogan
6  believes that if this property is found, the Erie
7  condo is found to be property of Peter Rogan
8  totally, you have no interest in it, the judge says
9  no, Judy, you have no interest in it, it belongs all
10  to Peter.
11  BY MR. STEWART:
12      Q. Do you believe that you will still have
13  an interest in that property by virtue of your
14  marriage to Peter?
15      A. I don't know.
16      Q. Okay. And that's all I'm trying to
17  understand is just whether you are making any claim
18  to any of these properties that a court may find
19  Peter is the actual owner of?
20      A. I'm making a claim because they're mine.
21      Q. Okay. Because you purchased it out of
22  money that came from an account in your name, for
23  instance?
24      A. Yes.

23 (Pages 86 to 89)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 90

1     Q.   Okay. But not because you are married to
2 Peter?
3     A.   I don't understand that.
4     MR. GOUVEIA: I don't understand the form of
5 that question.
6 BY MR. STEWART:
7     Q.   I'm trying to understand if -- let's just
8 do away with --
9     MR. GOUVEIA: Let me ask you this. Can we go
10 off the record for a second.
11         (WHEREUPON, discussion was had
12         off the record.)
13 BY MR. STEWART:
14     Q.   I understand that your schedules need to
15 be updated because you are working right now?
16     A.   Yes.
17     Q.   You are earning a wage, I understand, at
18 a doctor's office?
19     A.   Yes.
20     Q.   At a doctor's office, is that the same
21 one that's listed on the schedules?
22     A.   Yes.
23     Q.   Have you had a paycheck yet?
24     A.   No.

Page 91

1     Q.   You have not gotten a paycheck? Okay.
2 Let's assume you got a paycheck today, when was the
3 last time prior to today that you received a
4 paycheck?
5     A.   1974.
6     Q.   And it was a paycheck for what?
7     A.   I was a teacher. I can't remember what I
8 made.
9     Q.   So do I assume correctly that the last
10 time you worked as a teacher was 1974?
11     A.   No, 1978. Sorry.
12     Q.   That was the last time you received a
13 salary or a wage?
14     A.   Yes. There may have been some small
15 things in the middle, but yes.
16     Q.   1978. Since 1978, well -- strike that.
17         Did you receive any inheritance from your
18 father?
19     A.   No.
20     Q.   What about from your mother?
21     A.   She's alive.
22     Q.   She's alive? Okay. Has your mom gifted
23 you any money?
24     A.   No.

Page 92

1     Q.   Besides your mother --
2     A.   Other than --
3     MR. GOUVEIA: She's been living with her.
4 BY THE WITNESS:
5     A.   She's supporting me right now on her
6 Social Security.
7 BY MR. STEWART:
8     Q.   Okay. I'm talking about -- besides your
9 mom then and besides Peter, has anybody else given
10 you any property over the last five years?
11     A.   No.
12     Q.   So is it safe to say that since 1978, the
13 only property that you have received you received
14 from Peter?
15     A.   Yes.
16     Q.   Did you talk with Peter when you were
17 preparing your schedules --
18     A.   No.
19     Q.   -- in this bankruptcy?
20     MR. GOUVEIA: You can answer.
21 BY THE WITNESS:
22     A.   Other than to put the rent on our
23 schedules because his lawyer asked me.
24

Page 93

1 BY MR. STEWART:
2     Q.   So you did talk to him?
3     A.   Very briefly. It was only about the
4 $4200 in rent because his lawyer was concerned that
5 it was on both schedules, and we just said we are
6 not going to pay it twice.
7     Q.   You said that a couple of times now, both
8 schedules. What do you mean both schedules?
9     A.   The one in Canada, and then mine for
10 here.
11     Q.   Which schedule are you talking about? Do
12 you have a schedule from Canada?
13     A.   I don't know, but his lawyer was talking
14 to me about it.
15     Q.   Did you file bankruptcy in Canada?
16     A.   I don't think so.
17     Q.   Why would he have to file -- why would
18 Peter have to file a schedule in Canada?
19     A.   I think it has to do with the suit up
20 there. I don't know. I don't know. She just asked
21 if I knew that I could pay it or not.
22     Q.   Now, with regard to the money that your
23 children pay in connection with the Erie condo, do
24 they give that to you, and then you pay assessments?

