```
 1

 2                  UNITED STATES BANKRUPTCY COURT
                    NORTHERN DISTRICT OF INDIANA
 3                        HAMMOND DIVISION
 4   IN RE:  JUDITH K. ROGAN           )
                                       ) CASE NO. 08-23221
 5                                     )      Chapter 13
 6                        February 20, 2009
 7            -----------------------------
              HONORABLE J. PHILIP KLINGEBERGER
 8            -----------------------------
 9         HEARING ON APPLICATION BY THE DEBTOR TO
           EMPLOY GAYLEN DABBAS AS SPECIAL COUNSEL;
10         HEARING ON MOTION BY DEXIA CREDIT TO LIFT
           THE AUTOMATIC STAY WITH RESPECT TO PENDING
11         LITIGATION; HEARING ON MOTION BY THE UNITED
           STATES OF AMERICA TO LIFT THE AUTOMATIC STAY
12
     APPEARANCES:
13
     JULIA M. HOHAM, ESQ.          GORDON E. GOUVEIA, ESQ.
14   401 West 84th Drive, Suite C  433 West 84th Drive
     Merrillville, IN  46410       Merrillville, IN  46410
15
     Appearing on Behalf of        Appearing on Behalf of
16   the Chapter 13 Trustee        the Debtor
17
     CATHERINE MOLNAR-BONCELA, ESQ. GABRIEL AIZENBERG, ESQ.
18   433 West 84th Drive           321 N. Clark Street, Suite 3400
     Merrillville, IN  46410       Chicago, IL  60654
19
     Appearing on Behalf of        Appearing on Behalf of
20   the Debtor                    Dexia Credit Local
21
     JOSEPH A. STEWART, ESQ.
22   U.S. Attorney's Office
     219 S. Dearborn Street
23   5th Floor
     Chicago, IL  60604
24
     Appearing on Behalf of
25   the United States of America
```

**PLAINTIFF'S EXHIBIT**

854

Page 2

I N D E X

WITNESSES CALLED BY THE DEBTOR:

MICHAEL J. O'ROURKE

    (An affidavit was submitted
    in lieu of direct examination.)
CROSS-EXAMINATION
    BY MR. AIZENBERG.................... Page 42

CROSS-EXAMINATION
    BY MR. STEWART.................... Page 69
REDIRECT EXAMINATION
    BY MS. MOLNAR-BONCELA.............. Page 80

REDIRECT EXAMINATION
    BY MR. GOUVEIA.................... Page 89
RECROSS-EXAMINATION
    BY MR. AIZENBERG.................... Page 100

JUDITH K. ROGAN
DIRECT EXAMINATION
    BY MS. MOLNAR-BONCELA.............. Page 107

CROSS-EXAMINATION
    BY MR. AIZENBERG.................... Page 115
CROSS-EXAMINATION
    BY MR. STEWART.................... Page 142

REDIRECT EXAMINATION
    BY MR. GOUVEIA.................... Page 154
REDIRECT EXAMINATION
    BY MS. MOLNAR-BONCELA.............. Page 160

RECROSS-EXAMINATION
    BY MR. AIZENBERG.................... Page 162
RECROSS-EXAMINATION
    BY MR. STEWART.................... Page 163

Page 3

1    THE COURT: Good afternoon. Okay. There are three
2  matters before the Court this afternoon in the Chapter 13
3  case of Judith K. Rogan, Case No. 08-23221. One is an
4  application by the debtor to employ Gaylen Dabbas as special
5  counsel. Another is the motion by Dexia Credit to lift the
6  automatic stay with respect to pending litigation. And the
7  third is a similar motion by the United States of America to
8  also lift the automatic stay.
9    Would whoever is here actually representing a party in
10  this proceeding please state your name and whom you're
11  representing.
12    MR. GOUVEIA: Gordon Gouveia on behalf of Judy Rogan.
13    MS. MOLNAR-BONCELA: Cathy Molnar-Boncela on behalf of
14  Judy Rogan.
15    MR. AIZENBERG: Gabriel Aizenberg on behalf of Dexia.
16    MR. STEWART: Joseph Stewart on behalf of the United
17  States.
18    MS. HOHAM: Julia Hoham on behalf of Paul Chael, the
19  trustee.
20    THE COURT: Thank you. Let's take up the application
21  first. I think we can get that done pretty quickly. This
22  is an application by the debtor to employ counsel, as I
23  understand it, with respect to matters that are pending in
24  Canada; is that correct?
25    MR. GOUVEIA: Yes, it is, your Honor.

Page 4

1    MS. MOLNAR-BONCELA: Yes, your Honor.
2    THE COURT: And Dexia has objected to that
3  application.
4    Turning to the debtor, given that, as Dexia has noted,
5  a stay is in effect with respect to the debtor in Canada
6  and, to my knowledge, I haven't heard anybody say they're
7  violating it, why is it necessary for the debtor to have
8  counsel at this moment to do anything in Canada?
9    MR. GOUVEIA: Well, we don't know what's going on in
10  Canada. One of the reasons that we're concerned is because
11  we don't have counsel up there. Now Dexia can make all the
12  representations they want about what's going on up there
13  because apparently they have counsel. They filed this
14  matter up there. Mrs. Rogan doesn't have counsel up there
15  to tell her what's going on.
16    Now we've discussed with the person that we've asked to
17  be retained by the Court to find out preliminarily what's
18  going on up there, and he's given us his opinion about
19  what's going on. But he hasn't done -- in order to find out
20  what's going on he's got to enter his appearance, he's gotta
21  get into the court, he's gotta talk to the other parties
22  that are involved in the matter to see what can be done.
23    So in order to find out what's going on up there, we
24  need counsel. I mean, he's been kind enough to have some
25  guy up there volunteer to tell us, but who knows until he's

Page 5

1  retained. There's a few conversations we've had with him.
2  I mean, how many conversations are we gonna have with
3  counsel when he's not been retained?
4    THE COURT: Do you have any indication that anything is
5  happening with respect to Mrs. Rogan there in Canada?
6    MR. GOUVEIA: We don't know what's going on in Canada.
7    THE COURT: No, no. That wasn't the question. Do you
8  have any indication that anything is? Do you have any
9  affirmative knowledge that anything is happening up there
10  with respect to Mrs. Rogan?
11    MR. GOUVEIA: We don't have any knowledge one way or
12  the other, affirmative or negative. We don't know what's
13  going on. She doesn't have anybody representing her up
14  there. It's hard to tell what's going on. If I could enter
15  my appearance in Canada, I would have done that. I can't do
16  it.
17    THE COURT: Does her husband have counsel in that case
18  in Canada?
19    MR. GOUVEIA: I don't know that.
20    THE COURT: Mrs. Rogan, does he?
21    MS. ROGAN: I don't know if it's the same case. I
22  don't know if what's going on with me up there is the same
23  as what's going on with him. I don't have any idea. He has
24  counsel for himself up there. Yes, he does.
25    THE COURT: Do you communicate with your husband about

Page 6

1　legal proceedings that are going on in Canada?
2　　　MS. ROGAN: Not very much.
3　　　THE COURT: Do you communicate with your husband about
4　any legal proceedings that are going --
5　　　MS. ROGAN: Yes.
6　　　THE COURT: -- on in Canada?
7　　　MS. ROGAN: Yes.
8　　　THE COURT: And what has he told you about them?
9　　　MS. ROGAN: He's -- he's --
10　　　MR. GOUVEIA: Wait a minute, your Honor. Anything --
11　wait a minute. Any conversations that Mrs. Rogan would have
12　with her husband -- well, go ahead.
13　　　THE COURT: They're what? Privileged by spousal -- I'm
14　asking her about something that really isn't privileged.
15　It's what he said about what's going on --
16　　　MR. GOUVEIA: Right. Right.
17　　　THE COURT: -- in the litigation in Canada.
18　　　MR. GOUVEIA: You can answer that.
19　　　THE COURT: Yeah, I think she probably can.
20　Please.
21　　　MS. ROGAN: He's been working with his attorneys. He
22　does not tell me the particulars of what he's doing. I know
23　he's working with his attorneys on what's going on with him.
24　　　THE COURT: Okay. Thanks.
25　　　MR. AIZENBERG: Your Honor.

Page 7

1　　　THE COURT: Gabriel.
2　　　MR. AIZENBERG: Yes. Dexia filed a complaint -- I
3　think a little background will help too. Dexia filed a
4　complaint in Canada in the Vancouver, the lowest -- you
5　know, the trial court in Vancouver, I think, is actually
6　called the Supreme Court. And the complaint was filed
7　against Mr. Rogan and Mrs. Rogan. Against Mr. Rogan, it
8　seeks to -- either two counts, I think, pertain to Mr.
9　Rogan. One is simply to enforce the debt that was assessed
10　here by the Northern District of Illinois, just really sort
11　of to domesticate the debt there and collect on that debt
12　there. Then there's a second count, a fraudulent transfer
13　count; and that's alleged against both Mr. and Mrs. Rogan.
14　　　Mr. Rogan has counsel there. Her name is Katherine
15　Wellburn. She's represented him. She has participated even
16　after -- the injunction was an ex parte TRO. I came to the
17　one that was entered here; but after the TRO entered,
18　she started participating in the proceedings, exchanged
19　documents. I mean, I find it incredible that when
20　there's -- when Mrs. Rogan has a husband there, he can
21　certainly tell her -- I can tell you that Dexia has not --
22　before I get there, Dexia has not taken any steps to proceed
23　against Mrs. Rogan in Canada. In fact, one of the accounts
24　in Canada that's part of the basis for the claim involving
25　Mrs. Rogan, part of the basis for involving Mrs. Rogan in

Page 8

1　Canada is she has two accounts at HSBC in Vancouver that's
2　listed on her schedules. And we'd love to get more
3　information about those accounts there, if we could, through
4　Canadian procedures; but we have not done so because of the
5　pendency of this bankruptcy and the automatic stay.
6　　　So we've done nothing. No one's proceeded against Mrs.
7　Rogan there. At least Dexia hasn't. The idea that they
8　don't know what's going on, I mean, her husband's there.
9　Mrs. Rogan just said, I don't talk to him about it. I
10　haven't heard anybody saying she can't just ask him, Has
11　Dexia done anything to try to execute or try to address my
12　interests in Canada?
13　　　So, so far, I've heard no reason why a lawyer's needed
14　there, because we haven't done anything in Canada and --
15　　　MR. GOUVEIA: Well, your Honor, we're more than happy
16　to stipulate with Dexia that we don't need counsel up there
17　as long as they withdraw their motion for stay relief so we
18　don't have to worry about anything going on.
19　　　THE COURT: They're not asking for stay relief with
20　respect to the Canadian action.
21　　　MR. GOUVEIA: Oh, good.
22　　　THE COURT: And that's probably actually a good way to
23　resolve it, that Dexia will not affirmatively seek any
24　action in Canada without first filing a motion for relief
25　from the stay here.

Page 9

1　　　MR. AIZENBERG: Absolutely.
2　　　MR. GOUVEIA: Then -- so we can't retain counsel until
3　that happens --
4　　　THE COURT: When they do, then yeah, I'll definitely
5　entertain this. I mean, if they want to proceed in Canada
6　against her, yeah, she's gonna need an attorney. But I'm
7　taking them at their word. This is a major creditor. They
8　know not to take affirmative action against her in violation
9　of the stay, I assume. And I'll find out if they do.
10　　　MR. GOUVEIA: Well, presumably, we'll find out.
11　　　MS. MOLNAR-BONCELA: Respectfully, your Honor, in the
12　matter that is pending in the Illinois court, the injunction
13　included reference to the assets in Canada to the extent
14　that whatever happens, if there is any kind of relief
15　granted with reference to any kind of action that may result
16　in a turnover, at that point, even though there is no stay
17　relief because there was a turnover order in one of the
18　matters that Dexia and the United States is seeking stay
19　relief from, we may have a conflict and, you know, a real
20　problem then.
21　　　THE COURT: Well, as I understand what the focus of
22　these two stay relief motions are, it's not to take
23　affirmative action against property. It's to determine, in
24　essence, interest in property.
25　　　MR. GOUVEIA: Well, your Honor, there aren't --

Page 10

1      THE COURT: Gordon, please wait a minute.
2      MR. AIZENBERG: If Judge Kennelly were to determine
3  that these assets belong to Mr. Rogan, then we would seek
4  turnover of those assets.
5      THE COURT: Yeah. If it were determined they were not
6  implicated in this bankruptcy estate, yeah. Okay.
7      MR. GOUVEIA: Your Honor, before this -- before the
8  bankruptcy was -- well, since the bankruptcy, either before
9  or after the bankruptcy was filed, they sought turnover
10  against all the other assets involved in the matters in
11  front of Kennelly on behalf of the children. They filed
12  turnover orders and they were prepared to file and I think,
13  in fact, did file a turnover order -- Mr. O'Roarke would be
14  better to discuss that than I, but they sought turnover
15  orders and without any ruling from Judge Kennelly on
16  finality as to who these assets belonged to.
17      THE COURT: But to the extent of the children, how does
18  that implicate this bankruptcy?
19      MR. GOUVEIA: Well, you can assume they're gonna do the
20  same thing against her. Why wouldn't they?
21      THE COURT: They're stayed.
22      MR. GOUVEIA: Yeah, if you don't -- if you give them
23  the relief, they won't be.
24      THE COURT: It depends on the extent of the relief I
25  give them and what the focus of the action that they're

Page 11

1  seeking the relief for is, doesn't it?
2      MR. O'ROURKE: Your Honor, may I?
3      THE COURT: Michael, please. Yes.
4      MR. O'ROURKE: Thank you, your Honor. With respect to
5  the whole question of stay relief, the Court should know
6  that the underlying judgment upon which all the citations
7  and the preliminary injunction was founded was not a final
8  order because there was no diversity in the underlying
9  case. Two of the defendants, named defendants, were
10  nondiverse. And, also, at the time the default judgment was
11  entered against one of the defendants, Mr. Rogan, there was
12  a lacking of 54(b) language. So the judgment altogether
13  upon which forced Mrs. Rogan to bankruptcy turned out to be
14  nonfinal and without subject matter jurisdiction.
15      We went through a round of briefing in front of Judge
16  Kennelly to have that -- to have the whole proceeding
17  dismissed. Judge Kennelly, through a retroactive cure and a
18  nunc pro tunc order, dismissed those two nondiverse
19  defendants and retroactively found that the judgment could
20  be cured that way.
21      We argued and we brought that to the attention of the
22  Seventh Circuit, who has asked for a report on the entire
23  proceeding in front of Kennelly regarding lacking subject
24  matter jurisdiction. We argued in front of Judge Kennelly
25  that he could not nunc pro tunc and cure an invalid nonfinal

Page 12

1  judgment against Mrs. Rogan because she is in bankruptcy and
2  it violated the automatic stay. And we cited an opinion in
3  In re: Alberto of Judge Squires.
4      Now Judge Kennelly just entered an order denying that
5  motion. And one of the bases, and I wanted to hand this to
6  you, was that he found that you had earlier granted stay
7  relief with respect to the preliminary injunction that had
8  been entered against Mrs. Rogan over in front of him. And I
9  pointed out and used your order stating that's not what you
10  did.
11      THE COURT: I didn't grant stay relief. No, that
12  wasn't at all what we did and we all know what we did.
13      MR. O'ROURKE: We all know what we did. But I have the
14  order here and I had your order, and that's part of the
15  proceedings now in front of the Seventh Circuit, who, by the
16  way, your Honor, has suspended briefing until they get full
17  report on the matter, on the whole motion and the subject
18  matter jurisdiction, you know, essentially, mess that's now
19  pending in front of Judge Kennelly.
20      But I do -- this is the report and this is one of the
21  things that we wanted your Honor to see. Judge Kennelly's,
22  you know, orders and, you know, our briefs and also his last
23  order regarding the stay relief, which we found to be -- you
24  know, we argued that it violated the automatic stay that's
25  retroactive, you know, and finalized in a judgment. And his

Page 13

1  reference to your order, which we think is completely,
2  completely mischaracterized and misplaced.
3      So that's all now in front of the Seventh Circuit. But
4  as far as stay relief's concerned and as far as taking
5  action, they have, in fact, received an order from Judge
6  Kennelly, which we think directly violates the automatic
7  stay and that's part of the --
8      THE COURT: Unfortunately, I can't hold Judge Kennelly
9  in contempt.
10      MR. AIZENBERG: Your Honor, can I respond?
11      THE COURT: Yes.
12      MR. AIZENBERG: I'm not quite sure why this is all
13  relevant. They did move to dismiss the case for lack of
14  subject matter jurisdiction. They lost. They moved again
15  to reconsider. They lost. One of the grounds on which they
16  moved to reconsider involved this bankruptcy. They lost.
17  I'm not sure if they want you to revisit that issue or if
18  that's what they're asking for. But the fact is they've
19  litigated this issue. They had their day in court. They
20  lost. That's how the system works. I'm not sure what it
21  has to do with anything here.
22      As to the Seventh Circuit piece of this, because they
23  appealed the preliminary injunction that Judge Kennelly
24  entered against Mrs. Rogan, this issue has been in front of
25  the Seventh Circuit. The Seventh Circuit asked for a

Page 14

1   jurisdictional statement and so the issue was before them.
2   And when the Seventh Circuit realized that this was also
3   before Judge Kennelly, they asked the parties to submit a
4   report as to what is happening in front of the district
5   court. The Court of Appeals is a court of review. They
6   don't necessarily decide these things till the district
7   court decides.
8       And that's what's going on. I'm not sure what the
9   connection is to any of this that's going on here. But I
10  just wanted to clarify it for the procedure here.
11      MS. MOLNAR-BONCELA: Your Honor.
12      THE COURT: Well, the mechanism then that is used in
13  the Seventh Circuit is the appeal of the preliminary
14  injunction.
15      MR. AIZENBERG: Right.
16      THE COURT: Okay. That was a question I obviously
17  had: What are they doing with this?
18      MS. MOLNAR-BONCELA: And, your Honor, that's the
19  relevance to what we have going on here. We have an
20  underlying action and a preliminary or -- yes, a preliminary
21  injunction that there are significant arguments on behalf of
22  the debtor, Judy Rogan, that was improper and did not -- it
23  now affects her property. And this is now before the
24  Seventh Circuit. And if we have the opportunity to get a
25  Seventh Circuit decision on that before Judy, who doesn't

Page 15

1   have money to pay her attorneys, has to go forward in three
2   different lawsuits, which later, running up attorney fees,
3   everything's stayed. Recall we have a preliminary
4   injunction. And if the Seventh Circuit has an opportunity
5   to rule on the confused state of the record regarding the
6   status of the order, the status of the injunction, if this
7   is stayed until the Seventh Circuit has a chance to rule,
8   her assets are not going anywhere right now and there is no
9   prejudice. In fact, the debtor --
10      THE COURT: We're not arguing the stay relief motion
11  now. Okay? We're not arguing the stay relief motion.
12      MR. GOUVEIA: I'd like to get back to the application.
13      THE COURT: That's what we're on right now.
14      MS. MOLNAR-BONCELA: Okay.
15      MR. GOUVEIA: And we've strayed from that.
16      THE COURT: Thanks, Mike, for bringing that.
17      MR. GOUVEIA: But, you know, the -- what we would like
18  to do is to have somebody retained. We also agree with the
19  Court -- and we appreciate the Court making sure that there
20  is an agreement as to nothing goes on up there until
21  whatever court in the United States decides what's going to
22  happen.
23      But retaining somebody to sit on that case up there and
24  advise us is a small amount of money. In terms of the
25  amount of money that's being spent on attorneys in this

Page 16

1   case, that's gonna be minuscule in terms of what's
2   involved. And maybe we can even pare it down further. But
3   we think it's important to have somebody representing Judy
4   Rogan up there or we wouldn't have asked this Court for it
5   otherwise. We're not seeking to spend a lot of money that
6   she doesn't have, obviously. And -- but, you know, we think
7   it is important to have somebody up there. We also think
8   it's important, as you said, if they're not going to proceed
9   up there and have no desire to proceed up there, that that's
10  carved out in whatever order you issue and it's done.
11      THE COURT: Well, let's put it this way: The automatic
12  stay is the automatic stay is the automatic stay. A
13  statutory vehicle. It's not entered by a court. I have
14  nothing to do with it, whatsoever. And for you to ask me to
15  issue a separate thing that basically just reemphasizes what
16  the stay says, asking me to use Section 105(a), which I'm
17  precluded from doing because there is already a statute in
18  effect that places that stay in place.
19      MR. GOUVEIA: Well, when you grant relief, which you're
20  being asked to do, that's how it relates to the employment
21  of counsel. When you grant relief, if whatever order that
22  you issue regarding their motion for stay relief, in that
23  order, it's perfectly legitimate for you to say that that
24  does not include any relief for them to proceed in Canada.
25      THE COURT: They haven't asked for that. That's not

Page 17

1   part of either of their motions. That's not even before
2   me.
3       And we'll take -- you can stipulate right now that
4   there's nothing before me; correct? Gabriel, correct?
5       MR. AIZENBERG: We have not moved to lift up or modify
6   the automatic stay with respect to the Canadian proceeding.
7       THE COURT: Right.
8       MR. GOUVEIA: Well, in all fairness, your Honor, them
9   stipulating there's nothing in front of you is not a
10  stipulation that gives me any comfort. The stipulation that
11  gives me comfort would be the stipulation that they're not
12  gonna proceed in Canada.
13      THE COURT: They said that and your client is aware of
14  the parameters of the automatic stay. They've already
15  agreed, of course. They know the parameters.
16      MR. GOUVEIA: Is that right, you agreed, Gabriel, that
17  you will actually not proceed in Canada?
18      THE COURT: Without seeking relief from the automatic
19  stay.
20      MR. AIZENBERG: We would seek relief from the automatic
21  stay the same way we did with respect --
22      MR. GOUVEIA: The same way the United States --
23      MR. AIZENBERG: Your Honor, we're sounding a little
24  heavy-handed here. He's suggesting something that I don't
25  think needs to be suggested.

Page 18

1     THE COURT: No. I agree with you.
2     I think as a matter of law, were they to proceed, they
3 would violate the stay. You could bring an action for
4 whatever it would be if they do that. But I'm assuming that
5 a creditor of this magnitude with the caliber of counsel
6 that it apparently has knows what the stay allows and what
7 it doesn't.
8     So, no, I'm not issuing any kind of separate order that
9 emphasizes what 11 USC Section 362(a) already says. It's
10 there. It says it.
11     MR. GOUVEIA: I'm not asking you to, your Honor, and I
12 apologize if you interpreted it that way. I didn't mean to
13 ask you to do anything that violates the Bankruptcy Code,
14 nor would I.
15     THE COURT: Well, I understand that, but -- okay. Back
16 to the application. I really see no need for Mrs. Rogan at
17 this time, given there is nothing going on in relation to
18 her in Canada at this time, to have counsel.
19     MR. GOUVEIA: Well, we don't know if, when something
20 goes on, we'll be able to retain counsel. We'll have to
21 start all over again to try to find someone.
22     THE COURT: You know, again, we're going back and back
23 and back. Okay. I see no basis for assuming that a
24 creditor is going to violate the automatic stay.
25     I've asked all of you if you have any affirmative

Page 19

1 information that they're doing anything now; and the answer
2 I got was no.
3     MR. GOUVEIA: Well, the answer was a little more like
4 do you know and --
5     THE COURT: The answer was no. It wasn't, Do you
6 know? It was, Do you have any information that indicates
7 they are, in fact, violating the stay? And the answer was,
8 No.
9     MR. GOUVEIA: We have not been to Canada and --
10     THE COURT: The answer was no. Don't -- please.
11 Please, let's not argue with me. Okay? The answer is what
12 it was.
13     There's no basis that I see for allowing the
14 application at this time; however, if and when Dexia and/or
15 the United States files a motion for relief from the stay to
16 seek some type of relief in relation to the Canadian lawsuit
17 or any other action against Mrs. Rogan that doesn't relate
18 to their two pending stay relief motions, then you can bring
19 up again the application to employ counsel, because then it
20 will become potentially relevant.
21     MR. GOUVEIA: Judge, would that include any action by
22 Dexia in the action pending in front of Judge Kennelly that
23 they're getting control over these assets in Canada? Would
24 that include that? Are they precluded from proceeding in
25 front of -- assuming they get stay relief from you,

Page 20

1 proceeding in front of Judge Kennelly to get a ruling from
2 Judge Kennelly over the -- her interest in the Canadian
3 property?
4     THE COURT: Let's put it this way: What is stayed is
5 stayed is stayed by a statutory stay. What is not stayed
6 will be the scope to which I decide, if any, that any action
7 they seek to take is excepted or relieved from the automatic
8 stay. So --
9     MR. GOUVEIA: Okay.
10     THE COURT: -- it's stayed. There are little prongs
11 maybe that come in there and say those parts aren't. To the
12 extent there's no little prong that comes in and says this
13 action is excepted from the stay, it's still stayed.
14     So we're on the same page there, I think.
15     MR. STEWART: Yes.
16     MR. AIZENBERG: Yes.
17     THE COURT: So, as I said, with respect to the
18 application to employ special counsel for the Canadian
19 matter, at this time the Court denies the application
20 without prejudice for it to be re-presented to the Court in
21 the event any action is contemplated by anyone against Mrs.
22 Rogan in Canada. So there we go with that.
23     Okay. Now let's go to the two pending stay relief
24 actions. And just to kind of clarify where we are, we
25 started a hearing quite a while ago now, back in December,

Page 21

1 where we did create, in part, a record that's applicable to
2 this, to both of these motions. And I just want to clarify
3 where everybody thinks we are with that record.
4     As far as I can tell from what has already been
5 memorialized in the docket, Dexia and the United States
6 submitted into evidence the documents attached to docket
7 record entries Nos. 47 and 81. Those are in evidence now
8 with respect to these hearings; correct?
9     MR. AIZENBERG: Are those the briefs?
10     THE COURT: Well, they were the documents, Gabriel,
11 that were attached to the submissions. Yeah. Yeah.
12     MR. AIZENBERG: I just don't have the docket sheet in
13 front of me.
14     THE COURT: Yeah. Yeah. And then the Government also
15 submitted into evidence Government Exhibit 1, which was a
16 memorandum opinion and order signed on November 3 by John
17 Darrah. That's already in evidence.
18     Then we substituted Exhibit 3 in one of the two docket
19 record entries to clarify that so that -- and that has been
20 substituted. That is a separate document on the record, and
21 that now is part of record entry No. 81 in lieu of what was
22 filed in record entry No. 81.
23     Now let me ask you the next step: On January -- Mrs.
24 Rogan, in a -- pursuant to my order entered on December
25 23rd, has filed documentary evidence in the record which she

Page 22

1  wants me to consider. The same is true for Dexia and the
2  United States. They also filed evidence subsequent to this
3  hearing we had on December 23rd. Does everyone agree that
4  those documents also are in evidence, or do they require
5  separate foundations now?
6      MS. MOLNAR-BONCELA: Your Honor, it's my opinion that
7  those records are in evidence based on the discussions that
8  we had at the prior hearing. Regarding the presentation of
9  the matter on the record, when we offered to provide live
10  testimony, we were told that it was going to be based on
11  documents. And so we submitted documents at that point.
12      THE COURT: That would be my understanding too for both
13  sides, that those documents are submitted into evidence for
14  whatever use the Court will make of them in deciding these
15  motions.
16      Is that -- Gabriel and Joe, is that your understanding
17  too?
18      MR. AIZENBERG: Yes. Although, some of these documents
19  are of questionable relevance, but yes. I mean, aside from
20  a relevance objection, which is arguably what this motion is
21  about.
22      THE COURT: Right.
23      MR. AIZENBERG: And beyond that, though, certainly
24  Dexia has no objection.
25      MR. STEWART: And materiality as well.

