**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Credit Local de France, | ) ) ) | |
| | ) | Case No.  02 C 8288 |
| Plaintiff, | ) | Judge Matthew F. Kennelly |
| | ) | |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| PETER G. ROGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENORS' RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**

**Counsel for Intervenors
Robert, Brian and Sara Rogan**

| | |
|---|---|
| Michael J. O'Rourke | Timothy J. Touhy |
| Myles P. O'Rourke | Jeffrey J. Halldin |
| O'ROURKE & MOODY | TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP |
| 55 West Wacker Drive | 55 West Wacker Drive |
| Suite 1400 | Suite 1400 |
| Chicago, Illinois 60601 | Chicago, Illinois 60601 |
| (312) 849-2020 | (312) 372-2209 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................. 1

ARGUMEMT ....................................................................................................................... 1

I.      Whether the Trusts Are Properly Before the Court ........................................... 1

II.     Constructive Trust............................................................................................... 5

III.    Alter Ego/Nominee .......................................................................................... 10

        A.      Unity of Interest and Ownership............................................................ 13

                1.      Close Personal Relationship .................................................... 13

                2.      Consideration ........................................................................... 13

                3.      Settlor Contributed Corpus ...................................................... 14

                4.      Percentage of Wealth ............................................................... 14

                5.      Anticipation of Litigation ........................................................ 15

                6.      Shield Assets from Creditors ................................................... 15

                7.      Common Employees, Offices Records ..................................... 17

                8.      Settlor Pays Trust Expenses ..................................................... 17

                9.      Settlor Enjoys Fruits of Trust................................................... 17

                10.     Settlor Controls Trust Operations ............................................ 18

                        a.      The Testimony of Ilan Cohen ....................................... 18

                        b.      The Testimony of Jerry Whitlow .................................. 20

                11.     Concealment of Settlor's Role ................................................. 20

        B.      Fraud or Injustice ................................................................................... 21

IV.     Nominee .............................................................................................................. 22

V.      Spoilation ........................................................................................................... 22

CONCLUSION.................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Bankers Trust Co. v. Chicago Title & Trust Co.*, 89 Ill. App. 3d 1014, 412 N.E.2d 660 (1st Dist. 1980) ............................................................................................... 21

*Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461 (Bankr. M.D. Fla. 1994) ............................................... 12

*Hyatt Int'l v. Coco*, 302 F.3d 707 (7th Cir. 2002) ....................................... 15

*In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d 441, 764 N.E.2d 66 (1st Dist. 2001) ...................................................................................... 6, 8, 9

*In re Foxmeyer Corp.*, 290 B.R. 229 (Bankr. D. Del. 2003) ....................... 12

*In re Lawrence*, 238 B.R. 498 (Bankr. S.D. Fla. 1999) ............................. 14

*In re Rehabilitation of Centaur Ins. Co.*, 158 Ill. 2d 166, 632 N.E.2d 1015 (1994) ................... 21

*Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of New York*, 577 F.Supp.2d 1023 (N.D. Ill. 2008) ....................................................... 6, 9

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008) ...................................................................... 10, 11, 12

*Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221 (7th Cir. 1993) .......... 3

*Star Ins. Co. v. Risk Mktg. Group Inc.*, 561 F.3d 656 (7th Cir. 2009) ..... 1, 3

*United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006 ..................... 7

**Statutes**

735 ILCS 5/2-1402 ................................................................................... 2, 5, 6

760 ILCS 5/6 .................................................................................................. 16

Fla. Stat. Ann. § 736.0816 ........................................................................... 16

**Other Authorities**

BLACK'S LAW DICTIONARY (7th ed. 1999) ...................................................... 2

**Rules**

Ill. S. Ct. R. 277 ............................................................................................ 2

## INTRODUCTION

Intervenors respectfully submit this reply to Dexia's post-hearing brief.  As Intervenors have urged throughout, this trial involved a motion for a turnover order brought within a supplementary proceeding under Rule 69 and 735 ILCS 5/2-1402.  The scope of this proceeding under Illinois law is strictly limited and focuses exclusively upon two distinct inquiries:  (1) whether a judgment debtor citation respondent possesses assets subject to turnover or (2) whether a third-party citation respondent possesses assets of the judgment debtor subject to turnover.  *Star Ins. Co. v. Risk Mktg. Group Inc.*, 561 F.3d 656, 660-61 (7th Cir. 2009).

Intervenors submit, as more fully detailed below, that Dexia has failed to present a prima facie case to satisfy its burden of proof on either of these issues.  Instead, Dexia has labored to present a massive, highly-complex tort case bottomed on two theories—alter ego and constructive trust—neither of which properly lies within a supplementary proceeding.  Intervenors further submit that even if such equitable remedies were properly prosecuted in a supplementary proceeding, Dexia has failed to prove its claims on the merits and that its claims are barred by the applicable statutes of limitations.  On these grounds, Dexia's motion for a turnover order should be denied, the proceedings should be dismissed, and the preliminary injunction should be dissolved.

## ARGUMEMT

## I.      Whether the Trusts Are Properly Before the Court

Dexia argues first that the trusts are properly before Court because, even though the trustee has been removed and not replaced, Intervenors "stand in the shoes of the trustee of the trusts" and are individually subject to citations to discover assets.  [Dkt. 1059, p. 2]. Unfortunately, Dexia has never ***served*** any citations upon Intervenors so its argument fails on its own terms.  Apparently, Dexia caused citations (without notices) to be issued to Intervenors—at

least, the cover sheet referred to in Dexia's brief indicates that [Dkt. No. 822]—but Dexia coyly glosses over the fact that the citations were never served. Illinois Supreme Court Rule 277 specifically provides that a "supplementary proceeding shall be commenced by the service of a citation on the party against whom it is brought." Ill. S. Ct. R. 277(b). Because Dexia never served the citations, no supplementary proceeding has been commenced against them.

As noted in Intervenors' post-hearing brief [Dkt. 1051, pp. 7-9], the Court just held a hearing on Dexia's motion for a turnover order but, during the hearing, Dexia failed to show *what* property should be turned over who *who* should do it.[1] A turnover order is defined as:

> ***turnover order.*** An order by which the court commands a judgment debtor to surrender certain property to a judgment creditor, or to the sheriff or constable on the creditor's behalf. ● Such an order is usu. directed to property that is difficult to acquire by the ordinary judgment-collection process, such as share certificates and accounts receivable.

