**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEXIA CRÉDIT LOCAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 02 C 8288** |
| | ) | |
| **PETER G. ROGAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MATTHEW F. KENNELLY, District Judge:

In May 2007, Dexia Crédit Local (Dexia) obtained a final judgment against Peter Rogan in excess of $124 million.[1]  To satisfy that judgment, Dexia served citations to discover assets on Peter Rogan, his wife Judith Rogan, and one of his lawyers, Frederick Cuppy, pursuant to Federal Rule of Civil Procedure 69(a).

Dexia subsequently moved this Court, *ex parte*, for a series of temporary restraining orders seeking to freeze assets connected to Peter Rogan.  The Court entered the requested temporary restraining orders in September 2008.  Judith Rogan then intervened in these supplementary proceedings, as did her and Peter's three adult children, Brian, Robert, and Sara Rogan (collectively the Rogan children), to contest Dexia's rights to the assets.  The Court ultimately entered preliminary injunctions that had the effect of extending the freeze orders in large part.  *See Dexia Credit Local v.*

---

[1]This case involves five people with the last name "Rogan."  Unless otherwise indicated, the use of "Rogan" without a forename refers to Peter Rogan.

*Rogan*, No. 02 C 8288, 2008 WL 4543013 (N.D. Ill. Oct. 9, 2008) (*Dexia I*); *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2008 WL 4855416 (N.D. Ill. Nov. 10, 2008) (*Dexia II*).

Once the preliminary injunctions were in place, Dexia moved for an order directing the turnover of various assets to satisfy its judgment against Rogan. The Rogan children opposed that motion.[2]  Discovery and extensive motion practice followed on an array of issues, including subject matter jurisdiction and the right to a jury trial. *See Dexia Credit Local v. Rogan*, No. 02 C 8288, 2009 WL 230641 (N.D. Ill. Jan. 29, 2009) (*Dexia III*); *Dexia Credit Local v. Rogan*, 604 F. Supp. 2d 1180 (N.D. Ill. 2009); (*Dexia IV*); *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2009 WL 528902 (N.D. Ill. Mar. 2, 2009) (*Dexia V*).  The Court granted partial summary judgment in Dexia's favor. *See Dexia Credit Local v. Rogan*, --- F. Supp. 2d ---, 2009 WL 648634 (N.D. Ill. Mar. 12, 2009) (*Dexia VI*).  The Court also made a number of factual findings and legal conclusions pursuant to Federal Rules of Civil Procedure 16(c) and 56(d)(1). *See id.* at *5-9; *Dexia Credit Local v. Rogan*, No. 02 C 8288, 2009 WL 855638 (N.D. Ill. Mar. 30, 2009) (*Dexia VII*).

An evidentiary hearing was held over several days in March, May, and June 2008.  Dexia and the Rogan children participated in the hearing.  The parties also supplemented the hearing by submitting deposition transcripts of witnesses who did not testify in person.  Following the hearing, the Rogan children and Dexia submitted briefs

---

[2]Following entry of the preliminary injunctions, Judith Rogan filed for bankruptcy in the Northern District of Indiana.  She has not participated in the current supplementary proceedings, except as a witness, since filing for bankruptcy.  Dexia has moved the bankruptcy court to lift the Bankruptcy Code's automatic stay so that it may pursue before this Court its claim that she holds assets of Peter Rogan.  To date, the bankruptcy court has not ruled on Dexia's motion.

collectively totaling over 250 pages.  The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).  To the extent any findings of fact are deemed conclusions of law, they shall be considered conclusions of law and vice versa.

## Findings of Fact

### 1.    Peter Rogan's medical businesses and fraud

Rogan formed Edgewater Operating Company (EOC) in 1989 and, through EOC, acquired Edgewater Medical Center (EMC) for $1 million in cash and $10 million in assumed liabilities.  Rogan sold EMC to Northside Operating Group (NOG) in 1994 for cash and a note.  Bonds were sold to finance the purchase by NOG.  In or about 1998, those bonds were refinanced.  When the bonds were refinanced, Dexia guaranteed payment on the new bonds by issuing a letter of credit.  Following the sale of EMC, Rogan operated companies that continued to perform extensive management services at EMC.

Rogan engaged in a healthcare fraud scheme at EMC that enabled him to make tens of millions of dollars, both from his sale of the hospital and from management fees. The Court has previously determined that the fraud began no later than 1993.  The bondholders that financed the 1994 sale of the EMC to NOG were unaware of Rogan's fraud.  The same is true of the bondholders that subsequently provided the money to refinance the 1994 bonds.  Dexia likewise was unaware of Rogan's fraud when it agreed to guarantee the refinanced bonds.  Had Dexia known of Rogan's fraud, it would not have issued a letter of credit to guarantee repayment of the bonds.

On July 13, 1999, Dexia entered into a participation agreement with LaSalle Bank National Association (LaSalle Bank).  Under that agreement, LaSalle Bank agreed to assume part of the risk of the letter of credit previously issued by Dexia in return for various fees.  Paragraph 5A of the participation agreement provided that Dexia would manage any problems or actions that needed to be taken and would control decisions made with respect to the letter of credit.  That agreement also stated that Dexia was not an agent of and did not owe any fiduciary duties to LaSalle Bank.

In 2001, EMC, following discovery of Rogan's fraud, terminated its contract with Rogan's management companies.  Rogan and his companies were subsequently the subject of a number of lawsuits by the federal government and private parties, including the current case.  In 2006, after employing a number of stall tactics during the discovery phase of this case, Rogan fled the country, relocating to Canada.  He remains in Canada and has not directly participated in these proceedings since that time, though his Canadian counsel attempted to file a brief in opposition to an earlier motion by Dexia regarding the crime-fraud exception to the attorney-client privilege.

**2.      Structure of the trusts and businesses created by Rogan**

Dexia has identified a number of trusts that it contends holds assets subject to execution.  Those trusts, as part of their assets, hold interests in a number of companies.  The details of those trusts and their assets are set forth below.  As will quickly become apparent, Peter Rogan and those working with him structured the trusts and the related companies in an extremely complex and convoluted manner intentionally designed to frustrate Rogan's creditors.  Dexia summarized this complicated ownership structure in five charts that have been admitted into evidence as

4

Dexia exhibits 44A-E.  Those exhibits are attached as Appendix A, and the Court incorporates them as part of its factual findings.

Rogan utilized five primary agents to carry out his plan to conceal his assets. Frederick Cuppy and Troy Myers were the lawyers who had primary responsibility for setting up the various trusts and companies.  On several occasions, Cuppy expressed his general distrust of the court system in the United States, including with respect to the current case.  Two other attorneys, John Tatooles and John Foley, also performed work for the Rogan-related entities.  Foley in particular performed extensive tax work on their behalf.  David Miller, as detailed further below, performed extensive work on behalf of Rogan related to all of the various trusts and businesses.[3]

### a.    PGR trust

The Court previously granted summary judgment in Dexia's favor with respect to its claims regarding the Peter G. Rogan Irrevocable Trust (PGR trust).  *See Dexia VI*, 2009 WL 648634, at *2-5.  Some of the key facts about the PGR trust are set forth here to illustrate how that trust fit into Peter Rogan's overall plan.  The PGR trust owned CFMT Ltd., a Belizean company.[4]  That company in turn owned CFMT of Florida, LLC (CFMT of Florida) and ninety percent of Sheridan Investment Properties (Sheridan). Cuppy was the manager of both CFMT of Florida and Sheridan.  CFMT of Florida held a partial interest, directly or through intermediary companies, in at least eight other companies.  Cuppy was the manger or co-manager of most of those companies.  A

---

[3]Miller died in 2004.

[4]Unless otherwise indicated, a finding that a person or entity owned another entity means full ownership.

summary of the interests held through the PGR trust is found in Dexia exhibit 44A.

Prior to using CFMT Ltd. to conduct transactions and hold other business, the PGR Trust owned and utilized a company known as PPR GmbH. PPR GmbH was created under Bahamian law, even though the "GmbH" suffix is ordinarily used by German or Austrian companies. Myers testified that the name PPR GmbH was chosen to "misdirect" potential creditors. Myers 5/18/09 Dep. at 62:15.

**b.     RPP trust**

On March 8, 1995, Peter Rogan settled the RPP Finance Trust (RPP trust). Initially, Rogan and Cuppy served as co-trustees. Rogan resigned as a trustee in December 1996, leaving Cuppy as the sole trustee. On December 5, 2006, Cuppy purported to resign as trustee of the RPP trust and, simultaneously, attempted to appoint two new trustees, Matthew E. McNeilly and William H. Jennings. Dexia contends that the appointment of new trustees never took place because the putative trustees were not qualified to serve pursuant to the terms of the RPP trust. Even though the RPP trust specified B. Macon Brewer, John Tatooles, and John Foley as successor trustees, each of those individuals declined that appointment. The RPP trust owns RPP Finance Ltd. Cuppy is a director of that company.

**c.     Rogan domestic trusts**

In 1992, Peter and Judith Rogan created three trusts for their children, the Brian Rogan Domestic Trust, the Sara Caitlin Rogan Domestic Trust, and the Robert Rogan Domestic Trust (collectively the Rogan domestic trusts). The Rogan children are the only named beneficiaries of the Rogan domestic trusts, though each trust names

contingent beneficiaries in the event the named beneficiary dies. Cuppy served as trustee for all three trusts until the Court removed him from that role in November 2008. *See Dexia II*, 2008 WL 4855416, at *9. A new trustee has not yet been appointed for the Rogan domestic trusts.

