1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3

4 DEXIA CREDIT LOCAL, f/k/a   )
  Dexia Public Finance Bank   )
5 and Credit Local de France,  ) Docket No. 02 C 8288
              )
6       Plaintiff,  )
              )
7      vs.     ) Chicago, Illinois
              ) March 31, 2009
8 PETER G. ROGAN, et al.,   ) 2:15 p.m.
              )
9      Defendants. )

10       TRANSCRIPT OF PROCEEDINGS
11   BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
  APPEARANCES:
13

14 For the Plaintiff:   HOWREY LLP
           BY: MR. SCOTT T. MENDELOFF
15            MR. GABRIEL AIZENBERG
           321 North Clark Street, Suite 3400
16           Chicago, Illinois 60654

17

18 For Judith Rogan and
  Brian Rogan:     O'ROURKE & MOODY
19           BY: MR. MICHAEL J. O'ROURKE
            MR. MYLES P. O'ROURKE
20           55 West Wacker Drive, Suite 1400
           Chicago, Illinois 60601
21

22
  For Robert Rogan and
23 Sara Rogan:      TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
           BY: MR. TIMOTHY J. TOUHY
24            MR. JEFFREY J. HALLDIN
           55 West Wacker Drive, Suite 1400
25           Chicago, Illinois 60601

1                    LAURA M. BRENNAN - Official Court Reporter

2                     219 South Dearborn Street - Room 2102

Chicago, Illinois 60604

3                         (312) 427-4393

| 1 | (The following proceedings were had in open court:) |

1    (The following proceedings were had in open court:)

2         THE COURT:   02 C 8288, Dexia Credit v. Rogan.

3         Can the lawyers please give your appearances for the

4    record?

5         MR. MENDELOFF:   Scott Mendeloff and Gabriel Aizenberg

6    on behalf of Dexia.

7         MR. MICHAEL O'ROURKE:   Good afternoon, your Honor;

8    Michael O'Rourke and Myles O'Rourke on behalf of the Rogan

9    intervenors.

10        MR. TOUHY:   Timothy J. Touhy on behalf of Robert and

11   Sara Caitlin Rogan.

12        MR. HALLDIN:   Jeff Halldin on behalf of Robert and

13   Sara Caitlin Rogan.

14        THE COURT:   So is everybody ready to proceed?

15        MR. MENDELOFF:   Right.

16        THE COURT:   Anything we need to take up before

17   openings?

18        MR. TOUHY:   Yes, your Honor.  I have a suggestion and

19   I believe --

20        THE COURT:   I don't have -- I'm looking at this very

21   quickly.  What you are saying is defer opening and have sort

22   of mini-openings and closings as we go on.  I don't have a

23   problem with doing the latter actually.  I think it would be

24   helpful to me, but I would prefer not to defer openings

25   because I think it's going to be also helpful to me to kind of

1   get an overview at the beginning of where we are.

2           So I'm happy actually -- and the thought had crossed

3   my mind, and it just kind of crossed and passed, and so I'm

4   glad you suggested.  I'm happy to, you know, once we get the

5   rest of this scheduled, when you come back, I'm happy to have

6   people give little summations, you know, as we go along.  I

7   think that's actually a good idea.

8           MR. MENDELOFF:  I didn't read this, and I just got

9   it.

10          THE COURT:  You don't need to.  You don't need to.

11  The only part that really concerns you right now is he didn't

12  want you to give your opening, and I'm saying no on that.  You

13  are going to give your opening.

14          MR. MICHAEL O'ROURKE:  Oh, no.  We're more than

15  happy.  We just thought --

16          THE COURT:  If you guys don't want to give an opening

17  now, you don't have to.

18          MR. MICHAEL O'ROURKE:  Okay, that's all I wanted to

19  say.

20          THE COURT:  You can defer your openings.  I'm not

21  going to defer Mr. Mendeloff's.  Maybe that's what you

22  weren't --

23          MR. MICHAEL O'ROURKE:  We did not want to suggest

24  that, Judge.  Scott's prepared.

25          MR. MENDELOFF:  I'm prepared, and it will take

1    awhile.  That is going to work perfectly.  It's fine by us.

2         MR. MICHAEL O'ROURKE:  It works.

3         MR. MENDELOFF:  If they want to spring it on us

4    later, that's fine.

5         MR. MICHAEL O'ROURKE:  There is nothing really to

6    spring.

7         MR. TOUHY:  Two other points.

8         THE COURT:  Yes.

9         MR. TOUHY:  One is, rather than us having to be

10   repeating objections, we would like to adopt any objection

11   made by one of us.

12        THE COURT:  An objection for one defendant I think

13   should stand for all.  That is fine with me.

14        Hang on a second.  This can be off the record.

15      (Brief interruption.)

16        THE COURT:  All right.  Okay, so everybody have a

17   seat other than I guess --

18        MR. MICHAEL O'ROURKE:  One other little scheduling

19   item, Judge.

20        Brian Rogan has class in the morning tomorrow.  I

21   wonder if we could put him at 2:00 o'clock.

22        MR. MENDELOFF:  No problem.

23        THE COURT:  That sounds good to me.  Great.

24        All right, let me get situated so this lamp isn't in

25   the way here.

1        (Brief interruption.)

2        MR. MENDELOFF:    For the record, we have put up right

3   now Plaintiff's Exhibits 44-E and 44-D.

4        THE COURT:    Okay.

5        MR. MENDELOFF:    If it please the Court, we are here

6   to execute on a series of trusts Peter Rogan caused to be

7   created and funded in the names of each of his three children.

8   And we're going to refer collectively to them as the Domestic

9   Trusts and the Foreign Trusts.    The theories on which we're

10  going to -- we're seeking to execute on those trusts are

11  constructive trusts and a series of theories that are sort of

12  interrelated, as your Honor is aware, alter ego, sham trust,

13  and nominee.

14       The two theories have a completely different nature

15  of proof, and that is going to be evident in the case.    The

16  constructive trust theory really has two elements:    The source

17  of the funds were fraudulent or improper and that the funds

18  that -- we can trace those funds to the trust.    Additionally,

19  obviously, it's got to be fraudulent or improper in some way

20  to Dexia.    Dexia has to be some sort of a victim.

21       The second theory, the alter ego/sham trust/nominee

22  theory, is heavily fact bound based on a whole series of

23  factors that your Honor has identified and others that we're

24  going to rely upon that has been established by the courts.

25       Turning to the constructive trust portion of this, it

1   has been established based on the Court's ruling that the
2   fraud scheme, the health care fraud scheme, that Peter Rogan
3   perpetrated began in '93.  As a result, the 1994 bond issuance
4   which produced money for the children's '92 trust, the
5   Domestic Trusts, were generated as part of that scheme.  And
6   then it has been established that the management fees that
7   were paid to that trust and to the Foreign Trusts were paid in
8   furtherance of that fraud scheme.

9          It's incumbent upon Dexia to establish, and we will
10  through John Flaherty, who will testify tomorrow, that Dexia
11  was defrauded by the nondisclosure to the 1994 bondholders of
12  the existence of the fraud, by the nondisclosure to Dexia of
13  the scheme, including the nondisclosure of the payment of
14  fraudulent management fees, and by the continuing false
15  reports to Dexia after Dexia agreed to provide the letter of
16  credit from 1998 to 2001, the false reports being false
17  because, among other things, there is a nondisclosure of any
18  existence of the fraud.

19         Then it is also going to be incumbent upon Dexia to
20  trace the funds from the source to the trusts or the
21  trust-owned companies, which we will establish.

22         Now, turning to the alter ego/sham trust theory.  As
23  I indicated, we're going to be relying on a series of factors
24  that have been established by the courts and by this Court:  A
25  close personal relationship of the trust was created to or

1  used to shield assets from creditors; that transfers were made

2  into the trust in anticipation of litigation; that Rogan

3  contributed virtually all of the corpus; that Rogan continued

4  to enjoy the fruits of the trust; that there was no

5  consideration paid in return for Rogan's transfers into the

6  trust of the corpus; commingling of employees, offers --

7  officers -- excuse me -- employees, offices and the handling

8  of the trust, that the trusts were handled in a commingled

9  manner; that Rogan paid expenses for the trust directly; that

10 is, from his pocket; that Rogan controls the trust operations

11 and concealment of the trust.

