1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2       EASTERN DIVISION

3

4 DEXIA CREDIT LOCAL, f/k/a  )
 Dexia Public Finance Bank  )
5 and Credit Local de France, ) Docket No. 02 C 8288
          )
6     Plaintiff, )
          )
7     vs.   ) Chicago, Illinois
          ) April 1, 2009
8 PETER G. ROGAN, et al.,  ) 10:10 a.m.
          )
9     Defendants. )

10     TRANSCRIPT OF PROCEEDINGS
11  BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
 APPEARANCES:
13

14 For the Plaintiff:  HOWREY LLP
        BY: MR. SCOTT T. MENDELOFF
15         MR. GABRIEL AIZENBERG
        321 North Clark Street, Suite 3400
16        Chicago, Illinois 60654

17

18 For Judith Rogan and
 Brian Rogan:   O'ROURKE & MOODY
19        BY: MR. MICHAEL J. O'ROURKE
         MR. MYLES P. O'ROURKE
20        55 West Wacker Drive, Suite 1400
        Chicago, Illinois 60601
21

22
 For Robert Rogan and
23 Sara Rogan:   TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
        BY: MR. TIMOTHY J. TOUHY
24         MR. JEFFREY J. HALLDIN
        55 West Wacker Drive, Suite 1400
25        Chicago, Illinois 60601

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 427-4393

1    (The following proceedings were had in open court:)

2        THE CLERK:   02 C 8288, Dexia Credit v. Rogan.

3        MR. MENDELOFF:   Scott Mendeloff and Gabriel Aizenberg

4    on behalf of Dexia.

5        MR. MYLES O'ROURKE:   Good morning, your Honor; Myles

6    O'Rourke and Michael O'Rourke on behalf of the intervenor

7    children.

8        MR. TOUHY:   And Timothy J. Touhy and Jeffrey J.

9    Halldin on behalf of Sara Caitlin and Robert Rogan.

10       THE COURT:   Are we expecting the other two?

11       MR. MYLES O'ROURKE:   They --

12       THE COURT:   They are in the facilities, okay.

13       MR. MENDELOFF:   A couple of little things that I

14   don't think we need him here for this.

15       First of all, I wanted to apologize to the

16   intervenors and especially the Court for the AD screw-ups

17   yesterday.

18       THE COURT:   You don't have to apologize.

19       MR. MENDELOFF:   It's not his fault.  It's just --

20       MR. MYLES O'ROURKE:   I thought he did a good job.

21       MR. MENDELOFF:   He's great, it's not.  It's just a

22   miscommunication.  I know it went -- and so we're sorry for

23   taking up your time.

24       Secondly, an issue that I sort of have been wondering

25   about throughout these proceedings but now I think it

1  becomes -- it sort of comes to a point, and; that is, we have
2  got two sets of lawyers on the other side, and there seems
3  like there is an overlap of representation.  So when it comes
4  to cross examination, are our witnesses going to be subjected
5  to a double-barrel cross?

6  We have got -- Mr. Myles O'Rourke just represented
7  that they represent all the intervenors, and then Mr. Touhy
8  said he represents two of the three.

9  THE COURT:  So how are people planning to do cross of
10  these witnesses?

11  MR. TOUHY:  We were actually going to ask for your
12  guidance on this, your Honor.

13  THE COURT:  Here's the guidance.  Nobody gets to
14  repeat what everybody else has done.  There's the guidance.
15  So if you think that lawyer two is repeating what lawyer one
16  has done, you will object, and if I agree, I will sustain the
17  objection.

18  MR. MENDELOFF:  All right, thank you.

19  MR. MYLES O'ROURKE:  Thank you.

20  THE COURT:  Okay.  So are you ready to call a
21  witness?

22  MR. MENDELOFF:  We are.

23  THE COURT:  Are you still waiting for --

24  MR. MICHAEL O'ROURKE:  Your Honor, there is one
25  preliminary matter.  We do have a preliminary objection on a

1    motion to bar just a portion of what is potentially the
2    expected testimony of Mr. Flaherty.
3            Your Honor, in his declaration, Mr. Flaherty made
4    some -- made statements regarding what amounts to -- what
5    amount to be, or purport to be, legal opinions about the
6    status of Dexia standing in the shoes of the 1998 bondholders
7    in the terms of the --
8            THE COURT:  This is how I'd like to deal with this.
9    You get to a question or an answer that you think is
10   inappropriate, raise it then, and I will deal with it then.
11           MR. MICHAEL O'ROURKE:  Fine, Judge.  That's great.
12   Let's do it that way.
13           THE COURT:  You have flagged the issue for me, so I
14   will be watching for it.
15           MR. MICHAEL O'ROURKE:  Just one other thing.  We will
16   try to deal with this at a break, but Judy Rogan, your Honor
17   -- Mr. Mendeloff and I are have been talking about possibly
18   just stipulating to documents in lieu of testimony.
19           THE COURT:  Okay.
20           MR. MICHAEL O'ROURKE:  So we will work out that after
21   hours.  We wanted to tell you that it may come up at the end
22   of the day.
23           MR. MENDELOFF:  Thank you.
24           MR. MICHAEL O'ROURKE:  Thank you.
25           MR. MENDELOFF:  Dexia calls John Flaherty.

Flaherty - direct

1    (Witness sworn.)

2            MR. AIZENBERG:  May I inquire, your Honor?

3            THE COURT:  Yes.

4        JOHN FLAHERTY, PLAINTIFF'S WITNESS, DULY SWORN

5                     DIRECT EXAMINATION

6    BY MR. AIZENBERG:

7    Q    Good morning.

8            Please state your name for the record.

9    A    John Flaherty.

10           THE COURT:  Spell your last name, please.

11           THE WITNESS:  F, as in Frank, l-a-h-e-r-t-y.

12           THE COURT:  You don't have to lean all the way into

13   that.

14           THE WITNESS:  Okay.

15           THE COURT:  Sort of about a foot away is fine.

16           THE WITNESS:  Thank you.

17   BY MR. AIZENBERG:

18   Q    Mr. Flaherty, by whom are you employed?

19   A    I am employed by Dexia, which is the predecessor to the

20   firm.  When we did this transaction, it was Credit Local de

21   France.  Now the firm has changed its name to Dexia.

22   Q    How long have you been employed by Dexia or the

23   predecessor that you just referenced?

24   A    I have been with Dexia for 19 years.

25   Q    And what is your job title?

1  A   I am the managing director in charge of public finance.

2  Q   How long have you held this title?

3  A   Most of my -- for about the last 10 years at Dexia.

4  Q   And what are your primary job responsibilities?

5  A   I'm in charge of public finance activities at Dexia, which

6  primarily includes credit enhancements in support of bond

7  transactions throughout the United States.

8  Q   When you say credit enhancement, what do you mean?

9  A   Bonds are sold with either on their own rating, or they

10  are sold with what they call an enhancement, which is a letter

11  of credit in this particular case.

12       And in this situation, Dexia's rating applies to the

13  bonds when they are sold.  So we guarantee repayment of bonds

14  in the event that the underlying obligor is unable to make

15  payment.

16  Q   At some point you learned about a credit enhancement

17  opportunity related to Edgewater Medical Center, is that

18  correct?

19  A   Yes.

20  Q   When did you learn about this?

21  A   In late 1997.

22  Q   Describe how you learned about this opportunity.

23  A   We were approached by an underwriter at Cain Brothers, a

24  gentleman by the name of Matt Goldreich.  He called us and

25  told us that he had a transaction in the Chicago area, a

1   hospital transaction.  They had asked us if we would take a

2   look at it.

3   Q    What is Cain Brothers?  You said it's an underwriter, but

4   explain what that is.

5   A    Cain Brothers is an underwriter that actually specializes

6   in a health care transaction and not-for-profit deals.

7          An underwriter is a firm that puts together a bond

8   offering and sells bonds to the public investing in markets.

9   So its job, its responsibility, is to put together the bond

10  transaction and then to sell to the public capital market.

11  Q    You said you dealt with someone named Mr. Goldreich there?

12  A    Yes.

13          THE COURT:  Spell that.

14          THE WITNESS:  G-o-l-d-r-e-i-c-h.

15  BY MR. AIZENBERG:

16  Q    And had you dealt with Cain Brothers and Mr. Goldreich

17  before this particular opportunity came to you?

18  A    Yes, we have had several transactions with Cain Brothers.

19  Q    Does Cain Brothers have any special niche?

20  A    They are known to be a health care -- a health care

21  underwriter and a not-for-profit underwriter.

22  Q    How did Mr. Goldreich describe the deal?

23  A    He said that there was a hospital in Chicago that had

24  issue debt in 1994.  It was looking to refinance its debt for

25  a debt service savings cost, and that in addition to

1    refinancing the 1994 debt, they also had a small piece of

2    another $10 million or so that they were going to use in terms

3    of new money for capital projects at the hospital facility.

4    Q   When you say there was debt in 1994, was that bonds?

5    A   That was bonds that were sold in '94.

6    Q   What was Dexia's role potentially going to be?

7    A   In terms of credit enhancement, we were technically being

8    asked to provide a letter of credit to support the bond

9    transaction.

10    Q   And how would the letter of credit support the bond, this

11    1998 bond transaction?

12    A   The investors would look to the letter of credit for

13    Dexia.  If in the event that the underlying obligor could not

14    make payment, the letter of credit would elevate the rating of

15    the underlying transaction to our current rating at that time,

16    which was in the double A range.  And that would lower the

17    debt service costs and allow the refinancing to go forward.

18    Q   Did you receive any materials from Mr. Goldreich?

19    A   Yes.  As is common, when we receive requests for

20    proposals, we received a cover letter.  It included financial

21    statements.  It included operating statistics.  It described

22    the transaction.  And it included the 1994 bond offering

23    documents that made reference to it.

24    Q   And you wanted to look at these materials?

25    A   Yes.

Flaherty - direct

1   Q   What was the reason that you wanted to look at the 1994

2   offering circular that you mentioned?

3   A   The primary purpose of the 1998 financing was to refinance

4   the 1994 debt.  So it was a follow-through to the 1994

5   transaction.

6   Q   And you are referencing a document called an offering

7   circular.  Can you describe what that is?

8   A   Okay.  The offering circular is what the bondholders would

9   take a look at when they make a determination if they are

10   going to invest in the bonds.  And it describes the general

11   bond security for the transaction.  It discusses the

12   underlying borrower, provides financial information.  It also

13   has disclosure on the bank.

14   Q   After you reviewed the materials you got from

15   Mr. Goldreich, did you engage in any further investigation?

16   A   Yes.  We came into Chicago on several occasions.  We

17   visited with the hospital management, and we took tours of the

18   hospital facilities.

19   Q   When you said you met with hospital management, who

20   specifically did you meet with?

21   A   We met with Joann Skvarek.

22           THE COURT:  Joann?

23           THE WITNESS:  Joann Skvarek.

24           MR. AIZENBERG:  Skvarek.

25           THE WITNESS:  Skvarek.

Flaherty - direct

1      THE COURT:   Do the best you can to spell it.

2      THE WITNESS:   S-k-a-v-e-r-k. (sic)

3      THE COURT:   And others too?

4      THE WITNESS:   We also met with Mr. Henry Zeisel and

5  Peter Rogan.

6      THE COURT:   Zeisel is Z-e-i-s-e-l?

7      THE WITNESS:   Yes, your Honor.

8  BY MR. AIZENBERG:

9  Q    In meeting with these individuals, did you gain an

10 understanding as to who they worked for?

11 A    Yes.   They worked for Braddock Management, and they were

12 reporting directly to Peter Rogan as the CEO of Edgewater

13 Medical Center.

14 Q    Did you gain an understanding as to who Braddock

15 Management was?

16 A    Yes.   They were the operator of the hospital, the manager

17 of the hospital.

18 Q    Do you know what Mr. Rogan's role was at the hospital at

19 the time?

20 A    Yes.   He was the CEO at the hospital.

21 Q    What was your understanding as to what Mr. Rogan's role

22 would be in this potential letter of credit transaction?

23 A    Mr. Rogan was the -- he was the manager of the hospital

24 facility, and the financial information that we obtained when

25 we looked at this was sent to us from Peter Rogan and Mr.

1  Zeisel.

2  Q   As part of your due diligence, did you get additional

3  documentation in addition to what you had gotten from

4  Mr. Goldreich?

5  A   Yes.  We had gotten updated interim financial statements

6  because we had started this process late in 1997.

7           We actually obtained updated operating statistics,

8  what I would consider, you know, routine follow-along to an

9  initial package of information that we had received.

10  Q   How far back did these financials go time-wise?

11  A   We reviewed financial statements for the prior four years.

12  So, you know, we took a look at the historical trend and the

13  financial operations, which is what you do when you look at

14  these credits, and you make a determination as to the future

15  likelihood of the financial trends continuing.

16  Q   Did you also as part of your review of relevant documents

17  look at any documents related to the original bond

18  transaction?

19  A   Yes.  We looked at the 1994 offering circular.

20  Q   Anything in addition to that?

21  A   And the financial -- we looked at the four years of

22  historical financial statements.

23  Q   Was the fact that this was a refinance that had already

24  gone through a prior due diligence a relevant factor?

25  A   Yes, it was.

1    MR. MICHAEL O'ROURKE:  Objection.  There is no

2    foundation for prior due diligence.

3        THE COURT:  Yes, you need to cut little lead-ins to

4    that question.

5    BY MR. AIZENBERG:

6    Q   In the course of reviewing the offering circular, did you

7    gain an understanding as to whether there was any prior due

8    diligence related to the 1994 bond transaction?

9        MR. MICHAEL O'ROURKE:  Your Honor, he's just

10   speculating.

11       THE COURT:  Well, the question doesn't call for

12   speculation.  Either he knows or he doesn't.

13       Do you have the question in mind?

14       THE WITNESS:  Can you repeat the question?

15       THE COURT:  Put your question again.

16       MR. AIZENBERG:  I will withdraw that question and I

17   will ask a different question.

18   BY MR. AIZENBERG:

19   Q   Based on your experience in credit enhancement

20   transactions and bond related transactions, is it common for

21   bond purchasers to do due diligence?

22   A   Yes, it is.

23   Q   Was the fact that this was a refinance that had already

24   gone through such due diligence a relevant factor to you?

25       MR. MICHAEL O'ROURKE:  Objection, your Honor.  There

Flaherty - direct

1  is no foundation about due diligence or whether --

2  THE COURT: Yes. The way you asked the question, you

3  asked about whether it's common for bond purchasers to do due

4  diligence, and that really doesn't lay --

5  You asked about bond purchasers doing due diligence,

6  and that doesn't really lay the foundation for what you are

7  asking for now.

8  BY MR. AIZENBERG:

9  Q  Based on your experience, do bond purchasers ever purchase

10  bonds without doing any due diligence?

11  A  No.

12  THE COURT: I think that's a sufficient foundation,

13  and you are free to ask the follow-up question.

14  BY MR. AIZENBERG:

15  Q  Was the fact that this was a refinance that had already

16  gone through prior due diligence a relevant factor to you?

17  A  Yes.

18  MR. MICHAEL O'ROURKE: Objection.

19  THE COURT: Overruled.

20  THE WITNESS: Yes.

21  BY MR. AIZENBERG:

22  Q  Why?

23  A  We took comfort that the bonds were sold through a public

24  authority here in Chicago, the Illinois Health Facilities

25  Financing Authority.

Flaherty - direct

1    We also took comfort that the bonds were successfully

2  sold in 1994, that bondholders were willing to accept the

3  risk.

4    THE COURT:  What's the name of the state agency

5  again, the Illinois --

6    THE WITNESS:  Illinois Health Facilities Financing

7  Authority as a conduit issuer.

8  BY MR. AIZENBERG:

9  Q  What was your understanding as to the accuracy of the

10 financial information you received?

11 A  The financial information we received was -- unqualified,

12 audited legal opinions.  There were no exceptions.  So we

13 believe that the material that we received was true and

14 accurate.

15 Q  Was this important?

16 A  Yes.

17 Q  Why?

18 A  Because we need to make a determination as to the accuracy

19 and the viability of the operation.

20 Q  At the end of the due diligence process, what did you do?

21 A  As customary, we would prepare a formal credit application

22 and submit this to both the New York and the Paris credit

23 committee for formal approval.

24 Q  And what is the purpose of a credit application?

25 A  It discusses the transactions, uses of funds, the

Flaherty - direct

1    strengths and weaknesses of the credit, and why we believe the
2    transaction was worth pursuing.
3    Q    Mr. Flaherty, you have in front of you a pile of exhibits.
4    I'd like to direct your attention to Plaintiff's Exhibit
5    732-A.
6    A    Yes.
7            MR. AIZENBERG:    Your Honor, do you have them in front
8    of you as well?
9            THE COURT:    I've got the disk.    I've got them up on
10   the screen.
11           You said 732-A.
12           MR. AIZENBERG:    Yes.
13   BY MR. AIZENBERG:
14   Q    Mr. Flaherty, what is Exhibit 732-A?
15   A    This is the credit application that I prepared following
16   due diligence on this transaction.    It's dated March 30th, and
17   it's the formal credit application.
18   Q    And is your signature found on this document?
19   A    Yes, at the bottom of the page.
20   Q    Above where it says John Flaherty in typewritten letters?
21   A    That is correct.
22   Q    Can you tell by looking at this front page whether the
23   letter of credit transaction was approved?
24   A    Yes.    It was approved on the Paris signature with the
25   authorized credit officer from Credit Local de France.

Flaherty - direct

1  Q   Did you prepare this credit application in the regular and

2  ordinary course of your business activities at Dexia?

3  A   Yes.

4  Q   It was common for you, for all your credit enhancement

5  transactions that you were involved in, to prepare such credit

6  applications?

7  A   Yes.

8  Q   Mr. Flaherty, can you specifically identify which is your

9  signature?

10 A   Sure.  The one above my block there, the typed name.

11        THE COURT:  There's actually two of them.

12        THE WITNESS:  Two of them.

13        MR. AIZENBERG:  Your Honor, I move for the admission

14 of Exhibit 732-A.

15        MR. MICHAEL O'ROURKE:  No objection.

16        THE COURT:  732-A is admitted.

17 BY MR. AIZENBERG:

18 Q   The front page at the top lists customer contacts?

19 A   Yes.

20 Q   What is the purpose of that?

21 A   We put our primary contact at the borrower on the cover

22 page of the credit application.

23 Q   Who did you list here?

24 A   Peter Rogan as CFO of the hospital.

25 Q   Why did you list Mr. Rogan?

Flaherty - direct

1   A    We understood Peter to be the primary person responsible

2   for operations at Edgewater Medical Center as the CFO.

3   Q    Did your credit application include any -- address the

4   issue of collateral for this transaction?

5   A    Yes, it always does.

6   Q    Can you show us where?

7   A    It's addressed in two places on the cover page of the

8   credit application.

9   Q    On the cover page of the credit application?

10  A    Yes.   Towards the -- about halfway down the middle of the

11  page.

12  Q    Where it says collateral?

13  A    It says collateral.

14  Q    Can you read what it says on the back?

15  A    "Security interests and unrestricted receivables,

16  assignable general intangibles, and mortgage on hospital

17  facility equipment, furnishings and fixtures."

18           It's also discussed on page 2 in the credit

19  application under bond security.

20  Q    This is at Dexia 6650?

21  A    Correct.

22  Q    So you are looking at item 7?

23  A    Yes.

24  Q    Okay.   And it references the same sort of security that

25  you just read about moment ago?

Flaherty - direct

1    A    Yes.

2    Q    Why did you include a reference to the security in this

3    credit application?

4    A    Collateral is an important thing to the bank when we lend.

5    Q    Why?

6    A    In the event that we have to liquidate or try to get

7    repaid, collateral serves some value to the bank.

8    Q    Did your credit application include any discussion related

9    to management?

10   A    Yes, it did.

11   Q    Can you direct us to where that is?

12   A    On page 6 of the credit application, Dexia 6654.

13   Q    How long is this particular section?

14   A    Roughly two pages.

15   Q    Why did you include a discussion of the management company

16   in your credit application?

17   A    Because the hospital had been under this management

18   company for the last four years at the time that we looked at

19   the transaction.  And it was critical to us that this

20   management company was a key component to Edgewater's success.

21            THE COURT:  We're referring to this company Permian

22   here?

23            THE WITNESS:  No, Braddock.

24            THE COURT:  I'm on the wrong page then.  You said

25   page -- my mistake.  All right, Braddock, in other words.

1          THE WITNESS:   Yes.

2     BY MR. AIZENBERG:

3     Q     In your discussion of the management of the company, did

4     you list any personnel involved with the management of the

5     company?

6     A     Yes.   On page 7, or Dexia 6655, about the second full

7     paragraph, we mention the key members of the hospital facility

8     management staff, and we named Peter Rogan as a CEO.

9     Q     Why did you list the key members and Peter Rogan?

10    A     We wanted to have an understanding of who was running the

11    hospital.

12    Q     Is there anywhere else where you addressed the personnel

13    of the management company at Braddock?

14    A     Yes.   There is an Exhibit C to the credit application

15    where we list all of the Braddock management.

16    Q     Is that at Dexia 6678?

17    A     That's correct.

18    Q     Who is the first employee you listed there?

19    A     Peter Rogan.

20    Q     What if anything does your -- strike that.

21          Did your credit application address the original 1994

22    bond transaction?

23    A     Yes, it did, because the 1998 transaction refinanced the

24    1994 transaction.

25    Q     And where does your credit application address the 1994

| | |
|---|---|
| 1 | bond transaction? |
| 2 | A    Bear with me.  I'm sorry.  It's on page 5, Dexia 6653. |
| 3 | THE COURT:  Which page of the document is that? |
| 4 | THE WITNESS:  Page number 5 of the document. |
| 5 | THE COURT:  Thank you. |
| 6 | BY MR. AIZENBERG: |
| 7 | Q    And is it the third full paragraph? |
| 8 | A    Yes. |
| 9 | Q    You testified earlier that you, as part of your review of |
| 10 | documentation, you reviewed the circular for the 1994 bond |
| 11 | transaction; do you remember that testimony? |
| 12 | A    Yes. |
| 13 | Q    Did you find in the offering -- in that offering circular |
| 14 | any indication of an ongoing fraud scheme at Edgewater at the |
| 15 | time? |
| 16 | MR. MICHAEL O'ROURKE:  Your Honor, unless he has the |
| 17 | circular, I object to him testifying on the document that has |
| 18 | not been produced or identified or presented to counsel.  He |
| 19 | is testifying with respect to a document that is not in |
| 20 | evidence. |
| 21 | MR. AIZENBERG:  Your Honor, first of all, the |
| 22 | document was produced.  It's been made available to them. |
| 23 | THE COURT:  The objection is overruled. |
| 24 | The question is whether from any of the things he |
| 25 | reviewed, did he see any evidence of a scheme to defraud. |

1    MR. AIZENBERG:  Yes.

2    THE COURT:  He can answer the question.

3    BY THE WITNESS:

4    A    No.

5    BY MR. AIZENBERG:

6    Q    From the due diligence process, did Mr. Rogan ever

7    disclose to you that he had in any other way disclosed the

8    existence of a fraud scheme at Edgewater to the 1994

9    bondholders?

10    MR. MICHAEL O'ROURKE:  Judge, no foundation to that

11    question.

12    THE COURT:  He is asking --

13    He said he met with Peter Rogan.  He is asking

14    whether Mr. Rogan ever said this to him.  I think that's an

15    adequate foundation.  The answer is no -- or the objection is

16    overruled.

17    You can answer.

18    THE WITNESS:  No.

19    BY MR. AIZENBERG:

20    Q    From the due diligence process on, did Mr. Rogan ever

21    disclose to you that a fraud scheme that had begun in 1993 was

22    still going at Edgewater when Dexia was considering providing

23    the letter of credit?

24    MR. MICHAEL O'ROURKE:  Your Honor, I would object to

25    this without a foundation as to knowledge of Mr. Rogan at the

1    time of any conversations with Mr. Flaherty. He's asking --

2              THE COURT: No long --

3              Mr. O'Rourke, we're not going to have oral argument

4    on every objection. So no long-speaking objections, okay,

5    number one.

6              Number two, he can't testify about what Mr. Rogan did

7    or didn't know, and he is not being asked to. He is simply

8    being asked whether Mr. Rogan ever disclosed something to him,

9    and the objection is overruled.

10             So do you want to put your question again?

11             MR. AIZENBERG: Can I restate it?

12             THE COURT: Yes.

13   BY MR. AIZENBERG:

14   Q   From the due diligence process on, did Mr. Rogan ever

15   disclose to you that a fraud scheme that had begun in 1993 was

16   still ongoing at Edgewater when Dexia was considering

17   providing the letter of credit?

18   A   No.

19             MR. MICHAEL O'ROURKE: No foundation --

20             THE COURT: Overruled.

21   BY MR. AIZENBERG:

22   Q   From the due diligence process on, did Mr. Rogan ever

23   disclose to you from the due diligence -- strike that.

24             Did any of the financial materials that you received

25   from Mr. Rogan or Mr. Zeisel contain any hint of a fraud

1  scheme?

2  A   No.

3  Q   From the due diligence process on, did Mr. Rogan ever

4  disclose to you that his management companies were receiving

5  fees in furtherance of a fraud scheme both before and after

6  the 1998 bond transaction?

7          MR. MICHAEL O'ROURKE:  No foundation, your Honor.

8          THE COURT:  Overruled.

9  BY THE WITNESS:

10  A   No.

11  BY MR. AIZENBERG:

12  Q   Following the issuance --

13          THE COURT:  Just to be clear, to the extent that the

14  objection to the lack of foundation is that it assumes facts

15  not in evidence, I disagree with that because that's part of,

16  I think, what was established by the underlying judgment.

17  BY MR. AIZENBERG:

18  Q   Dexia eventually agreed to issue the letter of credit?

19  A   Yes.

20  Q   When did that occur?

21  A   In May of 1998.

22  Q   Following the issuance of the letter of credit, did Dexia

23  get financial or any sort of reporting from Edgewater?

24  A   Yes.

25  Q   What sort of reporting did they get?

1    A    Continuing financial reporting, annual financial

2    statements, quarterly financial statements.  This is routine

3    and common in these types of transactions.

4    Q    In any of these regular reports that you received from

5    Edgewater, did Mr. Rogan disclose that there was a fraud

6    scheme at Edgewater?

7                MR. MICHAEL O'ROURKE:  Objection, your Honor.  There

8    is foundation that Mr. Rogan was personally involved in

9    compiling information with respect to any financial reports.

10   Without that kind of foundation, it's simply speculating

11   unless he has personal knowledge of how --

12               THE COURT:  What is he speculating about?

13               MR. MICHAEL O'ROURKE:  He's speculating as to the

14   role of Peter Rogan in any kind of financial reporting.

15               THE COURT:  Honestly, Mr. O'Rourke, if that's what

16   you think, with all due respect, you are not listening to the

17   question.

18               The question is did Mr. Rogan tell him something,

19   okay.  It's a separate matter as to what Mr. Rogan did.  He is

20   not in a position to testify about what Mr. Rogan did or

21   didn't do.  He is simply being asked whether something was

22   disclosed to him.  I mean, this is no different than any other

23   alleged fraud by omissions case where the person who was the

24   recipient of information that has omissions is basically

25   asked, did you get ever get this information.  It's fairly

1  routine.  The objection is overruled.

