1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   DEXIA CREDIT LOCAL, f/k/a        )
    Dexia Public Finance Bank        )
5   and Credit Local de France,      )   Docket No. 02 C 8288
                                      )
6                    Plaintiff,       )
                                      )
7            vs.                      )   Chicago, Illinois
                                      )   April 2, 2009
8   PETER G. ROGAN, et al.,          )   10:45 a.m.
                                      )
9                    Defendants.      )

10
                    TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
    APPEARANCES:
13

14  For the Plaintiff:      HOWREY LLP
                            BY:   MR. SCOTT T. MENDELOFF
15                                MR. GABRIEL AIZENBERG
                            321 North Clark Street, Suite 3400
16                          Chicago, Illinois   60654

17

18  For Judith Rogan and
    Brian Rogan:            O'ROURKE & MOODY
19                          BY:   MR. MICHAEL J. O'ROURKE
                                  MR. MYLES P. O'ROURKE
20                          55 West Wacker Drive, Suite 1400
                            Chicago, Illinois   60601
21

22
    For Robert Rogan and
23  Sara Rogan:             TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
                            BY:   MR. TIMOTHY J. TOUHY
24                                MR. JEFFREY J. HALLDIN
                            55 West Wacker Drive, Suite 1400
25                          Chicago, Illinois   60601

```
1    For Judy Rogan:          MR. JEFFREY W. FINKE
                              55 West Wacker Drive
2                             Suite 1400
                              Chicago, Illinois   60601
3
```

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois   60604
(312) 427-4393

1    (The following proceedings were had in open court:)

2    THE COURT:   08 C 8288, Dexia v. Rogan.

3    Can the lawyers give your appearances for the record?

4    MR. MENDELOFF:   Scott Mendeloff and Gabriel Aizenberg

5    on behalf of Dexia.

6    MR. MYLES O'ROURKE:   Myles O'Rourke and Michael

7    O'Rourke on behalf of Brian Rogan.

8    MR. TOUHY:   Timothy J. Touhy on behalf of Sara

9    Caitlin Rogan and Robert Rogan.

10   MR. HALLDIN:   Jeff Halldin on behalf of Sara Caitlin

11   Rogan and Robert Rogan.

12   MR. FINKE:   My name is Jeffrey Finke, F-i-n-k-e.   I

13   am here today on behalf of Judy Rogan, but I have not been

14   retained by her.   It requires bankruptcy court approval for me

15   to be retained, but what I am here to do today is to say that

16   Judy Rogan objects to being called to testify.   I can tell you

17   why either now or whenever.

18   THE COURT:   Tell me why right now.

19   MR. FINKE:   If she is being called as a witness, then

20   to comply with Rule 45, she needs to be served with a subpoena

21   and given her witness fees.   That has not happened.   If she is

22   being called as a party, it violates the automatic stay rule,

23   Section 362 of the bankruptcy code, that prohibits the

24   continuation of any proceeding and prohibits the issuance of

25   process to anyone who has filed for bankruptcy.

1    In addition to all that, she would assert her Fifth
2  Amendment and would not --
3    THE COURT:  That has to be done on a
4  question-by-question basis.  You can't assert the Fifth
5  Amendment generally in this type of a proceeding.  You have to
6  assert it on a question-by-question basis.
7    Let me hear from plaintiff's lawyers on the first two
8  issues.
9    MR. MENDELOFF:  Well, we have not researched the very
10  first issue.
11    The second issue, we can tell you, we have
12  researched, and we think it's incorrect as a matter of law.
13    THE COURT:  The second issue being?
14    MR. MENDELOFF:  The second issue that she is not
15  subject to process because she is a debtor in bankruptcy.
16    THE COURT:  Okay, but your position, I take it, is
17  that you do not -- and I think this was articulated the other
18  day, that you don't need to serve her with a subpoena --
19    MR. MENDELOFF:  Right.
20    THE COURT:  -- because although she is being called
21  to testify as a witness, she doesn't have to be served with a
22  subpoena because she is a party to the case.
23    MR. MENDELOFF:  That's right.  That's our position.
24    THE COURT:  Okay.  Do you per chance have a copy of
25  362-A on you?

1   MR. FINKE: Right here.

2   THE COURT: Let me borrow it.

3   (Brief interruption.)

4   THE COURT: "Except as provided in subsection (b)...

5   a petition filed under" -- okay, "operates as a stay of the

6   commencement or continuation, including the issuance or

7   employment of process, of a judicial, administrative or other

8   action or proceeding against the debtor that was or could have

9   been commenced before the commencement of the case under this

10  title, or to recover a claim against the debtor that arose

11  before the commencement of the case under this title."

12  Okay, so if you look at that linguistically, what it

13  says is that -- this is that 362-A-1 -- it's a stay of the

14  commencement or continuation of an action or proceeding

15  against the debtor, and that includes the issuance or

16  employment of process.  And this proceeding, just so it's

17  clear, the proceeding that is going on right now is not, as I

18  understand it at least, and Mr. Mendeloff or Mr. Aizenberg

19  will correct me if I'm wrong about this, it's not a proceeding

20  against Mrs. Rogan, and what I mean by that is it's not a

21  proceeding that attempts to levy, collect, obtain relief

22  against her.

23  Am I correct about that?

24  MR. MENDELOFF: Correct.

25  THE COURT: So what you are saying, Mr. Finke, is

1    that the reference to issuance or employment of process

2    effectively includes telling somebody that because you are a

3    party, I don't need to subpoena you, I can just tell you, and

4    you have to show up.

5                MR. FINKE:  That's correct.  It says anything.

6                Now, it is possible under Rule 45 to get her into

7    court properly with a subpoena and with payment of witness

8    fees;  that has not been done.

9                MR. MENDELOFF:  Our view is that process was served

10   before she filed for bankruptcy.  That made her a party to the

11   proceedings.

12               THE COURT:  Well, what is the -- how does Mrs. Rogan

13   know to be here today?  By what means?

14               MR. MENDELOFF:  We informed Mr. O'Rourke.

15               THE COURT:  Mr. O'Rourke.

16               MR. MENDELOFF:  Mr. O'Rourke informed her.

17               THE COURT:  Who been had her counsel in this case

18   before the issuance of the automatic stay.

19               MR. MICHAEL O'ROURKE:  Right, that's correct, Judge.

20               MR. FINKE:  Your Honor just said the key point,

21   before the issuance of the automatic stay.

22               The world changes completely once the bankruptcy

23   petition is filed;  the automatic stay goes into effect.

24               THE COURT:  So let me ask you this question.

25               If Mr. -- now, I'm not saying this is what I'm going

1　　to do, but if Dexia's lawyers were to give a subpoena with the

2　　witness fee to Mr. O'Rourke, who currently has an appearance

3　　on file on behalf of Mrs. Rogan in this case, would that

4　　satisfy whatever is necessary to have her properly appear?

5　　　　　　MR. FINKE:　Not today because it's not the attorney;

6　　it's the witness --

7　　　　　　THE COURT:　He has an appearance on file for her.

8　　　　　　MR. FINKE:　-- that the --

9　　　　　　THE COURT:　Okay, so tell me where she is.

10　　　　　MR. FINKE:　Well, I wasn't here yesterday.

11　　　　　THE COURT:　Tell me where she is.

12　　　　　MR. FINKE:　She is right now in your witness room.

13　　　　　THE COURT:　Fine.　Go serve her with a subpoena.

14　　　　　MR. MENDELOFF:　We will.

15　　　　　MR. FINKE:　Well, it's my understanding she was --

16　　she came to court because your Honor stated --

17　　　　　THE COURT:　If what you are telling me is you are

18　　about to spirit her out of the courtroom, be my guest, and I

19　　will be seeing you in a couple of weeks.

20　　　　　MR. FINKE:　Obviously not, Judge, but she came

21　　because she understood that your Honor had ordered her here to

22　　serve --

23　　　　　THE COURT:　Understood that how?　From whom?　Who

24　　told you that?　Who told her that, or who told you that?

25　　　　　MR. FINKE:　I heard yesterday.

1    MR. MICHAEL O'ROURKE:   Your Honor --

2    THE COURT:   Excuse me.   I'm talking to this gentleman

3    right here.

4    You just said that she understood something, and I

5    want to know how she understood that.   Who told her that?

6    MR. FINKE:   I think it came up yesterday.   I was not

7    in court yesterday.   I am at a loss to know exactly what was

8    said, but it's my understanding that your Honor said she

9    should be here.

10   THE COURT:   Let me ask a different question.   I'm

11   going to set a ground rule.   You are going to pretend from

12   this point forward that you're on cross-examination.   So I

13   want responsive answers to my questions.

14   How did you come to learn that Mrs. Rogan had been

15   ordered by me to be here today?

16   MR. FINKE:   I was told by either Mr. O'Rourke or Mr.

17   Touhy.

18   THE COURT:   Thank you.

19   Mr. O'Rourke or Mr. Touhy, which one of you told him

20   that I had ordered Mrs. Rogan to be here?

21   MR. MICHAEL O'ROURKE:   I told him that you said she

22   has got to be here.   I said, you had better get here.

23   THE COURT:   Okay, and when did I say that?

24   MR. MICHAEL O'ROURKE:   At the end of the day

25   yesterday.

1        MR. MYLES O'ROURKE:   4:45, your Honor.

2        MR. MICHAEL O'ROURKE:   4:45.

3        THE COURT:   And did anybody raise to me at that point

4   any problem, issue, concern, objection, automatic stay,

5   anything like that?

6        MR. MICHAEL O'ROURKE:   I said, your Honor, that she

7   -- he said she was a party.  I said she's not a party.

8        MR. MYLES O'ROURKE:   I raised the fact that there was

9   not a subpoena on her.

10       MR. MICHAEL O'ROURKE:   There is not a subpoena on

11  her, and I don't believe that she can be brought in as a party

12  because of the bankruptcy stay.  And you said she is a

13  party --

14       THE COURT:   I want to think about this a little bit

15  more.  So we're going to table this.  You need to stay here in

16  case I need further argument, Mr. Finke.  So I want to finish

17  Mr. Rogan's testimony --

18       MR. MICHAEL O'ROURKE:   Fine.

19       THE COURT:   -- so that we can get him out of here.

20  He presumably has got other things to do.  I mean, he can stay

21  if he wants, but I want to finish that because my sense is

22  that's going to be short, and then we will just pick this up

23  after that.

24       While we're doing that, there are a couple of issues

25  that came up, a couple of things that came up yesterday that I

1  just want to flag and want to make sure that they get dealt
2  with at some point, and I need your undivided attention, Mr.
3  Mendeloff.

4  Okay, the gentleman who was testifying yesterday, Mr.
5  Flaherty, said something to the effect that the Dexia entity
6  in New York was, as he put it, I believe, a wholly owned
7  subsidiary of the French entity, which gives rise to a
8  question in my mind as to who is the plaintiff here.  Now, I
9  mean, presumably, and I guess my own thinking about this is
10  that the U.S. entity, if he's right about that -- let's
11  assume it's a separate entity -- doesn't necessarily have to
12  be the obligee on the promissory note.  It very likely would
13  still be the French entity even if the U.S. entity originated
14  the deal.

15  But I'm going to need you to tell me definitively at
16  some point in time fairly soon whether there's any further
17  issues about who is -- which Dexia is the party because that
18  could impact subject matter jurisdiction.

19  MR. MENDELOFF:  Sure, of course.

20  THE COURT:  So the second thing is, before you answer
21  the first one -- the second thing has to do, and what I think
22  I was getting as part of the thrust of Mr. O'Rourke's
23  examination yesterday when there was questioning about the
24  role of LaSalle National Bank as a -- we will just call it a
25  participant in the debt, if I was understanding the witness

1  correctly, and, granted, he did not have the participation

2  agreement or whatever it was in front of him at the time -- it

3  sounded like he was saying that both LaSalle Bank and Dexia,

4  each of them, was on the hook for something, whatever the

5  percentage was, 60/40, whatever it was.  And that led me to

6  question whether we have all of the real parties in interest

7  in here, and I forget what the rule is, maybe Rule 17 or

8  something like that.

9           Now, that is probably, at least possibly, dependent

10  upon the terms of whatever understanding Dexia has with

11  LaSalle, but, again, that is something that could potentially

12  impact subject matter jurisdiction.  So I'm going to need to

13  know more information about that, and it doesn't need to

14  happen right at this minute, but it needs to happen pretty

15  darned soon.

16           MR. MENDELOFF:  I can give it to you right at this

17  minute.