24 (Pages 90 to 93)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 94

1 They just pay the assessments?
2 MR. GOUVEIA: You have to answer for the
3 record.
4 BY THE WITNESS:
5 A. Yes, they pay it straight to the
6 building, to Sudler, the managing people.
7 BY MR. STEWART:
8 Q. Is that going to be declared income to
9 you, the money that they pay?
10 A. I wouldn't think so.
11 MR. GOUVEIA: You have to check with an
12 accountant about that. Do you know that?
13 THE WITNESS: I don't know. I don't have any
14 idea.
15 MR. GOUVEIA: Will you check with your
16 accountant about that?
17 THE WITNESS: I certainly could.
18 BY MR. STEWART:
19 Q. In your plan of organization, I think
20 that you say in the first 12 months, you are going
21 to pay like $100 a month towards creditors, and then
22 after that, you are going to file some sort of
23 amendment schedule. Where do you think the income
24 is going to come to fund this plan?

Page 95

1 A. I was just hoping that we would get
2 something freed up.
3 Q. From where?
4 A. From some of my accounts.
5 Q. Your mom's only source of income is
6 Social Security?
7 A. Yes.
8 Q. Did you bring a wallet today? You
9 brought a purse?
10 A. I brought a wallet, yes.
11 Q. You have a wallet? Can you open it up.
12 I'd like to see how much cash you have, and I would
13 like you to layout your credit cards.
14 A. I don't have any credit cards anymore.
15 They're gone. So I don't carry them anymore.
16 Q. Do you have any cash on you?
17 MR. GOUVEIA: Let the record show that the
18 debtor has $87, and Indiana driver's license, AAA
19 card, Hallmark card.
20 THE WITNESS: Rewards.
21 MR. GOUVEIA: Rewards card for AARP Medicare
22 card, Sam's club card, and a Cosco card.
23 BY MR. STEWART:
24 Q. No other credit cards, like house cards,

Page 96

1 no like American Express?
2 A. They're closed.
3 MR. GOUVEIA: You have to answer yes or no.
4 BY THE WITNESS:
5 A. No.
6 BY MR. STEWART:
7 Q. So what did you do with those cards?
8 A. They're in a pile at home.
9 Q. Do you have a passport?
10 A. Yes.
11 Q. Is that with you today too?
12 A. Yes.
13 Q. Can I see it?
14 Besides Canada, have you traveled any
15 place else in the last, say, two years?
16 A. In the last two years?
17 Q. There is a stamp here for the Bahamas for
18 April of 2007.
19 MR. GOUVEIA: Wait a minute. There is a
20 question pending before the witness. She was asked
21 whether has traveled any place in the past three
22 years.
23 BY THE WITNESS:
24 A. I went to Mexico, and the Bahamas. I'm

Page 97

1 trying to remember if I went to England in the last
2 two years.
3 MR. GOUVEIA: I'm assuming the question is have
4 you traveled to a foreign country in the past three
5 years.
6 THE WITNESS: Okay.
7 BY MR. STEWART:
8 Q. Have you traveled to a foreign country?
9 A. Yes, Mexico, Bahamas, and Cayman Islands.
10 Q. When you were in the Bahamas, did you go
11 into a bank at all?
12 A. I did not.
13 Q. Did you need cash when you were there?
14 A. I took cash.
15 Q. You took cash with you? Okay. And what
16 about when you were in the Cayman Islands, did you
17 go into a bank in the Cayman Island?
18 A. That was years ago. No, I did not go to
19 a bank at all.
20 MR. GOUVEIA: How many years did you go to the
21 Cayman Islands?
22 THE WITNESS: Years.
23 MR. GOUVEIA: Are you saying five years, ten
24 years?