Page 23

1      THE COURT: Right. Right. I understand that.
2  So okay. Those are part of the record as well.
3      MR. AIZENBERG: Yes.
4      THE COURT: Okay. We have a -- we might as well take
5  this up right now. Michael, thank you for coming today.
6  We have an affidavit by Mr. O'Rourke that is right now
7  part of the record. That was part of the concept of
8  pursuing these. And we have an objection in part by Dexia to my
9  considering part of those things. And let me say this so we
10  don't have to expend a lot of time paring that down.
11      Gabriel, I understand your objection is essentially
12  that portions of the affidavit you contend are, in essence,
13  legal conclusions. They're not facts.
14      MR. AIZENBERG: Yes.
15      THE COURT: And, of course, the primary foundation for
16  evidence under the Federal Rules of Evidence is facts of
17  which somebody has personal knowledge, not legal
18  conclusions, unless, of course, you're an expert. This
19  wasn't submitted as an expert affidavit. Everybody agree?
20      MR. AIZENBERG: Yeah.
21      THE COURT: Does everybody trust me to be able to look
22  at the affidavit and say that's a legal conclusion, it
23  doesn't count, don't look at it, don't care, and that's
24  fact, rather than parsing it and going through it paragraph
25  by paragraph? I mean, it's a bench trial. I can sort out

Page 24

1  the legal conclusions and I won't -- you know, to the extent
2  I read them, so what? I have to make findings of fact and
3  conclusions of law in deciding this. And the facts will be
4  the ones that I look at.
5      MR. AIZENBERG: Yes. I mean, I'm certain that you'll
6  be able to do that absolutely. We can agree that your Honor
7  definitely can decide that. I mean, I think we had -- at
8  least to some of the paragraphs in the affidavit, we had
9  basically relevance objections. And I think we at least
10  want to state them for the record --
11      THE COURT: Sure.
12      MR. AIZENBERG: -- so you know.
13      THE COURT: Yes.
14      MR. AIZENBERG: And your Honor can still let it go in
15  and you can decide how relevant it is. But I think, if your
16  Honor will allow, we would want to state what our objections
17  are because we haven't had a chance. This is in lieu of
18  testifying live, so we haven't had a chance to raise an
19  objection.
20      THE COURT: I agree. I agree. So, yeah. You want to
21  go ahead and make the record and state, you know, item by
22  item first which item it is and then what the objection is.
23      MR. AIZENBERG: And Mr. Stewart will handle it for both
24  Dexia and the United States.
25      THE COURT: Okay.

Page 25

1      MR. STEWART: With regard to the affidavit of Michael
2  O'Rourke, it addresses specifically paragraph 4, stating,
3  "Without access to her assets, Judith Rogan is unable to
4  compensate counsel to defend her interests in the assets
5  listed in Schedules A and B of her bankruptcy petition in
6  the lawsuits pending in the United States District Court for
7  the Northern District of Illinois in case Nos. 02-C-8288,
8  07-C-6398, and 02-C-3310."
9      This statement is not relevant to any of the issues
10  that are in the motion to modify the stay. They're not
11  relevant either to the issue of prejudice, hardship, or
12  likelihood of success. If they were to be argued to be
13  relevant to the prejudice matter, they're not probative or
14  material to any of those issues. And we'll enter an
15  objection on that basis as well.
16      Her ability to compensate or not compensate her
17  attorneys will be unaffected by whatever way the Court rules
18  on the pending motion to modify stay.
19      With regard to paragraph --
20      THE COURT: Wait a second.
21      MR. STEWART: Oh.
22      THE COURT: Let's take them separately.
23      MR. STEWART: Okay.
24      THE COURT: Response?
25      MS. MOLNAR-BONCELA: Your Honor, with reference to the

Page 26

1     Fernstrom analysis, I believe the paragraph 4 is relevant to
2 all three elements of that analysis with regard to the first
3 one, that there is going to be prejudice. If Mrs. Rogan
4 does not have access to her assets to pay counsel, she
5 relies on counsel continuing without being paid for their
6 representation. As we're aware, there is just so much that
7 counsel can do without having access to funds. So if Mrs.
8 Rogan cannot pay her counsel, there will be prejudice,
9 because going forward, she will not have counsel to
10 represent her in the additional proceedings.
11     With reference to hardship and the comparison between
12 the problems to Mrs. Rogan compared to the problems facing
13 the additional parties, the analysis is similar. Dexia and
14 the United States, their attorneys are being paid. They can
15 go forward with the prosecution of those assets, of that
16 litigation without concern for the status of Mrs. Rogan and
17 her rights that may be affected by her inability to have
18 counsel.
19     With reference to the likelihood of success on the
20 merits, I realize your Honor has determined that the
21 standard is going to be -- what is the word?
22     THE COURT: Frivolous.
23     MS. MOLNAR-BONCELA: Frivolous. Your Honor, with
24 reference to actions against assets of Mr. Rogan, there may
25 be an element that those actions against him and possibly

Page 27

1 other individuals involved in those lawsuits, the matters
2 may not be frivolous. But to the extent that the property
3 was obtained prior to the initiation of this action and
4 prior to the initiation of any acts that are complained of
5 in any of the underlying litigation between Mr. Rogan and
6 Dexia and the United States, then their action is
7 frivolous. Mrs. Rogan, as she will testify, had a 20-year
8 marriage before --
9     THE COURT: Okay. Let's not get too far afield here.
10 Isn't what you're telling me -- okay. I view Mr. O'Rourke's
11 statement in that paragraph to be essentially conclusion
12 based on facts not in evidence. Isn't Mrs. Rogan's
13 foundation of what this has as an impact on her necessary
14 for that conclusion to be derived?
15     MR. GOUVEIA: No. Mr. O'Rourke has represented Mrs.
16 Rogan for quite some time. He is well aware through
17 consultation with her over those years as to what her assets
18 are. He's defended her, defended -- or represented her.
19 Excuse me. He's represented her in those matters, so he's
20 well aware of what assets. He's looked at documents well
21 before we ever got involved in this case as to her ownership
22 interest in those assets, when she acquired them. He's had
23 numerous conversations and consultations with her regarding
24 the source of those assets. So he has personal knowledge of
25 when she got them, where she got them, and how she got

Page 28

1 them.
2     MR. STEWART: Judge, if I may, we're going far, far --
3     THE COURT: Yeah, we really are.
4     MR. STEWART: The statement that we're addressing right
5 now is the No. 4, without access to assets, Judy will not be
6 able to defend herself. It said, you know, that it relates
7 to prejudice based on access to funds, on hardship based on
8 access to funds. And I believe the likelihood of success on
9 the merits really isn't an issue, because it's not really
10 relevant to that at all.
11     It's still -- once again, our objection is the same.
12 It's either not relevant; or if it is relevant to the
13 present issue, it's not relevant -- it's not probative of
14 any issue, because, again, your Honor ruling in this matter
15 will not make it more or less likely that her assets are
16 going to be affected. Your ruling has nothing to do with
17 whether Judith has access to her assets.
18     MR. GOUVEIA: I would suggest that the Court directed
19 us to read Fernstrom and we did. We looked at Fernstrom
20 very carefully, and we believe we've enunciated the reasons
21 why we believe this testimony is relevant today.
22     THE COURT: Okay. And I accept the last argument by
23 Mr. Stewart. Their objection is sustained.
24     Next paragraph.
25     MR. STEWART: Judge, regarding paragraph 8 of the same

Page 29

1 affidavit, it reads, "Without access to her assets, Judith
2 Rogan cannot defend her interests in her property because
3 she will not be able to retain counsel to assist her."
4     We would -- I would repeat. It's the same objection.
5 It's a relevance objection. And if it comes down to any of
6 these three things, prejudice, hardship, or access to funds,
7 it's not probative of any of those issues, because once
8 again, the Court's ruling has nothing to do with whether she
9 has access to her assets.
10     THE COURT: And I assume your response would be the
11 same as was made to the prior paragraph?
12     MS. MOLNAR-BONCELA: Yes, your Honor.
13     THE COURT: Objection sustained.
14     MR. STEWART: With regard to paragraph 9, Freezing all
15 of her assets with the Preliminary Injunction effectively
16 makes those assets available to Dexia Credit Local and the
17 United States in contravention of Indiana property law. [As
18 read.]
19     With regard to that paragraph, your Honor, it's that
20 last phrase, "in contravention of Indiana property law,"
21 that we wish to have stricken for all the reasons that the
22 Court mentioned prior. It's an opinion on the law, and we
23 just wanted to make our record with regard to that
24 statement, which we believe is testimony as to a legal
25 matter.

Page 30

1 THE COURT: Well, 1, it's a legal conclusion; but, 2,
2 it's also a matter that would be the subject of expert
3 testimony. There's no foundation in that affidavit for
4 submitting that as an expert view on Indiana law. The
5 objection's sustained.
6 MR. STEWART: Thank you, Judge.
7 THE COURT: Okay.
8 MR. STEWART: We have some objections with regard to
9 moving on to Judith Rogan's proposed testimony. And if I
10 could draw your attention to -- I don't know if you have it
11 or not. There's something entitled Statement Concerning
12 Judith Rogan's Testimony. Have you seen that, your Honor?
13 THE COURT: No.
14 MR. STEWART: May I approach and tender it?
15 THE COURT: Yes.
16 (Mr. Aizenberg gives
17 the Court a document.)
18 THE COURT: Thank you.
19 Okay. Go ahead and generally state it, but I -- okay.
20 Go ahead.
21 MR. STEWART: Okay. Well, there's -- laid out in the
22 Statement Concerning Judith Rogan's Testimony there's five
23 categories of testimony that she intends on providing. The
24 first would be the explanation of her assets, of her
25 Schedules A and B. The second would be her relationship to

Page 31

1 the creditor's claim. The third would be her acquisition
2 and control of assets. The fourth would be the effect of
3 the creditor's litigation on her ability to defend her
4 interest in property. And the fifth would be her current
5 assets and liabilities.
6 Taking those in order, as far as the first category,
7 her explanation for her Schedules A and B, we don't see any
8 relevance again to the issues before this Court: Prejudice,
9 hardship, likelihood of success on the merits. What Judith
10 believes her assets to be in this case is a matter that is a
11 highly contested one and is not the subject matter of this
12 hearing. We're not gonna decide the assets, these assets,
13 whoever they belong to, whether they belong to Peter or
14 Judith. That's not what this motion is about. Therefore,
15 any explanation she makes as to those Schedules A and B, we
16 really don't regard those as relevant.
17 THE COURT: I do. I do regard them as relevant. I may
18 have a different slant on this case than any of you do. I
19 do think they're relevant. To the extent they're not really
20 relevant, when I decide the legal issues, I'll sort that
21 out. But I think the interest that she contends on property
22 of this bankruptcy estate are relevant to impart and
23 determine both of your motions.
24 MR. STEWART: The second category of testimony Ms.
25 Rogan proposes is her relationship with the creditors'

Page 32

1 claims. I'm not quite sure what that means, but it -- I
2 can't imagine what relevance that it has to the issues
3 before this Court right now. We all know that neither Dexia
4 nor the United States has a judgment against Mrs. Rogan.
5 And I don't know other than that, I can't -- I really cannot
6 fathom what that testimony will be relevant to.
7 THE COURT: Well, given it's really nebulous anyway in
8 terms of what it's kind of describing, why don't we address
9 that as each question is asked of her, and then you can
10 raise an objection if you deem it to be irrelevant or
11 whatever.
12 MS. MOLNAR-BONCELA: And, your Honor, if they're
13 willing to stipulate that they have no judgment against Mrs.
14 Rogan, we may be able to take care of that right there.
15 THE COURT: They don't.
16 MR. STEWART: We don't.
17 THE COURT: There is no judgment at this point against
18 Judy Rogan. That's part of the proceedings that they're
19 undertaking. And they've said that all along. That's
20 clear. There is no judgment against Judith Rogan at this
21 time anywhere.
22 MR. STEWART: And with regard to this third category --
23 THE COURT: Wait. Wait. Time out. Anywhere? There
24 is no judgment anywhere in the world against Judith Rogan at
25 this time by Dexia, the United States, either one?

Page 33

1 MR. AIZENBERG: We have no judgments.
2 THE COURT: Okay.
3 MR. AIZENBERG: With regard to the third category, Ms.
4 Rogan's acquisition and control of assets, I'm going to
5 defer to Mr. Aizenberg.
6 MR. AIZENBERG: This third fact is that Judith will
7 testify she had acquisitions and was in control of assets
8 that belonged to her. And so I think that goes -- it sounds
9 like that's going to the likelihood of success on the merits
10 to try to show that these assets are hers and given your
11 Honor has ruled the standard for factor No. 3 in Fernstrom
12 is frivolous. And I think our position is that you can rule
13 as a matter of law based on undisputed facts right now that
14 they're not frivolous.
15 There are three lawsuits pending that are subject to
16 this motion. One is what we call the foreclosure case.
17 It's a foreclosure case that the Government has brought
18 against property that's in Judith Rogan's name. Judge
19 Darrah denied a motion to dismiss. Judge Kennelly, I'm
20 sorry. I've confused the judges. Judge Kennelly denied the
21 motion to dismiss. When there's a ruling, it's not
22 frivolous. Once you pass the motion to dismiss stage, at
23 least at that point, when the Court has ruled, it's not
24 frivolous. We believe you have that. It's in evidence, and
25 you can rule just on that basis alone.

Page 34

1    Nothing Ms. Rogan says -- even if she's able to say
2  that I'm going to have this fantastic evidence at trial to
3  show that it's wrong, doesn't make the case any less
4  frivolous. Okay? Any more frivolous.
5    THE COURT: Strike.
6    MR. AIZENBERG: In other words, that the judge has
7  already ruled it's not frivolous by allowing the case to go
8  forward, and so the motion to dismiss was denied.
9    The same as with the fraudulent transfer petition that
10 the Government filed in front of Judge Darrah. Judge Darrah
11 denied the motion to dismiss. The same thing. The Court
12 has already ruled that the case is not frivolous, and any
13 evidence that's put in is not gonna change that fact.
14 Okay? And, your Honor, I think, given your ruling on the
15 Fernstrom factor No. 3, your Honor is not gonna decide
16 whether the assets belong to her or not or whether there was
17 a fraudulent transfer or not.
18   THE COURT: Not at this point.
19   MR. AIZENBERG: Exactly. Then the third matter is the
20 Dexia matter, the postjudgment proceedings pending in front
21 of Judge Kennelly. There is a preliminary injunction
22 pending against Mrs. Rogan. Everyone knows that. Okay?
23 There's no dispute. They may disagree with it. It may have
24 been incorrect to enter the preliminary injunction. But
25 that doesn't change the fact that there is one, and the

Page 35

1  Court has ruled that the factors necessary for a preliminary
2  injunction have been established.
3    Not only that, the judge, Judge Kennelly, has denied a
4  motion to dismiss that Mrs. Rogan filed on subject matter
5  jurisdiction grounds. He denied a motion to reconsider that
6  motion to dismiss. So a court has ruled. It may be that it
7  goes to the Seventh Circuit and sometime in the future
8  something changes. It may be that they can put into
9  evidence and prove that Dexia is wrong; but that doesn't
10 change the fact that, sitting here today, the case is not
11 frivolous, because a court has already looked at that
12 issue. If they -- if it was enough for a litigant to say,
13 In the future we're gonna prove them wrong, you'd never get
14 stay relief because you'd be trying the case in front of the
15 bankruptcy judge and you'd never get it, because the parties
16 would come in and ask the bankruptcy judge to decide the
17 issues that are being decided in other cases.
18   So it has to be, given those three decisions that have
19 already determined this issue, that that issue is determined
20 as a matter of law and can't be disputed as to the facts and
21 to procedurally what has happened in those cases.
22   THE COURT: Okay. Yeah. Go ahead.
23   MR. STEWART: Just one more element to that as well, in
24 addition to all the fine points Mr. Aizenberg has made, and
25 that is that I believe Ms. Rogan's testimony is going to be

Page 36

1  that she acquired these properties and she controlled these
2  properties. As a legal logical matter, that does not negate
3  the possibility or the fact that Peter Rogan helped in
4  acquiring these properties, controlled these properties,
5  helped -- used these properties to his own benefit, and
6  exercised all the attributes of ownership.
7    So, therefore, her testifying that she did anything
8  with the property will be really worthless unless she is
9  prepared to testify that Peter Rogan had nothing whatsoever
10 to do with any of these properties, that is, negating Peter
11 Rogan's -- any fact that would support his ownership in
12 these properties. And I don't really believe that she's
13 going to testify to that.
14   THE COURT: Okay. Let's -- and I know you could
15 respond, but I don't think you'll need to, given what I'm
16 gonna say. I tend to agree with you. Okay? But I'll be
17 real candid with you. I'm protecting the record. So it's a
18 bench trial. A lot of stuff can come in. Whether I deem it
19 relevant or not when I actually make the decision, you will
20 know by the findings of fact and conclusions of law. I --
21 that's why I limited the amount of time for her testimony so
22 we didn't sit here and try the Illinois litigation for five
23 days.
24   So I appreciate what you're saying. I tend to agree
25 with you, but she can testify as to what she testifies to.

Page 37

1  Again, if there's a question in particular that's asked of
2  her and you want to object to it, then that's the way to do
3  it. I don't want to exclude it as a class of evidence.
4    MR. STEWART: Okay.
5    THE COURT: I'd like to let her testify because the
6  more things that might or might not be marginally relevant
7  that she testifies to, the more her time will be used up
8  because it is going to be limited. Enough said.
9    MR. STEWART: The fourth category that Mrs. Rogan
10 proposes to testify on -- yeah, it's the effect of the
11 creditors' litigation on her ability to defend her interest
12 in the property. And this is a matter that we went over,
13 the same issue that we discussed with regard to Mr.
14 O'Rourke's affidavit, paragraphs 4 and 8. It's the
15 identical issue and we'll make the identical objections.
16   THE COURT: Again, depending on the question that's
17 asked and how it's phrased, that's something that I think
18 you can do question by question. So as a class, no, I won't
19 exclude that.
20   MR. STEWART: Okay. And, finally, what Ms. Rogan's
21 current assets and liabilities are. Again, we don't find
22 them relevant to any of the issues that are before this
23 Court right now, and we would ask that that category of
24 testimony be barred on relevance.
25   THE COURT: Well, again, as a class -- okay, here's

Page 38

1 where I think that could have relevance. Okay. One of the
2 prongs is prejudice to the debtor if the action proceeds and
3 I lift the stay. It involves expense. Okay? It definitely
4 involves expense that isn't there if I don't lift the stay.
5 But what I've been trying to tell Mrs. Rogan's counsel is:
6 That's not the test. If the litigation has to be done to
7 determine issues in this bankruptcy case, the issue is not,
8 just because it's done in Illinois it's expensive, if there
9 are duplicate expenses that are going to be incurred to do
10 it someplace else. So that's the focus of her testimony,
11 not just, Oh, yeah, we're gonna -- anytime litigation is
12 done anywhere, yes, it's expensive and, yes, it costs
13 money. That's not the test, given the way you guys have
14 approached this case with me: Determine, Judge, the assets
15 of her bankruptcy estate.
16      Well, if I'm gonna have to do that, it's gonna be
17 expensive. So, again, as a class of evidence, no, I will
18 not exclude it. I'm trying to limit the scope of this and
19 tell you you've got an hour. You better get the most bang
20 for your buck out of it.
21      MR. STEWART: Thank you, Judge.
22      MR. AIZENBERG: One of the last things I want to raise,
23 which is not an objection, when you had ordered us to --
24 after the initial hearing, you ordered each side to submit
25 documents, you know, and file them, any additional

Page 39

1 exhibits.
2      THE COURT: Right.
3      MR. AIZENBERG: At that point Mrs. Rogan was not going
4 to be testifying. You had denied -- they had done an offer
5 of proof.
6      THE COURT: Right.
7      MR. AIZENBERG: What I'm concerned about as far as
8 certain -- the record, I don't know exactly what -- I have a
9 sense of what the direct examination could be. There may be
10 some exhibits that I brought with me today that would be
11 relevant to that, and we want to get those admitted. But,
12 you know, we didn't think of them then, because we didn't
13 know that that would be -- that she was testifying.
14      THE COURT: That's fine.
15      MR. AIZENBERG: Okay.
16      THE COURT: I mean, if you have additional evidence,
17 the purpose of this is to actually make the entire record.
18 So if in the course of her testimony and your cross there
19 are additional documents that you want to seek to submit,
20 no, you're not -- this isn't a stipulated record. This is
21 what came before.
22      MR. AIZENBERG: That's what I was asking.
23      THE COURT: Yeah. And while we're on it, look at the
24 screen here, everybody. The ones I was referring to
25 previously, the submissions that were in response to the

Page 40

1 December 23rd order are 93, 94, and 95. Do we all agree
2 that 93, 94, and 95 are all part of the record for whatever
3 use may be made of them?
4      MR. AIZENBERG: Yes.
5      MS. MOLNAR-BONCELA: Yes, your Honor.
6      THE COURT: Okay. Okay. That's good. Okay. I just
7 wanted to make sure we were on the same page as to which of
8 those documents I was referring to before. Okay. So it's
9 93, 94, 95.
10      And, again, everybody is stipulating that whatever is
11 comprised of the documentary exhibits in record entry Nos.
12 93, 94, and 95 are admitted into evidence for the purposes
13 of the hearing; correct?
14      MR. STEWART: Uh-huh.
15      MR. AIZENBERG: Yes.
16      THE COURT: Cathy, Gordon, correct?
17      MS. MOLNAR-BONCELA: Yes, your Honor.
18      MR. GOUVEIA: Yeah.
19      THE COURT: Gordon, are you okay?
20      MR. GOUVEIA: Yeah.
21      THE COURT: Are you sure?
22      MR. GOUVEIA: Yeah.
23      THE COURT: Okay. Is there any other preliminary
24 matter? What I was contemplating was just immediately going
25 into Mrs. Rogan's testimony and have the debtor advance her

Page 41

1 as a witness.
2      MR. GOUVEIA: Your Honor, we'd ask that Mr. O'Rourke go
3 first.
4      THE COURT: Does he need to leave?
5      MR. AIZENBERG: We didn't think Mr. O'Rourke -- we
6 thought the purpose of the affidavit was that he wasn't
7 going to be testifying.
8      THE COURT: Unless they called him.
9      MR. AIZENBERG: Unless they called him and we're gonna
10 just cross him.
11      THE COURT: Yeah, they're just gonna cross him. Yeah.
12 Do you have to be somewhere, Mike?
13      MR. O'ROURKE: Well, I have to get back.
14      MR. AIZENBERG: That's fine, your Honor. We'll do
15 that. No problem.
16      MR. STEWART: That's fine with me.
17      THE COURT: That's fine if you want to do that.
18 Correct?
19      MR. AIZENBERG: That's fine from our perspective.
20      THE COURT: Okay. Let's take about a five-minute
21 break. Okay? And then, Mr. O'Rourke, you'll take the stand
22 for cross.
23      And then he can leave, correct, when you're done?
24 Everybody agree?
25      MR. AIZENBERG: Yes.

Page 42

1    MS. MOLNAR-BONCELA:  Unless we have additional
2    redirect.
3        THE COURT:  Okay.  Well, we'll deal with that when we
4    have it.  But yeah, I'll try to get him out of here.
5        MR. O'ROURKE:  Good.
6        MS. MOLNAR-BONCELA:  Thank you, your Honor.
7            (There was a pause
8             in the proceedings.)
9        THE COURT:  Okay.  You'll be calling Mr. O'Rourke,
10   essentially, on cross-examination of his affidavit.
11       Mike, you want to be sworn and then take the stand back
12   over here.
13       M I C H A E L   J.   O' R O U R K E,
14   having been called as a witness by the Debtor, being first duly
15   sworn upon his oath, to tell the truth, the whole truth, and
16   nothing but the truth, was examined and testified as follows:
17       MR. AIZENBERG:  May I inquire, your Honor?
18       THE COURT:  Yes.
19       C R O S S - E X A M I N A T I O N
20   BY MR. AIZENBERG:
21   Q.  Please state your name for the record.
22   A.  Michael J. O'Rourke.
23   Q.  And where are you employed?
24   A.  O'Rourke and Moody.
25   Q.  What do you do?

Page 43

1    A.  I'm an attorney.
2    Q.  And what kind of law do you practice?
3    A.  Business law and commercial litigation, bankruptcy,
4        creditors' rights, anything involving business law.
5    Q.  Do you currently represent Mrs. Rogan?
6    A.  Yes.
7    Q.  How long have you represented Ms. Rogan?
8    A.  Probably at least five years, probably more.  Maybe six.
9    Q.  Do you currently represent her in what we call the
10       foreclosure case in the Northern District of Illinois or you
11       did until the bankruptcy was filed?
12   A.  Yes.  Until the bankruptcy was filed, I did.  Yes.
13   Q.  And you represented her in what we call the fraudulent
14       transfer petition in front of Judge Darrah until the
15       bankruptcy was filed?
16   A.  Yes, but I withdrew because of the filing of the bankruptcy.
17   Q.  But until that time, you were representing her in that case?
18   A.  For the short time that it was pending.  It was only pending
19       for a short time.
20   Q.  All right.  You were involved in briefing the motion to
21       dismiss in that matter?
22   A.  Yes.
23   Q.  And you -- until the bankruptcy was filed, you represented
24       Mrs. Rogan in connection with the preliminary injunction
25       proceedings --

Page 44

1    A.  Yes.
2    Q.  -- pending in front of Judge Kennelly?
3    A.  Yes.
4    Q.  And you also do work for other members of Mrs. Rogan's
5        family; isn't that correct?
6    A.  Correct.
7    Q.  Okay.  And so you've represented Mrs. Rogan's children?
8    A.  Yes.
9    Q.  And how long have you represented any of the Rogan children?
10   A.  Brian, I've represented --
11       MS. MOLNAR-BONCELA:  Your Honor, relevance?
12       MR. AIZENBERG:  It goes to bias, your Honor.
13       THE COURT:  Overruled.  Go ahead.
14   A.  Brian Rogan, who is Judy's second son, I've represented for
15       probably five or six years.  Kate, her daughter, within the
16       last year in connection with the injunctions that were
17       entered against the children.  And, also, Rob Rogan, who is
18       her oldest child, we represent Rob in those injunction
19       proceedings along with Tim Touhy and Jeff Haldin, who are
20       co-counsel.
21   BY MR. AIZENBERG:  (Continuing)
22   Q.  And you've represented at least one of Mr. Rogan's
23       companies, PGR Properties; is that correct?
24   A.  I don't believe it was Mr. Rogan's property -- or company,
25       no.