BLACK'S LAW DICTIONARY 1125 (7th ed. 1999). After years of litigation and a full-blown hearing devoted specifically to Intervenors' domestic and foreign trusts, Dexia has failed to specify what property should be surrendered or who currently holds it. Without this information, the Court cannot enter a turnover order.

Although Dexia has never clearly articulated its theory, it seems that it does not want a turnover order but, instead, a declaratory judgment invalidating Intervenors' trusts. At least that is what Intervenors assume since Dexia offered almost no evidence at trial concerning what property it wants from their trusts or who should deliver it up. The problem is, Illinois' supplementary proceedings statute does not provide for extensive piecemeal litigation by allowing a judgment creditor to obtain a series of declaratory judgments leading up to a turnover order as Dexia seeks here. *See*, 735 ILCS 5/2-1402.

---

[1] Dexia claims that it had trouble finding this argument in Intervenors' 14-page brief by arguing, erroneously, that Intervenors failed to make it. [Dkt. 1068, pp. 4-5].

In its post-hearing brief, Dexia again emphasizes that "[p]roceedings to enforce judgments are meant to be swift, cheap, informal." [Dkt. 1059, p.1 (quoting *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993)]. But invalidating the existence of a third party via an alter ego claim does not lend itself to swift, cheap and informal proceedings. Indeed, when seeking leave to file a 139-page post-hearing brief, Dexia characterized this as a "highly complex case" involving over 1,000 exhibits, "exceedingly complex facts," and "myriad legal and factual questions." [Dkt. 1055, ¶¶ 1, 4]. Assessing its alter ego theory in particular, Dexia admitted that proving the claim "requires a very involved and detailed showing." [Dkt. 1055, ¶ 2]. Moreover, Dexia recognized that the complexity of its legal theories is compounded by "additional unusual issues like spoliation" (an issue that was not raised until after the trial concluded). [Dkt. 1055, ¶ 3].

Intevenors note, once again, that the complexity of Dexia's claims illustrate why veil-piercing and other equitable claims belong in standalone lawsuits instead of supplementary proceedings to enforce judgments. Illinois law confines supplementary proceedings to two discrete inquiries: whether a judgment debtor or a third party has assets that should be turned over to satisfy a judgment. *Star Ins. Co. v. Risk Mktg. Group Inc.*, 561 F.3d 656, 660-61 (7th Cir. 2009). Thus, when a judgment creditor attempts to enforce a judgment by negating the existence of a third party via an alter ego claim, it must file a new lawsuit against the third party as the judgment creditor did in *Star Insurance*. *Id.* Because constructive trust claims exceed the scope of supplementary proceedings for the same reasons that alter ego claims do, a judgment creditor attempts to enforce a judgment by imposing a constructive trust must also file a new lawsuit.

The difficulties created by shoehorning alter ego and other equitable claims into a supplementary proceeding were illustrated during the hearing on Dexia's motion for a turnover order. With no pretrial order in place to control evidentiary issues, Dexia continually "updated" its epic-length exhibit list during the hearing without giving any advance notice to Intervenors. Dexia continued using this tactic even after the hearing concluded. On June 5, 2009, Dexia filed its exhibit list identifying exhibits up to 1113 [Dkt. 1053], but in its post-hearing brief filed two days later, Dexia relied upon Exhibit 1115, which was first marked after the hearing concluded and the evidence was closed [Dkt. 1059, pp. 83, 100].

Another illustration involves Dexia's summary witness, James McGuire. Dexia called Mr. McGuire as its final witness to summarize the contents of numerous documents that had never been offered into evidence. When Intervenors objected, an exasperated Court recessed the hearing and ordered Dexia to file a detailed proffer identifying (1) which exhibits Mr. McGuire relied upon to render his summary and (2) the basis for each exhibit's admissibility. [Dkt. 1032]. When Dexia filed its proffer, it withdrew the majority of documents that Mr. McGuire summarized and replaced nearly all the rest with different exhibits. [Dkt. 1036].

At the conclusion of the hearing, Dexia sought the admission of many of its exhibits through the residual exception even though it had provided no notice to Intervenors in advance of trial or described how the elements of the rule had been satisfied. (The admissibility of these exhibits and others is now being briefed). Then, Dexia filed its post-hearing brief raising, for the first time in this proceeding, a spoliation claim. Under this claim, Dexia asks the Court to draw some generalized adverse inference against Intervenors from the fact that their father destroyed documents in the past. [Dkt. 1059, pp. 36-56]. Although Fred Cuppy and John Foley apparently reviewed and authorized the destruction of many of these documents [Pl. Ex. 8, pp. 236-38, Pl.

4

Ex. 89, pp. 237-40], Dexia asked neither witness about these documents during Mr. Cuppy's twelve-hour deposition, during Mr. Foley's deposition, or during the hearing when Mr. Foley testified live.

Dexia's policy throughout this proceeding has been to shoot first and ask questions later. From freezing Intervenors' personal bank accounts and credit cards on an ex parte basis to seeking a turnover order that does not turn any specific property over, the emphasis is on the questions that must be answered later: what property should be turned over to Dexia and who should do it? Those are the questions that should have been answered during the hearing on Dexia's motion for a turnover order. But they were not. Instead, as it has done throughout these proceedings, Dexia seeks a adverse inferences and further proceedings.

The whole point of a citation to discover assets is "to discover assets or income of the debtor not exempt from the enforcement of the judgment . . . and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment." 735 ILCS 5/2-1402(a). Yet, after months of discovery and a full-blown evidentiary hearing, the parties and the Court have only a vague notion of what assets the various trusts own. Because Dexia has failed to identify what assets should be turned over and who should do it, a turnover cannot be entered and these proceedings should be dismissed.

## II.  Constructive Trust

In addition to the issues of subject matter jurisdiction, the scope of supplementary proceedings and the applicable statutes of limitations and repose discussed elsewhere, Dexia's failure to identify what property should be turned over is also fatal to Dexia's constructive trust claim because no tracing has been done.