The Rogan domestic trusts were each settled with ten percent of the stock of EOC. When EOC was sold in 1994, each trust received ten percent of the sale proceeds, as well as an interest in a promissory note that was paid off several years later. Rogan also ostensibly transferred an indirect interest in one of his management companies to the Rogan domestic trusts. Specifically, in 1996 and 1997, Rogan assigned a total interest of 40.5% in Boulevard Management, Ltd. to the Rogan domestic trusts (13.5% each). Boulevard Management, Ltd. in turn owned 99% of Braddock Management, LP as a limited partner. Braddock Management, LP was one of the companies that received management fees from EMC. The Rogan domestic trusts also have partial interests in a number of real estate developments, including Walnut Hills, LLC, Taylor Row, LLC, and Gardens on Jones, LLC (GOJ). Cuppy was the manager or co-manager of each of those companies. Dexia exhibits 44B, 44D, and 44E depict the various interests held by Rogan domestic trusts.

### d.     Rogan children's Belizean trusts

In June 1997, Rogan created three additional trusts for his children under the laws of Belize (collectively the Belizean trusts). The Rogan children are the beneficiaries of the Belizean trusts. The Belizean trusts were funded with interests in various companies assigned by Rogan. Myers and Cuppy performed the legal work to create the Belizean trusts. A company known as Caribe Trustees Ltd. (Caribe) was

7

appointed trustee for each of the Belizean trusts. Cuppy owned Caribe. The Belizean trusts contained broad asset protection language, the purpose of which was to shield the trusts' assets from potential creditors.

The Rogan children contend that Peter Rogan established the domestic and Belizean trusts, at least in part, for generational wealth protection, i.e., lowering the taxes incurred through proper estate planning. Foley and Cuppy both conceded, however, that from an estate planning perspective, no tax benefit inured from siting the Belizean trusts offshore. Myers also acknowledged that one reason the Belizean trusts were sited in Belize was to put them in a foreign jurisdiction other than the Bahamas, which was already the home of the PGR trust. Similarly, the trust protector for both the Belizean trusts and the PGR trust, T Protection Ltd., was organized in a third country, the British Virgin Islands, and was created by Cuppy and Myers. The goal of this structure was to frustrate creditors by forcing them to obtain rulings in multiple, potentially hostile jurisdictions before they could collect on a judgment.

The Belizean trusts collectively held another Belizean company known as Boulevard Investors, Ltd. Cuppy and Myers served as directors for Boulevard Investors, Ltd. Boulevard Investors, Ltd. was assigned an interest of 49.5% of Boulevard Management, Ltd. (one of the companies described above). Boulevard Investors Ltd. also held 99% of two other companies, Bainbridge Management, LP and Boulevard Investors, LLC. Cuppy was the manager of Boulevard Investors, LLC, and that company in turn owned several real estate development investments, which Cuppy managed. Bainbridge Management, LP was another company controlled by Rogan that received fees from EMC. Dexia exhibits 44C, 44D, and 44E depict the various interests

8

of the Belizean trusts.

3.    **Operation of the trusts and related businesses**

    a.    **Shared expenses, employees, and offices**

Miller performed extensive work on behalf of Rogan, the Rogan domestic trusts, the Belizean trusts, and the various businesses related to those trusts. His responsibilities included accounting and financial functions for the real estate development companies and the trusts. Miller also performed such functions for Rogan's management companies. Myers testified in his deposition that "Mr. Miller, as far as I could tell, functioned as a financial enabler for Peter [Rogan]; meaning that he would make sure that aspects of whatever were decided were executed and when it was executed." Myers 5/18/09 Dep. at 17:4-7. In an affidavit Miller submitted earlier in this case that was admitted in evidence as Dexia exhibit 87A, he stated that he worked only for Bainbridge Management, Inc., an entity owned solely by Peter Rogan. Peter Rogan testified at a deposition taken in 2004, also admitted in evidence (Dexia exhibit 8), that he considered Miller to be his full-time employee. Based on the totality of the evidence presented by Dexia, it is abundantly clear that Miller worked directly for Rogan and was intimately and extensively involved with the companies and trusts Rogan created, regardless of Miller's formal title or employer. Miller carried out Rogan's wishes and orders. In short, Miller operated as Rogan's right hand.

It is equally clear that Cuppy served as Rogan's left hand. Though Cuppy was a partner in his own law firm and was not a direct employee of Rogan, the evidence clearly demonstrates that Cuppy worked extensively on Rogan's behalf to set up the

9

structure of the various trusts and related businesses. Cuppy served as a trustee of those trusts and as the manager of most of the companies the trusts held. He was in continuous contact with Rogan and Miller about these issues. One of his responsibilities was to make sure money went where Rogan wanted it to go. There is no evidence that he ever failed to comply with Rogan's directions or carry out Rogan's orders.

Rogan maintained an office located at 240 East 90th Street, Merrillville, Indiana (the Merrillville office). One witnesses referred to that location as the general Rogan business office. Dexia presented extensive evidence that the PGR trust, the RPP trust, the Rogan domestic trusts, the Belizean trusts, and the various businesses held by the trusts all were operated out of the Merrillville office. The Merrillville office did not have discrete staff or areas for each of the trusts or entities. Miller and Rogan both worked out of the Merrillville office, across the hall from each other. The staff employed at the Merrillville office worked on all of the Rogan-related and trust-related matters. For example, Carolinda Camisa worked as a secretary for both Rogan and Miller. Expenses for paying those staff and for the cost of maintaining the Merrillville office were not broken out for each of the entities that operated there.

Another entity, JKR Business, was also located at the Merrillville office. Judith Rogan's initials are JKR. She intended to use JKR Business to run a home decorating business, but she never did so. Miller, however, subsequently used the JKR Business name at the Merrillville office address to carry out a number of his tasks for Peter Rogan, the trusts, and the related companies.

Significantly, expenses for the trusts and Rogan-related businesses were often

10

treated as if only a single entity existed.  The trusts and their holdings were not charged for the overhead associated with the Merrillville office.  Many of the bills for legal services provided by Cuppy, Myers, Foley, and Tatooles lack specific itemization.  Some of the bills, however, contain greater detail.  Those bills reflect charges for matters related to the various trusts and Rogan's businesses in a single entry.  Cuppy sent his bills directly to Rogan at JKR Business.  The first page of each of Cuppy's bills states "Personal Legal Advice."  Dexia Ex. 899.  Similarly, most of Myers' bills contain the heading "Peter G. Rogan Business."  Dexia Ex. 908.  Myers sent his bills directly to Rogan at EMC.  Tatooles and Foley sent their bills to Rogan at Edgewater Property Company (another company that Rogan owned).  At one point, Miller told the attorneys to bill matters regarding the Rogan children's trusts to Edgewater Property Company.

Similar to the treatment of common employees, professionals, and administrative costs, Dexia has established that Rogan considered the various trusts as a single pool of assets for his benefit, regardless of who the putative beneficiaries were.  For example, a spreadsheet, prepared by Foley, contained the title "2001 Combined Taxable Income and Federal Income Tax Projections."  Dexia Ex. 349Q.  The spreadsheet set forth financial projections for "PGR," "U.S. Children's Trusts," and "Boulevard Investors."  *Id.*  It also contained a column totaling the financial projections for all of the trusts and entities listed.  Dexia also introduced several e-mails and letters addressing issues related to Peter and Judith Rogan, the children's domestic and Belizean trusts, and the various entities owned by Rogan and/or the trusts, all within the same document.  *See, e.g.*, Dexia Exs. 116, 163j, 990, 995.

**b.    Control over investment decisions**

As detailed above, the Rogan domestic and Belizean trusts made extensive investments in real estate development companies.  Many of those real estate developments were located in or around Savannah, Georgia.  As structured by Rogan and Cuppy, Rogan did not have, on paper, either a direct or an indirect interest in the Savannah real estate investments.  Nor did Rogan have any official role with the companies involved in those investments.  Nevertheless, Rogan organized and attended meetings with Cuppy, Myers, Miller, Foley, and Tatooles in Savannah to discuss those real estate investments.  Rogan also attended a meeting with an official at the bank that provided financing for many of the Savannah project.

During his deposition, Myers testified on the nature of the meetings in Savannah:

Q.  What was discussed at this meeting?

A.  The discussions were -- as was usual, were a summary of Peter's financial condition.  At various meetings there were discussions about his investments, what was happening and what was going on with them, including securities accounts and other miscellaneous United States accounts.

There would be a review on just different aspects of his business.  There would be some discussion with respect to planning, and things that were anticipated if there was something that was in progress . . .  and at this particular meeting, there was a summary and discussion of the proposals relating to the Savannah real estate projects that were either in place or being contemplated . . . .

Peter would ask questions, or he would conduct part of the discussion himself . . . .

[Rogan] was a listener, and he was also a talker.  I don't know that he presented so much as it did -- he sought to gain a summary of, you know, what was the current status and activities.

Myers 5/18/09 Dep. at 166:9-167:18.  The Court finds Myers' testimony credible

12

regarding Rogan's involvement with the Savannah real estate investments and how Rogan and those working for him operated in general.  It is apparent that with respect to investments made by all of the various trusts and related companies, Rogan was in control of the decisions, regardless of whether the documents showed him having an official direct or indirect interest.