12          The checkmarks that we have placed there are

13 indications of factors that have been already established.

14 Close personal relationship need not be discussed.  I think we

15 have established that Rogan has contributed virtually all the

16 corpus other than the money that was generated as a result of

17 the investments to the trust.  And as a result of the RTAs as

18 adjusted, there is, I think, no question.

19          THE COURT:  Requests to admit, you mean?

20          MR. MENDELOFF:  Yes, I'm sorry, requests to admit.

21          There is an agreement that there was no consideration

22 paid to Rogan for his transfer of the trusts and for -- excuse

23 me -- the original corpus and the management fees paid.

24          Going through some of these factors, the evidence is

25 going to be as to the shielding of the -- the creation and

1    operation of the trust to shield assets from creditors, that
2    each of the trusts -- and we will go over this in a minute --
3    contains language that is indicative of an attempt to do that,
4    among them spendthrift provisions, and that the trusts were
5    operated in a way to accomplish that.

6         Also, the timing of the creation of the trust we
7    think is relevant because the trusts were all created either
8    right before the beginning of the scheme or during the course
9    of the scheme, and the trusts were created all, except for the
10   first one, all offshore.  In fact, the evidence will be very
11   clear that, among other things, the country of Belize was
12   chosen intentionally to make it more difficult to locate the
13   trust assets and to execute against them.

14        Transfers in anticipation of litigation, we will
15   present case law eventually, probably at the end of the trial,
16   that indicates that trusts that were -- transfers that were
17   made during the course of a fraud scheme has with it ipso
18   facto an appreciation by the perpetrator of the fraud that
19   there is litigation that is potentially there; that is,
20   execution by the government and creditors against that fraud
21   scheme of discovery.

22        Additionally, we will produce evidence that
23   throughout 1995 to 2001, there was a series of threats of
24   litigation that Mr. Rogan was aware of including and
25   culminating with the criminal investigation that led to the

1    indictment of his management companies.

2        In terms of the contribution of virtually all the

3    corpus, we know in '94 that bond financing was provided by

4    Mr. Rogan, as your Honor has already found, and that

5    subsequent funding was made through management fees and

6    earnings.

7        For the Domestic Trusts, for the Belize Trust, the

8    initial funding was made through a loan from the Domestic

9    Trusts of $15,000 from each trust and then subsequent funding

10   through management fees and earnings.

11       Rogan continued to enjoy the fruits.  Your Honor's

12   aware of the circular transaction that is referenced in our

13   statement of facts, and also there will be evidence that on

14   February 10th, 1991 -- 2006, the Robert Rogan Trust paid

15   $30,000 to Peter Rogan directly.  These will be the -- this is

16   the direct proof of Peter Rogan's being able to continue to

17   enjoy the fruits of the trust.

18       THE COURT:  The circular thing, that's the thing that

19   was referred to in the preliminary injunction?

20       MR. MENDELOFF:  Yes, and that's it right there.

21       THE COURT:  Right here, okay.

22       MR. MENDELOFF:  The circular transaction is marked as

23   Exhibit 349-EE, and it's transaction --

24       THE COURT:  I think that's a double K.  Is that

25   double E?  Okay, you're right.  Sorry.

1          MR. MENDELOFF:   And the transaction is laid out
2     there.   I don't want to take up court time going through it,
3     but suffice it to say that we have a transfer from Rogan's
4     management company to the children's U.S. trusts, and then a
5     loan transfer by Fred Cuppy to the Boulevard Management
6     Company, which is the Florida partnership, and then on to
7     Peter Rogan.   Boulevard Management is right there.   Boulevard
8     Management, as you can see, is one of the owners of the
9     Braddock Management LP and is also owned by the Children's
10    Domestic Trusts.
11          This is not a very good slide, but 740-A is that
12    check.   And if it was clear, what you would see is the check
13    made out to Peter Rogan for $30,000 off Robert Rogan's
14    account, signed by Fred Cuppy and endorsed by Peter Rogan on
15    the back.
16          Now, in addition to those direct transfers, there is
17    a whole series of transfers between Mr. Rogan's trusts, trusts
18    that are the ones that he directly was a beneficiary of, and
19    the Children's Trusts.   We mentioned, I think, one of these in
20    the motion for the TRO, but there are a whole series, and they
21    are listed in this slide.   Your Honor can see that over time,
22    there is a whole panoply of transfers between -- of literally
23    millions of dollars -- between Peter Rogan owned entities,
24    including his trust and private companies, and the Children's
25    Trusts that extend from early on until 2006.

1    No consideration paid to Rogan.

2    On the issue of commingling of employees, offices and

3  handling of the trust assets, one of the things that the

4  evidence will show is that the trust businesses -- many of the

5  important trust businesses were located in the exact same

6  suite of offices as the Rogan businesses.   All the businesses

7  on the left-hand side are owned and controlled directly by

8  Peter Rogan.   And on the right-hand side, you can see

9  Boulevard Investors LLC, and three of the Savannah entities

10  are also located at that exact same suite of offices.

11  Boulevard Investors LLC is right here, and it is a wholly

12  owned entity of the Children's Belize Trusts.

13    And just backing up for a second, you will see

14  there's loans between Boulevard Investors LLC and Peter

15  Rogan's personal business in PGR Properties.

16    Just to quickly run through some of these examples,

17  Boulevard Investors LLC, you can see on their bank statement,

18  240 East 90th; Gardens on Jones' tax return, 40 East 90th;

19  Taylor Row tax return, 240 East 90th; Wilmington Condo

20  Commons' bank statement, 240 East 90th.   For the record, the

21  last four exhibits I mentioned are Exhibits 811, 12, 13 and

22  14.

23    In terms of alter ego commingling, the evidence will

24  show that there was a commingling of employees working for

25  both the Peter Rogan entities and for the trusts, most notably

1    David Miller and Fred Cuppy, but also Peter Rogan employees

2    from his office space.

3        The David Miller piece of this is extremely

4    significant.   The evidence will be that David Miller was a

5    core employee of Peter Rogan.   Peter Rogan testified that

6    David Miller was his full-time employee.   The evidence will

7    also be that David Miller had submitted an affidavit to the

8    Court prior to his death that he was a full-time employee of

9    Peter Rogan's companies.

10       Notwithstanding that, the evidence will be that David

11   Miller was absolutely centrally involved in the operation of

12   all of these trusts and was a conduit of information regarding

13   the trust and a conduit of messages and control directors from

14   Mr. Rogan to Mr. Cuppy.

15       There are numerous instances in this case where we

16   will see documents showing a unified handling of various

17   assets irrespective of whether they are trust assets.

18       Alan, can you focus on this side of this?  We're

19   losing the highlighting portion of it.

20       Well, this is an e-mail from David Cuppy to David

21   Miller on July 27th, 2001.   One of the things that we can see

22   in this is references to a whole variety of Rogan related,

23   trust related companies, irrespective of who owns what.

24       There is a reference to Sheridan.   That's a

25   partnership that's owned by Peter Rogan.   Boulevard Investors

1    LLC, which, as we mentioned, is the Children's Belize Trusts;
2    Bainbridge Management owned entirely by Rogan; Boulevard
3    Investors, LTD, again owned 100 percent by the Belize Trust.
4         There is an indication of Peter Rogan in the same
5    paragraph providing cash to his private businesses.
6         And keep going, please.
7         The next paragraph talks about Judy Rogan money, and
8    that paragraph is interesting.  Turn to the split screen.
9         So in Exhibit 116, what we see is a discussion of
10   money that -- how are they going to get money for this Judy
11   Rogan -- what is it -- insurance program.  And they are
12   looking all over for money because, as you can see in the
13   previous paragraph, it says that they are out of domestic
14   sources of funds.
15        Alan, again, this is not working in terms of --
16        Unfortunately, domestic sources are down to the point
17   where I need to reserve for PGR living expenses.  They talk
18   about this insurance policy, joint last to die policy, she
19   usually funds from her Zurich Revised Trust.  However, that
20   account is down to $10,000.
21        Can you go to the next page?
22        And would it be possible to get money from Ameritrade
23   account?
24        And then extremely interesting.  As I notice, she has
25   lots of money there.  Maybe she can lend some money to Peter

1    who lends to Bainbridge, et cetera, et cetera, exactly what
2    happens in connection with this case, the fluid transfer of
3    money from one entity to the other wherever an entity needs
4    money.