2      MR. MICHAEL O'ROURKE:  Your Honor, may I just make

3  another point?

4      The question, as I understood it, is that he was

5  asking whether in the financial reporting after the closing of

6  the letter of credit whether Mr. Rogan disclosed anything, and

7  that presumes that Mr. Rogan had a direct involvement in the

8  actual financial reporting which is not the same.

9      THE COURT:  Do you want to rephrase that question?

10      MR. AIZENBERG:  I was just going to add, Mr. Rogan

11  was the CEO of the hospital.

12      THE COURT:  But, I mean, to the extent that you're

13  sort of assuming that Mr. Rogan was the person -- I mean,

14  maybe he was and maybe I could draw a reasonable inference of

15  that, but why don't you just rephrase the question so it asks:

16  Did any of the documentation you got from Edgewater disclose

17  this?  I think that would be way easier.

18  BY MR. AIZENBERG:

19  Q   Mr. Flaherty, did any of the documentation that you

20  received from Edgewater after the issuance of the letter of

21  credit disclose that there was a fraud at Edgewater?

22  A   No.

23  Q   If you had known about any of the things that we have gone

24  over, would you have recommended going forward with the letter

25  of credit transaction?

Flaherty - direct

1   A   No.

2   Q   Why not?

3   A   Generally we don't support criminal activity, and the

4   fraud would have called into question the authenticity of the

5   revenues being generated at the hospital facility.

6   Q   What was the amount of the letter of credit?

7   A   56 million.

8   Q   And as part of the letter of credit transaction, new bonds

9   were issued as well?

10  A   Yes.

11  Q   When the new bonds -- and the new bonds were issued about

12  the same time?

13  A   The new bonds were issued in 1998.

14  Q   What month?

15  A   In May of 1998.

16  Q   When the new bonds were issued, what happened to the old

17  bonds?

18  A   The old bonds were paid off with the proceeds from the

19  1998 bonds.

20  Q   Is there any document that would describe these new bonds?

21  A   Yes.   It's the offering circular dated May 20th, 1998.

22  Q   And you are looking at Plaintiff's Exhibit 732-B?

23  A   Yes.

24  Q   And you are saying that this was the offering circular for

25  the 1998 bond transaction?

Flaherty - direct

1    A    Yes.   It included two series of bonds:   The 1998 bonds

2    which were used to refinance the 1994 debt, and then the 1998

3    B bonds, which was a new money borrowing for the hospital of

4    about 10.5 million.

5    Q    Did you review this offering circular as part of your work

6    related to the Edgewater transaction?

7    A    Yes.

8    Q    Was it common for you to review these offering circulars

9    as part of credit enhancement transactions?

10   A    Yes, it's typical.

11   Q    And does Dexia keep and maintain these offering circulars

12   in connection with its credit enhancement transactions?

13   A    Yes.

14   Q    Did you keep and maintain a copy of this offering circular

15   as part of your credit enhancement work?

16   A    Yes.

17            MR. AIZENBERG:   I move for the admission of

18   Plaintiff's Exhibit 732-B.

19            MR. MICHAEL O'ROURKE:   Your Honor, I object.   There's

20   no sufficient business record foundation unless the witness is

21   able to tell whether or not the information was prepared and

22   published in the regular course of the actual institution that

23   issued the circular.

24            THE COURT:   I take it you are offering this for the

25   purpose of showing that this is a document that he reviewed in

Flaherty - direct

1   terms of what was in it and what wasn't in it?

2           MR. AIZENBERG:   Yes.

3           THE COURT:   It's admissible for that purpose.

4           MR. MICHAEL O'ROURKE:   That's fine.

5           THE COURT:   All right.

6   BY MR. AIZENBERG:

7   Q   Now, you mentioned a moment ago that the bond circular

8   references the types of bond that were being issued?

9   A   Yes.

10  Q   Where does it do that?

11  A   On the cover page, the two series of bonds.

12  Q   We need to blow it up further.

13          So there's -- I see there is a reference to 1998-A?

14  A   Yes.

15  Q   Can you read that, what the first series of bonds?

16  A   Variable rate demand revenue bonds series 1998 A.

17  Q   That was for $44,475,000?

18  A   Correct.

19  Q   What was the second series of bonds?

20  A   10,525,000 variable rate demand revenue bonds.

21  Q   Does the offering circular address the uses of the bond

22  funds?

23  A   They typically do, and, yes, this does.

24  Q   Can you direct us to where it does that?

25  A   It's in this plan of financing, and estimated sources and

1  uses of funds are found at page 25 and 26 of the offering
2  circular.

3  Q    And what was -- what were the uses of the --

4         Can you go to the next page, please?

5         What were going to be the uses of the bond funds?

6  A    It would be 49 million to refund the series 1994 bonds,
7  and then 10.3 million was deposited into a project fund for
8  new capital expenditures and the costs of issuance of about $1
9  million.

10  Q    Were there any transaction documents related to the letter
11  of credit?

12  A    There were many transaction documents.   Typically we see
13  the trust indenture or master trust indenture, custodian and
14  pledge agreement, and our document is the main document that
15  we negotiate with the borrower.   It's a letter of credit and
16  reimbursement agreement.

17  Q    Before we ask you to look at these transaction documents,
18  I want to briefly run through the structure of the
19  transaction.

20         Was there any security for Dexia as part of the
21  letter of credit transaction?

22  A    Yes.   We're secured by the bonds in the event we make
23  payment under the letter of credit.

24  Q    I'm sorry.   I didn't hear what you said.

25  A    We're secured by the bonds.

Flaherty - direct

1  Q    And what do you mean when you say that Dexia was secured
2  by the bonds?
3  A    We agreed to make scheduled payments of the principal and
4  interest on the debt.
5         We also agreed that in an event of default and
6  acceleration, moneys are used from a draw under the letter of
7  credit to pay off the bondholders.  We effectively become the
8  bondholder of last resort.
9  Q    Were the bonds secured by anything?
10 A    Yes.  The bonds were secured by the security interests and
11 unrestricted receivables, assignable general intangibles, and
12 mortgage on hospital facility equipment, furnishings and
13 fixtures.
14        THE COURT:  Let me just make sure I'm getting this.
15        So, in other words, if Dexia had had to pay off on
16 the letter of credit, you would basically step into the shoes
17 of the bondholders at that point?  Is that the way it worked?
18        THE WITNESS:  Yes.
19        THE COURT:  Okay.
20 BY MR. AIZENBERG:
21 Q    Are there circumstances when the collateral that you just
22 mentioned would become Dexia's collateral?
23 A    Yes, when we make a payment on the letter of credit and
24 we're not reimbursed by the borrower.
25 Q    Now, you mentioned that there was a reimbursement

Flaherty - direct

1    agreement that was executed?

2    A    Yes.

3    Q    That was in May of 1998?

4    A    Yes.

5    Q    Was that reimbursement agreement amended at some point?

6    A    Yes, in May of 1999.

7    Q    I would like to direct your attention to Plaintiff's

8    Exhibit 732-C.

9         What is this document, Mr. Flaherty?

10   A    This is the amended and restated reimbursement and credit

11   agreement between Edgewater Medical Center and Credit Local

12   Dexia.

13   Q    Did you execute this document?

14   A    Yes, I did.

15   Q    Can you direct us to where that is?

16   A    My signature appears on page --

17   Q    I think it's 306 of 387, if you look at the top?

18   A    Yes, that's my signature.

19   Q    Where is your signature?

20   A    My signature is above my name and title on the signature

21   block.

22   Q    Do you recognize the signature below it?

23   A    Yes.

24   Q    Whose signature is that?

25   A    That's Henry Zeisel, senior vice-president of finance at

Flaherty - direct

1    Edgewater Medical Center.

2    Q    Did you execute this reimbursement and credit agreement in

3    the regular and ordinary course of your business activities

4    for Dexia?

5    A    Yes.

6    Q    Do you keep and maintain a copy of this reimbursement

7    agreement in your files at Dexia?

8    A    Yes.

9         MR. AIZENBERG:   I move for the admission of

10   Exhibit 732-C.

11        MR. MICHAEL O'ROURKE:   No objection, your Honor.

12        THE COURT:   732-C is admitted.

13   BY MR. AIZENBERG:

14   Q    A moment ago you said that Dexia's letter of credit was

15   secured by the 1998 bonds.

16        Is that addressed in the reimbursement agreement?

17   A    Yes, it is.

18   Q    Can you show us where?

19   A    In section 204, page 266 of 387 under pledged bonds.

20   Q    Can you read this section, please?

21   A    "The borrower's obligation to reimburse CLF for any

22   drawing of -- drawing the proceeds of which were used to

23   purchase series 1998 bonds shall be secured by the delivery of

24   series 1998 bonds to the trustee and registered in the name of

25   CLF or its designee or nominee as pledgee as provided in

1  section 5.08 of the indenture and the pledge agreement, it

2  being expressly understood that during such time CLF or its

3  designee or nominee shall be the pledgee of all such 1998

4  bonds, and it shall have all the rights granted to owners of

5  series 1998 bonds under the indenture, except those rights

6  specifically denied to CLF thereunder, and such additional

7  rights as may be granted to CLF thereunder and hereunder."

8  Q   Now, section 2.04 references a pledge agreement?

9  A   Yes.

10 Q   Is that another letter of credit transaction document that

11 was executed?

12 A   It's comments of letter of credit transactions, yes.

13 Q   I would like to direct your attention --

14          Before we turn to the next exhibit, can we go back to

15 Section 2.04?

16          Mr. Flaherty, can you --

17          So the point of Section 2.04 was basically giving

18 Dexia security in the bonds?

19 A   Correct.

20 Q   I would like to direct your attention to Plaintiff's

21 Exhibit 24.  Do you have that in front of you, Mr. Flaherty?

22 A   Yes, I do.

23 Q   What is this document?

24 A   This is the custody pledge and security agreement signed

25 between Edgewater Medical Center and the bank.

1   Q   Did you execute this document, Mr. Flaherty?

2   A   Yes, I did, on page 8.  It's not numbered as 8, but it

3   would be 8.

4   Q   So the last page of the document?

5   A   Yes.

6   Q   And is that your signature under Credit Local de France?

7   A   Yes.

8   Q   Do you recognize the signature above it?

9   A   Yes, Henry --

10  Q   Who is that?

11  A   Henry Zeisel, vice-president of finance of Edgewater

12  Medical Center.

13  Q   Did you execute this pledge agreement in the regular and

14  ordinary course of your business activities on behalf of

15  Dexia?

16  A   Yes.

17  Q   Is a copy of this document kept and maintained in Dexia's

18  files?

19  A   Yes.

20          MR. AIZENBERG:  I move for the admission of

21  Plaintiff's Exhibit 24.

22          MR. MICHAEL O'ROURKE:  Do we have a copy of it?  I

23  don't have a copy.  Is it part of the declaration?

24          THE COURT:  Just give him the one that's out of those

25  binders back there, which I'm never actually going to really

Flaherty - direct

1   ask you for.

2        (Brief interruption.)

3        THE COURT:  While we have this short pause here,

4   we're actually going to stop at about ten after 12:00 because

5   I have forgotten that I have a meeting at 12:15 I have to go

6   to.  So we will stop a little bit earlier today than I

7   expected.  We will take a break at about 11:15.

8        Go ahead, Mr. Aizenberg.

9   BY MR. AIZENBERG:

10  Q   Mr. Flaherty, what was the purpose of this agreement?

11  A   This actually is the mechanism through which the bonds are

12  delivered to the bank in the event that we made payment under

13  the letter of credit and were not reimbursed by the borrower.

14  Q   Does the pledge agreement address Dexia's collateral?

15  A   Yes, it does, on page 2, grant of security interest.

16  Q   Can you read that, please?

17  A   Sure.

18        "As security for all of the obligations of the

19  pledgor under the reimbursement agreement and the other

20  reimbursement documents, the obligations, the pledgor as

21  debtor, hereby grants, pledges and assigns to CLF, as the

22  secured party, a lien on and security interest in, all right,

23  title, and interest of the pledgor to (i) all series 1998

24  bonds purchased with the proceeds of the letter of credit, the

25  B pledged bonds and (ii) all payments, earnings, proceeds and

Flaherty - direct

1    substitutions of such pledged bonds, collectively the pledged

2    bonds and all payments, earnings, proceeds and substitutions

3    of such pledged bonds, and all property at any time pledged to

4    CLF hereunder and all income therefrom and proceeds thereof,

5    are hereinafter referred to as the collateral."

6    Q    So this provision basically makes the bonds Dexia's

7    collateral?

8    A    Yes.

9    Q    Does the pledge agreement address Dexia's rights --

10            Does the pledge agreement address what happens if

11   there's a default on the bonds?

12   A    Yes.

13   Q    Where does it do that?

14   A    In the Section 4.

15   Q    Specifically where?

16   A    4-B, "CLF shall be entitled to exercise all rights of the

17   owners -- all rights of an owner of series 1998 bonds with

18   respect to voting, consenting and directing the trustee as if

19   CLF were the owner of such series 1998 bonds, and the pledgor

20   hereby grants and assigns to CLF all such rights."

21   Q    So in the event of a default, this provides that Dexia

22   essentially stands in the shoes of the bondholders?

23   A    Correct.

24            MR. MICHAEL O'ROURKE:   That's the 1998 bondholders?

25            THE WITNESS:   Yes.

Flaherty - direct

1          MR. AIZENBERG:  Yes.

2          MR. MICHAEL O'ROURKE:  Objection to the form, your

3    Honor.  He is asking for a legal opinion.

4          THE COURT:  Overruled.

5    BY MR. AIZENBERG:

6    Q   You also said --

7          THE COURT:  He is in a position to give his

8    understanding of documents that he executed.

9    BY MR. AIZENBERG:

10   Q   Mr. Flaherty, you said that the 1998 bonds were secured by

11   receivables, cash and real property.

12          Is there a document that addresses that?

13   A   The security provisions are spelled out in the master

14   trust indenture.

15   Q   I direct your attention to Plaintiff's Exhibit 732-D.  Can

16   you tell us what this document is?

17   A   The master trust indenture described as security for the

18   transaction.  It also addresses the flow of the payments from

19   the hospital to the bondholders.

20   Q   Did you review this master trust indenture as part of your

21   regular business activities related to the bond transaction?

22   A   Yes.

23   Q   And is it common for you to review these sorts of -- are

24   these indentures common in bond transactions?

25   A   In every bond transaction, there's a bond --

Flaherty - direct

1   Q   So you review these indentures as part of your -- all the
2   work you do related to bond transactions?
3   A   Yes.
4   Q   Are copies of such indentures kept and maintained in
5   Dexia's files?
6   A   Yes.
7   Q   Is a copy of this particular master trust indenture kept
8   and maintained in Dexia's files as well?
9   A   Yes.
10                  MR. AIZENBERG:  I move for the admission of 732.
11                  MR. MICHAEL O'ROURKE:  Your Honor, again, we don't
12  have them.  It sounds like this -- if we just had a copy.
13                  MR. MENDELOFF:  For the record, these were all
14  provided in connection with the original motion.
15                  MR. MICHAEL O'ROURKE:  Your Honor, this will just
16  take a second.
17       (Brief interruption.)
18                  THE COURT:  So this is the same numbering system as
19  the exhibits that you have been using on all the motions that
20  you filed.
21                  MR. MENDELOFF:  Yes.
22                  THE COURT:  All right.
23                  MR. MICHAEL O'ROURKE:  No objection, your Honor.
24                  THE COURT:  All right, 732-D is admitted.
25  BY MR. AIZENBERG:

Flaherty - direct

1  Q   Mr. Flaherty, the cover page of this indenture states at
2  the bottom, do you see that it's amending and restating the
3  master trust indenture dated as of July 1, 1994?
4  A   Right.
5  Q   Do you have an understanding as to what that's about?
6  A   The master trust indenture was implemented at the time of
7  the 1994 transaction.
8  Q   And so it was amended and restated as part of the '98 bond
9  transaction?
10 A   Correct.
11 Q   So this essentially was a continuation of an indenture
12 that had been there since the original bond transaction?
13         MR. MICHAEL O'ROURKE:   Objection, your Honor.
14         He's reading, and he's asking for a legal opinion on
15 what the effect of this with respect to a transaction he is
16 not involved with.
17         THE COURT:   The objection to leading is sustained.
18 The other objection is overruled.
19 BY MR. AIZENBERG:
20 Q   What if any understanding did you have as to the effect --
21 as to the fact that this was amended?
22 A   That this transaction, the master trust indenture, was put
23 in place at the time of the 1994 transaction.
24 Q   Now, the front page of Exhibit 732-C references a master
25 trustee.

Flaherty - direct

1       Do you see that?

2    A   Yes.

3    Q   What is a master trustee in this context?

4    A   In this context a master trustee is the -- it's the -- it

5    controls the flow of payments and disburses funds to the bond

6    investors.  So moneys are received by the hospital -- I mean,

7    from the hospital to the master trustee, and under this master

8    trustee mechanism, debt service is paid.

9    Q   What role if any does the master trustee play with respect

10   to collateral of bonds?

11   A   They are required to control the collateral, maintain the

12   collateral.

13   Q   Is there any place in this master trust indenture that

14   addresses the collateral?

15   A   Yes.  It's addressed in the granting clauses, division one

16   and division two on page 14 of 387 and 15 of 387.

17   Q   Can we go to the next page, please?

18       So division one addresses --

19       Can you read that?  It addresses one category of

20   collateral.

21   A   Sure.

22       "All accounts and assignable general intangibles now

23   owned or hereafter acquired by any member of the obligated

24   group regardless of how general, and all proceeds therefrom,

25   whether cash or non-cash, all as defined in Article 9 of the

1    Uniform Commercial Code, as amended, of the state in which

2    such member has its primary place of business."

3    Q    I think that's enough for our purposes.

4         So, in general, it says that collateral accounts and

5    assignable general intangibles?

6    A    Correct.

7    Q    How about division two?  Can you read the beginning part

8    of division two?

9    A    Sure.

10        "Any and all of the property of every kind and nature

11   from time to time hereafter, by delivery or by writing of any

12   kind, conveyed, pledged, assigned or transferred as and for

13   additional security hereunder by any member or by anyone on

14   its behalf to the master trustee, including, without

15   limitation, funds of any member held by the master trustee as

16   security for the obligations."

17   Q    So basically this provision provides for additional

18   collateral of any other property that comes in the hands of

19   the master trustee?

20   A    Correct.

21   Q    Does the reimbursement agreement that you executed address

22   the underlying collateral for the bonds?

23   A    Yes, it does.

24   Q    Can you direct us to where it does that?

25   A    Section 510 of the reimbursement agreement.

Flaherty - direct

1    Q    That's at 279 of 387, Mr. Flaherty?

2    A    Yes.

3    Q    Can you describe the purpose of this particular provision?

4    A    It pertains to maintaining the collateral that is pledged

5    to the bank.

6    Q    And that collateral would include the items that we just

7    read about in the master indenture?

8    A    The unrestricted receivables, a valid and perfected first

9    priority security interest in favor of the master trustee

10   securing all the obligations of the borrower issued under the

11   master trust indenture.

12   Q    Mr. Flaherty, a little while ago, you mentioned that after

13   issuing the letter of credit, Dexia received periodic

14   financial reporting from Edgewater?

15   A    Yes.

16   Q    Is that addressed in the reimbursement agreement?

17   A    Yes, in Section 6 of the reimbursement agreement, page 280

18   of 387.

19   Q    What sort of reporting requirement does this section

20   obligate Edgewater to provide?

21   A    They were obligated to provide us annual statements

22   according to Section 601-A; under Section 601-B, quarterly

23   financial statements; 601-C, a certificate of compliance.

24   Q    You just mentioned a certificate of compliance.  What is

25   that?

1   A    When financial information is submitted to us, we ask that

2   they attest to the best of their knowledge to the accuracy of

3   the financial statements being presented and that no event of

4   default has occurred.

5   Q    After the letter of credit was issued, did you in fact

6   receive the reporting that the reimbursement agreement

7   required?

8   A    We received a reporting and the certificate of compliance.

9   Q    I would like to direct your attention to Plaintiff's

10  Exhibit 806.

11           What is this document?

12  A    This is the quarterly report for the period ended June

13  30th, 1998.

14  Q    And do you recognize the signature at the bottom of the

15  first page?

16  A    Henry Zeisel.

17  Q    Is this an example of the financial reporting that you

18  received pursuant to the reimbursement agreement?

19  A    Yes.

20  Q    Did you receive this financial report in the regular and

21  ordinary course of your business activities?

22  A    Yes.

23  Q    And was this financial reporting kept and maintained in

24  Dexia's files?

25  A    Yes.

Flaherty - direct

1   Q    And with respect to other enhancements transactions, you
2   received similar financial reporting?
3   A    Yes.
4   Q    And, also, that was kept and maintained in Dexia's files?
5   A    Yes.
6              MR. AIZENBERG:   I move for the admission of
7   Plaintiff's Exhibit 806.
8              THE COURT:   You said 806?  Any objection to 806?
9              MR. MICHAEL O'ROURKE:   No, your Honor.
10             THE COURT:   806 is admitted.
11  BY MR. AIZENBERG:
12  Q    Mr. Flaherty, I direct your attention to the last page of
13  Plaintiff's Exhibit 806.
14             What is this?
15  A    This is the certificate of compliance.
16  Q    So this is the certification that what's contained in this
17  reporting is accurate?
18  A    Right, and that no event of a default has occurred or if
19  no conditional event of default has occurred as well.
20  Q    I would like to direct your attention to Plaintiff's
21  Exhibit 808.
22             Mr. Flaherty, what is Plaintiff's Exhibit 808?
23  A    This is the quarterly report for the period ended
24  June 30th, 1999.
25  Q    Is this another example of the reporting you received

Flaherty - direct

1    pursuant to the reimbursement agreement?

2    A    Yes.

3    Q    And do you recognize the signature at the bottom?

4    A    Henry Zeisel.

5    Q    Did you similarly receive and maintain this reporting

6    document in the regular and ordinary course of your business

7    activities at Dexia?

8    A    Yes.

9         MR. AIZENBERG:    I move for the admission of

10   Plaintiff's Exhibit 808.

11        MR. MICHAEL O'ROURKE:    No objection.

12        THE COURT:    808 is admitted.

13   BY MR. AIZENBERG:

14   Q    The last page of Plaintiff's Exhibit 808, is that another

15   certification as to accuracy in no event of default?

16   A    Yes.

17   Q    Did Mr. Rogan or anyone else at Braddock ever disclose in

18   the financial reporting or otherwise that the revenues in the

19   financial statements were in part derived from the fraud at

20   Edgewater?

21   A    No.

22   Q    Eventually Dexia learned of the fraud at Edgewater?

23   A    Yes.

24   Q    When did that occur?

25   A    We received a phone call from Sherri Coon at the Chicago

1  FBI that they were investigating Edgewater Medical Center.

2  Q   Are you aware of any --

3          THE COURT:   Do you have an approximate date?

4          THE WITNESS:   It was probably in early 2001, early

5  2001.

6  BY MR. AIZENBERG:

7  Q   Are you aware of any action that the government took in

8  response to the fraud that it had discovered at Edgewater?

9  A   Yes.   It suspended its Medicare payments to the hospital.

10 Q   What was your understanding as to the effect, if any, that

11 this had upon the hospital?

12 A   It sharply diminished their revenues and called into

13 question the value of the collateral that we had in

14 unrestricted receivables that were no longer generated.

15 Q   And what happened as a result of the cutoff of the

16 Medicare funds to the hospital?

17 A   The hospital went out of business.

18 Q   What reaction, if any, is it your understanding that the

19 bondholders had to this event?

20 A   The bondholders did no longer want to hold the bonds.   So

21 the bank had to purchase them under an event of default.   We

22 had to pay $56 million to acquire the bonds.

23 Q   Once Dexia purchased the bonds, as you just described, did

24 that trigger any of the terms of the reimbursement agreement?

25 A   We became the bondholder of last resort.

Flaherty - direct

1  Q    Did that trigger any of the terms of the pledge agreement
2  that we looked at earlier?
3  A    Yes.   We purchased the bonds, and we had a security
4  interest in these bonds.
5  Q    As a result, did you get a security interest in the
6  underlying collateral?
7  A    Yes.
8  Q    Did the fraud that Rogan and his management companies
9  perpetrated at Edgewater harm Dexia?
10 A    Yes.
11            MR. MICHAEL O'ROURKE:   Objection, your Honor.
12            THE COURT:   Basis?  Basis?
13            MR. MICHAEL O'ROURKE:   There has been no showing of
14 any fraud by Peter Rogan -- any causation with respect to
15 these bonds; no foundation.
16            THE COURT:   Overruled.
17 BY THE WITNESS:
18 A    Yes, Dexia was harmed.   We had to purchase bonds, and we
19 no longer had a viable operation for sources of repayment.   So
20 we -- again, we became a bondholder of last resort.   We had to
21 write a check for $56 million, and there is no repayment
22 source, and so the hospital was shut down.
23 BY MR. AIZENBERG:
24 Q    So the collateral that you were looking to wasn't
25 happening anymore; you weren't getting the receivables in

Flaherty - direct

1    which you had the collateral?

2    A    That's correct.

3              MR. AIZENBERG:  I have nothing further, your Honor.

4              THE COURT:  Let's do our 10-minute break now, and we

5    will resume and go until 12:10.

6        (Brief recess.)

1    THE COURT:  Okay.  Are we ready to pick up?

2    MR. MENDELOFF:  Yes.

3    One thing, Your Honor.  During the break Mr. O'Rourke

4    indicated an intention to seek to depose Mr. Flaherty after

5    his testimony and before the defense case, and I want to make

6    clear we would object to that.  They had a chance to depose

7    Mr. Flaherty before, and they didn't.  They chose not to.  The

8    court even referenced it in one of its opinions.  And if they

9    want to call him back in the defense case, I guess they can do

10   that, but we -- I want to be clear that we are objecting to

11   any further discovery from Mr. Flaherty.  So we would

12   appreciate it if Mr. O'Rourke has any questions to ask

13   Mr. Flaherty he ask them all now.  But if he doesn't want to,

14   we just want to make clear we're going to object to a

15   deposition.

16   THE COURT:  Do you want to talk about this now?

17   MR. MICHAEL O'ROURKE:  I think it's just -- I don't

18   know if we -- I don't think we need to talk about it right

19   now, Your Honor.

20   THE COURT:  Okay.  So I think the way to tee this up,

21   then, is that if the defendants or if the intervenors at some

22   point notice his deposition, then you'll file some sort of a

23   motion to quash or protective order or whatever.

24   MR. MENDELOFF:  Right.  I just wanted to put it on

25   the record.

Flaherty - cross

1          THE COURT:  I understand.

2          Mr. Aizenberg, you can proceed.

3          MR. MICHAEL O'ROURKE:  Thank you, Your Honor.

4          THE COURT:  I'm sorry.  You had completed the direct.

5          MR. AIZENBERG:  I did.

6          THE COURT:  All right.  So, Mr. O'Rourke, you can

7     proceed.

8          MR. MICHAEL O'ROURKE:  Thank you.

9                    CROSS EXAMINATION

10    BY MR. MICHAEL O'ROURKE:

11    Q   Mr. Flaherty, my name is Mike O'Rourke.  Nice to meet you,

12    and thank you for coming out here from New York.