18           THE COURT:  Okay, go for it.

19           MR. MENDELOFF:  LaSalle's participation is

20  exclusively based on that participation agreement.  They are

21  not directly on the hook for anything.  LaSalle provided Dexia

22  as a subparticipant their 32.88 percent of the payout on this

23  letter of credit.  And under the terms of the participation

24  agreement, LaSalle, now Bank of America, has an obligation to

25  pay 32.88 percent of the expenses in connection with the case.

1     As an aside, they have not paid Dexia in over two
2     years, but that's between Dexia and them.

3     So while LaSalle does have an obligation -- the
4     obligation is exclusively to Dexia -- if LaSalle had said when
5     the letter of credits were called -- letter of credit was
6     called -- tough, I'm not paying, Dexia would have had to pay
7     the 56 million, and then they would have had to sue LaSalle
8     separately.  LaSalle is not --

9     THE COURT:  So LaSalle is not on a note.  They are
10    not the issuer of the letter of credit and so on.

11    MR. MENDELOFF:  Right, they are not a direct obligor.

12    THE COURT:  Again, I want to sort of do both the belt
13    and suspenders on this.  I guess my question to you --

14    Presumably you guys have got or have access to the
15    participation agreement.

16    MR. MENDELOFF:  Yes.

17    THE COURT:  Unless there is some, you know,
18    confidentiality issue, in which case I think we can deal with
19    it with a protective order, I think it makes sense for you to
20    produce that to the intervenors so that they can eyeball this
21    and so that I can -- everybody can sort of, you know, vet this
22    and make sure that we don't have some issue that is lurking
23    out there.

24    MR. MICHAEL O'ROURKE:  We will get it to you today.
25    THE COURT:  All right.  Now, what about the Dexia

1  issue?

2  MR. MENDELOFF:  Dexia New York is an agency of the

3  Paris entity.  The point of this was that Dexia New York is

4  not a freestanding independent entity in any way.

5  THE COURT:  And the entity that is on the hook or

6  that was on the hook on the letter of credit and that paid is

7  not any kind of domestic corporation; it is still the French

8  corporation, Dexia Credit Local, or whatever it is.

9  MR. MENDELOFF:  Exactly.

10  THE COURT:  Is there more that you think you need to

11  know about that particular aspect, Mr. O'Rourke?

12  MR. MICHAEL O'ROURKE:  Your Honor, yes, and I have

13  raised this very early with Mr. Mendeloff, and we did not

14  agree.  I asked for the documents and --

15  THE COURT:  What documents?

16  MR. MICHAEL O'ROURKE:  The documents showing the

17  relationship between this New York office or whatever it is.

18  THE COURT:  Is there a document like that?

19  MR. MENDELOFF:  I assume.

20  THE COURT:  I think, again, because we had sort of

21  this whole go-around about jurisdiction, I want to be safe,

22  and I don't want to have a situation -- and I don't care which

23  way it comes out.  I don't want to have a situation where we

24  go through this and then on appeal, the Court of Appeals asks

25  you about it, which they will, okay, if the issue is flagged

1  for them, and then everybody is scrambling around, and all of

2  a sudden the Court of Appeals says, hey, Kennelly, you

3  shouldn't have been working, you know, on this case, you know,

4  for the last 10 months.

5          MR. MICHAEL O'ROURKE:  We have been saying that.

6          THE COURT:  Different reasons.

7          MR. MYLES O'ROURKE:  And, your Honor, LaSalle -- we

8  would like to inquire about it, and we will talk with counsel,

9  of course.

10          But if LaSalle was damaged, we need to know because

11  we believe that they are an Illinois -- they are a

12  diversity --

13          THE COURT:  That's a question of who is the real

14  party in interest, and I suspect, and I can't guarantee that

15  this is right, but I suspect that at least in the first

16  instance, that's a matter of what the agreement between the

17  two parties says.

18          In other words, there's a lot of law about assignees

19  and things like that.  I mean, there's a whole week of civil

20  procedure many, many years ago for me, but I think, you know,

21  you will get information in their hands.

22          I do have --

23          As an aside, I do have here the official Chicago

24  neighborhood map.  There are 77 official neighborhoods in

25  Chicago, okay.  Rogers Park stops at Devon Avenue.

1    MR. MICHAEL O'ROURKE:  Geeze.

2    MR. AIZENBERG:  You are going to have get over it.

3    THE COURT:  Edgewater starts immediately below that

4    and it goes over to, it looks like to me, a little bit -- it's

5    somewhere between Ashland and Western.

6    MR. MICHAEL O'ROURKE:  Okay.

7    THE COURT:  However, what is defined in the official

8    map as Edgewater actually includes three things.  It includes

9    Edgewater, it includes Andersonville, and it includes Lakewood

10   Balmoral.

11   Now, I don't know exactly --

12   MR. MICHAEL O'ROURKE:  I don't know Lakewood.

13   THE COURT:  Well, it's a little nook in there

14   somewhere.

15   This may actually be Andersonville, but officially

16   it's Edgewater.  It's an official map.

17   MR. MICHAEL O'ROURKE:  Your Honor, if that's the

18   case --

19   THE COURT:  And I printed out a copy for you.

20   MR. MICHAEL O'ROURKE:  If that's the case, your

21   Honor, I'm going to ask Rogers Park to institute eminent

22   domain proceedings over Edgewater because --

23   THE COURT:  There's always these things about wanting

24   to be in other neighborhoods.

25   Last week I was having -- this doesn't need to be --

1    we can go off the record for a second.

2        (Brief interruption.)

3            MR. MENDELOFF:  Can we go back on the record?

4            THE COURT:  We're back on the record.

5            MR. MENDELOFF:  Referring to the map that your Honor

6    took judicial notice of, I'd ask the Court to take judicial

7    notice of the fact that the corner of Wabash and Erie is in

8    the Gold Coast.

9            THE COURT:  Is that where you live or something?

10           MR. MENDELOFF:  No, that's where the apartment is.

11           THE COURT:  You have got way better eyes than I do.

12           MR. MENDELOFF:  Number 8.

13           THE COURT:  Oh, neighborhood 8.

14           See, now, that's the thing.  My guess is is that

15   there was some lobbying that went on before what is called on

16   there the Gold Coast gets defined as the Gold Coast because

17   they have the Gold Coast going all the way over to the Chicago

18   River, I think.

19           MR. MICHAEL O'ROURKE:  That's too much.

20           THE COURT:  That's too far.

21           MR. MICHAEL O'ROURKE:  No, it's too much.

22           THE COURT:  I believe that little squiggly line along

23   the west edge of neighborhood 8 is the Chicago River.

24           MR. MENDELOFF:  Yes, maybe just take judicial notice

25   of this map.

1        THE COURT:  Well, you are going to have to go

2  through -- this is not off of an official Chicago website.

3  This purports to be the official map.

4        MR. MYLES O'ROURKE:  I'm about to -- please do not.

5        MR. MICHAEL O'ROURKE:  Where does it say Lincoln

6  Park --

7        THE COURT:  You will look at it later.  Let's get the

8  witness on the stand.

9        MR. TOUHY:  Judge, can I raise one point with respect

10  to the participation agreement?

11        THE COURT:  Yes.

12        MR. TOUHY:  Since the contractual relationship is

13  important, we would like a written communication which might

14  be or might not be relevant --

15        THE COURT:  Participation agreement only for now.  I

16  want to see what that says first before this gets much

17  farther.

18        MR. TIMS:  Okay.

19        MR. MENDELOFF:  Your Honor, before Brian Rogan goes

20  on, I just want to offer a few exhibits that we didn't offer

21  yesterday.

22        THE COURT:  That we dealt with yesterday, okay.  Go

23  ahead.

24        MR. MENDELOFF:  Exhibit 778, which is the first

25  interrogatory answer, the portion that is Brian Rogan's answer

1   is certified, not the entire thing, since we didn't get that

2   whole thing in.

3   　　　　　And Exhibit 779-B, D and E --

4   　　　　　THE COURT:  Again, just Brian Rogan's portions.

5   　　　　　MR. MENDELOFF:  Just Brian Rogan's portions.

6   　　　　　THE COURT:  So it's 778 and 779-B, D and E, Brian

7   Rogan's portions of the interrogatory answers.  Is there any

8   objection to that?

9   　　　　　MR. MICHAEL O'ROURKE:  No objection.

10  　　　　　THE COURT:  Those are admitted.

11  　　　　　MR. MENDELOFF:  I don't recall whether we got these

12  in or not, but Exhibits 817 and 818, those are the forms.

13  817 --

14  　　　　　THE COURT:  817 and 818 were admitted yesterday.

15  　　　　　MR. MENDELOFF:  All right, the citation.

16  　　　　　THE COURT:  That's 816.

17  　　　　　MR. MENDELOFF:  816.

18  　　　　　THE COURT:  Is there any objection to the admission

19  of the citation?  That's 816.

20  　　　　　MR. MICHAEL O'ROURKE:  No objection, your Honor.

21  　　　　　THE COURT:  That's admitted.

22  　　　　　MR. MENDELOFF:  The e-mail between Mr. Cuppy and Mr.

23  Rogan in July.

24  　　　　　THE COURT:  771.  Is there any objection to that?

25  I'm sorry, the July one?

1    MR. MENDELOFF:  The July one, 849.

2    THE COURT:  I'm sorry.  July 30th of '07.

3    MR. MENDELOFF:  Yes.

4    THE COURT:  I had that as 819.  Are you sure it's --

5    MR. MENDELOFF:  819.

6    THE COURT:  819, that was admitted yesterday.

7    MR. MENDELOFF:  The Chase Bank, the two Chase Bank

8    letters, 820 and 821.

9    THE COURT:  820 is the fax that Brian Rogan sent to

10   Ray Albain, and 821 is the communication that Mr. Albain sent

11   to Mr. Rogan.

12   MR. MENDELOFF:  Right.

13   THE COURT:  Is there any objection to either of

14   those?

15   MR. MICHAEL O'ROURKE:  No objection.

16   THE COURT:  Those are both in.

17   MR. MENDELOFF:  The attachment to Mr. Rogan's

18   prenuptial.

19   THE COURT:  That's 822.  Is there any objection to

20   that?

21   MR. MICHAEL O'ROURKE:  No objection.

22   THE COURT:  That's admitted as well.

23   Can we just get the man on the stand so I can get him

24   done in here so he can finish?  We can take this stuff up in a

25   minute.

1     Do you understand you are still under oath?

2     THE WITNESS: Yes, I do.

3     THE COURT: Have a seat.

4     BRIAN ROGAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5     CROSS EXAMINATION

6 BY MYLES O'ROURKE:

7 Q   Good morning, Brian.

8 A   Good morning.

9 Q   Do you remember a conversation we had yesterday with Mr.

10 Mendeloff about the Erie condominium?

11 A   Yes.

12 Q   And he asked a little bit about your move-in situation to

13 the Erie condominium, is that right?

14 A   Yes.

15 Q   He asked you something about keys. Do you remember that?

16 A   Yes.

17 Q   Now, when did you move into the Erie condominium?

18 A   In January of 2005.

19 Q   Did you specifically remember or recall who gave you the

20 keys to that?

21 A   No.

22 Q   Out of the universe of individuals who could have given

23 you the keys to that property, can you name them?

24 A   It could have been my mother or it could have been my

25 father.

B. Rogan - cross

1    Q    So you don't specifically know whether it was your mom or

2    your dad who gave you those keys?

3    A    Correct.

4    Q    But you know it was one of them, don't you?

5    A    Most likely, yes.

6    Q    How long did you --

7         How long did you stay at the Erie condominium?

8    A    From January of 2005 until September of 2005.

9    Q    And did you ever -- did you ever receive any visits from a

10    landlord?

11    A    No.

12    Q    Did you ever take a look at any of the real estate

13    records?

14    A    No.

15    Q    Of that property?

16    A    No.

17    Q    Were you there at the closing of that property?

18    A    No.

19    Q    Do you have any personal firsthand information about who

20    owns that property?

21    A    No.

22    Q    You said you stayed there until September of 2005?

23    A    Correct.

24    Q    Where did you go after September of 2005?

25    A    I moved to Savannah, Georgia.

1    Q    Why did you move to Savannah, Georgia?

2    A    I was offered a job.

3    Q    How did you get offered a job?

4    A    I was interviewed by Fred Cuppy, and he offered me a job

5    in Savannah.

6    Q    Do you recall the date of that interview?

7    A    It was in the summer of 2005, I believe.

8    Q    What did you believe you were going to be doing in

9    Savannah, Georgia?

10   A    Working at various real estate projects that were ongoing

11   at the time.

12   Q    In September 2005, you went down to Savannah, Georgia, is

13   that right?