25 (Pages 94 to 97)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 98

BY MR. STEWART:
1. Q. July 2004?
2. A. Oh, that's four years, four years. It was -- I was there over a weekend. It was a wedding or something.
3. Q. And that was Fred Cuppy's wedding, wasn't it?
4. A. Yes.
5. Q. Did you go to a bank when you were in the Cayman Islands?
6. A. I did not.
7. Q. What did you use for cash when you were there?
8. A. I took -- I travel with cash or did.
9. Q. And you were just in China recently?
10. A. Yes.
11. Q. And did you do the same thing there, just took cash with you?
12. A. Yes.
13. Q. And you used a credit card, right?
14. A. I used a credit card, yes.
15. Q. Did you get cash from your credit cards?
16. A. I don't think so, no. No. I just took cash.

Page 99

1. MR. STEWART: We will want a copy of that.
2. MR. GOUVEIA: I'm sorry?
3. MR. STEWART: I want to get a copy of that.
4. MR. GOUVEIA: I'm not sure that you are entitled to a copy of the passport, but we'll consider it.
5. BY MR. STEWART:
6. Q. Now, at some point in time just before the judgment was entered against your husband, Peter, you attempted to get a credit card, you and he did, didn't you, that would tap into the money at the Oceanic Bank?
7. A. I don't remember that.
8. Q. You don't remember that?
9. A. I don't remember that, no.
10. Q. You don't remember filling out an application for a credit card?
11. A. I could have. I could have. I don't remember.
12. Q. Was there any -- is there any credit cards or cash cards that you have or debit cards that you have right now --
13. MR. GOUVEIA: That's been asked and answered. Oh, I'm sorry.

Page 100

BY MR. STEWART:
1. Q. -- where you can get money from any bank that's not listed in your bankruptcy schedules?
2. A. No, no.
3. Q. Did you have a safe deposit box?
4. A. I did years ago.
5. Q. Where at?
6. A. It was at First National Bank, which is now First Source at the branch bank, but they got rid of them, and I never went anyplace else.
7. Q. What did you keep there?
8. A. My husband's mother had a watch that she gave me, not much else.
9. Q. Do you still have that watch?
10. A. No -- oh, the watch? Yes, it's an old watch. I kept my grandmother's wedding ring in it. The watch didn't work. It was just a --
11. Q. So the watch and the wedding ring you put in there?
12. A. I put my grandmother's wedding ring in there.
13. Q. Anything else?
14. A. Not much else. I mean, I didn't like going.

Page 101

1. Q. And so those you keep at home now? As far as your jewelry goes, did you -- do you have an insurance policy?
2. A. Yes.
3. Q. Do you have renter's insurance right now?
4. A. Yes.
5. Q. Something like that --
6. A. Yes.
7. Q. -- to insure the contents of your home. Is there any schedules of that insurance policy?
8. A. Uh-hum.
9. Q. As far as individual pieces of property being insured.
10. A. There is three or four, yes. I think my watch, and I have a diamond. I can't remember what else is on the schedule.
11. Q. So you have listed out values for those?
12. A. Appraised values.
13. Q. Appraised values?
14. A. Appraised values.
15. Q. Okay. That's how you came up with a $20,000 number on your schedules?
16. A. I don't have any idea what the difference is with appraised value and real value is, so --

26 (Pages 98 to 101)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 102

1  MR. GOUVEIA: Appraised value is something that
2  somebody tells you it's worth, and real value is
3  what somebody is willing to pay for it.
4  THE WITNESS: Right, right.
5  MR. GOUVEIA: Do you know what the real value
6  of it is?
7  THE WITNESS: No, I don't remember the real
8  value.
9  MR. GOUVEIA: But you do know what the
10  appraised value is?
11  THE WITNESS: Yes.
12  MR. GOUVEIA: And those are the values that you
13  put on your schedules?
14  THE WITNESS: We put the -- we didn't put the
15  appraised value on it. We put the --
16  MR. GOUVEIA: What you thought something was
17  worth?
18  THE WITNESS: Right, right.
19  BY MR. STEWART:
20  Q.  How -- how much did you say it was worth
21  in the insurance policy?
22  A.  In the insurance policy, I think they are
23  listed for $200,000, maybe $189,000, $170,000. I
24  can't remember.