Page 45

1    Q.  You represented a company that is related to the Rogans?
2    A.  I represent PGR Properties.  Brian Rogan was the officer
3        that I was representing that company with, yes.
4    Q.  Mr. Rogan was an officer of that company as well; am I
5        right?
6    A.  Probably a number of years ago, but I was not representing
7        the company when he was there.
8    Q.  And did you also represent a business called JKR Business at
9        some point?
10   A.  No.  I know of JKR Business, but I don't believe I ever
11       filed an appearance for JKR Business.
12   Q.  Did you ever represent someone who worked for Mr. Rogan
13       named David Miller?
14   A.  Yes.
15   Q.  When did you do that?
16   A.  Oh, probably five years ago when Mr. Miller was subpoenaed
17       in connection with a litigation.
18   Q.  And your law firm is a creditor in this bankruptcy; is that
19       correct?
20   A.  Yes.
21   Q.  You filed a claim for about $187,000?
22   A.  Probably, yes, that much.  Yes.  I did quite a bit of work.
23       MR. AIZENBERG:  I'd like to -- your Honor, may I
24       approach the witness?
25       THE COURT:  Yes.

Page 46

1  BY MR. AIZENBERG: (Continuing)
2  Q.  I'm handing you the affidavit that, just for purposes of
3       identification, we've marked as exhibit -- Dexia Exhibit
4       12.
5           (The witness reviews the document.)
6  Q.  Mr. O'Rourke, is this the affidavit that you submitted in
7       connection with this proceeding?
8  A.  Yes.
9  Q.  And the statements in this affidavit are true and correct?
10 A.  Yes.
11 Q.  Okay. I'd like to direct your attention to paragraph 3 of
12      the affidavit.
13 A.  Sure.
14 Q.  You see that this paragraph 3, you refer to the imposition
15      of the preliminary injunction against Mrs. Rogan before
16      Judge Kennelly?
17 A.  Yes.
18 Q.  And before the preliminary injunction was entered, isn't it
19      true that you, on behalf of Mrs. Rogan, presented some
20      evidence in opposition to the preliminary injunction?
21 A.  Yes.
22 Q.  Okay. Could you tell the Court what that evidence was.
23 A.  We filed affidavits on behalf of Judy Rogan contesting
24      jurisdiction, contesting all of the material allegations
25      directed against her, which were submitted as part of this

Page 47

1       ex parte proceeding that was filed without our knowledge in
2       front of Judge Kennelly. The evidence that we submitted
3       included, you know, affidavits. We also had evidence
4       relating to -- one of the allegations was that Judy Rogan
5       had not fully turned over records requested as part of the
6       citation proceedings. We turned over -- submitted
7       affidavits showing that we had, in fact, paid for the
8       production by banks, including the Canadian bank, HSBC, for
9       them to produce records on her account; that we contacted --
10      and I had to go to Citibank to get a -- to get my
11      fingerprints certified for Citibank to produce records,
12      because they had a procedure that -- you know, to get bank
13      records, I had to go through this verification process that
14      I was actually her attorney, even though she submitted a
15      power of attorney to me. I went to --
16          MR. AIZENBERG: Your Honor, the answer's not
17      responsive. I asked what kind of specific evidence was
18      submitted. In other words, was it an affidavit? Was it
19      testimony?
20 A.  I'm telling you about my affidavit. Okay?
21 BY MR. AIZENBERG: (Continuing)
22 Q.  No, I wasn't asking for a recitation of what was contained
23      in those documents.
24          THE COURT: Just the designation.
25          MR. AIZENBERG: Just the designation.

Page 48

1  A.  Just -- okay.
2  BY MR. AIZENBERG: (Continuing)
3  Q.  Yes.
4  A.  We presented a number of affidavits and we presented live
5       testimony on her behalf showing her ownership and control
6       and management of her real property and also her handling
7       accounts.
8  Q.  So there was an affidavit -- correct me if I'm wrong, there
9       was an affidavit of Mrs. Rogan, testimony of someone named
10      Barry Wachtel on the issue of property ownership, and
11      testimony from Paula Neff also on the issue of property
12      ownership?
13 A.  And also an affidavit of Ethan Crooks.
14 Q.  An affidavit of -- and that was on the issue of discovery
15      compliance; correct?
16 A.  A thick submission --
17 Q.  Okay. So --
18 A.  Let me finish, Counsel. -- with regard to discovery
19      compliance, which was extensive.
20 Q.  Okay. So two affidavits and two live witnesses; correct?
21 A.  I believe that there was more. I think that there was at
22      least three affidavits and two live witnesses.
23 Q.  Okay. Now on September 24th, 2008, you filed a bankruptcy
24      petition on Mrs. Rogan's behalf; is that correct?
25 A.  Yes.

Page 49

1  Q.  And is it correct that that same day you went to court and
2       informed Judge Kennelly of the filing of this petition?
3  A.  Correct.
4  Q.  Okay. And am I correct that in that proceeding you then
5       withdrew all that evidence that you submitted on behalf of
6       Mrs. Rogan in opposition to the preliminary injunction?
7  A.  Correct, because of the automatic stay being entered.
8  Q.  But you did withdraw all the evidence; correct?
9  A.  Yes.
10 Q.  Okay.
11          MR. AIZENBERG: Okay. Now on September 25th, the next
12      day, this Court -- I know your Honor signed it but --
13          THE COURT: Say this Court.
14 BY MR. AIZENBERG: (Continuing)
15 Q.  Yes. This Court dismissed that bankruptcy sua sponte for
16      procedural reasons; correct?
17 A.  I guess it did. I wasn't aware at the time, but apparently
18      it did.
19 Q.  But you had no reason to -- you now know that that's what
20      happened; correct?
21 A.  Yes. Yeah, because of a procedural glitch where the matrix
22      hadn't been filed. It was being prepared and hadn't been
23      filed.
24 Q.  Okay. So --
25          THE COURT: It was a substantive matter that relates to

Page 50

1  the initiation of a case.
2      MR. AIZENBERG: Correct.
3      THE COURT: I want to let the record be clear.
4      MR. AIZENBERG: Yes. You're right. Absolutely.
5  BY MR. AIZENBERG: (Continuing)
6  Q. So the -- so this is September 25th, 2008. And that day
7      Dexia informed Judge Kennelly of that dismissal in open
8      court; isn't that right?
9  A. I don't know. I wasn't there.
10 Q. Did your son tell you that that happened?
11 A. No, not really. I found out -- I found out, I think, after
12     the fact by a phone call from you or Scott Mendeloff. But I
13     wasn't in court at the time.
14     MR. AIZENBERG: May I approach, your Honor?
15     THE COURT: Yes.
16 BY MR. AIZENBERG: (Continuing)
17 Q. I'm handing you what was Exhibit 3 to the reply brief that
18     we filed. This is the substituted exhibit that we put on
19     the record. Now this is -- Mr. O'Rourke, this is a copy of
20     part of the transcript of a proceeding before Judge Kennelly
21     on September 25th.
22 A. Okay.
23 Q. Is that correct?
24 A. I don't know.
25 Q. Well, I mean, you're -- let's go back to your affidavit in

Page 51

1  paragraphs 1 and 2. Isn't it true that you attest that
2  you're counsel in the Dexia v. Rogan case and that, because
3  of that, you're familiar with the filings and practices that
4  have happened before the Court in connection with that case?
5  A. I'm familiar with the preliminary injunction proceedings in
6  front of Judge Kennelly.
7  Q. And isn't it true that, as such, you had access to the
8  pleadings and information relating to the litigation pending
9  there in front of him?
10 A. Yes.
11 Q. Okay. So can you tell me if this is a transcript from the
12  proceeding in front of Judge Kennelly?
13 A. I can't tell you that. I was not present at this time. If
14  it was officially -- if you're telling me that this was
15  officially entered as a transcript, I have no reason to
16  disagree with that; but I was not present at the time of
17  this hearing.
18 Q. Okay. Let's do this a little differently then.
19 A. That's fine.
20     MR. AIZENBERG: May I approach, your Honor?
21     THE COURT: Yes.
22     MR. AIZENBERG: Do you have an exhibit sticker?
23 A. I mean, I'm not quarreling with you. I just -- I was not
24  there in court.
25 ///

Page 52

1  BY MR. AIZENBERG: (Continuing)
2  Q. I'm not suggesting you are. If you can tell me that this is
3      the transcript, then we don't have to go through this.
4  A. To the best of my knowledge, I will say that -- I will agree
5      that this looks like a transcript that has been submitted in
6      the course -- certainly during the course of the appeal.
7  Q. Okay. Okay. Look at the first page of the transcript --
8  A. Sure.
9  Q. -- the cover page of Exhibit 3. Are you looking at that?
10 A. Yes.
11 Q. Okay. Who does it say -- does it show an appearance for
12     Judith Rogan?
13 A. Yes.
14 Q. Okay. Who does it say appeared on behalf of Judith Rogan?
15 A. Myles O'Rourke.
16 Q. Okay. Now please turn to page 4.
17 A. Yes.
18 Q. Please turn to page 4 of the transcript, which is the second
19     page of Exhibit 3. Are you there?
20 A. Yes.
21 Q. Okay. And let me just back up for a second before I ask
22     that question. Myles O'Rourke is your son?
23 A. Correct.
24 Q. And he was there on behalf of Mrs. Rogan at that hearing?
25 A. He was supposed to be. He better have been there, I'll tell

Page 53

1  you that. No, I believe he was.
2  Q. Okay. And isn't it correct that on that day, on September
3      25th, 2008, Judge Kennelly entered the preliminary
4      injunction against Mrs. Rogan?
5  A. To the best of my knowledge, yes, he did.
6  Q. And isn't it true also that your son, who was there on
7      behalf of Judith Rogan, didn't object to the entry of the
8      preliminary injunction?
9  A. Oh, I don't believe that's correct.
10 Q. Okay. Well, why don't you look at the transcript. I'd like
11     you to look through Exhibit 3. Okay?
12 A. Sure.
13 Q. And show me where in Exhibit 3 there's an objection to the
14     entry of the preliminary injunction.
15     MS. MOLNAR-BONCELA: Your Honor, I'm going to object
16     here. It appears that there are pages of this transcript
17     that are not a part of Exhibit No. 3. And to the extent
18     he's asking Mr. O'Rourke to conclude that there was no
19     objection to the entry of the preliminary injunction based
20     on language that they culled from a transcript, I believe
21     that's an inappropriate question of Mr. O'Rourke based on
22     three pages out of the transcript that we don't know how
23     long the transcript was. We don't know what happened at
24     points in the transcript that are not in front of Mr.
25     O'Rourke.

Page 54

1    MR. AIZENBERG: Can I respond, your Honor? This
2    document has been in the record since -- for more than a
3    month. And I think at one of the early hearings, maybe the
4    one in December, they raised that issue, the concern about
5    completeness of transcripts. They had plenty of time to
6    come back and say, You know what, we don't think this is
7    complete. There's a completeness problem here.
8        I mean, when someone submits part of a document, it's
9    not automatically excluded because it's incomplete. It's
10   the burden of the other side under Rule -- I think it's 106,
11   to come back and explain why it fails to satisfy the rules
12   of completeness. So I think the objection should be
13   overruled.
14       MS. MOLNAR-BONCELA: And, your Honor, to the extent
15   that the admission of the document for what it says on its
16   face he's dealing with, that may be correct. However, he
17   has a question before Mr. O'Rourke as to whether or not
18   based, on three pages of a transcript, someone objected to
19   the entry of a preliminary injunction. I don't believe
20   that's a proper question, because he can't examine the
21   entire transcript.
22  A.   Counsel, we had a long extensive objection to the
23   preliminary injunction.
24       THE COURT: I'm going to sustain the objection. If the
25   question is, based upon this document that is before him

Page 55

1    now, Exhibit 3, does that document reflect an objection --
2        MR. AIZENBERG: That's my question. And I think he can
3    answer that.
4        THE COURT: That document, as it's comprised, of the
5    pages that are in evidence.
6        MR. AIZENBERG: We believe it covers the relevant part
7    and they can argue why it doesn't.
8        THE COURT: Does that document reflect, within the
9    pages of Exhibit 3 --
10  A.   It reflects an attempt to respond, and the Court went ahead
11   and entered the injunction without awaiting a response.
12  BY MR. AIZENBERG: (Continuing)
13  Q.   Mr. O'Rourke, just answer --
14  A.   That's in the transcript.
15  Q.   Please answer my question. Based on the transcript here, do
16   you see Myles O'Rourke stating he objects to the entry of
17   the preliminary injunction?
18       MS. MOLNAR-BONCELA: Objection. Asked and answered,
19   your Honor.
20       THE COURT: Okay. Let's cut through it. Within the
21   confines, within the confines of exactly what is in front of
22   you --
23  A.   I do not see it.
24       THE COURT: Okay. And that's all that he's testified
25   to. It wasn't was one made at the hearing. It was within

Page 56

1    the confines of that document --
2        MR. AIZENBERG: Absolutely.
3        THE COURT: -- do you see one?
4    BY MR. AIZENBERG: (Continuing)
5    Q.  Okay. In addition to the actual preliminary injunction
6    document, which you've seen; correct? You've seen the
7    preliminary injunction that was entered against Mrs. Rogan?
8    A.  Yes.
9    Q.  Okay. In addition to that, there was a later date when
10   Judge Kennelly articulated additional reasons as to why he
11   granted the preliminary injunction; isn't that correct?
12   A.  I have no idea what you're talking about.
13       MR. AIZENBERG: May I approach, your Honor?
14       THE COURT: Yes.
15       MR. AIZENBERG: This is one you haven't seen before.
16   And I'll give you a copy too.
17       THE COURT: And please identify what you're giving him.
18       MR. AIZENBERG: I will.
19   BY MR. AIZENBERG: (Continuing)
20   Q.  I've just handed you what I've marked as Exhibit 13, and
21   it -- Mr. O'Rourke, does this appear to be a transcript of a
22   proceeding before Judge Kennelly on October 7th, 2008?
23   A.  I can't speak to that. I've never seen this before.
24   Q.  I'm not asking that. I'm asking -- I didn't ask you whether
25   you'd ever seen it before, Mr. O'Rourke. What I'm asking

Page 57

1    you is, based on the fact that you're counsel in the Dexia
2    versus Rogan case and have had many years of litigation
3    experience, can you say that this appears to be a transcript
4    for a proceeding before Judge Kennelly on October 7th,
5    2008?
6        MS. MOLNAR-BONCELA: I think, your Honor, at this point
7    I'm going to make an objection, because, No. 1, Mr. O'Rourke
8    has no personal knowledge of this particular document; No.
9    2, it's dated October 7th, 2008, and this bankruptcy was
10   filed days before and prior to any motion for stay relief.
11   And to the extent that it shows that there's an appearance
12   for Judy Rogan, we may have a violation of the automatic
13   stay here.
14       THE COURT: Okay. And any violation of the automatic
15   stay is pertinent to the use of this exhibit how?
16       MS. MOLNAR-BONCELA: Well, your Honor, it may not be
17   relevant to this proceeding. They're cross-examining based
18   on his affidavit, and they're going beyond the scope of the
19   affidavit by seeking to relate information at a hearing that
20   he was not present.
21       THE COURT: What portion of the affidavit does this
22   relate to?
23       MR. AIZENBERG: This relates to paragraphs 3, 5, and 6,
24   part of -- at least the way I read the affidavit, part of
25   the point of it is to show that there's some sort of

Page 58

1    question as to the validity of the proceedings in the
2    Northern District of Illinois, in part that there's an
3    appeal pending, in part because of this finality issue
4    that's referenced in paragraph 7. This is directly
5    responsive to that issue.
6         MS. MOLNAR-BONCELA: And, your Honor, those matters are
7    pending before the Seventh Circuit, not in front of the
8    district court.
9    A.  That's correct.
10        MR. AIZENBERG: Your Honor, I'm happy to -- if your
11   Honor wants to hear it, I'm happy to engage in more
12   argument, but I don't want the witness to hear the
13   argument.
14   A.  Well, I'm not contesting that, you know, statements were
15   made on October 7th. I'm just telling you I wasn't there
16   and I've never seen this transcript before. That's all I'm
17   saying. I mean, it appears to be a copy of the transcript
18   but I've been fooled before. So I can't tell you one way or
19   the other. I will say it appears to be.
20        THE COURT: And that was actually his question.
21        MR. AIZENBERG: Yeah. Does it appear to be?
22        THE COURT: Yeah. Does it appear?
23   A.  Yeah, it appears to be a transcript.
24        THE COURT: It wasn't, Is it an accurate transcription
25   of the proceedings? So given the question was, Does it

Page 59

1    appear --
2    A.  It appears to be for whatever it is.
3    BY MR. AIZENBERG: (Continuing)
4    Q.  Okay. I'd like to direct -- in Exhibit 13, I'd like to
5    direct your attention to page 11, the very last line, line
6    25. And rather than read this, I was going to suggest that,
7    Mr. O'Rourke, just read this to yourself and I'll just
8    follow up with a few pointed questions. Is that okay? So
9    if you could read from page 11, line 25, through to the end
10   of page 14, and then I'll follow up with some questions.
11   A.  Okay.
12        (The witness reviews the document.)
13   A.  Okay.
14   Q.  Are you finished reading?
15   A.  Yeah.
16   Q.  Okay. Now, if you could, the first page of Exhibit 13 shows
17   that Myles O'Rourke is appearing there on behalf of Judith
18   Rogan; is that correct?
19   A.  Okay. Yes.
20   Q.  Okay. And if you look on page 12, line 17, does it appear
21   that Myles O'Rourke is stating that he can speak on behalf
22   of Mrs. Rogan?
23   A.  Right.
24   Q.  Is that correct?
25   A.  Right.

Page 60

1    Q.  Okay. And is it correct -- I'm assuming that you disagree
2    with the reasoning. But am I correct that, in general,
3    Judge Kennelly is giving some explanation as to why he
4    granted the preliminary injunction?
5    A.  I don't know about that.
6    Q.  Okay. So let me just move on to the next question.
7    A.  Sure.
8    Q.  The transcript will speak for itself. Just show me where in
9    this transcript, particularly the pages I've directed you
10   to, it shows that Mr. O'Rourke -- and I'm referring to Myles
11   O'Rourke, your son -- raised any objection to the
12   preliminary injunction at that point.
13        MS. MOLNAR-BONCELA: Your Honor, this is October 7th.
14   I believe the record is clear that there has been no motion
15   for stay relief pending in this court and no ruling granting
16   stay relief, so for counsel for Dexia to be suggesting that
17   they were advancing in discussion on what was or was not
18   happening in the context of the bankruptcy I think is
19   inappropriate.
20        THE COURT: And that relates to the use of this
21   document again as some form of evidence how? Direct your
22   objection, please, to what's going on here, which is the use
23   of this document in examination of a witness, not whether or
24   not a violation of the automatic stay occurred.
25        MS. MOLNAR-BONCELA: Your Honor, Mr. O'Rourke has no

Page 61

1    personal knowledge of this document. And to the extent that
2    they're attempting to cross-examine the affidavit presented
3    based on personal knowledge, I believe that this exhibit is
4    inappropriate at this time.
5         THE COURT: Well, they haven't moved to admit it.
6         MS. MOLNAR-BONCELA: True, your Honor.
7         THE COURT: I don't know if they will. We'll come to
8    that when they do.
9         MR. AIZENBERG: I can move to admit it now on the
10   grounds that this Court can take judicial notice of a public
11   record in another court.
12        THE COURT: You would have to point me to the actual
13   place in the docket of that court's record for me to do
14   that, because I have no docket now of theirs. So is it your
15   contention that as it's supposed to be done now, these
16   transcripts are supposed to be actually placed on the record
17   of the district court? If I look at a particular location
18   on the docket record of this case in the district court, I
19   would find this transcript?
20        MR. AIZENBERG: The transcript, I don't believe that
21   you can actually see the PDF, but there will be a record
22   entry of the transcript because I know it was transmitted to
23   the Seventh Circuit. At the end of this proceeding I
24   believe I even have the specific docket entry available here
25   so the Court can see it.

Page 62

1   THE COURT: The docket entry, though, would show that a
2   particular transcript was filed with the court.
3   MR. AIZENBERG: Correct.
4   THE COURT: I can't tell from the docket entry unless I
5   have access to probably their private docket, which I do
6   not, whether or not this is an actual record of that
7   transcript.
8   MR. AIZENBERG: Your Honor, at the initial hearing when
9   the issue of transcripts came up, I thought you'd given some
10  guidance on the issue of transcripts, which is you weren't
11  going to require the parties to go and try to get certified
12  transcripts to establish that these are true and accurate
13  transcripts. And so --
14  THE COURT: No. I'm sorry if I gave you that
15  impression. I think what we were discussing was do you need
16  copies of documents that I can pull up the PDF on from the
17  docket record. How do I know whether this is an accurately
18  transcribed record of a hearing? I don't know that.
19  MR. AIZENBERG: Because the court reporter at the
20  end -- it's written by a court reporter though it's not
21  signed.
22  THE COURT: It's not certified by a court reporter.
23  MR. AIZENBERG: I can -- okay. Then I'll -- if your
24  Honor won't admit it, then I'll just move on.
25  THE COURT: To the extent Dexia Exhibit 13 is offered

Page 63

1   into evidence, the admission is denied.
2   BY MR. AIZENBERG: (Continuing)
3   Q. Okay. I'll direct, Mr. O'Rourke, your attention to
4   paragraph 5 of your affidavit. In paragraph 5 you refer to
5   the debtor's appeal of the preliminary injunction. Do you
6   see that?
7   A. Correct.
8   Q. Okay. So the appeal was filed in early October 2008?
9   A. I believe so, yes.
10  Q. And it's been pending now for about three and a half months?
11  A. Yes.
12  Q. And am I correct you've never, on behalf of Mrs. Rogan,
13  sought to stay the preliminary injunction in front of Judge
14  Kennelly?
15  A. While the bankruptcy was filed? After the bankruptcy,
16  absolutely not.
17  Q. Okay. Did you ask --
18  A. He has no jurisdiction.
19  Q. Did you, on behalf of Mrs. Rogan, ask the Seventh Circuit to
20  stay the preliminary injunction?
21  A. After the bankruptcy was filed, the stay took over.
22  Q. The question --
23  A. The answer is no. Absolutely not.
24  Q. Okay. Thank you.
25  Did you, on behalf of Mrs. Rogan, ever seek to have the

Page 64

1   Seventh Circuit consider the appeal on an expedited basis?
2   A. No.
3   Q. Okay. I'll direct your attention to paragraph 7 of your
4   affidavit. You refer here to the decision of Judge Kennelly
5   on the final judgment issue; is that correct?
6   A. Correct.
7   Q. Okay. Am I correct that Judge Kennelly ultimately denied
8   the motion to dismiss for lack of subject matter
9   jurisdiction?
10  A. Yes.
11  Q. And he held -- I know you disagree with it. But he held
12  that there was subject matter jurisdiction and that the
13  judgment in Dexia versus Rogan was final; isn't that
14  correct?
15  A. Wrongly, yes.
16  Q. And, also, am I correct that he denied a motion to
17  reconsider that ruling as well?
18  A. Yes.
19  MR. AIZENBERG: Can I approach, your Honor?
20  THE COURT: Yes.
21  BY MR. AIZENBERG: (Continuing)
22  Q. I'm gonna hand you Exhibits 14 and 15.
23  A. Thank you.
24  Q. Mr. O'Rourke, Exhibit 14 is Judge Kennelly's opinion denying
25  the motion to dismiss for lack of subject matter

Page 65

1   jurisdiction?
2   A. Correct.
3   Q. Okay. And Exhibit 15 is Judge Kennelly's denial of the
4   motion to reconsider that ruling?
5   A. That's correct.
6   MR. AIZENBERG: I do move for the admission of Exhibits
7   14 and 15, and I believe your Honor can take judicial notice
8   of these and these are on the public docket.
9   THE COURT: Response.
10  MS. MOLNAR-BONCELA: Your Honor, to the extent that
11  he's moving for the admission of documents 14 and 15, we
12  have a report to the Seventh Circuit Court of Appeals that
13  includes some of these documents and it includes additional
14  documents.
15  THE COURT: But he's only moving for the admission of
16  14 and 15. Do you have any objection to it?
17  MS. MOLNAR-BONCELA: No.
18  THE COURT: Then 14 and 15 are admitted.
19  BY MR. AIZENBERG: (Continuing)
20  Q. I want to direct your attention, Mr. O'Rourke, back to
21  paragraph 3 of your affidavit.
22  A. Yes.
23  Q. And you see at the end of that paragraph you make a
24  reference to -- that the preliminary injunction prevents
25  Judith Rogan access to her assets. Do you see that?

Page 66

1   A.  Yes.
2   Q.  Okay.  You agree that there is a dispute as to whether these
3       are her assets?
4   A.  Yes.  Well, as a sum, yes.
5   Q.  You agree that that dispute is the subject matter of
6       proceedings pending in the Northern District of Illinois;
7       isn't that correct?
8   A.  Only as to -- I believe, with respect to her assets, the
9       dispute really centers on the 6398 case, which relates to
10      all of her assets.  The preliminary injunction, I believe --
11      I believe that the preliminary injunction does not really
12      pertain to a lot of her assets, because they were already
13      under the jurisdiction of the 6398 case, so I would not -- I
14      would dispute whether the 8288 case involves all of her
15      assets.  Okay?
16  Q.  But you do agree that some --
17  A.  Oh, sure.
18  Q.  -- of the proceedings in the Northern District of Illinois
19      pertain to a dispute about Ms. Rogan's assets.
20  A.  Right.  Correct.
21  Q.  And back to the 8288 case that you're referring to, that was
22      the Dexia versus Rogan case?
23  A.  Yes.
24  Q.  And did you -- you reviewed the TRO preliminary injunction
25      briefing that Dexia submitted in that case, isn't that

Page 67

1       right, after it became public?  Isn't that correct?
2   A.  I reviewed much of it.
3   Q.  And colleagues of yours in your office reviewed it as well?
4   A.  Yes.
5   Q.  And, in fact, isn't it true that in that proceeding, because
6       you were disputing this, that Dexia argued that the assets
7       that you say are Mrs. Rogan's, that Dexia disputed that in
8       that case as well?  You didn't see that in those briefs?
9       And that's Exhibit 8 that we submitted.  Those briefs are
10      Exhibit 8, the CD ROM.  I didn't think we wanted to open
11      that all up but...
12  A.  They raised that but they did not deal with the fact that
13      the assets were already subject of, and in the jurisdiction
14      of, the 6398 case.
15  Q.  I understand.  So you're not --
16  A.  They never dealt with it.
17  Q.  So you're not disputing the fact that Dexia disputes it in
18      the Dexia case, but you're saying you think another case
19      should take precedence?
20  A.  I'm saying that those issues were already subsumed in
21      another case.  So the court didn't have any jurisdiction
22      over the issues related to those, the major assets of Ms.
23      Rogan.
24  Q.  Directing your attention to paragraph 9 of your affidavit --
25  A.  Yes.