It is undisputed that before the Court may impose a constructive trust on any of the trusts' assets, Dexia must establish each element of its claim by clear and convincing evidence. [Dkt.

1059, p. 10]. In its post-trial brief, Dexia "seeks to impose a constructive trust upon assets, Rogan, the judgment debtor: (a) obtained via his fraud upon Edgewater's bondholders and Dexia; and (b) caused to be transferred to the Children's Trusts." [Dkt. 1059, p. 3].

According to Dexia, "the inquiry here falls exactly within the ambit of Illinois procedure in supplementary proceedings in that it seeks to obtain assets of the judgment debtor that the judgment debtor: (a) improperly obtained, and (b) transferred to a third party." [Dkt. 1059, p. 3]. The inquiry is not within the ambit of Illinois procedure in supplementary proceedings because (a) whether the judgment debtor's property was improperly obtained is irrelevant under 735 ILCS 5/2-1402 and (b) the statute does not allow a judgment creditor to pursue constructive trust claims against a third party. This issue is briefed elsewhere so the arguments are not repeated here.

Turning to the merits of Dexia's claim, in order to impose a constructive trust, "a plaintiff must show that its funds can be traced into that fund. *Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1048-49 (N.D. Ill. 2008). When, as here, the funds have been used to purchase other assets, "[s]trict identification is required" and the plaintiff "must prove that *his specific funds* were used to purchase a *specific subsequent asset*." *In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d 441, 490, 764 N.E.2d 66, 108 (1st Dist. 2001) (emphasis added). Strict identification has been construed to mean "[d]irect tracing or a direct chain from the money deposited into the commingled fund to another asset or other fund"; tracing "in an unbroken line to the property he seeks to impress with the trust"; tracing "of funds from one repository to the next"; tracing "with particularity"; and tracing through "'step by step' dealings between the trustee and others." *Id.* at 490, 764 N.E.2d at 108-09. Dexia has failed to adequately trace its funds to assets held by the trusts.

6

Dexia argues at length that there need be no convergence between the victim of fraud and the person deceived [Dkt. 1059, pp. 6-7], but the point is not convergence, it is tracing. While Dexia focuses on 1994, when Edgewater Medical Center was sold, the domestic trusts were settled in 1992 with stock in Edgewater Operating Company, each trust receiving 10% of the company's stock. [Dkt. 953, p. 7]. Because Mr. Rogan created Edgewater Operating Company three years earlier and bought Edgewater Medical Center with $1 million in cash plus assumed liabilities, *United States v. Rogan*, 459 F. Supp. 2d 692, 697 (N.D. Ill. 2006), the stock had value when the trusts were settled in 1992—value that Mr. Rogan created by cash he earned from his previous endeavors and to which Dexia can lay no claim under a constructive trust theory.

Also, it is undisputed that Scott Gross gifted $10,000 to each trust. [Cuppy Deposition (5/21/2009), p. 43]. And again, Dexia has articulated no theory as to why it should be entitled to impose a constructive trust on the money gifted by Mr. Gross. In short, by failing to adduce any tracing evidence separating Mr. Gross's gifts and the cash component of Mr. Rogan's gifts (as well as what income was earned on those amounts from the trusts' investments), Dexia has failed to establish its entitlement to a constructive trust.

**Sale Proceeds.** Dexia argues that "it is irrelevant that Dexia was not a direct victim of Rogan's 1994 fraud, or that the injury to Dexia occurred later as part of its 1998 issuance of a letter of credit to EMC. Rather, it is enough that the 1998 bondholders stepped into the shoes of the 1994 bondholders and Dexia stepped later into the shoes of the 1998 bondholders. In so doing, Dexia became a victim of Rogan's original fraud." [Dkt. 1059 p. 6]. Thus, Dexia makes claims a constructive trust on the full amount of the sale proceeds. [Dkt. 1059, p. 16]. Dexia argues that had it known of fraud at Edgewater, it would not have issued the letter of credit. [Dkt. 1059, p. 15]. That may give Dexia grounds for rescission but not for a constructive trust.

Without sorting out which trust assets came from the 1994 hospital sale, which came from cash earned by Mr. Rogan in the 1970s and 1980s, and which came from Mr. Gross's gift of $10,000, Dexia has failed to demonstrate what property the Court should impose a constructive trust on.

**EMC Promissory Note.**  Dexia also seeks a constructive trust on the proceeds of a subordinated note that Edgewater Medical Center repaid before Dexia got involved in the bond refinancing.  [Dkt. 1059, p. 16].  Even assuming that Dexia stepped into the shoes of the 1994 bondholders, there is no evidence tracing these funds to Dexia so its claim must be denied.  *In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d at 490, 764 N.E.2d at 108 (the plaintiff "must prove that *his specific funds* were used to purchase a *specific subsequent asset*") (emphasis added).

**Management Fees.**  Dexia argues that between 1995 and 2000, "management companies Rogan controlled – Braddock Management LP and Bainbridge Management LP – fraudulently obtained more than $13 million in management fees from EMC."  [Dkt. 1059, p. 16].  Dexia also argues that "(a) during the time period 1998-2001, Braddock Management LP distributed $5,481,497 of these fraudulently obtained funds to the Children's Trusts; (b) in 2000, Bainbridge Management LP distributed $1,954,267 in fraudulently obtained funds to the Belizean Trusts."

There are numerous flaws with these arguments.  First, Dexia offered insufficient evidence tracing the funds from the management companies to the trusts.  Dexia's summary witness, James McGuire testified that the management companies reported income from management fees on their Form K-1s but admitted on cross examination that he did not know whether the companies distributed the funds to the trusts, a fact Dexia admits in its response brief.  [Dkt. 1068, p. 21].  Dexia claims that "[i]f the Trusts did not end up holding the funds in Trust-denominated accounts, it was by design" [Dkt. 1068, p. 21], but that argument fails to

rectify Dexia's failure to trace the funds into the trusts as any plaintiff seeking a constructive trust claim must do. *Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1048-49 (N.D. Ill. 2008); *In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d 441, 490, 764 N.E.2d 66, 108 (1st Dist. 2001).