Dexia presented additional proof of Rogan's control over the real estate investments held directly and indirectly by the Rogan domestic and Belizean trusts that ostensibly had no connection to Rogan.  Miller performed accounting work for GOJ, and Cuppy, in a letter to Rogan, referred to "our development in Savannah."  Dexia Ex. 94. Tatooles was copied on that letter even though Tatooles did not perform any work for the Rogan children's trusts.  In another letter, from Cuppy to the individual in charge of marketing for GOJ, with a copy to Miller, Cuppy stated, "I will talk to Peter this week and I will get back to you in connection with your compensation issue."  Dexia Ex. 382. Dexia submitted similar proof with respect to Rogan's involvement in other real estate development companies partially owned by the Rogan domestic and Belizean trusts, including Pax-Wit Property Co., 410 Montgomery, LLC, and Walnut Hills, LLC.  *See, e.g.*, Dexia Ex. 385 (e-mail from Cuppy to Miller in which Cuppy states he has "cleared" responsibilities for the Savannah projects with Rogan); Dexia Ex. 95 (letter from Cuppy to Rogan, Foley, and Miller with update on Pax-Wit business containing statement that "[w]e can walk away from the Contract up until June 15, 2000 without liability").

Seal Wrap Systems, LLC was another company held, in part, by the Belizean trusts, through their interest in Boulevard Investors.  On paper, Rogan had no interest in Seal Wrap.  Despite that, Cuppy sent a letter to Miller at Bainbridge Management, LP,

13

an entity with no interest in Seal Wrap, containing Seal Wrap's financial records. Subsequently, Rogan was responsible for setting up a meeting concerning Seal Wrap. Following that meeting, Rogan sent a memorandum to Seal Wrap, copying Foley, Cuppy, and Miller, stating Rogan's "understanding of our agreement" and setting forth recapitalization and ownership terms. Dexia Ex. 901 at BCC-April2009_0001561. That understanding contemplated a forty percent ownership interest in Seal Wrap for Boulevard Investors, LLC, an entity that, on paper, presumably had no connection to Rogan. The memorandum also indicates that Miller would review the Seal Wrap transaction. In light of this evidence, Foley's testimony that Rogan had only limited involvement with Seal Wrap is not credible.

Without citing any evidence, the Rogan children contend that at least some of the assets of their trusts were controlled by someone other Rogan or Cuppy, specifically Ilan Cohen, whom they describe as "the investment advisor for the children's trusts." Intervenors' Post-Trial Br. at 4. Cohen's deposition testimony belies that contention. Cohen clearly stated that his role, first at Morgan Stanley and later at Smith Barney, was to execute the investment decisions made by Cuppy, not to present investment ideas to Cuppy. The fact that Cohen dealt only with Cuppy and had never heard of Peter Rogan does not establish, as the Rogan children contend, that Rogan was not responsible for or involved with the investments of the children's trusts. Rather, it is emblematic of how Rogan operated, using Miller and Cuppy to execute his designs.

The Rogan children also contend, again without citing any evidence, that Cuppy, Foley, and Cohen all testified that "Rogan had no involvement with his children's domestic and foreign trusts." Intervenors' Post-Trial Br. at 4. To the extent those

14

witnesses offered such testimony, they lack any credibility. Based on the totality of the evidence presented, the Court concludes that the various trusts and related entities were created and configured in an effort maximize Rogan's continued control over the assets nominally held by the trusts, while at the same time insulating those assets from Rogan's creditors. Rogan in fact exercised control over those assets, either directly or through his agents, including Cuppy and Miller.

The Rogan children did not know about the existence of the Rogan domestic and Belizean trusts until years after their creation. For the early years, this is not surprising, given that all three children were minors when the trusts were settled. The Rogan children, however, were not even informed of the existence of the trusts when they first reached adulthood. In fact, Brian and Sara Rogan did not learn of the trusts until they were contacted by Dexia in this litigation. Robert Rogan did not learn of the trusts until he was about to get married and the issue came up in the context of a prenuptial agreement. Even after they learned the trusts existed, the Rogan children were largely unaware of what assets the trusts actually held.

### c.    Transfers of assets

As noted above, the Rogan domestic trusts initially received money after Rogan sold EMC. After selling EMC, companies that Rogan created and operated continued to manage the hospital and received millions of dollars for doing so. Rogan used Braddock Management, LP and Bainbridge Management, LP for that purpose. The Rogan domestic and Belizean trusts, by virtue of their indirect interests in those two companies, were the ultimate beneficiaries of the vast majority of the fees generated from Rogan's management of EMC. *See generally* Dexia Exs. 987-88. Rogan thereby

transferred the fruits of his ongoing fraudulent activities to the children's domestic and Belizean trusts. Dexia presented compelling evidence, however, that Rogan continued to enjoy the benefits of the assets transferred to those trusts.

Rogan was able to access assets putatively in the hands of the domestic trusts through a series of transfers. The basis for that transaction is set out in Dexia exhibit 349jj, a letter sent from Miller to Myers (with copies to Cuppy and Foley) on Braddock Management, LP letterhead containing the address of the Merrillville office. Each of the Rogan domestic trusts transferred $450,000, a total of $1.35 million, to a bank account in the name of Boulevard Management, Ltd. Ostensibly, these funds were a loan to Boulevard Management, Ltd. from the trusts. Following those transfers, Boulevard Management, Ltd. transferred $1.2 million to Rogan's money market account at Northern Trust Bank, supposedly to repay part of a loan made by Rogan. Though the Rogan children, and various witnesses, including Foley and Cuppy, characterize this transaction as nothing more than a transfer to funds to repay a loan, the Court finds that characterization implausible. When questioned on this issue, Foley admitted he could not find any loan documentation and did not know why his law firm had not produced any in discovery. Based on all the evidence of the circumstances surrounding this series of transactions, the Court finds that these transactions were designed to move money from the domestic trusts to Peter Rogan. The decision to execute this series of transactions was made at a meeting that Rogan attended.

Dexia has also proven that millions of dollars flowed from the Rogan domestic and Belizean trusts, of which Rogan ostensibly was not a beneficiary, to the PGR trust. On February 10, 2005, Cuppy sent Foley an e-mail regarding the transfer of $986,029

16

from Boulevard Investors, Ltd. or Boulevard Investors, LLC to CFMT Ltd. The Belizean trusts owned Boulevard Investors, Ltd., which held 99% of Boulevard Investors, LLC. The PGR trust owned CFMT, Ltd.

Later in 2005, Cuppy wrote a check on Taylor Row, LLC's bank account to CFMT of Florida, LLC in the amount of $674,375. The Rogan domestic trusts held a 66.66% interest in Taylor Row, LLC. Cuppy also wrote three checks from the bank account of 410 Montgomery LLC to the CFMT entities held by the PGR trust totaling $2.4 million. Boulevard Investors, LLC held a 100% interest in 410 Montgomery, LLC.

**4.      Discovery disputes and destruction of documents**

In addition to creating a complex web of foreign and domestic trusts and companies, at times Rogan took a more direct approach to evading his creditors – he shredded dozens of boxes of documents. Dexia identifies three occasions on which documents that were likely related to the issues in this case were destroyed. The first occurred on August 10, 2000, when Rogan, after obtaining Cuppy's advice, directed a third party to destroy twenty boxes of documents taken from Braddock Management, LP's office. The bill for that destruction was sent to Braddock Management at the Merrillville office address. The second document destruction came to light during Rogan's deposition on October 6, 2004, when he testified that he had not saved or kept wire transfer instructions and notes of conversations he had with Oceanic Bank in 2004 regarding distributions from the PGR trust. The third document destruction occurred in or about July 2006, when a company was hired to shred forty-seven boxes of documents. Bainbridge Management, Inc. received a bill for this destruction, sent to Camisa's attention at the Merrillville office. Around the time of 2006 document

17

destruction, Cuppy was aiding Rogan with the logistics of his plans to leave the United States. Cuppy was aware of this litigation, and in April 2004 Cuppy received a subpoena to produce documents in this case.

From August to November 2004, the parties engaged in a series of contentious discovery disputes in this case before Magistrate Judge Sidney Schenkier. Rogan repeatedly claimed that he had no access to information about various matters, including the PGR trust. Documents subsequently produced by a third party revealed that Cuppy instructed third parties to withhold documents from Rogan, so that Rogan could maintain the facade of lack of access. For example, in one e-mail Cuppy told an officer of Oceanic Bank that "IT WOULD BE HELPFUL IF YOU CAN ORALLY TELL [ROGAN'S ATTORNEY] THAT NO DOCUMENTS WILL BE SENT TO ANYONE AND THAT NO INFORMATION WILL BE GIVEN OUT ABOUT THE MATTER. THAT WILL ALLOW HIM TO DISCLOSE THAT HE IS UNABLE TO GET ANY INFORMATION ABOUT THE TRUST." Dexia Ex. 159. Cuppy also sought to evade complying with Dexia's subpoena, and Judge Schenkier eventually entered an order compelling him to produce documents. Despite that order, Cuppy failed to comply fully, claiming that he was told by his lawyers that he was not required to do so. Cuppy's claim about his counsel's alleged statements was a lie.

### Conclusions of Law

Dexia asserts several legal theories as to why it is entitled to turnover of the assets of the RPP trust, the Rogan domestic trusts, and the Belizean trusts. First, however, the Court must address several preliminary issues, including the Rogan children's second motion to dismiss the case for lack of subject matter jurisdiction, the

18

identity of the citation respondents before the Court, whether the citations issued to those parties are still valid, the admissibility of certain exhibits, and Dexia's request for an adverse inference based on spoliation of evidence.