5           Finally a reference to the Walnut Hills no
6    receivable.  Walnut Hills is right here.  It's owned by the
7    Children's Domestic Trusts, and the evidence will be that
8    there is a note receivable that was set up for the Boulevard
9    Investors LLC that loaned money to that trust.

10          Rogan paying expenses directly.  There will be
11   evidence that Rogan paid legal fees from the trust in the form
12   to the trust for the trust and the children -- we're talking
13   about the Children's Domestic and Foreign Trusts in the form
14   of invoices from various attorney's offices.

15          Now, turning to the last two issues:  Rogan controls
16   trust operations and Rogan and Cuppy's concealment of Rogan's
17   role in the trusts.  These issues are really best understood
18   against the backdrop of the overarching conspiracy to defraud
19   creditors via all the trusts, these and the other trusts.  And
20   the proof will be that all were treated as part of that
21   conspiracy.  So I'm going to turn now to a discussion of the
22   background conspiracy.

23          In this case we know of 10 known trusts.  Two of the
24   trusts are revocable trusts where Peter and Judy Rogan set up
25   in 1998 and 1999 respectively, after Rogan's acquisition of

1     Edgewater Hospital.  Those revocable trusts do not contain any

2     kind of spendthrift provisions or any kind of provisions to

3     hold off creditors.  But in 1992 -- from 1992 to 1997, there

4     are eight more trusts created, as your Honor is aware, and,

5     again, just before and during the pendency of the fraud

6     scheme:  The PGR Bahamas Trust, the RPP Trust, and the

7     Children's Domestic and Foreign Trusts.  Each of those trusts

8     contain spendthrift provisions and other provisions purporting

9     to shield assets from creditors.

10          This is the spendthrift provision for the original

11    trust, the Children's Domestic Trusts.  This is Exhibit 303.

12    Paragraph G at Section 7 lays out the spendthrift provisions.

13    The interest of any beneficiary will not be assignable or

14    subject to the claims of any creditor --

15          I can't read it.  Can you move that?

16          The next page.

17       (Brief interruption.)

18          THE COURT:  It's the page after that.

19          MR. MENDELOFF:  It's the next page.

20       (Brief interruption.)

21          MR. MENDELOFF:  Leave it the way you have it.  There

22    you go.

23          The interest of any beneficiary will not be

24    assignable or subject to the claims of any creditor or spouse

25    including the claims for alimony or separate payments.

1    Go to the previous page.

2    Additionally, there is an interesting provision in

3    this document.   The previous page.

4    One of the powers of the trustee is to hold trusts'

5    property in the name of a nominee or in any other way without

6    disclosing the trust relationship, a very interesting

7    provision and one that we are able to see in this case is used

8    -- is utilized to advance exactly the scheme involved.

9    The RPP Trust, which was also created at about that

10    time, also has a provision protecting the trust from

11    creditors, which was Article 8.   Your Honor is aware of that.

12    The PGR Trust has extensive provisions regarding

13    protecting the trust from creditors.   That's paragraph 25 of

14    that trust.   And in that paragraph, it purports to protect the

15    trust from any creditors in any jurisdiction, and it does not

16    matter in one way or the other whether the jurisdiction's law

17    is contrary.

18    Additionally, there is an indication in the last

19    paragraph of this section, which is paragraph 25-4, which

20    states that if the trustee believes that the trust protector

21    is being forced to take a position contrary to the interests

22    of the trust by a creditor, that the trustee shall ignore the

23    trust protector until the trust protector is "operating under

24    his own free will."

25    Finally, the provision, the spendthrift provision, in

1    the Bahamas Trust -- excuse me -- the Belize Trust, virtually

2    identical to the one that was done for the Bahamas Trust.

3              The evidence will be that Mr. Rogan, Mr. Cuppy, and

4    Mr. Miller and others intentionally created these trusts in

5    numerous foreign jurisdictions, the idea being, the evidence

6    will be, that if one part of the trust is subject to attack,

7    then a creditor would have to go to a different jurisdiction

8    and through a different court system to attack another part of

9    the holdings.

10             So the PGR Irrevocable Trust is set up in the

11   Bahamas, but the trust protector was created in the British

12   Virgin Islands.

13             The Children's Foreign Trusts are set up in Belize,

14   but the trust protector is in the British Virgin Islands.

15             And RPP, there was an attempt, as your Honor is

16   aware, to amend the trust to effectively make it a Cayman

17   trust.

18             Additionally, it will become clear, and this is

19   significant, that three of the four trusts basically had Mr.

20   Cuppy operating as trustee, the Children's Domestic Trusts,

21   the RPP Financial Trust until 2006, and the Children's Belize

22   Trusts.   The formal trustee for the children's Belize Trust

23   was a company called Caribe, C-a-r-i-b-e, but the evidence

24   will be that that was owned and controlled 100 percent by Mr.

25   Cuppy.

1      That is significant because the most explicit proof

2   your Honor will hear is going to be proof that was generated

3   from the one trust where the trustee was a third party, the

4   PGR Bahamas Trust.

5      The evidence will be that as to the other trusts,

6   there are significant gaps in what was produced, and there was

7   significant fighting and obstruction undertaken during

8   discovery by Mr. Cuppy and Mr. Rogan.  All the trusts were

9   created by Mr. Cuppy and Mr. Rogan.  Mr. Myers and Mr. Miller

10  were also involved in the creation of the PGR Bahamas Trust

11  and the Children's Belize Trusts.  You will hear from

12  Mr. Myers later in the case about the creation of those

13  trusts.

14     All trusts were made irrevocable, the purpose of

15  which was to ostensibly remove Peter Rogan from any control,

16  but they were all managed in exactly the same way.  Rogan

17  directed Cuppy behind the scenes.  Cuppy exercised predominant

18  day-to-day control, but there is substantial proof that Cuppy

19  went back and received guidance and approval from Mr. Rogan

20  throughout his management of these trusts.

21     And, finally, there will be proof of numerous

22  examples by Mr. Cuppy and Mr. Rogan to conceal Mr. Rogan's

23  involvement in the trust.  The PGR Bahamas Trust agreement was

24  organized to permit just this sort of operation.  The trust

25  agreement has terms in it specifically stating that Mr. Rogan

1    will be held at arm's length by the trustee and that the trust

2    protector will control the operation of the trusts.

3         The trust protector for the PGR Trust is this entity

4    named T Protection, Limited, which was created in the British

5    Virgin Islands.   The evidence will be that -- and we have

6    learned this only within the last three weeks -- that it was

7    Mr. Cuppy that was T Protection, Limited.   He was that

8    protector.

9         The trust property that is owned by the PGR Bahamas

10   Trust by operation of Bahamian law is held actually by

11   international business companies.   Under Bahamian law, the

12   trust must -- the trust itself can only own stock in one of

13   those companies, and it's those underlying companies that

14   actually control the trust's assets.   But there was an

15   agreement entered into in connection with this trust which

16   gave Mr. Cuppy complete and supreme control over those

17   international business companies and prevented the trustee

18   from removing Mr. Cuppy from that position of control.

19        In terms of Rogan being at arm's length in the PGR

20   Bahamas Trust document, Exhibit 14, at page 1006, under the

21   heading Restrictions on Trustees' Powers, it specifically

22   indicates that the trustees are only -- must treat Mr. Rogan

23   at arm's length, and the only time that they cannot treat Mr.

24   Rogan at arm's length is when he is giving a gift to the

25   trust.

1         Is there any way we can easily remove that

2    highlighting because we really can't see it?  It's the purpose

3    of having it there.

4         (Brief interruption.)

5              MR. MENDELOFF:    Thank you.

6              So the provision reads:

7              Notwithstanding anything stated before the trustee --

8    the administration of this trust may not deal with the settler

9    in a financial or business transaction in any manner other

10   than at arm's length.

11             There are provisions in this same exact part of the

12   trust that put the protector in complete control of the trust,

13   again, T Protection Limited being the protector.   And

14   throughout paragraph 25, it is clear over and again that T

15   Protection, Limited, that the protector is given supreme

16   control over the operation of the trust.