13         Just I just want to make clear on these Exhibits 806

14    and 808, which appear to be financial reporting by.

15         Edgewater Medical Center dated after, say, June of

16    1998, those financial reports were signed by Henry Zeisel; is

17    that correct?

18    A   Correct.

19    Q   Let me show you.

20         And can you tell us who Henry Zeisel was or is?

21    A   He was a V.P. of finance at Edgewater Medical Center.

22    Q   And his job was, among other things, he was in charge of

23    financial reporting and financial accounting at Edgewater; is

24    that correct?

25    A   That's correct.

1  Q   And how long had he been with Edgewater at the time that

2  you started dealing with the hospital?  Was he there from the

3  beginning of your involvement?

4         MR. AIZENBERG:  Objection.

5         Withdrawn.

6  BY THE WITNESS:

7  A   Yes, Henry was there since the beginning of the

8  transaction, since the initial discussions with Edgewater.

9  BY MR. MICHAEL O'ROURKE:

10  Q   And to the best of your knowledge, he had been there for

11  over how many years prior to the time you first got involved?

12  What was your understanding?  Had he been there for a number

13  of years, at the hospital?

14  A   Yes.

15  Q   Prior to the time the 1994 bonds were issued, as far as

16  you know?

17         MR. AIZENBERG:  Objection.  Foundation.

18         THE COURT:  Overruled.

19         You can testify about what your understanding was if

20  you had any.  Do you have any idea how long he had been there

21  before you got involved?

22  BY THE WITNESS:

23  A   He had been there a couple of years, but I'm not sure if

24  it was before the 1994 transaction.

25  BY MR. MICHAEL O'ROURKE:

Flaherty - cross

1    Q    Now, you're also familiar with a Mr. Mike Olson; is that

2    correct?  General counsel to the hospital?

3    A    Yes.

4    Q    Okay.  Did you have any dealings with Mr. Olson at the

5    time you were working on the Edgewater letter of credit?

6    A    Not that I recall specifically.

7    Q    He didn't -- you didn't have any meetings with Mr. Olson?

8    A    He may have been in group document meetings, which were

9    attended by a variety of attorneys on both sides.

10   Q    Did you understand him to be the general counsel or legal

11   counsel to the hospital?

12   A    I don't recall exactly.

13   Q    But you did deal with him?

14   A    I may have met him at a meeting.

15   Q    And he was a lawyer, correct?

16   A    You're telling me that, yes.

17              THE COURT:  I'm going to make a suggestion here.  Can

18   you guys sit on the same side so I don't have to hear

19   everything?

20              MR. MENDELOFF:  Sorry.

21   BY MR. MICHAEL O'ROURKE:

22   Q    I've always been curious about this relationship, and I

23   don't mean to make a big deal, but what exactly is this New

24   York agency for Dexia?  Is that -- is this a kind of a -- this

25   agency in New York, is this just a business office, or is it a

Flaherty - cross

1    company?  What exactly is the reality or the status or the

2    type of entity that's this Dexia presence in New York in the

3    United States?

4    A    The New York agency is the licensed banking entity.  It's

5    a subsidiary of Credit Local de France in the head office, and

6    in order for us to do business here in the United States we

7    need to have a banking license, so the agency is the entity

8    that is in name the banking license.

9    Q    Thank you.  I just wanted to clear that up.

10            Now, you've testified you first got involved in

11   reviewing or considering a financial transaction involving

12   Edgewater Medical Center through an approach by a Mr. Matthew

13   Goldreich at Cain Brothers?

14   A    Correct.

15   Q    And you had done -- as you said, you'd done a number of

16   deals with him before?

17   A    We've had dealings with Matt before.

18   Q    And had you done any hospital deals?

19   A    No.

20   Q    Had you done in your experience or history, career, better

21   word, at Dexia been involved in hospital finance prior to

22   Edgewater?

23   A    Yes.

24   Q    How many different kinds of hospital financing do you

25   recall being involved in?

Flaherty - cross

1    A    Hospital financing has never been a big component of our

2    business model, but we've done roughly two billion dollars

3    worth of health care financing in the 19 years that I've been

4    at Dexia.

5    Q    And you've been personally involved in some of those?

6    A    Yes.

7    Q    Had you ever been involved in a hospital financing out in

8    Chicago prior to the time that you got involved with

9    Edgewater?

10   A    No.

11   Q    Had you done any other financial deals, any enhancements

12   or any type of financial underwritings in Chicago prior to the

13   time that you did the Edgewater Medical Center transaction?

14            MR. AIZENBERG:  Objection.  Relevance.

15            THE COURT:  Overruled.

16   BY THE WITNESS:

17   A    Yes, we did a variety of transactions.  We did

18   transactions for the Chicago O'Hare Airport, Chicago Board of

19   Education.  You know, Dexia is a -- even though it's the New

20   York office, we provide credit enhancement throughout the

21   United States, so had many transactions in many states,

22   including transactions in Illinois.

23   BY MR. MICHAEL O'ROURKE:

24   Q    Okay.  I just want to clarify one thing.  In connection

25   with the Dexia letter of credit financing, did you get

1 guarantees by any corporation?  Corporate guarantees?

2 A   No.

3 Q   Now, you're familiar with an entity called Permian?

4 A   Yes.

5 Q   And could you tell Judge Kennelly who you understood

6 Permian to be?

7 A   They were a shareholder, I believe, from what I recall, in

8 Braddock Management.  It has been some time since I've looked

9 at this transaction.

10 Q   In your report you in fact state that Permian controls

11 Edgewater.  Do you remember saying that?

12 A   Yes.

13 Q   And Permian, who was Permian?

14 A   Mr. Scott Gross.

15         THE COURT:  Mr.

16         THE WITNESS:  Scott Gross.

17         THE COURT:  G-R-O-S-S.

18         THE WITNESS:  Yes.

19 BY MR. MICHAEL O'ROURKE:

20 Q   Do you remember an individual by the name of Bertram

21 Rosenthal?  Doctor Rosenthal.

22 A   Yes.

23 Q   Now, he was head of Permian, right?

24 A   He may have been at one point.

25 Q   Okay.  And Scott Gross actually was involved with Primus,

Flaherty - cross

1  correct?

2  A  Yes.

3  Q  And Primus actually controlled Braddock at the time that

4  you were dealing with the hospital; isn't that correct?

5        MR. AIZENBERG:  Objection.  Foundation.

6        THE COURT:  Overruled.

7  BY MR. MICHAEL O'ROURKE:

8  Q  Isn't that true?

9  A  Yes.

10 Q  Okay.  So Primus controlled --

11       THE COURT:  Primus is P-R-I-M-U-S?

12       MR. MICHAEL O'ROURKE:  P-R-I-M-U-S.

13 BY MR. MICHAEL O'ROURKE:

14 Q  And Scott Gross was the head of Primus, correct?

15 A  Yes.

16 Q  Okay.  I just want to clarify.  You did not get any

17 guarantees from any -- from Permian, and Permian actually was

18 the owner ultimately of Edgewater in 1997; isn't that correct?

19       MR. AIZENBERG:  Objection.  No foundation.

20       THE COURT:  Do you have an understanding who was the

21 owner of Edgewater?

22       You're talking about Edgewater Medical Center?

23       MR. MICHAEL O'ROURKE:  Yes.

24       THE COURT:  Do you have an understanding of who the

25 owner of Edgewater Medical Center was?

Flaherty - cross

| 1 | THE WITNESS:  Premium. |
| 2 | MR. MICHAEL O'ROURKE:  It's Permian. |
| 3 | THE WITNESS:  Permian. |

4     THE COURT:  Is that Permian spelled like the high

5  school in the movie version of Friday Night Lights?

6     MR. MICHAEL O'ROURKE:  Yes, that's exactly right,

7  Judge.

8     THE COURT:  Okay.

9     MR. MICHAEL O'ROURKE:  P-E-R-M-I-A-N.

10  BY MR. MICHAEL O'ROURKE:

11  Q   And Primus is P-R-I-M-U-S, correct?

12  A   Correct, yes.

13  Q   Okay.  At the time you were dealing with Edgewater

14  Hospital, who were the members of the board of the directors?

15  A   I do not recall specifically.

16  Q   Okay.  Do you know that Peter Rogan was not a member of

17  the board of directors of Edgewater at the time that you first

18  started dealing with Edgewater?

19  A   Yes.

20  Q   The answer to that, he was not?

21  A   Right.

22  Q   And you understand the board of directors is the

23  controlling body for the hospital?  Do you understand that?

24     MR. AIZENBERG:  Objection.  No foundation.

25     THE COURT:  Well, I mean, I think I know what a board

Flaherty - cross

1    of directors is.  I think it's a matter of debate as to what

2    any particular board of directors does.

3    BY MR. MICHAEL O'ROURKE:

4    Q   But Mr. Rogan in fact was not an owner of the hospital in

5    1997, was he?

6    A   No.

7    Q   He was not on the board of directors of Edgewater?

8    A   Right.

9    Q   He was not on the board of directors of Permian, who owned

10   the hospital?

11   A   Right.

12   Q   Okay.  He wasn't on the board of director of Primus,

13   right?

14   A   Correct.

15   Q   And Primus was run by Scott Gross, right?

16   A   Right.

17   Q   Okay.  And Henry Zeisel was the financial and accounting

18   guy, and he signed these financial reports, correct?

19   A   Yes.

20   Q   They weren't signed by Peter Rogan, were they?

21   A   No.

22   Q   Okay.  I want to talk to you a little bit about due

23   diligence, okay.

24       Now, due diligence -- and I don't want to hold you to

25   any kind of artificial definition, but when you say due

1  diligence, can you give us an idea of what kinds of things

2  from your standpoint -- now, let's look at a hospital. Let's

3  take a hospital. You don't have to take Edgewater, but just

4  take a hospital. What would be from your standpoint the kinds

5  of tasks or the kinds of activities that would make up a full

6  and thorough due diligence review of that hospital?

7          THE COURT: You mean due diligence by somebody doing

8  what his company was doing?

9          MR. MICHAEL O'ROURKE: Yes.

10         THE COURT: Okay. Go ahead.

11         THE WITNESS: We would review the audited financial

12 statements for the hospital. We would look at their operating

13 statistics. We would compare their results to medians that

14 are published by the rating agencies. We would tour the

15 hospital facilities. And we would meet with the key managers

16 at the hospital, in this case Peter Rogan, Henry Zeisel and

17 Joann Skvarek.

18         MR. MICHAEL O'ROURKE: Okay.

19         THE WITNESS: I'd like to say something.

20         We don't commonly meet with boards when we do these

21 transactions.

22 BY MR. MICHAEL O'ROURKE:

23 Q  But you understand that the boards have ultimate authority

24 or ultimate say as to what agreements the hospital enters

25 into; isn't that correct?

 1  A    Yes.

 2  Q    You're not saying that --

 3         MR. AIZENBERG:  Mr. O'Rourke, you're asking about his

 4  understanding?

 5         MR. MICHAEL O'ROURKE:  His understanding, yeah.

 6  BY MR. MICHAEL O'ROURKE:

 7  Q    Just to be clear, none of these documents that you

 8  testified to -- and, for example, Exhibit 24, which is the

 9  custody, pledge and security agreement, okay?

10  A    Yes.

11  Q    All right.  Now, that document for Edgewater Medical

12  Center is not signed by Peter Rogan, is it?

13  A    No.  It's signed by Henry Zeisel, who reported to Peter

14  Rogan.

15  Q    What is the basis for your saying that he reported to

16  Peter Rogan?  Do you have an organizational chart that

17  Edgewater -- of Edgewater which shows an organizational

18  diagram having Henry Zeisel reporting to Peter Rogan?

19  A    In my -- no, but in my numerous --

20  Q    Thank you.

21  A    -- conversations --

22         THE COURT:  No, no.  You asked a general question.

23  This is the problem with asking long, run-on questions,

24  Mr. O'Rourke.

25         Go ahead and complete your answer.  The first part of

1 that question was general, what's your basis for that? Go

2 ahead and tell me what the basis for it is.

3 THE WITNESS: When I had numerous conversations with

4 Henry Zeisel, he would always defer to Peter's judgment before

5 he'd respond back to the bank.

6 MR. MICHAEL O'ROURKE: Well, object to that as being

7 conclusory.

8 THE COURT: You opened the door by asking a question

9 what's your basis for that. The objection is overruled.

10 BY MR. MICHAEL O'ROURKE:

11 Q Now, in reviewing -- as part of due diligence you would

12 review the hospital's board of directors, the members of the

13 board of directors, who are the members of the board of

14 directors; is that correct?

15 A We would list them, yes.

16 Q Okay.

17 Would you check and see who were the hospital's --

18 whether they had a certificate of good standing with the

19 state?

20 A Yes.

21 Q Okay. Would you -- you would get three years or more of

22 audited financial statements?

23 A Yes.

24 Q Now, when we say audited financial statements, these are

25 not financial documents that are actually prepared by the

1   hospital itself; is that correct?

2   A   The auditors are retained by the hospital to prepare

3   financial statements.

4   Q   All right.  Now, who do you recall being the auditors of

5   Edgewater?  It was Ernst & Young, wasn't it?

6   A   It was Ernst & Young, and then it switched to McGladrey.

7   Q   So the hospital's finances were looked at by third party

8   accounting firms with -- and you would consider those

9   accounting firms to have good reputations?

10  A   I would.

11  Q   And you're aware that Arthur Andersen was the prior

12  auditor for --

13  A   I did not recall that.

14  Q   Okay.  Now, you were also -- as part of your due diligence

15  would you look at the hospital's annual reports, if available?

16  A   Their audited financial statements, yes.

17  Q   All right.  Would you also check to see whether or not or

18  to review any kind of capital budgets or capital planning

19  budgets with respect to any kind of future capital expansion

20  or typical -- or similar type of plans for a hospital?

21  A   Yes.

22  Q   In fact, you did it in this case because part of the --

23  the bond revenue or the bond issuance was designed to go to

24  the -- the construction of improvements at the hospital; isn't

25  that correct?

1    A    That's correct.

2    Q    Okay.  And from what I understand, the hospital as you saw

3    it and when you first visited the hospital, you felt that the

4    hospital was in good financial -- or good physical condition?

5    A    It was an older facility.  It was in need of improvements.

6    Q    But under the bond financing there was going to be ten

7    million dollars of improvements at least, right?

8    A    Yes.

9    Q    Now, with respect to --

10             Oh, just going back to this question of guarantee.

11   You did not get a guarantee of any individuals either on this

12   hospital financing at all, did you?

13   A    No.

14   Q    Okay.  You did not get a financial -- a guarantee from

15   Peter Rogan at all?

16   A    No.

17   Q    Okay.  Or any of the members of the board of directors of

18   Permian, the owner?

19   A    It would not be common to get guarantees by board of

20   directors.

21   Q    Okay.  But would you at any time get guarantees of

22   majority shareholders of the hospital?

23   A    No.

24   Q    From the standpoint, then, of the letter of credit

25   financing, Dexia was not seeking to have the -- or be a --

Flaherty - cross

1    a -- taken -- take a guarantee from Peter Rogan or any

2    individual to back up this financing; it was all going to be

3    other collateral, correct?

4    A    Correct.

5    Q    So you were not a -- so Dexia was not a creditor of Peter

6    Rogan in 1998, right?

7    A    Correct.

8    Q    And Dexia was not a creditor of Peter Rogan in 1999

9    either, right?

10            MR. AIZENBERG:  Objection.  Calls for a legal

11   conclusion.

12            THE COURT:  No.  Overruled.  He's asking for his

13   understanding.

14   BY MR. MICHAEL O'ROURKE:

15   Q    Your understanding, right?

16   A    Repeat the question.  I'm sorry.

17   Q    Dexia was not a creditor, from your understanding, of

18   Peter Rogan in 1999?

19   A    No.

20   Q    Or in 2000, correct?

21   A    Correct.

22   Q    All right.  In fact, the first time, from your

23   understanding, that Dexia became a creditor of Peter Rogan was

24   when Dexia obtained a judgment in this court, prior judge, in

25   2007, correct?

1    MR. AIZENBERG:  Mr. O'Rourke, you're asking about his
2    understanding at the time?
3    THE COURT:  Actually, you need to talk to me,
4    Mr. Aizenberg.  So what's your question for me?
5    MR. AIZENBERG:  Is he asking for the understanding at
6    the time with respect to all these questions about being a
7    creditor?
8    THE COURT:  Put your question again.
9    MR. MICHAEL O'ROURKE:  I'm asking about Dexia's
10   creditor's status relative to Peter Rogan at various periods
11   of time.
12   THE COURT:  Okay.  And he's asking for the witness's
13   understanding.  The witness can't put a legal conclusion on
14   it.  I may have to draw some legal conclusion at some point in
15   time based on facts, and I'll draw that, and it's not
16   necessarily going to be just based on what this witness's
17   understanding was.
18   With all that in mind, I'm going to allow you to ask
19   the question.  Put your question again.  It had to do when it
20   first became a creditor in 2007 when you got a judgment.
21   MR. MICHAEL O'ROURKE:  Is that right?
22   THE COURT:  Is that your understanding?
23   THE WITNESS:  That's my understanding.
24   BY MR. MICHAEL O'ROURKE:
25   Q   Okay.  So at any time in 2004 or 2005, 2006, if Peter

1    Rogan or any of his family members were engaged in any kind of

2    attempts to move assets around to, you know, to avoid

3    creditors, Dexia was not a creditor prior to 2007, correct?

4    A    That's my understanding.

5    Q    Okay.

6            Now, part of your due diligence in reviewing a

7    hospital would be to see what kind of management contracts and

8    vendor contracts that hospital has outstanding, correct?

9    A    The management contract would be reviewed, yes.

10   Q    Okay.  Now, in connection with Edgewater, what management

11   contracts did you and your -- did you review?

12   A    I believe it was a Braddock Management agreement.

13   Q    Okay.  Now, did you make any kinds of assessments, written

14   assessments of that management contract in connection with

15   your credit application review to Dexia?

16   A    Yes.

17   Q    Okay.  And is it in your credit application review?

18   A    Yes, it is.

19   Q    Okay.  Did you -- and do you recall -- and I can -- let me

20   see if I can help.  Did you make -- and let's look at your --

21           MR. MICHAEL O'ROURKE:  Your Honor, can I approach the

22   witness, Your Honor?

23           THE COURT:  Yes.  No need to ask.

24           MR. MICHAEL O'ROURKE:  Thank you.

25   BY MR. MICHAEL O'ROURKE:

1   Q   You have Exhibit A in front of you, right?

2   A   Yes, I do.

3   Q   Okay.  Sorry.

4           MR. MICHAEL O'ROURKE:  Your Honor, can I give you a

5   copy?

6           THE COURT:  Sure.  Is it on your disk?  Maybe not?

7   This is all one thing?

8           MR. MICHAEL O'ROURKE:  Yes.  It was an exhibit to his

9   affidavit.

10          MR. AIZENBERG:  Your Honor, this is Exhibit 732 A.

11          MR. MICHAEL O'ROURKE:  Sorry.

12          THE COURT:  Oh, it's one of Dexia's exhibits.

13          MR. MICHAEL O'ROURKE:  Yes.

14          MR. AIZENBERG:  Yes.

15          THE COURT:  I don't need this then.  I've got it on

16  my screen.

17  BY MR. MICHAEL O'ROURKE:

18  Q   Can you offhand find in this credit application report of

19  memo where you talk about the Braddock Management contract?

20  A   It's on page 7 or Dexia 6655, and it's in the fourth full

21  paragraph.  Fourth and fifth actually.

22  Q   All right.  And that's the second to last paragraph

23  relating to management services to Edgewater?

24  A   Correct.

25  Q   You recount or state what the relationship is and what the

Flaherty - cross

1    status of Braddock is.  You don't make any kinds of

2    assessments or opinions as to whether or not those management

3    fees are high or low, do you?

4    A    We want to understand the cost basis for it, and there was

5    a cap in terms of total percentage of the revenues.  We just

6    wanted to have a general understanding of the cost of

7    management contracts.

8    Q    And you were satisfied?

9    A    Yes.

10   Q    That was not a deal breaker from your standpoint?

11   A    Correct.

12   Q    In connection with the review of this hospital, you were

13   aware and are aware that when you look at a hospital a lot of

14   the payments are derived from services that are supplied to

15   individuals with government insurance like Medicare, Medicaid,

16   correct?

17   A    True.

18   Q    Is there some kind of Medicare, Medicaid or other types of

19   government payment review or audit that's looked at when you

20   actually go and review a hospital's finances in respect to a

21   potential transaction?

22           Do you understand what I'm saying?

23   A    Yes.

24           Not commonly.

25   Q    Okay.  Did you conduct any kind of review of the

1  procedures or the internal procedures of Edgewater regarding

2  the handling of Medicare, Medicaid payments?

3  A  No.

4  Q  You did not?

5      The auditors, did you rely on the auditors to

6  actually do that kind of review, the Ernst & Youngs and the

7  McGladrey that were involved here to do that kind of review?

8  A  Well, they were attesting to the accuracy of the revenues

9  that were published in the financial statements.  You could

10 rely on them.

11 Q  Okay.  You used a term that I'd like you to -- that I just

12 had a question about.  As part of your review you'd look at

13 the hospital's receivables, what kind of receivables, the

14 money they had coming in, correct?

15 A  Yes.

16 Q  Now, in your review of Edgewater it appears that your

17 collateral as it ended up consisted from the receivable

18 standpoint of something called restricted receivables?

19 A  Unrestricted receivables.

20 Q  Or unrestricted receivables.

21     What is an unrestricted receivable?

22 A  You generally can't have a pledge of Medicare revenue.

23 Unrestricted receivables are other revenues that are not

24 restricted by government payors.

25 Q  Now, in your review of Edgewater you also would be mindful

Flaherty - cross

1   and be interested in what other debt obligations besides the

2   bonds that the hospital had?

3   A   Yes.

4   Q   Okay.  Did it have any large, you know, any large bank

5   loans or any other large debt either current or long-term that

6   you recall?

7   A   There was a four million dollar note.

8   Q   Okay.  And a four million dollar note payable to who?

9   A   I forget exactly who it was, but it was a note payable to,

10  I think, Edgewater Operating Corporation.

11  Q   Now, I think in your report you said that note was paid

12  off in 1997; is that correct?

13  A   Yes.

14  Q   Okay.  So other than that, Edgewater didn't have any large

15  bank obligations or mortgages, things like that?

16  A   They had a lot of bonded debt.

17  Q   I'm sorry?

18  A   They had bonded debt.

19  Q   Okay, bonded debt, the 40 million dollars.

20          Part of the collateral and I would -- and it looks

21  like a large part of the collateral consisted of mortgage on

22  actual buildings or physical plant at the hospital, correct?

23  A   Correct.

24  Q   Okay.  Did you make -- your team make any kind of value

25  appraisal of that real estate, which was going to be part of

Flaherty - cross

1    your collateral?

2    A    We primarily looked to the ongoing operations to repay us.

3    The collateral was there, but it was secondary in the credit

4    decision.

5    Q    But the hospital did have about 40 million worth of real

6    estate, didn't it?

7    A    Special purpose real estate that didn't have value unless

8    it continued to operate as a hospital.

9    Q    Right, but that hospital had been there since 1929, right?

10   A    Yes.

11   Q    Okay.  Did you have any, you know, concerns that Edgewater

12   would all of a sudden go away in the Rogers Park neighborhood?

13   A    When we underwrote the deal we assumed that Edgewater

14   would continue to operate and generate sufficient revenues to

15   pay debt service.  There was not a reliance on the collateral.

16   Q    But you had 40 million dollars of hard physical assets,

17   didn't you?

18   A    Special purpose assets which have no value when it doesn't

19   continue to operate for the special purpose that it's

20   designated as.

21   Q    By either Edgewater or some successor, correct?

22   A    Correct.

23   Q    And at Grant Hospital there was a successor that came in

24   and ran Grant Hospital, wasn't there?

25   A    Yes.

Flaherty - cross

1   Q   Columbia did, right?

2   A   Yes.

3   Q   Okay.  And Columbia was one -- and Grant was one of the

4   hospitals that eventually came into this relationship, Grant

5   Hospital in Lincoln Park, correct?

6   A   Correct.

7   Q   All right.

8       You did a UCC filing search on this hospital,

9   correct?

10  A   Our attorneys did, yes.

11  Q   Okay.  Do you recall any major secured indebtedness

12  revealed in that UCC financing review that you can recall, any

13  major equipment leases or any other secured debt?

14  A   Not that I specifically recall.

15  Q   Minimal stuff.

16      Were there any other collateral pledges to which the

17  hospital was a pledgor or party to that you found when you did

18  your due diligence review, any other pledges to any other

19  lender or any other creditor?

20  A   Not that I recall specifically.

21  Q   When you were looking at Edgewater, you were aware that

22  Edgewater was involved in conducting a hospital business where

23  there's possibility of problems that needed to have insurance

24  coverage, correct?

25  A   Can you -- I don't understand the question.

Flaherty - cross

1    Q    Okay.  Let me make it simple.  I apologize.

2         Can you tell us when you reviewed Edgewater what

3    existing insurance coverage that you recall being, you know,

4    maintained by the hospital at that time?

5    A    I don't recall specifically.

6    Q    Do you know if they had a directors and officers policy?

7    A    After the fact, after we closed the deal I was aware of

8    that.

9    Q    Okay.  But that's something that was important, isn't it,

10   to have an insurance policy covering directors and officers

11   when you're doing a financing deal for a large hospital?

12   A    I would assume so.

13   Q    And how about malpractice coverage, medical malpractice

14   coverage to cover any kind of suits, correct?

15   A    I would assume so.

16   Q    Now, did you have a report written up on the insurance

17   coverage of the hospital?

18   A    No.

19   Q    But there was a D&O policy, correct?

20   A    From what I understand, yes.

21   Q    Okay.  And the policy what 25, 35 million?

22   A    I don't recall the amount.

23   Q    Do you have a copy of that -- if I asked your counsel,

24   could you get me a copy of that policy to see what -- you

25   know, what kind of insurance the hospital had?  You'd have

Flaherty - cross

1    that?

2    A    I would assume so.

3    Q    Okay.  Did you also check to see if there was any

4    outstanding litigation involving the hospital in 1997 material

5    to your review?

6    A    Nothing was disclosed to us.

7    Q    No, I'm not asking that.  Did you do a search of court --

8         THE COURT:  Did you do any checking on your own?

9         THE WITNESS:  No, I did not.

10        THE COURT:  He answered no.

11   BY MR. MICHAEL O'ROURKE:

12   Q    Did you do any review -- as part of a due diligence would

13   it be a ordinary and customary part of that to do a review of

14   any kind of -- see if there's any kind of governmental probes

15   or investigations or any kind of, you know, governmental

16   interests, shall we put it, of the hospital?

17   A    Generally the responsibility for that lies with the

18   underwriter of the bonds that conducts reviews with the

19   hospitals.  If there was material litigation that was in place

20   at the time, would have had to have been disclosed in the

21   official offering document, which there was none.

22   Q    Okay.  But would you do a review of the hospital -- of the

23   hospital's records or any other records to see whether or not

24   there's any governmental investigations with respect to the

25   operations of the hospital?

Flaherty - cross

1   A   We would not do that.  We would rely on the underwriters

2   to do that.

3   Q   And the underwriters in this case was Cain Brothers,

4   right?