14   A    Yes.

15   Q    Where did you --

16           Did you start working right away or did you just kind

17   of relax?

18   A    No.  I started working within days of moving down there.

19   Q    Where did you go to work?

20   A    I first trained at Hoover Creek for a few days, and then I

21   moved to the Commons on Wilmington Island on a full-time

22   basis, to work, not to move physically.  Excuse me.

23   Q    How did you know where to go to work?

24   A    I was instructed to by my bosses at the time.

25   Q    Who were your bosses at that time?

1   A   Rogers Mays, Fred Cuppy, and Frank Anthony.

2   Q   So you showed up at, you said, Hoover Creek?

3   A   Yes.  Hoover Creek Plantation, I'm sorry.

4   Q   What did you do at Hoover Creek?

5   A   I trained with the maintenance staff and the operations

6   people there for a few days before moving to the Commons on

7   Wilmington Island.  This was no more than probably three or

8   four days.

9   Q   This is in September 2005?

10   A   Yes, maybe the first part of October 2005.

11   Q   How long did you work at Hoover Creek?

12   A   Just for a few days before moving to -- first going to

13   Wilmington Island as my first main project.

14   Q   Sure.

15          So Wilmington Islands, about how far away is that

16   from Hoover Creek?

17   A   Twenty or 25 minutes by car.

18   Q   What is Wilmington Island?

19   A   The Commons on Wilmington Island is a project, an

20   apartment-to-condominium conversion project of 144 units.

21   Q   What was your function as an employee on that project?

22   A   I was working toward the completion of the project.  There

23   are approximately 20 units that had not been converted from

24   apartments to condos, and I was working with the general

25   contractor and the contractors' on-site construction

1    scheduling, inventory management of appliances and things of

2    that nature, and also coordinated with the sales team to know

3    which units were closing first and to know which ones we had

4    to get done first.

5    Q    How long did you work at Wilmington Islands?

6    A    I worked there until the first part of 2006, the end of

7    the first quarter, I would guess.

8    Q    Did you leave Savannah, Georgia, in the first part of

9    2006?

10   A    No.

11   Q    Where did you go?

12   A    I moved on to Hoover Creek Plantation to work there on a

13   full-time basis.

14   Q    What did you do at Hoover Creek?

15   A    I assisted in the ongoing renovation.  That was an

16   apartment-to-condo conversion project as well, and I was

17   assisting the operations manager on, again, scheduling of

18   contractors, installations of appliances and things of that

19   nature.

20   Q    Let me -- I'm sorry to go back just for one question, but

21   on Wilmington Islands LLC, you said that you would work there

22   from about September 2006, is that right -- I'm sorry --

23   September 2005?

24   A    2005, yes.

25   Q    To the early first part of 2006, right?

B. Rogan - cross

1  A   Correct.

2  Q   Did you ever ask your dad about that project?

3  A   No.

4  Q   Did you ever report to him about what was going on at that

5  project?

6  A   No.

7  Q   Now, back to Hoover Creek Plantation.  You mentioned that

8  you were assisting someone.

9       Who was that?

10  A   That was the operations team, the installers of, you know,

11  flooring and appliances.  I would help them coordinate and get

12  keys, access to units from our office.

13  Q   Who was on the operations team at Hoover Creek Plantation

14  LLC in 2006?

15  A   Well, there's a general property manager.  There was a

16  full -- and three full-time maintenance staff people.

17  Q   Do you remember any names?

18  A   Jessica Mays was the property manager.  Trent Mays was the

19  lead operations manager.

20       There's a man by the name of Fran who left.  I can't

21  remember his name -- his last name off the top of my head.

22  Q   Do you remember any specific communications that you had

23  with Stephanie Mays on the first day?

24  A   Jessica Mays.  I'm sorry.

25  Q   I'm sorry.

B. Rogan - cross

1          Jessica Mays on your first day of work at Hoover

2  Creek Plantation?

3  A    Any specific conversation?

4  Q    Specific communications.

5  A    No.

6  Q    Do you remember any specific communications with Stephanie

7  Mays on the second day of work?

8  A    Jessica Mays?

9  Q    Yes.

10 A    No.

11 Q    I'm sorry.  I keep on saying Stephanie.

12         Do you remember any communications specifically with

13 Jessica throughout that you can recall in any great detail?

14 A    In 2006?

15 Q    In 2006.

16 A    No.

17 Q    How long were you working on the Hoover Creek Plantation

18 project?

19 A    I worked there until the end of the spring, probably the

20 first part of the summer of 2006.

21 Q    Did you go back home?  Did you go back to Indiana after

22 the first part of the summer of 2006, or did you stay down

23 there?

24 A    I stayed in Savannah.

25 Q    What did you do?

1    A    I moved onto the next project that was under construction,
2    which was Jones Square condominiums.
3    Q    Geographically where is Jones Square in relation to Hoover
4    Creek Plantation in Savannah, Georgia?
5    A    Jones Square is located downtown Savannah.   And it's 15,
6    20 minutes away by car.
7    Q    Is that another town?
8    A    No.
9    Q    Okay.   What did you do at Jones Square?
10   A    I again assisted in the completion of the project.   It was
11   an ongoing new development.   There were two penthouses that
12   were under construction that I was communicating between the
13   owners, the contractors on-site, and the general contractor
14   about the completion of those units.
15   Q    Who was the general contractor on that job?
16   A    A company by the name of Carson Construction, or Carson
17   Company.
18   Q    How long did you work at Jones Square?
19   A    I worked there through the summer until probably the fall
20   of 2006.
21   Q    Did you come back to Chicago in the fall of 2006?
22   A    No.
23   Q    What did you do?
24   A    I moved on to the fourth project that I worked at, which
25   was Palmetto Commons condominiums.

B. Rogan - cross

1    Q    Where is Palmetto Commons condominiums?

2    A    That is located --

3           THE COURT:  The time frame, you said again, is the

4    fall?

5           THE WITNESS:  It was the fall of 2006.  I began work

6    at Palmetto Commons.

7           Palmetto Commons is located on Hilton Head Island,

8    South Carolina.

9    BY MYLES O'ROURKE:

10   Q    It's in South Carolina.  How did you get there?

11   A    I drove there by car.

12   Q    How long is the commute?

13   A    Approximately an hour, hour each way.

14   Q    What did you do at Palmetto Commons condominiums?

15   A    It was another apartment-to-condominium conversion

16   project.  So we were renovating the units, and we upgraded the

17   appliances, cabinets, countertops.

18          So I was coordinating with the installers of those

19   equipment along with painters and landscape personnel, things

20   of that nature, to the general maintenance of the property.

21   Q    Painters, landscapers, were they the same as you had at

22   Hoover Creek -- I'm sorry -- at Wilmington Island?

23   A    Wilmington Island, no.

24   Q    Okay.  Do you have any communications --

25          So how long did you work at Palmetto Commons?

338

B. Rogan - cross

1   A   I worked at the Palmetto Commons project from the fall
2   of 2006 until I left in July of 2008.
3   Q   Who did you report to at the Palmetto Commons condominium
4   project?
5   A   Directly Roger Mays.
6   Q   Do you remember the first communication you had with Roger
7   Mays about the Palmetto Commons condominium project?
8   A   The first ever?
9   Q   Yes.
10  A   No.
11  Q   How about the first day of your job, do you remember any
12  specific communication that you had with Roger Mays?
13  A   No.
14  Q   The second day, do you remember any specific communication
15  with Roger Mays?
16  A   No.
17  Q   You don't remember specific communications, do you?
18  A   No, no.
19          MR. MENDELOFF:   Objection, asked and answered.
20          THE COURT:   Overruled.
21  BY MYLES O'ROURKE:
22  Q   So you worked at Palmetto Commons until when?
23  A   July of 2008.
24  Q   So you worked at four different condo developments, is
25  that correct?

B. Rogan - cross

1    A   Correct.

2    Q   Hoover Creek -- I'm sorry.

3         Wilmington Island is LLC?

4    A   The Commons at Wilmington Island was the name of the

5 project.

6    Q   Sure.

7         Hoover Creek Plantation?

8    A   Yes.

9    Q   I have Jones Square condominiums?

10    A   Yes.

11    Q   Palmetto Commons condominiums, is that right?

12    A   Yes.

13    Q   Those are all four.

14         Did you ever report to your dad on what was going on

15 in any of these projects?

16    A   No.

17    Q   Did your dad ever come visit you down there?

18    A   Yes, once in 2006, I believe. Yes, in 2006.

19    Q   Do you remember the communications that you had with your

20 dad when he came to visit you?

21    A   We went out to dinner and had lunch and things like that

22 over a long weekend.

23    Q   You don't recall any specific communications you had with

24 your dad when he came to visit you?

25    A   No.

B. Rogan - cross

1  Q  Do you remember what day he came down there?

2  A  No, no.  Again, I think I remember it being in the spring,

3  I believe.

4  Q  Was he walking --

5      Did he accompany you on any of the properties?

6  A  Potentially the downtown properties because he was at a

7  hotel downtown.

8  Q  Did he order --

9      Did you recall him ordering anyone around on the

10  property?

11  A  No.

12  Q  Now, you left in July 2008?

13  A  Yes.

14  Q  Right?

15      You came back.  Where did you go after July 2008?

16  A  July 2008 I moved to the 55 East Erie building.

17  Q  That's in the Gold Coast, right?

18  A  Yes, apparently.

19  Q  Let's see.  What do you do now?

20  A  Right now I'm a full-time MBA student at DePaul

21  University.

22  Q  Do you recall receiving the interrogatories in this case?

23  A  Yes.

24  Q  That were shown to you yesterday by Dexia?

25  A  Yes.

B. Rogan - cross

1   Q   Do you remember looking at several different versions of
2   those interrogatories?
3   A   Yes.
4   Q   Do you remember how much --
5           You quickly answered the interrogatory questions?
6   A   No.
7   Q   Did you try to give it careful thought?
8   A   Yes.
9   Q   Can you tell Judge Kennelly that you gave it careful
10  thought and attention and tried to tell the truth, is that
11  right?
12  A   Yes, I did.
13  Q   Tell him.
14  A   I did give it considerable thought over --
15          THE COURT:   -- need to look at me, that's all right.
16  BY MYLES O'ROURKE:
17  Q   All right.   There is one question that had to do with --
18  that I have for you about this PGR Properties, all right.
19          You mentioned becoming an officer of PGR Properties.
20  How many employees in PGR Properties --
21          Let me start off, when did you become an officer of
22  PGR Properties?
23  A   January of 2007.
24  Q   How many employees were at PGR Properties at the time?
25  A   At the time it was just me.  I was the sole employee of --

1          After becoming president, I was the only employee

2     that I was aware of.

3     Q    So you didn't have to really ensure that anyone got paid?

4     A    No.

5     Q    What was PGR Properties?

6     A    PGR Properties was an independent company that held a

7     mortgage on a piece of property adjacent to the hospital.

8     Q    And in your position, how long were you president of PGR

9     Properties?

10    A    Officially I still am today.

11    Q    And Dexia inquired yesterday as to a communication about a

12    Chase Bank account?

13    A    Yes.

14    Q    Right?

15          You had written to Chase to try to gain access to the

16    Chase Bank account, right?

17    A    Yes.

18    Q    Is that the first time that you had tried to gain access

19    to that bank account?

20    A    No.

21    Q    When did you first try to gain access to the Chase Bank?

22    A    Shortly after becoming president in 2007.

23    Q    Becoming president.  You said you became president in

24    January 2007?

25    A    Yes.

1  Q   Why did you try to gain access to the Chase Bank account?

2  A   There were several outstanding invoices that needed to be

3  paid, and I knew that there were upcoming invoices that needed

4  to be paid as well on behalf of PGR Properties.

5          MR. MYLES O'ROURKE:   Your Honor, I have what I have

6  designated as Group Exhibit 40-1 as the intervenors, if I

7  could give you a copy of them.

8          THE COURT:   Is it on the disk, or no?

9          MR. MYLES O'ROURKE:   You know, it's not on the disk.

10          THE COURT:   I just wondered if I could look at it

11  that way.

12          MR. MYLES O'ROURKE:   Let the record reflect I

13  exchanged earlier a copy of group Exhibit 40-1 with Dexia

14  Credit counsel.

15          May I approach the witness?

16          THE COURT:   Sure.   It's not necessary to ask.

17          MR. MYLES O'ROURKE:   Thank you.

18  BY MYLES O'ROURKE:

19  Q   Can you take a little while to read over those group of

20  documents?   Take a look at it.

21      (Brief interruption.)