Page 103

1  MR. STEWART: I'd like to see copies of the
2  insurance policies with the schedules on them.
3  BY MR. STEWART:
4  Q.  If you want to pull up the schedules
5  again, I still have a few questions about those.
6  Mr. Aizenberg did a complete job. I just have one
7  or two things to go over.
8  In the summary of schedules that was
9  amended, you don't list anybody under co-debtors; is
10  that correct? Is that an oversight? I guess it
11  would be Schedule G. I was looking at the summary,
12  but we can go to the actual Schedule G. It's H.
13  Co-debtors, okay, you do list Peter Rogan as a
14  co-debtor, on both the debts to the United States
15  and to Dexia Credit. I just didn't see that listed
16  on the summary. Okay.
17  MR. GOUVEIA: I think there is no dollar
18  amounts.
19  THE WITNESS: No.
20  MALE SPEAKER: There isn't a dollar amount. I
21  don't know what software he uses, but a lot of the
22  softwares only pull a number if there is any dollar
23  amount in there.
24  THE STEWART: I just wanted to make sure I

Page 104

1  understood.
2  MR. GOUVEIA: The dollar amounts.
3  BY MR. STEWART:
4  Q.  Now, John, there is an accounts
5  receivable to John Rogan. He is not paying any
6  money, is he, on a monthly basis?
7  MR. GOUVEIA: You have to answer for the
8  record.
9  BY THE WITNESS:
10  A.  No. Sorry, sorry. No. I was just --
11  BY MR. STEWART:
12  Q.  Do you know if that was paid for? That's
13  all paid for? You don't owe any money on that?
14  A.  On what?
15  Q.  On the Hyundai?
16  A.  The Hyundai, yes.
17  Q.  I don't know how to say that. That's all
18  paid in full?
19  A.  Yes.
20  Q.  The cash that you have, the $87, there is
21  only $20 listed here. What is that --
22  A.  For my mother.
23  Q.  She got it from Social Security?
24  A.  Yes.

Page 105

1  Q.  David Talshow, he was an employee of the
2  decorating business. And how long was the
3  decorating business going on?
4  A.  Maybe the last -- I'm trying to remember.
5  Year and a half maybe.
6  Q.  Year and a half?
7  A.  Yes. I was trying to start something.
8  Q.  18 months?
9  A.  Maybe, maybe.
10  Q.  What do you think the decorating business
11  grossed over those 18 months?
12  A.  It didn't because as I said, I got
13  involved with all of this, and it just sat there,
14  so --
15  Q.  You had David Talshow's expenses, but you
16  had no income coming into that business?
17  A.  No, no.
18  Q.  But he worked for you before you had this
19  decorating business, right?
20  A.  He worked for my husband's company. I
21  don't know which one.
22  Q.  M.D. DuSchantz, that's who you work for
23  now?
24  A.  Yes.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 106

1      Q.   That $20,000 loan was paid to O'Rourke
2  and to your present counsel?
3      A.   Correct.
4      Q.   The other utilities, Direct T.V., cell
5  phones, internet, land line, how many cell phones do
6  you have?
7      A.   I have mine and my mother's and my
8  husband's that I still pay for.  Those are on my
9  account.
10     Q.   So the cell phones, part of it you're
11 paying for Peter's cell phone?
12     MALE SPEAKER:  You need to answer out loud.
13 You need to answer out loud.
14 BY THE WITNESS:
15     A.   Sorry.  Yes, yes.  Sorry.
16 BY MR. STEWART:
17     Q.   Why are you paying Peter's cell phone?
18     MR. GOUVEIA:  I would object to the form of the
19 question.  It calls for some kind of subjective
20 response, as opposed to that she's paying for it.
21 But I guess you can answer that question.
22 BY THE WITNESS:
23     A.   It's bundled into my bundle.
24