Page 68

1   Q.  -- not the part relating to property law, which the Court
2       has already addressed, but the beginning part.  You say,
3       Freezing all of her assets with the preliminary injunction
4       effectively makes those assets available to Dexia Credit
5       Local and the United States of America.  [As read.]  Do you
6       see that?
7   A.  Yes.
8   Q.  Okay.  Isn't it true that Judy Rogan has never given any of
9       her assets to Dexia or the United States?  Is that right?
10  A.  Given?
11  Q.  Yeah.
12  A.  That's not what this says.  No, she's never gifted anything
13      to the United States.  She's not a --
14  Q.  Isn't it true that --
15  A.  Excuse me.  She's not a judgment debtor of either the United
16      States or Dexia.
17  Q.  Isn't it true that Judge Kennelly has never ordered Mrs.
18      Rogan to give her assets to Dexia or the United States?
19  A.  No, he's frozen them.
20  Q.  But he hasn't actually ordered them to be turned over to
21      those parties; correct?
22  A.  Not yet.
23          MR. AIZENBERG:  I have no further questions.
24          THE COURT:  Cathy or Gordon, do you have -- oh, Joe.
25      Joe first.  I'm sorry.  Keeping it in the pattern of what

Page 69

1       we're doing.
2           MR. STEWART:  Thank you, Judge.
3           C R O S S - E X A M I N A T I O N
4   BY MR. STEWART:
5   Q.  Michael, you know who I am, don't you?
6   A.  I sure do, Joe.
7   Q.  How long have we known each other?
8           THE COURT:  If you don't really know, you can say a
9       long time.
10  A.  Yeah, a long time.  A number of years.  A number of years.
11  BY MR. STEWART:  (Continuing)
12  Q.  We met in late January or early February 2007?
13  A.  I thought -- no, I think we met earlier than that.
14  Q.  It was when we served the citation to discover assets on
15      Mrs. Rogan, wasn't it?
16  A.  I met you before then.  You don't remember?  I'm hurt but
17      that's okay, Joe.
18  Q.  We certainly met in January of '07 when we served the
19      citation to discover assets on Mrs. Rogan?
20  A.  Yes.
21  Q.  And you came to our office and we had a meeting about that
22      citation to discover assets?
23  A.  Yes.
24  Q.  And that citation proceeding has been pending in the
25      Northern District of Illinois since January of 2007 against

18 (Pages 66 to 69)

Page 70

1    Mrs. Rogan?
2    A.  It's lapsed.  It's only six months.
3    Q.  But it's pending?
4    A.  It is not pending.
5    Q.  Did you read Judge Darrah's opinion in that case where he
6        said that the citation didn't lapse?
7    A.  It lapsed.
8    Q.  Where he relied on the Seventh Circuit case that said that
9        citations to discover assets don't lapse?
10   A.  It lapsed.  I know.  I've read Judge Darrah's opinion but
11       Rule 277 and the portions that deal with that are pretty
12       clear about that.
13   Q.  So you disagree with Judge Darrah's decision?
14   A.  Absolutely.
15   Q.  Okay.  That's fair.  But that's the decision of the case.
16   A.  So far.
17   Q.  And you've practiced in Chicago all your life?
18   A.  Yes.
19   Q.  And how many cases do you have here in Indiana?
20   A.  Right now I have probably 20.  Maybe more.  Probably at
21       least 20.
22   Q.  What kind of cases are those?
23   A.  We represent a number of parties in Fleet litigation.
24   Q.  Fleet litigation?
25   A.  Phospho-soda litigation with Jack Kramer, who is in

Page 71

1        Schererville, Tauber, the Tauber law firm.
2    Q.  So you drive frequently between Illinois and Indiana?
3    A.  Yeah.  We also represent Falk Engineering in cases in
4        Valparaiso, Porter County, along with Hoeppner, Wagner &
5        Evans.  So I have a number of clients there.
6    Q.  So you're well-traveled?
7    A.  Not really but I have to drive.
8    Q.  As a matter of fact, you filed a lawsuit on behalf of Ms.
9        Rogan here in Indiana, did you not?
10   A.  Yes.
11   Q.  And that concerned the -- what we call the Wexford property,
12       the marital home?
13   A.  Well, both Wexford and Erie but primarily the Wexford.
14   Q.  And you also attacked the citation to discover assets that
15       had been served on Judy Rogan by the United States and by
16       Dexia in that lawsuit?
17   A.  No.  No.  We attacked the nominee judgment liens that were
18       filed against her real property that were completely
19       baseless, because there were no nominee findings against
20       Judy Rogan that formed any basis of a judgment lien.  And
21       that's what was filed in Indiana.
22   Q.  As a matter of fact, though, you filed claims with regard to
23       citations as well, didn't you, on behalf of Mrs. Rogan?
24   A.  I think primarily the claims were against the judgment
25       liens.

Page 72

1    Q.  I didn't ask you primarily.  I asked whether your claims in
2        that complaint that you filed involved the citation to
3        discover assets.
4    A.  I'm not sure they did.  I don't think so.  I think that they
5        involved the judgment liens.  I could be wrong.  I could be
6        wrong.
7    Q.  You could be wrong?
8    A.  Yeah.
9    Q.  All right.  You filed that first suit that you filed in
10       Indiana and it I was dismissed; isn't that correct?  You
11       filed the second suit in the state court in Indiana.  And
12       that was -- you sought to attack the liens that the
13       Government and Dexia had filed against those two properties?
14   A.  Against the -- on the Federal Debt Collection Act, yes.
15   Q.  And also attacking the citation to discover assets that had
16       been filed by Dexia Credit and the United States against
17       Mrs. Rogan?
18   A.  I don't remember that being part of the suit, but it could
19       have been.  I believe that the suit involved the -- you
20       know, specifically the judgment liens that were filed
21       against the real estate.
22   Q.  Well, that case was eventually transferred to the Northern
23       District of Illinois; isn't that correct?
24   A.  Right.
25   Q.  And consolidated into what you call the 6398 case?

Page 73

1    A.  That's correct.
2    Q.  And when that case was consolidated, you moved to dismiss
3        for lack of venue; isn't that correct?
4    A.  Right.
5    Q.  Because you wanted the case back here in Indiana?
6    A.  It had to do with Indiana real estate.
7    Q.  Well, there was the Erie condo in Chicago as well, wasn't
8        there?
9    A.  Yeah, but she was an Indiana resident and it involved
10       Indiana assets and it was Indiana real estate, which was the
11       primary focus of the litigation.
12   Q.  But you did seek to move the litigation over into Indiana;
13       isn't that correct?
14   A.  Right.
15   Q.  And then --
16   A.  No, no.  We just -- we dismissed it here for improper
17       venue.  It was an improper venue.
18   Q.  The first case was when you filed in -- after the district
19       court --
20   A.  Right.
21   Q.  -- and it was dismissed for lack of jurisdiction?
22   A.  Right.
23   Q.  The second time you filed it in state court.  We removed it
24       up to federal court?
25   A.  Federal court, right.

Page 74

1   Q.  And then it was transferred to Illinois?
2   A.  Right.
3   Q.  And then when the case was transferred to Illinois, you
4       tried once again to bring it back to Indiana by alleging
5       there was no venue.
6   A.  No.  No.  What you're -- no.  The case that we tried to
7       transfer back to Indiana was the foreclosure case that had
8       been independently filed by the United States against both
9       Rogans and Dexia regarding Wexford and the Erie
10      condominium.  There were two pieces of property that the
11      United States foreclosed.  We moved to dismiss that back
12      because it involved Indiana real estate and Judy Rogan was
13      not a resident of Illinois.  That's the one we tried to move
14      back.
15  Q.  Then you filed the Chapter 11 bankruptcy case here in
16      Indiana.
17  A.  Chapter 11, yes, and then the Chapter 13.
18  Q.  And then after the Chapter 13 was filed, then you once again
19      went into the Northern District of Illinois and you sought
20      to have a foreclosure action involving title to the Erie
21      property and the Wexford property transferred back here?
22  A.  That was before.  No, we moved before.
23  Q.  After the bankruptcy was filed?
24  A.  I believe we moved before to have that case dismissed or
25      transferred back to Indiana, the foreclosure case and --

Page 75

1   Q.  My question to you is:  After the Chapter 13 was filed,
2       didn't you make a motion before Judge Kennelly to transfer --
3   A.  Oh, I'm sorry.
4   Q.  -- the foreclosure case --
5   A.  Yes.
6   Q.  -- back to Indiana?
7   A.  Yes.  Yes.  Indeed, to be heard here in the bankruptcy
8       court.
9   Q.  And --
10  A.  Which is still pending.
11  Q.  Uh-huh.  How long does it take you to come here to Indiana?
12  A.  It depends on traffic, but usually I can get here within an
13      hour.
14  Q.  Within an hour?
15  A.  Yes.
16  Q.  So about two hours round trip?
17  A.  Right.
18  Q.  With regard to Mrs. Rogan's assets, you've referred to them
19      consistently as her assets.  I think you conceded with Mr.
20      Aizenberg that there is a genuine dispute about these
21      assets.
22  A.  I don't believe that they're genuine, but they have raised a
23      dispute.  I think as far as her Wexford property and her
24      real estate that she's owned for 20 years, you know, 15
25      years before either one, the United States or Dexia, showed

Page 76

1       up on the scene, I think the claims are frivolous.
2   Q.  You think they're frivolous?
3   A.  Yes, I do.
4   Q.  And so you were able to get these claims dismissed in the
5       district court as frivolous?
6   A.  We haven't gone on the merits on those cases.
7   Q.  Well, but if they're frivolous, you should be able to get
8       them dismissed; right?
9   A.  No, no, no.  No, we have jurisdictional motions and then the
10      bankruptcy was filed.  Those cases have just started.  The
11      6398 and the 8288 as to Judy Rogan have not gotten off the
12      ground yet.
13  Q.  Do you remember when the foreclosure case, the second
14      foreclosure case was pending and we were going to come here
15      to Indiana to have a hearing on that?  There was a
16      discussion between us about whether we should resolve that
17      case?
18  A.  Hold on.  The second foreclosure case?
19  Q.  Uh-huh.  In Indiana.
20  A.  What's the second foreclosure case, because I'm only aware
21      of one foreclosure case.
22  Q.  I'm sorry.  The second case that was filed in Indiana.
23  A.  Okay.  Okay.  That was not a foreclosure case.
24  Q.  Do you recall that there was going to be a hearing here in
25      Indiana, and we tried to resolve that prior to it going to

Page 77

1       hearing?
2   A.  We did.
3   Q.  We had discussions, though, you and I did, didn't we, before
4       that, that case?
5   A.  Yeah.
6   Q.  And didn't I tell you at that time that Dexia was going to
7       file a motion to freeze all the assets?
8   A.  No.
9   Q.  I didn't?
10  A.  No, you did not.
11  Q.  Didn't I tell you?  As a matter of fact, didn't I tell you,
12      Mike, that Dexia -- let me finish my question.
13  A.  Sure, I'll be happy to.
14  Q.  -- that Dexia was gonna file this motion to freeze assets,
15      and at that time Mrs. Rogan would be left without access to
16      her assets, or to any assets -- I stand corrected -- to any
17      assets?
18  A.  You did not.
19  Q.  And your response to that was, Joe, Scott's been telling --
20      Scott Mendeloff has been telling me for months that he's
21      going to file that motion and he never has.  Let him come
22      and file it.  Didn't you tell me that?
23  A.  I never discussed that with you, period.  What are you
24      talking about?  Where were we?
25          THE COURT:  Okay.  Asked and answered.

Page 78

1  A. All right. No. No.
2  BY MR. STEWART: (Continuing)
3  Q. And Mr. Mendeloff told you, didn't he, Mr. Aizenberg's
4     partner, that he was going to -- that Dexia was going to
5     file a motion --
6  A. No.
7  Q. -- to freeze assets --
8  A. No, he never did.
9  Q. -- in advance of the TRO?
10 A. Nonsense. Never. Because if he had, I would have said
11    bring it in front of Kennelly, because we're in front of
12    Kennelly. Instead, he went in on a case that we weren't
13    parties to.
14 Q. He did bring it before Judge Kennelly.
15 A. In another -- in a case that we're not parties to. That's
16    right. Without notice. And he did it with -- for weeks
17    without notice.
18 Q. Well --
19 A. Even though we were appearing in --
20     THE COURT: Okay. It's nonresponsive.
21 A. All right.
22 BY MR. STEWART: (Continuing)
23 Q. Finally, in your affidavit you refer to the suspect judgment
24    of Dexia.
25 A. Yes.

Page 79

1  Q. Now prior to coming here today you were aware of the fact
2     that Judge Kennelly issued a decision, not only one decision
3     but two decisions, finding that that judgment was indeed
4     final; isn't that correct?
5  A. Yes.
6  Q. Okay. But you never sought to file an amended affidavit,
7     did you?
8  A. Amended affidavit? It's still suspect because he didn't
9     have jurisdiction to do a nunc pro tunc order against Judy
10    Rogan.
11 Q. You consider it suspect.
12 A. He doesn't. It violates the automatic stay. You can't
13    go --
14     THE COURT: Okay. Wait a minute. Okay. Let's just
15    put this to rest. The affidavit is Mr. O'Rourke's
16    representation of his opinion as to the validity of that
17    judgment.
18     MR. STEWART: Fair enough. Very good. Thank you.
19     THE COURT: Cathy or Gordon.
20     MS. MOLNAR-BONCELA: Yes, your Honor. Your Honor,
21    could I ask your permission to do my examination from the
22    counsel table?
23     THE COURT: You can remain seated if you'd like. You
24    can be wherever you want as long as you don't sit up here
25    next to me.

Page 80

1      MS. MOLNAR-BONCELA: I'm not going to say anything,
2  your Honor.
3      I'm going to hand Counsel and your Honor an exhibit for
4  identification purposes, if I may come forward.
5      THE COURT: Uh-huh. Certainly.
6      MS. MOLNAR-BONCELA: Exhibit -- this is Debtor's
7  Exhibit U. T, I believe, is the last one that we had
8  included in our prior documents and statement of evidence.
9      R E D I R E C T   E X A M I N A T I O N
10 BY MS. MOLNAR-BONCELA:
11 Q. And, Mr. O'Rourke, I'm going to ask you if you recognize
12    what has been marked for identification purposes as Debtor's
13    Exhibit U.
14 A. Yes.
15 Q. And could you describe to the Court what that document is.
16 A. This is a report that was ordered to be filed by the Seventh
17    Circuit Court of Appeals when it was made aware of the
18    defects in the subject matter jurisdiction of the underlying
19    lawsuit upon which the injunction was issued against Judy
20    Rogan. In supplementary proceedings attendant to that
21    underlying case, Judge Cudahy entered an order directing the
22    parties to file a full report of the proceedings on Judy
23    Rogan's motion to dismiss the citation and the underlying
24    case for lack of subject matter jurisdiction and suspended
25    briefing pending a full report to the Seventh Circuit of the

Page 81

1  outcome of that proceeding. And it was ordered to be filed
2  by February 23rd. We have filed it as of -- filed it
3  February 19th.
4  Q. And does that document reflect a true and accurate copy of
5     what was filed with the Seventh Circuit?
6  A. Correct.
7      MS. MOLNAR-BONCELA: Your Honor, at this time I would
8  move for admission of the debtor's exhibit that has been
9  marked for identification as Exhibit U.
10     MR. STEWART: Judge, we're gonna object. I'm going to
11 object. I don't know what -- I think if they're saying that
12 this is relevant to the success on the merits element but --
13     THE COURT: I suppose that's what it goes to.
14 Correct?
15     MS. MOLNAR-BONCELA: Yes, your Honor.
16     MR. STEWART: With regard to that, it's not probative
17 of anything. It reflects that they're disputing the judge's
18 decision but that's all. There's no showing here that this
19 underlies the show that was already made that there is --
20 that, you know, there's a likelihood of success on the
21 merits in the Dexia matter.
22     Secondly, if there was gonna be any evidence proposed,
23 it would be something along the lines of a writ of mandamus
24 alleging that Judge Kennelly was doing something -- was or
25 was not doing something that was required by law. But

Page 82

1  there's no clear case here, you know. Judge Kennelly made a
2  decision. He's ruled on the facts and the law. And all
3  this reflects is a dispute about that. Whether it's even a
4  good faith dispute remains to be seen.
5      THE COURT: Okay. And having heard the objection, the
6  Court determines the objection is to the weight to be given
7  to this, not to the admissibility; therefore, the objection
8  is overruled.
9      MR. STEWART: Thank you, Judge.
10     MS. MOLNAR-BONCELA: Thank you, your Honor.
11     THE COURT: And Exhibit U is admitted.
12     MS. MOLNAR-BONCELA: Thank you. And the next thing
13  that Counsel would like to do at this point is to request
14  that paragraph 9, which was previously struck be
15  reconsidered as part of the affidavit before this Court.
16  Based on the direct examination of Mr. Mendeloff, which
17  explored extensively issues dealing with paragraph 9,
18  including a specific reference to the witness in the
19  cross-examination of Mr. O'Rourke to issues dealing with
20  paragraph 9 and the language of paragraph 9.
21     THE COURT: The only portion of paragraph 9 that was
22  actually stricken from consideration was the opinion that
23  whatever this states is in contravention of Indiana property
24  law. The rest of it remains for whatever use it is.
25     MS. MOLNAR-BONCELA: Okay. Then my note was

Page 83

1  inaccurate, your Honor. I had written that it was struck.
2      THE COURT: That was my recollection too, and that was
3  all they objected to was the characterization of it being a
4  contravention of Indiana law.
5      MR. AIZENBERG: Correct.
6      MS. MOLNAR-BONCELA: Thank you, your Honor, for
7  clearing that up. I don't write quickly enough and based on
8  my notes --
9      THE COURT: I didn't even write a note. I just
10  remember that. I'm pretty good, huh?
11     MS. MOLNAR-BONCELA: I'm sorry, your Honor.
12     MR. GOUVEIA: Can we have a minute, your Honor?
13     THE COURT: Sure.
14     MS. MOLNAR-BONCELA: I just have a couple more
15  follow-up questions at this point, your Honor.
16  BY MS. MOLNAR-BONCELA: (Continuing)
17  Q. Mr. O'Rourke, do you remember the discussion that was had
18     between yourself and the movant concerning the appeal of the
19     preliminary injunction to the Seventh Circuit?
20  A. We've had a number of discussions.
21  Q. Okay. What I'll refer you specifically to is the discussion
22     with reference to the automatic stay --
23  A. Yes.
24  Q. -- prohibiting the movant from requesting turnover of those
25     assets before the Court.

Page 84

1  A. Sure.
2  Q. Is there a real concern that, if the stay is lifted, that
3     they will seek turnover of those assets in --
4  A. No question.
5  Q. -- front of Judge Kennelly?
6  A. No question.
7      MR. AIZENBERG: Objection, your Honor. This is outside
8  the scope of his affidavit or any questioning that we
9  issued.
10     THE COURT: And it's also speculation. Objection
11  sustained.
12  BY MS. MOLNAR-BONCELA: (Continuing)
13  Q. Has there been a turnover motion in the 8288 case? I
14     believe that's the right number.
15  A. Yes.
16  Q. And has there been a turnover motion against Judy Rogan?
17  A. No.
18  Q. If there is relief from stay to proceed, is it your opinion
19     that there would be a possibility of filing of a turnover
20     motion?
21     MR. AIZENBERG: Objection, your Honor. His opinion is
22  very irrelevant and speculative as well.
23     THE COURT: The basis for submission of evidence in a
24  federal court is personal knowledge. This is entirely
25  speculative. The objection is sustained.

Page 85

1  BY MS. MOLNAR-BONCELA: (Continuing)
2  Q. Procedurally, if relief is granted, can a motion for
3     turnover be filed in District Court?
4      MR. AIZENBERG: Your Honor, same objection. And, also,
5  this is asking about the law again, and so that's a second
6  objection, just sort of asking whether the rules of civil
7  procedure are permitted or some other procedure.
8      THE COURT: I also deem it to be irrelevant so that's
9  sustained. But I deem it to be irrelevant because the scope
10  of the stay at issue here will be what I decide. And so
11  whether or not that's within the scope of what I decide if I
12  lift the stay is going to be determined by my order; and you
13  can't tell me in advance what I'm gonna write, can you?
14     MS. MOLNAR-BONCELA: No, I can't, your Honor.
15     THE COURT: Neither can Mr. O'Rourke, can he?
16     MS. MOLNAR-BONCELA: No, your Honor, but --
17     THE COURT: Then the objection's sustained.
18  BY MS. MOLNAR-BONCELA: (Continuing)
19  Q. Mr. O'Rourke, do you recall the discussion considering how
20     long you had represented Mrs. Rogan?
21  A. Yes.
22  Q. Do you recall the discussion where you indicated that you
23     were aware of the assets that Mrs. Rogan has?
24  A. Yes.
25  Q. Are you aware of any assets that have not been frozen?

Page 86

1   A. No.
2   Q. Are you aware of any assets available to Mrs. Rogan to pay
3      attorneys' fees in this case?
4        MR. AIZENBERG: Objection, your Honor. She's leading
5      the witness. This is her witness.
6        THE COURT: Overruled on that ground.
7   A. No. She is working but there are none and there have not
8      been funds available to support counsel, to my knowledge.
9        MR. AIZENBERG: Objection.
10      THE COURT: He's already testified.
11 BY MS. MOLNAR-BONCELA: (Continuing)
12   Q. And are you aware of the fees that Mrs. Rogan owes you based
13     on prepetition work?
14   A. Yes.
15   Q. And how much is that claim about, roughly?
16   A. Around $200,000.
17   Q. Are you aware of the fees that Mrs. Rogan owes you for
18     postpetition work?
19       MR. AIZENBERG: Objection, your Honor. You've already
20     ruled, based on the affidavit that any inquiry was
21     irrelevant. There are two parts of that affidavit,
22     paragraphs 4 and 8, which goes after the issue of access to
23     her assets for purposes of paying counsel.
24      THE COURT: Cathy, respond please.
25      MS. MOLNAR-BONCELA: Your Honor, that is all relevant

Page 87

1   to the issues with reference to what Mrs. Rogan can continue
2   and whether she's going to be able to continue having
3   counsel based on the availability of assets to pay counsel.
4      THE COURT: But the relief here that's being requested
5   is relief from the automatic stay to proceed in a case. And
6   you've got apparently a freeze order. Not apparently. The
7   record does disclose there's a freeze order, which I cannot
8   lift. I cannot affect the decision of the Northern District
9   of Illinois. That's up to them to decide whether or not
10   that violates the stay. All I can do is review and either
11   grant or deny the stay relief they've requested. I cannot
12   modify an order of the United States District Court for the
13   Northern District of Illinois.
14      MS. MOLNAR-BONCELA: And, your Honor, we're trying to
15   ask these questions in connection with how you are going to
16   phrase any order that you have concerning relief from the
17   automatic stay. You can limit or you can condition stay
18   relief on different elements. One of the elements that
19   we're going to is to limit the cost of the matters going
20   forward. And one way you can limit the cost, at least
21   initially, is to limit the stay relief to the prosecution of
22   the matter on the preliminary injunction before the Seventh
23   Circuit.
24      And if the Seventh Circuit, as we believe, will find
25   that the preliminary injunction may have been inappropriate,

Page 88

1   then Mrs. Rogan will have access to her assets in front of
2   this Court and we can come to this Court for the approval of
3   attorneys' fees in order to be paid out of those assets,
4   because as you're aware, all of, you know, the payment of
5   counsel is subject to review by this Court. So there is --
6   since there's a stay in effect and this Court has
7   jurisdiction over all of Mrs. Rogan's assets, there will be
8   no improper use of those assets and if --
9      THE COURT: Okay. Time out. Time out. You're going
10   way, way, way, way far afield. If you're asking him, are
11   her assets, to the extent he knows of her assets, frozen by
12   the preliminary injunction, everybody acknowledges, yes,
13   they are. Okay?
14      MS. MOLNAR-BONCELA: Uh-huh.
15      THE COURT: And then what else do you need to ask?
16   Isn't the rest an argument that she doesn't have money for
17   whatever reason you want to make that argument? What else
18   do you need in evidence other than that?
19      MR. GOUVEIA: Well, Mr. Stewart -- your Honor, Mr.
20   Stewart addressed the issue as to the witness's relationship
21   in defending Mrs. Rogan in the foreclosure action. And to
22   that extent, that is a continuing protection of her assets.
23   And if Mr. O'Rourke cannot continue in that because he's
24   owed attorney fees and this Court is unwilling or unable to
25   release those, unfreeze those assets, or allow her to use

Page 89

1   her assets to pay counsel, then she won't be able to defend
2   herself any longer.
3      THE COURT: Okay. The purpose of his examination is to
4   make an evidentiary record. It's not to give either side an
5   opportunity to argue their position. Let's wrap it up with
6   Mr. O'Rourke please. You've got another witness to go and
7   I'll limit that time further, if you don't wrap this up
8   soon.
9      MR. GOUVEIA: Well, your Honor, we're not seeking to
10   cause any argument with the Court. We're just trying to
11   address the issues as to their objection as to his
12   testimony. That's all we're doing.
13      THE COURT: And I've ruled the last question that was
14   asked, the objection was sustained. Now what's your next
15   question of Mr. O'Rourke?
16      MR. GOUVEIA: I'd like to ask some questions regarding
17   Mr. Stewart's examination of the witness.
18      THE COURT: Okay.
19      MR. AIZENBERG: Thank you, your Honor.
20      R E D I R E C T   E X A M I N A T I O N
21 BY MR. GOUVEIA:
22   Q. Mr. Stewart asked you about the failure to file any actions
23     in front of Judge Kennelly after the dismissal of the
24     Chapter 11 and his reinstatement of the -- or granting of
25     the preliminary injunction. Were you relying on the stay

Page 90

1    issued by this Court by the filing of the Chapter 13 to stay
2    any further proceedings against Mrs. O'Rourke [sic] in
3    the -- oh, against Mrs. Rogan in the Kennelly action, in the
4    action by Judge Kennelly?
5    A.  I assumed it would be --
6         MR. AIZENBERG:  I object.  I think -- I don't
7    understand the question.  The question is ambiguous.  I
8    object to the form of the question.
9         THE COURT:  Well, overruled.  I understand what he's
10   going to and that was something that was partially addressed
11   by Mr. Stewart.  Overruled.
12   A.  I relied on the automatic stay that was in place before
13   Judge Klingeberger.
14   BY MR. GOUVEIA:  (Continuing)
15   Q.  And have you received -- in your representation of Judy
16   Rogan in front of Judge Kennelly, have you received any
17   evidence from the judge or any evidence from Dexia or the
18   USA that they intend to move to take possession of her
19   assets?
20        MR. AIZENBERG:  Objection.  Assumes facts not in
21   evidence.
22   A.  Yes.
23        THE COURT:  Overruled.  He's asking him whether he has
24   any facts.
25   A.  Yes.  The preliminary injunction and the motion for turnover

Page 91

1    that's been filed and which has been stayed as to Mrs. Rogan
2    sets out their intent to seek a turnover of all assets that
3    Judy Rogan holds.  They've got a problem with jurisdiction,
4    because I don't think they can do that in that case.  But
5    they're seeking it.  There's no question about it.  That was
6    the whole purpose manifest in this monstrous filing of
7    theirs against Judy Rogan and on the Rogan children and
8    others affiliated with them.
9    BY MR. GOUVEIA:  (Continuing)
10   Q.  Well, can you tell the Court or do you know what will happen
11   if Judge Kennelly grants a turnover of her assets to Dexia?
12   What happens then, if you know?
13        MR. STEWART:  I'm going to object.  You already ruled
14   that any order that you may enter modifying the stay is yet
15   to be determined.  And all these questions go to is, you
16   know, the extent of the stay.  It's a matter of argument.
17   It's not a matter of this witness's testimony.  Everybody
18   here knows that, you know, in determining the property, one
19   of the consequences could be that the property is ordered to
20   be turned over.  There's no question there, you know.
21        THE COURT:  I agree.  It's sustained.
22   BY MR. GOUVEIA:  (Continuing)
23   Q.  Have there been any actions in front of Judge Kennelly by
24   Dexia or the United States of America regarding the
25   expatriation of --

Page 92

1    A.  Repatriation.
2    Q.  Repatriation.  Excuse me.  Repatriation.  I've been reading
3    too many --
4    A.  Too many mystery novels.
5    Q.  I guess it was expatriated in the first place.
6    A.  Too many spy novels.
7    Q.  The question is:  What actions, if any, have been taken by
8    either Dexia and/or the United States to repatriate the
9    funds from the Bahamian trust?
10   A.  There was a --
11        MR. AIZENBERG:  Objection, your Honor, relevance.
12        THE COURT:  I'm gonna sustain that.  Okay.  I know what
13   happened anyway.  We had a hearing on it.  There's a
14   stipulation.  But, yes, they were repatriated.
15        MR. GOUVEIA:  No, no, no.  The question goes to the
16   action by Judge Kennelly, not the actions of this Court.
17        THE COURT:  And that relates to what that I have to
18   decide?
19        MR. GOUVEIA:  Well, it relates to the turnover of
20   certain assets that she has a claim to.
21        THE COURT:  And that relates to what that I have to
22   decide?  I'm sorry.  I don't follow the relevance.
23        MR. GOUVEIA:  It relates to the fact that once --
24   you're considering relief from the stay and whether or not
25   that will affect any of that repatriation of money.