Second, not all of the management fees were fraudulently obtained. Edgewater Medical Center had sources of revenue other than Medicare and Medicaid [Pl. Ex. 732-A, p. 14] and, even if Dexia could assert a claim to recover some of those fees, at least some of those fees were for legitimate services.

More troubling, however, is the fact that Edgewater Medical Center seeks those ***same*** fees in its bankruptcy. [Int. Exs. 42, 43]. If Edgewater can claim those fees in one case and Dexia can claim them again in this case, there is a distinct possibility that different courts will impose amorphously-defined constructive trusts on the same assets. That is why the plaintiff seeking a constructive trust must specifically identify the assets subject to a constructive trust, *In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d at 490, 764 N.E.2d at 108, and that is why Dexia's failure to adduce appropriate tracing evidence is particularly troubling. Getting a money judgment is one thing; imposing a constructive trust is another thing completely. Under Dexia's theory, aggrieved creditors could simply jettison their burden to trace their money and identify the specific assets where it came to rest. All creditors could sound the simultaneous refrain that they had entitlement to a given asset. Dexia's approach would create a free-for-all, in which multiple creditors would each be trying to take more pieces than there are in the financial pie.

Intervenors further note that Dexia has made an unsatisfactory attempt to circumvent the five-year statute of limitations on its constructive trust claim. In 1998, Dexia knew that a portion of Edgewater's sale proceeds went to Intervenors' domestic trusts [Trans. (4/1/2009), pp. 189-

9

190] and, in 2001, Dexia "admits that by 2002, it was aware of Rogan's healthcare fraud [Dkt. 1068, p. 39]. Dexia chose not to sue the trusts to recover the proceeds of the fraud but, instead, waited until now to collect them in a supplementary proceeding. Dexia's decision does not extend Illinois' five-year statute of limitations to twenty years as Dexia argues.

Dexia agrees that the statute of limitations protects against spoliation of evidence and provides repose [Dkt. 1068, p. 42], yet it has no answer to problems its decision has created in this case. A key witness, David Miller—whose role has been characterized by Dexia as "important and revealing" in the alleged scheme to defraud creditors [Dkt. 1059, pp. 135-37]— passed away in 2005 and documents were destroyed in 2006 before Dexia asserted its claims against the trusts. Having allowed the evidence to spoil, Dexia now asks the Court to draw inferences against Intervenors because it failed to timely assert its claims. Dexia has articulated no reason why Illinois' five-year statute of limitations on constructive trust claims should be extended to twenty years just because a plaintiff makes the tactical decision to assert the claim within a supplementary proceeding instead of a standalone lawsuit.

## III.    Alter Ego/Nominee

In addition to the issues of subject matter jurisdiction, scope of supplementary proceedings and statutes of limitations and repose discussed elsewhere, there are several problems with Dexia's alter ego theory.

As a threshold matter, Dexia assumes that Illinois law applies even though Illinois' choice-of-law rules provide that veil-piercing claims are governed by the state of incorporation or—assuming that a trust can be pierced as Dexia argues—state of formation. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008). The domestic trusts were formed under the laws of Florida and the foreign trusts were formed under the laws of Belize.

10

Under Illinois law, which Dexia assumes is the applicable law, "[a] corporation's veil of limited liability will be pierced only when there is 'such unity of interest and ownership that the separate personalities of the corporation and the individual or other corporation no longer exist,' and when 'adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378-79 (7th Cir. 2008). "Piercing the corporate veil is not favored and in general, courts are reluctant to do so." *Id.* at 379. "[A] party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a 'dummy or sham' for another person or entity." *Id.*

Dexia cites no Florida (or Illinois) cases applying the alter ego doctrine to a trust rather than a corporation or some other business entity designed to limit its owners' liability, and Intervenors have found none. Although Dexia relies on corporate veil-piercing cases to support its claim on one hand, it argues on the other that "there is no corporate structure at issue that purports to limit liability" and that "assets have been put in another's name and so the inquiry is whether the transferor truly gave up ownership and control of those assets." [Dkt. 1068, p. 31]. As will be seen below, Dexia makes a much broader inquiry taking into account various factors that are completely different from the corporate veil-piercing factors and will be present in nearly all trusts, particularly those established by a parent for a child.

Turning to the first element of the corporate alter ego analysis—the "unity of interest" test—Illinois law considers the following factors:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378-79 (7th Cir. 2008).  But Dexia ignores these factors and relies upon completely different factors to analyze Intervenors' trust which, as noted above, are generally present whenever a parent creates a trust for his or her child (e.g., a close family relationship, no consideration, etc.).

Before turning to Dexia's trust factors, there is a conflict as to the applicable burden of proof.  In *In re Foxmeyer Corp.*, 290 B.R. 229, 237 (Bankr. D. Del. 2003), the court found that the preponderance of the evidence standard was too low because numerous Delaware cases held that the party seeking to pierce the corporate veil has a heavy burden and persuading courts to disregard the corporate form is a difficult task.  Thus, "the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law is, if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard."  *Id.*

Like Delaware, both Florida and Illinois impose a high burden on litigants attempting to pierce the corporate veil.  *See*, *Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994) ("Florida and Delaware courts disregard the corporate entity in only the most extraordinary cases.  Those who seek to pierce the corporate veil, in either jurisdiction, carry a very heavy burden."); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378-79 (7th Cir. 2008) ("Piercing the corporate veil is not favored and in general, courts are reluctant to do so.").

Because trust-piercing seeks to invalidate the individuality of a human being (the trusts' trustee) instead of a corporate entity (as in a traditional veil-piercing case), and because no appellate or supreme court from Illinois or Florida has allowed trust-piercing, the Court should reject this claim altogether.  If, on the other hand, the Court entertains the claim, it should apply a

12

strict standard of proof. And for good reason since a preponderance of evidence standard is one of "probabilities." The proof should be clear, and convincing, on *each* of the factors enumerated below—in other words, that no reasonable interpretation of the evidence (be it coincidental, innocent, or intentional) could be *other* than veil-piercing.