## 1.    Preliminary and procedural matters

### a.    Subject matter jurisdiction

The Rogan children contend that this Court lacks subject matter jurisdiction over this case due to the absence of complete diversity of citizenship.  Specifically, they argue that LaSalle Bank is a party to this litigation, despite the fact that it has never appeared as a plaintiff, due to the fact that it entered into the participation agreement with Dexia.  LaSalle Bank is a citizen of Illinois, as is one of the defendants in this case, Bainbridge Management, Inc.  Thus, if LaSalle Bank is a party, complete diversity would not exist, destroying this Court's subject matter jurisdiction.  *See* 28 U.S.C. § 1332(a).

Dexia's first response is that the Rogan children's motion to dismiss lacks merit because only Dexia, and not LaSalle Bank, is a real party in interest in this case. Federal Rule of Civil Procedure 17 provides that "[a]n action must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a)(1).  "Ordinarily, [courts] look only to the citizenship of the named parties and not to the citizenship of the person being represented by a named party in order to determine whether complete diversity exists."  *CCC Info. Servs., Inc. v. Am. Salvage Pool Ass'n*, 230 F.3d 342, 346 (7th Cir. 2000).  Even where third parties "feel the blow" of litigation "through a trickle down effect," only the citizenship of the named party will matter for diversity purposes.  *Id.* at 346-47.  Conversely, a plaintiff cannot sue in its own name when an injury has been felt

19

only by those that the named plaintiff represents, and the plaintiff itself has not suffered any injury. *Id.*

Dexia is the real party in interest in this case. It was directly injured as a result of Rogan's actions. It is noteworthy that Dexia did not sue Rogan for breach of the agreement under which it issued the letter of credit. Rather, Dexia sued Rogan for fraud, conspiracy, and a variety of similar torts. LaSalle Bank was not involved in the situation involving Rogan's fraud at EMC until 1999, when it entered into the participation agreement. The fact that LaSalle Bank took on part of the obligations with respect to the letter of credit does not transform it into a real party in interest with regard to Dexia's fraud claim against Rogan. Instead, LaSalle Bank suffered only the "trickle down" harm of Rogan's actions vis-à-vis Dexia. Dexia, on the other hand, suffered a direct injury.

The Rogan children also contend that LaSalle Bank is a party whose citizenship must be considered because, by entering into the participation agreement, Dexia and LaSalle Bank formed an unincorporated association that is essentially a partnership or joint venture. If true, this would destroy subject matter jurisdiction because, for diversity purposes, a partnership or unincorporated association is deemed to hold the citizenship of each of its partners. *See, e.g.*, *Lear Corp. v. Johnson Elec. Holdings, Ltd.*, 353 F.3d 580, 582 (7th Cir. 2003).

The parties disagree over whether New York or Illinois law applies to the question of whether Dexia and LaSalle Bank formed an unincorporated association. The Court need not resolve that question, however, because New York and Illinois law are effectively the same on this issue.

20

> In general, the following elements are determinative of [intent to form a joint venture]: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses.

*Ambuul v. Swanson*, 162 Ill. App. 3d 1065, 1068, 516 N.E.2d 427, 429 (1987); *see also*

*Correspondent Servs. Corp. v. J.V.W. Invs. Ltd*, 173 F. Supp. 2d 171, 179 (S.D.N.Y.

2001) (applying New York law and setting forth the same elements for formation of joint

venture).  The same elements that apply to formation of joint ventures also apply to

formation of partnerships, the only difference involving whether the association is

formed for a single purpose or an ongoing enterprise.  *See Ambuul*, 162 Ill. App. 3d at

1070, 516 N.E.2d at 431.

In light of these rules, the Rogan children's contention fails, because Dexia and

LaSalle Bank did not enter into a joint venture or a partnership.  There is no evidence

that Dexia and LaSalle Bank ever intended to enter into such an association.  To the

contrary, the participation agreement expressly provides that Dexia and LaSalle Bank

were not each other's agents and that no fiduciary relationship existed between them.

This fact is telling, because partners and joint venturers owe each other fiduciary duties.

*See, e.g.*, *Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1146 (7th Cir. 1998);

*Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930, 939-40, 821 N.E.2d 719, 727-

28 (2004).  A partnership cannot exist in the absence of fiduciary duties, and Dexia and

LaSalle Bank went out of their way to ensure they did not have any such obligations as

result of the participation agreement.  Additionally, there was no joint control over the

alleged enterprise.  Rather, the participation agreement delegated all such control

Dexia.  LaSalle Bank had no obligations or rights in that regard.

Moreover, it is significant that LaSalle Bank did not enter into the participation agreement with Dexia until a year after Dexia issued the letter of credit.  Thus Dexia and LaSalle Bank did not have any formal relationship with respect to EMC and Rogan until long after Dexia's involvement began.  The Rogan children attempt to discount the importance of this fact by noting that the initial credit application with Dexia indicated that Dexia always intended to sell a portion of the letter of credit and listed five banks, including  LaSalle Bank, that had "indicated an interest in participating."  Dexia Ex. 732A at DEXIA 006652.  Though it was contemplated Dexia would sell a portion of the credit facility, there certainly was no agreement to do so when Dexia issued the letter of credit as a result of Rogan's fraud.  LaSalle Bank may have expressed interest in participating, but it was not obligated to do so.  Expressing preliminary interest in a transaction is a far cry from entering into an unincorporated association.

To summarize, Dexia is the real party in interest on the plaintiff's side of this case. Dexia and LaSalle Bank did not enter into an unincorporated association when they signed the participation agreement.  Accordingly, the Court denies the Rogan children's second motion to dismiss this case for lack of subject matter jurisdiction.

> **b.**     **Identity of the citation respondents and continuing validity of the citations**

The Rogan children contend that the identity of the citation respondents before this Court is unclear.  That contention is without merit.  In 2007, Dexia served Peter Rogan, Judith Rogan, and Cuppy with citations.  In February 2009, Dexia served citations on each of the Rogan children.  Thus six citation respondents have been

brought before the Court, though the citation against Judith Rogan is currently stayed due to her bankruptcy filing. To the extent that any of the citation respondents other than Judith Rogan are found to possess Peter Rogan's assets, the Court will, if appropriate, order those respondents to turn them over to Dexia. *E.g.*, *Star Ins. Co. v. Risk Mktg. Group Inc.*, 561 F.3d 656, 660-61 (7th Cir. 2009); Fed. R. Civ. P. 69(a); 735 ILCS 5/2-1402.

Next, the Rogan children challenge whether the citation issued to Cuppy is still operative. That citation was served more than six months ago. Illinois Supreme Court Rule 277, made applicable to these proceedings by Federal Rule of Civil Procedure 69(a), provides that a citation "terminates automatically 6 months from the date of (1) the respondent's first personal appearance pursuant to the citation or (2) the respondent's first personal appearance pursuant to subsequent process issued to enforce the citation . . . ." Ill. S. Ct. R. 277(f). Other than a conclusory citation to Rule 277, the Rogan children do not provide additional support for their contention that the citation to Cuppy has expired.

The citation directed to Cuppy has not lapsed because six months have not passed since he appeared pursuant to the citation. *See United States v. Rogan*, No. 02 C 3310, 2008 WL 4853478, at *2 (N.D. Ill. Nov. 3, 2008). Cuppy did not sit for an examination pursuant to the citation until May 21, 2009. Though he testified at the preliminary injunction hearing in October 2008, that appearance did not start the six-month period, because Cuppy limited his testimony to his own assets. The purpose of his appearance at the hearing was to oppose the entry of a preliminary injunction affecting his own assets, not as a respondent to a citation to discover assets.

23

Moreover, a party that delays citation proceedings through contumacious conduct cannot receive the benefit of the six-month deadline. *See, e.g.*, *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1228 (7th Cir. 1993) (collecting authority). Such delays can "be thought of as continuances extending the six-month period, as the statute permits." *Id.*; *see also First State Bank of Princeton v. Leffelman*, 160 Ill. App. 3d 394, 396, 513 N.E.2d 610, 612 (1987). The record in this case is replete with examples of such conduct by Cuppy.

### c. Admissibility of exhibits

The Rogan children have made objections to a number of exhibits offered by Dexia that the Court has not yet resolved. The parties provided briefs on these evidentiary issues. The Court makes the following rulings with respect to the admissibility of those exhibits. First, the Rogan children have withdrawn their objections to Dexia exhibits 52-A, 67, 150, 158, 177, 350, 351, 354, 356, 357, 754, and 792. Accordingly, those exhibits are admitted.

The Rogan children object to Dexia exhibits 67 and 158 on relevance grounds. Those objections are overruled. These documents are relevant to Dexia's request for an evidentiary inference based on spoliation of evidence. The Rogan children's relevance objections, regarding what inference should be drawn from the exhibits, go to weight rather than relevance or admissibility. Dexia exhibit 209 is also objected to based on relevance. That exhibit is a utility bill sent to Judith Rogan, containing hand-written notes by Cuppy. Dexia exhibit 209 is admissible because it is relevant to show Cuppy's and Judy Rogan's roles in concealing assets.

Dexia exhibits 275 and 276 are summary tables of several underlying exhibits. The underlying exhibits have not been objected to, and Dexia has laid a proper

foundation for 275 and 276 under Federal Rule of Evidence 1006.  Accordingly, Dexia exhibits 275 and 276 are admitted.

Dexia exhibits 69, 70, 146, 149, 152, 153, 154, 163, 163a, 163-L, 296, 333, 334, 335, 336, 348, 349, 349-LL, 353, 371, 372, 399, 481, 482, 573, 583, 1007, and 1015 are admitted, but only for the non-hearsay purposes detailed in Dexia's Brief Regarding the Admissibility of Exhibits.  Similarly, Dexia exhibits 924, 925, 926, 927, 928, 929, 930, 931, 932, 933, 934, 936, and 985 are also admitted for the non-hearsay purposes Dexia cites.  Dexia has not offered these exhibits for the truth of any matter asserted within them.  Rather, Dexia proffers them to show the association of "JKR Business" with various matters pertaining to the Rogan domestic and Belizean trusts, as well companies affiliated with those trusts.