17             The international business company agreement that was

18   executed on the same day the trust was executed, Exhibit 73,

19   specifically states -- can you remove paragraph 2 -- that the

20   trustee shall not exercise the voting rights of the shares of

21   the IBCs to replace the persons serving as directors of those

22   IBCs.

23             The evidence will be in this case that Mr. Cuppy and

24   Mr. Myers were the ones who serve as directors.

25             The proof of Mr. Cuppy's role as Rogan's facilitator

1   with respect to these trusts is evidenced -- is clear

2   immediately after the creation of the PGR Bahamas Trust,

3   supposedly handled at arm's length by the settler.

4          On October 15th, '96, which was only 10 months after

5   the trust was created, Cuppy transferred $3.4 million in trust

6   funds to Peter Rogan without notifying the trustee.  In its

7   position running what was then the international business

8   company that held the trust assets, an entity called PPR GmbH,

9   Mr. Cuppy transferred 3. million dollars from the accounts of

10  PPR GmbH to Mr. Rogan.

11         The first indication that was given to the trustee

12  that this happened was two years later, on February 19, 1998,

13  a year and a half later, February 19th, 1998.  When Cuppy --

14         As we will see, Cuppy indicates to the trustee that

15  there had been a transfer.  He doesn't give him any details

16  but does meet with the trustee in June '98, provides the

17  details, and on July 16th, '98, sends the trustee proof of Mr.

18  Rogan's receipt of the money and a form that he suggests that

19  the trustee use to approve the transfer post hoc.

20         The exact amount of this transfer is ultimately made

21  clear in the letter on September 1st, '98, indicating that the

22  distribution was 3.4 million.  Then if we go to the PGR

23  business ledger, we can actually see when that comes in.

24         Exhibit 75.

25         Alan, you have to remove these.

1    (Brief interruption.)

2         MR. MENDELOFF:   We have caused --

3         In a letter to the trustee on February 19th, '98, we

4    have caused the distribution from the company to the settler

5    which we will discuss with you at some point.  Because of time

6    constraints, it did not go through the trustee.

7         On July 16th, '98, the letter comes through

8    indicating that, I am enclosing a suggested form -- back it

9    up, please -- I'm enclosing a suggested form authorization for

10   New World to ratify the distribution that was sent to

11   Mr. Rogan.  I am also enclosing Mr. Rogan's signed receipt

12   acknowledging receipt of the funds.

13        Recall that New World was the name of the trustee

14   when the trust was created.  Then in 2000 New World was

15   acquired by Oceanic.  That's why there is a reference to New

16   World here as opposed to Oceanic.

17        And as your Honor can see, the Bates stamp in

18   Exhibit 110 has an OB prefix which was produced from the

19   Oceanic records.

20        Finally, on September 1st we find out how much the

21   transfer was.  No distributions have been made from the

22   corporation to the trust other than the one $3.4 million

23   distribution that we previously completed pursuant to

24   resolution previously adopted.

25        So it's $3.4 million that we know happened.  When we

1    go to the PGR business ledger, we see that that $3.4 million

2    transfer actually happened on October 15th, 1996.

3              The other one here -- okay, there we go.

4              So, your Honor, you can see on October 15th, '96,

5    transfer in from OST, Offshore Trust, $3.4 million.  And on

6    that same day, we see how it was used.

7              Can you pull up the second page?

8              We can see on October 15th it was used to purchase

9    EMC bonds at par.  Premium on EMC bonds, the purchase was 3

10   million, the premium was 3.2 million.

11             Don't do that, please.  Don't do that.  Remove those.

12   Thanks.

13             Total amount 3.4 million.

14             THE COURT:   EMC, is that Edgewater?

15             MR. MENDELOFF:   Edgewater Medical Center.

16             THE COURT:   Medical Center, okay.

17             MR. MENDELOFF:   The evidence will show that as time

18   went on, it became clear that the property companies of Mr.

19   Rogan were under a federal investigation and that the property

20   companies and Mr. Rogan's right-hand man, Roger Ehmen, were

21   indicted on June 1st, 2001.  A superseding indictment came on

22   November, in November 2001, and the hospital closed in

23   December of 2001, at which time there was full default on all

24   the 1998 bonds causing Dexia to pay out $56 million to the

25   various bondholders.

Now, the evidence will be from Mr. Flaherty that at the time that that happened, Dexia had stepped into the shoes of those bondholders and received as collateral for its bonds the collateral that had originally been posted in support of the issuance of the bond, which was the hospital building and some receivables, cash, and equipment.

1    In 2002 the United States filed suit against

2  Mr. Rogan civilly, as did Dexia in this case.  The evidence

3  will be that the legal costs that were generated as a result

4  of all this activity caused a huge drain on Mr. Rogan, and by

5  mid 2001 Mr. Rogan was already running out of domestic sources

6  of cash.  And we saw that reference on Exhibit 116.  I won't

7  go through it again.  But that's the exhibit where there was

8  the e-mail from Mr. Cuppy -- from Mr. Miller to Mr. Cuppy in

9  which he said he was running out of domestic sources of cash.

10    Also in 2002 there were inquiries from the Bahamian

11  authorities about the international business company that

12  underlay the PGR Trust investment at the time, PPR GmbH, and

13  that caused Mr. Cuppy to close that entity and replace it with

14  a new international business company organized under the laws

15  of Belize because the authorities there can't inquire as to

16  the identities of directors.  We saw that particular document

17  yesterday, Your Honor.  And this is the internal memo

18  recounting the woman at Oceanic's conversation with Mr. Cuppy.

19    THE COURT:  I have got it on my screen here.

20    MR. MENDELOFF:  Okay.  Great.

21    Significantly, she indicates that PPR was terminated

22  after the Bahamian government wanted to know the identity of

23  the directors of the Bahamian companies, and the assets were

24  transferred to CFMT Limited.  It also indicates that CFMT

25  Limited has created a sub-company, CFMT in Florida.  It's

1  actually called -- or referred to as CFMT of Florida, as

2  you'll see as we go along.

3  The evidence will be that Mr. Cuppy then manipulated

4  the trust structure to facilitate to obtain cash from

5  Mr. Rogan.  On October 9th, 2002, Mr. Cuppy caused CFMT to

6  send to the trust $950,000, and over the next two and half

7  months Mr. Rogan directly instructed the trustee how to

8  distribute that money.  The money went going to Mr. Rogan's

9  companies and to Judy Rogan.

10  Exhibit 120 is the account statement for Mr. Rogan's

11  trust at Oceanic Bank, and you can see there that on October

12  9th, 2002, $950,000 comes in from underlying company.  Your

13  Honor can see from this account statement that throughout the

14  year until that point this account had almost no money in it,

15  sometimes negative, but on October 9th, 2002, 950,000 comes in

16  from the underlying company.  We also see distributions coming

17  out off of that money over the next two and a half months,

18  50,000, 100,000, 80,000, 170,000.

19  This is the internal Oceanic record showing the

20  source of that money, and you'll see on the right-hand side of

21  the page, this is Exhibit 121, a check from Mr. Cuppy on CFMT

22  Limited account for $950,000 going back to the trustee.  The

23  trustee then credits it against the account and makes it

24  available to Mr. Rogan.

25  The transfers out of that account by Mr. Rogan are

1   documented through records produced in the case.  There's a
2   fax sheet, and we'll see these over and over again, from
3   Bainbridge Management, Inc.  This was the fax sheet originally
4   sent from Mr. Rogan to Charles Hepburn, who is the CFMT
5   employee, indicating the request for the funds.  And can you
6   please send the money to the accounts on the pages attached.
7   After Mr. Hepburn sent the money, he then used that same form
8   over and over again to send back his acknowledgment that the
9   transaction happened to Mr. Rogan, and that's why you can see
10  that he scratched out to and from and made it to and from the
11  other way, and you can see the fax headers at the top showing
12  the transfers going back.
13        In this original request there's the request for
14  50,000, the first 50,000, and the hundred thousand that we
15  saw, and the first one goes to BFB Limited, a wholly-owned
16  company of Peter Rogan's, and the other hundred thousand goes
17  to Judy Rogan's revokable trust account at Scudder.
18        Again, a couple of weeks later another request, this
19  time $170,000 going to Bainbridge Management, Inc., and
20  $80,000 going to Edgewater Property Company.  Later in 2002
21  Mr. Rogan, who had been under negotiations with the federal
22  government on a plea deal for his management companies, needed
23  2.9 million dollars to pay restitution for those management
24  companies.  Again Mr. Cuppy facilitated this for Mr. Rogan by
25  causing CFMT to pay out four million dollars of trust proceeds

1  that were then sent to the -- to Oceanic Bank.  Thereafter

2  Mr. Rogan personally arranged for the transfer of those funds

3  so that he could pay restitution.