5   A   Right.

6   Q   And Cain Brothers is a very competent and a highly

7   resourceful organization.  Did they do that review to check

8   and see whether there was any kind of governmental

9   investigations or problems?

10          MR. AIZENBERG:  Objection.

11   BY THE WITNESS:

12   A   I don't know.

13          MR. AIZENBERG:  Calls for speculation.

14   BY MR. MICHAEL O'ROURKE:

15   Q   To your understanding?

16   A   I don't know exactly what Cain Brothers did or did not do.

17          THE COURT:  The objection is overruled.

18   BY MR. MICHAEL O'ROURKE:

19   Q   Did you check to see whether or not there had been any

20   newspaper articles or magazine articles regarding Edgewater or

21   any of the individuals or entities that you were involved with

22   in looking at the Edgewater letter of credit transaction?

23   A   No.

24   Q   So you didn't check to see if there had been any kind of

25   adverse newspaper reporting or any kind of unfavorable

Flaherty - cross

1   publicity about the hospital?

2   A   No.

3   Q   But you could have -- I mean, that's something that you

4   can do, correct?

5   A   Yes.

6   Q   And does Cain Brothers or the underwriter who's looking at

7   all -- the whole picture, you would expect them to check and

8   see whether or not there's any unfavorable publicity about the

9   hospital?

10  A   If it ran to the extent of material litigation, it would

11  have been disclosed in the official statement.

12  Q   Okay.  But what if there was an investigation by the state

13  or the federal government regarding purported irregular or

14  unlawful practices at the hospital?  That would be something

15  that would be material to you, wouldn't it?

16  A   It would be.

17  Q   And if that kind of publicity or reporting is going on at

18  the time that you're reviewing the hospital, you'd want to

19  know about it, wouldn't you?

20  A   Yes.  But we rely on a certificate of good standing.

21  Q   The certificate of good standing?

22  A   Yes.

23  Q   What's that?

24  A   It's issued by the state that the hospital -- you know,

25  it's a certificate of good standing that there's nothing, you

1  know, material.  It attests to the -- not the soundness, but

2  that there's nothing that's been disclosed to the state that

3  they would be aware of.

4  Q   Are you familiar with a publication called Modern Health

5  Care?

6  A   I've heard of it.

7  Q   Have you ever looked into it or read anything?

8  A   I may have in the past.  I don't recall.

9  Q   I mean when you -- probably the only time you'd ever be

10  interested is when you'd be looking at a hospital, I would

11  think, right?

12  A   Presumably.

13  Q   What's that?

14  A   Yes.

15  Q   It's actually one of your counsel's exhibits.  Let me show

16  you this.

17         THE COURT:  What's the number?

18         MR. MICHAEL O'ROURKE:  It's 36, Plaintiff's Exhibit

19  36.

20  BY MR. MICHAEL O'ROURKE:

21  Q   Showing you what's Exhibit 36, it's a -- appears to be a

22  copy of an article in Modern Health Care, April 1996.  "Agency

23  Probes Chicago Clinic's Referrals."  Have you ever seen this

24  before?

25  A   I have not.

1  Q   Okay.  Do you know -- you don't have any question that

2  this article was actually published in Modern Health Care at

3  that time?

4  A   No.

5  Q   Okay.  So and Modern Health Care is a publication that is

6  distributed generally in the health care industry from your

7  understanding?

8  A   Yes.

9  Q   Okay.  Now, reading that, it talks about the Chicago

10  Housing Authority plans more stringent reviews of a clinic

11  operated by a hospital.  Can you read this?  Take a moment and

12  read it.

13  A   (Witness complying.)

14       Okay.

15  Q   This discloses an FBI investigation into Edgewater going

16  to some activity that apparently involves illegally taking

17  seniors from other areas and bringing them into the hospital

18  in violation of federal law.  Wouldn't this be a red flag to

19  Dexia that Edgewater --

20  A   Yes, had we been aware of it.

21  Q   Okay.  Now, Cain Brothers, your underwriter, is charged to

22  know all the material facts about a hospital deal as your

23  agent, correct?

24  A   As a representative of the bond holders, yes.

25  Q   Okay.  And did Cain Brothers not come up with this?  Is

1    that what you're saying?

2    A    I did not see it.

3    Q    Okay.  You didn't see it?

4         So at no time -- and this is two years before Dexia

5    got involved.  This is out in the public.  Do you have any

6    doubt about that?

7    A    No doubt.

8    Q    Okay.  So if you'd known about this, you never would have

9    done the deal, would you?  Absolutely not?  You wouldn't get

10   involved in a hospital that had this kind of FBI probe?

11        THE COURT:  Are you going to let him answer the

12   question?

13        MR. MICHAEL O'ROURKE:  I'm sorry.

14        THE COURT:  So if you had known about this, would you

15   have done the deal?

16        THE WITNESS:  It would have raised red flags, and we

17   would have addressed it; and if it was satisfactorily

18   resolved, we may have done the deal.

19   BY MR. MICHAEL O'ROURKE:

20   Q    Do you know if this FBI probe was satisfactorily resolved?

21   A    I have no idea.

22   Q    But if it hadn't been resolved, you wouldn't have done the

23   deal, would you?

24   A    Well, we do address this contract with the Chicago Housing

25   Authority in the credit application.

1    Q    Right, but you don't --

2    A    We were aware of it.

3    Q    But you don't address the fact that the Edgewater -- at

4    least they're alleged to have been transporting patients from

5    other areas, right?

6    A    Correct.

7            MR. MICHAEL O'ROURKE:  Exhibit 35.  Your Honor,

8    Exhibit 35.

9    BY MR. MICHAEL O'ROURKE:

10   Q    Mr. Flaherty, Exhibit 35 -- and I'm going to give you as

11   much time as you need -- is another article from Modern Health

12   Care, this time in 1995, again, before your letter of credit

13   financing.

14   A    What's the date on that?  I'm sorry.  I can't see that.

15           THE COURT:  Can't really make out the year.

16           MR. MICHAEL O'ROURKE:  I'm sorry.  Your Honor,

17   it's --

18           THE COURT:  Does it say '95?

19           MR. MICHAEL O'ROURKE:  I think it's '95.

20           MR. AIZENBERG:  '96.

21           MR. MICHAEL O'ROURKE:  '96, I'm sorry, '96.

22           Take a look at that.  Take your time.

23           THE COURT:  Just so you know, this is actually a week

24   before the other one.

25           MR. MICHAEL O'ROURKE:  I thought it was 1995, so I

1  apologize.  That's right.

2  BY MR. MICHAEL O'ROURKE:

3  Q  Have you seen this before?

4  A  No.

5  Q  Okay.  Have you seen it at all in the last --

6        THE COURT:  He hasn't seen it before.  Before means

7  never, so ask the next question.

8        MR. MICHAEL O'ROURKE:  Okay.  Okay.

9  BY MR. MICHAEL O'ROURKE:

10 Q  Do you have any doubt that this article also ran in Modern

11 Health Care in 1996?

12 A  No doubt.

13 Q  And Dexia from your understanding was not aware of this?

14 A  Correct.

15 Q  Okay.  And Cain Brothers did not bring this to your

16 attention?

17 A  Correct.

18 Q  Now, you also see that it has on page 33, it talks about

19 the purchase in August 1994 by Permian of the hospital.  Do

20 you see in the left-hand column?

21 A  Okay.

22 Q  Okay?  41 million dollar bond issue in the original sale,

23 you're familiar with that, right?

24 A  Yes.

25 Q  Okay.  And then the money -- 31 million of that was paid

Flaherty - cross

1    to Edgewater's shareholders, who are Rogan and his three

2    children, right?

3    A    Yes.

4    Q    Okay.  And you were aware when you were looking at Dexia

5    that Rogan had sold the hospital for 31 million and the money

6    had gone to him and his children?  You're aware of that?

7    A    I was aware it went to Peter Rogan.

8    Q    And his children?

9    A    Yes.

10           THE COURT:  We're going to break for lunch at this

11   point.  My guess is it's going to be about 1:50, so please be

12   ready to go then.

13           MR. TOUHY:  50 or 15?

14           THE COURT:  Five, zero.

15           (Said hearing was recessed from 12:10 p.m. until 1:50

16   p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4   DEXIA CREDIT LOCAL, f/k/a       )
     Dexia Public Finance Bank       )
 5   and Credit Local de France,     )   Docket No. 02 C 8288
                                      )
 6                  Plaintiff,        )
                                      )
 7             vs.                    )   Chicago, Illinois
                                      )   April 1, 2009
 8   PETER G. ROGAN, et al.,          )   2:10 p.m.
                                      )
 9                  Defendants.       )

10                       TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
     APPEARANCES:
13

14   For the Plaintiff:       HOWREY LLP
                               BY:  MR. SCOTT T. MENDELOFF
15                                  MR. GABRIEL AIZENBERG
                               321 North Clark Street, Suite 3400
16                             Chicago, Illinois  60654

17

18   For Judith Rogan and
     Brian Rogan:             O'ROURKE & MOODY
19                             BY:  MR. MICHAEL J. O'ROURKE
                                    MR. MYLES P. O'ROURKE
20                             55 West Wacker Drive, Suite 1400
                               Chicago, Illinois  60601
21