22          THE WITNESS:   Okay.

23  BY MYLES O'ROURKE:

24  Q   Now, you said --

25          Why did you try to gain access to the Chase Bank

1  account in January or around -- at around that time in

2  January 2007?

3  A    Because there were outstanding invoices and upcoming

4  invoices that needed to be paid.

5  Q    Will you take a look at those documents?  What are these

6  documents?

7  A    Some of these documents are the invoices from the law firm

8  of the Tatooles Foley & Associates, and some of them are

9  invoices from CT Corporation, who is the registered agent of

10  PGR Properties.

11          THE COURT:   Tatooles is T-a-t-o-o-l-e-s.

12  BY MYLES O'ROURKE:

13  Q    Let's take a look at what's been marked as Group

14  Exhibit 40-1.

15          Can you describe what is the date on this exhibit?

16  A    July 11th, 2007.

17  Q    Who is it directed to?

18  A    PGR Properties, Incorporated.

19  Q    What is the balance due?

20  A    The balance due is $1,951.34.

21  Q    Would you consider this an invoice --

22          Would you consider this a representative invoice of

23  PGR Properties?

24  A    Yes.

25  Q    Let's go to Group Exhibit 40-2.  Can you tell me the date

1  of that exhibit?

2  A   April 25th, 2007.

3  Q   Can you tell me who it's directed to?

4  A   PGR Properties, Incorporated.

5  Q   What is the balance due?

6  A   $1,859.20.

7  Q   Let's go to Group Exhibit 40-3.

8       THE COURT:  It's not necessary to go through all of

9  these.

10       MR. MYLES O'ROURKE:  We're not going to go through

11  all of them.

12       THE COURT:  Are you going to offer them?

13       MR. MYLES O'ROURKE:  Not at this time.

14       THE COURT:  Okay.

15  BY MYLES O'ROURKE:

16  Q   Brian, did you ever gain access to the Chase Bank account?

17  A   No.

18  Q   Can you look specifically, and this is the only one --

19       THE COURT:  Sure.

20       MYLES O'ROURKE:  It's Group Exhibit 40-7, your Honor.

21       THE COURT:  40-7?

22       MR. MYLES O'ROURKE:  40-7.

23       THE WITNESS:  Yes.

24  BY MYLES O'ROURKE:

25  Q   It appears to be a check?

B. Rogan - cross

1  A   Yes, it is.

2  Q   This is a check what looks to be made payable by you.   Are

3  you familiar with this check?

4  A   Yes.

5  Q   Where is the --

6        Are you familiar with this bank account?

7  A   The bank account, yes, that is my bank account with

8  Wachovia.

9  Q   You personally paid this.

10        Did you personally pay $335 to CT Corporation?

11  A   Yes.

12        MR. MYLES O'ROURKE:   One moment, your Honor.

13        THE COURT:   Yes.

14      (Brief interruption.)

15  BY MR. MYLES O'ROURKE:

16  Q   How much did you understand was in the Chase Bank account

17  in or around January of 2007?

18  A   When I started investigating and trying to get access to

19  it, there was approximately $3,500 in there.

20  Q   I'm going to just ask you a couple different questions

21  just to back up on your working on these projects.

22        How did you get paid for working on the condominium

23  projects?

24  A   I was paid via direct deposit.

25  Q   Who paid you?  Who paid you for working on these projects?

B. Rogan - redirect

1    A    The payroll company, Total HR Solutions.

2    Q    Did that payroll method ever change while you were working

3    on these projects?

4    A    No.

5    Q    Now, you also took a look at a citation to discover assets

6    yesterday.  I believe Mr. Mendeloff showed you a citation to

7    discover assets directed to PGR Properties.

8    A    Yes.

9    Q    Is that correct?

10   A    Yes.

11   Q    Do you recall being represented by counsel in receipt of

12   this citation?

13   A    No.

14   Q    You were not represented by counsel on behalf of -- on

15   behalf of PGR Properties?

16   A    Well, I don't recall being at the time, no.

17              MR. MYLES O'ROURKE:   Your witness.

18              THE COURT:   Mr. Touhy, did you have any questions?

19              MR. TOUHY:   No, your Honor.

20              THE COURT:   Mr. Mendeloff.

21                     REDIRECT EXAMINATION

22   BY MR. MENDELOFF:

23   Q    Mr. Rogan, you testified that you -- I guess the question

24   was that you tried to gain access to the money at the Chase

25   account.  You tried to move the money, correct?

B. Rogan - redirect

1    A    I tried to close the account out, yes.

2    Q    And move the money somewhere else?

3    A    Into the bank account or into an account at Wachovia.

4    Q    That means you tried to move it to somewhere else, right?

5    A    Yes.

6    Q    On the issue of your jobs, let's just go back to your

7    interrogatory answer for a second.    That's exhibit 779-B.

8    Let's go to page 21.

9              Pull up this part right here.

10         (Brief interruption.)

11   BY MR. MENDELOFF:

12   Q    You testified that you understood you were supposed to be

13   as complete as possible in these answers, right?

14   A    Yes.

15   Q    And you repeat you supplemented these filings four or five

16   times and certified it four times, I believe, and you knew

17   each time you were supposed to be careful of what you had to

18   say, right?

19   A    Yes.

20   Q    Now, the employer you list here is an employer that you

21   worked for based on your testimony, it sounds like, for

22   approximately three months during the three years you were

23   down in Savannah, is that right?

24   A    Yes.    It was the first part of 2006 through probably the

25   summer of 2006.

B. Rogan - redirect

1    Q    You said late spring?

2    A    I don't remember the specific month.  You know, late

3    spring, first part of the summer.  I can't recall

4    specifically.

5    Q    So three to four months, something like that.

6              And you worked at Palmetto Commons for roughly

7    21 months?

8    A    Yes.  It's just short of two years, yes.

9    Q    And you worked for Jones Square for a little longer than

10   you worked at Hoover Creek, correct?

11   A    Correct, approximately.

12   Q    And you worked at Wilmington Islands for a little longer

13   than you worked at Hoover Creek?

14   A    Yes.

15   Q    You don't list any of these other jobs that you worked at

16   that were longer than you worked at Hoover Creek.

17             You just list the one that you worked at the

18   shortest, is that correct?

19   A    Yes.

20   Q    Now, finally, with respect to your answers with respect to

21   the ownership, your testimony regarding the ownership of this

22   condominium that you live in right now, your testimony was

23   that -- as I understand it now, you are trying to say that

24   you -- or it's your position that you answered that you didn't

25   know who owned the apartments because you weren't there at the

B. Rogan - redirect

1  closing and you didn't have any firsthand knowledge; is that

2  correct?

3  A   Yes.

4  Q   So is it your testimony then that the house you grew up in

5  on Wexford, you don't know who owns that house?

6  A   I don't know how the title is held in that house.   I would

7  guess that it is my parents in some capacity.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B. Rogan - redirect

1   Q   When you were asked three times in your deposition under

2   oath who owns this property, you didn't say I think it was my

3   parents, I think it's my parents', did you?

4   A   No.  I did not want to guess.

5   Q   Did you say in fact in one of the answers, "I wouldn't

6   know who it is"?

7   A   I don't know.  I can't recall that specific question.

8   Q   You can't recall a specific question?  All right.  Direct

9   your attention to Exhibit 26, page 43.  Let's pull out this

10  part right here.

11          "Question:  Do you have any reason to believe that

12  your father or mother may have an ownership interest in this

13  condo?

14          "Answer:  I wouldn't know."

15          Were you asked that question, and did you give that

16  answer?

17  A   Yes.

18  Q   You had reason to believe it, didn't you, sir?  They gave

19  you the keys, they moved you in, you had reason to believe

20  that they owned the condo, didn't you?

21  A   I -- I -- again, according to -- with that answer, I

22  wouldn't know at the time.  This is in 2005.  In 2008 when I

23  moved there, I didn't want to guess in this deposition.

24  I was --

25          MR. MENDELOFF:  Nothing further.

B. Rogan - recross

1          THE COURT:  Mr. O'Rourke, anything else?

2          MR. MYLES O'ROURKE:  One question.

3   BY MR. MYLES O'ROURKE:

4   Q   Do you know what tenancy by the entirety means?

5   A   No.

6   Q   Do you know what tenancy in common means?

7   A   Vaguely from a real estate law class.

8   Q   Have you ever -- have you ever looked at real estate

9   records?

10  A   No.

11  Q   Can you tell me what -- how your parents held the property

12  prior to 1989?

13  A   No.

14          MR. MYLES O'ROURKE:  Thank you.

15          THE COURT:  Mr. Mendeloff, anything else?

16          MR. MENDELOFF:  No.

17          THE COURT:  I have a couple of questions.

18          Number one, how old are you?

19          THE WITNESS:  I am 28.

20          THE COURT:  28.

21          I neglected to ask your sister.  Do you know how old

22  she is?

23          THE WITNESS:  25 in June, so 24.

24          THE COURT:  You said that PGR Properties, I think the

25  way you put it was it held a mortgage on the property that was

B. Rogan -

1  adjacent to the hospital.  I assume you meant Edgewater
2  Hospital.
3         THE WITNESS:  Edgewater Medical Center.
4         THE COURT:  What was the property?
5         THE WITNESS:  I believe it was a parking lot in some
6  capacity.
7         THE COURT:  When you say "a parking lot," do you mean
8  was it a parking garage?
9         THE WITNESS:  I don't believe it had a structure on
10  it.
11         THE COURT:  No structure.
12         THE WITNESS:  I do not believe so.  But I can't be
13  certain.
14         THE COURT:  As far as the ownership of the condo is
15  concerned, it would be fair to say that you may not know how
16  title is held, you think your parents are the owners?
17         THE WITNESS:  Yes, in some capacity.
18         THE COURT:  All right.  Now, the last questions, it
19  would be helpful to me if you could put up on the screen
20  Exhibit 824 because I wanted to ask a couple of questions
21  about that.  Can you put two up there at the same time?  823
22  would be the other one.  If you could put them side by side.
23         823 and 824, I think that 823, if you could blow that
24  one up so we can just see 823 for the moment.  That looks like
25  to me that it's a work sheet that was probably generated by an

B. Rogan -

1  accountant or somebody like that who was putting together a

2  tax return.  Does that sound right to you?

3          THE WITNESS:  Yes.  I believe that was put together

4  by John Foley, who is my tax attorney.

5          THE COURT:  And this is the one that reflects for the

6  year 1999 $27,000 in wages from JKR Business.

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  Then put the other one up there.

9  That's the W-2.  That's number 823.  No, 824 is the W-2 form.

10          That's -- that doesn't look -- that looks like to me

11  like a form that's generated by the employer.  I mean, you get

12  W-2s from other people.

13          THE WITNESS:  Yes, yes.

14          THE COURT:  Does that look like sort of a standard

15  kind of W-2 from you?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  So here's my question to you:  Did

18  you actually get $27,000 from either JKR Business or any other

19  company in either '99 or 2000?

20          THE WITNESS:  Not that I recall.  In 1999 I was

21  entering college.  In 2000 I was completing my freshman year.

22  So I don't recall ever receiving a check for $27,000.

23          THE COURT:  Okay.

24          THE WITNESS:  Or money in any capacity.

25          THE COURT:  Or money that totaled up to $27,000.

B. Rogan -

1          THE WITNESS:  No.

2          THE COURT:  Okay.  So, now, if I recall correctly,

3   the testimony was that these documents came from your files

4   somewhere.  In other words, your lawyers produced them to

5   Dexia's lawyers.  Is that right?

6          THE WITNESS:  I believe so, yes.

7          THE COURT:  Okay.  I mean, have you ever gone back

8   and asked somebody, hey, where's my 27,000?

9          THE WITNESS:  No, I have not actually.  I mean, that

10  was ten years ago.

11         THE COURT:  Have you inquired at all of anybody as to

12  what these documents are all about?  Aside from your own

13  lawyer, have you inquired of anybody about what these two

14  things are all about or --

15         THE WITNESS:  Not specifically JKR Business.  I've

16  spoken at length with John Foley about my own tax returns and

17  filings when I was working.

18         THE COURT:  I'm asking the lawyers.  Is Foley a

19  lawyer or an accountant?

20         MR. MICHAEL O'ROURKE:  Both, Your Honor.

21         MR. MYLES O'ROURKE:  He does tax law.

22         MR. MENDELOFF:  He serves as an accountant, though.

23         THE COURT:  Okay.

24         Okay.  And so asking a different question then, do

25  you know -- do you have any idea what JKR Business is?

1          THE WITNESS:  No, no.

2          THE COURT:  Do the initials look at all familiar to

3    you?

4          THE WITNESS:  Yes.

5          THE COURT:  It's your mother's initials, right?

6          THE WITNESS:  Yes.

7          THE COURT:  Have you ever heard that name, JKR

8    Business, before?

9          THE WITNESS:  Only in document requests and things

10   like that.