Page 107

1  BY MR. STEWART:
2      Q.   Are you legally obligated to Peter to pay
3  for his cell phone?
4      MR. GOUVEIA:  I will object to the form of that
5  question.
6      MR. STEWART:  Legal obligation --
7      MR. GOUVEIA:  It calls for a conclusion.
8  Legally obligated?  Well, I guess you can answer.
9  Are you legally obligated?
10 BY THE WITNESS:
11     A.   I don't know.  I mean, I assume --
12     MR. GOUVEIA:  Are you legally obligated?
13 BY THE WITNESS:
14     A.   I don't know whether I'm legally
15 obligated.  Would I pay for his expenses --
16     MR. GOUVEIA:  Is there a court order saying
17 that --
18     THE WITNESS:  No, no.
19     MALE SPEAKER:  You said it was a bundle.  Is it
20 part of your contract?
21     THE WITNESS:  It's part of Verizon, Direct
22 T.V., land line, phone line, internet.  It's a
23 bundle.
24     MR. GOUVEIA:  Well, in that way, it's legally

Page 108

1  obligated.
2  BY MR. STEWART:
3      Q.   During the course -- you have been
4  married to Peter for how long?
5      A.   Since 1975.
6      Q.   '75?  Were there any understanding that
7  the two of you had about how to deal with money?
8      A.   We certainly would share it.  I certainly
9  got money in my account over the years to pay for
10 things, pay utilities of the house, and pay for
11 things, and pay for whatever we needed.  We didn't
12 ever really have questions about money.
13     Q.   Did there ever come a point in time when
14 it became more formal, where you and Peter sat down,
15 and you had an agreement saying, "Okay.  This is how
16 we are going to have property.  I'm going to have
17 this, and you're going to have that, or we are going
18 to share this"?
19     A.   Well, I had the property in my name
20 because we chose -- I decided not to go back to
21 work.  So I had the properties in my name.  That
22 was --
23     Q.   The property, you mean the Wexford
24 property?

Page 109

1      A.   The Wexford property, and eventually the
2  Erie property.  I had the lot in Florida.  All those
3  were in my name.  I did that for my own little
4  security.
5      MR. GOUVEIA:  Retirement accounts.
6  BY THE WITNESS:
7      A.   Retirement things and my retirement
8  accounts.
9  BY MR. STEWART:
10     Q.   Was that a part of -- I guess my
11 question still is was that a part of an agreement
12 with Peter?
13     A.   Yes, my agreement to have some things in
14 my own name and to have some cash in my name over
15 the years for my sense of security because I didn't
16 go back to work.
17     Q.   Okay.  And what would be some of those
18 eventualities or some of those things you were
19 protecting against?
20     A.   Death, dying.
21     Q.   Of whose?
22     A.   His.
23     Q.   Peter's?  Did he maintain a life
24 insurance policy?

28 (Pages 106 to 109)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 110

1    A.   He did for while.  I don't know that he
2  has one now.  We had the trust.
3    Q.   Well --
4    A.   Early on, he had a life insurance policy
5  to protect, but I just felt if I divorced, I wanted
6  some things in my name.  I just wanted some things
7  in my own name.  It was, as I said, my mother
8  struggled to raise us, and I didn't plan on doing
9  the same thing.
10    Q.   So but this arrangement, there is nothing
11  in writing about it?
12    A.   There's nothing in writing.  It was mine.
13    Q.   Did you sit down one day and have a
14  discussion with Peter where all this was hammered
15  out, or did some of it progress over a period of
16  time?
17    A.   Progressed over the -- when we did our
18  wills.  I'm not sure exactly the year.  In the late
19  '80s, we redid our wills, and got into some of the
20  planning with the kids and things, but mostly my
21  sense of security because I had seen my mother
22  struggle to raise us.
23    Q.   The Decorative Services, you have listed
24  here out of 55 East Erie?