Page 93

1         THE COURT:  But whatever I decide with respect to
2    relief from the stay will be delineated by the scope of my
3    order.
4         MR. GOUVEIA:  Well, the scope of your order may have
5    some assistance you may be able to get in doing that by
6    listening to his testimony about what Judge Kennelly has
7    already or has not done.
8         THE COURT:  Isn't all that in most of the documents
9    that have already been submitted to me?
10        MR. GOUVEIA:  I don't know.  Some of these documents
11   we -- I don't think so.
12        THE COURT:  You know, it seems to me you're asking him
13   to speculate on what Judge Kennelly may or may not do in
14   response to what I may or may not do and I don't deem that
15   to be relevant.
16        MR. GOUVEIA:  No, sir.  I'm not asking him that at
17   all.
18        THE COURT:  Objection sustained.  Move on please.
19   BY MR. GOUVEIA:  (Continuing)
20   Q.  Has Dexia filed any actions in front of Judge Kennelly and
21   has Judge Kennelly ruled on any actions regarding the
22   appointment of a receiver to hold assets of the other Rogan
23   defendants?
24   A.  Yes.
25        MR. AIZENBERG:  Objection, your Honor.  Relevance.

Page 94

1   THE COURT: He's already answered. You got there too
2   slow.
3   BY MR. GOUVEIA: (Continuing)
4   Q.  Was the receiver that was appointed -- did you know who that
5   receiver was?
6   A.  Yes.
7   MR. STEWART: Your Honor, I'm gonna ask -- Judge, this
8   whole line of argument or questioning about access to assets
9   is completely irrelevant. I think that the elements of this
10  motion deal with, you know, prejudice, hardship, likelihood
11  of success on the merits. There's nothing here that needs
12  to be decided about access to assets.
13  THE COURT: Well, and it seems to me again everybody
14  acknowledges that whatever assets are known to be available
15  to her are subject right now to a preliminary injunction
16  issued by the Unites States District Court for the Northern
17  District of Illinois; and beyond that, what more could she
18  be prejudiced by? Everything she has is frozen. Okay. If
19  you want to argue that's prejudice and somehow that relates
20  to this action, that's a legal argument and we don't need
21  evidence on it.
22  MR. STEWART: Judge, on the other hand, we could be
23  asking Mr. O'Rourke all these questions about what would
24  happen if these assets were determined to be Peter Rogan's.
25  Well, you know...

Page 95

1   THE COURT: It's beyond the scope of what the actual
2   proceedings before me relate to. So, yeah, the objection's
3   sustained.
4   MR. GOUVEIA: Well, your Honor, the Fernstrom case
5   where you painfully instructed me to -- plainly instructed
6   me to review talks about whether the stay relief is going to
7   cause great prejudice to either -- to the bankruptcy
8   estate. And our position is that the bankruptcy estate is
9   her assets so --
10  THE COURT: Okay. Are you arguing the position that
11  you're going to espouse with me in this case, or are you now
12  arguing the evidentiary ruling I made, because if you're
13  arguing the evidentiary ruling I made, you're out of order
14  and don't.
15  MR. GOUVEIA: No, I'm not arguing any --
16  THE COURT: Ask the next question. He's a witness.
17  You can examine him. Don't argue with me please. Ask him a
18  question.
19  MR. GOUVEIA: I'm trying to ask questions and every
20  question I've asked you've overruled me, so I'm trying to
21  find out where I can go with the issues that I'm trying to
22  address. And the issue that I'm trying to address, your
23  Honor, in all respect, is that the relief from the stay that
24  they've asked for is going to prejudice our client because
25  she's going to lose all of her assets, her ability to

Page 96

1   function in either defending herself, feeding herself, or
2   doing anything else on behalf of herself. That's all I'm
3   trying to address. This witness has been representing Mrs.
4   Rogan, as his previous testimony is, for quite some time.
5   THE COURT: And don't you think I can tell from the
6   documents that are already in evidence and what those
7   proceedings relate to what the potential manifestations are
8   to that litigation? Don't you think I can do that? I've
9   been a commercial lawyer for 30 years. Don't you think I
10  can figure that out? You can make an argument from the
11  evidence. Okay? This is getting really long now. You've
12  got another witness. Practically everything you're asking
13  him is irrelevant in my view.
14  MR. GOUVEIA: Your Honor --
15  THE COURT: Ask him another question please.
16  MR. GOUVEIA: Your Honor --
17  THE COURT: Don't argue with me any further.
18  BY MR. GOUVEIA: (Continuing)
19  Q.  Do you know of any ruling that Judge Kennelly has made that
20  will impact Judy Rogan's assets?
21  MR. AIZENBERG: Objection, your Honor.
22  MR. STEWART: Objection.
23  MR. AIZENBERG: Relevance. This is the same line of
24  questioning.
25  THE COURT: The rulings speak for themselves. They're

Page 97

1   already part of the record. Sustained.
2   BY MR. GOUVEIA: (Continuing)
3   Q.  Can you tell us, Mr. O'Rourke, what the status of the
4   Seventh Circuit appeal is on the preliminary injunction?
5   MR. AIZENBERG: Objection. Relevance. We'll stipulate
6   that it's pending.
7   THE COURT: Well, I think that's been the evidence. Go
8   ahead and quickly respond. Overruled.
9   A.  Yeah. The appellant's brief is filed, and the brief of
10  Dexia is going to be ordered, I believe, or something's
11  gonna be done. The briefing's been suspended pending the
12  Court's review of the -- the Seventh Circuit Court's review
13  of the motion to dismiss. And we're expecting an order with
14  respect to further -- well, whatever. Either taking action
15  with respect to jurisdiction or ordering further briefing.
16  But our brief's filed and the -- and our report is
17  filed. I believe Dexia has their report to file, and then
18  the Seventh Circuit should issue an order to decide the next
19  step, which may be order briefing. But the appellant's
20  brief, there is no date yet set for that.
21  BY MR. GOUVEIA: (Continuing)
22  Q.  Thank you. Prior to the entry of the stay, the automatic
23  stay that was occasioned by the filing of the Chapter 13
24  bankruptcy of Judy Rogan, were there any pending motions in
25  front of Judge Kennelly affecting her property?

Page 98

1  A.  Yes.
2  Q.  What would that be?
3  A.  Preliminary injunction.
4  Q.  Other than the preliminary injunction that was appealed --
5      excuse me -- are there any other pending motions?  Are there
6      any pending matters before Judge Kennelly that were stayed
7      by that action, other than the preliminary injunction?
8  A.  Yes.  The Mareva injunction that had been obtained against
9      her in Canada was also obtained and was a precipitating or a
10     catalyzing factor in the filing of the bankruptcy.
11 Q.  And in which action is that pending?
12 A.  It's up in -- actually it's pending up in Canada in the
13     Vancouver trial court.
14 Q.  Is there any pending discovery or any other pending motions
15     regarding the -- by Dexia or the USA in front of Judge
16     Kennelly that were stayed or that were halted as a result of
17     the stay?
18 A.  Yes.  The 6398 case was --
19 Q.  When you say 6398 --
20 A.  Well, I'm sorry.  The judicial foreclosure filed by the
21     United States --
22 Q.  That's the 6398?
23 A.  The 6398 case was also stayed.
24 Q.  And what was pending there, if anything?
25 A.  The complaint in and -- the complaint for foreclosure of the

Page 99

1      Wexford, Indiana, and the Erie condominium, Chicago,
2      property by the United States against Judy Rogan and Dexia,
3      foreclosure against Dexia, and our counter -- Judy Rogan's
4      counterclaim for the improper nominee judgment liens filed
5      against Wexford and against her condominium and taking and
6      questioning the actions under the Federal Debt Collection
7      Procedures Act by the United States with respect to her
8      assets generally.
9          THE COURT:  Okay.  When you say "foreclosure," I need
10     to have all this clarified; although I'm pretty sure I know
11     the answer.  That is the foreclosure judgment lien obtained
12     by the United States with respect to her husband?
13         MR. STEWART:  Yes.
14 A.  Yes.
15         THE COURT:  Okay.  Fine.  Thank you.  I know that the
16     FDCPA kind of refers to it as something, but I think of
17     foreclosure as a voluntary lien.  But okay, now we know
18     that's the enforcement of the judicial lien the United
19     States obtained as a result of this judgment.
20 BY MR. GOUVEIA:  (Continuing)
21 Q.  And can you tell the Court what the status of that action
22     is, that 98 action?
23         MR. STEWART:  I'm going to object.  You know, the
24     purpose of redirect is to really address what was discussed
25     on cross.  We kept our questions on cross-examination to

Page 100

1      what's in this affidavit.  It wasn't a wide ranging
2      cross-examination.  And these matters are going far afield,
3      and I object on that basis.  They had an opportunity to
4      submit either a lengthier affidavit or to put Mr. O'Rourke
5      on live and ask him all these questions.  We're -- you know,
6      we have other things to do and we'd like to get to them.
7          MR. GOUVEIA:  I thought Mr. Stewart got into that area,
8      and I apologize to the Court if he did not.
9          THE COURT:  It's so tangentially related to anything,
10     I'm gonna have to sustain it.
11         MR. GOUVEIA:  We have no further questions, your Honor.
12         THE COURT:  Any redirect?  Re -- I suppose it's
13     recross.
14     R E C R O S S - E X A M I N A T I O N
15 BY MR. AIZENBERG:
16 Q.  Mr. O'Rourke, did you state -- I want to make sure this was
17     your testimony -- that no objection was raised to the
18     preliminary injunction after it was entered after the
19     Chapter 13 was filed because of the automatic stay?  Is
20     that --
21 A.  I don't understand your question.
22 Q.  Did you testify earlier that no objection has been raised to
23     the preliminary injunction in any way in front of Judge
24     Kennelly because of the automatic stay?  Was that your
25     testimony?

Page 101

1  A.  No, I didn't testify to that.
2  Q.  Okay.  Then I have no questions.  I thought that I heard
3      that and I was just checking.
4          THE COURT:  Okay.  Joe.
5          MR. STEWART:  No.  Thank you, Judge.
6          THE COURT:  Okay.  Are we all done?  Thanks.
7      Can we discharge Mr. O'Rourke --
8          MR. AIZENBERG:  Yes.
9          THE COURT:  -- so he can leave?  Everybody agree?
10         MR. GOUVEIA:  Yes, sir.
11         MR. AIZENBERG:  Yes.
12         THE COURT:  Okay.  Now what do we have left?
13         MR. GOUVEIA:  Mrs. Rogan.
14         THE COURT:  Mrs. Rogan?  Do you anticipate taking an
15     hour?  I gave you an hour, if you want an hour.
16         MR. GOUVEIA:  Well, we'll try to make it as short as
17     possible and if it lasts 45 minutes or a half hour, we'll
18     stop.  And they have questions to go through.
19         THE COURT:  Yeah, however long it takes.
20         MR. AIZENBERG:  Does that include our
21     cross-examination?
22         THE COURT:  No, no.  It's pretty explicit here.  They
23     have an hour; you have an hour; they have 20 minutes on
24     redirect; you have 20 minutes on recross.  Let me remind
25     both sides though that if we really go two hours and 40

Page 102

1    minutes on examination of Mrs. Rogan, it's going to be 7:00
2    o'clock before we get out of here.
3        So, anyway, we're going to take a recess now and be
4    back at 4:15.
5            (There was a pause
6            in the proceedings.)
7        THE COURT: Let's talk about something for a minute.
8    You asked me what, kind of, the scope I'm looking for is.
9    There are two adversary proceedings pending here in this
10   Chapter 13. They relate to a bank account investment.
11   Dexia is a defendant in both of those adversary
12   proceedings. I realize there's a motion to dismiss. But
13   isn't the focus of those to determine that those assets were
14   property of this estate and that they should be freed up
15   from whatever is precluding their use?
16       MR. GOUVEIA: Yes.
17       THE COURT: Okay. Didn't you say when we started all
18   of this that your focus in opposing the stay relief was to
19   have me decide certain issues of what is Judith Rogan's
20   property and what is not?
21       MR. GOUVEIA: We want you to decide only to the extent
22   of allowing her to use those assets.
23       THE COURT: Well, part of what they're saying, though,
24   especially the United States, if I understand their theory
25   of nominee lien, is even though it might be titled to Judy

Page 103

1    Rogan, it's not really hers. She's essentially a straw.
2        MR. GOUVEIA: We're not sure --
3        THE COURT: Wait a minute. Is that essentially what
4    you're --
5        MR. STEWART: Yes, your Honor. And, moreover, in
6    discovery Ms. Rogan has said that Peter Rogan has zero
7    interest in these properties. So it seems to us that,
8    having taken that position, that if we can prove that he
9    does have interest in these properties, then Mrs. Rogan,
10   conversely, has zero interest in these properties.
11       THE COURT: Okay. But, yeah, your contention is
12   basically it's not her property.
13       MR. STEWART: That's correct.
14       THE COURT: And then Dexia, in turn, in a fraudulent
15   conveyance context, is saying certain assets that had been
16   placed in her name were fraudulently conveyed to her; and,
17   therefore, should either be transferred back to the original
18   transferor, or an alternative for that is always a monetary
19   judgment in case you can't replace the assets. Is that
20   correct.
21       MR. STEWART: That's one of our theories.
22       THE COURT: Yeah. That's one of your theories?
23       MR. AIZENBERG: That's correct.
24       MR. GOUVEIA: Well, what else is your theory?
25       THE COURT: Well, the other thing you want me to decide

Page 104

1    then is, is it really property of her estate or is it
2    somehow impressed with some kind of title in somebody else
3    so it's not property of her estate; or with respect to the
4    foreclosure action, is it really her property or can they
5    succeed in saying, No, it really isn't, she really has no
6    interest?
7        Okay. Now, the focus of the prejudice isn't whether
8    you're gonna win or lose those. That's not what the case
9    law says, and that's not what I've tried to tell you. Her
10   prejudice isn't potentially losing the case in the Northern
11   District of Illinois, because you're gonna ask me to decide
12   and I've got two pending adversaries here that tell me
13   you're asking me in part to decide this, issues of what is
14   hers and what might be somebody else's. So the real
15   question to me is what's the difference between the Northern
16   District of Illinois determining issues concerning the
17   extent of her interest in properties as opposed to me? What
18   prejudice is up there as opposed to me in relation to
19   expense?
20       MR. GOUVEIA: Well, that's always the issue. That's
21   what Fernstrom tells us. Fernstrom tells us -- you're
22   asking for argument now.
23       THE COURT: No.
24       MR. GOUVEIA: But Fernstrom tells us that that's always
25   the question that you're asking in stay relief: What is the

Page 105

1    prejudice to the parties in terms of granting stay relief?
2    Now I will grant you that the distinction here
3    is -- and it's a proper one that you've taken -- is what
4    difference does it make where that decision goes? And, yes,
5    there is prejudice for her to go up there. That's not where
6    she resides. That's not where she lives. That's not
7    where -- you know, and, two, unless somebody frees up these
8    assets for her, she can't even go anywhere.
9        THE COURT: Okay. But the focus is not --
10       MR. GOUVEIA: She's not gonna be able to defend
11   herself.
12       THE COURT: The focus is not freeing up the assets.
13   The issue is not whether she wins or loses, the issue is
14   what's the prejudice deciding -- you've told me all along
15   it's gonna have to be decided somewhere, here or there.
16   What is the difference between deciding it there as opposed
17   to here that prejudices her?
18       MR. GOUVEIA: You're the bankruptcy judge and you're
19   taking into consideration a number of things that that --
20   that those courts can't or don't necessarily have to
21   consider and that is other creditors. They're looking at
22   two creditors, these two.
23       THE COURT: Okay. That's a legal argument.
24       MR. GOUVEIA: No, it's not.
25       THE COURT: Yes, it is. You don't need her to testify

Page 106

1    to that. She filed schedules. I assume the schedules state
2    all the creditors, do they not?
3        MR. GOUVEIA: Oh, you're trying -- I'm sorry. I didn't
4    realize. Are we talking about what she's going to testify
5    to here today?
6        THE COURT: Well, yeah. I'm asking you what the
7    scope -- you've asked me what is the scope of what prejudice
8    is, and I'm trying to direct your testimony so I don't get a
9    lot of stuff about I have no money, it cost me X dollars to
10   litigate up there. Unless you can tell me that X up there
11   is greater than Y here to do the same thing, then I deem it
12   irrelevant.
13       MS. MOLNAR-BONCELA: But, your Honor, I think the real
14   issue of prejudice here is that Seventh Circuit appeal of
15   the preliminary injunction, which solves a number of
16   issues. If that injunction is overturned, when her assets
17   are available to this court as property of the estate. And,
18   your Honor, you may then grant them additional relief from
19   the stay to prosecute those actions in the Illinois court.
20   However, with those assets freed up, she then has the
21   opportunity to hire counsel to represent her in those
22   actions.
23       THE COURT: Okay. But that's a legal argument. That
24   doesn't have anything to do with lifting the stay. Okay?
25   Okay. That's enough. That's enough. We've gotta move on.

Page 107

1        Call your witness please.
2        MS. MOLNAR-BONCELA: Your Honor, we call Judy Rogan.
3        THE COURT: Please stand and be sworn.
4        J U D I T H   K.   R O G A N,
5    having been called as a witness on her own behalf, being first
6    duly sworn upon her oath, to tell the truth, the whole truth, and
7    nothing but the truth, was examined and testified as follows:
8        D I R E C T   E X A M I N A T I O N
9    BY MS. MOLNAR-BONCELA:
10   Q.  Good afternoon. Please state your name for the record.
11   A.  Judy Rogan, Judith.
12   Q.  And have you filed a bankruptcy petition in this court?
13   A.  Yes.
14   Q.  What is your address?
15   A.  206 Scarborough Court, Valparaiso, Indiana.
16   Q.  And how long have you lived there?
17   A.  Since October of 2007.
18   Q.  And prior to that time, where did you live?
19   A.  I lived at 476 Wexford Road from about 1993 or '94 on.
20   Q.  And prior to the Wexford address, where did you live?
21   A.  I lived at 198 Amhurst Court in the same neighborhood in
22       Indiana.
23   Q.  And prior to that, did you live in Illinois?
24   A.  I lived in Illinois for a few years, yes, when I was working
25       and teaching. Our first house was in Roselle, Illinois.

Page 108

1    Q.  And how long have you been married?
2    A.  33 years.
3    Q.  And are you working now?
4    A.  Yes.
5    Q.  And where are you working?
6    A.  I'm working for an eye surgeon in his office doing patient
7        instructions and routing everybody through the place and
8        updating their computers and things.
9    Q.  How much do you take home every two weeks?
10   A.  I would say about $1,500.
11   Q.  Okay.
12   A.  I work whenever I'm not in court or taking my mother to an
13       appointment.
14   Q.  Prior to working for Dr. Deschamps, where have you -- what
15       other career have you had?
16   A.  I was a teacher when I got out of graduate school. I taught
17       until I was 30. And then in the interim, I was probably 35
18       or 38, I sold toys, maybe for three years. That's about it,
19       other than raising my children and entertaining the world.
20   Q.  And did your husband have a career?
21   A.  He did. He was -- he became a partner with Ernst & Winnie
22       and it was Ernst & Ernst back then. And he left that to do
23       some -- he was at St. Anthony's. He did some private
24       consulting. He opened some urgent care centers. He had
25       several businesses.

Page 109

1    Q.  And while he was working at Ernst & Winnie, do you know what
2        his salary was?
3    A.  Several hundred thousand dollars.
4    Q.  And how long was he a partner at Ernst & Winnie? Do you
5        recall?
6    A.  I don't really -- maybe four or five years. Four or five.
7        Probably four or five.
8    Q.  Okay. And at some point did you not pursue a career while
9        your husband was pursuing his?
10   A.  Yes. I was -- when my daughter was in kindergarten, I was
11       going to go back to teaching and I had a part-time job. A
12       friend of mine was a principal. And I had always taught
13       handicapped children. And we just decided it would be too
14       much with his career and so I didn't. I ended up staying
15       home. I wanted to stay home anyway with my children so...
16   Q.  Did you support his career?
17   A.  Completely. Yes.
18   Q.  And what did you do between 1975, when you got married, and
19       recently to support his career?
20   A.  Well, I taught for the first five years till I was 30. And
21       so we bought our first house with that. And then after
22       that, I just took care of the house, the family, paid the
23       bills, did everything while he had his career. And I raised
24       the kids, entertained all of his clients.
25   Q.  So his purchase of Edgewater Hospital sometime in the '90s

Page 110

1   was not the beginning of your family's financial success?
2   A.   No.
3        MR. AIZENBERG:  Objection.  Forget it.
4   BY MS. MOLNAR-BONCELA:  (Continuing)
5   Q.   Okay.  How was money handled during your marriage?
6   A.   I usually paid the bills.  We had separate accounts.  Well,
7        we started off with a joint account but it didn't last very
8        long.  We weren't good at two people in one checkbook.  So
9        as we got -- as he became more successful and for tax
10       reasons, the tax people separated us out and we had separate
11       accounts and separate investments and separate money.
12       I had the property.  I wasn't an idiot, you know.  I
13       had friends around me divorcing.  I thought maybe that, you
14       know, we might too one day.  You never know.  So I really
15       wanted just some security.  So it was really my idea.  The
16       property was my idea.  I bought the lot in Florida.  I
17       bought the lots in -- where I live now.  I built the house.
18       It was just my security, and he wanted me to be secure.  And
19       I had other investments too.  He put money in my account.
20       He gave me money over those early years, so that I would
21       have my own little nest egg if I weren't going back to
22       work.
23  Q.   And at some point did you own real estate together with your
24       husband?
25  A.   We owned the first -- maybe the first two houses together

Page 111

1        until about 1989 or '90.
2   Q.   And then what happened then?
3   A.   That was about the time I decided not to go back to work.
4        It was a time that we made new wills.  We had our third
5        child, so we made new wills.  And that kind of morphed
6        into -- could I have some water?  I'm just dry.  I have this
7        eye thing going on and taking medication for it.
8            (Mr. Aizenberg brings
9            the witness a glass of water.)
10  A.   But we went to do a new will, and it kind of morphed into
11       estate planning.  And that's how the trust, the early trust,
12       came into being in 1989, which was just my revocable trust.
13  Q.   And at some point did you own property in your own name?
14  A.   Yeah.  He grew up a renter in New York City, so property
15       meant nothing to him.  He would actually prefer to rent and
16       prefer to be in the city.  So the suburbs were not his cup
17       of tea.
18  Q.   You talked about your mother.  Could you tell us a little
19       bit about that relationship.
20  A.   She's lived with us since -- let's see.  Since -- for at
21       least 25 or 26 years.  She came to live with us when she was
22       about 55 so maybe 30 years now.  She's 85 now.
23  Q.   And what is the health of your mom?
24  A.   She's fragile now.  She's -- her brain is good.  She's just
25       kind of frail.  She had her knee replaced two years ago and

Page 112

1        broke her ankle.  So I can't leave her for long periods of
2        time anymore.
3   Q.   And did Dexia take any action with regard to her finances?
4   A.   Yes, they froze her account too.
5            MR. AIZENBERG:  Objection.  Relevance.
6            THE COURT:  She already answered.  Overruled.
7   BY MS. MOLNAR-BONCELA:  (Continuing)
8   Q.   Do you own real estate in Chicago?
9   A.   I do.  I own a condo in Chicago.
10  Q.   Could you tell us now how that property is being taken care
11       of?
12  A.   My son and his wife and my daughter are living there, and
13       they're paying for the assessment and the utilities.  And
14       I'm overdue on the taxes.  I can't pay the taxes but...
15  Q.   And how was that property acquired?
16  A.   It was acquired through the last of -- I think about the
17       last of my investments.  And then I borrowed $600,000 from
18       one of my husband's companies to close it, and then I took a
19       mortgage out on the Wexford property to pay that loan back
20       to the company.  And then when I sold the house, I paid the
21       mortgage off.
22  Q.   And do you recall your testimony about owning property in
23       Florida?
24  A.   Maybe, yeah.  I did own property in -- oh, you mean just
25       now.  Yes, I did.