### A. Unity of Interest and Ownership

#### 1. Close Personal Relationship

Dexia argues first that the Court should consider whether a close relationship exists between the Rogans and their children. [Dkt. 1059, p. 20]. Obviously, this relationship will be present every time a trust is settled by a parent for his or her child. For the same reason, Dexia gets no further with its argument that the family lawyer drafted the trust instruments and served as trustee. This factor is irrelevant.

#### 2. Consideration

Dexia argues next that the Court should consider whether Intervenors paid their parents consideration for the trust assets when the trusts were settled. [Dkt. 1059, p. 21]. As the Court knows, Intervenors were al minors when the domestic trusts were settled. Also, the fact that these children did not pay their parents for these trusts is perfectly consistent with the fact that parents who create trusts for their children generally intend to make a gift.

Dexia also observes that Intervenors knew nothing about the trusts until long after their creation. [Dkt. 1059, p. 61]. It is unsurprising that Intervenors were not told about their trusts when they were young because their parents supported them as children and the trusts were specifically created to support them as adults: each trust provides that the beneficiary shall receive half of the trust's principal at age 35 and the other half at age 40. [Pl. Ex. 302-04, pp. 102]. Of course, Robert was told of his trust and shown a statement of trust assets in 2003 as soon as he got engaged so that his lawyer could prepare a prenuptial agreement. [Pl. Ex. 27, pp.

80-81, 84-85].   While Dexia argues for some nebulous adverse interest, the fact that the Rogans were silent about the trusts until their existence took on some legal significance—in Rob's case, an engagement—could equally give rise to the inference that they wanted to ensure that their children would diligently pursue their education and careers.

### 3.     Settlor Contributed Corpus

Dexia argues next that the Court should consider whether the Rogans contributed virtually the whole trust corpus.  [Dkt. 1059, p. 21].  Once again, this factor will be present whenever parents create trusts for their children.  Thus, this point is irrelevant.  Moreover, Scott Gross gifted $10,000 to each trust [Cuppy Deposition (5/21/2009), p. 43], a fact which cuts against this factor (and which seriously undermines Dexia's constructive trust claim, which requires strict evidence tracing assets).

### 4.     Percentage of Wealth

Dexia argues next that the Court should consider whether the Rogans transferred a large percentage of his total wealth is to the trust.  [Dkt. 1059, p. 22].  In support of this argument, Dexia points to a case in which the court refused to believe that an individual transferred "over ninety percent of his liquid net worth, to a trust in a far away place administered by a stranger." [Dkt. 1059, pp. 22-23 (quoting *In re Lawrence*, 238 B.R. 498, 500 (Bankr. S.D. Fla. 1999)].

The problem with this argument is that it cuts against Dexia.  Three years before the Rogans settled the domestic trusts, Mr. Rogan bought Edgewater Medical Center through Edgewater Operating Company for $1 million in cash and assumed liabilities, *United States v. Rogan*, 459 F. Supp. 2d 692, 697 (N.D. Ill. 2006), and when the Rogans settled the trusts in 1992, they gave each child a 10% interest in Edgewater Operating Company [Dkt. 953, p. 7].

Because the Rogans settled the trusts with a minority interest in only one of their assets, this factor weighs against an alter ego finding.  Recognizing this fact, Dexia argues that Mr.

Rogan put the bulk of his wealth into *other* trusts—namely, self-settled trusts that the Court has already entered summary judgment against.  [Dkt. 1059, p. 99].  That, however, does nothing to change the amounts the Rogans gifted to their children.

### 5.      Anticipation of Litigation

Dexia argues next that the Court should consider whether the trusts were created in anticipation of litigation or collection activity.  [Dkt. 1059, pp. 23-24].  As the Seventh Circuit has held, "the fact that litigation was not filed until years later confirms no threat at the relevant time."  *Hyatt Int'l v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002).

There is scant evidence to justify the inference Dexia seeks to draw in that the domestic trusts were made in anticipation of collection activity.  They were created in 1992, more than eight years before any lawsuits were filed against their parents, the settlors of the trusts.  The only events identified by Dexia that would have made the Rogans anticipate litigation occurred well after the domestic trusts were settled.  [Dkt. 1059, pp. 83-92].  Thus, this factor weighs against an alter ego finding.

### 6.      Shield Assets from Creditors

Dexia argues next that the Court should consider whether the settler created or operated the trusts to shield his assets from creditors.  [Dkt. 1059, p. 26].  This is true of most trusts and many types of business entities such as corporations, limited liability companies, limited liability partnerships, limited partnership and so on.

Dexia notes that each of the Domestic Trusts contains a spendthrift provision, even though the Rogan children were youngsters when the Rogans settled the trusts for their children.  That, however, is because the trusts were designed to provide for the youngsters well into adulthood:  each trust provides that the beneficiary shall receive half of the trust's principal at age 35 and the other half at age 40.  [Pl. Ex. 302-04, pp. 102].

Dexia also notes that each of the Domestic Trusts contains a provision that empowers the trustee "[t]o hold trust property in the name of a nominee or in any other way without disclosing the trust relationship."  This typical trust provision is specifically authorized under both Florida and Illinois law.  *See*, Fla. Stat. Ann. § 736.0816(1) ("a trustee may . . . hold property in the name of a nominee or in other form without disclosure of the trust . . ."); 760 ILCS 5/6 (a "trustee may cause stocks, bonds, and other property, real or personal, belonging to the trust to be registered and held in the name of a nominee without mention of the trust in any instrument or record constituting or evidencing title thereto").

Intervenors provide both states' law for two reasons:  first, because the law is uniform insofar as it grants this power to trustees and amounts to a typical trust provision and, second, because Dexia has been opportunistic in its choice of law analyses, arguing on one hand that Intervenors should be bound to a New York choice of law provision in a contract to which they were not party [Dkt. 984, p. 3; Dkt. 1027, p. 12] while claiming on the other that it cannot be bound by the trusts' Florida choice of law provision [Dkt. 895, p. 13].

In addition to the fact that this provision is both common and perfectly legal throughout the United States, Dexia offered no evidence that the trustee ever used the power, especially to accomplish anything wrong.

Dexia argues at length that the fact that the trusts were set up offshore is an illegitimate attempt to shield the trusts assets from creditors.  Following this logic, the domestic trusts, which were formed in Florida, were not designed to confound creditors.  More to the point, the domestic trusts did not in fact confound creditors—at least not Dexia—because Dexia knew about them before it issued the letter of credit in 1998.  [Trans. (4/1/2009), pp. 189-190].