Dexia also seeks to admit a number of exhibits pursuant to the residual exception of Federal Rule of Evidence 807.  To utilize Rule 807, a party must establish "(1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice."  *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999).  A document is trustworthy depending on the circumstances surrounding its creation, including its appearance and contents, as well as whether other individuals have relied on its accuracy.  *See United States v. Dumeisi*, 424 F.3d 566, 575-76 (7th Cir. 2005); *United States v. Bachsian*, 4 F.3d 796, 798 (9th Cir. 1993).  The Rogan children incorrectly assert that they did not receive sufficient notice of the exhibits Dexia intended to offer under the residual exception.  The exhibits were identified either before the hearing began or during the course of the hearing.  The Rogan children had ample opportunity to counter this evidence and protect themselves against surprise, as the hearing was spread out over several weeks, and the Court provided the Rogan

25

children with the opportunity address the evidence at issue. *See, e.g.*, *United States v. Munoz*, 16 F.3d 1116, 1122 (11th Cir. 1994); .

Dexia has also established that the interests of justice favor the use of Rule 807 in this case. A number of key witnesses with knowledge going to the heart of Dexia's claims are unavailable for various reasons, including Peter Rogan (who resides outside the United States), Judith Rogan (who invoked her Fifth Amendment rights when called to testify), and Miller (who is deceased). The unavailability of these witnesses also makes the documents offered by Dexia the most probative evidence available with respect to the matters for which Dexia offers those documents.

Dexia exhibits 32A and 32B contain itemizations of expenses for which Rogan received reimbursement from EMC. These exhibits are probative of Rogan's awareness of the threat of litigation at certain times, a material issue in this case. Their trustworthiness is corroborated by other evidence, as well as the inherent incentive to be accurate in a claim for reimbursement. Accordingly, the Court admits Dexia exhibits 32A and 32B.

Rule 807 may not have been necessary to introduce Dexia exhibit 52, a newsletter from Cuppy's firm regarding asset protection and control. Regardless, Cuppy confirmed its accuracy, and it is highly probative of Rogan and Cuppy's intent that Rogan retain control over his assets. Accordingly, Dexia exhibit 52 is admitted.

Dexia exhibits 69, 70, 152, 153, 296, and 571 are transcripts of proceeding before Judge Schenkier concerning the contentious discovery disputes in this case. There is no question of their authenticity, and the statements contained in them were made by attorneys speaking to a court or a judge, inherently demonstrating their trustworthiness. The exhibits are material and probative of Rogan's counsel's

awareness of the consequences of Rogan's actions in discovery. They also are probative of Rogan's attempt to conceal evidence. These exhibits are admitted.

Dexia exhibit 112 is a copy of Peter Rogan's interrogatory answers, including information about his net worth. The statements were made under oath, providing circumstantial guarantees of trustworthiness. They are also material, in that they go to Dexia's proof concerning Rogan's assets. The Court admits Dexia exhibit 112.

Dexia exhibit 118 is a memo by the trustee of the PGR trust regarding a telephone call with Cuppy. Cuppy confirmed the accuracy of the memo in his deposition, and the trustee, who was seeking advice from Cuppy regarding producing documents, had an incentive to accurately record the advice. This document is probative of the structure of the PGR trust and Rogan's control over its assets, a highly material issue. The exhibit is admitted.

Dexia exhibits 133, 134, 163-L, 371, 372, 399, 481, 482, 583, 1007, and 1015 are ledgers and financial statements for Rogan's management companies and entities held by the Rogan domestic and Belizean trusts. These documents were prepared with and eye towards filing tax returns based on them, and were prepared by an accountant who prepared similar records that have been admitted in evidence, thus providing circumstantial guarantees their trustworthiness. They are relevant regarding transactions between the various trusts and the fact that some entities were not charged overhead and administrative expenses. The Court admits these exhibits. *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F3d 532, 541 (4th Cir. 2007).

Dexia exhibits 163-P, 349-ii-2, 349-ii-3, 349-ii-4, 349-ii-5, 349-ii-6, 349-ii-7, 349-ii-8, and 484 are various documents relating to Rogan's role in the meetings that took place in Savannah, Georgia regarding projects owned by the Rogan domestic and

Belizean trusts.  They are material to and probative of Rogan's control of those assets. Their trustworthiness is corroborated by other exhibits concerning these meetings, as well as Myers' deposition testimony.  These exhibits are admitted.

Dexia exhibits 136, 377, 378, 379, 934, and 986 are bank documents.  Their trustworthiness is guaranteed by their nature and similarity to other business records, as banks and their customers routinely rely on the accuracy of such documents.  *See Karme v. Comm'r of Internal Revenue*, 673 F.2d 1062, 1064-65 (9th Cir. 1982).  These exhibits are relevant to and probative of Dexia's contention regarding Rogan's control of assets, commingling of assets, and receipt of money from the PGR trust.  They are admitted.

Dexia exhibit 388 is a $600,000 note for a loan to Walnut Hills, LLC from Boulevard Investors, LLC.  It trustworthiness is circumstantially shown by other exhibits. It is probative to show Rogan's efforts to shield money from his U.S. creditors.  The Court admits this exhibit.

Dexia exhibits 533 and 626 are e-mails from Cuppy to Miler regarding the Rogan domestic and Belizean trusts.  Exhibit 533's header indicates that Miller printed it out, and it comes from Boulevard Investors' files, providing circumstantial guarantees of its trustworthiness, and exhibit 626's trustworthiness is shown by other exhibits regarding Miller's bookkeeping.  They are probative of how the various trusts operated, including administration of their assets.  The Court admits these exhibits.

Dexia exhibits 99, 747, 748, 749, 774, 934, 936, and 986 are letters and e-mails demonstrating Cuppy and Miller's role in various businesses owned by the trusts.  They are relevant to refute several statements by Cuppy and to demonstrate Miller's use of the name "JKR Business."  Except for exhibit 774, these documents were produced

from the files of Rogan's attorneys on these issues, which provides a circumstantial guarantee of their trustworthiness. Exhibit 774 comes from the files located at the Merrillville office and relates to the business conducted out of that office. The Court admits these documents.

Dexia exhibits 768, 769, 770, 771, and 772 are pertain to Peter Rogan and Cuppy's efforts to provide Brian Rogan with nominal authority over PGR Properties shortly before Rogan left the United States. These documents were produced from the files of Rogan's attorneys on these issues, which provides a circumstantial guarantee of their trustworthiness, and Brian Rogan confirmed one e-mail's accuracy as well. They are relevant and probative of Rogan's efforts to place assets nominally in the hands of others, while retaining actual control over them himself. These exhibits are admitted.

Dexia exhibits 823 and 824 are documents related to Brian Rogan's 1999 and 2000 tax returns. They were produced by Brian Rogan and used in preparation of these tax returns, which provides a circumstantial guarantee of their trustworthiness. These documents are Dexia's only evidence on this matter, and they go to the issue of how JKR Business was used by Rogan and his agents. The Court admits these exhibits.

Finally, Dexia exhibit 392-a is a page of handwritten notes regarding Walnut Hills, LLC. The Court sustains the Rogan children's objection to this exhibit, because the notes' author is unknown and their contents are uncorroborated by other evidence.

### d.    Spoliation of evidence

Dexia contends that Rogan and Cuppy improperly destroyed documents to avoid their discovery or production. "The prevailing rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that

29

production of the document would have been unfavorable to the party responsible for its destruction." *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985). As detailed earlier, Dexia contends that Cuppy and Rogan improperly destroyed documents on three occasions. The Court will not address the first destruction, which took place in 2000, because it is too remote, occurring two years before this case was filed. The other two instances on which documents were destroyed, in 2004 and 2006, occurred when this case was pending. By 2006, both Cuppy and Rogan had been personally involved in extensive discovery disputes with Dexia. In 2004 and 2006, both Rogan and Cuppy were fully aware that they had a duty to preserve documents that might be relevant to this litigation, especially documents related to Rogan's finances and assets and the complex web of trusts and companies that Rogan and Cuppy had manufactured. The documents were destroyed in bad faith. Particularly with respect to the 2006 destruction, no effort was made to catalogue what was destroyed or the rationale for doing so. In light of the contentious nature of this case, including ongoing discovery disputes, there could be no justification to destroy documents regarding wire transfers or the forty-seven boxes of documents at the Merrillville office.

Documents subsequently produced by third parties, such as Oceanic Bank, demonstrate that there were substantial gaps in the documents produced by Rogan and Cuppy. *See Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 271-72 (7th Cir. 1993). Moreover, the lack of e-mails between them, even though both were known to frequently communicate through e-mail, and the paucity of documents related to the Rogan children's trusts is surprising, based on all the circumstantial evidence of how closely Rogan, Miller, and Cuppy operated with respect to these issues. Cuppy's involvement in the destruction of documents by Rogan is supported by his close

working relationship with Rogan on all of these issues and, with respect to the 2006 destruction, the fact that around the time the documents were destroyed, Cuppy was actively aiding Rogan with his plans to flee the United States. It is also supported by the fact that Cuppy communicated with the trustee of the PGR trust to aid Rogan in his efforts to avoid turning documents about that trust over to Dexia.