4          We go back to the Rogan trust document, we can see

5  that there is four million dollars coming into the trust from

6  underlying company, four million dollars on December the 10th,

7  2003.  And we can see where that comes from.  Exhibit 136 is

8  the CFMT account holding at the time 11 million dollars.  And

9  if we look at page three of that account, we can see a wire

10  transfer of four million dollars going out on December 10th.

11          Exhibit 139 shows Mr. Rogan arranging for -- this is

12  important for purposes of acts of concealment that we'll get

13  to in a second -- Mr. Rogan personally arranging for a meeting

14  with the trustee before Christmas in 2002, obviously to

15  arrange for this three million dollar transfer.  In this

16  document he says, "Charles" -- that's Mr. Hepburn's name, "I

17  would like to set a time that we might meet.  I would suggest

18  12/17 or 12/23.  Please advise."

19          They then meet, and there's a transfer out, a request

20  for -- excuse me, a request from Mr. Rogan to Mr. Hepburn on

21  12/24/02.  "Per our discussion, please wire transfer three

22  million dollars to the account listed below."  That's the

23  American National Bank account.

24          Now, on October 6th, 2004, Mr. Rogan was deposed

25  about these very events, less than two years after, and

1    offered false testimony as to what exactly was happening.

2            "Now, around the time that these transfers occurred

3    did you ever meet with Mr. Hepburn?

4            "Which transfers?

5            "The transfers you just mentioned in 2002.

6            "Yes, in December of 2002.

7            "What caused you to meet Mr. Hepburn?"

8            "Answer:  Mr. Hepburn requested that I come down to

9    meet.

10           "Why did he do that?

11           "He didn't say why.  He stated he wanted me to come

12   down and meet him, and he requested I bring a copy of his

13   passport.

14           "Question:  When you received" -- when you -- should

15   have been arrived "down in the Bahamas and met with

16   Mr. Hepburn, did he tell you why he wanted to meet with you?

17           "He asked me for a copy of my passport, and he wanted

18   a copy of it.

19           "Why is it that he couldn't simply -- you couldn't

20   simply FedEx him a copy of your passport?

21           "I don't know.  He asked me to come down.  He asked

22   me to come down.

23           "He asked you to come down.  When you get there, you

24   sat down with him and he said -- and two other gentlemen whose

25   names I can't remember, and he said we'd like a copy of your

1    passport?

2            "Correct."

3            Well, the next year and a half Mr. Rogan received and

4    distributed another million dollars in exactly this manner.

5    In early 2004 Dexia began an effort to obtain discovery in

6    this case, serving Mr. Rogan and Mr. Cuppy and others with

7    intensive requests for documentation on all aspects of

8    Mr. Rogan's finances.  Initially there was a refusal by

9    Mr. Rogan to provide any information.  Finally Dexia filed a

10   motion to compel in front of Judge Schenkier, which was heard

11   on June 9th.  When we appeared for the June 9th hearing,

12   Mr. Rogan's lawyers indicated that they were prepared to

13   comply.  Judge Schenkier then entered an order requiring

14   Mr. Cuppy to produce everything that was requested.

15   Notwithstanding that -- excuse me.  Mr. Rogan to produce

16   everything that was requested.  At the same time there were

17   similar requests made to Mr. Cuppy.  Notwithstanding that,

18   there was not production made, and Dexia was forced to file a

19   motion for a rule to show cause, which was heard on July 27th,

20   prominently mentioning the evidence that Dexia wanted to

21   obtain regarding the offshore trusts.  At the time Dexia knew

22   nothing about the RPP Trust but was aware of the existence of

23   the PGR Trust.

24           Amidst this activity, Mr. Rogan needed to request

25   another distribution.  He needed money.  Instead of doing this

1   himself this time, Mr. Cuppy took over.  In a letter -- in a

2   fax letter dated July 20th, 2004, that's Exhibit 130, "I'm

3   faxing through wire numbers for fees that Peter Rogan would

4   like you to pay through his account, and you are free to give

5   him a call to verify, but he didn't want to have the call on

6   his line due to the current situation."  And then the

7   requested funds are funds to be paid to his law firms that

8   were representing him at the time, Winston & Strawn 360,000

9   and two different transfers to Mayer, Brown, 31,000 and

10  80,000.

11          At the August 16th rule to show cause hearing Rogan

12  claimed he didn't know where to get a copy of the Bahamas

13  Trust.  At the time the court made very clear its displeasure

14  with Mr. Rogan.  This is significant because of what happens

15  later.  It shows motive.  He says -- Judge Schenkier says:

16  "Well, I think you'd better try to find out where the

17  documents are.  Let me step back for a moment.  I'd like you

18  to imagine for a moment you were sitting where Mr. Mendeloff

19  is sitting or that you were sitting where I'm sitting, and

20  what I've heard this morning is that the person who creates

21  the trust says I don't have access to the documents that show

22  the trust's creation, I wouldn't know where to go to get them,

23  and there isn't somebody who is, I think un -- and this isn't

24  somebody who is, I would think, unsophisticated financially,

25  and I hear that other defendants, at least one other defendant

1   is redacting documents on a basis that does not strike me as
2   permitted under the law, chooses to redact documents, and that
3   it found important enough to cull out or retain and redact
4   them in a way that destroyed information on the documents and
5   made it unobtainable or irretrievable."

6           What that refers to is that at the time Dexia had
7   sought information from Mr. Miller, and what we got was
8   redacted documents, and he said that he redacted the
9   originals.

10          "What picture would that start to paint for you if
11  you were sitting where I'm sitting or if you were standing
12  where Mr. Mendeloff is standing?  The picture would be -- it
13  wouldn't be a pretty one, would it?"

14          A little later:  "This kind of approach it seems to
15  me it's certain that clients may be taking a very dangerous
16  approach.  I mean, if people stall long enough or destroy
17  documents, you know, there will be a number of sanctions that
18  are available.  Money is the least of them.  I mean, there are
19  merits based sanctions that are available, and certainly at a
20  minimum if Mr. Rogan can't find it within himself to go to the
21  people to get the documents that he has control over, then to
22  have to go to the expense that's necessary to obtain the
23  documents, he'll pay for it."

24          At the end of August suddenly Mr. Rogan was able to
25  produce a copy of this trust after all.  Dexia had made that

1    clear at the September 9th status.  But also at the September

2    9th status Dexia made clear that Mr. Rogan had produced not a

3    single document related to these trusts.  Dexia emphasized at

4    the status that it had proof that Mr. Rogan had had direct

5    contacts with the trustee.  And the proof was limited.  It was

6    narrow, but it was irrefutable, and that was, Dexia had

7    obtained a bank document showing the transfer of the $50,000

8    that we went over earlier from the trust to BFB Limited.  Now,

9    BFB Limited was not listed as a beneficiary of the trust, so

10   how would the trustee know to send it to Mr. Rogan's company

11   unless Mr. Rogan had told him?

12          Dexia raised this proof and discussed in the hearing

13   obtaining -- contacting the actual trust protector, which at

14   the time all that anyone knew was that it was T. Protection

15   Limited.  Mr. Rogan's counsel responded that Mr. Rogan cannot

16   get documents from the trustee.  Counsel agreed to try to

17   address obtaining documents personally himself before the next

18   status, which was set for September 20th.  At that hearing

19   again, and I won't read it, but the court admonished Mr. Rogan

20   of the seriousness of this activity.

21          Two things happened between the September 9th status

22   and the next status on September 20th.  Suddenly T.

23   Protection, quote/unquote, resigned as protector.  We didn't

24   learn that until three years later when finally Oceanic

25   produced files.  Within days of Dexia indicating it was going

1  to seek discovery from T. Protection, T. Protection resigns.