22
     For Robert Rogan and
23   Sara Rogan:              TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
                               BY:  MR. TIMOTHY J. TOUHY
24                                  MR. JEFFREY J. HALLDIN
                               55 West Wacker Drive, Suite 1400
25                             Chicago, Illinois  60601
```

1

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois 60604
(312) 427-4393

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were had in open court:)

2              THE COURT:  Do you know that you're still under oath?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  Anything we need to take up

5      before we start with the witness?

6              MR. MENDELOFF:  Yes, just one quick thing, your

7      Honor.  I just wanted to put on the record that we have not

8      been and will not be objecting on the basis of outside the

9      scope.

10             THE COURT:  Right.

11             MR. MENDELOFF:  For reasons that we discussed

12     previously.

13             THE COURT:  Okay.

14             Mr. O'Rourke, you can proceed.

15             MR. MICHAEL O'ROURKE:  Thank you.

16        JOHN FLAHERTY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

17                  CONTINUED CROSS EXAMINATION

18     BY MR. MICHAEL O'ROURKE:

19     Q    Mr. Flaherty, when we broke, we were talking about

20     publicity surrounding the FBI and an FBI investigation at

21     Edgewater Hospital in 1996.

22             Do you remember those subjects we were talking about?

23     A    Yes.

24     Q    Okay.  And as an experienced and extremely capable

25     financial executive, it stands to reason that you would not

1  approve going into a lending relationship with a borrower who

2  has an unresolved FBI investigation on that borrower for

3  fraud?

4         MR. AIZENBERG:  Objection, asked and answered.

5         THE COURT:  It's okay to kind of get things going

6  again.

7  BY THE WITNESS:

8  A    Yes.

9  BY MR. O'ROURKE:

10 Q    You would not do that, okay.

11        Do you have a letter of understanding with Cain

12 Brothers as to the scope of the responsibilities as your

13 underwriter and advisor in this relationship?

14 A    They are not our underwriter; they are the underwriter for

15 the hospital.

16 Q    I'm sorry?

17 A    They're not the underwriter for Dexia.  They're the

18 underwriter for the hospital.

19 Q    But you worked with Cain Brothers in putting this

20 transaction together, correct?

21 A    Cain Brothers did have independent reviews with the

22 hospital in reviewing this information.  We were not party to

23 all of those investigations.

24 Q    We have talked earlier today about some of the sources of

25 documents you would be looking at in your review of Edgewater.

1    We talked about -- and remember we talked a little
2    bit about insurance policies.

3    A    Yes.

4    Q    And you do recall that insurance policies were reviewed?

5    A    No, I do not.

6    Q    Do you know if there was a fidelity bond issued for this
7    hospital?

8    A    I don't recall that particularly.

9    Q    Do you have an insurance file?  Do you have an insurance
10   file or something containing documents relating to insurance
11   that would be part of your due diligence document file for
12   this transaction?

13   A    No, we do not.

14   Q    But if there were any insurance policies that were
15   pertinent or active for the hospital during the time of your
16   review, those would be in your general file?

17   A    No.

18   Q    Where would you find those?

19   A    We never received them.

20   Q    Did you remember ever asking the hospital for copies of
21   any insurance policies for directors' or officers' liability,
22   medical malpractice, or anything like that?

23   A    No.

24   Q    You do not.

25                Among the other areas that you might -- well, that

Flaherty - cross

1  you in the ordinary course would look into in a due

2  diligence -- is any filings by the hospital or the borrower of

3  any governmental agency, would that be correct, either state

4  or federal?

5  A   Not particularly.  We didn't look into filings of any kind

6  as part of the due diligence process.

7  Q   Would you have looked at any filings by -- you said that

8  the Edgewater had a certificate of compliance with the state.

9  Did you review those documents prior to --

10 A   Certificate of good standing.

11 Q   Certificate of good standing?

12 A   Yes.

13 Q   Okay.  Would you look at any other filings by Edgewater

14 with the state concerning its shareholders or its business

15 commission or anything like that?

16 A   No.

17 Q   Could you look at your Exhibit A, in your report, your

18 credit report, credit application, which has been admitted as

19 732, I believe, A?

20 A   Yes.

21        Did you say Exhibit A?

22 Q   Yes.  It's your credit application, Dexia 6648.

23 A   Yes.

24 Q   Do you have it?

25 A   I do.  What is -- I don't see the reference to Exhibit A,

Flaherty - cross

1    though.

2    Q    I'm sorry.  It's the lawyer's designations, just your

3    credit application.  But it has been marked as an Exhibit A.

4    A    Okay.

5    Q    Do you have it in front of you?

6    A    Yes, I do.

7    Q    Reviewing the cover page, it talks about or it lists

8    Mr. Peter Rogan as being the CFO, chief financial officer, or

9    is that a misprint?

10   A    CFO, CEO, it's used interchangeably.

11   Q    Now, wasn't Mr. Zeisel the chief financial officer of the

12   hospital?

13   A    He was vice-president of finance.

14   Q    Now, the type of facility that Dexia is offering here or

15   is reviewing here is a facility of a 55 million dollar letter

16   of credit, correct?

17   A    Correct.

18   Q    And you are getting an upfront fee of 20,000 as a fee?

19   A    Correct.

20   Q    Okay, and an annual fee of 80 basis points, which is based

21   on, what, the outstanding amount under the letter?

22   A    Correct.

23   Q    We have the source of repayment being -- number one, the

24   loan repayments are a loan agreement with the issuer.  Are

25   those the bonds?

Flaherty - cross

1    A    They pertain to the bonds.  It's a loan agreement.

2    Q    Remarketing proceeds.  What is referred to there as

3    remarketing proceeds?

4    A    In these transactions, given that they are -- the bonds

5    were sold in a floating variable rate, if the bonds are put by

6    an investor and then they are resold, those remarketing

7    proceeds are used to pay the purchase price.

8    Q    Funds under the bond indenture, we talked about that, and

9    liquidation of mortgage, all right.

10            Now, again, the mortgage, I asked you before and I

11   wonder if it's in this report.  Do you have a valuation of the

12   actual assets covered by a mortgage?

13   A    Just what's expressed in the balance sheet.

14   Q    In the balance sheet.

15            Now, the balance sheet is actually at the back of

16   this or toward the back of this credit application report, and

17   I believe it's beginning at 6669 and 6670.

18   A    Yes.

19   Q    We will get to that.

20            There is a section here on covenants.

21            Now, could you explain this usual and customary 1.25

22   X great covenant minimum.  What does that mean?

23   A    Typical in many of these hospital transactions, there is a

24   requirement that the borrower establish rates and charges to

25   produce 1.25 times annual debt service coverage.  It's

Flaherty - cross

1   somewhat an industry norm.

2   Q   And 1.5 X current ratio, is that current debt or current

3   assets to current debt?

4   A   Correct.

5   Q   And minimum 10 million cash and liquid investments,

6   correct?

7   A   Correct.

8   Q   Now, at the time that you were looking at Dexia, Dexia had

9   much more than 10 million in cash and liquid investments,

10  didn't it?

11  A   You mean Edgewater.

12  Q   I'm sorry.  Strike that.  Not Dexia.

13          Edgewater had liquid cash and liquid investments of

14  an amount much greater than $10 million, isn't that correct?

15  A   That is correct.

16  Q   In fact, one of the very appealing features of this

17  proposed transaction was that Edgewater had, based on your

18  review, $40 million plus in cash and liquid securities, didn't

19  it?

20          MR. AIZENBERG:  Objection, relevance.

21          THE COURT:  Overruled.  He can answer.

22  BY THE WITNESS:

23  A   Yes.

24  BY MR. MICHAEL O'ROURKE:

25  Q   Okay, and that 40 million was just about what the bonds

1  needed to be to pay it off, right?

2  A    It was a significant amount in relation to the bonds.

3  Q    So that 40 million in liquid investments, and we're

4  talking about stocks, securities, cash, things that can be

5  sold and liquidated quickly to pay off debt, the hospital had

6  almost enough to pay off the bonds out of its own cash, didn't

7  it?

8  A    Yes.

9  Q    Okay.   And the other 10 million that you were going to be

10  putting up, that was going to go into produce improvements and

11  rehabbing and adding and increasing the value of the physical

12  plant, which, on the basis of your review, was worth about

13  $40 million at the time you put into it, right?

14  A    Correct.

15  Q    So you were going to put 10 million.   You had 40 million

16  of liquid investment collateral and 50 million in mortgage

17  debt, 90 million to cover a possible exposure of around 55

18  million, is that right?

19  A    Yes.

20  Q    Thank you.

21           All right.   Let's look at --

22           Now, who did you report to?  Who do you report to

23  when you were doing this review?  Did you have any superior in

24  New York?

25  A    Yes.

Flaherty - cross

1  Q   Who was that?

2  A   Jim Miller, the general manager.

3        THE COURT:  Spell the last name.

4        THE WITNESS:  James R. Miller, M-i-l-l-e-r.

5        THE COURT:  Oh, Miller.

6  BY MR. MICHAEL O'ROURKE:

7  Q   Okay.  Now, his signature is not on this cover page, is

8  it?

9  A   Yes, it is.

10 Q   Where is it?

11 A   It's under CLF New York manager.

12 Q   Oh, Jim Miller, general manager, okay.

13       Now, did he have ultimate approval authority for this

14 kind of deal?

15 A   Yes.

16 Q   Okay.  Did you have --

17       And I see other names here.  And at the bottom of the

18 page, could you tell us who these other gentlemen are:

19 Mr. Eisendrath?

20 A   He was a deputy general manager, and he sat on the credit

21 committee along with Jim Miller.

22 Q   Okay.

23 A   And at the bottom there, you can never figure that out

24 because his name is not written, but it was the signature of

25 Rowan Hecht, H-e-c-h-t.  He was the report in that office.

1  Q   He is the guy in Paris?

2  A   Correct.

3  Q   He is the big, big guy in Paris, right?

4  A   He chaired the credit committee in Paris.

5  Q   Now, I see that he has made a note here, and I'd like to

6  take you to that note and have you explain it.  It looks to me

7  as if he --

8         His comments are:   Underwriting of USD -- that's U.S.

9  dollars -- 55 million approved with a final retention limited

10 to 35 million?

11 A   Correct.

12 Q   Okay.  So Mr. Hecht, he's the top guy in this chain, isn't

13 he?

14 A   Correct.

15 Q   So he --

16        His approval of this deal was not for 55 million but

17 for 35 million, correct?

18 A   No.   His approval was 55 million, and it was the best

19 efforts to sell down to 35 million.

20 Q   The best efforts?

21 A   Yes.

22 Q   Well, that's what he says.  You can only retain 35

23 million.   That's what he's saying.

24        Am I misreading this?

25 A   There were further discussions, and it was a best efforts

1   indication down to 35 million.  Regardless, Dexia was still

2   exposed to 55 million.

3   Q   I didn't hear.  I'm sorry.

4   A   Regardless, Dexia was exposed to the 55 million, the full

5   amount.

6   Q   Forgive me.  I'm sorry.  Say that one more time.

7   A   Dexia was exposed to the full 55 million because that was

8   the available letter of credit that we issued.

9           THE COURT:  Explain again what that final retention

10  reference means.  I just want to make sure I get it.

11          THE WITNESS:  In transactions where banks underwrite,

12  facilities occasioned as a requirement that a portion of the

13  transaction be sold or participated --

14          THE COURT:  It's like a participation.

15          THE WITNESS:  Correct, and actually, ultimately,

16  LaSalle as a local participant came into this transaction.

17          THE COURT:  Basically what --

18          And, of course, like most French people, I can't read

19  the signature.  But whatever the gentleman was saying is that

20  he basically was saying he wanted you to participate out 20

21  million of it.

22          THE WITNESS:  Yes.

23          THE COURT:  Okay, I get it.

24  BY MR. MICHAEL O'ROURKE:

25  Q   And that was his approval, right?

Flaherty - cross

1    A    Yes.

2    Q    Now, if you go into your report, there are some potential

3    participants.

4          When we say participants, other banks and financial

5    institutions that would take a piece of this risk or this

6    credit, correct?

7    A    Correct.

8    Q    And you in your credit application proposal suggested

9    that -- I'm looking at page 6652, a syndication.  Item 14, we

10   propose a $20 million sell-down after closing.  The following

11   banks indicated an interest in participating.

12         Do you see that?

13   A    Yes.

14   Q    What does it mean there that the following banks have

15   indicated an interest in participating?

16   A    It was a preliminary indication that they would review the

17   transaction and consider it for approval.

18   Q    Did they?  Did any of them?

19   A    Ultimately LaSalle did.

20   Q    What did LaSalle take?

21   A    They took a $20 million participation, 20 or 25.

22   Q    Okay.  So LaSalle actually got $20 million of this

23   $55 million facility, correct?

24   A    Correct.

25   Q    Do they still have it?

Flaherty - cross

1    A    Yes.

2    Q    Who at LaSalle Bank are you dealing with on their $20

3    million participation?

4    A    It has been some time since I have had any direct contact

5    with LaSalle.  It's being handled by our legal department.

6    Q    Well, who on the Dexia side is responsible for the ongoing

7    relationship to this $20 million participant?  They're a 40

8    percent participant, aren't they?

9    A    Right.

10   Q    Who at Dexia is handling it?

11   A    It's being handled through our legal counsel.

12   Q    Mr. Mendeloff?

13   A    No, our in-house legal counsel.

14   Q    Who is that?

15   A    Francine Marx.

16   Q    Francine Marx?

17   A    Yes.

18   Q    She is at -- she's in-house at Dexia?

19   A    She is our in-house legal counsel.

20   Q    Can we go to 6649, which is the second page of the -- I

21   guess it's the first page of the review -- of the report,

22   cover page.

23          You have a section here called Strengths, and you

24   list a number of things which are all well-taken, one of which

25   is that financing the design to preserve existing levels of

1  cash investments invested at taxable rates while arbitraging

2  against tax exempt borrowing cost.

3  　　　　Do you see that?

4  　　　　THE COURT:  It's the fourth bullet point.

5  BY THE WITNESS:

6  A  Yes.

7  BY MR. O'ROURKE:

8  Q  The financing was designed to maintain that $40 million

9  liquid investment collateral cushion, wasn't it, keep it up

10  there, right?

11  A  No.  The point was that while they had the money and they

12  could have used the money to finance the program, they elected

13  to retain that and continued to invest it at a taxable rate.

14  Q  And that's good for Dexia because that's money that Dexia

15  can count on if something happens to the bonds, right?

16  A  Collateral was also a strategic decision on the part of

17  the hospital.  It's a lower cost of capital to borrow in a tax

18  exempt market.

19  Q  Well, the hospital and Dexia would agree on that.  They

20  have to keep the costs down, keep your liquid collateral up,

21  be ready.  If anything happens, boom, you have got all the

22  collateral there, right?

23  A  Yes.

24  Q  Now unrestricted cash investments total 40.3 million at

25  fiscal year end '97, covering 75 percent of the total bond

Flaherty - cross

1   issue amount.  We know that.

2          And who else contributed to this report?  Did you

3   write it all yourself?

4   A    Yes.

5   Q    Who actually could have put together the documents

6   regarding the mortgage, the pledge, putting all the collateral

7   under a security agreement, a mortgage?  Was it your counsel?

8   A    Yes.

9   Q    Foley & Lardner?

10  A    No.

11  Q    Who?

12  A    Arent Fox.

13  Q    Arent Fox, okay.

14         THE COURT:  A-r-e-n-t.

15  BY MR. MICHAEL O'ROURKE:

16  Q    The mortgage and security interest that Dexia took in the

17  Edgewater financing include the hospital facility, the

18  equipment and fixtures; and the hospital facility, from what I

19  understand, consisted of eight buildings?

20  A    From what I recall, yes.

21  Q    Where was this -- this is up in Rogers Park on Central,

22  like Devon and Central?

23  A    It's located, as it says on the credit application cover

24  page, at 5700 North Ashland.

25         THE COURT:  I don't want to get into a debate about

Flaherty - cross

1    neighborhoods, but that's not Rogers Park.  Surprisingly --

2              MR. MICHAEL O'ROURKE:  Oh, it's west.

3              THE COURT:  Surprisingly enough, it's Edgewater.

4              MR. MICHAEL O'ROURKE:  Okay, that's right.

5              THE COURT:  Hence the name.

6              MR. MICHAEL O'ROURKE:  Isn't that Rogers Park still,

7    though?

8              THE COURT:  No.

9              MR. MICHAEL O'ROURKE:  Oh, come on.

10             THE COURT:  It ends at Devon.  It ends at Devon.

11   There is an official map that proves this.

12             MR. MICHAEL O'ROURKE:  All right.  I always thought

13   it was Rogers Park.  Okay.

14   BY MR. MICHAEL O'ROURKE:

15   Q   You talk about the hospital ownership structure and the

16   corporate structure on page 6653, section 4.

17             And I want you, if you could, look at the last two

18   paragraphs.  Edgewater is exempt from federal tax.  It's a

19   hospital -- it's a not-for-profit.

20             And it's included in a group in a group exemption

21   extended to Permian Health Care.

22             Permian functions as a parent holding company for

23   its controlled subordinates.  Do you see that?

24   A   Yes.

25   Q   And you continue to write, it was created primarily to

Flaherty - cross

1  confer the benefits of group tax exemption to its controlled
2  subordinates and has no real assets.
3          What does that mean?
4  A   It's a holding company.
5  Q   Okay.  So Permian stands at the top as a holding company
6  and has all these other -- all these subsidiary corporations
7  and whatnot?
8  A   Correct.
9  Q   And they have their little management companies and also
10  their little subsidiaries and a big organizational chart;
11  wouldn't that be right?
12  A   Correct.
13  Q   So if you look at Permian, the corporate structure of
14  Permian was just at the -- which is your Exhibit A.
15          Can you turn back to Exhibit A?
16  A   Do you mean Exhibit A to the credit application?
17  Q   Yes.  Do you see Permian Health Care, Inc.?  6676.
18  A   Okay, yes.
19  Q   Okay.  Could you describe what that is for us and where
20  you got it?
21  A   It was provided to us by the people at Edgewater Medical
22  Center.
23  Q   Okay.  And it shows a tree of corporations and various
24  levels, and the overall owner in this corporate structure
25  appears to be Permian Health Care, Inc., right?

Flaherty - cross

1   A    Um-hmm.

2          THE COURT:   You have to say yes or no.

3          THE WITNESS:   Yes.  I'm sorry.

4   BY MR. MICHAEL O'ROURKE:

5   Q    Then its management service company is Primus Management.

6   Is that that Scott Gross?

7   A    Yes.

8   Q    Now, there are a number of different hospitals or it looks

9   like a number of different organizations below the holding

10  company level.   One is Vista Medical Foundation.

11         Do you know what that is?

12  A    I don't particularly recall.

13  Q    Was that a hospital?

14  A    I believe that it was.

15  Q    In fact, Permian owned a number of hospitals, didn't they?

16  A    Yes, they did.

17  Q    Some in California, right?

18  A    Yes.

19  Q    So Permian, which was the ultimate owner and the

20  controller of Edgewater, was a fairly large hospital holding

21  company?

22  A    I wouldn't know what to say.   They were fairly large

23  compared to other hospital holding companies, but they have

24  had more than one hospital that they owned.

25  Q    Okay.   They also own French Hospital Medical Center.   You

1    are familiar with that?

2    A    I have heard the name, yes.

3    Q    In fact, didn't Permian buy French Medical Center during

4    the time that you were reviewing the letter of credit?

5    A    I don't recall the time frame, but I believe that they did

6    purchase them.

7    Q    And that was actually Permian's call, wasn't it, that

8    Permian wanted to buy that hospital, French Hospital, in

9    California?

10   A    I don't know what Permian's intent was.

11   Q    And Permian -- but Permian did buy it?

12   A    I think they did, yes.

13   Q    We have Vista Hospital Systems.  What is Vista Hospital,

14   another group of hospitals?

15   A    Yes, and I don't recall where they are located.

16   Q    Then you have Northside Operating Company which owned

17   Edgewater?

18   A    Yes.

19   Q    Now, was there any contemplation entertained by Dexia to

20   obtain a crosscollateralization from Permian on any of its

21   other hospital facilities to back up this letter?

22   A    No, and that was not how the deal was presented to us.  We

23   didn't ask for that.

24   Q    But you were comfortable in giving all the assets you did

25   have that you could go ahead on this deal?

Flaherty - cross

1   A    Yes.   We looked at Edgewater Medical Center as the primary
2   obligor.
3   Q    Back to 6653.   Your last paragraph, you start out by
4   saying that Edgewater is a controlled subordinate of Permian.
5          You acknowledge that here, correct?
6   A    Correct.
7   Q    I'm sorry?
8   A    Correct.
9   Q    And Permian's other controlled subordinate, Vista Hospital
10  Systems, is a California nonprofit public benefit corporation
11  that owns and operates two acute care hospitals?
12  A    Okay.
13  Q    Okay.   And the next page you talk about Permian, the
14  umbrella parent holding company, is governed by a five-member
15  board.   Do you see that second paragraph?
16          THE COURT:   What page are we on at this point?
17          MR. MICHAEL O'ROURKE:   6654.
18          THE COURT:   Thank you.
19          THE WITNESS:   Okay, yes.
20  BY MR. MICHAEL O'ROURKE:
21  Q    As a controlled subordinate, each subordinate has separate
22  governing boards; however, these boards share common
23  membership with Permian; is that correct?
24  A    That's what that states, yes.
25  Q    So Permian runs everything throughout its organization,

1  doesn't it?

2  A   It reads that way, yes.

3  Q   Okay, and that's how you understood because this is

4  your -- you're reading your writing, right?

5  A   This is information verbatim that was provided to us from

6  Edgewater Medical Center.

7  Q   Did you verify it to check to make sure it's right?

8  A   I don't recall.

9  Q   You have no reason to doubt that Permian did control the

10  whole organization, do you?

11  A   Yes.   We were really looking to how Edgewater was

12  established as a not-for-profit.   So we were looking to the

13  tax status as a tax exempt entity, how they got the benefit of

14  that, and this is how this came up.

15  Q   Fine.   But Permian from your standpoint runs the whole

16  organization, don't they?

17  A   We didn't quite look at it that way, but, yes.

18  Q   It goes on to say, Permian has entered into a professional

19  services agreement with Primus Management, which is this

20  service organization that runs the actual hospital facility,

21  isn't that correct?

22  A   Correct.

23  Q   And Primus was the main component of Braddock Management.

24  They controlled Braddock Management, as you said before.   You

25  said that Braddock is owned and operated by Primus, correct?

Flaherty - cross

1   A    Right.

2   Q    And Primus is a general partner, and the limited partners

3   are Mr. Gross' family members.

4        Do you see that, that second to the last paragraph?

5   A    Umm-hmm.

6        THE COURT:   You have to say yes or no.

7        THE WITNESS:   Yes.   I'm sorry.

8   BY MR. MICHAEL O'ROURKE:

9   Q    Now, Mr. Rogan doesn't have any ownership at all of this

10  partnership, does he?

11  A    No.

12       MR. AIZENBERG:   Objection, foundation.

13       THE COURT:   Again, he is asking for the state of his

14  knowledge.   The objection is overruled.

15  BY MR. MICHAEL O'ROURKE:

16  Q    Mr. Gross has --

17       Now, did you meet Mr. Gross?

18  A    Not that I recall.

19  Q    Did you ever check into his background?

20  A    No.

21  Q    Well, if you did, you would have found that he went to

22  Harvard University of Southern California.

23       Do you see that down at the bottom?

24  A    Okay.

25  Q    You meant to say he went to the University of Southern

1  California, right?  There's no Harvard University of -- I'm
2  just teasing you.

3         But anyway, I just --

4         Now, you have -- we have gone over this.  Braddock
5  provides management services to Edgewater.  This is the next
6  paragraph.  And at the end of 6655, the last paragraph of
7  6655, you start going into the introduction into some
8  financial information, okay.

9         You say, as privately held companies, Primus and
10 Braddock are not required to nor do they publish audited
11 financial statements, is that correct?

12 A   We had asked for audited financial statements, and this
13 was the response that we had obtained.

14 Q   Mr. Gross said no, right?

15 A   We didn't direct this question directly to Mr. Gross.  We
16 went through Henry Zeisel at Edgewater Medical Center.

17 Q   And somebody at Primus said no?

18 A   Presumably.

19 Q   But the following information was compiled by Primus as an
20 accounting of revenues and expenses for all the facilities
21 under management.

22        Now, this is a -- this next section here in this
23 bracket shows Primus Management, Inc., unaudited financials
24 for 1996, 1997 projected to 1998.  Do you see that?

25 A   Yes.

1  Q   Who was supplying that financial information?

2  A   It came from Henry Zeisel at Edgewater Medical Center.

3  Q   You are not saying that came from Peter Rogan, do you?

4  A   No.   It came from Henry Zeisel.

5  Q   Okay.   And this is important financial information for you

6  to review what the overall organization, what their financial

7  or their operating history is, isn't that right?

8  A   Correct.

9  Q   Going down to the next financial section, which is down at

10  the bottom of the page, Edgewater Medical Center utilization

11  trends.

12         Where did you get this information?

13  A   From Edgewater Medical Center, Henry Zeisel.

14  Q   You go to 6657.   There are some statistics relating to

15  Edgewater's 1997 admission.   44 percent were attributed to

16  hospital sponsored programs.

17         Do you see that?

18  A   What paragraph?  I'm sorry.

19  Q   It's down -- it's the second to the last section on

20  page 6657.

21  A   I see it, okay, yes.

22  Q   Hospital sponsored programs would be what?

23  A   Their referral programs perhaps for inpatient and

24  outpatient services.

25  Q   And that came from Mr. Zeisel, too?

Flaherty - cross

1   A    It came from Edgewater Medical Center, Henry Zeisel.

2   Q    Going to the service area, what did you know about this

3   hospital, you know, their service area?  I mean, did you --

4        Did anybody take any time to review and see what the

5   Edgewater's competition was within the Edgewater area and how

6   it fit into the overall medical facility scene, for lack of a

7   better word?

8        Did anybody ever look to see how Edgewater fit into

9   the overall hospital facility demographics in Chicago?

10  A    Yes.  We knew it was a small niche player.  It wasn't a

11  large, you know, Northwestern Hospital type transaction and

12  that they --

13  Q    Isn't this the kind of hospital that ended up getting

14  bought up in these, you know, like the Resurrection Health

15  Care and become part of these big hospital systems that bought

16  up all the hospitals in the '80s and '90s?

17  A    There's a history of that, yes.

18  Q    So this would be the type of hospital that would get

19  bought up by one of those systems, right?  It was a small

20  niche player in that area?

21  A    It could have been, yes.

22  Q    There's no Edgewater Medical Center surrogate in that area

23  now, is there?

24           THE COURT:  What does that mean?  I'm not sure.

25           MR. MICHAEL O'ROURKE:  A hospital that replaced

1  Edgewater in that market.

2         MR. AIZENBERG:  Objection, foundation.

3         THE COURT:  Sustained.

4  BY MR. MICHAEL O'ROURKE:

5  Q   If you know.

6         THE COURT:  The objection is sustained.

7  BY MR. O'ROURKE:

8  Q   Okay.  Did you know if anybody replaced them?

9         THE COURT:  The objection is sustained.

10  BY MR. MICHAEL O'ROURKE:

11  Q   Turn to the financial discussion of your memo, if you

12  would.

13         THE COURT:  What page?

14         MR. MICHAEL O'ROURKE:  This is 6662, your Honor.

15         THE WITNESS:  Okay.

16         THE COURT:  1532.

17         MR. O'ROURKE:  Yes, 15, your Honor, 32.

18  BY MR. MICHAEL O'ROURKE:

19  Q   You state the balance sheet is liquid with a current ratio

20  of 3.11 times and a net working capital of 30.8 million cash

21  investments.

22         3.11 times, is that -- what does that ratio reflect?

23  A   That is the current asset ratio.

24  Q   And you go on to say that Edgewater's asset base has

25  increased by 28.1 million, right?

Flaherty - cross

1   A   Between '95 and '97, yes.

2   Q   So its assets now are at 102.3 million, right?

3   A   Yes.

4   Q   Okay.  Now, those assets are reflected on the balance

5   sheet 6669 and 6670.

6           Do you see that?

7   A   Yes.

8   Q   Now, was this balance sheet, was that supplied by Mr.

9   Zeisel as well?

10  A   Yes.

11  Q   Okay.  Now, if you look at the first three columns, 94,

12  95, 96, these numbers are audited, correct?

13  A   Correct.

14  Q   That was by McGladrey.  So they are actually certified,

15  right, the financial statement?

16  A   Correct.

17  Q   So the total amount of the assets, and this includes these

18  investments, which are verifiable, and the property, which is

19  verifiable, amount to about 102 million, right?

20  A   Correct.

21  Q   And the total liabilities are 60 million, right?

22  A   Correct.

23  Q   40 of which are the bonds?

24  A   Correct.

25  Q   So you had a -- you had an asset-to-debt ratio going into

1   this deal of over three, right?

2   A   Correct.  It appeared to be a pretty good cushion.

3   Q   A big cushion.

4   A   It appeared to be that way.

5   Q   Now, when --

6           After the letter of credit closed, did Dexia have

7   anybody, anyone, who acted as an observer to Edgewater's board

8   of directors to keep track of what decisions were going on at

9   the board of directors that would impact the financial

10  operations of the hospital?

11  A   No.

12  Q   Okay.  Did you rely on Cain Brothers to do that or

13  somebody else to do that, or you don't do that?

14  A   We don't do that.

15  Q   In 2001 did Dexia actually come in and take over the

16  hospital?

17  A   No.

18  Q   Did somebody on behalf of Dexia come in and run the

19  hospital?

20  A   The hospital was shut down.

21  Q   In 2001?

22  A   I don't exactly recall.

23  Q   Can we go to 732 for a minute, which is your declaration?

24          Your Honor, it's Exhibit 732, and I have a copy for

25  you if you need one.

1       THE COURT:   All the 732s I have on this disk have

2   letters on them, A through H.   Which one is it?  It's not one

3   of the ones that's marked?

4       MR. MICHAEL O'ROURKE:   I think it is, Judge.   Maybe

5   it's not.  I thought it was.

6       THE COURT:   It's not one of the ones on the disk,

7   let's put it that way.  The disk has 732-A through H.   This is

8   just plain old 732.

9       (Brief interruption.)

10       THE WITNESS:   I don't have a copy of that document.

11       THE COURT:   I will tell you what, he can use mine.

12   That's fine.

13       THE WITNESS:   Thank you.

14       MR. MICHAEL O'ROURKE:   Thank you, your Honor.

15   BY MR. MICHAEL O'ROURKE:

16   Q   Before we leave --

17       MR. AIZENBERG:   I need a copy as well.

18       (Brief interruption.)

19   BY MR. MICHAEL O'ROURKE:

20   Q   Before we leave the credit application, I just wanted you

21   to go to exhibit -- that Exhibit A, that structure of Permian

22   which we talked about a little bit.

23   A   Yes.

24   Q   Okay.   Now, given your experience in dealing with health

25   care institutions, does a corporate chart such as Permian

Flaherty - cross

1  Health Care -- we have a holding company at the top and a

2  number of operating subsidiary hospital entities flowing from

3  the holding company.  Is that an unusual structure from your,

4  you know, from your experience?

5  A    I really can't say from my experience.

6  Q    Okay.  You have not come in and done hospital deals.  We

7  had a holding company like a Colombia Health Care.  You have