11         THE COURT:  The address that's on the W-2, 240 East

12   90th Drive in Merrillville, do you know where that is?

13         THE WITNESS:  I can't say for sure, but I think 90th

14   Drive is off of Broadway, which is --

15         THE COURT:  Is it like a business area?

16         THE WITNESS:  Yes, industrial -- or not industrial

17   park, but office park with medical facilities.

18         THE COURT:  Okay.  That's all I've got.  Any

19   follow-up questions?

20         MR. MENDELOFF:  Oh, yes.

21         Can you put that back up there?

22                      REDIRECT EXAMINATION

23   BY MR. MENDELOFF:

24   Q    240 East 90th.  Your testimony is that you're not for

25   sure, you don't know for sure where that is?

1  A   That address.  I don't know exactly where that address is,
2  no.

3  Q   Your father worked there and had his offices there for
4  years and you don't know exactly where it is?  Is that your
5  testimony?

6      MR. MYLES O'ROURKE:  Objection, Your Honor.
7  Argumentative.

8      THE COURT:  I don't think so.  Overruled.  You can
9  answer.

10  BY THE WITNESS:

11  A   I don't know the specific address.  I drove -- it was
12  across the street from my allergist's office, so I knew the
13  general area.  Like I said, I'm not familiar with the 90th
14  Street, you know, 90th -- excuse me, 90th Drive, but I'm
15  familiar with Broadway and it being off that.  I can't tell
16  you the specific address.

17  BY MR. MENDELOFF:

18  Q   Do you know where your father worked for years in
19  Merrillville, his office?

20  A   I know where his office is located, yes.

21  Q   And your testimony is that you don't know that your
22  father's office is 240 East 90th?

23  A   Like I said, I didn't know the specific address of the
24  building.  I could drive you there, but I don't know the
25  specific address of the building.

B. Rogan - redirect

1   Q   You grew up in Merrillville?

2   A   No.

3   Q   Where did you grow up?

4   A   Valparaiso, Indiana.

5   Q   And where is that in relation to Merrillville?

6   A   They're neighboring towns.

7   Q   And you grew up right next to Merrillville your entire

8   life?

9   A   About 20 minutes away, yes.

10  Q   And you've been in the neighborhood of 240 East 90th

11  Drive, I assume, many, many times?

12  A   Yes.

13          MR. MENDELOFF:  Nothing further.

14          THE COURT:  Mr. O'Rourke, anything else?

15          MR. MYLES O'ROURKE:  No.

16          THE COURT:  No?

17          MR. MYLES O'ROURKE:  No.

18          THE COURT:  You're excused.

19          THE WITNESS:  Thank you.

20          THE COURT:  We're going to take a ten-minute break,

21  and when we come back I want to deal with Mr. Finke so that we

22  can have that sort of dealt with one way or another, and then

23  we'll sort of see where we are at that point.

24          MR. MENDELOFF:  Can I just say one thing about that?

25          THE COURT:  Yes.

1          Mr. Finke is in the room, just so the record's clear.

2          MR. MENDELOFF:  We have a subpoena for Mrs. Rogan.

3    We don't have a check.  We have cash.  I feel uncomfortable

4    giving a witness cash without telling the court that we're

5    giving a witness cash.

6          THE COURT:  Okay.  Now you've told me.

7          MR. MENDELOFF:  Thank you.

8          (Recess taken.)

9          THE COURT:  Okay.  We're back on the record.

10         Ready to proceed?

11         MR. MENDELOFF:  Yes.

12         THE COURT:  Okay.

13         Mr. Finke is here.  Mr. Finke, have you got any

14   issues you want to raise with me?

15         MR. FINKE:  Yes.

16         THE COURT:  Go for it.

17         MR. FINKE:  They handed her a subpoena while she was

18   sitting here.  I have the final words from Your Honor of

19   yesterday.  You said, "She's required," she being Judy Rogan,

20   "is required to appear as a witness.  So you either get

21   Gouveia or whatever his name is here for you or not.  She's

22   going to be sitting in my courtroom tomorrow.  That's all I

23   have to say about the topic.  I'm done for the day.  See you

24   tomorrow."

25         Before that Your Honor mentioned contempt power,

1    so --

2            THE COURT:  Let me see the transcript.  Particularly

3    the before that part.  Let me see the transcript.

4            (Document tendered to the court.)

5            THE COURT:  Okay.  So just to put a little context in

6    this, Mr. Mendeloff -- and I'm looking at page 307 of the

7    transcript -- said that Mrs. Rogan is going to be the next

8    witness after current witness who's on the stand, referred to

9    a conflict of interest involving Mrs. Rogan's representation.

10   I asked what the conflict was.  Some description about issues

11   between the bankruptcy and this and advising her whether she

12   should take the Fifth in light of Mr. O'Rourke's

13   representation of other people in this case.

14           I asked whether Mrs. Rogan had a lawyer in the

15   bankruptcy case.  The name Gordon Gouveia was identified.

16           The Mr. O'Rourke I was just referring to was Mike

17   O'Rourke, and Myles O'Rourke said, "I don't know if there's a

18   trial subpoena," and I said, "I'm going to tell you something,

19   I don't care.  The subpoena is directed to the witness.  They

20   don't say this anymore, but what they mean is lay all other

21   business aside.  The lawyer's here, the lawyer's not here, I

22   don't care."  Then Mr. Mendeloff says, "We didn't subpoena her

23   because she's a party," and I agreed with that.  I said,

24   "She's a party.  Then you don't need to subpoena her.  It's a

25   notice to appear and she's going to be here.  If she's not

1    here, then I'll take other steps.  And my contempt power is

2    not restrained or constrained by one iota by the pendency of a

3    bankruptcy proceeding."

4           Okay.  So what's your point?

5           MR. FINKE:  My point is that she's here because she

6    was ordered to be here.  Your Honor apparently had the point

7    she was a party.  To hand her a subpoena in the courthouse

8    after she's been ordered by the court to be here is improper.

9    She has to be served --

10          THE COURT:  Why is it improper?

11          MR. FINKE:  -- at home.

12          THE COURT:  Why is it improper?

13          MR. FINKE:  Because Rule 45 says subpoena first, then

14   go to court.

15          THE COURT:  You lost me here.  I mean, you don't have

16   to subpoena somebody at home.  If I run into you on the

17   street, I can hand you a subpoena on the street.

18          MR. FINKE:  But she was here because Your Honor

19   ordered her.

20          THE COURT:  Again, but what does that have to do with

21   the effectiveness of the service?

22          MR. FINKE:  Because --

23          THE COURT:  In other words, just to give you an

24   example, let's say you have a party that's somebody -- a party

25   in one case and they're ordered to appear let's say for a

1    settlement conference in that case and somebody who's trying

2    to subpoena them in another case kind of hangs around and

3    subpoenas them when they come to court to appear for the

4    settlement conference.  Are you saying that there's something

5    wrong with that service, because that's essentially the

6    analogy?

7            MR. FINKE:  If someone is in the courthouse because

8    they have been ordered to be in the courthouse, you can't

9    serve them.

10           THE COURT:  Give your authority for that.  What's the

11   legal authority for that?

12           MR. FINKE:  I cannot cite a particular case.

13           THE COURT:  I'll tell you what.  There's a law

14   library in the building.

15           MR. FINKE:  Yes.

16           THE COURT:  It's on the 16th floor.  Come back at

17   12:30.

18           MR. FINKE:  I'll do that.

19           THE COURT:  Okay.  You go find a case and -- but, I

20   mean, until something else happens, she's under subpoena now.

21   Okay?  And so until I quash the subpoena, you'll be back up

22   here.

23           You guys might want to go to the law library too.

24           You can get wireless on the second floor actually if

25   you need to get wireless.

1    MR. MENDELOFF:  Can I just put one thing on the
2  record?
3         THE COURT:  Yes.
4         MR. MENDELOFF:  I've got Rule 45 in front of me.
5  I've read it.  I don't see a thing in Rule 45 that supports
6  that.
7         THE COURT:  It's not in the rule.  He's talking about
8  what I think would amount to a common law gloss on the rule.
9  So I just want to give people a chance to make their argument,
10  so I'll see you at 12:30.
11         (Said hearing was recessed from 12:00 p.m. until
12  12:30 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1    THE COURT:  Okay.  We're back on the record.  Let me

2    hear first from Mr. Finke.

3    MR. FINKE:  Thank you, Judge.

4    I want to bring to your attention the United States

5    Supreme Court case of Steward versus Ramsay, 242 U.S. 128.  At

6    page 129 the U.S. Supreme Court cites a New Jersey Supreme

7    Court case, and it says, quoting:  "Now this great object in

8    the administration of justice would in a variety of ways be

9    obstructed if parties and witnesses were liable to be served

10   with process while actually attending the court."

11   And in that case, a case, by the way, that came from

12   the Northern District of Illinois, went to the U.S. Supreme

13   Court, the court held that it was improper to serve process

14   upon a citizen of another state who was attending court.

15   THE COURT:  May I see it?

16   MR. FINKE:  Yes.

17   THE COURT:  Okay.  Keep going.

18   MR. FINKE:  I have a Fourth Circuit 1974 case by the

19   name of Celanese Corporation versus Duplan Corporation.

20   That's at 502 F2d, 188.  And that says, the court of appeals

21   says, "We think the district judge acted appropriately in

22   immunizing the witness from the service of the subpoena during

23   the time he was present in the District of Carolina, of South

24   Carolina, for the purpose of giving his deposition in the

25   litigation pending in that district."  In that case this

1    Mr. Crouzet, the witness, was there for a deposition, then got

2    served with a subpoena in another matter.  I'm happy to give

3    you this case as well if you care to see it.

4              THE COURT:  Thank you.

5              (Documents tendered to the court.)

6              MR. FINKE:  The point being that a witness or person

7    summoned to court is exempt from service of process while in

8    court or going to and from court.

9              THE COURT:  Mrs. Rogan resides in?

10             MR. FINKE:  Indiana.

11             THE COURT:  Valparaiso?

12             MR. FINKE:  Correct.

13             THE COURT:  Which is within a hundred miles of this

14   court?

15             MR. FINKE:  It is within a hundred miles.

16             THE COURT:  I'm just asking a question.

17             MR. FINKE:  It is within subpoena range, but these

18   cases talk about citizens of different states.

19             THE COURT:  You didn't read carefully enough.

20             Go ahead, Mr. Aizenberg.

21             MR. AIZENBERG:  Rule 45(b)(2)(A) doesn't impose any

22   limitations.  All it says is that service needs to be -- if

23   the person is within the district, you can serve them.  We

24   were able to check in the short time that Wright Miller also

25   says the same thing, provides a subpoena may be served on a

1  witness at anyplace within the district.  Didn't see any

2  limitations on that connected as to why they are within the

3  district.

4        The fact is, as Your Honor has noted, that she is

5  within the court's subpoena power even if she hadn't been in

6  court today.

7        THE COURT:  Hang on a second.  I just need to go grab

8  a book.  It will take me one second to do this.

9        (Brief pause.)

10        THE COURT:  Okay.  Steward versus Ramsay -- I just

11  sort of note for interest that the lawyer for I think the

12  party that won in the Supreme Court was Clarence S. Darrow --

13  is a case about service of a summons.  The plaintiff brought a

14  suit against the defendant in the Northern District of

15  Illinois.  The summons was served personally upon the

16  defendant in the Northern District of Illinois while the

17  defendant, who was a resident of the state of Colorado, was in

18  the Northern District of Illinois testifying as a witness.

19        The other case that Mr. Finke referred to, Celanese

20  versus Duplan, actually has the following discussion about

21  this.  I'm going to read the sentence that Mr. Finke read and

22  then the sentence immediately after it.

23        "We think the district judge acted appropriately in

24  immunizing Crouzet," C-R-O-U-Z-E-T, "from the service of the

25  subpoena during the time he was present in the District of

1   South Carolina for the purpose of giving his deposition in the

2   litigation pending in that district.  This action of the court

3   was consonant with the general rule that witnesses and parties

4   attending a judicial proceeding outside the territorial

5   jurisdiction of their residence are immune and exempt from

6   service of civil process in another suit while in attendance

7   at court in that jurisdiction," citing Steward versus Ramsay,

8   the Supreme Court case, and other cases.

9           That's not what we're talking about here.  It is true

10  that Mrs. Rogan is not within the state of Indiana right now.

11  She's within the state of Illinois and she lives in Indiana.

12  But she's within this court's territorial jurisdiction as far

13  as the service of the subpoena is concerned.