Page 111

1    A.   Because John Foley is an Illinois
2  attorney.  I forgot.  I wanted it out of Indiana.
3  We did the corporation together, and he just did it
4  in Illinois.
5    Q.   Did you actually work out of 55 East
6  Erie?
7    A.   No.
8    Q.   Do you ever stay -- well --
9    A.   Some.  I stay there.  I shouldn't say I
10  never did do anything out of that.
11    Q.   You stayed there like how often?
12    A.   Not as often as I used to because my kids
13  live there.
14    Q.   When did your kids start living there?
15    A.   My daughter moved in late spring.  I
16  would say late June.
17    Q.   Late June?  Okay.
18    A.   Maybe a little bit before that.
19    MR. GOUVEIA:  What year are we talking about?
20    THE WITNESS:  This year, 2008.
21  BY MR. STEWART:
22    Q.   This year?  She was living in California
23  before that?
24    A.   Yes.  And then my son and his wife moved

Page 112

1  in August when he left his job.
2    Q.   Of this year?
3    A.   Of this year.
4    Q.   August?  Okay.  So prior to June, who was
5  -- prior to June of 2008, who was occupying the Erie
6  condo?
7    A.   Nobody, except me sometimes when I would
8  go down.
9    Q.   So how often do you think you were there?
10    A.   I don't know.  It varied.  Sometimes I
11  would be there for a weekend, or sometimes I would
12  be there for longer, but not very much time.
13    Q.   And you get into the Erie condo by using
14  a card or something like that?
15    A.   A key faub.
16    Q.   A key faub?  And who has the key faubs?
17  How many are there, first of all?
18    A.   I don't know.  Who has one now, Brian,
19  Colleen, his wife, Kate, me.  I think that's all we
20  have.
21    Q.   Is that the extent of it; there is just
22  four faubs?
23    A.   There might be five.  I'm not sure.  I
24  don't know that one is working, and Brian and

Page 113

1  Colleen just ordered two, a new one because one of
2  them wasn't working, so I'm not sure.  But I never
3  had more than that.
4    Q.   So you would go to the Erie condo on the
5  weekend sometimes and during the week sometimes?
6    MR. GOUVEIA:  That has been asked and answered.
7  She said occasionally.
8    MR. STEWART:  I'm trying to get a sense.
9    MR. GOUVEIA:  You have asked it several times
10  to attempt, I assume --
11  BY THE WITNESS:
12    A.   Not very often.
13    MR. GOUVEIA:  You went there on weekends?
14    THE WITNESS:  Occasionally.
15    MR. STEWART:  Okay.  So you will provide us
16  with the insurance policies with the schedules?
17    MR. GOUVEIA:  Yes.
18    MR. AIZENBERG:  And a copy of the passport?
19    MR. GOUVEIA:  No.
20    MR. AIZENBERG:  You won't provide that to us.
21    MR. GOUVEIA:  I didn't say that.  My previous
22  response was that we would consider it, take a look
23  at what rights you have to a passport.  I'm not
24  sure.  Passport information is confidential under

29 (Pages 110 to 113)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 114

1  some statutes in the United States. I don't know
2  that you are entitled to any of it. The request has
3  come from the U.S. Attorney's Office. I treat that
4  with a little more --
5      MR. STEWART: We're just a creditor for $64
6  million.
7      MR. GOUVEIA: I treat that with a little bit
8  more deference in terms of the availability of the
9  passport.
10      MR. AIZENBERG: I think one of the issue in
11  bankruptcy is residency over the last -- you have to
12  be in a certain place. I'm not a real bankruptcy
13  guy, but you have to be in a certain place for a
14  certain amount of time.
15      MR. GOUVEIA: It depends on how the passport
16  proves that.
17      MR. AIZENBERG: Sure. It would show when she
18  has been in and out of the country and how long.
19      MR. GOUVEIA: As I said, we'll take a look at
20  it.
21      MR. AIZENBERG: You asked for the relevancy.
22  That's the relevancy.
23      MR. GOUVEIA: Well, that's not relevant at all.
24  A passport doesn't prove residency in any stretch of