Page 113

1   Q.   When you sold the property in Florida, that was a long time
2        prior to filing this bankruptcy?
3   A.   Yes.
4   Q.   Did you use any of those funds to purchase additional
5        assets?
6   A.   It may have been about the same time I purchased the condo.
7        I can't remember.  I don't remember whether it was that
8        money that went directly in -- it went into my bank account,
9        but I don't remember exactly where it went.
10  Q.   The Wexford real estate in Valparaiso, how did you own that
11       property?
12  A.   It was in -- I bought the lots originally in 1989 and then
13       built the house a couple years later.  And it was eventually
14       dumped into my trust.  I think that it was an oversight that
15       it wasn't in there to begin with.  I wasn't very good at
16       estate planning so...
17  Q.   You indicated that you currently have income in the form of
18       wages.  Do you have any other income?
19  A.   No.
20  Q.   Have you received gifts from friends?
21  A.   Yes, two.  Well, one from my brother.  He's helped me pay my
22       rent.  And one from my -- another friend who's helped me pay
23       the rent.
24  Q.   And what are your current financial concerns?
25  A.   Let's see.  I'm behind in my Indiana taxes.  I owe Illinois

Page 114

1  $15,000 in taxes for the condo. I won't be able to pay
2  my -- any of my insurance in April. And I need another loan
3  to pay some more rent.
4  Q.  What about the status of your income taxes, 2008?
5  A.  For 2008? I won't be able to pay that, but I'm not sure
6  I'll owe anything.
7  Q.  Do you owe money that was listed on your bankruptcy petition
8  to your accountant?
9  A.  Yes.
10 Q.  Are you going to have a problem preparing your 2008 taxes
11 without assistance from an accountant?
12 A.  Probably.
13 Q.  Okay. Do you have an ability to have access to funds to
14 finance the litigation that is pending against you?
15 A.  No.
16     MR. AIZENBERG: Objection, your Honor. This is the
17 same line of questioning as to whether she has access to
18 assets. No one disputes that there's a preliminary
19 injunction that freezes her assets.
20     THE COURT: Well, this was access to assets. It wasn't
21 limited to hers. She already said no, so overruled.
22     MS. MOLNAR-BONCELA: Your Honor, I pass the witness.
23     THE COURT: Gabriel.
24 ///
25 ///

Page 115

1      C R O S S - E X A M I N A T I O N
2  BY MR. AIZENBERG:
3  Q.  Good afternoon. Before your current job, working for a
4  doctor, the last time you received a paycheck was
5  approximately in 1978; isn't that right?
6  A.  No. I received --
7  Q.  When you worked as a teacher?
8  A.  No. I received -- I sold toys after that, Discovery Toys,
9  for three years in -- let's see. I was 30 when I quit
10 working. I was probably 40. So that would be 19 -- in the
11 '80s.
12 Q.  The early '80s --
13 A.  Early '80s.
14 Q.  -- was the last time you got a paycheck?
15 A.  And then I started a little business, JKR Business, which
16 didn't amount to much of anything, but that was in the
17 '90s. I had three kids in three schools so I gave it up.
18 Q.  Isn't it true that since 1978 the only money you've received
19 is from Peter Rogan?
20 A.  No. I had -- well, most of it was, certainly; but I did
21 sell toys.
22 Q.  Aside from that, yes?
23 A.  Aside from that and aside from my little business in the
24 early '90s, yes.
25 Q.  Okay. Now your husband gave you the money to buy the land

Page 116

1  on which the Wexford property was eventually built; isn't
2  that right?
3  A.  That's correct.
4  Q.  And several years later a house was built on that land?
5  A.  Yes.
6  Q.  About 1994, is that right?
7  A.  I think it was started earlier than that. '92, I started
8  designing it, maybe '93.
9  Q.  And it was completed about '94?
10 A.  Uh-huh.
11 Q.  Yes?
12 A.  Yes.
13 Q.  You have to answer out loud.
14 A.  Yes. I'm sorry.
15     THE COURT: You have to say yes or no so the court
16 reporter can take it down.
17 A.  I'm sorry.
18 BY MR. AIZENBERG:  (Continuing)
19 Q.  And you had no independent source of funds at the time;
20 right?
21 A.  No, other than that little business. No.
22 Q.  Okay. So the money to build the house came from your
23 husband as well; isn't that right?
24 A.  Yes. It had already been given to me, but it originally
25 came from him. Yeah.

Page 117

1  Q.  So, in other words, either the money came from him directly
2  or it was given to you and then you --
3  A.  Correct. And, as I said, when we started doing estate
4  planning in '89, that's when we, you know, did a lot of
5  these things.
6  Q.  And he also -- this was the same -- he paid for -- your
7  house had expenses, right, after it was built?
8  A.  Uh-huh.
9  Q.  Utilities?
10 A.  Uh-huh.
11 Q.  Yes?
12 A.  Yes. Sorry. Sorry. Yes.
13 Q.  Taxes?
14 A.  Yes.
15 Q.  Decorating expenses?
16 A.  Yes.
17 Q.  Okay. And the ultimate source of those funds was also your
18 husband; isn't that right?
19 A.  Yes. And then the money that I had from investments that I
20 had had early on from the original money he gave me.
21 Q.  Okay. Now you testified a few minutes ago, I think you said
22 that you also have -- own a property and this property is in
23 your name on Erie Street in Chicago?
24 A.  Yes.
25 Q.  Right?

Page 118

1  A.  Yes.
2  Q.  Okay.  And you said that you had borrowed money from a
3      company of your husband's?
4  A.  Yes.
5  Q.  What company was that?  Was that PGR Properties?
6  A.  I think it was PGR.
7  Q.  Okay.  And you borrowed in the vicinity of $600,000?
8  A.  I borrowed $600,000.
9  Q.  Okay.
10  A.  Because the close came up sooner than I expected it to
11      actually.
12  Q.  Okay.  And so what happened?  You went to your husband and
13      said, I need money?
14  A.  Or he offered.  I can't remember.  But, I mean, I knew I was
15      going to close it and so I borrowed it from his company, and
16      then I took a mortgage out on the Wexford property.
17  Q.  Now you bought the -- you bought the Erie property in 2004;
18      isn't that right?  June of 2004?
19  A.  It was either 3 or 4.  It was on my daughter's birthday in
20      either 2003 or 2004.
21  Q.  Okay.  And the mortgage you took was in 2006; right?
22  A.  It could have been.  It could have been.
23  Q.  The mortgage on the Wexford property was in 2006?
24  A.  Again, it could have been.
25  Q.  Okay.  And what you're saying in your testimony today is

Page 119

1      that the money for -- that you got from the mortgage on the
2      Wexford property was used to repay the Erie property loan
3      you took from PGR?
4  A.  No.
5  Q.  Oh, okay.
6  A.  No.  I took out the loan.  I paid the mortgage for a while.
7      No, no.  Let's go back.  Let's see.  I closed the property.
8  Q.  Which one?
9  A.  The Erie property.
10  Q.  Yes.
11  A.  With a loan from PGR Properties.
12  Q.  Okay.
13  A.  And then I took out the mortgage on the 476 property to
14      repay that loan.  So that would have been in 2005 or 2006 to
15      repay that.
16  Q.  So the Wexford mortgage proceeds, your testimony is, were
17      used to pay off the loan that you took out from PGR to buy
18      the Erie property?
19  A.  No.  I repaid the mortgage with those.  I repaid the --
20  Q.  The mortgage on Erie?
21  A.  No.
22  Q.  Oh, okay.
23  A.  I repaid the mortgage company with -- when I sold the house.
24  Q.  Which house?
25  A.  The 476, the only one I sold lately.

Page 120

1  Q.  Okay.
2  A.  Okay.  I took that money -- I had a $600,000 mortgage --
3  Q.  Right.
4  A.  -- which I had taken out in order to -- I had taken that out
5      to repay the company.  So the company was repaid already.
6  Q.  Which company?
7  A.  PGR.  I took the loan from them earlier on, and then I just
8      paid off the mortgage when I sold the house.  I wasn't
9      paying back the company then.  I was paying back -- I paid
10      back the mortgage.
11  Q.  Okay.  I'm -- I want to make sure I understand, so let's try
12      to do this --
13  A.  Okay.
14  Q.  I'll try to do this slowly.
15  A.  I'm not very good at explaining.
16  Q.  No, that's fine.  So to buy --
17  A.  To buy Erie.
18  Q.  To buy Erie, you borrowed about $600,000 --
19  A.  Yes.
20  Q.  -- from PGR Properties; correct?
21  A.  Correct.
22  Q.  So you owe $600,000?
23  A.  Correct.
24  Q.  Okay.  So then later on you take out a mortgage on Wexford;
25      correct?

Page 121

1  A.  Correct.
2  Q.  And --
3  A.  And I repaid PGR Properties.
4  Q.  With the mortgage funds?
5  A.  Yes.
6  Q.  Okay.  So you used the -- so your testimony is that the
7      funds from the Wexford mortgage that you took out were used
8      to repay the PGR debt that you owed?
9  A.  Correct.  Yes.  Correct.
10  Q.  Okay.  Are you sure that that's how it happened?
11  A.  That's the best of my recollection, yes.
12  Q.  Okay.
13  A.  And John Foley would be able to answer that for you
14      completely, my accountant, because he --
15      THE COURT:  Okay.  Wait until there's a question in
16      front of you.
17  A.  I'm sorry.  I'm sorry.
18      MR. AIZENBERG:  May I approach the witness, your
19      Honor?
20      THE COURT:  Yes.
21  BY MR. AIZENBERG:  (Continuing)
22  Q.  I'm gonna hand you what we've marked as Plaintiff's Exhibit
23      455.
24  A.  Sure.
25  Q.  And we're just using the same -- this is numbering we had in

1   other proceedings so rather than having mixed up numbers --
2        THE COURT: Oh, okay.
3        MR. AIZENBERG: Okay?
4        THE COURT: Yeah.
5   BY MR. AIZENBERG: (Continuing)
6   Q. Mrs. Rogan, is this a copy of the mortgage on the Wexford
7     property?
8       (The witness reviews the document.)
9   Q. I'll note for the record that it bears the Bates number of
10    JR, which means -- you may be able to accept my
11    representation that this was produced by you. That's why it
12    has the JR Bates number. But does this look like the
13    mortgage?
14   A. Yeah, but I don't see the company name on here. It was sold
15    to IndyMac but it was originally Market Street Mortgage.
16   Q. I think IndyMac shows up in the back.
17   A. They took it over. Yeah, Market Street Mortgage was who I
18    originally made the mortgage with.
19   Q. Okay. So this appears to be the mortgage?
20   A. It appears to be.
21      MS. MOLNAR-BONCELA: Your Honor, I'm going to object to
22   the characterization of an adjustable rate note as the
23   mortgage.
24      MR. AIZENBERG: She already testified that it appears
25   to be the mortgage so...

1   A. It was a note. I'm sorry.
2      MS. MOLNAR-BONCELA: Well, your Honor --
3      THE COURT: Okay. Let's put it this way: It is what
4   it is. It states it's a note. Okay?
5      MS. MOLNAR-BONCELA: Yes, your Honor.
6      THE COURT: She's not an attorney.
7      MR. AIZENBERG: That's fine, your Honor.
8      THE COURT: You're not contending that this was
9   recorded as a security instrument as a mortgage, are you?
10     MR. AIZENBERG: No. It's just -- you know what? I'll
11   ask the question a different way.
12     THE COURT: Yeah.
13   BY MR. AIZENBERG: (Continuing)
14   Q. Mrs. Rogan, is this the document that evidences the loan you
15    took out on your Wexford property for about $650,000?
16   A. I believe it is.
17   Q. Okay. Thank you. And it shows -- correct me if I'm wrong,
18    but that the date is June 23rd, 2006?
19   A. Uh-huh.
20   Q. Yes?
21   A. Yes.
22   Q. And it's $650,000; right?
23   A. Yes.
24   Q. Does that fit with your recollection as to the amount of the
25    mortgage?

1   A. Yes, of the note.
2   Q. Of the note, I should say. Sorry.
3      I'm handing you what's been marked as Exhibit 243.
4    Mrs. Rogan, this is an account statement for your bank
5    account at First National Bank of Valparaiso, statement date
6    7/3/06; is that right?
7   A. Yes.
8   Q. And you still have an account at First National Bank? It's
9    now First Source; isn't that right?
10   A. Yes.
11   Q. How long did you bank with that bank?
12   A. Probably since 1973 --
13   Q. A long time?
14   A. -- when I moved here, or '74.
15   Q. And do you see on the first page it shows under deposits --
16   A. Uh-huh. Yes, I do.
17   Q. -- it shows a deposit of $632,707.37, do you see that?
18   A. Yes.
19   Q. Okay. And just given the proximity in time to the date of
20    the note, does that seem to be the same set of funds?
21   A. It could be but I'm not sure if that money went into my
22    Scudder account for the note.
23   Q. Well, did you have any other -- in or about the end of June
24    of 2006, were you getting six hundred plus thousand dollars
25    from any other source?

1   A. Well, not that I remember. But I could have been moving
2    money. I don't know the answer to that. But let me see.
3   Q. Okay. Now turn to the back of the last page of exhibit
4    243.
5   A. Uh-huh.
6   Q. Okay. There are checks written here to your husband. Do
7    you see those?
8   A. Yes.
9   Q. Okay. And so there's a check dated 6/13/06 from you to Mr.
10    Rogan, do you see that, for $150,000?
11   A. Yes.
12   Q. Okay. And then there's a check dated 6/29/06 to Mr. Rogan
13    for $400,000.
14   A. Yes.
15   Q. Right? And that's right after June 23rd, '06; right? Six
16    days later?
17   A. Yes.
18   Q. Okay. And then there's a check to Mr. Rogan on 6/21/06 for
19    a hundred thousand dollars. Do you see that?
20   A. Yes.
21   Q. Okay. And there's a check to Mr. Rogan for $10,000 on
22    6/26/06. Do you see that?
23   A. Yes.
24   Q. Okay. And there's a check, another check, to Mr. Rogan for
25    $40,000 on 6/26/06?

Page 126

1  A. Yes.
2  Q. Okay. And these are all checks that you wrote? That's your
3     signature on the checks?
4  A. My signature but CaraLinda wrote these checks. She was our
5     secretary. My husband's secretary really.
6  Q. But these checks were written on your behalf; isn't that
7     right?
8     MR. GOUVEIA: Wait until she's done answering the
9     question.
10 BY MR. AIZENBERG: (Continuing)
11 Q. I thought you were done. I'm sorry.
12 A. She wrote them. I asked her to write things. She may not
13    have stubbed them correctly; and as I said, these may not be
14    the -- what I repaid the loan with. But I did use that
15    money to repay the loan. I'm not sure if it came out of my
16    Scudder account. John Foley, who's my accountant, would
17    know. Okay? He has every piece of paper that I've touched
18    so...
19 Q. Okay.
20 A. But that is what I did with the money.
21 Q. Well, let me ask you something.
22 A. Yes.
23 Q. Go to the first page of -- well, let me back up first.
24 A. Uh-huh.
25 Q. The checks, they were written on your behalf; isn't that

Page 127

1     right?
2  A. Yes. Correct. And I did ask CaraLinda to write them. She
3     may not -- these may or may not have gone to his company.
4     She may or may not have stubbed them -- I mean written them
5     on the little memo correctly --
6  Q. Okay.
7  A. -- because she would have been depositing them also.
8  Q. But if you look at the checks, you'd agree with me, it
9     doesn't -- the checks are written to your husband
10    personally; isn't that right?
11 A. Yes. Yes.
12 Q. Okay. It doesn't have any reference to a company?
13 A. No. But as I said, she would have been depositing them
14    directly to the PGR account or whatever. She would have
15    been doing that.
16 Q. Okay. And if you go to the first page, please, of Exhibit
17    243, you'll see that the balance on the statement opening
18    date is $27,819.23.
19 A. Yes.
20 Q. Okay. So clearly those checks couldn't have been written
21    unless there was this deposit; isn't that right?
22 A. No. But there's also a deposit of $325,000 down further.
23 Q. Yes.
24 A. So, as I say, I could have been moving money in and out of
25    my Scudder account for some reason.

Page 128

1     THE COURT: Just to interject, if you look at
2  electronic credits on the front of the statement, I think
3  you'll see the source of the deposits.
4  A. Yes.
5     THE COURT: Don't those correlate to electronic
6  automatic deposits?
7  A. Yes.
8     THE COURT: Those appear to be EFT transactions.
9     MR. AIZENBERG: That seems to fit with the $325,000.
10    THE COURT: Yeah. Uh-huh. Yes.
11    MR. AIZENBERG: Okay.
12 BY MR. AIZENBERG: (Continuing)
13 Q. I'm going to have you look at what we've marked as Exhibit
14    423. Mrs. Rogan, you have before you Exhibit 423. I'm
15    going to direct your attention in particular to the last
16    page of Exhibit 423.
17 A. Uh-huh. Yes.
18 Q. Okay. This is a picture of a check. This is the check from
19    PGR Properties to you, isn't that right, in June of 2004?
20 A. Yes. I don't know that I ever actually saw it, but David
21    Miller --
22 Q. This would be the check that you used? This would be called
23    the loan from PGR?
24 A. Yes.
25 Q. Yes?

Page 129

1  A. Yes. I never actually saw this check; but, yes, it would
2     be.
3  Q. Okay. So the signature on the back of the check was written
4     on your behalf?
5  A. It was written by David Miller, who handled my husband's
6     things. It was written on my -- I mean, I didn't write it.
7  Q. Okay. So someone --
8  A. You know, I didn't order it to be written. David Miller
9     wrote it from PGR Properties.
10 Q. But you agree that this is a copy of the check that was the
11    loan to you from PGR properties?
12 A. I've never seen this check before, as I said. I don't
13    know. I went to the closing. Mr. Foley handled all of
14    those things. David Miller and Mr. Foley handled my -- all
15    of these things for me.
16 Q. Did you authorize someone to endorse the check on your
17    behalf?
18 A. Mr. Aizenberg, it was handled for me. I didn't specifically
19    authorize anybody to endorse it on the back. Mr. Foley, who
20    was my tax accountant and attorney, went to the closing with
21    me and he handled the paperwork. I never saw this before.
22    But I did borrow money from my husband's company.
23 Q. Okay. Now some of the money to purchase the Erie property
24    came from you, right, that you didn't have to borrow from
25    PGR Properties? Isn't that right?

Page 130

1    A.  I think it did.  I believe it came from some of my
2        investment accounts; but, again, Mr. Foley and Mr. Miller
3        handled it.  They arranged the financing.  I showed up the
4        day of the signing.
5    Q.  Okay.  Did it come from your Ameritrade account?  Do you
6        know?
7    A.  I don't know.  I know that I was somewhat short and that's
8        why I borrowed the money.  The closing came up, as I said, a
9        little earlier than I had planned.
10   Q.  I'm just handing you what's been marked as Exhibit 425.
11       This is a copy of an account statement of yours at First
12       National Bank, also?  You can look at the last page, the
13       second page.
14   A.  I assume it is.  Do I remember it specifically?  No.  But I
15       assume it is.
16   Q.  Does it look like an account statement of yours?  Did you
17       get account statements?
18   A.  Yes.  But I've never seen this format.  But, yes.
19   Q.  Okay.  Now do you see on the first page of Exhibit 425 it
20       shows that $400,000 is coming in from Ameritrade under
21       statement activity?
22   A.  I see the plus four hundred thousand.  I don't see that it
23       comes in from Ameritrade; but, as I say, it very well could
24       have.
25   Q.  Okay.  And do you see that a few days later it shows a wire

Page 131

1        transfer out to Mr. Foley's firm for four hundred thousand?
2        Does that fit with your recollection that the firm handled
3        this for you?
4    A.  Yes.  I honestly -- I don't know.
5    Q.  So you're saying the actual handling of the funds, the
6        movement of the funds, was not handled by you?
7    A.  No.
8    Q.  Okay.  It was handled by Mr. Miller?
9    A.  By Mr. Miller and by Mr. Foley.
10   Q.  Okay.  And Mr. Miller worked for your husband?
11   A.  Yes.  And he did my things in the evenings and on the side
12       or whenever.
13   Q.  And now when you repaid what you say is the loan from PGR
14       Properties, you paid it with some interest too?
15   A.  Yes.
16   Q.  Was it like five hundred and seventy-two thousand?  Does
17       that sound right?
18   A.  I don't know.  But I believe it was on my taxes.  You
19       probably -- I'm sorry.
20          THE COURT:  Wait till a question is before you.
21   A.  I'm sorry.
22   BY MR. AIZENBERG:  (Continuing)
23   Q.  Mrs. Rogan, I've handed you what's been marked as Exhibit
24       233.  Is this an account statement of yours from Scudder?
25   A.  Again, it could be.  Do I recognize this specific document?

Page 132

1        No.
2    Q.  Well, did you get account statements from Scudder?
3    A.  Yes.
4    Q.  Okay.  So does this look like an account statement from
5        Scudder that you received?
6    A.  Again, a little bit different form, but, yeah, it could have
7        been back then.  Yeah.
8    Q.  And the investment professional that handled this for you
9        was Lawrence Littlewood?
10   A.  You know what, his name has been on there all these years.
11       I don't know him.  I've never met him.  I've never spoken to
12       him.
13   Q.  But you had an account at Scudder; isn't that right?
14   A.  Yes.  Yes.  I still have.  Yes.
15   Q.  And you see that on 11/4/05 it shows a wire transfer in for
16       about 1.5 million?  Do you see that?
17   A.  Yes.
18   Q.  Okay.  And do you see that a few days later, on 11/9/05, it
19       shows a wire transfer out for about $775,000?
20   A.  Yes.
21   Q.  Okay.  And the wire transfer in that came from the Peter G.
22       Rogan Irrevocable Trust in the Bahamas; isn't that right?
23   A.  I don't know.  Does it say that?
24   Q.  I'm asking you, do you remember?
25   A.  I don't remember, no.  I asked for money at some point from

Page 133

1        the trust, but this may have come from my revocable trust
2        too.  I don't know.  My revocable trust.  I don't know.
3    Q.  I've just handed you what's been marked as Exhibit 214.  Is
4        this an account statement of yours at Oceanic Bank in the
5        Bahamas?
6    A.  I never got account statements from them.
7    Q.  You had an account at Oceanic Bank in the Bahamas?
8    A.  I never got a statement from them.
9    Q.  I'm asking you a different question.  Did you ever have an
10       account at Oceanic Bank in the Bahamas?
11   A.  I believe I did.
12   Q.  Okay.  And did you establish that account?
13   A.  I don't know how that account was established, but I know I
14       had an account.
15   Q.  But you don't know how it came to be?
16   A.  No, I don't, to tell you the truth.
17   Q.  And you never got account statements for your bank account
18       in the Bahamas?
19   A.  No.
20   Q.  Okay.
21   A.  I believe that a gentleman --
22   Q.  You don't --
23   A.  I believe a gentleman --
24          MR. GOUVEIA:  Wait a minute.  Wait a minute.  You need
25       to let her answer the question.

Page 134

1    A.   I believe a gentleman called me up.
2    BY MR. AIZENBERG:  (Continuing)
3    Q.   Say that again.
4    A.   I believe a gentleman called me up and told me I was going
5         to get a distribution from the trust and would -- first of
6         all, I thought he might be a prank caller, you know.  I
7         didn't pay much attention to it at the time.  And he asked
8         me if I would like him to open an account and I said sure.
9         So I assume that's how this came about.
10   Q.   Now you had an account at Oceanic Bank but you didn't
11        receive account statements?
12   A.   I never had a statement.
13   Q.   Do you know who received account statements?
14   A.   No.
15   Q.   Well, do you see on Exhibit 214 it shows that on November
16        1st, there's a -- November 3rd, there's a distribution to
17        Judy Rogan for $1.5 million?
18   A.   I'm sorry.  Say the date again.  November --
19   Q.   November 3rd, 2005.
20   A.   Yes.
21   Q.   That's the same date -- we just looked at the Scudder
22        account.  That's the same date that there's a wire transfer
23        into the Scudder account that we just looked at; is that
24        right?
25   A.   Yes.

Page 135

1    Q.   So do you have any -- is it -- does this -- you said you
2         didn't remember where the money came into the Scudder
3         account.  Does looking at this Oceanic statement refresh
4         your recollection that it came from the Oceanic Bank
5         account?
6    A.   I assume it did from this.  I mean, everything came into my
7         Scudder -- I mean, I -- I'm sorry.
8    Q.   I'm handing you what's been marked as Exhibit 230.
9              MS. MOLNAR-BONCELA:  Your Honor, at this point we're
10        going to object.  During direct examination of Mrs. Rogan we
11        talked about the status of her financial condition.
12             THE COURT:  There's nothing before her for you to
13        object to right now.  There's no question.
14             MS. MOLNAR-BONCELA:  Well, for --
15             THE COURT:  There's nothing before her for you to
16        object to right now.  Wait until he asks a question.
17             MS. MOLNAR-BONCELA:  Okay, your Honor.
18   BY MR. AIZENBERG:  (Continuing)
19   Q.   I've handed you what's been marked as Exhibit 230.  This is
20        an account statement of yours from First National Bank of
21        Valparaiso?
22             MS. MOLNAR-BONCELA:  Objection, your Honor.  We've been
23        very patient with this analysis.  We spent 20 minutes asking
24        very general questions that we believe relate directly to
25        the three prongs of Fernstrom.  Counsel here has been

Page 136

1         attempting to try the issue as to whose property belongs to
2         whom in front of this Court, so we're going to object.  At
3         this point we've already had 30 minutes of testimony and
4         discussion, and we believe this is way beyond the scope of
5         the direct exam.
6              THE COURT:  Respond.
7              MR. AIZENBERG:  Your Honor, she testified that the --
8         as to the way that she funded the purchase of the Erie
9         property and what -- Mrs. Rogan testified about what she did
10        with the mortgage from the sale of the property.  She did
11        this on direct.
12             THE COURT:  Right.
13             MR. AIZENBERG:  And so I'm showing that's not true.
14             MS. MOLNAR-BONCELA:  Well, your Honor --
15             MR. AIZENBERG:  These documents show that.  I'm
16        entitled to address the veracity of these statements.
17             THE COURT:  So these documents here in your view go
18        directly to --
19             MR. AIZENBERG:  The credibility of that direct
20        testimony.
21             THE COURT:  Well, the transactions that she testified
22        to on direct?
23             MR. AIZENBERG:  Absolutely.
24             MS. MOLNAR-BONCELA:  Well, your Honor, in response to
25        that, that was in possibly 2004, 2005.  The most recent

Page 137

1         statements that we have start talking about 2007.  He is
2         going way beyond -- or '95.  I'm sorry.  The purchase of the
3         Erie property was in '95, and we're now going into 2000
4         going way beyond the scope of some of the questions in
5         direct.
6              MR. AIZENBERG:  Your Honor, the purchase of the Erie
7         property was in June of 2004, as Mrs. Rogan just testified.
8         The mortgage on the Erie property was later.  It was like in
9         2006, I think we showed.  And what I'm going to show is that
10        actually she paid it from Bahamian trust money.  That's how
11        she repaid the mortgage.  That's how she repaid PGR
12        Properties.  In other words, it wasn't the later money that
13        repaid it.  It was the earlier money from the Bahamas.
14             And, your Honor, I don't think any of that was relevant
15        in the first place.  But since your Honor allowed the
16        testimony in, I think we're entitled to address it with
17        cross-examination.
18             THE COURT:  Go ahead.  I'm gonna overrule the
19        objection.  I'll let it in for whatever it's worth.
20   BY MR. AIZENBERG:  (Continuing)
21   Q.   Okay.  Mrs. Rogan, Exhibit 230, this is an account statement
22        of yours at First National Bank of Valparaiso; isn't that
23        right?
24   A.   It appears to be, yes.
25   Q.   Okay.  And it's a statement dated 12/2/05?