16

### 7. Common Employees, Offices Records

Dexia argues next that the Court should consider whether the trusts shared employees, offices and records with the settlor's other business. [Dkt. 1059 ¶ 86]. It will be an unusual family who would use different people to manage their children's trusts. Not only would it be inefficient to use completely different people to establish and operate separate trusts with common goals, it would run contrary to most parents' desire to treat their children equally. Moreover, during the hearing the Court saw many documents identifying transactions involving trusts and businesses with each separate entity separately broken out. The fact is, the records indicate that the trusts and businesses are and were separate and always treated that way. That is what the thousands of documents offered at trial—including separate tax returns for each person, trust and business, financial statements allocating income and losses to particular trusts and businesses and memoranda reflecting the same—show.

### 8. Settlor Pays Trust Expenses

Dexia argues next that the Court should consider whether the settlor paid expenses of the trust. [Dkt. 1059 ¶ 87]. Many of the documents identified by Dexia merely "suggest" that David Miller was involved in projects that the trusts invested in. [Dkt. 1059, pp. 70-73]. Dexia then notes that Mr. Rogan retained three law firms to represent him and those firms billed, in a couple instances, for small amounts of time spent on Intervenors trusts. [Dkt. 1059, p. 82]. Aside from the fact these instances are few and far between, after taking the time and incurring the expense to form trusts for their children, it is unsurprising that the Rogans paid spent some further de minimus amount on legal advice relating to those gifts.

### 9. Settlor Enjoys Fruits of Trust

Dexia argues next that the Court should consider whether the settlor continued to enjoy the benefits of the property following the transfer. [Dkt. 1059 ¶ 88]. In support of this argument,

Dexia argues that a loan was actually a "circular transaction" [Dkt. 1059, pp. 102-03]—which is discussed in Intervenors' opening brief—and expresses incredulity that he visited real estate projects owned by the trusts while meeting with his business and legal advisors about his business affairs [Dkt. 1059, pp. 103-07]. Running even further afield, Dexia argues about transactions between business entities owned by the various trusts. [Dkt. 1059, pp. 107-09]. What is interesting is that Dexia does not argue that these businesses were illegitimate or unprofitable. Despite Dexia's pleas for adverse inferences at every turn, the fact that Mr. Rogan remained interested the investments his children's trusts merely reflects a father's concern for the trusts he created to provide for his children in the future.

### 10. Settlor Controls Trust Operations

Dexia argues next that the Court should consider whether the settlor controls or otherwise dominates the trusts. [Dkt. 1059 ¶ 89]. Dexia claims that "[i]n some of the most significant testimony in this case, Troy Myers testified that maintaining control over the trust after settlement 'was one of the primary considerations relating to acceptability of the structure to start with… They did not want to give up control over the investments.'" [Dkt. 1059, p. 109]. Of course, Meyers was first retained to work on what became the PGR Bahamas trust sometime in 1994 [Cuppy Dep. (5/21/2009), p. 44], and that was long after the domestic trusts had been settled in 1992. Consequently, Meyers' testimony is completely irrelevant to any issue relating to the formation of Intervenors' domestic trusts.

On the other hand, Ilan Cohen, Jerry Whitlow and John Foley carry this issue without serious opposition.

### a. The Testimony of Ilan Cohen

Ilan Cohen, Senior Vice President of Wealth Management for Bank of America in New York, testified at length to Fred Cuppy's control over the Domestic Trust at his March 24, 2009

deposition. His deposition was introduced into evidence as Defendant's Exhibit 22. Mr. Cohen formerly worked as a financial advisor for Morgan Stanley from 2000 until November 12, 2004. [Defendants' Exhibit 22, p. 6] In his employment he took over as investment advisor to the Domestic Trusts in 2003 and worked cooperatively with Fred Cuppy to manage the assets. [*Id.*, at p. 8-11] It was Mr. Cohen's understanding when he took over as advisor that Fred Cuppy was handling the trusts for Brian Peter Rogan, Sara Caitlin Rogan and Robert Cashman Rogan. [*Id.*, at p. 10] Mr. Cohen worked exclusively with Fred Cuppy to manage the brokerage accounts comprised of field index funds, stock and cash.

Mr. Cuppy took the position of trading or buying positions in those accounts and Ilan Cohen would send all trust account information to the attention of Fred Cuppy at 3100 North Ocean Boulevard, apartment 703 in Florida. [*Id.*, at p. 11-12] Mr. Cohen never received any calls or communications from Peter Rogan, Judith Rogan or David Miller. [*Id.*, at p. 12-13]

Eventually Mr. Cohen left the employ of Morgan Stanley in 2004 to take a similar position and took the accounts owned by the Rogan Children's Domestic Trusts with him to Smith Barney where he had obtained a similar position. Fred Cuppy continued to operate and manage the accounts kept at Smith Barney. [*Id.*, at p. 17] Throughout Mr. Cohen's employment at Smith Barney as financial advisor to the domestic trust accounts, a period that spanned from 2004 until January 2009, he never communicated with either Peter or Judith Rogan. [*Id.*, at p. 17] Ilan Cohen communicated solely with Fred Cuppy on a daily basis from 2005 until 2009. [*Id.*, at p. 18] In fact, Mr. Cohen had never, prior to the taking of his deposition, heard the name Peter Rogan expressed. When asked about Peter Rogan, he answered, "I never heard that name before." [*Id.*, at p. 18]

### b.    The Testimony of Jerry Whitlow

Intervenors also designated as their Defendant's Exhibit 32 relevant portions of Jerry Whitlow's deposition taken in a related proceeding by the United States in post-judgment proceedings of *United States of America v. Peter G. Rogan*, No. 02 C 3310.