In short, the judgment debtor and the trustee of the Rogan domestic and Belizean trusts destroyed documents that were relevant to this litigation. For that reason, it is appropriate for the Court to draw an adverse inference against them. Cuppy is a citation respondent before this Court. Before being served with citations directed towards them, the Rogan children intervened in this litigation to protect any interests they might have in assets held by Cuppy as trustee. It is appropriate to draw an adverse evidentiary interest the Rogan children based on Cuppy's actions, because they intervened to stake a claim to assets that Cuppy holds as trustee.

The Rogan children contend, without citing any authority, that Dexia has forfeited its "spoliation claim" by not raising it earlier in the case. Intervenors' Resp. to Pl.'s Post-Trial Br. at 23. In addition to being completely unsupported, this contention misapprehends the nature of Dexia's spoliation argument. This is not a situation where Dexia seeks, as permitted in some jurisdictions, to bring a cause of action for spoliation, i.e., to sue a party for destroying documents. Rather, Dexia seeks an evidentiary inference. There is nothing inappropriate about raising this at trial and in post-trial briefing.

Accordingly, the Court will infer that the wire transfer documents destroyed in 2004 and the forty-seven boxes of documents from the Merrillville office destroyed in 2006 would have contained negative information pertaining to Peter Rogan and Cuppy,

including about their involvement with and use of the RPP, Rogan domestic, and Belizean trusts.

**2. RPP Trust**

The Court previously made a number of findings pursuant to Rules 16(c) and 56(d) with respect to the RPP Trust. *See Dexia VII*, 2009 WL 855638, at *1-2; *Dexia VI*, 2009 WL 648634, at *5-9. As detailed above, the RPP trust was settled by Peter Rogan. Rogan is also a beneficiary of that trust. The RPP trust required its trustee to distribute income and principal for Peter Rogan's benefit so that he could "maintain his accustomed standard of living." Dexia Ex. 297 at FMC Jan2008 564950. Thus the RPP trust is a self-settled trust for Peter Rogan's benefit. Under such circumstances, Dexia can reach the RPP trust's assets to satisfy its judgment against Peter Rogan. *See Dexia VI*, 2009 WL 648634, at *6-9.

The Rogan children contend that the assets of the RPP trust are not subject to turnover because Dexia has failed to prove that the trust's assets are in the possession of a citation respondent. Ordinarily, a trust's trustee would be the appropriate citation respondent whom a court would order to turn over trust assets to satisfy a judgment. Cuppy served as the RPP trust's sole trustee from 1996 until December 5, 2006, when he purported to resign. The trust specifies several potential successor trustees, but each of those individuals refused to assume that duty. Though Cuppy attempted to appoint two alternate trustees, neither of them were qualified to serve as trustee of the RPP trust, because they were not "adverse parties" within the meaning of section 672 of the Internal Revenue Code. That statute defines an adverse party as a person having a "substantial beneficial interest in the trust." 26 U.S.C. § 672(a); *see also Schultz v. Comm'r of Internal Revenue*, 686 F.2d 490, 495 (7th Cir. 1982). The RPP

trust expressly required that an "adverse party" serve as a successor trustee, yet neither of the putative successor trustees identified by Cuppy in December 2006 satisfied that requirement.

Following the resignation of a trustee, the Florida Trust Code authorizes a court to appoint a trustee to fill that vacancy if the successor trustees identified by the trust have refused to become trustees and no trustee has been appointed "by unanimous agreement of qualified beneficiaries." *See* Fla. Stat. § 736.0704(3). This result is consistent with the common law. *See Van Roy v. Hoover*, 96 Fla. 194, 200-01, 117 So. 887, 889 (1928) ("It is also well settled that the law will never permit a trust to fail for the want of a trustee and that the power of courts of equity to appoint new trustees is very broad."); Restatement (Second) of Trusts § 108(a) (courts may appoint a new trustee following resignation). In this case, the successor trustees identified by the RPP trust have refused to assume the role of trustee and there has been no evidence of agreement by the beneficiaries of the trust as to a new trustee. Accordingly, the Court may appoint a trustee.

As things currently stand, Cuppy has resigned as trustee of the RPP trust, yet no successor trustee has been named. According to the Rogan children, the fact that there is not currently a trustee prevents Dexia of executing on the RPP trust's assets, despite the fact that it otherwise has a right to do so. That is absurd. If the Rogan children were correct, a debtor could avoid having his creditors execute on assets held in trust simply by arranging for the trustee to resign without a successor. Dexia has served citations to discovery on the last validly appointed trustee (Cuppy) and the settlor-beneficiary whose assets are subject to turnover (Peter Rogan). Under these circumstances, the Court has the power to appoint a new trustee for the purpose of

ordering that trustee to turn over the assets of the RPP trust to Dexia. *See* Fla. Stat. §

736.0704(3); *Van Roy*, 96 Fla. at 200-01, 117 So. at 889. The Rogan children cite

numerous cases for the undisputed proposition that a court may not order a third party

to turn over assets unless they are assets of a judgment debtor and subject to

collection. Those cases have no bearing on this issue. Dexia has established that it is

entitled to execute on the assets of the RPP trust. *Dexia VI*, 2009 WL 648634, at *6-9.

Though that trust currently lacks a trustee, the Court will appoint one. Once that

happens, the Court can and will order the new trustee to turn over the assets of the

RPP trust to Dexia.

**3.  The Rogan children's domestic and Belize trusts**

    **a.  Peter Rogan's property held by the trusts**

The Rogan children have moved the Court to reconsider its March 12, 2009

order concluding that the relief sought by Dexia was proper as part of a supplementary

proceeding. *See Dexia VI*, 2009 WL 648634, at *11. They argue that the relief Dexia

seeks falls outside the proper scope of a supplementary proceeding under Illinois law.

The Seventh Circuit recently addressed this issue:

> The only relevant inquiries in supplementary proceedings are:  (1) whether
> the judgment debtor is in possession of assets that should be applied to
> satisfy the judgment; or (2) whether a third party is holding assets of the
> judgment debtor that should be applied to satisfy the judgment.

*Star Ins. Co.*, 561 F.3d at 660-61 (citing *Pyshos v. Heart-Land Dev. Co.*, 258 Ill. App. 3d

618, 630 N.E.2d 1054 (1994)); *see also Schak v. Blom*, 334 Ill. App. 3d 129, 133, 777

N.E.2d 635, 639 (2002). Based on this principle, the Seventh Circuit, in *Star Insurance*,

concluded that a district court judge did not err when she declined to consolidate an

action to pierce the corporate veil with supplementary proceedings, even though there

were factual similarities between the two cases, because piercing the corporate veil does not require a finding that a third party holds the assets of a debtor. *Star Ins. Co.*, 561 F.3d at 660-61.

At first blush, *Star Insurance*, which was decided after this Court ruled on Dexia's the Rogan children's cross motions for summary judgment, could be construed as inconsistent with both this Court's March 12, 2009 order and with a previous Seventh Circuit decision. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 737 (7th Cir. 2004); *Dexia VI*, 2009 WL 648634 at *10-11. Such a conclusion, however, would improperly elevate form over substance by focusing on the labels Dexia attaches to the relief it seeks, rather than on the substance of the relief Dexia seeks. *See Johnson v. Gudmundsson*, 35 F.3d 1104, 1114 n.7 (1994) (noting that a party's "failure to consistently label his related legal theories ought not to result in forfeiture").

Traditionally, when a party attempts to pierce the corporate veil, it seeks to disregard "adherence to the fiction of a separate corporate existence." *Star Ins. Co.*, 561 F.3d at 661 (internal quotation omitted). In other words, when the corporate veil is pierced, a corporation and a person or another entity associated with the corporation are no longer considered have a separate existence. Along those lines, the Rogan children contend that "Dexia must negate the existence of several trusts" to succeed in these proceedings. Intervenors' Mot. to Recons. ¶ 23. That contention does not accurately describe the relief Dexia seeks. Dexia does not seek to end the existence of the Rogan domestic and Belizean trusts; rather, it seeks to prove that those trusts hold property that actually belongs to Peter Rogan and to have that property turned over to satisfy the judgment against him. Such an inquiry clearly falls within the scope of a supplementary proceeding under Illinois law. *Id.* at 660-61. Following turnover, those

trusts would continue to exist and hold any property that does not actually belong to Peter Rogan.

Despite the fact that Dexia has, in some instances, mislabeled the relief it seeks, its post-hearing briefs clearly demonstrate that it seeks an order requiring third parties to turn over assets in their possession that actually belong to Rogan – not to impose liability on those third parties. *See, e.g.*, Dexia's Resp. to Intervenors' Post-Trial Br. at 31 ("Nor is there an attempt by Dexia to impose derivative liability upon a third-party for the judgment debtor's debt. Rather, assets have been put in another's name and so the inquiry is whether the transferor truly gave up ownership and control."); Dexia's Reply to Intervenors' Br. in Resp. to Dexia's Post-Trial Br. at 7 ("[I]n corporate veil piercing, the issue is the propriety of the potential imposition of derivative liability, while here . . . the issue is the reality of ownership."). Importantly, Dexia presented extensive evidence and argument concerning the key elements of determining whether any third parties hold Rogan's assets, control over and enjoyment of property. *See, e.g.*, Dexia's Corrected & Am. Proposed Post-Trial Findings of Fact and Conclusions of Law at 29-32, 69-82, 92-109.