2      The next thing that happens is that Mr. Cuppy

3  contacted the trustee to tell them not to produce records if

4  Mr. Rogan's lawyer called, affirmatively upsetting the clear

5  indications and instructions that the court had given and that

6  counsel said he was going to do to comply with the court's

7  order.

8      Exhibits 155 and 156 lay this out clearly.  On

9  September 16th, which was four days before the hearing,

10  there's an e-mail from Mr. Hepburn to Mr. Cuppy saying Neil

11  Holmen, Winston & Strawn Chicago, that was Mr. Cuppy's

12  lawyer -- Mr. Rogan's lawyer, who is this person?  He's been

13  attempting to contact me.  The responsive e-mail that he sends

14  to his -- that Mr. Hepburn sends to his employee after talking

15  to Mr. Cuppy, he said:  "Cecilia, received a phone response

16  from Mr. Cuppy, the documented authorized contact person for

17  this relationship.  He advises that under no circumstances are

18  we to divulge information to this person or anyone else except

19  by his specific instructions."  "Except by his specific

20  instructions."  Clearly that indicates Mr. Cuppy's complete

21  control over this.

22      Now, also we have an e-mail that Mr. Cuppy evidently

23  sent after the telephone conversation that he had with

24  Mr. Hepburn from Mr. Cuppy to Mr. Hepburn.  "Charles, you will

25  be receiving T. Protection Limited's resignation as trust

1   protector." September 17 was the day that T. Protection

2   Limited resigned, and obviously Mr. Cuppy knew that. "Also it

3   would be helpful if you could orally, orally tell Neil Holmen

4   that no documents will be sent to anyone and that no

5   information will be given out about this matter. That will

6   allow him to disclose that he's unable to get any information

7   about the trust."

8           At the September 20th status hearing Rogan's lawyer

9   reports that he had a -- consistent with exactly what we just

10  read, that he had a personal conversation with the

11  representative of the trustee, who advised me that he would

12  entertain no more conversations or communications with me or

13  Mr. Rogan regarding documents because to do so would violate

14  his fiduciary obligations and be a matter of Bahamian criminal

15  law, and with that he said thank you and he hung up.

16          Now, significantly in connection with this

17  concealment, we know that later on Mr. Cuppy, in fighting

18  aspects or another motion in connection with this case,

19  attached an e-mail that he had sent to his counsel which was

20  then attached to a pleading that was submitted in this case.

21  In that e-mail the following language is included: Mr. Cuppy

22  says that he has no ability to obtain documents from the

23  Bahamas and adds that Mr. Rogan's lawyers had previously tried

24  to obtain such documents and that the court is aware that for

25  such documents to be produced would be a criminal act under

1   Bahamian law.  Mr. Cuppy citing his own scam in defense of not
2   producing records.

3          Also at the September 20th hearing Rogan's counsel
4   reported, I'll represent to the court that Mr. Rogan hasn't
5   had any communications with the protector over the life of
6   this.  And again the evidence will be that the protector was
7   Mr. Cuppy.

8          Now would be a good time to break.

9          THE COURT:  Okay.  About how much more do you think
10  you have?

11         MR. MENDELOFF:  45 minutes.

12         THE COURT:  Okay.  How difficult would it be for you
13  to have somebody between now and tomorrow burn another one of
14  these CDs?

15         MR. MENDELOFF:  Very easy.

16         THE COURT:  Because I think it's going to be way
17  easier to handle.

18         MR. MENDELOFF:  No problem.

19         THE COURT:  Thanks.  See you in ten minutes.

20         (Recess taken.)

21         THE COURT:  Go ahead.

22         MR. MENDELOFF:  So in the wake of very contentious
23  proceedings that occurred in front of Judge Schenkier in the
24  fall of 2004, major changes occur in how Mr. Rogan and
25  Mr. Cuppy handled the PGR Trust.  E-mails from Mr. Cuppy at

1    the time give you indication of their motivations.

2    An e-mail from Mr. Cuppy on September 28th, just

3    after that September 20th hearing, to Charles Hepburn, the

4    trustee:  "I really don't like the idea of moving assets from

5    the Caymans into the United States with Lehman Brothers unless

6    I'm missing something.  As we know, U.S. courts are compelling

7    any bank who has U.S. connections to give data up under

8    massive daily fines, and I hope that Oceanic does not have

9    such U.S. ties that we will end up in this situation.  Since

10   they are out of the U.S. at the present time other than what

11   you have and since you control CFMT Limited by the stock, it

12   would be easier for us to have you appoint new directors of

13   the company when we get to that situation, hence keeping

14   control of the assets out of the U.S."

15   Then it goes on and indicates that there's an

16   additional 11 million dollars that are in the Caymans, and he

17   says, "Besides the investments in the U.S., which we recognize

18   are at risk, but we are doing business as usual here since

19   that is what is necessary."

20   After that, turning into the early -- 2005, Rogan

21   ceased dealing directly with the trustees on distributions.

22   We saw that from 2002 to 2004 Mr. Rogan was the one directing

23   Mr. Hepburn where to send the money.  Suddenly that stopped

24   and never happened again.  Instead, in April of 2005 Mr. Cuppy

25   and Mrs. Rogan open an account for Oceanic in her name.  All

1    subsequent distributions ran through her.  And what happened
2    in connection with those distributions is that Mr. Cuppy would
3    ask the trustee to transfer money to her account, and she
4    would then send a letter directing the trustee where the money
5    was to go.

6          Thereafter Judy Rogan expended the money in one of
7    two basic ways, either paying for Mr. Rogan's legal expenses,
8    in which she just sent money directly to the creditor, or
9    forwarding money on to Mr. Rogan himself.  She handled that
10   transaction completely differently.  In those transactions, as
11   we'll see in this case, Mrs. Rogan sent the money on a very
12   circuitous route in almost every instance through at least
13   three and sometimes four different bank accounts.  And as we
14   will see in this case, there were times where she even went to
15   the extent of signing Mr. Rogan's name to the backs of checks
16   that she was sending to him and depositing those checks
17   herself.  So she transferred the checks from account to
18   account to account, finally writing a check to Mr. Rogan
19   directly and then endorsing it and depositing it in
20   Mr. Rogan's account.

21         When she -- when her account was created, document
22   211 demonstrates at the top that Mr. Cuppy was named as a
23   co-signatory on the account.  And as you can see under
24   authorized signatories, you can see Mr. Cuppy is listed with
25   his name.

1        On April 26th -- excuse me, April 28th, 2005,
2   Mr. Cuppy sends Mr. Hepburn, the trustee, a letter
3   anticipating the creation of the account and indicating that
4   we want to transfer four million dollars under Judy's name
5   from the money market account, that is, the Peter Rogan Trust
6   account, keeping 1.5 million in her money market and then
7   putting 2.5 million in what was called Stars, which was a
8   mutual fund investment account.  And then very important:  "If
9   you need anything else, please feel free to contact me.  And
10  if you need Peter to do anything, let me know."  Clearly this
11  document demonstrates vividly Mr. Cuppy operating with Peter
12  and Judy Rogan to transfer money instead of through Peter,
13  through Judy.
14        The account opening documents that were created
15  indicates that the source of the funds were beneficiary of the
16  Rogan Trust, and that's account number 1021.
17        Then on November 2nd, 2005, Mr. Cuppy sent to the
18  trustee an extremely revealing explanation of why they opened
19  the account for Mrs. Rogan in which he said:  "The reason that
20  a separate account was set up is that after received a
21  distribution from the trust as a beneficiary, she then wanted
22  the distribution to be in her name alone, separate from her
23  husband and from the trust.  As you'll recall by reviewing the
24  file, her husband is involved in some lengthy hospital
25  litigation here in the states, so she didn't want to be

1    involved with that once a distribution was made to her."

2              That exhibit demonstrates vividly, Exhibit 176, the

3    motivation for running these transfers through Mrs. Rogan, to

4    avoid the creditor in this case.

5              Over the next year and a half the evidence will be

6    that Mr. Cuppy caused six and a half million dollars to be

7    transferred to Judy Rogan, thereafter Judy sending the money

8    as I described.