8  heard of Colombia Health Care?

9  A    Yes.

10 Q    That's a holding company, right?

11 A    Yes.

12 Q    They own a bunch of hospitals, right?

13 A    Yes.

14 Q    So that's not an unusual structure?

15 A    Right.

Flaherty - cross

1   Q   Plaintiff's Exhibit 732 is a declaration with your name on

2   it.  Do you recognize that, Mr. Flaherty?

3   A   Yes, I do.

4   Q   Okay.  Now, who wrote this?  Did you write this or did

5   somebody else write it?

6   A   This was prepared by our legal counsel.

7   Q   Okay.  Paragraph 3:  "With the assistance of outside

8   counsel, I was primarily responsible for the due diligence

9   related to the letter of credit."

10          Who was your outside counsel?

11  A   Arent Fox.  They drafted the letter of credit

12  reimbursement agreement.

13          They drafted the letter of credit reimbursement

14  agreement.

15  Q   Who at Arent Fox did you work with?

16  A   Arlene Fine.

17  Q   Arlene Fine?

18  A   F-I-N-E.

19  Q   Is she out of New York?

20  A   No.  She's in Washington, D.C.

21  Q   Is she still there?

22  A   I don't know where Arlene is.

23  Q   And what did she do?

24  A   She prepared the reimbursement and credit agreement and

25  negotiated -- helped negotiate the legal documents for the

Flaherty - cross

1    bank.

2    Q    Did she participate in the due diligence?

3    A    She attended meetings where we talked about Edgewater

4    Medical Center.  She didn't attend the meetings.  We met with

5    Peter Rogan and Henry Zeisel and Joann, but she attended the

6    documentation meetings, the legal documentation meetings.

7    Q    Okay.  But as far as actually accumulating information and

8    assessing and reviewing financial information and all other

9    information related to the assets and contracts and what not,

10   who was responsible for that?  Was that just you?

11   A    That was me.

12   Q    Okay.  And who helped you do that?  That's a big job, I

13   mean.  Did you do that all on your own?

14   A    Yes, I did.

15   Q    Okay.

16        And the people you worked with, did you work at all

17   with Joann Skvarek in getting that information together?

18   She's executive vice president at Edgewater?

19   A    Yes.  Again, our contacts were primarily with Henry

20   Zeisel.

21   Q    Okay.  And you know Joann Skvarek was chief operating

22   officer at the hospital?

23   A    Correct.

24   Q    Okay.  She was involved on Edgewater's behalf, Henry

25   Zeisel, of course.  Michael Naiman, do you remember him?

Flaherty - cross

1   A   That does not sound familiar to me.

2   Q   Okay.  John Lunde or Judy Lunde?

3   A   I think she was director of nursing.

4   Q   Yes.  You work with her?

5   A   I remember the name, and I may have met her but --

6   Q   Okay.

7       Going to paragraph 5.

8       THE COURT:  Can I get a feel for how much longer on

9  cross you think you have.

10       MR. MICHAEL O'ROURKE:  Less than 15 minutes, Judge.

11       THE COURT:  Okay.

12  BY MR. MICHAEL O'ROURKE:

13   Q   And I don't want to fight with you over words, but let me

14  ask you about this particular paragraph:

15       "Throughout the due diligence process neither Rogan

16  nor anyone else at EMC have disclosed to Dexia the fact that

17  Rogan had been perpetrating a health care fraud scheme at EMC.

18  This health care scheme he had was already active at the time

19  EMC had obtained its previous bond financing in August 1994."

20       Do you see that, B?

21   A   Yes.

22   Q   What do you mean "already active"?  Do you have personal

23  knowledge of that?

24   A   The courts have decided that.

25   Q   I'm sorry?

1   A   The courts have already decided that.

2   Q   You're not saying the courts have already decided; you're

3   saying that you're saying that.  You don't have any personal

4   knowledge of that, do you?

5           MR. AIZENBERG:  Objection.  That's not what the

6   affidavit says.

7           THE COURT:  Excuse me.  The objection is sustained.

8   You can argue this to me later.  It's an argumentative

9   question.  You're arguing with the witness.  The objection is

10  sustained.

11  BY MR. MICHAEL O'ROURKE:

12  Q   There is a section of this paragraph, "C, Rogan had

13  concealed the fact of this fraud scheme from the 1994 bond

14  holders."

15          Is that something else that the court has already

16  found?  That's not something that you know?

17          MR. AIZENBERG:  Objection.  Same objection.  That's

18  not what this says.

19          THE COURT:  He's asking whether in that statement

20  he's saying that -- whether that's something he has personal

21  knowledge or whether it comes from some other source, so you

22  can answer that question.

23  BY THE WITNESS:

24  A   It was determined in the courts.  I did not have knowledge

25  at the time.

1      MR. MICHAEL O'ROURKE:  That's fine.  Okay.  Thank
2   you.
3   BY MR. MICHAEL O'ROURKE:
4   Q   The last sentence of that, which I reviewed during -- and
5   it says, "D, the fact that Edgewater's financial records,
6   which I reviewed during the due diligence process, included a
7   significant quantity of revenues obtained by health care
8   fraud," what do you mean by "significant quantity"?  Is that
9   something that -- have you computed that, or is that something
10  that the -- is that something else the courts have found?
11  A   Well --
12      THE COURT:  What did you mean when you said
13  "significant quantity"?  I think that's the question.
14      THE WITNESS:  Yes.  It's that a dramatic portion of
15  their revenue was Medicare, and that's where the fraud was
16  found.
17  BY MR. MICHAEL O'ROURKE:
18  Q   Okay.
19      And paragraph 9, "On or about May 1, 1998, Rogan and
20  NLC caused EMC to execute a reimbursement agreement," do you
21  see that?
22  A   Yes.
23  Q   Do you see that?
24  A   Yes.
25  Q   Okay.  Do you have personal knowledge of the

1    decision-making process at Edgewater Medical Center which led

2    to the execution of the reimbursement agreement with Dexia?

3    Were you there?

4    A    Yes.

5    Q    You were present?

6    A    To sign the letter of credit reimbursement agreement, yes.

7    Q    You were there for the signing?

8    A    Yes.

9    Q    Did you attend any board meetings in connection with the

10   hospital reviewing that?

11   A    No.

12   Q    Okay.  And the board, you know, did not have Peter Rogan

13   in it?

14   A    Correct.

15   Q    Okay.  And do you have any doubt that the Edgewater

16   Medical Center board was involved in approving these financing

17   documents with Dexia?

18           MR. AIZENBERG:  Objection.  Calls for speculation.

19           THE COURT:  The objection is sustained.  He doesn't

20   have any foundation to testify about that.

21   BY MR. MICHAEL O'ROURKE:

22   Q    Do you have a personal file of your own that you've

23   maintained or had maintained at any time that comprises or

24   includes all of the documents or what not that you, you know,

25   put together for your own personal file on this particular

1  letter of credit transaction?

2  A    No.  As a matter of bank policy everything that we obtain

3  goes to the credit files.

4  Q    Okay.  So you don't have a personal file which you keep as

5  being the file that you maintain as your own, you know,

6  officer file, your own --

7  A    Correct.

8  Q    Okay.

9        Now, at some point in the relationship or at some

10  point in the history of Edgewater the hospital Grant Hospital

11  came on the scene, correct?

12  A    Correct.

13  Q    Did Dexia have any dealings or any involvement in the

14  Grant Hospital acquisition?

15  A    Yes.  We provided a letter of credit for that deal.

16  Q    Okay.  The letter of credit.  And that Grant Hospital deal

17  did close, correct?

18  A    Correct.

19  Q    Okay.  And that hospital, Grant Hospital, did eventually

20  get sold, right?

21  A    Correct.

22  Q    For about 26 million dollars, wasn't it?

23  A    I don't recall the sale price.

24  Q    But it ended up being a pretty good deal, wasn't it?

25  A    I don't recall the dollar amount, but we --

Flaherty - cross

1    Q    But there was no letter of credit foreclosed on Grant?

2    A    Correct.

3    Q    Were there any management agreements that Dexia is aware

4    of that were in place at Grant Hospital, any management

5    contracts that Braddock, when we talk about Braddock, had with

6    Grant Hospital?

7    A    I don't recall.

8    Q    You're not saying no, but you just don't recall?

9    A    I don't recall.

10            MR. MICHAEL O'ROURKE:  One second, Your Honor.  I may

11   be done.

12            THE COURT:  Okay.

13            (Brief pause.)

14            MR. MICHAEL O'ROURKE:  Your Honor, I don't have

15   anything further.  Thank you.

16            THE COURT:  Okay.  Are there other people

17   representing other people who were going to question this

18   witness?

19            MR. TOUHY:  I can do it in about two minutes.

20            THE COURT:  Then I have a question for you.

21   Mr. O'Rourke, who were you representing when you were

22   questioning this witness?

23            MR. MICHAEL O'ROURKE:  Brian Rogan.

24            THE COURT:  And this is who you're going to be stuck

25   with throughout the hearing.

1          MR. MICHAEL O'ROURKE:  Brian Rogan.

2          THE COURT:  Okay.  And who are you representing?

3          MR. TOUHY:  Sara Caitlin and Rob, Robert.

4          THE COURT:  So that's going to be the deal from here

5    on in.  We're not going to be doing any switching back and

6    forth so that people get extra cracks.  Okay?  And so the

7    repetitiveness rule applies.

8          Mr. Touhy, go ahead.

9          MR. MICHAEL O'ROURKE:  Your Honor, I also represent

10   Sara too.

11         THE COURT:  You're going to -- you're going to be

12   confined -- I'm not going to have you bopping back and forth

13   between people so that I have repetitive cross examination, so

14   that's the deal.  It's the only deal I'm going to make with

15   you.  Otherwise the intervenors are done here.

16         MR. MICHAEL O'ROURKE:  Thanks.

17         THE COURT:  Okay.  So go ahead, Mr. Touhy.

18                    CROSS EXAMINATION

19   BY MR. TOUHY:

20   Q    Mr. Flaherty, you have Exhibit 732, which is your

21   declaration?

22   A    Yes.

23   Q    I just wanted to ask you a follow-up question about

24   paragraph 5 on the nature and the timing of this health care

25   fraud that you refer to?

Flaherty - cross

1    A    Yes.

2    Q    You indicate in paragraph 5 D that you reviewed

3    Edgewater's financial records.

4    A    Correct.

5    Q    What records are we talking about, the records in the

6    file?

7    A    The audited financial statements.

8    Q    We looked at today that are marked as 732 A through H?

9         MR. AIZENBERG:  Objection.  Asked and answered.

10   BY THE WITNESS:

11   A    Yes.

12        THE COURT:  That question I'll let -- I'll let that

13   question stand.  It would be difficult for me to imagine

14   anything about the 732 exhibits that has not been asked, but

15   I'll withhold judgment till I hear the next question.

16   BY MR. TOUHY:

17   Q    And the due diligence process that you are referring to in

18   paragraph 5, when did that due diligence process start that

19   you're referring to?

20   A    At the time that we were initially approached on the

21   transaction, late in 1997 through and including the closing

22   date in May of 1998.

23   Q    Now, your reference to significant quantity of revenues,

24   you're referring to how much money?

25        MR. AIZENBERG:  Objection.  Asked and answered.

1    THE COURT:  Sustained.  Rule 403.

2  BY MR. TOUHY:

3  Q    When is the first date that your due diligence indicated

4  that there was revenue received by Edgewater from this health

5  care fraud?

6    MR. AIZENBERG:  Objection.  Asked and answered.

7    THE COURT:  Overruled.

8  BY THE WITNESS:

9  A    It was determined by the courts after we issued the letter

10 of credit.

11    THE COURT:  Right.  It wasn't part of his due

12 diligence, in other words.  You asked as part of his due

13 diligence, and that wasn't part of his due diligence.

14 BY MR. TOUHY:

15 Q    We put the courts to the side.  What I'm trying to find

16 out is whether or not you were able to determine what the

17 first date, by your review of the financial records, there

18 were significant revenues from health care fraud?

19    THE COURT:  Did you make any kind of independent

20 review of that yourself other than what you learned from what

21 courts had found?

22    THE WITNESS:  No.

23    THE COURT:  Okay.

24    MR. TOUHY:  I have no other questions.

25    THE COURT:  All right.  Redirect.

1    MR. MENDELOFF:  Your Honor, could we have about five

2  minutes to organize?

3    THE COURT:  We'll take a five-minute break and then

4  we're going to go till 4:30.

5    (Recess taken.)

6    THE COURT:  Redirect.

7    REDIRECT EXAMINATION

8  BY MR. AIZENBERG:

9  Q   Mr. Flaherty, do you recall that on cross you were asked

10  about who approved the letter of credit?

11  A   Yes.

12  Q   Who was the ultimate approver of the letter of credit?

13  A   It was ultimately approved in the head office, in our

14  Paris head office by Mr. Rowland Ash, but the New York office

15  and the Paris head office.  New York is a control subsidiary

16  of the head office, so we're in effect the same entity.

17  Q   And in terms of operations, how do Paris and New York

18  function?

19  A   We communicate on a daily basis, and we're considered one

20  and the same.

21  Q   Do you recall on cross that you were asked questions about

22  the board of Edgewater?

23  A   Yes.

24  Q   Do you know how that board was selected?

25  A   No, I do not.

1   Q   Did Mr. Rogan ever disclose to you how that board was

2   selected?

3   A   No, he did not.

4   Q   Please turn to Plaintiff's Exhibit 732 A, which is the

5   credit agreement.

6   A   Okay.

7   Q   I mean the credit application.

8   A   Yes.

9   Q   I want to direct your attention to the balance sheet,

10  which is at Dexia 6669.

11  A   Yes.

12  Q   Do you recall you were asked some questions about the

13  balance sheet?

14  A   Yes.

15  Q   Does this balance sheet -- is this a going concern balance

16  sheet?

17  A   Yes.

18          MR. MICHAEL O'ROURKE:  Objection.  No foundation.

19          THE COURT:  Lay the foundation.

20          Well, okay, you can ask him what it is, and then you

21  can ask him how he knows what that means.  And if he doesn't

22  say, then I'll strike it.

23  BY MR. AIZENBERG:

24  Q   Is this a balance sheet that assumes that the entity is

25  functioning as a going concern?

Flaherty - redirect

1    A    Yes.

2    Q    And do you know what a going concern is?

3    A    Yes.

4    Q    What is a going concern?

5    A    That's a viable operation that continues to produce

6    revenues and generate income for debt service.

7    Q    Do you recall that you were asked about the 40 million

8    dollars in cash and investments that Edgewater had when Dexia

9    agreed to issue the letter of credit?

10   A    Yes.

11   Q    And do you know if those cash and investments were used in

12   part for the Grant transaction?

13   A    Yes, they were.

14   Q    Was it a substantial portion?

15   A    About ten million if I recall correctly.

16   Q    Had you known that there was a fraud going on at

17   Edgewater, would Dexia have ever agreed to issue a letter of

18   credit for Grant?

19   A    No.

20   Q    How come?

21   A    Because it would have reduced the revenues at Edgewater,

22   and we would not have allowed the transaction to continue.

23   Q    Do you recall that on cross you were asked some questions

24   about LaSalle's role vis-a-vis the letter of credit?

25   A    Yes.

1    Q   Can you describe what is LaSalle's role?

2    A   They are a participant in the transaction.  They're a

3   silent participant, so we front for the market, and in the

4   event that we have to make payment we go to LaSalle and seek a

5   pro rata share of any reimbursement of advances that we make

6   and also reimbursement of expenses.

7    Q   Is Dexia still ultimately responsible under the letter of

8   credit?

9    A   Yes.

10       MR. MICHAEL O'ROURKE:  Objection, Your Honor.  He's

11   asking who's ultimately responsible.

12       THE COURT:  Overruled.

13   BY MR. AIZENBERG:

14    Q   Directing your attention to Plaintiff's Exhibit 732, which

15   is your declaration?

16    A   Yes.

17    Q   Did -- were you involved in preparing this document?

18    A   Yes.

19    Q   Describe how you were involved.

20    A   You prepared the initial draft, and you and I discussed

21   it, and I made changes to the declaration.

22    Q   And how long had you and I and my partner Mr. Mendeloff

23   been working together on this matter?

24    A   Many years at this point.

25    Q   And you reviewed and made any changes you wanted?

Flaherty -

1    A    Yes, I did.

2    Q    And did you in fact make some changes?

3    A    Yes, I did.

4         MR. AIZENBERG:  I have nothing further.

5         THE COURT:  Any further questions on either side?

6         MR. MICHAEL O'ROURKE:  No further questions, Your

7    Honor.

8         THE COURT:  I have one or two.

9         You testified regarding this company Cain.  That's --

10   is that C-A-I-N?

11        THE WITNESS:  Yes.

12        THE COURT:  Okay.  And you said that they were the

13   underwriter for the hospital, not for Dexia, and I think I

14   know what that means, but I'd rather not assume, so would you

15   explain to me what that means?

16        THE WITNESS:  Okay.

17        THE COURT:  The fact that they were the hospital's

18   underwriter and not yours.

19        THE WITNESS:  When the hospital decided to pursue a

20   bond financing, they retained an underwriter to help them

21   compile the documentation, put together the official statement

22   and sell the bonds to the public capital market.

23        THE COURT:  So they were working for the hospital?

24        THE WITNESS:  Correct.

25        THE COURT:  And I assume you've worked in other types

1    of deals where whoever the person is that wants to undertake

2    the debt has an underwriter like that?

3              THE WITNESS:  Yes.

4              THE COURT:  Does the -- in your dealings in these

5    things, does the underwriter typically have any kind of a duty

6    to disclose things to you as the party who's going to sort of

7    stand behind the thing?

8              I don't know the answer.  That's why I'm asking.

9              THE WITNESS:  And I don't know the answer.  I think

10   their duty is to disclose to the investors.

11             THE COURT:  Okay.  Let me ask it in a different way.

12   If there were something that Cain had known that was untoward,

13   let's say, about the hospital, is that something you would

14   expect Cain to tell you without you asking?

15             THE WITNESS:  I would hope that they would.

16             THE COURT:  You would hope that they would, okay.

17   Hope and expect are maybe two different things.  That's why I

18   asked the question the way I did.

19             THE WITNESS:  I would expect if it was material it

20   would have been disclosed in the official statement.

21             THE COURT:  Okay.

22             THE WITNESS:  Because they're not retained by us;

23   they're retained by the hospital.

24             THE COURT:  Okay.  And so whatever obligation to

25   disclose the hospital would have, that's more or less the same

1    that Cain would have?

2         THE WITNESS:  Correct.

3         THE COURT:  Is that fair to say?  Okay.

4         And the other question I wanted to ask you had to do

5    with LaSalle.  You were asked questions by both sides about

6    that, but you weren't asked about what the nature of the deal

7    was between you and LaSalle on this participation, so was

8    there -- the deal that Dexia had with LaSalle, was there some

9    contractual provision or understanding that said what would

10   happen if the deal cratered and you had to pay off, in other

11   words, who would get stuck on the hook?

12        THE WITNESS:  Yes.

13        THE COURT:  Who?

14        THE WITNESS:  We share the risk equally for their

15   participation percentage in the transaction, which is roughly

16   32 percent.

17        THE COURT:  Okay.  So when the lawsuit ended up

18   getting filed against Mr. Rogan, why wasn't it Dexia plus

19   LaSalle?  Why was it just Dexia?  If you know.  Maybe that was

20   a lawyer's decision.

21        THE WITNESS:  I think it perhaps is a lawyer's

22   decision.  But we're the agent on the transaction.  LaSalle

23   participates.  Technically they're considered a silent

24   participant, so they're behind us in the transaction.

25        THE COURT:  That may be something you might want to

 1   clear up with some other document or witness.  I'm just saying
 2   this here just so I have -- that may be something you might
 3   want to clear up with some other document or witness.  It's
 4   just a question I have.
 5          Does anybody have any follow-up questions based on
 6   the questions that I asked?  Mr. Aizenberg?
 7          MR. AIZENBERG:  If I could follow up on your
 8   question.
 9          THE COURT:  Yeah, go ahead.  That's fine.  That's why
10   I'm asking.
11                    REDIRECT EXAMINATION
12   BY MR. AIZENBERG:
13   Q   In terms of the participation agreement with LaSalle, how
14   is it supposed to work?  Why is Dexia taking the lead?  Do you
15   know?
16   A   Because we had a higher rating than LaSalle and --
17          THE COURT:  Higher bond rating.
18          THE WITNESS:  Higher bond.
19          THE COURT:  Yours was double A; theirs would have
20   been lower than that?
21          THE WITNESS:  Yes.  Ours was a higher long-term debt
22   rating.
23   BY MR. AIZENBERG:
24   Q   Any other reasons that you know of?
25   A   No.

Flaherty - recross

1    MR. MICHAEL O'ROURKE:  Could I just have a follow-up,

2    Judge?

3         THE COURT:  Sure.

4                   RECROSS EXAMINATION

5    BY MR. MICHAEL O'ROURKE:

6    Q    LaSalle is an Illinois bank; is that correct?

7    A    Yes.

8    Q    Okay.  And they have a shared risk with you, with Dexia,

9    on this letter of credit?

10   A    Yes.

11   Q    Okay.  So they're actually -- so they're actually --

12   they've got 32 percent, and they have 32 percent of the loss

13   and 32 percent of the recovery?

14   A    Yes.

15   Q    Okay.  And you say it was the lawyer's decision not to

16   have LaSalle as part of this case?

17   A    I didn't say that.

18   Q    Okay.  All right.  And you had -- there's an underwriting

19   agreement?  Is there a copy of that underwriting agreement

20   available?

21   A    The participation agreement?

22   Q    I'm sorry.  My apology.  Participation agreement.

23   A    Yes.

24        MR. MICHAEL O'ROURKE:  Okay.  And -- okay.  That's

25   all I have.

1        THE COURT:  Anything else?

2        MR. AIZENBERG:  I want to do a brief follow-up.

3        THE COURT:  Yes.

4                FURTHER REDIRECT EXAMINATION

5    BY MR. AIZENBERG:

6    Q   As far as you know, in terms of the letter of credit

7    documents, is LaSalle a participant in those documents, the

8    letter of credit, the reimbursement agreement or the bond

9    documents?

10        MR. MICHAEL O'ROURKE:  Objection, Your Honor.  Now

11   he's asking him to speculate.

12        THE COURT:  Kind of like you were doing a second ago?

13        MR. MICHAEL O'ROURKE:  No.

14        THE COURT:  The objection is overruled.

15   BY THE WITNESS:

16   A   Yes, they're a participant.

17   BY MR. AIZENBERG:

18   Q   Now, in the actual bond documents that we looked at

19   earlier today, the pledge agreement, the reimbursement

20   agreement, the master indenture, was LaSalle a party to those

21   documents?

22   A   They were not a party to those documents.

23   Q   They're party to a separate document called a participant

24   agreement?

25   A   Correct.

1    Q    So they're essentially a sub-participant?

2    A    Right.

3              MR. MICHAEL O'ROURKE:  Objection, Your Honor.  He's

4    leading.

5              MR. AIZENBERG:  Is that right?

6              THE COURT:  Overruled.

7    BY THE WITNESS:

8    A    They are a participant behind us.

9              MR. AIZENBERG:  I have nothing further.

10             THE COURT:  Anything else?

11             MR. MICHAEL O'ROURKE:  No.

12             THE COURT:  The witness is excused.  Next witness,

13   please.

14             MR. MENDELOFF:  We call Sara Rogan.

15             Your Honor, at this time we'd like witness

16   sequestration.  Brian Rogan is here.  We'd ask him to step

17   out, please.

18             THE COURT:  He's a party.  Your request is overruled.

19             By the way, if those are the two folks in the second

20   row, they've been here quite a while, both of them.

21             MR. MENDELOFF:  Your Honor, just for the record, our

22   concern is just the testimony --

23             THE COURT:  She's a party.  Give me some basis to

24   exclude.  You know, I understand, but it's no different from

25   any other multiple defendant case or multiple party case.

1    Raise your right hand.

2    (Witness sworn.)

3    MR. AIZENBERG:  May I inquire, Your Honor?

4    THE COURT:  Yes.

5    SARA CAITLIN ROGAN, PLAINTIFF'S WITNESS, DULY SWORN

6    DIRECT EXAMINATION

7  BY MR. AIZENBERG:

8  Q    Good afternoon.  My name is Gabriel Aizenberg.  I'm

9  counsel for Dexia.

10    Can you please state your name and spell your last

11  name for the record.

12  A    Sara Caitlin Rogan, R-O-G-A-N.

13    THE COURT:  And Sara is without an H, right?

14    THE WITNESS:  Without an H.  And Caitlin is

15  C-A-I-T-L-I-N.

16  BY MR. AIZENBERG:

17  Q    Miss Rogan, do you recall that you were deposed in

18  connection with this litigation?

19  A    Yes.

20  Q    And that deposition occurred on September 2nd, 2005?

21  A    Yes.

22  Q    At your September 2005 deposition you were not aware of

23  whether you were the beneficiary of any trusts, right?

24  A    Correct.

25  Q    And at that time, or until that time no one had ever told

1   you that you were the beneficiary of a trust; isn't that

2   right?

3   A    Correct.

4   Q    I'd like to direct your attention to Exhibit 304.

5            Wrong exhibit.  Exhibit 117.

6            THE COURT:  117 is an e-mail.  Is that what you want?

7   304 is the trust agreement.

8            MR. AIZENBERG:  That's what I want.

9            THE COURT:  It was actually 304.

10  BY MR. AIZENBERG:

11  Q    And I'm going to hand you a copy of that exhibit as well

12  so you have it in front of you.

13           Directing your attention to Exhibit 304, which is

14  entitled "Trust Agreement Sara Caitlin Rogan Trust," at the

15  time of your September 2005 deposition you knew nothing about

16  this trust, correct?

17  A    Correct.

18  Q    And you knew nothing about the assets it owned, correct?

19  A    Correct.

20  Q    And you knew nothing about the management of this trust,

21  correct?

22  A    Yes.

23  Q    And you had never heard of this trust before you were

24  asked about it at your deposition; is that correct?

25  A    Yes.

1   Q   At the time of your September 2005 deposition, you were

2   not aware of whether you were the beneficiary of any trust

3   that existed outside of the United States; is that correct?

4   A   Correct.

5   Q   And at that time, as of that time no one had ever told you

6   that you were the beneficiary of a trust created in the

7   country of Belize; is that correct?

8   A   Correct.

9   Q   And you hadn't at that time, at the time of your

10  deposition, ever heard anyone discuss a Belize trust in which

11  you were a beneficiary, correct?

12  A   Correct.

13  Q   Directing your attention to Exhibit 367, which if you

14  could turn to the third page of this exhibit, do you see at

15  the top it's entitled The Deed of Settlement For the Benefit

16  of Sara Caitlin Rogan (Trust 002)?  Do you see that?

17  A   Yes.

18  Q   As of the time of your September 2005 deposition, you knew

19  nothing about this trust, correct?

20  A   Correct.

21  Q   And you knew nothing about the assets it owned?

22  A   Correct.

23  Q   And you knew nothing about the management of the trust at

24  that time, correct?

25  A   Correct.

1  Q   And you had never heard of that trust before you were

2  asked about it at your deposition, correct?

3  A   Yes.

4  Q   Before your September 2005 deposition you never had

5  discussed any trust with Mr. Cuppy, correct?

6  A   I'm sorry.  At the time.

7  Q   Before your September 2005 deposition you never had

8  discussed any trust with Mr. Cuppy?

9  A   Correct.

10 Q   Correct?

11 A   Correct.

12 Q   You knew a man named David Miller?

13 A   Yes.

14 Q   He was a personal friend of your family?

15 A   Yes.

16 Q   And your understanding was that he worked for your father,

17 correct?

18 A   I -- I don't know exactly who he worked for.

19 Q   Do you recall that you were deposed in this case?

20 A   Um-hum.

21         THE COURT:  You have to say yes.

22 BY THE WITNESS:

23 A   Yes.

24 BY MR. AIZENBERG:

25 Q   Page 43, line 12.  Did I ask you the following question,

1    and did you give the following answer?

2            "Question:  Well, do you have an understanding at all

3    who Mr. Miller may have worked for?

4            "Answer:  My father."

5            Did I ask you that, and did you give that answer?

6    A    You didn't ask me.

7    Q    Were you asked that, and did you give that answer?

8    A    Yes.

9    Q    You currently live at 55 East Erie Street?

10   A    Correct.

11   Q    And 55 East Erie is a luxury high-rise condominium

12   building?

13           MR. MICHAEL O'ROURKE:  Objection.  Foundation.

14           THE COURT:  Well, that's one of those eye of the

15   beholder things.  Why don't you ask it in a different way.

16   BY MR. AIZENBERG:

17   Q    Is 55 East Erie off of Michigan Avenue at Erie and Wabash?

18   A    Yes.

19   Q    And how long have you lived there?

20   A    Since May of 2008, end of May.

21   Q    And who owns the condo that you live in?

22   A    I'm not sure.

23   Q    So you live in a condo, but you don't know who owns it?

24           MR. TOUHY:  I object.  Argumentative.

25           THE COURT:  She's already said she isn't sure.  Move

1   on.

2   BY MR. AIZENBERG:

3   Q   The building has some nice amenities, doesn't it?

4           MR. TOUHY:  I object.  Irrelevant.

5           THE COURT:  Overruled.

6   BY MR. AIZENBERG:

7   Q   It has a fitness center?

8   A   Yes.

9   Q   It has a full-length lap pool?

10  A   I don't know how long the pool is.

11  Q   But it has a lap pool?

12  A   Okay.

13  Q   Yes?

14  A   Yes.

15  Q   It has a jacuzzi?

16  A   I believe so.

17  Q   Locker rooms with saunas and steam rooms?

18  A   Yes.

19  Q   I want to direct your attention to your response to

20  Dexia's interrogatories, Exhibit 777.  In particular I want

21  to -- do you recognize this document?

22          THE COURT:  You might want to show her the page with

23  the signature.

24          MR. AIZENBERG:  Yes, I was going to get to that.

25          Second to the last page.

1   BY MR. AIZENBERG:

2   Q   Directing your attention to Exhibit 779 D.  Is that your

3   signature at the second to the last page?

4   A   Yes.

5   Q   And by signing it you were certifying to the accuracy of

6   the statements that were made in there on your behalf?

7   A   Yes.

8   Q   In particular I'm directing your attention to page 13.  Do

9   you see under E through F you said that there was some

10   decision to pay rent, and this is rent for the Erie condo that

11   you're living in?

12   A   Where does it -- I'm sorry?

13   Q   It says, "She recalls," that's referring to you, "that

14   upon moving into the condominium Sara Rogan would have to pay

15   some form of rent."  Do you see that?

16   A   Yes.

17   Q   "And the decision to pay rent came from Sara Rogan and

18   Brian Rogan."  Do you see that?

19   A   Yes.

20   Q   And this was -- you signed that this was accurate; isn't

21   that right?

22   A   Yes.

23   Q   To whom do you pay the rent?

24   A   The 55 East Erie condo association.

25   Q   So you pay actually a monthly assessment?

B. Rogan - direct

1   A   Um-hum.

2   Q   So it's not --

3           THE COURT:  Say yes or no.

4   BY THE WITNESS:

5   A   Yes.

6           THE COURT:  Everybody does it.  That's okay.  You'll

7   do it more than once.

8   BY MR. AIZENBERG:

9   Q   So how much of the monthly assessment do you pay?

10  A   Half.

11  Q   And how much is that?

12  A   Around $500.

13          MR. AIZENBERG:  I have nothing further.

14          MR. TOUHY:  No questions, Your Honor.

15          THE COURT:  You're excused.

16          Next witness.

17          MR. MENDELOFF:  Brian Rogan, Your Honor.

18          (Witness sworn.)

19       BRIAN PETER ROGAN, PLAINTIFF'S WITNESS, DULY SWORN

20                  DIRECT EXAMINATION

21  BY MR. MENDELOFF:

22  Q   Sir, please state your name and spell your last name for

23  the court reporter.

24  A   Brian Peter Rogan.  Last name is R-O-G-A-N.

25  Q   I've placed in front of you several exhibits marked

1  Exhibits 778 and 779 A through E.  Would you review those

2  exhibits and tell me first whether they all appear to be

3  responses to interrogatories and discovery in connection with

4  this case?

5  A   All of them individually?

6  Q   Just look at each cover page.

7          THE COURT:  Is that what they say they are on the

8  front?

9  BY MR. MENDELOFF:

10  Q   On the front page.

11  A   Yes, they do all say that.

12          Well, the first one says that.  Excuse me.

13  Q   Well, look at the cover page of each one and just confirm