14          And just from a sort of a common knowledge type of

15  thing, it's a fairly common occurrence for lawyers when

16  they're taking witnesses' depositions and the witness has

17  appeared at a deposition pursuant to a subpoena and is

18  therefore compelled to be there to serve the witness with a

19  trial subpoena at the same time.  Now, obviously you can't use

20  that to evade territorial limitations of a court's subpoena

21  power.  That's what Celanese versus Duplan would be about.

22  But as long as the witness is within the court's territorial

23  jurisdiction as far as the subpoena power, serving them with a

24  subpoena at a deposition that they're compelled to be at isn't

25  considered, I think by any reasonable lawyer, to be

1    inappropriate and never has been.

2        And so then the only question -- and so on the theory

3    that Ms. Rogan felt compelled to be here, which I could take

4    issue with but I won't for purposes of this, the only question

5    would be whether the fact that this is a courthouse makes it

6    different, and the only theory on which that would work is if

7    a courthouse is essentially the equivalent of a cathedral in

8    the 14th Century where you can go because you have some sort

9    of asylum, or whatever it was called in those days.  It isn't.

10   She's properly served.  I so find.

11       And let me just add the one other thing is that the

12   third of the three points that Mr. Finke made to me when we

13   first convened this morning was that Mrs. Rogan is intending

14   to take the Fifth Amendment anyway, and so I have to say that

15   on a completely practical -- and that may not be true, but if

16   it turns out to be true, on a completely practical level,

17   completely aside from all this issue about territorial

18   jurisdiction and what not, there is absolutely nothing to be

19   gained by having that done two weeks from now rather than now,

20   unless there is some intention to evade a subpoena in the

21   meantime, which, you know, wouldn't be a good reason anyway.

22       So we're going to reconvene at 2:00.  I have a guilty

23   plea at 1:30.  We'll reconvene at 2:00.  And I assume the next

24   witness, then, will be Mrs. Rogan.

25       MR. MENDELOFF:  Yes.

1    THE COURT:  And is she in fact going to claim the
2    privilege?

3    MR. FINKE:  The Fifth Amendment, yes, she will,
4    Judge.

5    THE COURT:  Okay.  All right.

6    MR. FINKE:  I have to be at 400 West Superior at
7    1:30.  I'll be back here as soon as I possibly can.

8    THE COURT:  We're starting at two, okay.  We're
9    starting at two.  Your witness is under subpoena.  We're
10    starting at two.

11    Now having heard that she's going to claim the
12    privilege, Mr. Mendeloff, what I would like you to -- and I
13    don't know whether any inference can be drawn against anybody
14    else in this case from her assertion of the Fifth.  I don't
15    know the answer to that.  What I'm hoping that you're going to
16    do is kind of figure out these are exactly the questions I
17    need to ask her for whatever purpose, you'll ask her those and
18    we're not going to sort of go on and on ad nauseam.

19    MR. MENDELOFF:  That's correct, Your Honor, but there
20    are -- we'll get to it this afternoon.  There's a twist to
21    this.

22    THE COURT:  Okay.

23    MR. MENDELOFF:  Thank you.

24    (Said hearing was recessed at 12:40 p.m. until 2:00
25    p.m.)

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
     DEXIA CREDIT LOCAL, f/k/a Dexia    )
 4   Public Finance Bank and Credit     )    No. 02 C 8288
     Local de France,                   )
 5                                      )    Chicago, Illinois
                       Plaintiff,       )    April 2, 2009
 6                                      )    2:00 p.m.
             v.                         )
 7                                      )
     PETER G. ROGAN, et al.,            )
 8                                      )
                       Defendants.      )
 9
                         TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12   For the Plaintiff:        HOWREY LLP
                               BY:  MR. SCOTT M. MENDELOFF
13                                  MR. GABRIEL AIZENBERG
                               321 North Clark Street - Suite 3400
14                             Chicago, Illinois 60654

15

16

17

18   For Judith Rogan and     O'ROURKE & MOODY
     Brian Rogan:             BY:  MR. MICHAEL J. O'ROURKE
19                                  MR. MYLES P. O'ROURKE
                               55 West Wacker Drive - Suite 1400
20                             Chicago, Illinois 60601

21

22   For Robert Rogan and     TOUHY, TOUHY, BUEHLER & WILLIAMS, LLP
     Sara Rogan:              BY:  MR. TIMOTHY J. TOUHY
23                                  MR. JEFFREY J. HALLDIN
                               55 West Wacker Drive - Suite 1400
24                             Chicago, Illinois 60601