Page 115

1  the imagination. You can spend 99 percent of your
2  time in the Bahamas under a tent and still reside in
3  Chicago, Illinois.
4      MR. AIZENBERG: I think you have to be in the
5  place.
6      MR. GOUVEIA: Residency has nothing to do with
7  where you physically are.
8      MALE SPEAKER: I don't know if I remember the
9  rules on domicile and all that. You are renting a
10  place there. You got a passport. I'm telling you
11  that's what it's about.
12      MR. GOUVEIA: Under a tent in the Bahamas
13  doesn't matter. She wasn't down there long anyway.
14  She testified that she was in the Caymans for a
15  week.
16      MR. AIZENBERG: Providing a passport should be
17  a problem.
18      THE WITNESS: Actually, I'm sure you have a
19  copy of it, Mr. Stewart.
20      MR. GOUVEIA: We don't give information on
21  passports to people willingly, whether legal or
22  otherwise. Whether the government is entitled to
23  one, that may very well be. I'm not sure. I know
24  it wasn't too long ago, the government got somebody

Page 116

1  in the passport office got in all kinds of trouble
2  for disclosing information on passports. I don't
3  know. I think passports might be protected by
4  United States government for a lot of different
5  reasons.
6      MALE SPEAKER: Well, the easy answer to that is
7  if there is an issue on it, the rules of discovery
8  apply. You can file a discovery request, and if
9  there is an objection to it, the judge can decide
10  because I'm not equipped -- I don't know, and that's
11  not my job.
12      MR. STEWART: I just have one more questions.
13  BY MR. STEWART:
14      Q.   We were talking before about how you
15  would fund a plan potentially, and so if it turned
16  out that Judge Kennelly decides that all these trust
17  funds, we'll call them, are really Peter's property
18  and not yours, you really wouldn't have any money to
19  fund this bankruptcy plan, will you?
20      A.   No, not unless you free up what is in my
21  name, you know, the moneys in my accounts.
22      Q.   Again, assuming one state of facts, which
23  is that Judge Kennelly decided that all of this
24  money is Peter's really and not yours, then you

Page 117

1  would have no money to fund any bankruptcy plan?
2      MS. GARGULA: I think that is being
3  argumentative. She indicated that she has got a
4  job. There might be a way that that plan could be
5  put together.
6      MR. STEWART: That's where my question is going
7  to.
8  BY MR. STEWART:
9      A.   I'm saying without that income from the
10  trust, I guess what other income would you use to
11  fund the plan?
12      MR. GOUVEIA: She is employed, and I assume she
13  is working part-time now, but she has Social
14  Security.
15  BY MR. STEWART:
16      Q.   You make how much per hour?
17      A.   $15 an hour maybe.
18      Q.   $50 an hour?
19      A.   $15.
20      Q.   And how many hours a week are you
21  working?
22      A.   When I'm not here, I'm trying to work.
23  It varies.
24      Q.   Have you committed to a certain number of

30 (Pages 114 to 117)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS, NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 118

1 hours a week?
2    A.   Three days at least, but I can work more
3 than that if I'm not in court.
4    MS. GARGULA:  I'm sure you are aware that the
5 Chapter 13 plan and the procedure, she only has to
6 pay to her unsecured creditors money equal to
7 nonexempt property.  Assuming that Judge Kennelly
8 takes all of her property, she only has to make a
9 minimal distribution to unsecured creditors.  We can
10 talk about that.
11    MR. GOUVEIA:  And $100 might --
12    MS. GARGULA:  And $100 might be way too much a
13 month.  So she can still fund the plan.
14    MR. STEWART:  The United States might be
15 regarded as a secured creditor.
16    MS. GARGULA:  If you don't have any property,
17 we can do a motion to determine the value of your
18 security interest, and if Judge Kennelly takes
19 everything, then you're not a secured creditor
20 anymore.  You're unsecured, whatever every other
21 unsecured creditor gets.
22    MR. GOUVEIA:  You just drop down to the
23 unsecured class.  You've got everything.  You can't
24 get blood from a turnip.