Page 138

1   A.  Yes.
2   Q.  Okay.  Do you see that it shows a wire transfer in for
3       $775,000?
4   A.  Yes.
5   Q.  Okay.  And do you see that the -- if you look at the --
6       where it shows the opening balance was $27,000; correct?
7   A.  Correct.
8   Q.  Twenty-seven plus, correct?
9   A.  Yes.
10  Q.  Okay.  And then it gets increased substantially with
11      $775,000?
12  A.  Yes.
13  Q.  You agree with that?
14  A.  Yes.  That it came in, yes.
15  Q.  Okay.  I'm handing you what's been marked as Exhibit 231.
16      This is the following month's account statement of yours at
17      First National Bank of Valparaiso; isn't that right?
18  A.  Yes.
19  Q.  Okay.  And so the statement date is 1/3/06?
20  A.  Yes.
21  Q.  Okay.  And you see that -- hold Exhibit 230 next to you as
22      well.
23  A.  Yes.
24  Q.  Okay.  Do you see the closing balance for Exhibit 230 is
25      about seven hundred and sixty-two thousand plus dollars?

Page 139

1   A.  Yes.
2   Q.  Okay.  And the opening balance the next month is the same;
3       right?
4   A.  Yes.
5   Q.  Okay.  And then if you look down, there's -- under checks
6       and other debits, there's a check on 12/21/05 for $572,000.
7       Do you see that?  Just in the first page under checks and
8       debits.
9   A.  I can see better on the back page.  My eyes aren't so great.
10  Q.  Oh, that's fine.  Okay.  So let's turn to the back page.
11      Okay.  This is the last page of Exhibit 231.
12  A.  Yes.
13  Q.  You see that there's a check written there by you to PGR
14      Properties?
15  A.  Yes, I do.
16  Q.  Okay.  And that's for $572,000?
17  A.  Yes.
18  Q.  Okay.  And so that's -- that was the repayment of your -- of
19      the loan to PGR Properties?
20  A.  Well, no.  I mean, it may have gone through a couple of
21      morphs, but I paid -- I mean, I wouldn't have taken the
22      mortgage out if I didn't have to borrow the money and pay it
23      back.  I paid it -- I paid it back by paying the mortgage to
24      that property.
25  Q.  Mrs. Rogan, go back to Exhibit 455.

Page 140

1   A.  I understand what you're saying.  I'm just telling you, you
2       know, John Foley handled this for me.  I'm sorry.
3       THE COURT:  There's no question pending.
4   BY MR. AIZENBERG:  (Continuing)
5   Q.  Mrs. Rogan, the note that we discussed is dated June 23rd,
6       2006.
7   A.  I understand what you're saying.
8   Q.  Do you agree with me?
9   A.  Yes.
10  Q.  Okay.  And do you see that the repayment -- it appears that
11      repayment, the check you wrote, is dated 12/16/05?
12  A.  It appears that way, yes.
13  Q.  Okay.  You don't dispute that you wrote this check or that
14      someone signed it on your behalf?
15  A.  No, I wrote that.
16  Q.  Okay.  That's your handwriting?
17  A.  That's my handwriting.
18  Q.  Okay.  Do you see also that on 12 -- it looks like 12/21 of
19      '05, you wrote a check to Peter Rogan also for $190,000.
20  A.  Yes.  I believe that was for one of his attorney bills.
21  Q.  Say that again.
22  A.  I believe that was for an attorney bill.
23  Q.  You were paying his attorney bills?
24  A.  Occasionally.  I believe.  I'm not sure what that was for.
25  Q.  But the check is written to your husband?

Page 141

1   A.  Yes.  But I'm not sure what it was for.  But that's what I
2       was doing with those sums of money.
3       THE COURT:  Okay.  Let's be consistent here because
4       most times we've been referring to the date of the check as
5       the date it was; and I think, Gabriel, you just referred to
6       the date of the endorsement on it.  So you're referring to
7       the date of the endorsement on it.  So you're referring to a
8       check that, when you read the bottom of the check, it's
9       really 12/16/05.
10      MR. AIZENBERG:  I am, your Honor, and thank you for
11      pointing that out.  You're right.
12      Okay.  I don't have any more questions, but I do want
13      to move for the admission of the documents that I put in
14      front of Mrs. Rogan.
15      THE COURT:  Okay.  So that would be Exhibits 455, 243,
16      423, 425, 233, 213, 230, and 231; correct?
17      MR. AIZENBERG:  Yes.
18      THE COURT:  Response.
19      MS. MOLNAR-BONCELA:  Your Honor, we're going to object
20      to the admission of those documents on the grounds that
21      those documents relate only to the determination of the
22      validity or not of any claims that Mrs. Rogan may be making
23      to any of these assets, and they don't relate to the issue
24      of stay relief, because you're Honor has consistently said
25      you're not going to try the issues of whether this property
    is hers or not.  And that's exactly what Counsel is

Page 142

1 attempting to use these documents for. Also, I don't
2 know -- well, like I've said, relevance. Okay, your Honor.
3     THE COURT: Well, given that there was no objection to
4 her testimony from these documents until perhaps the last
5 two of them, she did establish a foundation for their
6 admission so your objection is overruled. They are
7 admitted.
8     MR. AIZENBERG: I have nothing further. I don't know
9 if my colleague does.
10     THE COURT: Joe.
11     MR. STEWART: Just a few things, your Honor.
12     MS. MOLNAR-BONCELA: Your Honor, does Mr. Stewart have
13 another hour?
14     MR. STEWART: No.
15     THE COURT: No. That's the two of them combined.
16     MS. MOLNAR-BONCELA: Okay. Because based on my
17 calculations he has five minutes.
18     THE COURT: No, I beg to differ. Your testimony
19 started with you at 4:25.
20     MR. GOUVEIA: Whatever.
21     C R O S S - E X A M I N A T I O N
22 BY MR. STEWART:
23 Q. Mrs. Rogan, the United States has sued you for five and a
24   half million dollars; is that correct?
25 A. So I understand, yes --

Page 143

1 Q. All right.
2 A. -- from my attorneys.
3 Q. So the United States has sued you for five and a half
4   million dollars?
5 A. Yes.
6 Q. And in that petition it lists that there were two transfers,
7   the four million dollar transfer and the one and a half
8   million dollar transfer that was made from Mr. Rogan to you;
9   is that correct?
10 A. I believe that that's what it says. I'm not very good at
11   understanding your papers but...
12 Q. And turning back to the -- one of the exhibits that Mr.
13   Aizenberg showed you, Exhibit No. 214, did you keep a copy
14   of that?
15 A. Yes.
16 Q. Now if you look at the very top of that account statement --
17   and you said you never got a copy of this account statement?
18 A. No.
19 Q. And that somebody just called you up on the phone and they
20   said they wanted to give you some money?
21 A. That's what happened.
22 Q. And then you got $4 million?
23 A. I never really knew what I got because I never got a
24   statement.
25 Q. But that $4 million is the same $4 million that the United

Page 144

1   States has alleged that Peter fraudulently transferred to
2   you; isn't that correct?
3 A. I don't know.
4 Q. You don't know?
5 A. I don't know.
6 Q. And the source of this $4 million is listed on Exhibit 214
7   as your husband, Peter Rogan; isn't that correct?
8 A. You mean the irrevocable trust?
9 Q. Well, he's the beneficiary of the irrevocable trust, isn't
10   he?
11 A. He's the beneficiary, I'm the beneficiary, my children are
12   beneficiaries.
13 Q. But, yes, the Peter Rogan irrevocable trust?
14 A. Yes.
15 Q. That's where the $5 million came from?
16 A. Yes. I don't know that for sure. I've never seen a
17   statement from the other trust. I have no idea.
18 Q. Yeah.
19 A. I might assume so but I don't know.
20 Q. Now how many times have you been sued for five and a half
21   million dollars in your life?
22 A. Never.
23 Q. Never. And you filled out bankruptcy schedules in this
24   case?
25 A. Yes.

Page 145

1 Q. You didn't list the five and a half million dollar lawsuit
2   that the United States filed against you, did you?
3 A. I thought we did.
4     MR. GOUVEIA: Is there a question?
5     THE COURT: Do you recall whether you did or not?
6 BY MR. STEWART: (Continuing)
7 Q. My question to you is: You did not?
8 A. I don't. I mean, I thought we -- I had so many suits going
9   on, that's one reason I filed bankruptcy because I can't --
10     THE COURT: The document will show whether or not it's
11   included.
12 BY MR. STEWART: (Continuing)
13 Q. You didn't, did you?
14 A. I certainly didn't mean to exclude it. I worked with my
15   attorneys. That's all I can do.
16 Q. You had an opportunity to amend your schedules, didn't you?
17 A. Yes.
18 Q. You still didn't list the lawsuit?
19 A. Mr. Stewart, I can't tell you. Okay?
20 Q. Well, besides that, it's very clear here that the United
21   States and -- leaving that five and a half million dollar
22   lawsuit aside --
23     MS. MOLNAR-BONCELA: Objection, your Honor. He's
24   badgering the witness.
25     THE COURT: No, he hasn't asked her anything yet. He's

Page 146

1    just making a recitation as a preparatory statement.
2        MR. STEWART: Thank you, your Honor.
3    BY MR. STEWART: (Continuing)
4    Q.  Leaving aside the five and a half million dollar lawsuit
5        that the United States has filed against you, neither Dexia
6        nor the United States is a creditor of yours; is that
7        correct?
8    A.  I don't understand what you mean. You mean --
9    Q.  You don't owe the government any money?
10   A.  No. No.
11   Q.  And you don't owe Dexia Bank any money?
12   A.  No.
13   Q.  No?
14   A.  Other than what you say I owe you, no.
15   Q.  Aside from the five and a half million dollars?
16   A.  Aside from that, right.
17   Q.  So when this bankruptcy was filed, it was because, not that
18       you were being hounded by your creditors, but it was because
19       of the suit that was going on in the Northern District of
20       Illinois.
21       MR. GOUVEIA: I'm going to object to the form of that
22       question, your Honor. I'm not sure that it is even a
23       question. It sounds more like a statement.
24       MR. STEWART: I can ask her in a different way about
25       it.

Page 147

1        THE COURT: So the objection is to the form of the
2    question?
3        MR. GOUVEIA: Yes.
4        THE COURT: Sustained.
5        MR. STEWART: Okay. I'll withdraw the question.
6        THE COURT: Okay.
7    BY MR. STEWART: (Continuing)
8    Q.  Besides the United States and Dexia, you listed other
9        creditors on your schedules?
10   A.  Yes.
11   Q.  Who'd you list? Just a couple. American Express?
12   A.  My charge cards for that month.
13   Q.  Telephone bill?
14   A.  Right.
15   Q.  Had any of those creditors initiated any collection actions
16       against you?
17   A.  No.
18   Q.  They hadn't filed suit against you?
19   A.  Because I was current until then.
20   Q.  So there really had not been any collection process
21       initiated against you, Judy Rogan?
22   A.  No.
23   Q.  Now do you read the statements that -- or the briefs that
24       are filed on behalf of you? In fact, I'm holding one here
25       that says, Debtor's Memorandum of Law in Opposition to the

Page 148

1    Motion for Relief from Stay Filed by Dexia Credit Local and
2    the United States of America. Did you read this by any
3    chance?
4    A.  You know what? Sometimes I read them; sometimes I don't.
5        But I don't understand them, so it doesn't do me much good
6        to read them. I really have no idea what they say.
7    Q.  I'm reading from page 6 of this, it says here, Ms. Rogan
8        engaged in no such evasive tactics in the case at issue.
9        [As read.] They're talking about trying to evade creditors
10       and whatnot. That's your statement, that you didn't try
11       to -- that you didn't employ any evasive tactics; isn't that
12       correct?
13   A.  That's correct.
14   Q.  But that's not true; right?
15   A.  It's true as far as I can --
16   Q.  Isn't it a fact that in the fraudulent transfer petition
17       that the United States filed against you that Judge Darrah
18       found that, indeed, you had been engaged in evasive tactics?
19   A.  I've never seen -- I don't know that I've ever seen -- well,
20       I've seen Judge Darrah, but I've never actually been before
21       Judge Darrah. I don't know that he actually found that at
22       all.
23   Q.  Okay. Okay. So when the statement was made that Mrs. Rogan
24       engaged in no such evasive tactics in the case at issue, you
25       just can't say whether that's true?

Page 149

1        MR. GOUVEIA: I'm gonna object to the form of the
2    question and also that it's been asked and answered.
3        THE COURT: Sustained.
4    BY MR. STEWART: (Continuing)
5    Q.  My question is: You cannot say for certain whether that
6        statement is true or not?
7    A.  I certainly --
8        MR. GOUVEIA: I'll object to the form of the question
9    again.
10       THE COURT: Sustained. It's the same question as
11   before, Joe. Move along please.
12       MR. STEWART: Okay. Thank you.
13   BY MR. STEWART: (Continuing)
14   Q.  Again, referring to the page 6 of that same memorandum of
15       law that I referred to last time, Debtor's Memorandum of Law
16       in Opposition to the Motion for Relief from Stay, it states
17       that it defies reason to suggest that Dexia's counsel might
18       prevail in its claim that every asset owned by Ms. Rogan is
19       actually Peter Rogan's property. Did you read that
20       statement?
21   A.  I may have. Honestly, I read so much, it doesn't -- I don't
22       even understand sometimes which case they're related to, to
23       tell you the truth, which is the reason I filed the
24       bankruptcy. Because I had so many cases, I couldn't keep
25       track of them all, and I couldn't pay my attorneys to do

Page 150

1    them. I had no hope of paying the attorneys.
2  Q.  Well, that's -- okay. You said it defies reason. But it's
3      still within the realm of possibility that Dexia and/or the
4      United States could prevail in its claim that every asset
5      that's held by you is actually Peter Rogan's; isn't that
6      correct?
7  A.  I don't think so.
8      MR. GOUVEIA: I'm gonna object to the form of that
9      question, your Honor. This has gone way --
10     THE COURT: I'm gonna sustain that as well. And in
11     particular, she didn't write that. An attorney wrote it on
12     her behalf.
13     MR. STEWART: Well, yes. But, Judge, under the rules
14     she's responsible for --
15     THE COURT: Well, you asked her about her directly
16     saying it. She didn't say it. It was written by the
17     attorney. The objection's sustained. Okay?
18 BY MR. STEWART: (Continuing)
19 Q.  Right after the -- did you ever make a motion or did your
20     attorney ever make a motion before Judge Kennelly for
21     release of funds for you?
22 A.  I don't think it actually got to a motion, because I think
23     we were arguing -- I think Mr. O'Rourke was arguing with Mr.
24     Aizenberg about what I would be able to get, and there was
25     no agreement. So that was another reason I ended up here.

Page 151

1    I had no way to pay anything so...
2  Q.  So --
3  A.  That's my -- that's what I know. I never saw Judge
4      Kennelly. I was never in his courtroom.
5  Q.  My question was: Did you ever ask Judge Kennelly to free up
6      assets for you, and your answer to that is no?
7  A.  We -- my answer is that we tried to reach an agreement and
8      there was no agreement. And my bills were due, and I had
9      already discussed with Mike a few weeks ago filing the
10     bankruptcy because of the attorneys and the amounts of money
11     that I was spending.
12 Q.  I don't think that's --
13     THE COURT: It's not responsive. I think what he's
14     looking for is either a yes-or-no answer. To your
15     knowledge, was there ever a motion filed in that
16     litigation --
17 A.  I don't know.
18 Q.  -- to release funds?
19 A.  I don't know. I don't know. Not to my knowledge
20 BY MR. STEWART: (Continuing)
21 Q.  After Judge Darrah entered a judgment against your husband
22     in October of 2006, you and he went to Canada; isn't that
23     correct?
24 A.  No. A week or so later.
25 Q.  And then very soon after that you set up accounts in Canada?

Page 152

1  A.  Yes.
2  Q.  The HSBC account --
3  A.  Yes.
4  Q.  -- you were discussing before?
5  A.  Yes.
6  Q.  Now the source of that money was the Peter Rogan revocable
7      trust in the Bahamas; isn't that correct?
8  A.  The source of that money was -- I'm not sure if it came from
9      that bank account, from Oceanic, or it came from the -- is
10     there a revocable trust in the Bahamas? I don't know.
11     There's an irrevocable trust, I believe, in the Bahamas.
12     The family trust, that's an irrevocable trust.
13 Q.  I think that the facts were that there's simply a revocable
14     trust in the Bahamas for Peter Rogan and perhaps one for
15     you.
16 A.  I don't know.
17 Q.  All right. Isn't it true --
18 A.  I have a revocable trust.
19 Q.  -- after the judgment was entered against Mr. Rogan --
20 A.  Yes.
21 Q.  -- that you and he went to Canada --
22 A.  Yes.
23 Q.  -- and then money was transferred from the Peter Rogan
24     revocable trust to your bank account in Indiana --
25 A.  Not transferred from --

Page 153

1  Q.  And then from your bank account to --
2  A.  As far as I know there's no revocable trust. I believe that
3      money was transferred from either my revocable trust or
4      maybe it -- and it came from that bank account at Oceanic. I
5      don't believe there is a revocable trust in the Bahamas for
6      him. I think our revocable trusts were set up in 1989 as
7      the first arm of our estate planning. And I thought they
8      were domestic, but I could be wrong.
9      MR. STEWART: All right. I have no further questions,
10     Judge.
11     THE COURT: Okay. Cathy. Gordon.
12     MR. STEWART: Judge, I -- just for the record, I
13     misspoke when I said irrevocable. I think the irrevocable
14     trust in the Bahamas is actually a revocable trust in the
15     Bahamas. I apologize. Perhaps I should restate the
16     question then.
17     THE COURT: Is there any confusion that you'd like him
18     to clear up with another question?
19 A.  No.
20     THE COURT: You understood what he was asking?
21 A.  I understood. I knew there wasn't one.
22     THE COURT: Thanks, Joe.
23     MR. GOUVEIA: Am I to understand then that all the
24     questions related to a Bahamas trust, there's only one trust
25     in the Bahamas that we're talking about?

Page 154

1     MR. AIZENBERG: Yes. Well, the Peter G. Rogan
2 revocable trust.
3     MR. GOUVEIA: Mr. Stewart? Mr. Stewart?
4     MR. STEWART: Well, there's actually -- I'm sorry. As
5 I understand it, there's -- okay. I'm sorry. That's
6 right. There's only one trust in the Bahamas.
7     MR. GOUVEIA: Thank you.
8     MR. STEWART: Judge, while we have this little
9 interval, I just wanted, for the record, to direct the Court
10 to the Government's Exhibit No. 1, where, in fact, Judge
11 Darrah does find that Mrs. Rogan engaged in evasive tactics
12 in her response to the fraudulent transfer petition, just to
13 tie that up.
14     THE COURT: Okay. Well, that's in the record, I
15 suppose.
16     MR. STEWART: Thank you.
17     MR. GOUVEIA: Is there someplace in the record that
18 that's reflected?
19     THE COURT: He just mentioned it.
20     MR. STEWART: Government Exhibit No. 1.
21     MR. GOUVEIA: I'm sorry?
22     MR. STEWART: Government Exhibit No. 1 at page 6.
23     R E D I R E C T   E X A M I N A T I O N
24 BY MR. GOUVEIA:
25 Q. Mrs. Rogan, you testified earlier about Judge Darrah. Were

Page 155

1 you ever in front of Judge Darrah on any matter at all?
2 A. No.
3 Q. Did you ever give any deposition testimony in that case at
4 all?
5 A. No.
6 Q. Were you ever served with any documents from Judge Darrah's
7 court to appear and testify there?
8 A. No.
9 Q. To the best of your knowledge, have you ever taken any
10 evasive actions to -- that are discussed by Judge Darrah?
11 A. None. I don't even speed. No. None.
12 Q. Now you were shown a number of exhibits by Mr. Aizenberg
13 starting with Exhibit 455. I'm not gonna try to -- I want
14 to try to summarize those exhibits. Now they show a
15 considerable amount of money going in and out of your
16 accounts; is that correct?
17 A. That's correct.
18 Q. Now do you have any knowledge -- maybe you're better off
19 looking at those documents and trying to give an
20 explanation. We haven't seen these documents at all until
21 today, as you know. Do you have any recollection as to
22 where this money was coming from and where it was going to
23 as reflected in these documents?
24 A. Well, money from my -- I believe, as it turned out, and
25 maybe David Miller did this too, most of -- all of my money

Page 156

1 eventually got dumped into the Valparaiso bank because I
2 could only transfer from -- all the money from the trust, I
3 think, got dumped into Scudder, as it turned out.
4 Q. And you had -- the bank account you're talking about is the
5 First National Bank account?
6 A. Right. And then in order to -- I had -- the only place that
7 Scudder could move money to was First National Bank.
8 Everything --
9 Q. So you also had the Scudder investment account.
10 A. Yes.
11 Q. And what was the source of that money? Where did the money
12 come from in Scudder?
13 A. I had that. That account is longstanding. It was
14 longstanding from investments that I had made a long time
15 ago. David Miller handled that for me for years. And he
16 set all these things up with safety measures. Everything
17 had to eventually dump into the Valpo account so that I
18 could keep track of it, what little track I kept of it.
19 Q. Now there did come a time when moneys came from the Bahamian
20 trust.
21 A. Yes.
22 Q. And what account did those moneys, to the best of your
23 recollection, come into from the Bahamian trust? Do you
24 know? Did they come to First National Bank or did they come
25 to Scudder?

Page 157

1 A. I believe they came to Scudder, unless they were wired to
2 Canada.
3 Q. So they didn't come through any of your accounts. None of
4 these documents here reflect those moneys?
5     MR. AIZENBERG: Objection, your Honor. Foundation.
6     THE COURT: Well, with regard to foundation he's asking
7 her whether these documents reflect it. I suppose she can
8 look at the documents.
9     MR. AIZENBERG: Okay. If that's what he's asking.
10 A. I would have to really look at these and try to remember.
11 For the most part, this money, as I've learned what it
12 was --
13 BY MR. GOUVEIA: (Continuing)
14 Q. What document are you referring to?
15 A. I'm sorry. The statement from Global -- from the Bahamas.
16 I believe they only dumped --
17     THE COURT: What exhibit number is that?
18 BY MR. GOUVEIA: (Continuing)
19 Q. Is that Plaintiff's Exhibit 214?
20 A. Yes.
21 Q. So that's the money -- the statement that -- you never saw
22 this document before today?
23 A. I never saw it. But it -- I believe David Miller set my
24 accounts up somewhat circuitously so that all the
25 accounts -- Scudder could only deposit into my First

Page 158

1  National account.
2  Q.  You said that.
3  A.  And apparently this, I think most of the money came from
4      this Exhibit 214. I believe it went into Scudder. It could
5      only go to Scudder. He had things set up so there was some
6      checks and balances because he was uncomfortable being the
7      only one who ever saw my statements. So in order to get
8      money out, I had to move it from one account to the other to
9      the next. It was kind of a laborious process sometimes, but
10     at least everything dumped into my Valpo account.
11 Q.  But without carefully tracking any of this, you wouldn't be
12     able to testify today what moneys came from the Bahamian
13     trust --
14 A.  No.
15 Q.  -- into your accounts?
16 A.  No. No.
17 Q.  Now you testified earlier that the money to pay off the loan
18     that you obtained to buy the Erie property in Chicago came
19     from a company owned by your husband?
20 A.  Yes.
21 Q.  And you also testified that you took out a mortgage on your
22     house in Wexford Court in Valpo.
23 A.  Yes.
24 Q.  And you used that mortgage money to pay off the company
25     loan.