Jerry Whitlow performed work on common developments including The Gardens on Jones and Taylor Row Side Gardens Projects, and was a business partner with Fred Cuppy through the trusts. [Defendants' Exhibit 32, at pp. 17-19, 37] He recalled meeting with Fred Cuppy and Brian Rogan at a time when Fred Cuppy was considering an investment of a hotel purchase in Northeast Georgia. [*Id*., at p. 28]

He has known Fred Cuppy since the middle of the 1990s and understands him to be a business person for the Rogan Trust, a Trust he understands to be for the three children of Peter Rogan. [*Id*., at p. 17] Jerry Whitlow first met Peter Rogan in 1998 and did not recall having any conversations with Peter Rogan about the Domestic Trusts investment in real estate. Mr. Whitlow specifically stated that Peter Rogan did not ask about the children's investment during any of his meetings with Peter Rogan and stated he "barely knew the man." [*Id*., at p. 27]

He knew that Boulevard Investors LLC was controlled by Fred Cuppy. [*Id*., at p. 79] He also knew that Fred Cuppy ran the development at 410 Montgomery and never did observe that Fred Cuppy was operating the development as an agent for anyone else. [*Id*., at p. 87]

### 11.    Concealment of Settlor's Role

Dexia argues next that the Court should consider whether Mr. Rogan concealed his role in the trusts' conduct.  [Dkt. 1059 ¶ 90].  Dexia goes so far here as to rely on correspondence from David Miller asking individuals to "**check your calendars**" for availability to meet as the "language of a directive coming down from on-high" and "compelling proof that Rogan was clearly the man in charge."  [Dkt. 1059, p. 128].  The main problem with this argument is not the

weakness of Dexia's "evidence" but, instead, the undisputed fact that no one concealed anyone's role in the domestic trusts. Indeed, Dexia knew of the trusts while considering the refinancing in 1998. [Trans. (4/1/2009), pp. 189-190].

      **B.**     **Fraud or Injustice**

     As noted in its post-trial brief, Dexia was secured by 1998 bonds which, in turn, were secured by Edgewater Medical Center's receivables, intangibles and a mortgage on hospital's facility and equipment. [Dkt. 1059 p. 13]. Dexia notes that it had to purchase the bonds and argues that "with EMC shut-down there was no viable source of repayment – that is, EMC had no revenues, which constituted a portion of Dexia's collateral (*i.e.*, receivables), with which to repay it $56 million debt to Dexia." [Dkt. 1059, p. 15]. But, as noted in Dexia's earlier statement, it had many forms of collateral—revenue was only one of them. Dexia offered no evidence of what it did with the millions of dollars of cash in Edgewater's or its real estate or equipment.

     "The alter ego doctrine was developed for and has been traditionally used by third persons injured due to their reliance on the existence of a distinct corporate entity." *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill. 2d 166, 173, 632 N.E.2d 1015, 1018 (1994). Thus, when the party seeking to pierce the corporate veil is fully cognizant of an entity's corporate existence, no fraud or injustice occurs. *Bankers Trust Co. v. Chicago Title & Trust Co.*, 89 Ill. App. 3d 1014, 1020, 412 N.E.2d 660, 665 (1st Dist. 1980). Florida law likewise holds that the corporate veil will not be pierced unless a corporation is actually organized to mislead creditors. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1119-20 (Fla. 1984).

     Here, as reflected by the testimony of John Flaherty, Dexia was well-aware of the domestic trusts' existence and the fact that they received money from the hospital sale at the time it issued the letter of credit. [Trans. (4/1/2009), pp. 189-190]. Thus, the trusts were not used as a

21

device to mislead Dexia—Dexia knew exactly who received money from the 1994 hospital sale and cannot use the alter ego doctrine to undo the domestic trusts. That is not to say that Dexia has no remedy for the fraud it claims that Rogan perpetrated upon it. A constructive trust may be appropriate, but only if Dexia asserts it claim in a timely fashion and traces the funds as required by law (more on that above).

## IV.    Nominee

Dexia's nominee theory is basically the same as its alter ego theory. [Dkt. 1059 pp. 33-35]. Thus, for the same reasons the Court should deny Dexia recovery under its alter ego theory, it should also deny Dexia's nominee claim.

## V.    Spoilation

Dexia argues that, applying the doctrine of spoliation, the Court should draw an adverse inference against the domestic and foreign trusts because a variety unidentified documents were destroyed. Dexia identifies no specific inferences that the Court should draw; instead, it argues that the Court should draw a generic conclusion that documents would have been unfavorable. The inference is akin to the generalized adverse interest Dexia asked the Court to draw from Judy Rogan's invocation of the Fifth Amendment, which the Court refused to do. [Dkt. 1026].

As a threshold matter, this is the first time Dexia has raised this argument. Even if one could potentially infer some sort of spoilation argument from the of paper filed with Dexia's ex parte motion for a temporary restraining order, its "focused pleading" directed at Intervenors' trusts avoided any such allegation [Dkt. 757] and Dexia raised none during its lengthy opening argument [Trans. (3/31/2009), pp. 60-106]. Also, while Dexia attempts to blame Fred Cuppy for orchestrating the destruction of the documents, it chose not to pursue this issue in his lengthy deposition.

In its response brief, Dexia argues that Intervenors waived their statute of limitations defense because it was not pled with sufficient particularity. [Dkt. 1068, pp. 37-38]. Intervenors dispute this argument because they clearly pled the defense in their claims to property (as Dexia acknowledges [Dkt. 1068, p. 37]) and Dexia never moved to strike it. Dexia cites cases striking a statute of limitations defense for failure to plead adequate facts and cases finding waiver when a party failed to plead the defense at all. [Dkt. 1068, p. 38]. Dexia cites no case finding waiver when the defense was plainly asserted throughout the litigation and never the subject of a motion to strike. But Dexia's argument holds when a party fails to raise a claim or defense before or during trial and raises it for the first time in its post-trial brief. Under these circumstances, Dexia is correct that the claim—here, Dexia's spoliation claim—is waived.

Moreover, Dexia's claim fails on the merits.