The Rogan children also attempt to characterize the relief sought by Dexia as outside the proper scope of a supplementary proceeding, by repeatedly quoting the Seventh Circuit's statement that "[p]roceedings to enforce judgments are meant to be swift, cheap, and informal." *Resolution Trust Corp.*, 994 F.2d at 1226. Though that perhaps cannot be said of the instant proceedings, that fact results less from Dexia's actions than it does from the byzantine maze of domestic and foreign trusts, limited liability companies, partnerships, and corporations designed by Rogan, Cuppy, and others as part of a calculated strategy to hide Rogan's assets and frustrate his

creditors. The delay caused by their machinations in creating this complex structure has been compounded by Rogan and Cuppy's obfuscation and dilatory conduct throughout this litigation. Though the Rogan children are innocent of such conduct, the parties aligned with their interests are the primary source of complexity of these proceedings, not Dexia.

Dexia might persist in mislabeling its theories of relief "alter ego" or "veil piercing," but the relief it seeks and the evidence and law it has presented go to the question of whether third parties before this Court – the Rogan domestic and Belizean trusts – are in possession of Peter Rogan's assets. With this understanding of Dexia's claims, and fully cognizant of proper scope of supplementary proceedings under Illinois law as recently discussed by the Seventh Circuit in *Star Insurance*, the Court denies the Rogan children's motion for reconsideration and turns to the question of whether the Rogan domestic and Belizean trusts possess Peter Rogan's assets. If the answer is affirmative, then Dexia is entitled to turnover of those assets.[5]

The law of Illinois, Florida, and Indiana (the three jurisdictions with the closest relationship to Rogan, Cuppy, and the Rogan domestic and Belizean trusts) is similar regarding what it means for a person to own property:

> The word 'owner' is a broad, flexible word, applying not only to legal title holders but to others having control or enjoyment of the property. . . . "Title to property does not necessarily involve ownership of property. Title refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in [property] other than that of holding title thereto."

*Mason v. Rosewell*, 107 Ill. App. 3d 943, 946, 438 N.E.2d 653, 655-56 (1982) (quoting

---

[5]This inquiry is also different from a fraudulent transfer claim. Dexia does not seek to prove that Rogan fraudulently transferred assets. Rather, Dexia contends that Rogan never transferred any assets at all, i.e., he still controls and enjoys those assets and never ceased to do so.

*People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479, 489, 389 N.E.2d 540, 544 (1979));
*see also Womack v. State*, 738 N.E.2d 320, 324 (Ind. Ct. App. 2000); *United*
*Contractors, Inc. v. United Constr. Corp.*, 187 So. 2d 695, 701 (Fla. Dist. Ct. App.
1966). Enjoyment and control of property are the "primary elements of ownership."
*Department of Trans. v. Anderson*, 384 Ill. App. 3d 309, 312, 892 N.E.2d 116, 120
(2008) (holding a person was not an owner of property where, "[r]egardless of actual
title, [he did] not possess, use or otherwise control the property").

There is no dispute that Rogan no longer has title to the property held by the
Rogan domestic and Belizean trusts. But that fact does not mean he is not the true
owner of the property held by those trusts. Rather, it is necessary to determine whether
he exercises control over and enjoys the benefits of that property.

The Seventh Circuit conducted such an analysis in *Resolution Trust Corp. v.*
*Ruggiero*. In that case, after obtaining a judgment against Angelo Ruggiero, the plaintiff
sought to satisfy its judgment by executing on assets nominally held by Angelo' wife,
Gina Ruggiero. *Resolution Trust Corp.*, 994 F.2d at 1223-24. The plaintiff asked the
district court to impose a resulting trust on the real estate or to enter a turnover order
against Gina. *Id.* at 1224. The Seventh Circuit concluded that it was appropriate to do
so based on several factors: (1) Angelo purchased the real estate with his own money;
(2) Angelo maintained the property and paid expenses associated with it; and (3) Gina
had no knowledge about the details of the properties, including its location and worth.
*Id.* at 1227. Though Angelo contended that he had merely attempted to give his
property to Gina (something he certainly had the right to do), the court did not find his
self-serving testimony credible in light of the totality of the circumstances. *Id.* It was
also immaterial that most of the property had been placed in Gina's name before the

plaintiff obtained a judgment against Angelo, because the plaintiff proved that Gina received "only a bare title in the properties" that the evidence showed "were always Angelo's." *Id.*

Another instructive decision from this district is *Cohen v. Ulz (In re Cohen)*, 388 B.R. 865 (Bankr. N.D. Ill. 2008). In *Cohen*, a bankruptcy trustee sought to recover property that a debtor had titled to his wife and daughter to keep it from his creditors. *Id.* at 867. The bankruptcy court recognized that whether a person has an interest in property is a matter of state law and, under Illinois law, "ownership rights do not depend solely on formalities of title. A person may have an interest in property – and may even be considered the owner – although someone else has title." *Id.* at 868 (citing 30A *Illinois Law & Practice, Property* § 11 (1994)). The bankruptcy court distinguished this inquiry from a fraudulent transfer action. *Id.* at 867. In other words, the trustee sought to prove that the debtor "held interests in the property in question, and that in fact he still holds those interests. Bare legal title may have been vested in [family members], but [the debtor] at all times controlled the property and so was then and still is the true owner." *Id.* at 867-68.

Other cases confirm that a judgment debtor can still be the true owner of property he contends has been transferred to third parties when he continues to control and enjoy the benefits of that property. *See, e.g.*, *Richards v. United States (In re Richards)*, 231 B.R. 571, 578-80 (E.D. Pa. 1999) (holding property belonged to a judgment debtor "if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property"); *Massey-Ferguson, Inc. v. Finocchiaro Equip. Co.*, 496 F. Supp. 655, 658 (E.D. Pa. 1980) (acknowledging that judgment creditor can execute on assets held by third parties if the

creditor proves the judgment debtor remains the true owner of the property); *Fields v. Tillerson*, 726 A.2d 670, 674 (D.C. 1999) (holding trial court erred by assuming that property did not belong to judgment debtor simply because it was titled in the name of a third party); *Dale v. Fin. Am. Corp.*, 929 S.W.2d 495, 498-99 (Tex. App. 1996) (judgment creditor entitled to property held by third parties where property was subject to judgment debtor's control and could be traced back to him); *Smith v. Fid. Deposit Co. of Md.*, 279 Ark. 38, 38-40, 648 S.W.2d 475, 475-76 (1983).

The parties dispute whether Dexia is required to establish that the Rogan children's trusts hold Peter Rogan's assets by a preponderance of the evidence or by clear and convincing evidence. Neither side cites a case directly dealing with this point. Without specifying a specific standard, Illinois courts have stated only that "[t]he provisions of section 2-1402 are to be liberally construed, and the burden lies with the petitioner to show that the citation respondent possesses assets belonging to the judgment creditor."[6] *Schak*, 334 Ill. App. 3d at 133, 777 N.E.2d at 639. Regardless of which standard is correct, Dexia is entitled to an order of turnover with respect to the property held by the Rogan domestic and Belizean trusts because it has established, by clear and convincing evidence, that Peter Rogan is the true owner of the property held by those trusts based on his extensive, unfettered control of that property and his ability to enjoy its benefits.

---

[6]Similar to the RPP trust, the Rogan domestic and Belizean trusts are currently without a trustee. *See Dexia II*, 2008 WL 4855416, at *9. Dexia, however, has served citations to discover assets on the trusts' last trustee (Cuppy) and the trusts' beneficiaries (the Rogan children). Thus those trusts are properly before the Court for the same reasons as the RPP trust.

### i.    Control of property nominally held by the Rogan children's trusts

Dexia has clearly and convincingly established that Rogan controlled the assets held by Rogan domestic and Belizean trusts, sometimes directly and sometimes through his agents, primarily Cuppy and Miller.  As detailed above, those trusts were created at Peter Rogan's direction and funded almost entirely with assets that originated from him.[7]  Though he ostensibly placed assets worth millions of dollars beyond his reach, Rogan continued to control those assets in every respect.

First, Rogan was extensively involved in investment decisions, particularly with respect to the trusts' investments in real estate, despite the fact that he supposedly had no personal interest in them.  *See Resolution Trust Corp.*, 994 F.2d at 1227.  Rogan organized and attended numerous meetings pertaining to the investments of the Rogan domestic and Belizean trusts.  At those meetings, Rogan was not treated like a disinterested outsider.  Rather, it is apparent that the meetings were conducted for his benefit and that Cuppy, Miller, and others were reporting to him.  As to the non-real estate investments made by the trusts, decisions about those investments were made by Cuppy.  The Court determines, based on the totality of the evidence, that whenever Cuppy took any important action with respect to the trusts, he did so at Rogan's direction.  Cuppy functioned as an agent of Rogan, not as an independent trustee.

Moreover, communications between Cuppy, Miller, and others confirm Rogan's control over the assets of the children's trusts.  In e-mails and letters, Rogan's

---

[7]The Rogan domestic trusts received a (relatively) de minimis gift of $10,000 each from an individual named Scott Gross.  Though no evidence was presented on the circumstances of that gift, Dexia contends that they were questionable at best.  Out of an abundance of caution, however, the Court will exempt from its order of turnover $10,000 in cash from each of the Rogan domestic trusts.

lieutenants would refer to Rogan's authorization regarding issues related to the children's trusts and their related companies. They would also, in communications to Rogan, use the word "we" when referring investments being made by the trusts. It is clear that Cuppy and Miller were doing more than simply keeping Rogan in the loop. They spoke of the assets as if Rogan were the true owner.