9              In Exhibit 143 and 214 we can see all these transfers

10   demonstrated clearly.  This is account statement for the Peter

11   G. Rogan Trust account at Oceanic, account 1021.  You can see

12   the withdrawal from the underlying company of three million

13   dollars.  Capital distribution to Judy Rogan four million

14   dollars May 4th, 2005.  Then there's another transfer to Judy

15   Rogan on May 9th, 2006, of a million dollars.  Finally,

16   another distribution to Judy Rogan November 3rd, 2006, 1.5

17   million.  Total, 6.5 million.  The first and last transactions

18   go through the Judy Rogan Oceanic account.  The middle

19   transaction goes directly from the Peter Rogan Trust account

20   to her account at Scudder.

21              The other part of that page was showing the money

22   going into Judy's account, but we'll skip that to try and make

23   this somewhat less painful.

24              Exhibit 40 demonstrates Judy Rogan then requesting

25   shortly after that money, the first four million dollars came

1   in, a request for 1.2 million of it to be sent to Winston &

2   Strawn on 5/5/05, which was the day after the money was

3   transferred into the account on the 4th.

4           As we said, Judy's transfers to Rogan himself were

5   different from the transfers to third parties.  All those

6   transfers, the evidence will be, followed a circuitous route.

7   Here's an example, which is from the statement of facts at

8   page 84.  Four million dollars comes in on 5/4/05.  On 11/3/05

9   she sends one and a half million dollars of that money to her

10  Scudder account.  On 11/9/05, six days later, she sends it to

11  her First Valpo account.  And then on December 16th she sends

12  763,000 of the 775,000 on to Peter Rogan.

13          There are even more dramatic examples of this that we

14  will go through in the evidence in which we see her

15  transferring money literally sometimes the day before it hits

16  her account at First Valpo on to Peter Rogan.  Other times

17  she'll transfer the money from Oceanic to Scudder into her

18  First Valpo account and then the next day sending it to Peter

19  Rogan.

20          When she ran through the first four million dollars,

21  Cuppy caused the trustee to transfer another million into her

22  account.  Exhibit 168 demonstrates the request for that money.

23  "Peter and Judy would like to have two million dollars

24  transferred to Judy at the end of February, and Judy will give

25  you written instructions on where she would like the

1    distribution made."  Turned out that there was not adequate
2    money in the account to make a two million dollar
3    distribution, so they agreed to make it one million.  We're
4    now in receipt of the funds -- e-mail from Cuppy to
5    Mrs. Marshall:  "We are now in receipts of the funds re the
6    redemption of the Peter G. Rogan Trust, a million dollars,
7    which is to be sent to Judy Rogan."  The trustee says:  "As a
8    matter of clarification after reading your e-mail of February
9    6th, please advise if the two million or one million were to
10   be redeemed from the fund.  Also please advise if this is to
11   be treated as a loan to her or as a distribution."  Clearly
12   the trustee is relying completely on Cuppy to determine how --
13   what the nature of the transactions are.  Cuppy indicates that
14   it's to be a distribution.  Immediately after funds come in
15   Judy Rogan then distributes those funds.

16          At the end of the year, at the end of 2006 it becomes
17   clear that the trustee wants them to close the account.  We'll
18   get into the evidence surrounding that, but the evidence that
19   relates to it in summary is that in or about August of 2006,
20   just two months before Mr. Rogan absconded, Mr. Cuppy
21   attempted to convince the trustee to give Mr. Rogan and
22   Mrs. Rogan a credit card which would draw directly off the
23   trust account, the reason being that they will be traveling.
24   The bank became suspicious and performed an internal review of
25   Mr. Rogan and Mr. Cuppy and found out about the various fraud

1   cases against Mr. Rogan and shortly thereafter told Mr. Rogan

2   that they wanted him to close the account.  In anticipation of

3   that, Mr. Rogan requested the transfer of another million and

4   a half dollars to Judy Rogan.  "In the meantime Mrs. Rogan

5   would like to have you distribute 1.5 million from the trust

6   as a beneficiary to her Scudder account, which you have record

7   of.  Since the assets are being converted from the fund, that

8   should not be any problem."  They had the money in the funds,

9   and because they were closing the accounts, they had to

10  convert all those moneys out of the funds.

11          But when Mrs. Rogan actually sends the request, which

12  is Exhibit 277, instead she asked the money -- she asks for

13  the money to be sent to her account at HSBC in Canada.  She

14  says:  "I am currently completing plans to reside in Canada.

15  As such, I request a distribution to me of 1.5 million.  If

16  you wire the account to HSBC West Hasting Street in

17  Vancouver," which is what happened.

18          On October 4th, 2006, Rogan and Mrs. Rogan leave the

19  United States for Canada.  On October 13th and 18th Judy Rogan

20  opened HSBC accounts.  On October 20th Cuppy began the effort

21  that we just went over to move the 1.5 million from her

22  account into the HSBC account.  Exhibit 272 shows the 1.5

23  million coming into an HSBC account.

24          In November 2006 Judy Rogan then removed the balance

25  of the money that was in the Oceanic Bank account, some

1  $846,000, to her account at -- excuse me -- the balance of the
2  money in her trust account in the Bahamas to her account at
3  HSBC, some $846,000.

4        Now, it is revealing that in another case filed in
5  front of this court Mrs. Rogan seeks declaratory judgment that
6  all assets that are in her name are exclusively hers and not
7  Dexia's.  And in the complaint in that case Mrs. Rogan seeks
8  declaratory judgment specifically requesting that all personal
9  and real estate assets that are in her name are hers and
10  immune from execution against Dexia -- execution by Dexia.  In
11  light of her activities that we just went over, the receipt
12  and immediate transfer of funds from Peter Rogan's trust
13  account to her and then on to Peter Rogan and his creditors,
14  the motivations behind that complaint becomes obvious.

15        Now, one final thing regarding the background
16  conspiracy, and that has to do with the RPP Trust.  Throughout
17  the course of the discovery in this case, the evidence will be
18  that the subpoena -- that the required discovery absolutely
19  incorporated and required production of the RPP Trust account.
20  The original March 29th, 2004, subpoena to Fred Cuppy and the
21  original document demands to Rogan clearly encompassed that
22  account, that trust.  The December 9th, 2004, order compelling
23  Mr. Cuppy to produce records clearly incorporated --
24  encompasses that trust.  Yet until December 11th, 2006, there
25  was never a mention even of the existence of that trust, and

1   the only time -- the only reason that came up then is because

2   several weeks before that Dexia disclosed that it was already

3   aware of the existence of that trust by dint of its own

4   investigative efforts by AUSA Eric Pruitt, who is not here.

5   And once Dexia disclosed its awareness of that trust, finally

6   that trust document was produced.  But it wasn't until -- and

7   that was produced by Mr. Rogan.  It wasn't until January 22nd,

8   2008, that Mr. Cuppy produced any records in connection with

9   that trust.

10  Now, against this backdrop let's return to the alter

11  ego sham, two remaining alter ego sham factors concerning

12  Mr. Rogan's control over trust operations.  There are numerous

13  direct and circumstantial indications of Mr. Rogan's control

14  over those operations, direct documented proof and

15  circumstantial proof.

16  The direct proof obviously includes the circular

17  transfer we mentioned and the direct transfer of funds back to

18  Mr. Rogan from Robert Rogan's account.  It also includes

19  direct evidence that you will hear, Your Honor, of Mr. Rogan

20  making the decision to invest in the various Savannah projects

21  himself.  Mr. Rogan traveled down to Savannah in 2001 after

22  the Gardens on Jones project was ongoing to tour the other

23  projects that they were considering, that is, Walnut Hills,

24  Taylor Row, 410 Montgomery, and it was Mr. Rogan who made the

25  decision after touring those projects to go ahead and invest

1  in those endeavors.

2      This is a hotel receipt from that trip, and that

3  receipt indicates clearly Mr. Cuppy, Mr. Foley, Mr. Miller,

4  Mr. Myers, Mr. Tatooles, all people that are of Mr. Rogan's

5  group.  This was paid for by Mr. Rogan's property management

6  company, Edgewater Property Company.

7      Gardens on Jones ledger from Fred Cuppy to Jerry

8  Whitlow, who was the man in charge of the construction on

9  Gardens on Jones, January 25th, 1998:  "I will get the

10  contracts done this week for the elevator and the lumber.  Let

11  me know what Palmer wants to do so we can handle him in the

12  future.  I will talk to Peter this week, and I will get back

13  to you in connection with your compensation issue."  Clear

14  indication that Mr. Rogan was the power behind Mr. Cuppy in

15  connection with that project.