14  that that's what they are.

15  A   Yes, all of the documents are interrogatories.

16  Q   For each of the documents -- you'll find a colored tab on

17  some of them.  If you look at the colored -- I'd like you to

18  go through the documents one by one, read off the exhibit

19  number and tell us if your signature appears on a

20  certification for that document.  Look at the colored tabs

21  only.

22  A   There's two colors.  There's yellow and orange.

23  Q   I'm sorry.  The orange tabs.  So read the first -- so

24  what's the cover page there?  What's the number, the exhibit?

25  A   The exhibit is 778.

B. Rogan - direct

1    Q    Okay.

2    A    And, yes, my signature appears on the -- near the end of

3    the document.

4    Q    All right.  And then go to the next one that has an orange

5    tab.  If it doesn't have an orange tab, skip it.

6    A    Skip it?

7         This exhibit number is 779 B, and my signature

8    appears on this document.

9    Q    Okay.

10   A    This document is 779 D, as in dog, and my signature does

11   appear on it.

12        And this is Exhibit 779 E, as in Edward, and my

13   signature does appear near the back.

14   Q    All right.  Thank you.

15        You're aware that by signing the certifications for

16   each of these interrogatory answers you were making statements

17   to the court certifying that your answers were truthful and

18   accurate; is that correct?

19   A    Yes.

20   Q    And you were aware that these were representations that

21   were being made not to opposing counsel but in this proceeding

22   as an official answer?

23   A    My responses individually, yes.

24   Q    And you knew it was important as a result to be fully

25   accurate with your answers; is that correct?

1   A   Yes.

2   Q   Now, let me ask you -- first let's look at Exhibit 778,

3   and let's turn to page 11 -- page 10 of 778, and let's look at

4   the -- let's just focus on the question, which was to --

5   for -- asking you to identify each employer that you worked

6   for, the name and telephone number and address, the nature of

7   the work, circumstances of your employment.  And you

8   understand that -- you understood that was a question

9   regarding all employment you'd ever had, correct?

10  A   Yes.

11  Q   Now, turn to the next page, please.  So we start with

12  September 2000, and you say you worked for Dynamic Alliance;

13  is that correct?

14  A   Yes.

15  Q   And is that an entity associated with Mr. Cuppy?

16  A   Yes.

17  Q   And do you recall how much money you made at that job?

18  A   No.  It was between my freshman and sophomore year of

19  college.  I do not recall a specific amount.

20  Q   $10,000, $20,000?

21  A   No, no, it was not -- well, I couldn't say for sure.  I

22  mean I --

23  Q   Just your best memory.  If you can't -- I don't want you

24  to speculate, but if you have a general range that's what we

25  need.

B. Rogan - direct

1    A    I really can't remember.

2    Q    All right.

3    A    I really can't.

4    Q    Let's skip to the next line.  The next job is a research

5    assistant with Professor Schweikart?

6    A    Yes.

7    Q    And what did you make in that job?

8    A    It varied.  The first part of the -- I was more of an

9    assistant to him, so I didn't -- I didn't have -- I wasn't

10   paid.  It was more a voluntary basis.  He asked me to perform

11   some research for him.  And then towards the end of my years

12   at the University of Dayton I would submit hour -- or weekly

13   hourly time that I would work for him, so it would -- I can't

14   remember the specific hourly wage, but I was paid as a student

15   employee of the University of Dayton.

16   Q    Pretty low?

17   A    Yes.

18   Q    Then the next position right out of school, I guess it was

19   a Spain summer internship?

20   A    Um-hum.

21   Q    And that was unpaid, right?

22   A    That was unpaid, yes.

23   Q    All right.  And then the next position was ABF Freight

24   Systems, and that was paid, and you were making what, $60,000,

25   I believe?

B. Rogan - direct

1    A    At the end of my employment there, yes, including

2    benefits.  So I started -- I can't remember when I started

3    that.  I believe it was $1,800 a month because I started as a

4    management trainee, and then over two years working there,

5    progressing up.

6    Q    So you started out at more like $30,000 and then up from

7    there?

8    A    Um-hum.

9              THE COURT:  You have to say yes or no.

10   BY THE WITNESS:

11   A    Oh.  Yes.  Excuse me.

12   BY MR. MENDELOFF:

13   Q    Then the next job was for Hoover Creek Plantation?

14   A    Yes.

15   Q    And you made $60,000 a year there?

16   A    Yes.

17   Q    And there you worked with Mr. Cuppy?

18   A    And other managers, yes.

19   Q    And now you're in school?

20   A    Now I'm in school, yes.

21   Q    Now, when you answered those questions you did your best

22   to answer completely and fully and list every employer you'd

23   ever had; is that correct?

24   A    Yes.

25   Q    And is it fair to say that you made the same answer in all

B. Rogan - direct

1  of the interrogatory answers that you certified, and you saw
2  four of them?
3  A  Yes.
4  Q  Now, can you explain to the court --
5      Let me show you first Exhibit 823.  First of all,
6  let's see the whole thing again.  Do you see the Bates number?
7  That's this little code here.  It starts with B R.  Do you see
8  that?
9  A  Um-hum, yes.
10 Q  And are you aware that that means that that was produced
11 on your behalf, Brian Rogan?
12 A  I don't know how Bates numbers are generated.
13 Q  So you're not aware of how -- that it was produced on your
14 behalf or not?
15 A  That number?
16 Q  This document.  Anything that has B R on it?  You don't
17 know anything about that?
18 A  Well, the document I didn't get a good look at, but the --
19 Q  No, no.  I'm just talking about the Bates number right
20 now.  Did anyone ever tell you that the documents that were
21 going to be produced for you were going to have your initials
22 on them?
23 A  Any document that was ever produced on my behalf?
24 Q  Yes.
25 A  I don't recall a conversation with anyone stating that any

1  document created would be --

2  Q   Let's look at the top portion of the document.  Do you see

3  that this is a -- purports to be a federal work sheet 1999 for

4  Brian P. Rogan?  Do you see that?

5  A   Yes.

6  Q   And is that your Social Security number there?

7  A   Yes.

8  Q   And do you see it says taxpayer employer?  Do you see

9  where I'm pointing?

10 A   Yes.

11 Q   Underneath that it says JKR Business, and it shows wages

12 of $27,000.  Do you see that?

13 A   Yes.

14 Q   Did you ever work for JKR Business and make $27,000 in

15 1999?

16 A   No, I don't recall being employed by JKR Business.

17 Q   All right.  Let's go to Plaintiff's Exhibit 824.  Again

18 you see that it has the B R Bates number on the bottom, B R

19 240?

20 A   Yes.

21 Q   All right.  And let's go to the -- do you see that this is

22 a copy of a employee's record slip, like a W-2?  Actually it

23 is -- not like it.  It is a W-2 for the year 2000.  Do you see

24 it's a --

25 A   Yes.

1   Q   W-2 down here, year 2000 up there.

2            And what's the name of the employee?

3   A   That would be me.

4   Q   And the Social Security number is yours?

5   A   Where is the Social Security?

6            Oh, right there.

7   Q   Do you see -- can you see the red pointer from where you

8   are?

9   A   Yes.  I thought you were pointing to the line that said

10  employee's name.

11  Q   Who does it say the employer is?

12  A   JKR Business.

13  Q   And how much does it say you're making?

14  A   27,000.

15  Q   Did you work for JKR Business or make $27,000 in 2000?

16  A   No, I do not recall working for a company called JKR

17  Business.

18  Q   Do you have any idea why these documents were prepared?

19  A   The W-2?

20  Q   Yes.

21  A   Tax filing reasons.

22  Q   You're in business school right now, aren't you?

23  A   Yes.

24  Q   Would you file taxes reporting wages for an employee that

25  didn't actually work as far as you know?

1    A    For an entity that bared a different name.  I don't recall

2    working for a company called JKR Business.

3    Q    What I'm asking you is we can go back and look at your

4    interrogatory answers, but your interrogatory answers indicate

5    that in 2000 the only job you had was a summer employee at

6    Dynamic Alliance, right?

7    A    Correct.

8    Q    And so that's not JKR Business, is it?

9    A    No.  Those are two different names.

10   Q    So the question is, do you have any idea why these tax

11   forms for '99 and 2000 are prepared in your name with your

12   Social Security number?

13   A    Well, my tax attorney prepared the documents on my behalf.

14   Q    You're aware that your tax attorney prepared these

15   documents?

16   A    I don't recall this specific document as a part of my 2000

17   filing, but on behalf of me I have a tax attorney that

18   prepares them for me.

19   Q    I'm asking about these specific documents.  I'm not asking

20   you what your tax attorney does with something else.

21            MR. MICHAEL O'ROURKE:  No foundation.

22            THE COURT:  Overruled.

23            This document that's up on the screen there, just so

24   it's clear, is a W-2.  I mean, unless you've got a different

25   tax attorney, pretty much every tax attorney I've ever heard

B. Rogan - direct

1  of, tax attorneys don't prepare W-2s.  That comes from the
2  employer.
3          So ask your question again.
4  BY MR. MENDELOFF:
5  Q    My question is, do you have any idea why a W-2 was
6  prepared in your name with your Social Security number
7  reflecting wages to you in the year 2000 from JKR Business of
8  $27,000?
9  A    No, I do not.
10  Q    And you don't have any idea why -- do you have any
11  information at all as to the preparation of this document?
12  A    This -- the W-2 document, no, I do not have any knowledge
13  as to the preparation of it.
14  Q    Now, sir, where do you live?
15  A    I live at 55 East Erie Street in Chicago.
16  Q    And you were in the courtroom when your sister testified.
17  Did she accurately state the -- describe the building?
18  A    It's a high-rise.  I believe it has 56 floors.
19  Q    And it has the amenities that she described?
20  A    I don't recall all the -- the facility does have a pool,
21  and it does have a workout room.
22  Q    And a locker room with a sauna and all that?  Do you
23  remember that?
24  A    I believe it has a sauna.  And I don't know if there's
25  actual lockers there.  I can't remember specifically.  But

1    there's a sauna and a pool and a fitness center.

2    Q   You'd agree, wouldn't you, that the area that you live in

3    is an extremely high-end area?

4    A   What boundaries?  From like the river north, like the

5    river --

6    Q   You live two blocks off of Michigan Avenue going east,

7    don't you?

8    A   Going west.

9    Q   Going west.

10   A   Yes.

11   Q   You'd agree that that is a very high-end area of Chicago,

12   wouldn't you?

13          MR. MICHAEL O'ROURKE:  I would disagree with that,

14   Your Honor.  I object.  No foundation.

15          THE COURT:  Okay.  The man lives in Chicago.  I think

16   he can answer the question.  The objection is overruled.

17   BY THE WITNESS:

18   A   It's a nice neighborhood, yes.  The degree to which it's

19   extremely I can't say.

20   BY MR. MENDELOFF:

21   Q   You were pretty excited about moving into that

22   neighborhood, that location, weren't you, when you moved in?

23   A   When I was with DePaul, when I was going to school at

24   DePaul, yes, because it's right off the red line.

25   Q   My question is when you moved in.  You moved in in January

1  of 2005, right?

2  A    That -- no.

3         Oh, January 2005 is my first tenure in that building,

4  yes.

5  Q    Okay.  So when you first moved into that building you were

6  very excited about moving into that area, weren't you?

7         MR. MICHAEL O'ROURKE:  Asked and answered.

8         MR. MENDELOFF:  I didn't get an answer.

9         THE COURT:  Overruled.

10         You can answer.

11  BY THE WITNESS:

12  A    I was happy to be moving to that neighborhood, yes.

13  BY MR. MENDELOFF:

14  Q    You were so excited about moving there that when you

15  talked about it with your parents the only thing you told them

16  was the location of the building; isn't that right?

17  A    When I talked about moving with my parents when?

18  Q    When you talked about moving into that apartment or that

19  condo with your parents before you moved in, you were so

20  excited about it that the only thing you said to them was you

21  talked about the location; isn't that right?

22         MR. MICHAEL O'ROURKE:  Objection.  There's no

23  foundation that he moved in there with his parents.

24         THE COURT:  That wasn't the question.

25         MR. MICHAEL O'ROURKE:  I think that's what he said.

1    MR. MENDELOFF:  No, that's not what I said.

2    THE WITNESS:  In 2005 or most recently in 2008?

3  BY MR. MENDELOFF:

4  Q   When you first moved in in 2005 --

5  A   Yes.

6  Q   -- in January.

7    Prior to moving in you spoke about moving into this

8  apartment with your parents, correct?

9  A   Not -- they would not be living there, but I would be

10  living there.

11    THE COURT:  You spoke with your parents about moving

12  in.

13    MR. MENDELOFF:  Right.

14    THE WITNESS:  Yes.

15    THE COURT:  Okay.

16  BY MR. MENDELOFF:

17  Q   And the only thing you talked to them about in terms of

18  moving in was its location, correct?

19  A   In 2005 I don't recall specifically talking to them about

20  my excitement about specific things about the area or the

21  building.

22  Q   That's not my question.  My question is, the only thing

23  you talked about -- the only thing you mentioned to your

24  parents about moving into this apartment --

25    THE COURT:  Can I kind of cut this short?

1    I mean, I've lived in Chicago for -- you know, since

2    1981.  It's a really nice neighborhood.  It's right off of

3    Michigan Avenue.  I can take judicial notice of that.  Let's

4    move on.

5    MR. MENDELOFF:  Thank you.

6    BY MR. MENDELOFF:

7    Q    Now, sir, when you moved in, your parents moved you into

8    this condo, correct?

9    A    They helped me move from my previous apartment, yes.

10   Q    And they moved you into this condo, correct?

11   A    Well, physically there were movers there lifting the

12   furniture and boxes, but they were there and helping me.

13   Q    They were there helping you move in?

14   A    Yes.

15   Q    And when you moved in, at the time you moved in your

16   understanding was that if you were to leave that one of the

17   people you would talk to about leaving would be your parents;

18   is that correct?

19   A    Yes.

20   Q    Now, do you pay anything -- when you first moved in there

21   did you pay anything to live there?

22   A    I believe I was paying the condo assessment fee, the

23   monthly condo assessment fee.

24   Q    And today --

25   THE COURT:  Could we have the date approximately.

1    MR. MENDELOFF:  January 2005.

2    THE WITNESS:  My lease ended in January of 2005, so

3    end of January, first part of February 2005.

4    BY MR. MENDELOFF:

5    Q   And when you moved in --

6    I'm sorry.  Okay.

7    And today it's your testimony that you pay half of

8    the assessment?

9    A   Approximately, with my sister, yes.

10   Q   With your sister, and your wife lives there too?

11   A   Yes.

12   Q   So it's a sizeable place if all three of you are living

13   there?

14   A   Well, there's -- yes, I mean, we each have our own

15   bedroom.

16   Q   Right.

17   Now, tell us, who's your landlord?

18   A   I'm not aware that we have a landlord.

19   Q   You don't know who your landlord is?

20   MR. MICHAEL O'ROURKE:  Well, Your Honor, there's no

21   testimony there's a lease.

22   MR. MENDELOFF:  I didn't say that.  I'm asking who is

23   your landlord?

24   MR. MICHAEL O'ROURKE:  Same objection.

25   THE COURT:  Okay.  First of all, let's remind

1  everybody of the ground rules.  When you stood up and said

2  something, I did not hear the word "objection" in there, and

3  that's what I'd like to hear.  I'd like to hear what the

4  objection is.

5         Then you talk to me, not to him.

6         MR. MENDELOFF:  Yes.

7         THE COURT:  Now, you're making an objection.  The

8  objection is overruled.  Thanks.

9         Ask your question again.

10 BY MR. MENDELOFF:

11 Q   You've been living there for over three years and you

12 don't know who your landlord is; is that correct?

13 A   I have not been living there for three years consistently.

14 I've lived in Savannah for a period as -- for -- I worked for

15 Hoover Creek Plantation.

16 Q   So tell us, when you first lived there in '05 how long did

17 you stay?

18 A   I changed jobs in September of 2005, September, October of

19 2005, and then I worked for Hoover Creek Plantation from

20 October of 2005 until July of 2008.  And I was -- and Hoover

21 Creek Plantation is located in Savannah, Georgia.

22 Q   So you lived there from January to October of 2005, left?

23 A   Yes.

24 Q   Went down to Savannah and then moved back up here in July

25 of 2008, and you've been living there ever since?

B. Rogan - direct

1   A   Yeah.  I think the end of July, so the first part of

2   August.

3   Q   And when you moved out did anyone else move in, in 2005,

4   as far as you knew?

5   A   To my current residence at the condo?

6   Q   At 55 East Erie when you moved out in October of 2005, do

7   you know if anyone moved in?

8   A   No, I'm not aware that anyone moved in.

9   Q   Now, you've rented units, apartments throughout your

10  college years, I assume; is that right?

11  A   Yes.

12  Q   And I assume did you rent an apartment down in Savannah?

13  A   Yes.

14  Q   And did you pay rent in all those places?

15  A   Yes.  The first two years of college I was in student

16  housing, so it was a little bit different, but, yes, junior

17  year I was in an apartment, or duplex, excuse me.

18  Q   And in junior year and senior year and down in Savannah

19  every month you'd have to write a check to your landlord?

20  A   Correct.

21  Q   Except at 55 East Erie, where you don't have to write a

22  check to your landlord; is that correct?

23  A   Correct.  I write a check to the condo association.

24  Q   And is it your testimony that you don't know who owns this

25  unit?

1   A   I cannot say for sure who owns the unit.  I don't know.

2   Q   Well, you say you cannot say for sure.  My question is, is

3   it your testimony that you do not know who owns this unit?

4   A   Yes, it is my testimony.

5   Q   In fact, is it your testimony that you -- when you moved

6   in you heard about this great deal where you only pay an

7   assessment to live in this area from someone you can't

8   remember; is that correct?

9   A   In 2005 or --

10  Q   2005.

11  A   Can you repeat the question?  I'm sorry.  I'm confused.

12  Q   When you moved in in January of 2005, how did you hear

13  about this great deal where you only pay an assessment and no

14  rent to live in this tony neighborhood?

15  A   I heard about it from my mother and father.

16  Q   Now, did you give a deposition in this case on August

17  15th, 2005?

18  A   Yes.  Well, it was August of 2005.  I'm not exactly sure

19  about the date.

20  Q   And was that deposition under oath?

21  A   Yes, it was.

22  Q   Just like your testimony today is under oath?

23  A   Yes.

24  Q   Let me ask you to look at page 36 of that deposition.  It

25  will be up on the screen.  And let's zero in here.

1          THE COURT:  Wrong page.

2          MR. MENDELOFF:  I'm sorry, 39.

3   BY MR. MENDELOFF:

4   Q   "How did you come to live" --

5          Were you asked these questions, and did you give

6   these answers?

7          "How did you come to live in this condo at 55 East

8   Erie?

9          "Answer:  I knew it was vacant.

10         "How did you known it was vacant?

11         "I don't remember specifically who told me it was

12  vacant.

13         "Did you have a conversation with someone regarding

14  the fact it was vacant?

15         "I don't remember who if I did."

16         Were you asked those questions, and did you give

17  those answers?

18  A   Yes.  According to the document, yes.  I don't recall the

19  specific questions.

20         THE COURT:  Can there be a stipulation that that's

21  his testimony?

22         MR. MICHAEL O'ROURKE:  Yes, Your Honor.

23         THE COURT:  Okay.  All right.  Keep going.

24  BY MR. MENDELOFF:

25  Q   So is it your testimony that when you gave this sworn

1  testimony in 2005 that it slipped your mind that your parents

2  told you about this unit?

3      MR. MICHAEL O'ROURKE:  Your Honor, this is

4  argumentative.

5      THE COURT:  Overruled.

6      And may I see the answer to the question -- can you

7  read the question that's at the bottom of that page and

8  continues to the top of the next page and the answer.

9      MR. MENDELOFF:  Sure.

10      "Question:  How did you become aware that there was a

11  condo at 55 East Erie that you could live in at all?

12      "I don't specifically remember who told me.

13      "Do you recall that some individual told you this was

14  available?

15      "Yes."

16      That's on page -- for the record, that's on page 40.

17  BY MR. MENDELOFF:

18  Q  So is it your testimony -- now, this testimony was given

19  August 15th, 2005.  You'd only been living in this unit for

20  eight and a half months, or seven and a half months.  Is it

21  your testimony that it slipped your mind that your parents had

22  told you about this unit only seven or eight months before

23  this?

24  A  No.  I -- as it says there, I don't specifically remember

25  who told me the unit was vacant.  I remember discussing --

1   well, I can't say that because I'm not specifically sure.  But
2   like I said, I remember having a conversation with my parents
3   about moving into the condo building.
4   Q   Do you recall that not less than five minutes ago you were
5   asked under oath in this courtroom who told you the unit was
6   vacant and you said it was your parents?  Do you remember
7   asking that and giving that answer under oath?
8   A   Yes, I remember giving that.
9        I'm sorry.  I'm not trying to be difficult.
10  Q   That's not what I think you're trying to do.
11       So answer the question again, please.
12  A   Okay.
13  Q   On August 15th, 2005, some seven and a half months after
14  you moved into this unit, is it your testimony that it just
15  slipped your mind that it was your parents that told you this
16  unit was vacant?
17  A   No, I can't say that it just slipped my mind.  Like I
18  said, I don't specifically remember who told me the unit was
19  vacant in 2005.  I mean, maybe I'm assuming that.  I'm sorry.
20  Q   Now, sir, when you moved in where did you get the keys for
21  this unit in 2005?
22  A   In 2005 I don't remember who gave me the keys.
23  Q   You don't remember getting the keys?
24  A   No, I don't remember who gave me the keys.
25  Q   And during the time that you lived there, if you were

1    going to make an adjustment to the unit or if there's a

2    problem with the unit, normally you'd ask your landlord can I

3    build this or can I do that.  Who would you ask in this

4    setting?

5    A    I recall an incident where I had a problem with the toilet

6    and I called the maintenance department.

7    Q    I'm not talking about that.  I'm talking about if you

8    wanted to make an adjustment to the unit when normally you'd

9    ask the landlord if you could build something, here you don't

10   know who your landlord is, so what would you do?

11   A    It never occurred to me to do that in that unit, so I

12   don't know who I would contact.

13   Q    Let me show you Exhibit 778, please.  And this is one of

14   the -- I think you'll recall this is one of the interrogatory

15   packets that you had certified.  Do you recall that?

16   A    Yes.

17   Q    Now, let me ask you to direct your attention to page 12.

18   And do you see what date you signed it?

19   A    Yes.

20   Q    What date was that?

21   A    Oh, I'm sorry.  January 20th, 2009.

22   Q    And going back to page 12 of the exhibit, let's --

23            MR. MICHAEL O'ROURKE:  Counsel 778?

24            MR. MENDELOFF:  778.

25

 1          Actually first let's go to the signature page, which
 2    is about four or five pages.  Which number is this again?  I'm
 3    sorry.  Four or five pages from the end where the signature is.
 4    There you go.
 5          Now, going back to page -- zeroing in on the question
 6    all communications between Brian Rogan, Peter Rogan, Judy
 7    Rogan, and Fred Cuppy or any other individual operating as an
 8    agent for those people concerning PGR Properties, including all
 9    discussions concerning Brian Rogan's becoming an officer of PGR
10    Properties.  You see that?
11    A.   Yes.
12    Q.   You understood in being asked this question it was pretty
13    simple, any conversation you had involving PGR Properties, with
14    any of those people, or people who worked for him, you were
15    supposed to tell us, correct?
16    A.   Correct.
17    Q.   And that included anything that had to do with you becoming
18    an officer, correct?
19    A.   Correct.
20    Q.   And it says communications too.  It wasn't just a
21    conversation.  It was written communications.  You understood
22    that?
23    A.   Yes.
24    Q.   And you understood and certified that your answers to this
25    were 100 percent accurate, correct?

B. Rogan - direct                                                276

1  A.  Yes.

2  Q.  Now, let's look at -- let's look at this part of the page.

3  This is your answer, communications with Fred Cuppy regarding

4  protecting the assets of PGR Properties.  Did you give that

5  answer to these interrogatories?

6  A.  Yes.

7  Q.  Assuming officer position of PGR Properties to protect

8  assets of PGR Properties.  Did you give that answer?

9  A.  Yes.

10 Q.  And this has to do with conversations with Fred Cuppy, is

11 that correct?

12 A.  Yes.

13 Q.  Now, let's look at Exhibit 770.  And you will see that this

14 is an e-mail dated January 16, 2007 from Fred Cuppy to John

15 Foley.  You see that?

16 A.  Yes.

17 Q.  Let's zero in on the paragraph, "Turning my attention to

18 our discussion today 1.  Appoint CIT as the agent since I want

19 to keep track of PGR because the kids own 90 percent and

20 there's a big mortgage outstanding to be protected."

21          MR. MYLES O'ROURKE:  Objection, hearsay.

22          MR. MENDELOFF:  I didn't finish the question.

23          THE COURT:  I don't have a question yet.

24 BY MR. MENDELOFF:

25 Q.  "2, check online to give me the real estate status.  3,

B. Rogan - direct                277

1    also I want to have Brian Rogan appointed as sole director and

2    president and I have discussed his appointment with Peter and

3    Brian.  That way we have an officer for handling corp issues."

4              Now, do you recall -- now, let's look back at the

5    whole page again.  Having seen that do you recall a

6    conversation with yourself, your father, and Fred Cuppy around

7    January 18th, 2007 about you becoming president of this

8    organization?

9              MR. MICHAEL O'ROURKE:  Objection.  That's not what it

10   says, Your Honor.  Objection, no foundation.

11             THE COURT:  Your objection's overruled.  The question

12   isn't whether he seen the e-mail.  The question is whether

13   having now seen the e-mail he recalls a conversation like that

14   around that date.  He can answer that question.

15             THE WITNESS:  In January of 2007 I do not recall a

16   specific conversation with Fred or my father, and I don't

17   specifically recall any conversation with my father relating to

18   PGR Properties.

19   BY MR. MENDELOFF:

20   Q.  You keep interjecting the word specifically.  You

21   understand that any memory you have of a conversation you were

22   supposed to give us in response to that interrogatory, correct?

23   A.  Correct.

24   Q.  Now, shortly after that -- let's look at Exhibit 817 and

25   let's zero in on 817 at the bottom right-hand corner.  You see

B. Rogan - direct                                278

1   that he says BR 905.  You see that?

2   A.  Yes.

3   Q.  Now, let's look at the larger exhibit, please.  Have you

4   ever seen this document before?

5   A.  I believe I've seen a similar -- if it's not this document,

6   I have seen a similar document to this.

7   Q.  And this was the document that was created that made you

8   the director of PGR Properties and president, treasurer and

9   secretary of PGR Properties; correct?

10  A.  Yes, that's what that document says.

11  Q.  And you had this document in your files, didn't you?

12  A.  That's -- yes, I couldn't recall if it -- this was the

13  specific verbiage, but I remember seeing a document very

14  similar to this.

15  Q.  Well, you had a document, this document in your files?

16  Didn't you produce it in this case?  Didn't you?

17  A.  Yes.  Yes.

18  Q.  And this document is -- turn to the next page -- signed by

19  your father, correct?

20  A.  Yes.

21  Q.  That's your father's signature?

22  A.  It looks like my father's signature, yes.

23  Q.  And it's signed on the 24th of January 2007, correct?

24  A.  Yes.

25  Q.  And that was -- you saw that e-mail on the 16th.  So it was

B. Rogan - direct                279

1    seven days later, right?

2    A.  Yes.

3    Q.  And that was only one and a half years before the

4    proceedings in this case, right?

5    A.  Correct.

6    Q.  Let's look at 818.  Look at the Bates number first.  You

7    see that says BR 907?

8    A.  Yes.

9    Q.  And let's look at the top.  Do you see that that's a letter

10   of resignation on the same date indicating that Peter G. Rogan

11   resigning as director, president, treasurer, and secretary of

12   PGR Properties, Inc.?  Do you see that it says that?

13   A.  Yes, it does.

14   Q.  And does that look like your father's signature?

15   A.  Yes, it does look like it.

16   Q.  And you're aware that this was produced from your files in

17   this case as well?

18   A.  Yes.

19   Q.  When did you receive these, the documents?

20   A.  I don't recall -- I don't recall when I received them.

21          MR. MENDELOFF:  We move the admission of 817 and 818,

22   Your Honor.

23          MR. MICHAEL O'ROURKE:  No objection, Your Honor.

24          THE COURT:  817 and 818 are admitted.

25      (Whereupon, Plaintiff's Exhibits 817 and 818 were received

B. Rogan - direct                    280

1        in evidence.)

2   BY MR. MENDELOFF:

3   Q.  Now, before this time had you ever in your life been named

4   to be the president, director, treasurer, and secretary of a

5   company?

6   A.  No.

7   Q.  Had you ever previously been named sole director of a

8   company?

9   A.  No.

10  Q.  Let's look at Exhibit 771.  And let's blow up this part

11  right here, (indicating).  You see 771, an e-mail from Fred

12  Cuppy to yourself on February 5, 2007?

13  A.  Yes.

14  Q.  And that would be only a few weeks after that form was

15  signed, correct?

16  A.  The form signed by my father?

17  Q.  Yes.

18  A.  Yes.

19  Q.  We discussed -- talked about it.  And you see that the

20  e-mail indicates that on the 14th of February 2007 Mr.

21  Cuppy wrote you to saying, Brian, here is a motion that we will

22  want to have counsel appear and file posttrial briefs and

23  proposed findings as PGR Properties, Inc. (hereinafter referred

24  to as PGR) which you now are the president and sole director.

25  John Foley should be sending you copies of corporate minutes

1    and other records for your file.  You see that?

2    A.  Yes.

3    Q.  Is it your testimony that when you prepared the

4    interrogatory answers in this case you didn't remember that

5    Fred Cuppy had told you that you were going to be president and

6    sole director of PGR Properties, Inc.?

7              MR. MICHAEL O'ROURKE:  Objection, Your Honor.  There's

8    no basis for this.  It mischaracterizes the testimony.

9              THE COURT:  Overruled.

10             THE WITNESS:  I'm sorry.  Can you repeat the question

11   then?

12   BY MR. MENDELOFF:

13   Q.  Is it your testimony that when you filled out the

14   interrogatory answers in this case and certified them that you

15   didn't remember that Fred Cuppy had told you that you were

16   going to be president and sole director of PGR Properties,

17   Inc.?

18   A.  I don't recall that it was that moment that I learned that

19   I was the president and sole director of PGR Properties.

20   Q.  Do you dispute it?

21   A.  I can't say for sure that's what I mean.  I can't say for

22   sure that that's when I first learned that I was president and

23   sole director.

24   Q.  Well, you certainly had a communication here with

25   Mr. Cuppy where he's telling you that you are?

B. Rogan - direct                282

1   A.  Yes.

2   Q.  And that would be responsive to the interrogatory, wouldn't

3   it?  It's a communication regarding PGR Properties and--

4   A.  And wasn't the indication I had multiple communications

5   with Fred Cuppy.

6   Q.  Well, so you agree that this is consistent, what you said

7   in your interrogatory answer then that you had conversations

8   with Fred Cuppy about you becoming an officer, correct?

9   A.  I'm getting confused about conversations.  With becoming an

10  officer?

11  Q.  Let me back up.  First of all, let me see the whole e-mail.