25
```

1    For Judy Rogan:          MR. JEFFREY W. FINKE
                              55 West Wacker Drive
2                             Suite 1400
                              Chicago, Illinois 60601
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
                    LAURA M. BRENNAN - Official Court Reporter
22                   219 South Dearborn Street - Room 2102
                          Chicago, Illinois 60604
23                            (312) 427-4393

24

25

1    THE COURT:  Okay.  Recalling 02 C 8288, Dexia Credit

2  versus Rogan, et al.

3    And the lawyers give your appearances again for the

4  record.

5    MR. MENDELOFF:  Scott Mendeloff and Gabriel Aizenberg

6  on behalf of Dexia.

7    MR. MYLES O'ROURKE:  Good afternoon, Your Honor.

8  Myles O'Rourke and Michael O'Rourke on behalf of Brian Rogan.

9    MR. TOUHY:  Timothy J. Touhy on behalf of Sara

10  Caitlin Rogan and Robert Rogan.

11    MR. HALLDIN:  Jeff Halldin on behalf of Sara Caitlin

12  Rogan and Robert Rogan.

13    MR. FINKE:  Jeffrey Finke here today on behalf of

14  Judy Rogan.  I have not yet been retained because the

15  bankruptcy court process requires that I be retained.

16    THE COURT:  I assume that you're going to put

17  something in the pipeline at some point in time.

18    MR. FINKE:  Yes.  Just couldn't be done overnight.

19    THE COURT:  Yes.

20    You I think said at the end of the morning session,

21  Mr. Mendeloff, that there were some --

22    MR. MENDELOFF:  Twists.

23    THE COURT:  -- twists.  So why don't we --

24    MR. MENDELOFF:  The twist is that she has testified

25  previously without taking the Fifth Amendment to a number of

1    the questions we've got.  They have been -- there's been

2    testimony offered under oath and are admissible against her if

3    she takes the Fifth on those same questions under

4    801(d)(1)(A).

5              THE COURT:  You're not talking about against her;

6    you're talking about it's admissible --

7              MR. MENDELOFF:  Admissible as evidence.

8              THE COURT:  -- as evidence.  Okay.  But, I mean, you

9    don't need -- I mean, once she takes the Fifth on the same

10   topics, I mean, you don't need to go through -- all you'd need

11   to do would be to authenticate the prior testimony in some

12   way.  I mean, and presumably there could be a stipulation that

13   whatever it is is an accurate record of her testimony.  I

14   don't think you need to go through that with her on the stand,

15   or do you?

16             MR. MENDELOFF:  I think we'd better.

17             THE COURT:  Why?

18             MR. MENDELOFF:  Because it's a prior inconsistent

19   statement.  I don't know if I have to ask her the same

20   question and have her take the Fifth or if there's going to be

21   a stipulation that she take the Fifth as to everything.

22             THE COURT:  Let's talk this through here.  I mean,

23   under 804, if a witness is unavailable and unavailability

24   involves a claim of privilege under 804(a)(1), then the

25   witness's former testimony is admissible if -- well, and this

1    is the if, I guess -- if the party against whom the testimony

2    is offered had an opportunity and similar motive to develop

3    it.  Now, but even if that wasn't true, you could talk about

4    Rule 807.

5              You referred to 801(d) which part?

6              MR. MENDELOFF:  (d)(1)(A).

7              THE COURT:  (d)(1)(A), Prior Statement By the

8    Witness.  Testifies at trial or hearing and the subject of

9    cross examination concerning the statement is inconsistent and

10   was given under penalty of perjury.

11             MR. FINKE:  If I could be heard.

12             THE COURT:  You're not party to this case.  That's

13   what you told me this morning, right?

14             MR. FINKE:  That's correct.

15             THE COURT:  Tell me what your standing is to be heard

16   on this particular issue of the admissibility of the evidence

17   in this case.

18             MR. FINKE:  Not the admissibility of the evidence.

19   It is simply whether there's been a Fifth Amendment waiver.

20             THE COURT:  I don't think he's arguing that.

21             MR. FINKE:  Okay.  Fine.

22             THE COURT:  Mr. Mendeloff has been in the criminal

23   law business too long to argue that if you don't claim it at

24   one proceeding you can't claim it at another.

25             MR. FINKE:  Exactly.

1      THE COURT:  Even if he wasn't, I have.  So, all
2  right, that's not an issue.

3      MR. FINKE:  Fine.

4      THE COURT:  Let me throw it over to the intervenors
5  on this.

6      So what you have in mind -- let me just ask
7  Mr. Mendeloff this.  I just want to make sure we have the
8  issue kind of clear and focused.  Anticipating that Mrs. Rogan
9  is going to claim the Fifth on a particular subject on which
10 she has testified before under oath in some former proceeding,
11 what you're concerned about is whether you need to confront
12 her with the particular statement.

13     MR. MENDELOFF:  The particular question.

14     THE COURT:  The particular question.

15     MR. MENDELOFF:  Have her take the Fifth and then
16 provide the inconsistent answer, which is the answer that she
17 offered without taking the Fifth previously.

18     THE COURT:  Let me just ask Mr. Finke.  I mean, other
19 than the question as to what's your name, is it your
20 understanding that Mrs. Rogan is going to claim the privilege
21 against self-incrimination on everything else that's asked?

22     MR. FINKE:  Yes.

23     THE COURT:  Okay.  And is anybody arguing that that's
24 not a viable claim of privilege?

25     MR. MICHAEL O'ROURKE:  No.

1          THE COURT:  Okay.  Good.  Because, I mean, pretty

2  clearly is.

3          So let me ask the intervenors what your thinking is

4  on the issue that's posed by what Mr. Mendeloff has stated.

5          MR. TOUHY:  It's improper for somebody to call a

6  witness solely for the purpose of impeaching them, and that's

7  what it sounds to me that Dexia is attempting to do.

8          THE COURT:  I did not hear it that way.  I hear them

9  they're calling the witness to get testimony.  They now know

10  that the witness is going to take the Fifth, and then they're

11  talking about what they're going to do once that happens.

12          MR. TOUHY:  And 801 or 804, that is what we're

13  talking about, the unavailability?

14          THE COURT:  Well, that may be what we're talking

15  about.  We may be also talking about 801(d)(1).

16          MR. TOUHY:  It's a party against -- who has testified

17  in the past and it's being offered --

18          THE COURT:  No.

19          MR. TOUHY:  -- against that party.

20          THE COURT:  Testimony given as a witness.  No, you're

21  reading that wrong.  804(b) says the following are not

22  excluded by the hearsay rule if the declarant is unavailable

23  as a witness.  801(b)(1) is testimony given as a witness at

24  another hearing of the same or a different proceeding or

25  deposition, et cetera, et cetera, if the party against whom

1    the testimony is now offered, which would be the intervenors,

2    or in a civil action or proceeding a predecessor in interest

3    had an opportunity and similar motive to develop the testimony

4    by direct, cross or redirect examination.

5         MR. TOUHY:  Who is it being offered against?

6         THE COURT:  The only other people on the opposite

7    side of the case that we're trying right now is you guys.

8         MR. TOUHY:  And that's our position.  We didn't have

9    an opportunity.

10        THE COURT:  Okay.  So you're arguing that it's not

11   admissible under 804(b)(1) because you didn't have an

12   opportunity and similar motive to develop the testimony.  What

13   was the earlier proceeding?

14        MR. MENDELOFF:  341 proceeding in which she was

15   represented by Mr. Gouveia.

16        THE COURT:  I thought she took the Fifth.

17        MR. MENDELOFF:  There were places where she didn't.

18   And the -- a proceeding in front of Judge Klingeberger in

19   relation to the motion to lift stay, where she also testified.

20        THE COURT:  Both in the bankruptcy case is what

21   you're saying?

22        MR. MENDELOFF:  But she was represented by counsel in

23   both instances.  It's the same issues as here.

24        THE COURT:  Okay.

25        MR. MENDELOFF:  In fact, some of the testimony we

1  want to offer --

2       THE COURT:  And I recognize you didn't refer to

3  804(b)(1), and I've sort of pushed you over to that, but was

4  there -- the Rogan children are not a -- are they creditors in

5  the bankruptcy of Mrs. Rogan?

6       MR. MENDELOFF:  Yes.

7       THE COURT:  Are they creditors in the bankruptcy of

8  Mrs. Rogan?

9       MR. MICHAEL O'ROURKE:  I don't believe so.  I'm not

10  sure, Judge.

11       MR. MENDELOFF:  Brian filed proof of claim.

12       THE COURT:  That makes him a creditor.  And any

13  creditor can question the debtor in a 341 examination.  So he

14  had an opportunity and similar motive to develop that

15  testimony by direct, cross or redirect at the 341, did he not?

16       The same would be true of anybody who had filed a

17  claim and was a creditor in the bankruptcy.

18       MR. MICHAEL O'ROURKE:  I'm not familiar with any

19  claim filed by Brian Rogan in the bankruptcy.

20       MR. AIZENBERG:  He filed a proof of claim.  I've seen

21  it.

22       MR. TOUHY:  However, we need -- there has to be an

23  additional foundation because it's not -- it's the motive and

24  the opportunity, so he had to have a motive to develop it and

25  the opportunity.  If he was represented by counsel or he was

1  given the opportunity, and this is foundational, they have to

2  show that that was offered to him, which there is no evidence.

3  THE COURT:  What do you mean "offered to him"?  The

4  notice of a 341 examination is given to every creditor in the

5  case.  It's like come now and show up.

6  MR. TOUHY:  The motive and the opportunity.  And I

7  don't know.  They haven't shown that yet.  But if we can

8  stipulate, which we certainly are willing to do, that there

9  will be assertion of the Fifth Amendment privilege here, that

10  is -- that foundational requirement will be satisfied, and

11  then if they can satisfy the rest of 804(b)(1) on the

12  foundational issue on opportunity and motive, that is

13  something that can be reserved for another day.

14  MR. MENDELOFF:  Well, there's a couple of different

15  things here.  First, there's the 801 basis.

16  THE COURT:  Well, let's talk about 801(d)(1).

17  MR. MENDELOFF:  And, Your Honor, for some of the

18  statements that we're offering, 804 -- I'm sorry.

19  THE COURT:  Statement against interest.

20  MR. MENDELOFF:  Right, 804(b)(3).

21  THE COURT:  Okay.  So maybe we need to break it down.

22  Give me an example of a statement that -- something that

23  Mrs. Rogan said under oath in the 341 examination on the other

24  thing you mentioned which would be a statement against

25  pecuniary or proprietary interest, et cetera.

1      MR. MENDELOFF:  She said that -- she admitted that

2    she received money from the PGR Trust, that her husband

3    directed her to then immediately send some of the money to his

4    creditors, and she did it.

5      THE COURT:  I'm not asking you to respond on that one

6    right now on the intervenors' side.

7      801(d)(1), so, Mr. Mendeloff, talk me through that

8    and then -- do you have a copy of 801(d)(1) on you?

9      MR. MENDELOFF:  Yes.

10      The declarant will be her.  She's testifying at trial

11    when she gets on the stand and takes the Fifth.  The statement

12    we'd be offering would be inconsistent with the testimony

13    she's offering at trial because at trial she's taking the

14    Fifth Amendment and previously she gave substantive testimony

15    on the issue.  Previously the testimony was given under oath

16    and subject to penalty of perjury.  That's exactly what

17    happened in all these cases, with respect to all of these.

18    They were all given under oath, all subject to the penalty of

19    perjury.  And it comes in substantively.  It's not hearsay.

20      THE COURT:  Mr. Touhy.

21      MR. TOUHY:  That I agree with, but you don't need

22    Mrs. Rogan on the witness stand as a foundation for that

23    purpose.  What that says, and it adopts the common law

24    principle on this, is that declaration against penal interest.

25      THE COURT:  No, we're not talking about that.  We've

1  shifted.  We're not talking about 804(b)(5) at this point.

2  We're talking about 801(d)(1).  I want to make sure you're

3  looking at the right rule, because you're right as far as the

4  declaration against penal interest or pecuniary interest.  The

5  person doesn't have to be on the witness stand.  What

6  Mr. Mendeloff is now talking about is 801(d)(1), which says a

7  statement is not hearsay if the declarant testifies at the

8  trial or hearing and is subject to cross examination

9  concerning the statement and the statement is inconsistent

10  with the declarant's testimony and was given under oath

11  subject to the penalty of perjury at a trial, hearing or other

12  proceeding or in a deposition.

13          MR. TOUHY:  What is then the testimony they're saying

14  she's giving?

15          THE COURT:  The testimony, in what I just read, the

16  statement, what's referred to in the rule as the statement is

17  the prior testimony.  What's referred to in the rule as the

18  declarant's testimony is whatever she says here in the

19  courtroom.  And Mr. Mendeloff's argument as I understood it is

20  that claiming the Fifth is inconsistent, which is one of the

21  prerequisites of that rule, with the prior testimony, whatever

22  it was, on the particular topic.

23          MR. TOUHY:  Okay.  I don't necessarily agree with

24  that as a legal principle, but if we can all agree that in

25  fact there will be an assertion of her constitutional

1   privilege, that then -- she does not need to be on the witness

2   stand in order to offer this testimony because that comes in

3   because they are out-of-court statements, if I am

4   understanding what the court and what counsel is saying.

5       MR. MENDELOFF:  No, that's not correct.  That's not

6   correct.

7       MR. TOUHY:  Then he would be calling a witness for

8   the purpose of impeaching the witness with a prior

9   inconsistent statement.

10      MR. MENDELOFF:  We're not impeaching the witness.

11      THE COURT:  I've already ruled on that.  We don't

12  need to keep talking about that.

13      I'm doubtful that 801(d)(1) applies because I don't

14  think she's subject to cross examination.  She's claiming the

15  privilege.  That's the problem.  And I know that hasn't been

16  raised, but that's the problem.

17      I think there's a good chance that 801(b)(1) might

18  apply at least to some because it doesn't -- at least to one

19  person.  I think there's a good chance that 804(b)(3) may

20  apply to some things that you're talking about.  And I think

21  there's also a possibility that you could offer it under the

22  residual exception, which is 807, because it's testimony under

23  oath.  I suspect there are probably cases about that.

24      Some of that we can argue about later, which I think

25  is the point that you're making over here, let's just get it

1   over with and then argue about it later.  The only question is

2   whether anybody on the intervenors' side is -- if I just take

3   a representation -- and maybe I could actually have Mrs. Rogan

4   walk up here and she could listen to it.  I could ask her, is

5   what he just said true, so I get it out of her mouth.  In

6   other words, if somebody says I'm Judith Rogan and I'm going

7   to take the Fifth Amendment on any questions asked of me other

8   than my name, is anybody going to argue that Mr. Mendeloff,

9   Dexia hasn't laid the proper foundation by asking all a whole

10  bunch of questions?

11           MR. TOUHY:  No.

12           MR. MICHAEL O'ROURKE:  No, Your Honor.

13           MR. MENDELOFF:  Let me just say this:  Can we get a

14  formal waiver?  What I'm worried about is they get new counsel

15  on appeal and so --

16           THE COURT:  They would be in the wrong circuit for

17  that.

18           MR. MENDELOFF:  You're right.

19           THE COURT:  They would be in the wrong circuit for

20  that.

21           MR. MENDELOFF:  You're right.

22           THE COURT:  So I think them just stating it is as

23  formal as it needs to be.

24           MR. MENDELOFF:  Okay.

25           THE COURT:  So is your client here?

1    MR. FINKE:  My client is here.

2    THE COURT:  Just have her step up for a second.

3    Let me rehearse this with you first.  I'll tell you

4 what I propose to do, and you'll tell me whether you have any

5 problem with it.

6    MR. FINKE:  All right.

7    THE COURT:  The only concern I have is if a lawyer

8 just steps up and says something and she doesn't stand there

9 and adopt it out of her own mouth, at some later point in time

10 she could actually say wait a second, you know, I didn't

11 authorize Mr. Finke to claim the privilege on my behalf, so

12 all I propose to do is I would ask you the following question:

13 You're here today representing Mrs. Rogan, and she's standing

14 next to you, and you've represented to me that she will claim

15 her privilege against self-incrimination in these proceedings

16 here today on any question other than is your name Judith K.

17 Rogan.  You'll tell me yes.  I'll turn to her.  I'll say, Are

18 you Judith K. Rogan?  She's say yes.  And I'll say, Is what

19 that man just said correct?  And she'll say yes and we'll be

20 done.

21    MR. FINKE:  That's fine.

22    I just want to make absolutely clear for the record

23 that she's not voluntarily taking the stand and she's being

24 compelled to take the stand or to go through the scenario that

25 Your Honor just went through.