Page 119

1    MS. GARGULA:  That's why we have bankruptcy.
2    MR. STEWART:  We have potential for a five and
3 a half million dollar judgement against Mrs. Rogan.
4 And if it turns out that she has property, if it
5 turns out that the District Court should say that
6 half of Erie belongs to her, we'll have a lien on
7 that property for five and a half million dollars.
8    MS. GARGULA:  Your hypothetical was based on
9 Judge Kennelly taking everything and giving it to
10 whatever creditors there are, so if she doesn't have
11 any assets left --
12    MR. STEWART:  Then you assumed another state of
13 facts, which was that there would be only unsecured
14 creditors, no assets left, and my counter to that
15 was that there may be a little bit of both.  There
16 may be assets, portions of these assets, and our
17 five and a half million judgment dollars against
18 Ms. Rogan.
19    MS. GARGULA:  Are you talking settlement, then?
20 Are you releasing funds?
21    MR. STEWART:  Not at all.  Not at all.  I'm
22 saying --
23    MS. GARGULA:  Well, then your hypothetical
24 keeps changing here.

Page 120

1    MR. STEWART:  You offered a new one, and I was
2 just trying to respond to that.
3    MR. GOUVEIA:  Well, we are all open to
4 discussions with the United States government in
5 terms of resolution of this, and we hope, in all
6 honesty, we hope that maybe somewhere down the line,
7 some resolution of this could be made on behalf of
8 Mrs. Rogan.
9    MR. STEWART:  We are all ears.
10    MR. GOUVEIA:  We'll try to chat with you about
11 those.
12    MALE SPEAKER:  If you have any questions -- are
13 you all set?  Anything else?
14    MR. STEWART:  We're all set.  Continuing on
15 getting these documents that --
16    MALE SPEAKER:  You have got discovery rules.
17 Thanks.  We are going to show this meeting as
18 concluded, then, on the 10th of November.  Thank
19 you.
20       (WHEREUPON, the CD Audio disk was
21       concluded.)
22
23
24

Page 121

1 STATE OF ILLINOIS )
2                   ) SS:
3 COUNTY OF C O O K )
4
5    I, MIGDALIA MONTERO, a Certified Shorthand
6 Reporter of the State of Illinois, do hereby certify
7 that I transcribed the CD audio of the proceedings
8 had the hearing aforesaid, and that the foregoing is
9 as true and complete a transcription as possible of
10 the CD audio of the proceedings transcribed under my
11 personal direction.
12    IN WITNESS WHEREOF, I do hereunto set my
13 hand at Chicago, Illinois, this 15th day of January,
14 2009.
15
16       MIGDALIA MONTERO
17       Certified Shorthand Reporter
18
19 C.S.R. Certificate No. 84-4383.
20
21
22
23
24

31 (Pages 118 to 121)

THE AUDIO TRANSCRIPTION OF PROCEEDINGS,  NOVEMBER 10, 2008
IN RE: JUDITH K. ROGAN

Page 122

```
 1              I N D E X
 2
 3    WITNESS            DX  CX  RDX  RCX
 4    JUDITH K. ROGAN
 5       By Mr. Aizenberg    5
 6       By Mr. Stewart     72
 7
 8
 9            E X H I B I T S
10
11    NUMBER         MARKED FOR ID   RECEIVED
12
13          No Exhibits Marked.
14
15
16
17
18
19
20
21
22
23
24
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950