Page 159

1  A.  Yes.
2  Q.  Is that correct?
3  A.  That's correct. If it wasn't --
4  Q.  Is that still your testimony?
5  A.  It's still my testimony. If it wasn't immediate, it was --
6      you know, if I spent the first money on something else, I
7      can't answer that. I'm telling you that's what I thought I
8      did.
9  Q.  Now did there also come a time when you invested in property
10     in Canada?
11 A.  I rented a place. I have a rental up there.
12 Q.  And did you take funds -- did funds come to you through the
13     Bahamian trust that you used to rent property in Canada?
14 A.  Yes. I believe those are in my revocable trust, I believe,
15     but I'm not sure.
16 Q.  And did you also put money from the Bahamian trust into bank
17     accounts in Canada?
18 A.  In Canada you have to -- in order to transfer money, you
19     have to have three -- at least three accounts. You have to
20     have a U.S. dollars account where they hold the U.S.
21     dollars. You have to have a Canada savings account where
22     then you would just transfer. And then you have to have --
23     I have a checking account there which I use to pay the rent.
24 Q.  How did you learn that?
25 A.  First, I went to the bank. I couldn't open just one

Page 160

1      account. I had to open all these accounts in order to be
2      able to handle the exchange.
3  Q.  So this statement, 214 --
4  A.  Uh-huh.
5  Q.  -- would reflect moneys taken out of the -- out of the
6      Bahamian trust through November 2006. Do you recall when
7      you set up those accounts in Canada?
8  A.  It would have been October, my first trip up there.
9  Q.  October what?
10 A.  2006.
11     MR. GOUVEIA: Cathy's got a couple questions.
12     R E D I R E C T  E X A M I N A T I O N
13 BY MS. MOLNAR-BONCELA:
14 Q.  Judy, I'll have you take a look at Plaintiff's Exhibit 255,
15     which is the adjustable rate note.
16     MR. AIZENBERG: You mean 455?
17     MS. MOLNAR-BONCELA: 455. I'm sorry. I have too many
18 numbers and I'm dyslexic.
19     THE COURT: Okay.
20 BY MS. MOLNAR-BONCELA: (Continuing)
21 Q.  And what is the date of that document?
22 A.  I'm sorry. Say that again.
23 Q.  And the date of that document?
24 A.  June 23rd, 2006.
25 Q.  Okay. And documents 233, 231, 230, 243, and 425, if you

Page 161

1      look at each of those five documents, do they predate June
2      23rd, 2006?
3  A.  Yes.
4  Q.  Okay. And so a reasonable conclusion is that none of the
5      moneys from those accounts would have paid off the note
6      dated June 23rd, 2006, in Plaintiff's Exhibit 455.
7      THE COURT: Is that a question?
8      MR. AIZENBERG: Your Honor, that's not responsive to
9  what was asked.
10     THE COURT: Overruled.
11     Is that a question? You better rephrase it.
12     MS. MOLNAR-BONCELA: Yes, your Honor. I need to
13 rephrase it.
14     MR. GOUVEIA: Let's do that one again.
15 BY MS. MOLNAR-BONCELA: (Continuing)
16 Q.  So, in other words, the money that you received as a result
17     of the adjustable rate note dated June 23rd, 2006, as
18     Exhibit 455, could not have been any of the funds that were
19     deposited in your account reflected by Exhibits 233, 231,
20     230, 243, and 425, because those, the dates of those
21     exhibits all predate the note.
22 A.  That would be correct.
23 Q.  Do you recall what you did with any of the funds represented
24     by Exhibit 455, which is the adjustable rate note?
25 A.  It was my recollection -- and I believe this is on my taxes,

Page 162

1  but I would have to look them up. I know you have copies of
2  them. This is what I believe I paid off the loan to PGR
3  Properties with. But, again, John Foley --
4      THE COURT: Well, there's no question before you.
5  A.  Sorry.
6      MS. MOLNAR-BONCELA: We're concluded, your Honor. We
7  have no more questions.
8      THE COURT: Gabriel.
9      MR. AIZENBERG: Briefly.
10     R E C R O S S - E X A M I N A T I O N
11 BY MR. AIZENBERG:
12 Q.  Mrs. Rogan, turn to Exhibit 231.
13 A.  Okay. The last one. I have it.
14 Q.  Turn to the last page. We looked at this a few minutes
15     ago. That's a check you wrote to PGR Properties for five
16     hundred and seventy-two thousand; correct?
17 A.  That's correct.
18 Q.  And that repaid the loan, didn't it?
19     MR. GOUVEIA: Objection, your Honor. That's already
20     been asked and answered on his previous examination and she
21     testified that that -- that she thought that that was
22     another loan from the company and had nothing to do with the
23     loan that she obtained for the property.
24     THE COURT: And on redirect you went into a line of
25     questioning that establishes apparently a different

Page 163

1  recollection so it's overruled. He's now crossing on your
2  redirect.
3  A.  I don't have an explanation for it. Okay? I -- maybe I put
4  the money in and didn't pay it for a while. I don't have
5  any idea. That was my intent. I believe John -- as I said,
6  John Foley handles all of my things.
7  BY MR. AIZENBERG: (Continuing)
8  Q.  Can you think of any other reason you'd be writing PGR
9  Properties a check for more than half a million dollars?
10 A.  No, but I'm just telling you that was my recollection.
11     MR. AIZENBERG: And I have nothing further.
12     THE COURT: Thank you.
13     Joe.
14     R E C R O S S - E X A M I N A T I O N
15 BY MR. STEWART:
16 Q.  Mrs. Rogan, I'd like to show you what was handed to you by
17     your attorney as exhibit -- I believe it's Exhibit F.
18 A.  Could I have some more water please.
19 Q.  Can you identify what that is?
20 A.  This is United States Petition for Relief Against Judith K.
21     Rogan.
22          (The witness is
23          given a glass of water.)
24 Q.  And that's the suit we were discussing before where the
25     government has sued you for five and a half million dollars

Page 164

1  or sued you for what we regard as a fraudulent transfer of
2  five and a half million dollars?
3  A.  It appears to be, yes.
4  Q.  And that case has been filed before Judge Darrah?
5  A.  Yes.
6  Q.  Okay. So you were, in fact, before Judge Darrah. You filed
7  this, what I'm going to show you as Exhibit G.
8  A.  When I said I wasn't before Judge Darrah, I didn't mean that
9  I -- I didn't understand that this was being before Judge
10 Darrah. I'm sorry.
11 Q.  Okay.
12 A.  I was never -- I mean, I never appeared.
13 Q.  You are -- except for the stay that's been entered in this
14 case, you are a party in a case before Judge Darrah; isn't
15 that correct?
16 A.  Yes. If that's -- yes. I'm sorry.
17     MR. STEWART: No further questions, your Honor.
18     THE COURT: Okay. We've had direct, cross, redirect,
19 recross.
20     MR. GOUVEIA: We rest.
21     THE COURT: Customarily --
22     MR. AIZENBERG: No further questions, your Honor.
23     THE COURT: Okay. You're released. Thank you.
24 A.  Thank you.
25     THE COURT: Is there any other evidence that anybody

Page 165

1  wants to put in or seek to put in?
2      MR. GOUVEIA: No, your Honor.
3      THE COURT: Okay. So the record's closed as far as
4  both parties are concerned on the evidence?
5      MR. AIZENBERG: Yes.
6      THE COURT: Okay. The set of documents that I have
7  here that I was handed during the testimony by which they
8  were admitted, I'll use as the Court's set of the exhibits.
9      MR. AIZENBERG: Thanks, your Honor. I was going to
10 offer to give you a --
11     THE COURT: Oh, no, that's fine.
12     MR. AIZENBERG: Okay.
13     THE COURT: Yeah, that's fine. That will work. Well,
14 there's another set too.
15     Okay. Now, that closes the case. Does anyone want to
16 file any kind of supplemental brief? It seems to me we've
17 briefed this to death.
18     MR. AIZENBERG: Yes.
19     THE COURT: But --
20     MS. MOLNAR-BONCELA: Your Honor, we would like the
21 opportunity to file a supplemental brief.
22     MR. STEWART: Your Honor, may we ask or inquire about
23 what issue precisely?
24     THE COURT: Yeah. You know what? That's a fair
25 question. Just generally on the issues for stay relief?

Page 166

1   MS. MOLNAR-BONCELA: Yes, on the issues for stay relief
2   and the application of Fernstrom to the facts as in the
3   record of this case.
4   THE COURT: Applying Fernstrom to the facts as they are
5   now on the record?
6   MS. MOLNAR-BONCELA: Applying Fernstrom to the record
7   and testimony that was given today. This is additional
8   evidence that was not in the record when we had briefed the
9   issues prior to this.
10   THE COURT: Joe.
11   MR. STEWART: My suggestion would be -- I can't speak
12   for Dexia -- but take five minutes for each side to just
13   make a short argument and be done with it.
14   THE COURT: Okay. Are you in a position to do that
15   instead?
16   MR. GOUVEIA: We've argued this case ad infinitum. I
17   don't think there's another thing we could say that's gonna
18   change this Court's opinion. Now we do think that --
19   THE COURT: The Court doesn't have an opinion. I don't
20   have an opinion at all. This is one of those complicated
21   cases I've seen, and there is an issue here that I think
22   you've all missed but I see it.
23   MR. GOUVEIA: We think if we can file a brief, that
24   might help the Court in terms of what we've been telling
25   it. But if you want to listen to argument it, we'll be

Page 167

1   happy to give you argument on our view. But we've sure
2   spent enough time doing that. I didn't mean to say you'd
3   made up your mind. But you've listened to a lot of argument
4   already, because you've asked some questions that --
5   THE COURT: You could tie up.
6   I mean, Joe, I sense from you're saying that, you would
7   like to have some kind of a little tie-up statement.
8   MR. STEWART: If that's what they -- I think that -- as
9   far as the United States is concerned, I believe that we've
10   made our arguments. The facts are in, you know. Take a few
11   minutes to tie it up. I could see it if you want that; but
12   if the Court rules otherwise, we're happy with the way
13   things are.
14   MR. AIZENBERG: I don't seen any reason for any more
15   argument at all. I think, as your Honor said, when you
16   asked the question, this has been briefed ad infinitum. The
17   testimony today was -- if we had testified for three days,
18   I'd say something that would tie it together would be
19   helpful. But there hasn't been that many hours of
20   testimony, so I don't think there's any need for any more.
21   THE COURT: Yeah, and, Cathy, with all due respect, it
22   has been briefed. I know what the issues are. I know what
23   the law is. I know what the facts are. Any argument really
24   isn't going to be helpful to me, because as I said, there
25   are some relatively convoluted potential issues here that

Page 168

1   I'll have to look at to see if I think they're really
2   pertinent.
3   Terry, how long will it take you, if I expedite the
4   transcript? How long will it take to get it? Well, I don't
5   mean like over the weekend or anything.
6   THE COURT REPORTER: Thank you.
7   THE COURT: Trust me. Okay. I've got a trial all next
8   week.
9   (A discussion is held between the Court
10   and the court reporter off the record.)
11   MR. STEWART: One related issue is there is a hearing
12   set on March 5th on the creditor's transfer motion. The
13   ruling of the Court on the stay motion could impact the
14   decision on whether or not we would want to go forward on
15   the transfer motion, especially given the fact that Dexia
16   has a hearing scheduled before Judge Kennelly that is
17   scheduled for March 16th. And I think that part of the
18   consideration here is, if the Court were to lift the stay,
19   then Ms. Rogan would then be back as a party in that
20   proceeding. And she would, I think, need to know that
21   sooner rather than later. And I think that would impact on
22   our desire to go forward with the transfer motion.
23   THE COURT: In what way?
24   MR. STEWART: Simply because at this point it might be
25   better to devote our resources to the proceedings that are

Page 169

1   going on before Judge Kennelly that he's adjudicating,
2   because that's gonna go on regardless, you know, the
3   children there and their interest in these assets being
4   determined. So that's gonna go forward regardless whether
5   the ruling is made or not made or deferred. But, certainly,
6   I think that the transfer motion is -- the way the Court
7   rules on the stay motion will impact that transfer motion.
8   THE COURT: If I'm reading you correctly, you're
9   proposing to continue the hearing on the venue change until
10   I can decide this?
11   MR. STEWART: I think that would be -- I don't want to
12   take the wind out of --
13   THE COURT: I look at this as the critical decision I
14   had to make. The venue transfer is secondary to this, and
15   I'm not -- I'm going to make the decision on this regardless
16   of whether or not there's a transfer of venue obviously. So
17   suggesting to bump that and reset it after the determination
18   is made on this, that would be fine with me.
19   MR. STEWART: Uh-huh.
20   THE COURT: Is that acceptable to you guys?
21   MR. GOUVEIA: Our preference would be to get the
22   transfer motion done with. The evidence is fairly
23   duplicative of some of the things that we did here. And the
24   earlier we do it, the less likely we're gonna have to get
25   additional testimony that we've already given here. So

Page 170

1   March 5th is right around the corner, and we've got the time
2   reserved, and it's not gonna take much to get it done. You
3   can reserve your opinions. You're in charge of -- as you
4   very well know, you're in charge of when you render these
5   opinions and how you render them.
6       We'd like to get the evidence done and go on. I mean,
7   there's not a lot of evidence in that case, as this Court
8   well knows. There's a little bit but not a whole lot. We'd
9   like to get it over with.
10      We don't think that -- you know, for the Government and
11  Dexia to worry about cost and expense in this case belies
12  credibility.
13      THE COURT: You're suggesting, I think, that depending
14  on how the -- okay. Let me really lay it on the table what
15  I think you're suggesting. If you succeed on the motion for
16  stay relief, you'll probably give up on the motion for venue
17  change.
18      MR. STEWART: I think that's a distinct possibility,
19  your Honor.
20      THE COURT: That's the way I'm reading what you're
21  saying.
22      MR. STEWART: And because I think at that point in time
23  the way these stars are alining is that the Dexia proceeding
24  before Judge Kennelly is scheduled for mid March, and the
25  parties are gonna want to focus on that and devote their

Page 171

1   energy to that.
2       MR. GOUVEIA: So that presupposes this Court's gonna
3   rule by mid March, and it may or may not.
4       THE COURT: Well, I'm trying to get this one moved so
5   I'm asking how fast you can get it done, because I'll move
6   this one forward. It won't sit in a stack like most of them
7   have to.
8       MR. STEWART: And you know what? I think that it's
9   fair, too, to mention that, as a possibility, because if the
10  Court does rule in that way, Ms. Rogan then may be back as
11  part of that proceeding before Judge Kennelly with a trial
12  date that's set for mid March. Now most of the evidence is
13  going to be, you know, the same with regard to Mrs. Rogan,
14  as I understand it. It's going to overlap substantially
15  between the evidence that will be presented as to the
16  children's interest and the evidence that was presented as
17  to her interest.
18      So I think that -- but I think that, you know, she
19  should know that sooner rather than later whether she's
20  gonna be made a part of that case.
21      MR. AIZENBERG: Your Honor, I can't say what we'll do
22  if you ruled in our favor on the transfer. I do agree with
23  Mr. Stewart, that certainly it will have an impact on the
24  decision-making with respect to the transfer motion.
25      THE COURT: How fast are you contemplating I can rule

Page 172

1   on this?
2       Terry, two and a half weeks from now is a Monday, March
3   the 9th. Can I have the transcript by then?
4       THE COURT REPORTER: Yes.
5       THE COURT: So that's the soonest I'm gonna get the
6   trial testimony. And I can tell you in advance, I don't see
7   the opportunity until I get that to begin to look at all of
8   these documentary exhibits.
9       MR. AIZENBERG: Fair enough.
10      THE COURT: I've got a trial all week next week. So
11  how fast do you want me to try to get this done?
12      MR. STEWART: Well, I think that maybe at this point
13  the decision that is -- and I'll just move that the hearing
14  on the transfer motion be continued for a period of time.
15      MR. GOUVEIA: I'm not aware of -- I'm not aware and Mr.
16  O'Rourke's not here. I don't know what's set for March 16th
17  in front of Judge Kennelly.
18      MR. AIZENBERG: We have a --
19      MR. GOUVEIA: Do you have a status conference?
20      MR. AIZENBERG: We have a turnover hearing with respect
21  to the Rogan children's trusts.
22      MR. GOUVEIA: That's got nothing to do with her.
23      THE COURT: There's no way I can render this decision
24  by then.
25      MR. AIZENBERG: We're not suggesting that.

Page 173

1       THE COURT: No, but just so you know.
2       MR. AIZENBERG: We're not suggesting that at all.
3       MR. STEWART: I agree.
4       MR. GOUVEIA: You were suggesting that.
5       MR. AIZENBERG: No. I agree with Mr. Stewart that we
6   would, likewise, move to continue the transfer hearing until
7   after the stay decision is issued.
8       MR. GOUVEIA: Well, we don't want to make this Court do
9   any extra work regarding the transfer. If the Court's got
10  enough problems dealing with the stay relief, we agree that
11  that's the crux of the issue.
12      We didn't file a transfer motion. They did. They
13  forced us to address it. We briefed it. We've done all the
14  things -- we've addressed every part of it. We've spent an
15  enormous amount of time and effort. Now they come and
16  decide that they don't need it but that's -- in deference to
17  this Court --
18      THE COURT: No, no. They're not saying that. I
19  understand what they're saying, and I understand why they're
20  saying it.
21      MR. GOUVEIA: Okay. In deference to the Court,
22  whatever the Court feels, we will agree with. We don't need
23  to burden this Court with additional work if it ultimately
24  isn't gonna happen. But I will tell you this, that for
25  them -- I will not -- I don't believe that they're going to

Page 174

1  drop that transfer motion if you rule against them on the
2  stay relief. I don't believe that in a million years.
3      THE COURT: They didn't say that.
4      MR. GOUVEIA: Oh, they didn't?
5      THE COURT: They said if I rule in favor of them, they
6  might consider waiving the motion.
7      MR. GOUVEIA: No, they said either way it may go away
8  is what I heard.
9      THE COURT: No. What they're saying is if they win to
10  a certain extent or whatever on this stay relief, then they
11  may not move to transfer the venue for obvious reasons.
12      MR. GOUVEIA: I think that my solution is simple.
13  Whatever is convenient for the Court, we will agree to;
14  otherwise, I have no sympathy with them. They filed the
15  motion. You set it for hearing. We're entitled to have it
16  heard; but in deference to this Court, we will agree
17  whatever the Judge feels you want to do in deferring that,
18  we'll agree to that.
19      THE COURT: Well --
20      MR. GOUVEIA: Then they come in here and indicate that
21  they may or may not drop it, it's disingenuous at best.
22      THE COURT: Well, whatever, but they've now made a
23  motion to continue the hearing that's set for March 5th on
24  the motion to transfer of venue. The Court, having heard
25  the arguments of the attorneys, the motion for continuance

Page 175

1  is granted. I'll reset it at a date that we get together
2  with the parties on, if it is then necessary after my
3  decision.
4      I will try my best to get this decision done prior to
5  the last week in March, if I at all can. That's about the
6  best I can say. I really want to get it done before the end
7  of March. I'll really try, but the next month coming up
8  here is gonna be a lot of cases.
9      MR. AIZENBERG: Thank you, your Honor. You've devoted
10  an immense amount of time to this so we appreciate it.
11      THE COURT: Well, no. Thanks. And I do want to try to
12  get this done as fast as possible because I know everybody
13  wants to know how it comes out.
14      And just so you're not so suspicious of what it is I'm
15  thinking about, I've touched on this before. The concept of
16  what may be or may not be property of a bankruptcy estate in
17  the context of a nominee or in the context of, say, a
18  fraudulent transfer, is really complicated. There's a Sixth
19  Circuit case that I was reading last night that talks a lot
20  about concepts of embezzlement, theft, transfer of title,
21  what then happens? If a thief -- you know, we mentioned
22  this in one of the pretrial conferences. What then happens
23  if a thief acquires title?
24      Not to say you're a thief.
25      But what if the actual property interest that comes

Page 176

1  into the possession of a debtor, now in the position of Mrs.
2  Rogan, is not derived solely from or all from legitimate
3  income of your husband? What if it is traceable back to --
4  what was -- this was, in essence, a Medicare fraud, wasn't
5  it?
6      MR. AIZENBERG: Yes.
7      MR. STEWART: Yes.
8      THE COURT: And the original -- okay. Just for my
9  edification so I can conceptualize this a little better, Mr.
10  Rogan was involved in Edgewater; right?
11      MR. AIZENBERG: Yes.
12      THE COURT: Okay. And the Medicare payments were made
13  to Edgewater; correct?
14      MR. GOUVEIA: It was paid to the doctors who worked at
15  Edgewater.
16      THE COURT: They were made to doctors who worked for
17  Edgewater?
18      MR. AIZENBERG: And Edgewater.
19      THE COURT: And Edgewater?
20      MR. AIZENBERG: Yes.
21      MR. STEWART: Edgewater was the one that was putting in
22  the claims to Medicare.
23      THE COURT: Okay. That's where I'm getting to.
24  Edgewater puts in the claim.
25      MR. AIZENBERG: Yes.

Page 177

1      MR. STEWART: Right.
2      THE COURT: And then the payments are made. And what
3  was apparently proved to the satisfaction of the district
4  court was that your husband was involved in the fraudulent
5  preparation of these claims that resulted in CMMA -- back
6  then it was HIGPA -- making these payments to whomever it
7  may. And then those payments then, how did he come into
8  possession of the money? It's alleged.
9      MR. AIZENBERG: Mr. -- well, I mean, this was Judge
10  Darrah's finding.
11      THE COURT: Yeah, this was decided. Yeah.
12      MR. AIZENBERG: Yeah, fact. Judge Darrah found that
13  Mr. Rogan's management company ran the hospital. They were
14  paid by the hospital. So the Government pays Edgewater,
15  Edgewater pays the hospital or Edgewater pays --
16      THE COURT: The management company.
17      MR. AIZENBERG: -- the management company, and the
18  management company pays Mr. Rogan.
19      THE COURT: Pays Mr. Rogan.
20      MR. AIZENBERG: And now, also, it's been subsequently
21  ruled that the companies and Mr. Rogan are alter egos. So
22  it's the corporate form has been pierced so that there's
23  no -- we don't think there's any argument that they're not
24  separate entities. But regardless of that, that was the
25  flow of money.

45 (Pages 174 to 177)

Page 178

1       THE COURT: Yeah. Okay.
2       MR. STEWART: And the Seventh Circuit affirmed that
3   decision as well.
4       THE COURT: Yeah. Yeah.
5       MS. MOLNAR-BONCELA: And, your Honor, the timing of
6   those payments was anywhere between 2004, 2005, 2006. We
7   have property here that goes back to the 1990s.
8       THE COURT: Well, we're not arguing the case. We're
9   arguing the conception of where the money came from and how
10  it got to where it ultimately is now, or potentially the
11  property -- property potentially acquired -- in relation to
12  whether or not it's property of this bankruptcy estate.
13      MR. GOUVEIA: Well, but that's why we presented
14  evidence on where her property came from.
15      THE COURT: Yeah. No, Gordon, you did. You've got
16  evidence, you know, before potentially.
17      MR. GOUVEIA: Potentially before.
18      MR. AIZENBERG: Your Honor, of all the matters in the
19  Northern District, the fraudulent transfer or unjust
20  enrichment theory is only one of our theories.
21      THE COURT: Right.
22      MR. AIZENBERG: We have, of course, an alter ego
23  theory.
24      MR. GOUVEIA: You have as many theories as they exist.
25      MR. AIZENBERG: We have a lot of theories. That's

Page 179

1   true. And so, in other words, our case, at least the part
2   with Judge Kennelly, doesn't rest or fall to the funds being
3   the fruit of fraud. That was one theory.
4       MR. GOUVEIA: Well, the real problem they've had with
5   the fraudulent transfer theory arguments is the statute of
6   limitations. You know, how long ago did they go back in
7   terms of when the transfers occurred? That's part of the
8   problem.
9       THE COURT: Well, okay. Okay. No, I understand all
10  this. I'm just saying it's an intriguing case when you
11  really get to the real nub of the issue, part of which is
12  what is really potentially going to remove itself as
13  property of the estate that I can do a determination of the
14  stay relief. That is part of both of those cases,
15  especially probably the Government's, because you're sitting
16  there saying, It might be titled in her name but guess what,
17  she had nothing to do with it. Interesting concept.
18      Do either of the parties -- has Dexia filed a claim
19  yet? They did, didn't they?
20      MS. MOLNAR-BONCELA: They filed a claim yesterday.
21      THE COURT: Is the Government gonna file one?
22      MR. STEWART: We've drafted one. I've not filed it
23  yet.
24      THE COURT: Okay. Because the question, as you know,
25  and having done financial litigation as long as you have, in

Page 180

1   some cases you don't want to waive 106. That's not a
2   concern here I wouldn't think.
3       MR. STEWART: I hope not.
4       THE COURT: You probably can file claims.
5       MR. STEWART: I can file it tonight, your Honor.
6       THE COURT: No, no, no. Just -- you know, you've got
7   six months from the date the case is filed.
8       MR. STEWART: Yeah. One thing I think I've just
9   observed here is that there's been some question raised
10  about the finality of Dexia's judgment. And that really
11  should not be an issue in this case. The Government has a
12  judgment that is unimpeachable for $64 million; and with
13  interest, right now it's up to $75 million. If there was
14  any question, any suspicion, any thought that Dexia's
15  judgment might fail, we would be before Judge Kennelly in a
16  heartbeat seeking to establish ourselves as the named
17  creditor in that case with the injunction running to us and
18  all the other rights and remedies that they've sought in
19  that case.
20      So the idea that Dexia's rights or remedies are in some
21  way undermined, is really kind of fanciful. If you look
22  back, you'll see that, you know, there's a second judgment
23  creditor here that is ready, willing, and able to come in
24  and to litigate these matters in its own right.
25      MS. MOLNAR-BONCELA: And, your Honor, we respectfully

Page 181

1   disagree in that the injunction was entered by Judge
2   Kennelly in a case where Dexia was the litigant; and we've
3   gone over that ad nauseam that the bankruptcy intervened.
4   And at the point where the preliminary injunction was
5   entered, the United States was not involved in that
6   preliminary injunction. And to the extent that the Seventh
7   Circuit would overrule that --
8       (The lights in the courtroom go out.)
9       MR. GOUVEIA: Oops.
10      MS. MOLNAR-BONCELA: That cut me off right there.
11      THE COURT: They usually pop back on. Wait a minute.
12  I've got the panel.
13      MR. GOUVEIA: Have you got an override button up
14  there?
15      THE COURT: Here we go.
16      (The lights in the courtroom come back on.)
17      MS. MOLNAR-BONCELA: Oh, there they go. I'm sorry.
18      THE COURT: That's okay. Surprise.
19      Okay. I don't view what's happening in the Seventh
20  Circuit in relation to that to be a whole lot of moment to
21  me. It has a life of its own. If that judgment is set
22  aside, then obviously there is an issue about Dexia being
23  able to proceed on its collection remedies because it now
24  doesn't have a final judgment. But as we sit here today, it
25  hasn't been. So I'm gonna decide it, no matter what. Now

Page 182

1   if they would set it aside before the decision's entered, I
2   would appreciate somebody telling me.
3        MR. GOUVEIA: We certainly will.
4        THE COURT: I'm sure you will.
5        MR. GOUVEIA: We'll save you all that writing.
6        MR. STEWART: We're getting our own injunction imposed.
7        THE COURT: Yeah. Then you can proceed as you would
8   choose. So okay.
9        Well, I think we're done.
10       MR. AIZENBERG: Thank you, your Honor.
11       MR. STEWART: Thank you.
12       THE COURT: Thank you all. Have a nice weekend and
13  watch the snow. It's supposed to snow pretty hard. Thanks.
14         (The proceedings were
15         concluded at 6:15 p.m.)
16          **********
17
18
19
20
21
22
23
24
25

---

Page 183

1  STATE OF INDIANA  )
             ) SS:
2  COUNTY OF PORTER  )
3
4
5       REPORTER'S CERTIFICATE
6       I, TERRY M. PICKERING, a qualified stenotype reporter,
7  being duly authorized to administer said oath, do hereby certify
8  that the foregoing proceedings were held on Friday, February 20,
9  2009.
10      I further certify that I then and there reported in
11  machine shorthand the proceedings so held at said time and place,
12  reduced the same to typewriting from my original shorthand notes,
13  and that the foregoing is a true, correct, and complete
14  transcript of said proceedings.
15      IN WITNESS WHEREOF, I hereby affix my name and seal
16  this _____ day of _____, 2009.
17
18
                           SEAL
_____
19  TERRY M. PICKERING, Court Reporter
      Notary Public
20
  My commission expires August 30, 2015.
21
22
23
24
25