**First Destruction.** On August 10, 2000, Rogan had 20 boxes of documents from Braddock Management L.P. destroyed. [Dkt. 1059 ¶ 100]. While Dexia attempts to characterize Mr. Cuppy as engaged in nefarious conduct with respect to this destruction, the documents were from the 1980s and early 1990s and were reviewed, prior to destruction, by both Mr. Cuppy *and Mr. Foley* who told Mr. Rogan he could destroy them. [Pl. Ex. 8, pp. 236-38, Pl. Ex. 89, pp. 237-40]. Notably, although Dexia took both Mr. Cuppy Mr. Foley's depositions in this matter and called Mr. Foley as a live witness, it never asked either one about these documents. After choosing not to pursue information about these documents from two witnesses who reviewed them—especially after obtaining an order allowing it to inquire into otherwise privileged communications under the crime-fraud exception [Dkt. 827]—Dexia cannot make a belated request to draw an adverse inference from actual testimony it could have elicited.

23

**Second Destruction.** At some unknown time, Rogan destroyed wire transfer instructions and notes of telephone conversations relating to Oceanic Bank and the PGR Bahamas Trust. [Dkt. 101]. These documents relate solely to the PGR Bahamas Trust. There is no adverse interest that can be drawn against Intervenors' domestic and foreign trusts from the destruction of these documents and Dexia suggests none.

**Third Destruction.** Around July 2006, Bainbridge Management, Inc. had 47 boxes of documents destroyed. [Dkt. 102]. Dexia states that Bainbridge Management, Inc. had 47 boxes of documents destroyed but corporations cannot act—some person had to issue the order and Dexia has failed to identify who that person was. The nature of these documents is unknown, but Dexia argues that Cuppy probably had a hand in their destruction. If he did, Dexia should have questioned him about it during his deposition. Instead, Dexia chose not to elicit any testimony on the issue so Intervenors and the Court are now at a loss to know what Mr. Cuppy (and Mr. Foley) knew and did and, if necessary, assess these witness's credibility. This problem is compounded by the fact that Dexia never before raised this claim so Intervenors were unable to develop this testimony on their own. In short, rather than asking knowledgeable witnesses about the circumstances surrounding the destruction of these documents and getting direct answers, Dexia wishes to create inferences in the absence of sworn competent testimony.

## CONCLUSION

The Intervenors have fully argued the legal bases both here and in separate briefs for the dismissal of these proceedings on numerous grounds; including (1) the lack of subject matter jurisdiction; (2) Dexia's failure to account for LaSalle's participation; (3) the absence of evidence on the elements necessary to establish a prima facie case in a turnover order (a citation respondent holding assets of the judgment debtor); (4) the statute of repose and 5 year statute of

limitations on both alter ego and constructive trust under Illinois law and Florida law; (5) the absence of evidence of control re alter ego and tracing on constructive trust.

All of these grounds compel the Court to deny Dexia's Motion for turnover and dismiss the proceedings. Moreover, despite Dexia's complaint that they have been deprived of the means to prove their case, the real fault lies in the manner Dexia has chosen to proceed on its claims. This was never a federal case but rather a local state law case involving a local hospital and local bond financing with an out-of-state and local bank providing security. It should have been filed in state court where it belongs. The enforcement proceedings have been similarly mis-prosecuted by Dexia. The supplementary proceedings brought here are simply not the forum in which to prosecute essentially state law (and over pled) tort claims by Dexia.

Moreover, the volume and costs of these proceedings must clearly be charged to Dexia. An involuntary bankruptcy by Peter Rogan's creditors against Peter Rogan should have been filed years ago and a trustee charged with the responsibility of recovering assets of Peter Rogan for his creditors. Had the matter been prudently handled, 95% of these proceedings and concomitant expense and imposition on the court would have been avoided. Yet Dexia's lawyers chose to pursue a course of action to maximize rather than streamline litigation. Why was an involuntary bankruptcy not filed in 2007 when all of the judgments against Peter Rogan had matured? Dexia has no answer and only itself to blame for the actions leading up to this trial. Its Motion should be denied and the proceedings dismissed.

Dated: June 15, 2009                      Respectfully submitted,

BRIAN P. ROGAN and ROBERT C. ROGAN, Intervenors

By:    /s/ Michael J. O'Rourke           
            One of Their Attorneys

Michael J. O'Rourke
Myles P. O'Rourke
O'ROURKE & MOODY
55 West Wacker Drive
Suite 1400
Chicago, Illinois 60601
(312) 849-2020

SARA C. ROGAN and ROBERT C. ROGAN,
Intervenors


By:  ___/s/ Jeffrey J. Halldin_____
     One of Their Attorneys

     Timothy J. Touhy
     Jeffrey J. Halldin
     TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
     55 West Wacker Drive
     Suite 1400
     Chicago, Illinois 60601
     (312) 372-2209

## SERVICE OF DOCUMENTS BY ELECTRONIC MEANS

The undersigned hereby certifies that on June 15, 2009, he caused the foregoing document to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using its Electronic Case Filing System which will send a Notice of Electronic Filing to the following Filing Users:

| | |
|---|---|
| **Abigail Lynn Peluso** | **Jeffrey J. Halldin** |
| **Andrew Neal Levine** | **John Michael Touhy** |
| **Brian Michael Dougherty** | **Joseph A. Stewart** |
| **Camille E. Bennett** | **Joseph Andrew Spiegler** |
| **Chad W. Riley** | **Limo T. Cherian** |
| **Cornelius Moore Murphy** | **Michael J. O'Rourke** |
| **Debra L Bogo-Ernst** | **Mitchell Bruce Katten** |
| **Douglas Alan Albritton** | **Monika Maria Blacha** |
| **Erin E Krejci** | **Myles Patrick ORourke** |
| **Ethan Lasher Crooks** | **Neil E. Holmen** |
| **Gabriel Aizenberg** | **Phillip Stewart Reed** |
| **Harold C. Hirshman** | **Scott T. Mendeloff** |
| **Hillary Paige Krantz** | **Sean Patrick Dailey** |
| **Howard Michael Pearl** | **Timothy J. Touhy** |
| **Jason L. Rubin** | **Vincent J. Connelly** |
| **Jeffery S Davis** | |

The undersigned also certifies that on the above date he caused the foregoing document to be mailed by United States Postal Service to the following non-Filing Users:

(Not Applicable)

/s/      Jeffrey J. Halldin
TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
55 West Wacker Drive
Suite 1400
Chicago, Illinois 60601
Phone: (312) 372-2209
Fax:      (312) 456-3838
Email:  jhalldin@touhylaw.com