Another factor demonstrating Rogan's control over the assets of the Rogan domestic and Belizean trusts concerns the administration of the those trusts and payment of trust expenses. *See id.*; *Richards*, 231 B.R. at 579-80. Miller performed extensive work on behalf of the trusts despite the fact that he was Rogan's full-time employee. Indeed, Miller was described as Rogan's "financial enabler." The work Miller performed on behalf of the trusts was conducted primarily at the Merrillville office, even though the trusts and their related companies were never charged any expenses for maintaining that office. Witnesses described the Merrillville office as the general office for Peter Rogan's business affairs. At the Merrillville office, Miller and Rogan worked across the hall from each other. The commingling of expenses did not stop with employees and office space. Cuppy, Foley, and Myers all billed Peter Rogan directly for legal work performed on behalf of the trusts.

The Rogan children attempt to discount Cuppy's and Miller's extensive involvement with the Rogan domestic and Belizean trusts, and their associated businesses, by contending that there is nothing surprising about Rogan wanting own his lawyers and advisors involved with trusts he set up in his children's names. Though it is true in general that a family lawyer may often handle matters for multiple generations of the same family, the evidence in this case points to a different sort of role assumed by Cuppy and Miller.

42

It is also telling that the Rogan children were unaware of the existence of the Rogan domestic and Belizean trusts at an earlier date. Though there was no reason to tell them of the trusts when they were minors, the fact that they were not informed about the trusts promptly upon becoming adults supports Dexia's contention that the Rogan children were not the true beneficial owners of the property held by the trusts. *See Resolution Trust Corp.*, 994 F.2d at 1227 (wife not true owner of property in her name when she lacked important knowledge about the property). Indeed, two of the three children did not even know of the trusts until Dexia took their depositions as part of this litigation.

Finally, even though it is unnecessary in light of the compelling evidence presented by Dexia, the Court can draw further support for its determination regarding Rogan's control of assets from the adverse inference related to the destruction of wire transfer information and forty-seven boxes of documents that had been located at the Merrillville office.

### ii. Enjoyment of property nominally held by the Rogan children's trusts

Dexia has also demonstrated that Rogan has enjoyed the benefits of the assets nominally held by the Rogan domestic and Belizean trusts. One example of this is what Dexia refers to as the "circular transfer" in 1998, when the Rogan domestic trusts transferred $1.35 million to Boulevard Management, Ltd. and that entity, in turn, transferred $1.2 million to Rogan. That transaction was planned at a meeting that Peter Rogan attended. Though the Rogan children attempt to characterize this transaction as a repayment of a loan Rogan made to Boulevard Management, Ltd., the Court does not find that explanation credible. Rather, Peter Rogan orchestrated this series of

transactions so that he could access the assets of Rogan domestic trusts.

Similarly, the Belizean trusts and entities partially owned by the trusts transferred millions of dollars to the PGR trust over the course of several transactions. In particular, entities in which the Rogan domestic and Belizean trusts had an interest, and in which the PGR trust had not interest, including Taylor Row, LLC, Boulevard Investors, LLC, and 410 Montgomery LLC, transferred millions of dollars to the PGR trust. Rogan was a beneficiary of the PGR trust and, as the Court previously concluded, had virtually unlimited access to the assets of the PGR trust. *See Dexia VI*, 2009 WL 648534 at *4-5. The Rogan children do not offer an explanation as to why these transactions occurred. None is needed. Rogan plainly was able to enjoy the benefits of the assets held directly and indirectly by the Rogan domestic and Belizean trusts.

Perhaps the most telling evidence of Peter Rogan's continued enjoyment of and control over the assets held by the Rogan domestic and Belizean trusts is Dexia Exhibit 349Q. In that document, Foley created a financial analysis and projections for children's trusts, as well as the PGR trust, including a "total" of all trust assets. This document is emblematic of how Rogan and those working for him treated and viewed the assets nominally held by the various trusts. Regardless of the separation of title or the identities of the named beneficiaries of the various trusts, the property held by those trusts was treated as a single pool of assets from which Rogan would draw as he wanted and needed. And finally, though it is unnecessary to do so, the Court can draw an inference that the documents destroyed by Peter Rogan and Cuppy would have contained negative evidence with respect to Rogan's enjoyment of the benefits of the assets held by the Rogan domestic and Belizean trusts. Given these circumstances,

44

Dexia has established, by clear and convincing evidence, that the assets held by the Rogan domestic and Belizean trusts are the property of Peter Rogan and thus should be turned over to Dexia.

**b.    Constructive trust**

Alternatively, it is also appropriate to impose a constructive trust on the property held by the Rogan domestic and Belizean trusts, except for the $10,000 given to each of the Rogan domestic trusts that Dexia has not proven was the result of Rogan's fraudulent activities (*see* n.7 *supra*).  Under Illinois law, "a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving [a] benefit to convey the property back to the person from whom it was received."  *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 56, 643 N.E.2d 734, 745 (1994).  "In order to impose a constructive trust, it is sufficient that a party has received money properly belonging to another under circumstances that, in equity, the party ought not be allowed to retain." *Jackson v. Callan Publishing, Inc.*, 356 Ill. App. 3d 326, 334, 826 N.E.2d 413, 423 (2005).  A constructive trust may be imposed even when the ultimate recipient of the property is an innocent party.  *Id.*; *see also Smithberg v. Ill. Mun. Ret. Fund*, 192 Ill. 2d 291, 300, 735 N.E.2d 560, 566 (2000) ("By accepting property, [a person] adopts the means by which it was procured.").  A party seeking a constructive must establish "the existence of identifiable property to serve as the res upon which a trust can be imposed and possession of that res or its product by the person who is to be charged as the constructive trustee."  *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 502, 501 N.E.2d 188, 191 (1986).  The right to a constructive trust must be established by clear and convincing evidence.  *Suttles v. Vogel*, 126 Ill.2d 186, 194, 533 N.E.2d 901, 905 (1988).

As detailed above and in an earlier ruling, Dexia has established that the money transferred to the Rogan domestic and Belizean trusts as a result of the sale of EMC and management fees for services provided by Braddock Management, LP and Bainbridge Management, LP constituted the proceeds of Peter Rogan's fraudulent activities. The Rogan children contend that Dexia was not a victim of the fraud that occurred when the original bonds for EMC were issued in 1994, because most of the fraudulent activities occurred before Dexia became involved with EMC and Rogan. Even though Dexia did not guarantee payment of bonds until 1998, when it did so, it stepped into the shoes of earlier victims of Peter Rogan's ongoing frauds. *See United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008) (party was entitled to constructive trust where it covered loss suffered by its insured as a result of defendant's fraud). Under these circumstances, Dexia, as the victim of Rogan's fraud, is entitled to the fruits of the fraud that Rogan caused to be transferred to the Rogan domestic and Belizean trusts.

The Rogan children also challenge whether Dexia has sufficiently traced assets from Peter Rogan's fraudulent activities to the Rogan domestic and Belizean trusts. Dexia has established, however, that those trusts either received money from those activities (i.e., the sale of EMC and the management fees) or from companies those trusts held received the money. In either instance, Dexia has traced specific property, the proceeds of Rogan's fraud, to the Rogan domestic and Belizean trusts, either directly or through a stake in a subsidiary company.

Finally, the Rogan children's contention that Dexia is barred by the statute of limitations from seeking a constructive trust fails. Dexia seeks a constructive trust on the assets of held by the Rogan domestic and Belizean trusts because those trusts hold

the fruit of Rogan's fraud on Dexia. The judgment against Peter Rogan was entered in 2007. *See Dexia IV*, 604 F. Supp. 2d at 1187. Under Illinois law, a party has seven years to enforce a judgment. 735 ILCS 5/12-108(a). Accordingly, Dexia's motion for the imposition of a constructive trust in order to execute on its judgment against Rogan was filed well within the applicable limitations period.

## Conclusion

For the reasons set forth above, the Court denies Robert, Brian, and Sara Rogan's motion for judgment as a matter of law [#1045], their motion for reconsideration [#1012], and their motion to dismiss for lack of subject matter jurisdiction [#1041]. The Court grants in part Dexia's renewed motion for turnover pertaining to the interests of the Rogan children [#757]. Specifically, the Court finds that Dexia is entitled to turnover of the assets of the RPP Finance Trust, the Brian Rogan Domestic Trust (except for $10,000), the Sara Caitlin Rogan Domestic Trust (except for $10,000), the Robert Rogan Domestic Trust (except for $10,000), the Brian Peter Rogan Trust BPR002, the Robert Cashman Rogan Trust RCR002, and the Sara Caitlin Rogan Trust SCR002, because those seven trusts hold the property of Peter Rogan. Any interest held by the Rogan children in any of those trusts is terminated effective immediately. To the extent that Cuppy remains trustee of any of those trusts, the Court orders him to turn over the assets of those trusts to Dexia by July 14, 2009. To the extent that any of those trusts do not currently have a trustee, Dexia is directed to file a motion for the appointment of a trustee by July 14, 2009 (noticed for hearing on July 16, 2009), so that the Court, upon appointing a trustee, can order that trustee to turn the trusts' assets over to Dexia. Also by July 14, 2009, Dexia is directed to file a motion (noticed for hearing on July 16, 2009) for entry of an appropriate order

memorializing the Court's decision regarding the Peter G. Rogan Irrevocable Trust.

Dexia is directed to file a status report by July 20, 2009, detailing what issues remain before this Court and describing the status of Dexia's motion pending in the Bankruptcy Court for the Northern District of Indiana seeking to lift the automatic stay as it pertains to Judith Rogan.  This matter is set for a status hearing on July 27, 2009 at 9:30 a.m.


Date:  July 7, 2009

MATTHEW F. KENNELLY
United States District Judge