16      On November 19, 2002, in relation to 410 Montgomery,

17  an e-mail from Fred Cuppy to David Miller talking about using

18  Roger Mays to work with Boulevard LLC, Boulevard LLC being an

19  entity that was owned by the Belize Trust.  The evidence will

20  be that Boulevard LLC was doing management of all of the

21  various Savannah projects.  And that indicates I have cleared

22  with -- they wanted to have him monitor and follow up in more

23  detail on the Savannah projects.  "I've cleared with Peter on

24  this too since I need someone there more often than we have

25  had and hopefully to assist with a lot of issues, and we feel

1   Peter will be good to assist for a short while."

2   Okay.  This document dated March 2nd, 2004, is very

3   revealing with respect to the Walnut Hills project.  The

4   first -- the second two e-mails in this chain are between Fred

5   Cuppy and David Miller regarding Walnut Hills.  And that's the

6   only people attached to the e-mails.  But let's look at the

7   last e-mail in the chain.  Something changes that is

8   significant.  All of a sudden Peter Rogan and John Foley are

9   added to the e-mail, talking about the fact that Cuppy's

10  nephew, who was a co-investor in the Walnut Hills project,

11  could not come up with the money that they owed on the

12  projects, and then it states, "We need to decide what we want

13  to do, so let's discuss at your convenience."

14  Also it talks about another investment that the

15  trusts were involved in, Seal-Wrap, and it says that Seal-Wrap

16  only lost about 5,000 last month.

17  Another letter, April 17th, 1998, from Fred Cuppy to

18  David Miller, JKR Business, and Peter Rogan at Edgewater

19  Medical Center:  "I'm enclosing a copy of an article in

20  connection with our development in Savannah."  Next page:

21  "Historic District Condos Receive Initial OK," and that

22  relates to the development of the new sets of condos.

23  At least as significant as those documents is the

24  evidence, the circumstantial proof regarding Mr. Miller's

25  role.  The evidence will be that Mr. Miller is absolutely

1   central to all administration of this and that he is critical
2   with respect to the flow of information to Mr. Rogan.  Here is
3   a letter from Mr. Cuppy to Mr. Miller talking about how
4   they're going to set up the construction of Gardens on Jones
5   development and stating that they're going to create a
6   development company called Gardens Development Company LLC to
7   actually do the construction with Gardens Development LLC
8   having very little assets and for that reason Cuppy's offshore
9   company Caribe would be its managing member, all of that kind
10  of information being provided to David Miller, Mr. Rogan's
11  employee.

12          Also you'll see throughout this case that many of the
13  times that Mr. Miller is handling these transactions for
14  Mr. Rogan they are sent to Mr. Miller at JKR Business, located
15  at 240 East 90th Street.  That tidbit provides a very
16  important bit of circumstantial evidence in connection with
17  this case because the evidence will be that JKR Business is a
18  entity that has bank accounts on which Mr. Rogan is a
19  signatory.  It is an entity for which Mr. Rogan has indicated
20  in various instances a personal connection.

21          Another letter, February 19th, 2002, showing
22  Mr. Miller's central role.  In this letter Mr. Miller is
23  talking about -- with Mr. Cuppy about how they're going to
24  handle the distribution of profits and the role of Boulevard
25  LLC doing the management of the various trusts' entities.

1      An e-mail from Mr. Miller to Mr. Whitlow, the man who
2  was in charge of the construction and later the marketing of
3  these projects, talking about the kind of return that
4  Mr. Miller and -- excuse me -- that they could all expect on
5  the various projects, Side Gardens and Taylor Row.  And you
6  can see Side Gardens on the chart here.  It is a hundred
7  percent owned -- is a smaller development a hundred percent
8  owned by the Taylor Row development, which is in turn owned 66
9  percent by the Children's Domestic Trust.

10      The next document is an e-mail from Mr. Miller to
11  Mr. Cuppy reporting to Mr. Cuppy that because of the structure
12  of the ownership regarding the Side Gardens development that
13  the actual amount of money that the construction company is
14  going to get in terms of the project is zero because of the
15  preferred return to the management companies and that he
16  wanted Mr. Cuppy to know that the construction company was not
17  going to get any money on the Side Gardens development.

18      The next document is an e-mail showing Mr. Cuppy --
19  Mr. Miller dealing with Mr. Cuppy in connection with various
20  payments for Boulevard Management LL -- Boulevard Management
21  LLC, right here.  He's concerned.  Mr. Miller is indicating a
22  concern about the cash balance for Boulevard at that time and
23  was wondering if there had been any kind of a deposit made.
24  In response Mr. Cuppy says that the envelope that Peter has
25  has the deposit, deposit slip made on 7/9/03.  The account

1    record for Boulevard LLC does indicate a deposit on 7 -- on or

2    about 7/9/03 of $38,000.  Here's proof that Peter Rogan is

3    possessing that.  It's also proof that the bill -- the

4    envelope that Mr. Rogan has has a variety of other bills,

5    including an important architectural bill for 410 Montgomery

6    that is in the envelope.

7            THE COURT:  I will make a suggestion that you sort of

8    skip some of this detail.

9            MR. MENDELOFF:  Okay.  We're almost done anyway.

10           During his testimony on October 6th, 2004, Mr. Rogan

11   specifically stated that he had nothing to do with the

12   Savannah projects from a business standpoint.  He represented

13   to the court on September 17th, 2004, that he had never

14   knowingly dealt with PGR Trust's trustee.  And Mr. Cuppy

15   indicated in an affidavit in this case that Mr. Rogan has no

16   interest in or ownership in the Savannah trust properties.

17   All of that evidence is direct proof of their concealment of

18   Mr. Rogan's role in this case.

19           Your Honor will hear additional -- substantial

20   additional evidence regarding that kind of concealment in

21   relation to the responses in discovery in this case.

22           Together we believe that all the evidence that we've

23   reviewed today in painful detail will provide more than

24   adequate proof that -- not only that a constructive trust

25   should be imposed, but also that under an alter ego standard

1    Mr. Rogan is the alter ego of the Children's Trust, and we
2    will at the end of the case ask the court to so find.
3              Thank you.
4              THE COURT:  Okay.  And the intervenors are asking to
5    defer opening statements for now.
6              MR. MICHAEL O'ROURKE:  Yes.
7              MR. TOUHY:  Yes.
8              THE COURT:  Okay.  That's fine.
9              So tomorrow, then, we've got Mr. Flaherty and then?
10             MR. MENDELOFF:  The Rogan children.
11             THE COURT:  And in that sequence.
12             MR. MENDELOFF:  Whatever works for them.  It will be
13   Mr. Flaherty and then either of the Rogan children.
14             THE COURT:  I should be done with my call about 10:00
15   or 10:10, so I'd say be ready to go at 10:00.
16             MR. MENDELOFF:  For Your Honor's planning, at least
17   the direct for Mr. Flaherty should not be even an hour.
18             THE COURT:  Okay.
19             MR. MENDELOFF:  And then we can do, I guess, Sara
20   after that.  I don't know how long the cross would be but --
21             MR. MICHAEL O'ROURKE:  Probably the afternoon, Your
22   Honor.  Do you plan to break for lunch say around noon?
23             THE COURT:  Actually I'm going to break probably --
24   well, we'll break when we're done, but if we're not done we'll
25   break at 12:30.

1        MR. MICHAEL O'ROURKE:  Okay.

2        THE COURT:  And then I've got one short criminal

3   status and a change of plea at 1:30.  Should take about 20

4   minutes.

5        MR. MICHAEL O'ROURKE:  Would Your Honor want me -- I

6   could have them both here at 1:30.

7        THE COURT:  Well, that depends.  I want to use the

8   time we have, and so if people think that Mr. Flaherty is

9   going to be done in the morning and one of the children is

10  available in the morning, I'd rather have that person here

11  even though it means they come in at 11:30, 11:45 or whatever.

12       MR. MICHAEL O'ROURKE:  We'll have Sara here in the

13  morning, Judge.

14       THE COURT:  Okay.  I'll see you tomorrow then.

15  Thanks.

16       (Said hearing was adjourned at 4:00 p.m., to resume

17  April 1, 2009, at 10:00 a.m.)

18

19

20

21

22

23

24

25