12  Do you recall receiving an e-mail from Fred Cuppy on the

13  subject on or about February 15th, 2007?

14  A.  Yes.

15  Q.  And you agree with me that in your answer -- the answer you

16  gave to interrogatories that we went over, this is completely

17  consistent with what you said when you said that you had had

18  multiple conversations with Fred Cuppy about assuming the

19  officer position?

20       MR. MICHAEL O'ROURKE:  What answer are you referring

21  to counsel?

22       MR. MENDELOFF:  Answer 6 on Exhibit 778.

23  BY MR. MENDELOFF:

24  Q.  You agree with me that this conversation was entirely

25  consistent with what you said in your answer to paragraph 6 in

B. Rogan - direct                283

 1   Exhibit 778 when you said you had multiple conversations with

 2   Fred Cuppy about assuming the officer position of PGR

 3   Properties?

 4   A.   That this e-mail is in concert with that?

 5   Q.   Yes.

 6   A.   Yes.

 7   Q.   It's completely consistent with it, correct?

 8   A.   Yes, I would say it is consistent.

 9   Q.   Not inconsistent?

10   A.   No, it is consistent.

11   Q.   And I take it you stand behind what you said in that

12   interrogatory answer?  That's completely accurate, correct?

13   A.   That I had multiple conversations with Fred Cuppy?

14   Q.   About becoming president?

15   A.   What was that again?  What's the specific line?  I don't

16   have it in front of me.

17          THE COURT:  He said about conversations with Fred

18   Cuppy about protecting the assets, assuming the officer

19   position of PGR Properties to protect the assets of PGR

20   Properties.

21          THE WITNESS:  Yes, I had multiple conversations with

22   Fred Cuppy about that.

23   BY MR. MENDELOFF:

24   Q.   So right here, assuming the officer position with PGR

25   Properties to protect the assets of PGR Properties, correct?

B. Rogan - direct                284

1   A.  What was the question?  I'm sorry.  Oh, yes.  That's

2   correct, yes.

3   Q.  Now, I'm going to ask you -- I'm going to show you your

4   answer to the other certified interrogatory answers you filed

5   in connection with this case.  Exhibit 778.  And again let's

6   look at the third to last page.  779-B.  Thank you for

7   correcting me.

8          All right.  And we want to go -- 779-B.  Now, let's

9   look at the second to last page.  I guess it's 37.  You see

10  your signature there?

11  A.  Yes.

12  Q.  And you signed this on February 22nd, '09.

13  A.  Yes.

14  Q.  And in the prior answer that we just had looked at, which

15  you verified for the Court just now, was on January 20th '09,

16  so a month earlier, right?

17  A.  Yes.

18  Q.  Now, let's look at your answer to the same question on page

19  22.  You'll agree with us that that's the same question?

20  Paragraph 6.

21  A.  Yes, that appears to be the same question.

22  Q.  And for the record this document purports to be nonparty

23  intervenor's second supplemental and final responses.  Let's

24  turn to the bottom -- scroll down a little bit, the very

25  bottom.  The conversation is with Fred Cuppy.  And turn to the

B. Rogan - direct                    285

1   next page, please.  Do you see where it says Brian Rogan -- or

2   Brian does not recall any specific communication with Fred

3   Cuppy about him becoming an officer of PGR Properties?  You see

4   that?

5   A.  Yes.

6   Q.  That's not true, is it?

7   A.  At the time of this interrogatory it was the 20th -- the

8   22nd.

9   Q.  You had just answered the same interrogatory a month

10  earlier.  You said there were multiple conversations.  When we

11  went through the e-mails and talked about it, you confirmed for

12  the Court that that was accurate.  And what I'm asking you is

13  if you had multiple conversations, then the statement you made

14  in the certified interrogatory a month later that you don't

15  remember any couldn't be true, isn't that correct?

16          MR. MICHAEL O'ROURKE:  Objection, Your Honor.

17  Mischaracterizes the testimony.

18          THE COURT:  Overruled.

19          THE WITNESS:  Well, no, I believe my -- what I meant

20  by this statement is I don't recall any specific conversations

21  with Fred.  I had multiple conversations with him dating back

22  to the first part of the year, or not this year but the first

23  part of 2007.  I mean, I don't -- until this proceeding began,

24  not this one specifically, but this process I had to review and

25  I was remem -- I was going through all the documents and

B. Rogan - direct                286

1    learning as much as I could.

2    BY MR. MENDELOFF:

3    Q.  All right.  Your prior testimony was not only that the

4    interrogatory said that you had multiple conversations with him

5    about becoming an officer was completely accurate and you

6    verified it for the Court.  Here, yes, you talk about Brian had

7    conversations with Fred Cuppy about PGR Properties, but then

8    you say only a few sentences later, Brian does not recall any

9    specific conversation with Fred Cuppy about him becoming an

10   officer of PGR Properties.

11            I'm going to ask you once more and then I'm going to

12   stop.  That can't be true that your prior testimony is

13   accurate, can it?

14            MR. MICHAEL O'ROURKE:  Objection, Your Honor.  That's

15   completely -- that's improper impeachment.  It's improper

16   impeachment.

17            THE COURT:  Overruled.

18            THE WITNESS:  So can you repeat the -- the previous

19   one and this one you're asking?

20   BY MR. MENDELOFF:

21   Q.  What we're doing is we're putting the two answers side by

22   side.

23   A.  Okay.

24   Q.  This is your first answer.  Multiple conversations with

25   Fred Cuppy regarding protecting the assets of PGR Properties,

B. Rogan - direct                287

 1   assuming officer position of PGR Properties to protect assets

 2   of PGR Properties.

 3          You said under oath in this court that you were saying

 4   here that you had multiple conversations with Fred Cuppy about

 5   assuming the officer position of PGR Properties.  That's what

 6   you testified to.  And you said that this was entirely -- your

 7   memory was entirely consistent with this first answer.  The

 8   second answer says you don't recall any specific communication

 9   with Fred Cuppy about becoming an officer of PGR Properties.

10          So my question for you is if your answers regarding

11   this interrogatory are true, which you said they were, then

12   your answers regarding this interrogatory could not be true,

13   isn't that correct?

14          MR. MICHAEL O'ROURKE:  Your Honor, same objection.

15   Improper impeachment.

16          THE COURT:  Overruled.

17          THE WITNESS:  I can't say that because the second

18   document again -- or this one on the left-hand side of the

19   screen, I'm saying I had specific conversations.  The ones -- I

20   recall conversations with Fred Cuppy about becoming an officer

21   and with other functions of PGR Properties, but I don't recall

22   specific moments where I was conversing with him about specific

23   topics on specific days.

24   BY MR. MENDELOFF:

25   Q.  Do you recall being asked only a few minutes ago --

B. Rogan - direct                          288

1            THE COURT:  Enough please.

2            MR. MENDELOFF:  Okay.

3            THE COURT:  Let's save it for argument.  Next.

4    BY MR. MENDELOFF:

5    Q.  All right.  Will you agree that you answered exactly the

6    same way in the two other certified answers?

7            MR. MICHAEL O'ROURKE:  Objection, Your Honor.

8    BY MR. MENDELOFF:

9    Q.  Exactly the same way as --

10           THE COURT:  Can we stipulate that the other answers

11   are the same?

12           MR. MICHAEL O'ROURKE:  Yes.

13           MR. MENDELOFF:  Thank you.

14           THE COURT:  Yes.  Okay.  Good.

15   BY MR. MENDELOFF:

16   Q.  Let's look back at Exhibit 771.  That's not the one I want.

17   Make it 817.  Now, 817 you see that the registered agent for

18   PGR Properties is CT Corporate Systems.  You see that?

19   A.  Yes, I do.

20   Q.  And you were aware that CT Corporate Systems is the

21   registered agent of the company that you are president of and

22   sole director, correct?

23   A.  I'm aware now?

24   Q.  You were aware?

25   A.  When?

B. Rogan - direct                    289

1    Q.   Weren't you?  Well, you said this document had been in your

2    files.

3    A.   Uh-huh.

4    Q.   And you were aware --

5    A.   Oh, excuse me.  Yes.

6    Q.   You were aware that the document made CT Corporate Systems

7    the registered agent of your company, correct?

8    A.   Yes, I'm aware of that.

9    Q.   And you were aware of that, correct?  You had been aware of

10   that since you had this document?

11   A.   This document that was in my files, yes.

12   Q.   Now, let me show you Exhibit 816.  816 is a citation to

13   discover assets in Edgewater Medical Center versus Edgewater

14   Property Company.  You see that?

15   A.   Yes.

16   Q.   And do you see who it's addressed to?

17   A.   Yes.

18   Q.   PGR Properties, Inc.?

19   A.   Yes.

20   Q.   And let's zero in on this first paragraph.  You see that it

21   indicates to PGR Properties, Inc. that a judgment against

22   defendants Edgewater Property Company PPC and PGP Properties,

23   Inc., collectively judgment debtors was entered on April 27,

24   2007 in the amount of $203,822, plus post judgment interest.

25   Do you see that?

B. Rogan - direct                                    290

1    A.  Yes.

2    Q.  All right.  Let's turn to the next page and zero in on the

3    certificate of service.  And this indicates that it was issued

4    by the clerk of the bankruptcy court.  You see that?

5    A.  Yes.

6    Q.  It wasn't just something that was issued by some lawyer,

7    right?  It was the bankruptcy court.  Turn to the next page,

8    please.  Next page.  Go to the last page, please.  And you see

9    that this is an affidavit of service.  That it was actually

10   given to somebody.  You see that?  Affidavit of service.

11   A.  Oh, yes.  Yes.

12   Q.  Now, you see who it was given to?  Right here.

13          THE COURT:  Patricia Jones.

14   BY MR. MENDELOFF:

15   Q.  PGR Properties, Inc., care of CT Corporation Systems, which

16   is the process servicer -- I mean, the registered agent,

17   correct?

18   A.  CT Corporation is the registered agent, yes.

19   Q.  And the registered agent got it on July 12, 2007, right?

20   A.  Yes.

21   Q.  And were you aware shortly after this that this citation

22   had been served and that there was a hold on the assets of PGR

23   Properties, Inc.?

24   A.  There was a hole?

25   Q.  Were you aware --

B. Rogan - direct                     291

1          THE COURT:  Hold, H-O-L-D.

2          THE WITNESS:  Oh, hold.  I can't say for sure that in

3  July 2007 that I was -- well, I'm sorry.  I'm confused.  Can

4  you repeat the question then.

5  BY MR. MENDELOFF:

6  Q.  My question is were you aware at or shortly after this date

7  that the citation to discover assets had been served on PGR

8  Properties, Inc.?

9  A.  I cannot recall specifically if this citation -- when this

10  citation was served on me personally.  I cannot recall.

11  Q.  So if we contacted CT Corporation, would you be surprised

12  to learn they would say yes, they contacted you and told you

13  there was a citation served?

14          MR. MICHAEL O'ROURKE:  Objection.  Calls for

15  speculation.

16          THE COURT:  The objection is overruled.

17          THE WITNESS:  Would I be surprised if CT Corporation

18  confirmed that was this served on PGR?

19  BY MR. MENDELOFF:

20  Q.  On you.

21  A.  On me.

22  Q.  That you were informed.  They're your agent.  So when they

23  get it, they tell the president.

24  A.  Yes.  No, I would not be surprised about that.  I've

25  received several services.

B. Rogan - direct                    292

1   Q.  Now, let's look at Exhibit 819.  You see that this is a --
2   first of all, this -- hold on.  You see it has the Bates number
3   BR 1002.
4   A.  Yes.
5   Q.  Now, let's look at the body of the e-mail.  You see it's an
6   e-mail from Fred Cuppy to you.  It was produced from your
7   e-mail account.  You see that at the top?
8   A.  Oh, I received that e-mail from Fred, yes.
9   Q.  Yes.  Bprogan@gmail.com.  And you received this from Fred
10  on or about July 30th, 2007, correct?
11  A.  Correct.
12  Q.  And you maintained it and produced it in connection with
13  this case, correct?
14  A.  Correct.
15         MR. MENDELOFF:  Move the admission of this exhibit,
16  Your Honor.
17         MR. MICHAEL O'ROURKE:  No objection, Your Honor.
18         THE COURT:  What's the number again?  I'm sorry.
19         MR. MENDELOFF:  It's Exhibit 819.
20         THE COURT:  819 is admitted.
21      (Whereupon, Plaintiff's Exhibit 819 was received in
22       evidence.)
23  BY MR. MENDELOFF:
24  Q.  Let's look at the body.  "Brian, on the citation, you need
25  to send Eric Pruitt copies of anything you have in regard to

B. Rogan - direct                    293

1    the citation and with documents.  Then tell him since you live

2    in Savannah that he can depose you in Georgia."

3           Does that refresh your memory that at least by July

4    30, 2007 you knew about the citation?

5    A.  Yes.

6    Q.  Let's go back to the citation, please, Exhibit 771.

7    Exhibit 819, let's try that.  816.  Sorry.  816.  That's it.

8    I'll show you the second page of the citation.  And

9    specifically you see on page 2 of the citation here you're

10   getting notice that your company has been named a debtor.  And

11   you turn to page 2 and it says in big black block letters, you

12   are prohibited.  Do you see that?

13   A.  Uh-huh -- oh, yes.

14   Q.  You think in reading this you could have missed that?

15          MR. MICHAEL O'ROURKE:  Your Honor, that's argument.

16   That's --

17          THE COURT:  The objection is overruled.

18   BY MR. MENDELOFF:

19   Q.  Sir?

20   A.  I'm reading it.  I'm sorry.

21   Q.  What I'm wondering is just do you think -- well, read it

22   and then I'll ask you a question.  And we'll make clear what

23   this is telling you -- read it and then I'll ask you a summary

24   question.

25   A.  Okay.

B. Rogan - direct                                294

1    Q.  All right.  So this is telling you that you're prohibited

2    from transferring any property of PGR Properties, Inc. because

3    of this judgment, correct?

4    A.  Correct.

5    Q.  So you understood that you couldn't move property of this

6    entity because there was $203,000 judgment against the

7    property, correct?

8    A.  Yes, that's what that document says, yes.

9    Q.  And you understood this at or about the time, right?

10   A.  Yes.

11   Q.  By July?

12   A.  Yes.

13   Q.  Let me show you Exhibit 820, which is a fax transmittal

14   from yourself -- hold on.  First let's look at the Bates

15   number.  It's the BR Bates series, correct?  Right there, BR?

16   A.  Oh, yes.  I'm sorry.

17   Q.  This is a fax transmittal from yourself to Ray Albain dated

18   October 31st, 2007.  You see that?

19   A.  Yes.

20   Q.  And you produced this fax from your files?

21   A.  I cannot say for sure, but yes.

22   Q.  Do you remember writing this letter on or about -- sending

23   a fax like this on or about October 31st, 2007?

24   A.  I don't know what the fax contains.  I know a gentlemen by

25   the name of Ray Albain who I contacted.

B. Rogan - direct                295

1   Q.  Okay.  And who is it?

2   A.  I can't remember which organization he works for honestly.

3   Q.  Let's go to Exhibit 821?

4          THE COURT:  What was that number there?

5          MR. MENDELOFF:  That's 820.

6          THE COURT:  8-2-0.  Okay.

7   BY MR. MENDELOFF:

8   Q.  Exhibit 821.  Do you see that this is a letter from Ray

9   Albain to you from JP Morgan?

10  A.  Yes.

11  Q.  Let's look at the date.  November 6th, 2007.  Let's zero

12  back.  And you see the Bates number's yours?

13  A.  Yes.

14  Q.  And does that refresh your memory that Ray Albain was a

15  banker at JP Morgan Chase?

16  A.  Yes.

17  Q.  Now, let's go back to the other document, 820.  This fax

18  transmittal form is that your fax number up on the right-hand

19  side?

20  A.  Yes.

21  Q.  And do you see it says, "Please contact me if you have any

22  questions.  Thank you.  Brian Rogan."  You see that?

23  A.  Yes.

24  Q.  Let's look at the next page.  And let's zoom -- I'm sorry.

25  First let's look at -- the Bates No. BR 904, correct?

B. Rogan - direct 296

1   A.   Yes.

2   Q.   Give me the prior page.   That was BR 903, right?

3   A.   Yes.

4   Q.   Let's look at the letter.   Same date, October 31st, 2007,

5   right?

6   A.   Yes.

7   Q.   "Dear, Ray.   Please close the above-referenced account

8   number and mail the balance of the account to Brian Rogan at

9   12300 Apache Avenue, No. 914, Savannah, Georgia."   You see

10  that?

11  A.   Yes.

12  Q.   You knew because you had -- and the account, by the way, is

13  for PGR Properties, Inc., correct?

14  A.   PGR Properties.

15  Q.   PGR Properties, Inc.

16  A.   Incorporated, yes.

17  Q.   And so you knew based on the citation that you were not

18  supposed to move any assets, didn't you?

19  A.   Again, I don't recall specifically receiving that citation,

20  but based on the information on that citation, yes, that would

21  be true.

22  Q.   So you were moving assets when you weren't supposed to

23  here, is that correct, or attempting to?

24       MR. MICHAEL O'ROURKE:   Objection, Your Honor.   This is

25  a different case entirely irrelevant to this.

1          THE COURT:  Oh, I don't agree in the least.  The

2    objection is overruled.

3          THE WITNESS:  Can you repeat the question.  I'm sorry.

4    BY MR. MENDELOFF:

5    Q.  My question is that this -- on this document you're trying

6    to move assets on October 31st, 2007 for PGR Properties, Inc.,

7    when you knew as of July 2007 that you weren't supposed to be

8    moving assets, isn't that correct?

9    A.  Yes, based on the citation.  The purpose of that was to

10   close an account that I couldn't get access to as president.

11   It had $3500 I think in it, because I had to pay -- not me

12   personally, but PGR Properties had incurred bills from CT

13   Corporation and Tatooles & Foley for filing tax returns and

14   things like that.  It was solely to try and pay the outstanding

15   invoices.

16   Q.  I didn't ask why you were doing it.

17   A.  No.  I understand that.  I understand that.

18   Q.  My question is you knew you weren't supposed to be moving

19   assets, correct?

20   A.  Based on the citation, yes.

21   Q.  Now, let's look at --

22          THE COURT:  We need to find a place to stop today.

23          MR. MENDELOFF:  I'm almost done.  I've got five

24   minutes.

25          THE COURT:  All right.

B. Rogan - direct                          298

1    BY MR. MENDELOFF:

2    Q.  I'm going to show you two tables, Exhibits 44-A for the

3    record and Exhibit 44-E.  Can you see those?

4              THE COURT:  If you need to stand up, that's fine.

5              THE WITNESS:  No, I can see.  Depending on the

6    question, I can move.

7    BY MR. MENDELOFF:

8    Q.  I'm going to just ask you.  If you look at the bottom of

9    these tables and you see references to certain developments

10   that are -- and I think you know of that are in Savannah,

11   Georgia.  You see it right here?

12   A.  I'm familiar with some of those properties.

13   Q.  Yes, I know that.  Okay.  And also on the Peter G. Rogan

14   Trust side do you see some developments over here on the

15   bottom?

16   A.  Yes.

17   Q.  Now, my question is which of these developments are you

18   familiar with?

19   A.  I'm familiar with the Commons on Wilmington Island.  I'm

20   not familiar with the LLC.  The property is called the Commons

21   at Wilmington Island.

22   Q.  And you're familiar with that?

23   A.  The property?

24   Q.  Yes.

25   A.  Yes.

1    Q.   Did you work for that property?

2    A.   Yes.

3    Q.   All right.  And what about Palmetto Commons?

4    A.   Palmetto Commons Condominiums is a property that I'm

5    familiar with.

6    Q.   And you worked with Palmetto Commons Condominium project?

7    A.   The project, yes.

8    Q.   Yes, right.  And what about any of the projects over here?

9    A.   I'm familiar --

10   Q.   For the record Exhibit 44-E.

11   A.   I'm familiar with Gardens on Jones and the Taylor Row

12   project.

13   Q.   Now, how is it that you're familiar with the Gardens on

14   Jones project?

15   A.   I have seen it.

16   Q.   And did Mr. Cuppy take you down there?

17   A.   The first time I saw it it was in 2005 and I was on -- I

18   was in Savannah with Mr. Cuppy, yes.

19   Q.   And he gave you a tour in 2005 of the Gardens and Jones

20   project, right?

21   A.   I don't specifically recall a tour.  I remember the

22   building, being outside of it.  I don't remember going into the

23   building.  I think it was completed in 2005, but I cannot be

24   sure.

25   Q.   All I'm asking you is he walked you around there?

B. Rogan - direct          300

1    A.   Around the area, yes.

2    Q.   And with respect to these other projects, Taylor Row, how

3    do you know about that?

4    A.   Taylor Row is one block away from Gardens on Jones.

5    Q.   And so did you learn about that at the same time?

6    A.   In 2005 I can't be sure if I learned about it then, but I

7    am aware of where the project is in Savannah.

8    Q.   Right.  And did you work on any of these -- either of these

9    projects, any of the Savannah projects?

10   A.   I didn't work at Gardens on Jones, and I didn't -- Taylor

11   Row was being completed at the time, but I didn't work on it.

12   Q.   And Side Gardens?

13   A.   Side Gardens I'm not exactly sure.  It's in the general

14   downtown Savannah area.  I'm not familiar with it beyond that.

15   Q.   Okay.  Now, the 410 Montgomery is known as Jones Square.

16   A.   Jones Square Condominium -- well, 410 is one address.  It's

17   on the corner, so it's one address here and the other address

18   here.  The address of the building is 323 West Jones I think.

19   Q.   Okay.  And you're familiar with that one?

20   A.   The building, yes.

21   Q.   And how is it that you're familiar with that?

22   A.   I worked on that project as well.  The completion of that

23   project I should say.

24   Q.   And you worked at the condos at -- Commons at Wilmington

25   Island LLC, correct?

B. Rogan - direct                301

1   A.  I worked at the project.

2   Q.  Right.  And you said Palmetto Commons condos you worked at?

3   A.  Yes.

4   Q.  And in connection with these projects did you work with --

5   in association with among other people Fred Cuppy?

6   A.  Yes.

7   Q.  And did you also have contact with David Miller in

8   connection with some of these projects?

9   A.  Not in anything related to these projects.  I believe he

10  died in 2004.

11  Q.  So this would have all happened in 2005 or after?

12  A.  Yes.

13  Q.  Now, sir, did you -- when you were down in Savannah working

14  on these various things did you have occasion to discuss this

15  with your father?

16  A.  I discussed with him how my job was going, and beyond that

17  nothing.

18  Q.  Did your father -- is it your testimony that nobody ever

19  told you that you had an ownership interest, a beneficial

20  ownership interest in everything you were working on?

21  A.  Not -- I didn't learn of that until 2000 -- late 2007.

22  Q.  And --

23  A.  Well, not late, but in 2007.

24  Q.  How did you learn about it in 2007?

25  A.  I was preparing a prenuptial agreement.

B. Rogan - direct                    302

1    Q.  And in preparing the prenuptial agreement, did you have to

2    talk to Mr. Cuppy about it?

3    A.  Yes.

4    Q.  And based on that did he provide you information regarding

5    certain contingent assets you had?

6    A.  I recall some information about -- of Taylor Row

7    specifically.

8    Q.  What about the other entities?

9    A.  I don't recall, I don't recall anything specific -- I don't

10   recall anything related to those properties and any beneficial

11   interest, or my beneficial interests.

12   Q.  You worked as I understand it from October of '05 until

13   July of '08 on these various projects.  And you didn't know

14   until the middle of '07 that you were -- you had a beneficial

15   ownership interest in all of these things, is that what you're

16   saying?

17   A.  No, I said specifically only Taylor Row.  I don't -- I

18   didn't -- I don't know that I have a beneficial interest in all

19   of those projects.

20   Q.  Let me show you what we're going to mark as Exhibit 822.

21   And I'm going to ask you -- this was produced from -- well, it

22   at least has a BR 510 sticker -- or Bates number on it.  And my

23   only question on this is do you know what this is?

24   A.  That is the attachment to my prenuptial agreement.

25   Q.  All right.  Great.  That's what I figured, but I wasn't

B. Rogan - direct                303

1   sure.

2   A.  Well, it appears to be.  I don't know if you got it from

3   somewhere else.

4   Q.  I got it from you?

5   A.  Oh, I produced it.

6   Q.  I got it from your lawyer.

7   A.  Yes, that's fine.

8   Q.  Does that look like the attachment?

9   A.  Yes.  Yes, it does.  I'm sorry.

10  Q.  Now, I have a question -- a couple questions about this and

11  then I'm done.  Sir, in this agreement it indicates that you

12  were presently earning $60,000 for your employment at Palmetto

13  Commons Partners LLC.  You see that?

14  A.  Correct.

15  Q.  Can you explain to us why it is that in your interrogatory

16  answers you don't list Palmetto Commons as an employer at all?

17  A.  I was working at -- there were four different properties

18  that I was working at.  And each of the properties was operated

19  independently.  So when I was working at Hoover Creek

20  Plantation, I was employed by Hoover Creek Plantation, and that

21  was managed by Posada Properties, which was a company that

22  oversaw all four properties.  And then so when I worked for

23  Palmetto Commons Partners, I was actually working at the

24  Palmetto Commons project on Hilton Head Island.  They're one in

25  the same essentially.

B. Rogan - direct                                              304

1    Q.  So is your testimony Posada Properties, Posada -- what did

2    you call it?  Posada Partners?

3    A.  No, there's a company in Savannah that is called Posada

4    Properties.

5    Q.  Posada Properties.  And your testimony is that Posada

6    Properties owns Hoover Creek, Taylor Row, the Commons at

7    Wilmington Island, and 410 Montgomery?

8    A.  No, I am not testifying that they own that at all.

9    Q.  Okay.  Then I'm not following you.  You worked for the

10   Posada Properties entity.  And what is their relationship to

11   the four properties?

12   A.  From my understanding, I don't know for sure, but there

13   was -- the four properties were managed by a group of

14   individuals.  And then I worked for those individuals who --

15   you know, the Palmetto Commons Partners LLC was the Palmetto

16   Commons project that I worked on at Hilton Head.  So when I was

17   working at that property, I was associated and employed by that

18   facility.

19   Q.  Well, explain for us why it is that you don't list -- let's

20   look at the whole page again.  You see Posada Properties, LLC

21   there on this form.  And it says you were only paid $3,178,

22   right?

23   A.  Yes.

24   Q.  And we see -- and we see that at Palmetto Commons Partners,

25   LLC you were making 60,000.  Can you explain why neither of

B. Rogan - direct                          305

1   those entities appear on your interrogatory answers.

2   A.  Well, again the companies are one in the same.  My salary

3   never changed from when I was working on what project.  So I

4   began employment at the Commons on Wilmington Island and then I

5   transferred to Hoover Creek Plantation and then I transferred

6   to Jones Square Condominiums, and then my final employment was

7   at the project of Palmetto Commons Partners LLC.

8          Again, we were paid from Total HR Solutions, which was

9   actually a payroll company.  So that's who I physically

10  received my checks.  But sometimes like in this case Palmetto

11  Commons Partners LLC was the -- they were the managers of the

12  Palmetto Commons property.  But at Hoover Creek Plantation I

13  believe it was another name.  That may have been Posada

14  Properties.  I'm not sure.

15  Q.  All right.  One final question.  Sir, given your

16  interrogatory answer where the only thing you identified was

17  Hoover Creek, would it be the case that the reason you did that

18  was because you didn't want to disclose that you were also

19  working at the Commons of Wilmington Island, 410 Montgomery,

20  and Taylor Row?

21          MR. MICHAEL O'ROURKE:  Objection, asked and answered.

22          THE COURT:  Overruled.  He said why.  That's the

23  question.

24          THE WITNESS:  The reason I didn't list it -- excuse

25  me.  Can you repeat the question again.

B. Rogan - direct                          306

1    BY MR. MENDELOFF:

2    Q.  Yes.  Is the reason that you only listed the Hoover

3    Creek job as your employer is because you didn't want to

4    disclose that, in fact, you were working at -- also working at

5    the Commons at Wilmington Island, Taylor Row, and 410

6    Montgomery?

7    A.  No.  I list those on my resume.

8    Q.  You didn't list them for this Court, though, did you?

9    A.  No, because they're, they're the same company.  I mean, the

10   project changed and my employment changed at them, but the

11   actual -- again, Palmetto Commons Property -- or Palmetto

12   Commons Partners was the last company that I worked at that

13   project.

14            MR. MENDELOFF:  Nothing further, Your Honor.

15            THE COURT:  Are you going to have questions?

16            MR. MICHAEL O'ROURKE:  I'd like to just have a brief

17   period of time for just some small questions on redirect.

18            THE COURT:  Yes, so we're going to do it tomorrow

19   then.

20            MR. MICHAEL O'ROURKE:  Okay.  Fair enough.

21            THE COURT:  Because we're past my quitting time.

22            MR. MENDELOFF:  Your Honor, we have an issue about

23   tomorrow that we have to raise with Your Honor.

24            THE COURT:  Okay.  You can step down.

25            THE WITNESS:  Thank you.

1          MR. MENDELOFF:  Judy Rogan is the next witness.

2          THE COURT:  Yes.

3          MR. MENDELOFF:  And apparently there is a conflict

4   issue that has arisen.

5          THE COURT:  A conflict?

6          MR. MENDELOFF:  A conflict of interest issue.  Judy

7   Rogan and some of the questions that we're going to ask Judy

8   Rogan are questions that on the 341 examination in the

9   bankruptcy court she took the 5th Amendment on.

10         THE COURT:  Okay.

11         MR. MENDELOFF:  Counsel understandably doesn't want to

12  be representing her in connection with this proceeding with

13  these individuals and advising her as to whether she should

14  take the 5th Amendment.

15         THE COURT:  Right.

16         MR. MENDELOFF:  I wish we had this come before now.

17  We've been clear we were going to do this for quite a while,

18  but that's what came up.  And so we agreed that she does need

19  separate counsel for purposes of that.  Now, there's a couple

20  of ways to do it.  One is I don't want to waste court time,

21  so --

22         THE COURT:  I mean, folks, I mean -- and I guess I'm

23  talking to you all over here.  If there was a conflict, there's

24  a conflict.  It doesn't matter whether there's two cases or

25  one.  I mean, that's something that -- what's the conflict?

1    Explain to me.

2              MR. MICHAEL O'ROURKE:  Well, I mean, not having been

3    at that deposition and not knowing --

4              THE COURT:  Does she have a lawyer in that case?

5              MR. MICHAEL O'ROURKE:  Yes, Gordon Gouveia.

6              THE COURT:  Why can't that person be here tomorrow?

7              MR. MENDELOFF:  Well, then you know, that's what I'm

8    going to have to --

9              THE COURT:  Then let's just do it that way.

10             MR. MENDELOFF:  I don't know if he can be here.

11             MR. MYLES O'ROURKE:  I don't know if there's a trial

12   subpoena.

13             THE COURT:  I'm going to tell you something, I don't

14   care.  The subpoena is directed to the witness.  They don't say

15   this anymore, but what they mean is lay all other business

16   aside.  The lawyer's here, the lawyer's here, the lawyer's not

17   here, the lawyer's not here, I don't care.

18             MR. MENDELOFF:  Your Honor, we did not subpoena her

19   because she's a party.

20             THE COURT:  She's a party.  Then you don't need to

21   subpoena her.  It's a notice to appear and she is going to be

22   here.  If she's not here, then I'll take other steps.  And my

23   contempt power is not restrained or constrained by one iota by

24   the pendency of a bankruptcy proceeding.

25             MR. MICHAEL O'ROURKE:  I understand, Your Honor.

1    THE COURT:  She's required to appear as a witness.  So
2    you either get Gouveia or whatever his name is here or you
3    don't.  She's going to be sitting in my courtroom tomorrow.
4    That's all I have to say about the topic.  I'm done for the
5    day.  See you tomorrow.
6    MR. MENDELOFF:  Thank you, Your Honor.
7    (Whereupon, said trial was recessed at 4:45 p.m., to
8    reconvene on 4/1/09, at 9:45 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25