1          THE COURT:  I don't think anybody will dispute that.

2          Okay.  Fine.  Is she still here?

3          MR. FINKE:  She's in the witness room.

4          THE COURT:  Go get her.

5          MR. FINKE:  She's been in the witness room since

6     9:45.

7          THE COURT:  If you want to talk it through with her

8     first, Mr. Finke, I don't have a problem with you taking a few

9     minutes.

10          MR. FINKE:  Okay.  Thanks.

11          MR. MENDELOFF:  While we're waiting, can we set up a

12     procedure for -- we're going to break now apparently -- for

13     getting this issue resolved?  And, I mean, are we going to

14     have to file a brief, I suppose, on this?

15          THE COURT:  On the evidentiary issue.  Yeah, we can

16     talk about that.

17          So I think -- I mean, you're the proponent of the

18     evidence.  I think it makes sense for you to file something

19     first.

20          MR. MENDELOFF:  We will.

21          THE COURT:  You haven't filed anything for about

22     three days, either side, so you're probably --

23          MR. MENDELOFF:  Itching to stay up all night for

24     that.  We stayed up all night for this for no reason now.

25          THE COURT:  When can you file something?  We're not

1   in a mad rush at this point.

2           MR. MENDELOFF:  Right.  Can we have two weeks?

3           THE COURT:  Sure.  That's fine.  So we'll call it --

4           MR. MICHAEL O'ROURKE:  Three weeks is fine, Judge.

5           THE COURT:  Okay.  So that would be the 23rd of

6   April.  We'll call that the plaintiff's brief on admissibility

7   of Judith Rogan former testimony.

8           How long do you guys want, three weeks after that?

9   Do you need that long?  You tell me.

10          MR. MICHAEL O'ROURKE:  Two.

11          MR. TOUHY:  Two weeks is fine, Judge.

12          THE COURT:  7th of May.

13          MR. TOUHY:  Are they going to make a proffer of what

14  it is they're going to offer?

15          THE COURT:  I'm assuming you're going to tell me what

16  it is.

17          MR. MENDELOFF:  Sure.

18          THE COURT:  That would be a nice thing.

19          MR. TOUHY:  Can we get that in advance?

20          MR. MENDELOFF:  We'll do it in an appendix to the

21  brief.

22          THE COURT:  Yeah, you'll just attach the stuff.  Just

23  say you're offering the following stuff.

24          So what other things are we going to need to talk

25  about?  We're going to need to talk about what happens next, I

1  suppose.

2       MR. MENDELOFF:  Do you want to set a reply brief?

3       THE COURT:  Yes.  A week after the 7th of May, so

4  that would be the 14th of May.  Okay.  Response, reply.  I'll

5  put that in an order.

6       And so she's coming back in the room.  We'll just

7  take care of this.

8       MR. MICHAEL O'ROURKE:  One other housekeeping matter.

9  The only reason I mention it is so I don't forget about it.

10       Your Honor had scheduled today for the other

11  beneficiaries to file, Mr. Rogan and his brother and wives.

12  They're talking about hiring and getting somebody to come in

13  and represent.  Could they have another 14 days?

14       THE COURT:  Somebody is going to have to come in

15  who's filed an appearance for them and make a motion for

16  extension of time, and I'll entertain it just as I would

17  anything else, but let's table that.

18       Good afternoon, Mrs. Rogan.

19       MRS. ROGAN:  Good afternoon.

20       THE COURT:  So I'm going to -- you pay attention

21  here.  I'm going to ask your lawyer something based on some

22  things he's told me before, and then I'm going to ask you to

23  confirm what your name is, and then I'm going to ask him --

24  I'm going to ask you whether what he told me is right.

25       MRS. ROGAN:  Okay.

1    THE COURT:  So, Mr. Finke, it's my understanding

2    based on the discussions we've had here so far that if

3    Mrs. Rogan, who's standing to your left, were called to

4    testify in this case she would give her name and then she

5    would claim a privilege against self-incrimination as to any

6    other question that's asked of her; is that correct?

7        MR. FINKE:  That's correct, Judge.

8        THE COURT:  And are you Judith K. Rogan?

9        MRS. ROGAN:  I am.

10        THE COURT:  And is what he just answered correct?

11        MRS. ROGAN:  Correct.

12        THE COURT:  Okay.  Thank you very much.  You're free

13    to go.

14        MR. FINKE:  Thank you.

15        THE COURT:  All right.  Mr. O'Rourke, my answer on

16    that is that I'm not going to grant extensions of time to

17    people who -- you know, unless somebody files a motion.

18        MR. MICHAEL O'ROURKE:  All right, Judge.

19        THE COURT:  And you need to tell them that there is

20    no guarantee, okay, because I suspect that there's going to be

21    an objection to it, and I'll deal with it at that time, and

22    they need to understand that there's no guarantee, and the

23    longer they wait, the less guaranteed it is.

24        MR. MICHAEL O'ROURKE:  Very well.  Understood, Judge.

25        MR. MENDELOFF:  I note, Your Honor, for the record

1    that the deadline was yesterday, not today.

2          THE COURT:  All right.  So are there any other issues

3    you guys need to take up with me other than scheduling what we

4    need to do next?

5          MR. AIZENBERG:  Two exhibits yesterday that --

6          THE COURT:  That you need to offer.

7          MR. AIZENBERG:  -- that I need to offer.  I used them

8    with Mr. Flaherty.  One is Exhibit 24.

9          THE COURT:  Just a second.

10          This was during your direct?

11          MR. AIZENBERG:  Yes.

12          THE COURT:  24 has already been admitted.  That's the

13    pledge agreement?

14          MR. AIZENBERG:  Yes.

15          THE COURT:  I have it in my notes as having been

16    admitted.

17          MR. AIZENBERG:  Okay.  And Exhibit 732, the master --

18          THE COURT:  732 D is the master trust and --

19          MR. AIZENBERG:  Is that admitted?

20          THE COURT:  Likewise admitted.

21          That's it?  Okay.

22          So other than scheduling things, is there -- are

23    there other things that the intervenors' lawyers need to take

24    up with me?

25          Okay.  So let's just talk about where we are at this

1    point.  What we've got kind of waiting in the wings is

2    Mr. Cuppy, the accountant.

3              MR. MENDELOFF:  Foley.

4              THE COURT:  Foley.  And what else?

5              MR. MENDELOFF:  Mr. Myers.

6              THE COURT:  Myers.  You're going to call Myers?

7              MR. MENDELOFF:  Yes.

8              THE COURT:  These are people you're going to call, in

9    other words.

10             MR. MENDELOFF:  Yes, yes.

11             THE COURT:  Myers.

12             MR. MENDELOFF:  And a summary witness, a tracing

13   witness, and I think that's it.

14             THE COURT:  Okay.  So let's just walk through --

15             MR. MENDELOFF:  Your Honor, we may have one other

16   witness regarding the pendency of the federal investigation,

17   but I'm not sure about that.

18             THE COURT:  Okay.  So let's just walk through each of

19   those so I make sure I have an understanding of what's going

20   on.

21             On Mr. Cuppy we've got, I think, a deadline by

22   which -- I think I set a deadline by which the law firm is to

23   produce records, and then there's a date -- I think we -- I

24   entered and continued the motion regarding where his

25   deposition happens and the subject.

1          MR. MENDELOFF:  On Wednesday.

2          MR. MICHAEL O'ROURKE:  April 8th, next --

3          THE COURT:  Next week, okay, 4/8.

4          With regard to Mr. Foley where are things?

5          MR. MENDELOFF:  He's the one who's got --

6          THE COURT:  Tax time.

7          MR. MENDELOFF:  Tax time, and we're also analyzing

8     those records.  And, frankly, given everything else we've been

9     doing --

10         THE COURT:  I can just table -- you know, what I can

11    do is just set the case for a status on April 8th since you're

12    going to be here anyway and you can just be prepared to tell

13    me where you are on that date.

14         MR. MENDELOFF:  That would be great.

15         THE COURT:  Myers, there was something different

16    about him.

17         MR. MENDELOFF:  He's in Florida.

18         THE COURT:  A deposition.

19         MR. MENDELOFF:  We were back and forth on whether we

20    were going to do a deposition or ask him to come here, and

21    we're still up in the air on that.  We may do that by

22    deposition, but it would be a video deposition.

23         THE COURT:  You don't have anything scheduled at this

24    point?

25         MR. MENDELOFF:  No.

1   THE COURT:  Okay.  And the summary witness, we talked
2   about that the other day, and I think there was some
3   discussion about giving the intervenors an opportunity to
4   depose.

5   MR. MENDELOFF:  Absolutely.

6   THE COURT:  I assume you're going to work that out.

7   MR. MENDELOFF:  We'll get them summary charts first,
8   charts and everything ahead of time so they have time to
9   prepare.

10  THE COURT:  So in terms of scheduling, I mean, I
11  can't give you any date right now in April or May that I know
12  I'm going to be available, and I don't want to give you a date
13  just for the heck of giving you a date.  The odds are that I
14  won't know much more about that when you come in next week, so
15  likely what's going to happen is when you come in next week
16  you'll sort of lay out what -- you know, what you have left to
17  do, but what I'd really like to know from you is the time
18  frame when you think you're going to get that all completed.

19  In other words, I'll make a ruling on the Cuppy
20  thing.  I'd like to be able to get your time frame, this is
21  what we'll have done, what we need to have done in order to
22  present the rest of our case.  My guess is we're probably
23  talking about a June date.  The only way that wouldn't happen
24  is if, you know, my patent case up in Madison settles and
25  somehow you were able to get all this other stuff done in the

1 next four weeks, which I'm guessing is not likely.

2 Does anybody have a problem with that just sort of

3 conceptually as to figuring out where we go next?

4 MR. MICHAEL O'ROURKE: No, Your Honor.

5 THE COURT: I will just tell you the one concern I

6 have is that -- and my schedule is what it is, and partly this

7 is a result of my schedule. I can't have major gigantic gaps

8 because it just makes it impossible to remember stuff. And, I

9 mean, I've got notes and I've got a transcript, but I need to

10 be able to remember things too. So one way or another I think

11 everybody should figure that we're going to be completing this

12 hopefully in the month of June, but if not in the month of

13 June, probably in the first half of July.

14 MR. MENDELOFF: That's fine by us.

15 THE COURT: And I won't be able to give you any -- I

16 may be able to give you some more specific dates when you come

17 in next week, but that should be kind of the thinking. And

18 the idea is going to be I'm going to try to rule on it very

19 promptly when I'm done. Probably what I'll do is ask people

20 to submit proposed findings and conclusions very shortly after

21 we finish and you give your closing arguments, and then I'm

22 going to try to rule on it as promptly as I can.

23 So I think unless anybody has got anything else, I'll

24 enter the schedule on the briefing of the evidentiary issue,

25 I'll give you a status date for the 8th of April at 9:30 and I

1    can send everybody on their way.

2           MR. MENDELOFF:  We have some -- we think we have

3    adequate evidence to establish the authenticity of the RPP

4    Trust at this stage.  Can we submit that, or do you still want

5    to hear that during the proceedings?

6           THE COURT:  This is the thing about the signature?

7    When you say can you submit it, in other words, you -- what's

8    the it that you want to submit?

9           MR. MENDELOFF:  Make a filing.

10          THE COURT:  That explains why it is you think you've

11   laid the foundation.

12          MR. MENDELOFF:  Yes, yes.

13          THE COURT:  Sure.

14          MR. MENDELOFF:  Okay.

15          THE COURT:  Yeah.  If there's a way you could do that

16   before next Wednesday, which I wouldn't require if you can't

17   do it.

18          MR. MENDELOFF:  No.  We can.

19          THE COURT:  If you can do it before next Wednesday,

20   then I can ask these folks next Wednesday if they want time to

21   respond and how much.

22          MR. MENDELOFF:  That's fine.  We can do that.  That's

23   not a problem.

24          And then the other issue is we filed a brief on the

25   constructive trust issue, the additional law that you wanted

1     on that. I don't know if you wanted a responsive brief.

2           THE COURT: I think it's a little early.

3           MR. MENDELOFF: Okay.

4           THE COURT: I think we can wait a little bit on that.

5           MR. MENDELOFF: All right.

6           THE COURT: Mr. Touhy.

7           MR. TOUHY: Practical issues.

8           From what I've just listened to, we have two

9     depositions. One will be a transcript, Mr. Cuppy. One will

10     be a live -- or not live, a video deposition.

11           THE COURT: Myers.

12           MR. TOUHY: In which case --

13           THE COURT: Although I'm not sure that -- I mean, is

14     it the intention to submit Mr. Cuppy's deposition or take his

15     deposition, then call him live?

16           MR. MENDELOFF: Call him live.

17           MR. TOUHY: So we have Mr. Cuppy as a live witness.

18     We have Mr. Foley as a live witness.

19           THE COURT: Just to be clear on that, events could

20     intervene like they could with any witness, and so everybody

21     should assume, like you're supposed to in every federal case,

22     that if you take the deposition this could be the whole story.

23     But I think the plan is to submit him live.

24           MR. TOUHY: And if we do have a video deposition,

25     we're going to need to submit objections to Your Honor --

1          THE COURT:  Right.

2          MR. TOUHY:  -- so you can rule.

3          THE COURT:  Right.

4          MR. TOUHY:  And if we have a video, I mean, do we all

5    sit here and watch it at the same time?

6          THE COURT:  Absolutely not.  You'll submit it to me

7    along with the transcript along with your objections, and I'll

8    rule on them and we'll deal with that.  Absolutely not.  We're

9    not going to take up your time and the court time to do that.

10         MR. TOUHY:  So if there's a video deposition, we

11   don't need to take up any court time to introduce that.

12         THE COURT:  Correct.  We'll need to talk about how

13   you get your objections to me, but we'll worry about that

14   later.

15         MR. TOUHY:  So we have three other witnesses who will

16   be providing live testimony.

17         THE COURT:  Well, I heard four with an asterisk.

18   Maybe three.  Cuppy and Foley sound like live witnesses.

19   Myers sounds like a deposition.  The summary witness sounds

20   like a live witness.  And then Mr. Mendeloff said the

21   possibility of somebody, didn't have a name, about the

22   pendency of the federal investigation.

23         MR. TOUHY:  Okay.

24         THE COURT:  Okay.  All right.  So I'll see you next

25   the 8th at 9:30.

1    MR. MENDELOFF:  Yes.  And we will submit to the other
2  side the participation agreement that was requested.

3    THE COURT:  Oh, okay.  Yeah.

4    MR. MENDELOFF:  Should we file it with the court as
5  well?

6    THE COURT:  No.  I'd say -- do you know what, yes,
7  do.  The participation agreement you're talking about between
8  Dexia and LaSalle.

9    MR. MENDELOFF:  Yes.

10    THE COURT:  Yeah, do file it.  And the quicker you
11  can get that to them.  I'd like to kind of have on the agenda
12  for next Wednesday what more, if anything, we're going to need
13  to do about that, like if you want to submit any further
14  written materials or what.

15    MR. TOUHY:  One thing we may ask for, Judge, these
16  institutions have been communicating.  We'd like to have the
17  correspondence and e-mails or what not that relate to their
18  communications on this because I know banks.  I used to work
19  in a bank.  You have participation agreements, and then what
20  you have is the real working agreement, what exactly is the
21  deal between the two institutions, and sometimes and
22  oftentimes the two are not the same.

23    MR. MENDELOFF:  I can tell you this:  That's not the
24  case here.  I am the conduit of all communications between
25  both sides, and it's all privileged.

1      THE COURT:  Let me just be clear on what I want to

2  make sure gets into their hands.  And I'm not imposing any

3  additional discovery obligations about e-mails or whatever.

4  What I want to make sure gets into the intervenors' hands are

5  the documents that describe the legal relationship between

6  LaSalle, Dexia -- LaSalle and Dexia as it relates to the

7  letter of credit and the aftermath of the need to pay off on

8  that and then collect, in other words, the documents that

9  would define essentially who the real party in interest is, or

10 parties in interest.  And if there's some dispute about the

11 sufficiency of what they give you, then we'll take it up.

12      MR. TOUHY:  How about a privilege log?

13      THE COURT:  No, because it's not a discovery request,

14 it's a court order, and I'm telling them what to turn over,

15 and he said he's going to turn it over, and if we get into

16 discovery requests, I know because it got mentioned that we're

17 going to have an issue about their timeliness, so we'll worry

18 about that when we get to it.

19      MR. MENDELOFF:  All right.

20      THE COURT:  We're in recess.  Thank you very much.

21      (Said hearing was recessed at 2:30 p.m.)

22

23

24

25