```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    DEXIA CREDIT LOCAL, f/k/a Dexia    )
 4  Public Finance Bank and Credit     )  No. 02 C 8288
    Local de France,                   )
 5                                     )  Chicago, Illinois
                   Plaintiff,          )  November 18, 2008
 6                                     )  10:30 a.m.
           v.                          )
 7                                     )
    PETER G. ROGAN, et al.,            )
 8                                     )
                   Defendants.         )
 9
                 TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11  APPEARANCES:

12  For the Plaintiff:      HOWREY LLP, by
                            MR. SCOTT T. MENDELOFF
13                          MR. GABRIEL AIZENBERG
                            321 North Clark Street - Suite 3400
14                          Chicago, Illinois 60654

15  For Fred Cuppy:         KELLEY DRYE & WARREN LLP, by
                            MS. ERIN KREJCI
16                          400 Atlantic Street
                            Stamford, Connecticut 06901
17
                            KELLEY DRYE & WARREN LLP, by
18                          MR. DAVID M. SHORT
                            333 West Wacker Drive - 26th Floor
19                          Chicago, Illinois 60606

20  For Robert Rogan and    O'ROURKE & MOODY, by
    Brian Rogan:            MR. MICHAEL J. O'ROURKE
21                          MR. MYLES PATRICK O'ROURKE
                            55 West Wacker Drive - Suite 1400
22                          Chicago, Illinois 60601

23

24              Valarie M. Ramsey, CSR, RMR
                       P.O. Box 16
25              Hazel Crest, Illinois 60604
                     (708) 860-8482
```

1    APPEARANCES (Continued):

2

3    For Robert Rogan and        TOUHY, TOUHY,
     Sara Caitlin Rogan:          BUEHLER & WILLIAMS, LLP, by
4                                 MR. JEFFREY J. HALLDIN
                                  55 West Wacker Drive - Suite 1400
5                                 Chicago, Illinois 60601

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         THE CLERK:  02 C 8288, Dexia versus Rogan.

2         THE COURT:  All right.  Let's get everybody in a spot

3   first.  And we'll start on this side, and we'll go right

4   across the room.

5         MS. KREJCI:  Good morning, Your Honor.  Erin Krejci

6   on behalf of Fred Cuppy.

7         MR. SHORT:  Good morning, Your Honor.  David Short

8   also on behalf of Fred Cuppy.

9         MR. MICHAEL O'ROURKE:  Good morning, Your Honor.

10  Mike O'Rourke on behalf of Brian Rogan.  We also filed an

11  appearance for Robert Rogan this morning, or last night.

12        THE COURT:  So it's Brian and Robert at this point?

13        MR. MICHAEL O'ROURKE:  Yes.

14        MR. HALLDIN:  Jeff Halldin on behalf of Sara Caitlin,

15  Robert Rogan.

16        MR. MYLES O'ROURKE:  Myles O'Rourke on behalf of

17  Robert Rogan and Brian Rogan.

18        MR. MENDELOFF:  Scott Mendeloff on behalf of Dexia.

19        MR. AIZENBERG:  Gabriel Aizenberg on behalf of Dexia.

20        THE COURT:  Okay.  Got a bunch here, and looked like

21  everybody came into the room late, so I'm guessing you all got

22  my e-mail.  I didn't want you to have to sit around through

23  the whole call.

24        MR. MICHAEL O'ROURKE:  Thank you.

25        MR. SHORT:  Thank you very much, Judge.

1       THE COURT:  All right.  Let me just get the easiest

2  thing done first.

3       There is noticed up for today a motion by Dexia, an

4  agreed motion to amend the temporary restraining order

5  directed to the Bank of America.

6       MR. MENDELOFF:  Yes, Your Honor.

7       THE COURT:  That's granted.  And so I assume somebody

8  is going to get me an order on that.

9       MR. MENDELOFF:  I sent you last week --

10      THE COURT:  Do you know what, the problem is there's

11  so gosh darn many orders in this case, I think I deleted that.

12  Can you send it again?

13      MR. MENDELOFF:  Sure.  And I sent you one redacted

14  and unredacted for that.

15      THE COURT:  Okay.  So send me both.

16      MR. MENDELOFF:  I'll send it to you again.

17      THE COURT:  Let me just make a note on that.

18      And so the other substantive matters that I believe

19  are up today, and you'll tell me if there's anything else,

20  I've got Robert Rogan's motion to dismiss for lack of personal

21  jurisdiction, and I had said that I'm going to hear further

22  argument on -- at least on the case that was cited in the

23  reply.  I've got the -- Dexia's motion for partial

24  reconsideration relating to Mr. Cuppy.  And I got the response

25  that was filed on that yesterday.  And then I think we had

1  tabled until today, but I'm not sure, the matter of setting up

2  some sort of procedure for how to deal with the Rogan -- what

3  I'll just call generically the Rogan children and how we're

4  going to go ahead from there.  Is that right?

5          MR. MICHAEL O'ROURKE:  Yes.

6          MR. MENDELOFF:  That's right.

7          On that, Your Honor, we had a conference call last

8  Friday.  We agreed on a schedule, and I'd like to hand that up

9  if I could.

10          THE COURT:  That's great.  Okay.  If I can deal with

11  that quickly, then I can deal with that first.

12          (Documents tendered to the court.)

13          THE COURT:  So this is essentially -- is this an

14  agreed proposed schedule?

15          MR. MENDELOFF:  Yes.

16          MR. MICHAEL O'ROURKE:  Yes, Your Honor.

17          THE COURT:  Works for me.  Okay.  So, Augie, I'll

18  take care of this with you later.

19          MR. MICHAEL O'ROURKE:  The dates aren't set.  I mean,

20  it gives, Your Honor, and the parties agree that it gives us a

21  pretty good time frame to get in everything that we need to

22  get in.

23          THE COURT:  Okay.  So, I mean, it's quick, but it

24  should be relatively quick.

25          MR. MICHAEL O'ROURKE:  I think so.

1          THE COURT:  Okay.  All right.  Okay.

2          MR. MENDELOFF:  The one thing on that, Your Honor.

3          THE COURT:  Yes.

4          MR. MENDELOFF:  And I don't want to belabor this, but

5    we are going to make a motion in front of the bankruptcy court

6    in Indiana to see if we can try Mrs. Rogan's issues before

7    Your Honor.

8          THE COURT:  And so at some point we might need to be

9    folding that into this or something like this.

10         MR. MENDELOFF:  Yes.  And we discussed that, and what

11   we'd propose is we would only fold in the aspects of the case

12   on Mrs. Rogan that overlap with the children.

13         THE COURT:  You know what, I'm going to worry about

14   that when I have to worry about it.

15         MR. MICHAEL O'ROURKE:  Fine.

16         THE COURT:  Okay.  So let me deal first, then, with

17   the Robert Rogan motion to dismiss.  And so I got -- I have

18   the motion, I've got -- and the supporting memorandum, I've

19   got the response, I've got the reply, and I've looked at SEC

20   versus Ross, which is the primary authority that's relied on

21   in the reply, and that was the thing that prompted the

22   plaintiff to want to say more.  So, Mr. Aizenberg, you've got

23   the floor.

24         MR. AIZENBERG:  Okay.  Thank you, Your Honor.

25         THE COURT:  And then I'll give whoever it is on this

1 | side the chance to comment.

2 | MR. AIZENBERG:  Ross isn't applicable for two
3 | reasons.  One is it's contrary to the weight of authority,
4 | which the Ross case itself acknowledges.  And even if one
5 | accepts the Ross case, it's factually distinguishable because
6 | the intervenor in Ross took affirmative steps to raise their
7 | objection multiple times, including substantive argument.  I
8 | want to go through each of these two items briefly.  Okay.

9 | Contrary to the weight of authority.  Ross itself
10 | acknowledges that the overwhelming weight of authority goes
11 | the other way; in other words, that when a party moves to
12 | intervene, they waive personal jurisdiction.  And Ross cites
13 | cases from federal courts of appeal in the Eleventh, the Sixth
14 | and the D.C. Circuit.

15 | In addition, we cited a case in our briefing --
16 | THE COURT:  There were a couple of district court
17 | cases, I recall.

18 | MR. AIZENBERG:  Yes.  That was affirmed by the Second
19 | Circuit, although the Second Circuit didn't address that
20 | issue, but it's the Second Circuit case.  And we also cited a
21 | Seventh Circuit case that's not an intervention case, but I
22 | believe it's pretty factually analogous.

23 | THE COURT:  Is that Sharif?
24 | MR. AIZENBERG:  That is DeWitt Porter versus Kovalic.
25 | THE COURT:  Oh, okay.

1    MR. AIZENBERG:  It's a case where a -- it's an

2  unpublished opinion, Your Honor.

3    THE COURT:  Unpublished from when?

4    MR. AIZENBERG:  Oh.  I don't know the year.

5    THE COURT:  Is it prior to December 1st of 2007?

6    MR. AIZENBERG:  I believe so.

7    THE COURT:  Then you can't talk about it.

8    MR. AIZENBERG:  Okay.  I won't talk about it.

9    THE COURT:  Up until that, that's when they changed

10  the rules about relying on unpublished authority.

11    MR. AIZENBERG:  Okay.

12    But bottom line is contrary to the weight of

13  authority, which Ross acknowledges itself, but even if you

14  say, well, you know, I want to consider the Ross reasoning,

15  it's factually distinguishable.

16    First, in Ross, the sales agent intervenors filed

17  four separate documents that the Ninth Circuit found preserved

18  their objections.  They filed a motion to intervene where they

19  raised an objection.  They raised the objection in their

20  answers.  They raise it in a document called preliminary

21  objections, which the Ninth Circuit explained set forth, and I

22  quote, "the legal bases for the defenses."  And in their

23  opposition to the disgorgement motion these intervenors

24  reiterated their procedural objections, and the Ninth Circuit

25  notes that there was substantive discussion in these briefing.

1        Second of all, it's factually distinguishable because

2    in Ross the sales agents raised these four -- four times these

3    objections before there was a substantive ruling.  In other

4    words, the district court made its decision on the

5    disgorgement issue after they had already four times raised

6    this objection.  Here it was raised afterward, okay.  So in

7    this case what's distinguishable is less quality, less

8    quantity and the timing, okay.

9        Here the objection was raised twice, four times in

10   Ross.  In Robert Rogan's reply brief at page 11, he says that

11   on at least five prior occasions before the motion to dismiss

12   he repeatedly, and I'm quoting, "raised and reiterated his

13   objection to this court's exercise of personal jurisdiction."

14   This is at page 11.  Okay.  And the five occasions he

15   identifies at page 10 of his reply brief are, one, the motion

16   to intervene, which was filed on September 15th.  Which is

17   true, the objection is mentioned there.  In the motion to

18   dissolve --

19        THE COURT:  Wait, wait.  The catalog of the five

20   places is on which page?

21        MR. AIZENBERG:  Page 10 at the bottom, I believe.

22        THE COURT:  Got it.

23        So the motion to inter-- the motion to intervene.

24   Okay.  Go ahead.  I'm listening.

25        MR. AIZENBERG:  The motion to dissolve.

1          THE COURT:  All right.

2          MR. AIZENBERG:  Then Robert Rogan says that he raised

3     it in the memorandum of law in support of the motion to

4     dissolve.  We --

5          THE COURT:  Well, the first two I agree with.  It's

6     paragraph -- because I pulled these all myself.  The motion to

7     intervene it's referenced in paragraph four.

8          MR. AIZENBERG:  Correct.

9          THE COURT:  No notice, no jurisdiction.

10          MR. AIZENBERG:  Correct.

11          THE COURT:  The motion to dissolve says in paragraph

12     five no personal jurisdiction.

13          MR. AIZENBERG:  Correct.

14          THE COURT:  There's nothing in the memorandum.

15          MR. AIZENBERG:  Nothing.  And what's notable too is

16     in the memorandum they argue --

17          THE COURT:  It talks about venue.

18          MR. AIZENBERG:  Venue.  Okay, and it's a similar set

19     of arguments, similar factual argument, but they didn't argue

20     personal jurisdiction.  They only argued venue.

21          They also say, Robert Rogan says he raised it in his

22     brief in opposition to the preliminary injunction.

23          THE COURT:  Yeah.

24          MR. AIZENBERG:  And it's not there.  That brief, as

25     Your Honor may recall, dealt with the issue of whether the

1    citation proceeding was set up properly.

2          And then, lastly, they say that they raised it during

3    the oral argument.

4          THE COURT:  And I just didn't remember one way or

5    another on that.

6          MR. AIZENBERG:  It's not there.  We -- in the -- when

7    they filed their motion to intervene, it was on September

8    16th.  The transcript at page 15, we attached it to our

9    response brief.

10         THE COURT:  I'm assuming that in oral argument, he

11   means oral argument after the preliminary injunction hearing.

12   Is that what you meant?

13         MR. MYLES O'ROURKE:  That was oral argument after

14   the -- that's in closing on that issue.

15         THE COURT:  Is that the September 16th thing you're

16   talking about?

17         MR. AIZENBERG:  No.  I was looking -- we looked at

18   anytime when it could have come up orally.  So that's on the

19   motion to intervene, not there; the opening statements to the

20   preliminary injunction hearing, not there, and we're trying to

21   prove a negative, but it wasn't mentioned; and, lastly, the

22   closing on the preliminary injunction hearing, and literally

23   the only words referenced on the issue is they are their

24   processing concerns about personal jurisdiction.  That was it.

25   It wasn't even really an objection.  It was more an expression

1 of concern about the issue.

2 So, again, Ross, four times, including substantive

3 argument.  Our case twice, no substantive argument.  So the

4 difference in quality and quantity, okay.

5 And, lastly, in Ross, again, I'm just going to

6 reiterate the point I made initially, the issue of personal

7 jurisdiction was raised before the district court ruled.

8 Here, I don't know whether this was intentional or not, but

9 it's almost as if Robert Rogan was waiting to see how this

10 court would rule.  If you went their way, no need to object to

11 personal jurisdiction.  If you went against them, then they

12 raised the objection.  And that's the problem with doing it

13 the way they did it because once the party has participated,

14 they've consented to the decision-making of the court.

15 THE COURT:  Can I ask you a question?  It's off

16 point, but I was trying to track down this morning, you know,

17 in the decision I issued on the preliminary injunction motion

18 that's dated October the 9th it says give me a draft order in

19 hard copy by October the 15th, and I was trying to figure out

20 which order that was, and the one that I came up with is this

21 one that was signed and entered on the 16th of October which

22 is entitled Order Amending Temporary Restraining Order With

23 Asset Freeze and Other Equitable Relief to Wachovia Bank,

24 Citibank and Bank of America, and it basically strikes certain

25 provisions of the TRO with regard to Robert Rogan's account at

1  Bank of America, Sara Caitlin Rogan's account at Bank of

2  America, Brian Rogan's account at Bank of America, Brian

3  Rogan's account at Wachovia Bank, and then some things about

4  Citibank credit cards.  Is that the order that embodies the

5  preliminary injunction?

6         MR. AIZENBERG:  I believe that was the order that

7  effectuated the preliminary injunction.

8         THE COURT:  So, I mean, basically the preliminary

9  injunction took stuff off.

10        MR. AIZENBERG:  Yes, because there was no preliminary

11 injunction directly against these individuals.

12        THE COURT:  Right.  So do you agree with that, that

13 that was --

14        MR. MYLES O'ROURKE:  I do agree with that.  Actually

15 that was actually effectuating your preliminary injunction

16 order.

17        THE COURT:  All right.  All right.  Had you finished

18 what you wanted to say, Mr. Aizenberg?

19        MR. AIZENBERG:  I have finished.

20        THE COURT:  Okay.  Let me hear from you.

21        MR. MYLES O'ROURKE:  Your Honor, on the waiver

22 argument, as you're familiar, we made the objection in the

23 preliminary motion to intervene.  Like the respondent Bustos

24 in the SEC versus Ross case --

25        THE COURT:  Tell you what.  I'd like to get past this

1    issue of waiver for a second.  I want to talk to you about
2    something more substantive, because I read the Ross decision,
3    and I'm looking at -- I guess it starts on page 1141, carries
4    over after that.  And, of course, Ross is an SEC enforcement
5    proceeding where a receiver is trying to get disgorgement
6    from, I guess, sales representatives who were not parties to
7    the underlying action.  And on page 1141 there's a heading
8    that says Nominal Defendants in Summary Proceedings, and then
9    there's a subheading A that says Nominal Defendant
10   Designation.  And it talks about -- and it distinguishes the
11   Ross case.  It basically says that the Ninth Circuit had
12   recognized a truncated form of process in certain types of
13   situations, and it says the following.  It says:  "Although
14   the paradigmatic example of a nominal defendant as a bank or
15   trustee that has only a custodial claim to the property, the
16   term is broad enough to encompass persons who are in
17   possession of funds to which they have no rightful claim, such
18   as money that has been fraudulently transferred by the
19   defendant in the underlying securities enforcement action."  I
20   left out the cites.
21          Goes on to say that Bustos, the person who's
22   objecting in this case, doesn't fall into any of those
23   categories, there's no contention -- there's no evidence that
24   he received fraudulent transfers, and basically the conclusion
25   in that section at the very end, which is over on page 1142,

1  says:  "We don't believe the Constitution permits the receiver
2  to use the nominal defendant designation to deprive one whose
3  only plausible basis for liability is a violation of the
4  securities laws of either his right to full and formal service
5  of process or his right to fully litigate the question of his
6  own liability under the securities laws."

7         What I read that as saying is that in a situation
8  like the one in Bustos -- or like the one in SEC versus Ross
9  in which Mr. Bustos was the objecting party, where the
10 contention against the nonparty is that they themselves
11 violated the law or did something wrong, then you have to
12 treat them just like you would any other party in a lawsuit
13 because they're a party in a lawsuit effectively, but that
14 there are other situations that fall short of that in which
15 you don't have to treat them as a party in a lawsuit, one of
16 which is the recipient of a fraudulent transfer, which is
17 exactly what I found that the plaintiff had established a
18 reasonable likelihood of success on in this case.

19        And then the second thing, the sort of the
20 preliminary point in Ross at page 1138 is it says:  "Before a
21 court may exercise the state's coercive authority over a
22 person or property, some statute must authorize the act."
23 Now, in this case, of course, there's the Illinois
24 supplementary proceedings statute.  And so putting aside
25 completely the question of waiver or forfeiture of the point,

1    I guess I'm just not seeing how Ross governs this case even if
2    there's no waiver or forfeiture issue.

3          MR. MYLES O'ROURKE:  Your Honor, if I may, just to
4    respond to that.

5          THE COURT:  Yes.

6          MR. MYLES O'ROURKE:  The receiver in Ross did make
7    the arguments, did present the arguments that the money that
8    was given to Bustos was ripe for disgorgement because there
9    were commissions that were not earned.

10         THE COURT:  Right, but the court rejected that,
11   unlike what I did in this case.

12         MR. MYLES O'ROURKE:  Right.  However, and the same
13   point, one of these trusts, the domestic trust, actually holds
14   Robert Rogan's home, to which he lives in, pays bills on.  I
15   mean, there's inferences that --

16         THE COURT:  Have I been told that before right now?

17         MR. MYLES O'ROURKE:  You made a finding in your
18   preliminary injunction order that it's -- from evidence
19   submitted by Dexia or from some papers that indeed that the
20   Cashman -- Robert Cashman Rogan domestic trust owns his home.

21         THE COURT:  I got the preliminary injunction
22   decision.

23         MR. MYLES O'ROURKE:  I'll get you the preliminary
24   injunction order.

25         MR. MICHAEL O'ROURKE:  It's in your October 9th

1 ┃ preliminary injunction order.

2 ┃     MR. MYLES O'ROURKE:  The October 9th.

3 ┃     THE COURT:  Just tell me where.

4 ┃     MR. MYLES O'ROURKE:  But that's really where we --

5 ┃ where I believe this case falls within --

6 ┃     THE COURT:  Okay, but the trust -- wait a second.  I

7 ┃ think you're mixing apples and oranges here because the

8 ┃ preliminary injunction that you're dealing with here, I mean,

9 ┃ nobody opposed the entry of a preliminary injunction vis-a-vis

10 ┃ the trust.  Nobody opposed that.  You didn't oppose it.

11 ┃ Nobody opposed it.  I mean, that's pointed out several times

12 ┃ in this order.

13 ┃     What the preliminary injunction order deals with are

14 ┃ moneys that had been distributed from the trust or from other

15 ┃ Peter Rogan connected entities or persons, I guess, to the

16 ┃ Rogan children.  I mean, nobody contested the entry of a

17 ┃ preliminary injunction regarding the trust, and so, okay,

18 ┃ maybe the trust does hold his home, and maybe what you ought

19 ┃ to be asking me if that's a problem, if he wants to sell the

20 ┃ place or something, is this really isn't part of any

21 ┃ fraudulent conveyance, you know, lift that, but I'm not

22 ┃ sure -- what does that have to do with what we're talking

23 ┃ about here today?

24 ┃     MR. MYLES O'ROURKE:  It has to do with if you're

25 ┃ seeking to under -- if what you're doing is you're seeking to

1   have Robert Rogan and his accounts that control, you know --

2   and the funds in those trusts, the trust controls his home, if

3   you want to have personal jurisdiction over those funds, you

4   need personal jurisdiction over the res, and that is, you need

5   personal jurisdiction --

6            THE COURT:  R-E-S, res, R-E-S.

7            MR. MYLES O'ROURKE:  -- over the holder.  The res.

8   Sorry for the use of the Latin, but -- and that really is --

9   that's really what we're -- we're really fighting here is that

10  Robert Rogan, if -- to take Dexia's position, if there was a

11  fraudulent conveyance claim against a person, they could be

12  hailed, that person could be hailed -- hailed before any court

13  in the United States based upon the claim, based upon that

14  claim.  And no one would be able to contest personal

15  jurisdiction as Dexia argued.  Nobody would be able to contest

16  it because by coming into court they would have waived that

17  personal jurisdiction argument.

18           THE COURT:  So are you telling me that you think that

19  the preliminary injunction that I entered relating to the

20  domestic trust that's for the benefit of Robert Rogan, that

21  there's something legally infirm about that?  I'm not talking

22  about the preliminary injunction as it's directed to the bank

23  accounts that are in the name of Robert Rogan.  Are you saying

24  there's something infirm about the preliminary injunction that

25  relates to the domestic trust for his benefit?

1    MR. MYLES O'ROURKE:  I don't find anything infirm
2  about your preliminary injunction order whatsoever.

3    THE COURT:  So why are you talking to me about the
4  house, then?  Because that's the only way the house is tied
5  up, because of an order that you just told me and that I'd
6  been led to believe before that there wasn't any opposition.

7    MR. MYLES O'ROURKE:  I do have a -- and I do believe
8  that we've preserved our objections to personal jurisdiction,
9  and I do believe that to go forward on a turnover of these
10  assets and these trusts, at least to which are titled in
11  Robert Rogan's name and which he's been a beneficiary on, it
12  would need to be a finding of personal jurisdiction.

13    THE COURT:  Time out.

14    I entered a preliminary injunction.  I don't know how
15  long ago that was, but it was before October the --it was
16  before I ruled on the preliminary injunction order that we're
17  dealing with here today dated October the 9th, you know.
18  Those are -- preliminary injunctions are appealable orders.
19  Somebody could have appealed that.  Nobody appealed it.
20  Nobody objected to it.  It's clear nobody objected to it.
21  Never.  There was never any objection to that.  And if there
22  was any doubt about that when I said it at least twice and
23  probably more than twice in the October 9th opinion, there's
24  been no objection to the entry of a preliminary injunction
25  regarding the trust, and somebody should have popped up and

1    said, hey, Judge, you're wrong about that, we really did
2    object to that.

3            And the other problem that I have here is if the
4    injunction, the preliminary injunction that I entered, which
5    we just established is embodied in this order of October the
6    16th, which was entered on the docket on October the 16th, why
7    didn't somebody appeal that?

8            MR. MYLES O'ROURKE:  Judge, I believe that there's a
9    --

10           THE COURT:  It's an appealable order.

11           MR. MYLES O'ROURKE:  Right.  I understand.  And I
12   just wanted to deal with that, that there is a difference
13   between enjoining for preserving the status quo.  In this case
14   the injunctive relief was prompted not by Robert Rogan's
15   actions.  It was by some other parties', some of which are
16   represented in this courtroom, but it was by other actions
17   taken by other people, and what we're talking about now for
18   a -- to go forward on a mandatory -- well, which would amount
19   to a turnover of assets, that is about people who have rights
20   to be disputed that -- in which we need personal jurisdiction.
21   There was no objection that he could reasonably have made to
22   this court's --

23           THE COURT:  To holding it in place.  I get your point
24   about that.  What you're telling me now is that, okay, you
25   didn't object to enjoining the trust, but that doesn't mean

1   you're not objecting to turning over the assets in the trust,

2   which I recognize is a separate proceeding.  And, I mean, you

3   know, Dexia is going to have to prove to me at some point in

4   time whether particular assets in these things that are just

5   all kind of sitting there in a state of suspended animation

6   get turned over or not.  Okay, I get that.

7          All right.  Tell me what else you'd like to tell me

8   on this personal jurisdiction issue.

9          MR. MYLES O'ROURKE:  I mean, as to the -- as to --

10  about objecting to the action of others and that led you to

11  make your preliminary injunction finding based upon Dexia's

12  motion, emergency motion for ex parte relief, it was -- it

13  was -- the problem is it really puts Robert in a trick box

14  because if he participates extensively in that proceeding, he

15  waives his personal jurisdiction.  You made findings

16  throughout your personal --

17         THE COURT:  Do you know what.  I agree with you.

18         MR. MYLES O'ROURKE:  Throughout your --

19         THE COURT:  I agree with you on that.  You don't have

20  to argue that point anymore.  I agree with you.  You've

21  convinced me on that one.

22         MR. MYLES O'ROURKE:  And you made findings on page 3,

23  pages 6 and page 12 that Rob Rogan and the other children --

24  I'm just going to streamline it and say Rob Rogan; you

25  mentioned other children -- presented no evidence why Peter

1  Rogan should be enjoined.  They presented no --

2          THE COURT:  Why he should not be.

3          MR. MYLES O'ROURKE:  Why he ought not be enjoined.

4          THE COURT:  Right, right.

5          MR. MYLES O'ROURKE:  They presented no, you know,

6  evidence.

7          THE COURT:  Your point basically is that, hey, wait a

8  second, my assets are frozen.  If by coming in and saying,

9  hey, please unfreeze my assets, I'm going to be deemed to have

10  waived personal jurisdiction, it just isn't fair.

11          MR. MYLES O'ROURKE:  I'm in a trick box.

12          THE COURT:  Yeah, I get it.  That's the point the

13  Ninth Circuit made.  I agree with you.  I agree with you.  But

14  I don't think that wins the day for you.

15          I'm not comfortable with relying on this waiver of

16  forfeiture issue, and I think I may well have made, you know,

17  an incorrect ruling on that in the October 9th decision,

18  although it was only an alternative holding.  In the October

19  9th decision, and specifically on -- in the October 9th

20  decision and specifically -- when I was talking about venue.

21  We'll come back to the waiver issue in a second, but when I

22  was talking about venue and I said at the bottom of page 11

23  that the Rogan children likely have waived any objection to

24  venue by intervening, citing a couple of district court cases,

25  I went on to say that even if that were not the case, venue is

1  proper here because the current proceedings are supplementary

2  post-judgment collection proceedings that arise from the

3  court's entry of a judgment against Rogan, namely, Peter

4  Rogan.  The events that gave rise to the "cause of action,"

5  namely, Dexia's collection efforts, took place in this

6  district, so even if venue must be determined separately, for

7  post-judgment proceedings it's been established.  And so the

8  idea that there had been a waiver of any objection to venue

9  was an alternative holding.

10        On the question of whether this was raised often

11 enough, I think it was.  I mean, the one thing that I would

12 fault, I guess, is that even though there's a mention of this

13 in the motion to dissolve itself, there's no mention of it in

14 the memorandum.  And, honestly, what I relied on in making the

15 decision was what was argued in the memorandum.  And I did

16 that essentially for the reason that, you know, you often hear

17 courts say that it's one thing to just make a point in a

18 sentence or two, it's another thing to develop it, and

19 undeveloped points are forfeited.  And so I relied on the

20 points that had been developed in the memorandum, and,

21 frankly, I think that's what Dexia did too because in their

22 response they only address the things that are in the

23 memorandum.

24        Having said that, I do think -- I mean, it clearly

25 was raised in the motion to intervene.  It was raised in the

1    motion to dissolve.  And I agree, as I said a minute ago, with

2    Mr. O'Rourke's point that the situation that Robert Rogan

3    found himself in is that, okay, either I sit here and say

4    nothing and my assets remain frozen or I come in and ask to

5    say something and then I'm deemed to have waived any objection

6    to personal jurisdiction.  I think the Ninth Circuit has a

7    pretty decent point about that, is that a coerced waiver

8    really isn't a waiver.  And so I agree with that point.

9          However, I don't think that Fine governs this case

10   for the reasons that I was suggesting when I was asking

11   questions of Mr. O'Rourke a couple of minutes ago.  First of

12   all, in this case, unlike in the SEC versus Fine case, there

13   is a statute that authorizes the act, and that's, as I

14   discussed in the preliminary injunction decision, the Illinois

15   supplementary process statute.  And to the extent that Fine,

16   which is a different sort of a proceeding that has some

17   similarities but also some significant differences --

18         MR. MYLES O'ROURKE:  Your Honor, if I can interrupt.

19   It's Ross, SEC versus Ross.

20         THE COURT:  I keep saying Fine.  Why do I say Fine?

21   There's a case called SEC versus Fine.

22         MR. MYLES O'ROURKE:  I want to make sure if it's

23   Fine.

24         THE COURT:  There is a case called SEC versus Fine.

25   Why am I thinking of that?

1       Ross.   Thank you for stopping me.

2               The situation that was at issue in SEC versus Ross is

3       similar to this type of case.   There's some significant

4       differences, but it's similar so that I think the discussion

5       in the case does have a bearing on what I have to do.   But

6       what the court says at page 1141 -- that's 504 F3d 1141.   This

7       is a Ninth Circuit decision from 2007.   It recognizes an

8       alternative means of proceeding, in other words, short of

9       service of a summons and the -- all the full panoply of

10      personal jurisdiction findings that one would have to make in

11      a case in which a person is claimed to have, you know,

12      violated somebody else's rights.   It recognizes an exception

13      to that in a situation in which, as the court says, a person

14      who is in possession of funds to which he has no rightful

15      claim, such as money that has been fraudulently transferred by

16      the defendant in the underlying action.   And that's

17      essentially the situation here.   I mean, I found -- I made

18      findings, at least for purposes of the preliminary injunction,

19      that the plaintiff had shown a reasonable likelihood of

20      success on its contention that Mr. Rogan, Robert Rogan, was

21      the recipient of fraudulent transfers.   And the Ninth Circuit

22      says in that case that in that type of a situation that's an

23      exception to the normal requirement of serving a summons and

24      having the same type of minimum contacts that you would

25      normally have in a case in which the defendant's conduct is at

1    issue, and it makes that point clear at the tail end of that
2    part of the discussion at page 1142 where it says you can't
3    call somebody a nominal defendant in the manner that I've just
4    described when their only plausible basis for liability is
5    their own violation of the securities laws.  There's no
6    contention here, at least that I've dealt with yet, that
7    Robert Rogan himself did anything wrong.  I think I made a --
8    essentially made a finding for purposes of the preliminary
9    injunction that the children seem to have been the innocent
10   beneficiaries of Peter Rogan's wrongdoing, but I think that
11   that essentially means that the Ross case does not govern this
12   one.

13           And so putting aside any question of waiver, I think
14   that there's a -- there is a sufficient basis to assert
15   jurisdiction in this case.  And so the motion to dismiss for
16   lack of personal jurisdiction is denied.

17           So as far as the schedule is concerned, let me just
18   eyeball this again for a second here, and then I'll get to the
19   Cuppy matter momentarily.

20           Give me a sense.  You've basically got a two-month
21   period in here from mid December to mid February where you're
22   going to be taking depositions.  Have you given any thought as
23   to how many depositions you're talking about?

24           MR. MICHAEL O'ROURKE:  Your Honor, we're really in
25   the neighborhood of, I think, between 10 and 20.

1        THE COURT:  Guys.

2        MR. MICHAEL O'ROURKE:  To give you a rough number.

3        THE COURT:  Well, I guess you'll know that better

4   when you do the 26(a)(1) disclosure --

5        MR. MICHAEL O'ROURKE:  Yes.

6        THE COURT:  -- which that's the primary purpose of

7   that.  Okay.

8        And have you given any thought yet or discussed yet,

9   as far as -- because at least some of the people, including

10  one or maybe two of the Rogan children, are not in town.  I

11  mean, I know Robert's in California.  Have you talked about

12  where you're going to do their depositions?

13       MR. MENDELOFF:  We haven't talked about that.

14       MR. MICHAEL O'ROURKE:  We have not talked about that,

15  but two of the Rogan children are in town.

16       THE COURT:  Two are in town, one's not.

17       Well, the default rule is that, you know, the

18  deposition of a nonresident happens where the nonresident is.

19  And I can imagine reasons why people might say it's cheaper

20  for him to come here than for his lawyers to go out there, but

21  I'm going to leave that to you all in the first instance to

22  decide.

23       But this schedule looks fine to me.  I guess what I'd

24  like to do -- what we're talking about here is this is

25  essentially the anticipated motion for turnover relating to

1    the children's interests in the various trusts; is that right?

2               MR. MENDELOFF:  That's correct.

3               MR. MICHAEL O'ROURKE:  In the children's trusts, Your

4    Honor.

5               THE COURT:  In the children's trusts.  Well, this

6    also says the RPP.

7               MR. MENDELOFF:  And the RPP.

8               MR. MICHAEL O'ROURKE:  And the RPP, yes.  I'm sorry.

9    And RPP.

10              THE COURT:  It would seem to me that I ought to go

11   ahead and set a hearing date so that you have something that

12   you can point towards and lock in.  So let me just pull up a

13   calendar here.

14              What I would propose to you would be something like

15   the beginning of May, you know, a little more than a month

16   after you're going to be finishing up this discovery.  I just

17   need to check.  I could give you something like the 4th of

18   May.

19              MR. MENDELOFF:  That's great, Your Honor.

20              THE COURT:  Does that work?

21              MR. MICHAEL O'ROURKE:  Let me check my schedule, but

22   that should work.

23              THE COURT:  Well, I'm going to tentatively set it for

24   a -- we're calling it for a hearing on the -- I mean, you

25   haven't actually filed this motion for a turnover order yet,

1 but you'll have to file -- I assume you have to file a motion
2 at some point.

3     MR. MENDELOFF:  Original motion requesting turnover.

4     THE COURT:  Okay.  Hearing on plaintiff's request for
5 turnover of Rogan children's interests in the domestic trust
6 and the Belize Trusts and the RPP Finance Trust, I'm going to
7 set that for the 4th of May.  And so I'm going to give you a
8 status date on that part of the case let's say in about two
9 months.  I'm going to give you a status date of January the
10 27th at 9:30.  Okay.

11     MR. MICHAEL O'ROURKE:  Your Honor, could I -- on that
12 topic about the motion for turnover, there is really nothing
13 in the motion for turnover which sets out any cause of action
14 against the Rogan children.

15     THE COURT:  You know, I'm going to make a suggestion
16 here because now that you've reminded me, there's no question
17 it's in there, but that's in that pile of paper that's about
18 as -- you know, half as tall as I am.  I think it would not be
19 a bad idea at some point, and I'll give you a date for this
20 that's reasonable, for you to set out specifically as to these
21 particular interests what your grounds for a turnover are.

22     MR. MENDELOFF:  We actually talked about that, Your
23 Honor.

24     THE COURT:  Did we?

25     MR. MENDELOFF:  I think that's a good idea.  And what

1   we had talked about is setting up a schedule for both parties

2   to lay out their theories so that people know -- they know

3   where we're coming from, we know what their defenses are.

4           THE COURT:  Yeah, but I'd like you to file some sort

5   of a more focused motion.  So what if I gave you until the

6   same December 8th date to do that.

7           MR. MENDELOFF:  Sure.

8           MR. MICHAEL O'ROURKE:  That would be great, Judge.

9           THE COURT:  Okay.  12/8.  I'll put that in the order

10  too.

11          MR. MICHAEL O'ROURKE:  And the only thing that I

12  would add, Judge, is it may be covered in the March 31 date

13  that's set out in this schedule, but we haven't specifically

14  talked about dispositive motion cutoff dates, and we will be

15  making motions on statute of limitations on the theories that

16  we believe are going to be raised by Dexia.

17          THE COURT:  Okay.  So this is what I'm inclined to

18  do.  I'm inclined to make that date not go at the end of the

19  expert stuff because it's probably not going to be affected by

20  the experts.  So your fact discovery cutoff date is February

21  the 15th, so I'm going to make the dispositive motion date

22  three weeks after that.

23          MR. MICHAEL O'ROURKE:  That sounds great.

24          THE COURT:  That would be March the 9th.  Okay.  So

25  I'll add that.

1       You'll get an order which will have all these dates
2   in it.

3           MR. MICHAEL O'ROURKE:  Great.  Thank you.

4           MR. MENDELOFF:  Great.

5           THE COURT:  Okay.  So unless you guys have anything
6   else, I'm done with the Rogan children and I can move on to
7   the Cuppy stuff unless you've got other stuff.

8           MR. MICHAEL O'ROURKE:  Just one matter, Your Honor,
9   which I don't want to file a formal motion.  I would like to
10  discuss this and hopefully get this cleared up.  But my
11  understanding from talking with Mr. Dubovoy, we had a
12  discussion --

13          THE COURT:  Mr.?

14          MR. MICHAEL O'ROURKE:  Dubovoy, who is -- I'm sorry.
15  I should explain.

16          THE COURT:  Who is he?

17          MR. MICHAEL O'ROURKE:  Judith Rogan's bankruptcy
18  counsel.

19          THE COURT:  Got it.

20          MR. MICHAEL O'ROURKE:  Had a conversation with the
21  receiver, Mr. Gene Crane.

22          THE COURT:  The person in the Bahamas.

23          My receiver.

24          MR. MICHAEL O'ROURKE:  Your receiver.

25          THE COURT:  Okay.

1    MR. MICHAEL O'ROURKE:  And, Your Honor, out of that

2  conversation came some what I had not understood before that

3  there's a business -- there's a relationship between Mr. Crane

4  and the Howrey firm where they represent him on a matter, and

5  Dexia also has a business relationship with Mr. Crane, which,

6  Your Honor, raised the question in our mind of conflict and

7  independence, and I'd like to have a discussion --

8    THE COURT:  My suggestion is you talk about that.  If

9  there's an issue that you can't resolve, get a motion on file.

10    MR. MICHAEL O'ROURKE:  That's what I was going to

11  suggest.

12    THE COURT:  And if, you know, you come to some

13  agreement that we're going to plug somebody else in place,

14  that will be fine with me, I mean, assuming that the person is

15  qualified.  So I'm just going to leave it to you all to

16  discuss.

17    MR. MICHAEL O'ROURKE:  I just want to raise it so

18  Your Honor won't be caught unawares.

19    THE COURT:  Okay.  All right.  So we're done with the

20  Rogan children part.  I'm going to move on now to the Cuppy

21  thing.  Okay.  Let me just get this set of papers put aside

22  and get the other set in front of me.

23    So this is before me on the plaintiff's motion for

24  partial reconsideration of the ruling on the preliminary

25  injunction regarding Mr. Cuppy.  I ordered a response to that.

1    There's a response been filed by Mr. Cuppy.  Then there was --
2    there had been -- in the interim there was a motion to
3    supplement the record, which I entered an order denying, and
4    as a result of that Dexia withdrew one of the arguments in the
5    motion for reconsideration.

6         And so I guess what I would like to hear, since the
7    last document I got was from Mr. Cuppy's lawyer, is I'd like
8    to hear from the plaintiff.  And then if there's something
9    that they say that you need to respond to, I'll give
10   Mr. Cuppy's lawyers a chance to respond.

11        MR. MENDELOFF:  Thank you, Your Honor.

12        First of all, thank you for hearing us.  It's the
13   worst kind of -- one of the worst kind of motions I can have
14   to bring.

15        THE COURT:  Motion to reconsider?

16        MR. MENDELOFF:  To have to point out to a court that
17   there might be an error.  And I hate doing that.  But, Your
18   Honor, there are several issues that are raised in the
19   response I'd like to go through one at a time.

20        First, they try to cast this motion as a Rule 59(e)
21   motion.  It is not a Rule 59(e) motion.  This is not a final
22   judgment.

23        THE COURT:  There's no final judgment.

24        MR. MENDELOFF:  It's a motion under Rule 54(b).

25        THE COURT:  I'm not sure it's even that.  I think

1   it's a common law motion to reconsider, frankly.

2           MR. MENDELOFF:  All right.

3           THE COURT:  It's not a motion that -- but I'm not

4   sure any of that matters.

5           MR. MENDELOFF:  Okay.

6           And just to cite our position with respect to that,

7   there's case law in the Seventh Circuit and the Supreme Court

8   that indicates that interlocutory orders like this can be

9   reconsidered at any time prior to final judgment.

10          THE COURT:  Yes.

11          MR. MENDELOFF:  So the request itself is not flawed.

12  So the next question is --

13          THE COURT:  As far as I'm concerned, you don't have

14  to worry about arguing, hey, Judge, you flubbed or overlooked

15  something, because you've basically made that point, and I

16  will tell you that when I ruled on this, it may have been

17  available, but I did not have the transcript of the last day

18  of the hearing at which the argument was made.  I had very

19  extensive notes of that.  And I acknowledge that I may not

20  have dealt specifically with every argument that had been

21  asserted in the -- you know, in the final arguments that were

22  made in that case, and, on the flip side of it, it's entirely

23  possible that I may have ruled on one thing that wasn't even

24  really argued to me, in other words, the 20,000.  And that all

25  is part of the same ball of wax.

1       And so let's just talk about the merits of this, in

2  other words.  Don't worry about the threshold issues because I

3  think that you're close enough on that.

4       MR. MENDELOFF:  Okay, Your Honor.

5       First of all, there's clear case law that establishes

6  that -- first of all, there's a Seventh Circuit instruction

7  that states that argument is not evidence.  Argument is not to

8  be considered as evidence.  But there's also case law that

9  establishes that a party's arguments do not set the contours

10  of what the trier of fact can conclude, and the trier of fact

11  is not limited by a party's arguments, and a party's arguments

12  do not limit the party from thereafter arguing for a larger

13  amount if the trier of fact makes a determination based on the

14  evidence that supports the larger amount.

15       And the case law that I can cite for Your Honor --

16       THE COURT:  So when you're saying that, which part of

17  what you're asking for in the motion to reconsider are you

18  talking about?

19       MR. MENDELOFF:  I'm talking about --

20       THE COURT:  Talking about the 78,000?

21       MR. MENDELOFF:  No.

22       THE COURT:  Because the 78,000 you clearly asked for.

23       MR. MENDELOFF:  Yes.  I'm talking about the 25,000.

24       THE COURT:  Okay.  So let me just give you my

25  reaction to that.  I mean, I don't necessarily disagree with

1  anything that you just said as a general proposition of law.

2  But on the other hand, if the scenario here, as now appears to

3  be the case, is that when people stood up in front me and said

4  this is what we want, they said the 300 and whatever it is

5  thousand dollars and the $78,000, period, okay, honestly, as a

6  matter of, I don't know what I'd call it, judicial prudence, I

7  think that it would be inappropriate for me to then say not

8  just that, but I'm going to give you these other things too

9  that you didn't even ask for, for this reason, the reason

10  being that, you know, when people make arguments at the end of

11  a hearing like this, necessarily they're reacting to what the

12  other side said.  In other words, and if one side gets up and

13  says, okay, Judge, give me this $300,000 and give me this

14  $78,000, then the other side is going to confine themselves to

15  that argument.  That's the way lawyers work, and that's the

16  way it ought to work.  Then if the judge kind of goes beyond

17  that, and not in the situation where I say, okay, it's your

18  $300,000, but it's really worth more than $300,000, but

19  instead goes on to something else that wasn't asked for, as I

20  evidently did, and said, okay, you know, I'm going to give you

21  this $20,000 too, I don't think that that legitimately opens

22  up other things that were not asked for at the hearing.

23  That's why essentially I denied the motion to supplement the

24  record.

25          And to me, if I made a mistake here, or if I made

1    mistakes here, the mistakes I made had to do with -- the

2    mistakes I arguably made had to do with the $78,000 that you

3    asked for that I did not specifically deal with in the motion,

4    number one, and on the other side the 20,000 that you didn't

5    ask for that I did deal with.

6            And I'm just going to tell you that at a minimum here

7    the one thing I am definitely going to do as part of this

8    hearing is I'm eliminating that 20,000.  And with all respect

9    to what you just said, I just don't think it's appropriate for

10   me to, now that I look back on it, to have ordered relief that

11   wasn't asked for in this type of scenario.  So what I'd like

12   you to do is talk about the 78,000.

13           MR. MENDELOFF:  All right, Your Honor.  As for the

14   78, we cite in our brief clearly the evidence that establishes

15   that Mr. Cuppy admitted that that $78,000 was a distribution

16   from RPP Finance.  And defendants acknowledge that in their

17   brief.  I mean, they made this part of the argument quite

18   simple because they indicate that we had thought in our

19   original brief that they would be arguing, no, that that 78

20   wasn't really a distribution to Mr. Cuppy, it was basically an

21   advance reimbursement for paying taxes for RPP, but

22   Mr. Cuppy's brief acknowledges -- and this is, I think, at

23   page 5 -- that -- or states that Cuppy did not testify the

24   distribution had anything to do with RPP's taxes.  He was

25   saying that he used the distribution to pay his own taxes.

1          THE COURT:   Yeah, but if I'm reading -- the way I

2     read page 5, the thing you just referred to, is that what

3     Mr. Cuppy's lawyers are saying that he testified to is that,

4     yes, it's his own tax obligation that he was supposedly paying

5     out of the $78,000, but it was his own tax obligation with

6     regard to income that was attributed to him because he's a

7     beneficiary of the RPP Trust.  In other words, the income tax

8     obligation essentially flows through to the beneficiary.  The

9     beneficiary has to pay it.  And since he's getting stuck with

10    this tax obligation, implicitly what's happening is that the

11    trust is basically giving him the money to pay the tax

12    obligation.

13         MR. MENDELOFF:   Whatever, it doesn't make it

14    something other than a distribution.

15         THE COURT:   Yeah, but the question is whether it

16    makes it a fraudulent distribution.  In other words, the basis

17    on which -- the basis on which I -- as I understand it, that I

18    granted the relief that I did in that order regarding

19    Mr. Cuppy is essentially -- it's roughly similar to the

20    grounds on which I granted relief with regard to the Rogan

21    children, in other words, that there was a reasonable

22    likelihood of success on the proposition that this was a

23    fraudulent -- that something was a fraudulent transfer, and in

24    the case of the 300,000 whatever that was either a loan or not

25    a loan, what I essentially concluded is that -- well, I'm not

1  going to restate my conclusion.  That's in the order.

2          So the question on this would be, yeah, that's a

3  transfer.  Everybody agrees he got the $78,000.  The question

4  is whether Dexia has made a reasonable likelihood of success

5  or has shown a reasonable likelihood of success for the

6  proposition that I can grab that.

7          Go ahead.

8          MR. MENDELOFF:  The only evidence that's credible as

9  to the corpus of the trust here is that that was provided by

10  Mr. Rogan, which were funds he obtained by fraud, and as a

11  result, Mr. Cuppy's receipt of those funds should not be -- is

12  not proper and is the basis for a fraudulent transfer claim

13  irrespective of what Mr. Cuppy does with it.  Mr. Cuppy can

14  use it --

15          THE COURT:  So, in other words, it's a fraudulent

16  transfer not because there was no real consideration for it,

17  but it's a fraudulent transfer because they were funds that

18  were obtained by fraud, and it's just like, you know, if I go

19  in and rob a bank of $10,000 and then give the money to you,

20  you don't get to keep it just because you didn't know.

21          MR. MENDELOFF:  It's both actually.  I think that the

22  fraudulent transfer analysis that you did in your order is

23  applicable, and there is no consideration for this, and, in

24  addition, these are proceeds of fraud.  And by the time this

25  happened, I will note, there was adequate information

 1    available to Mr. Cuppy for him to have known that, that these

 2    were proceeds of fraud.

 3         THE COURT:   And is what you're talking about right

 4    now, is this part of what's in the evidence in connection with

 5    the motion for preliminary injunction, when you say there's

 6    evidence --

 7         MR. MENDELOFF:   Yes.

 8         THE COURT:   -- that he knew that?

 9         MR. MENDELOFF:   Yes, it's in the underlying motion.

10         And, by the way, the 20,000, I'm not asking you to

11    revise it.

12         THE COURT:   That was in there too.

13         MR. MENDELOFF:   That was in there too.

14         THE COURT:   I know.

15         MR. MENDELOFF:   That's I think where you probably got

16    it from.

17         THE COURT:   That is where I got it.

18         Go ahead.

19         MR. MENDELOFF:   So, you know, it's our view that the

20    fact that he's going to turn around and use this money to pay

21    his income taxes -- by the way, we established at the hearing

22    that as to the $40,000 of that 78,000, he did not use it to

23    pay his income taxes and that it is --

24         THE COURT:   It's still sitting there.

25         MR. MENDELOFF:   It's still sitting there.

1    But even for the other 38,000, the fact that he's

2  going to use it to pay it for his income taxes doesn't change

3  the analysis that Your Honor, which we agreed with, that Your

4  Honor put in the order, and he did not provide any kind of

5  consideration for this.  As Your Honor is aware, we did not

6  appeal and do not question Your Honor's rationale regarding

7  his receipt of funds.

8    THE COURT:  Time hasn't run yet, so.

9    MR. MENDELOFF:  Well, we will not be appealing Your

10  Honor's determination that he should be entitled to keep his

11  fees, that he earned them based on the evidence that Your

12  Honor heard.  But as to this, there's no question that this

13  was a distribution, and there was no transfer of

14  consideration, and under the rationale Your Honor set forth in

15  your brief -- I mean in your order, we think that it follows

16  that this should be included.  And as Your Honor noted, we did

17  argue this.

18    THE COURT:  All right.  It's Mr. Short, right?

19    MR. SHORT:  Yes, sir.  Thank you, Your Honor.

20    And I did file an appearance this morning.  I

21  apologize.  I have one --

22    THE COURT:  Don't worry about it.

23    MR. SHORT:  -- filed in the matter before Judge

24  Darrah and just had inadvertently had not filed one here.

25    But, Your Honor, let me see if I can follow along

1    here with Mr. Mendeloff's reasoning, focusing on the $78,000,
2    which I think the court has instructed us to focus on.
3            The way I read -- and I apologize.  Mr. Gregory, as
4    you know, from our Connecticut office handled the hearings,
5    but I read the transcripts, including the October 31st one,
6    and I'm having trouble understanding at the end of that
7    Mr. Mendeloff seemed to split the $78,000 and say we're only
8    here to talk about $40,000 of that 78.  And that's
9    specifically --
10           THE COURT:  Can I look at -- I had so many papers
11   here.
12           MR. SHORT:  No, no, no.  Let me find a page number
13   cite for that.
14           THE COURT:  It may be attached to your --
15           MR. SHORT:  If you look at page 60.
16           THE COURT:  Yeah, but I need you to hand me the
17   transcript.
18           MR. SHORT:  Oh, sure.  Do you mind if it's marked up?
19           THE COURT:  Not in the least.
20           MR. SHORT:  Do you mind if I approach?
21           THE COURT:  That's fine.
22           (Document tendered to the court.)
23           THE COURT:  I'm looking at page 60.  Let me just take
24   a couple of minutes to read this.
25           (Brief pause.)

1    THE COURT:  Okay.  So at page 60, and this is the

2    October 31st transcript, page 60, Mr. Mendeloff starts off

3    talking about, quote/unquote, the $83,000:  There were two

4    transactions that made that up, the 40,000 that was the

5    proceeds of the $78,000 distribution from the trustee in the

6    Bahamas and 43,000 in allegedly earned income.  Let's start

7    with the $40,000 distribution.  It's our position that that's

8    a fraudulent transfer.

9    Okay.  And then there's intervening discussion, and

10   then over on page 66 then there's a discussion about the

11   $43,000:  Mr. Cuppy would have us believe that the $43,000

12   that he received, that the 43,000 that he took out of the

13   60,000 that he received, the 43,000 that ended up and is still

14   in the Ameritrade account is all earned money and should not

15   be considered proceeds this court needs to protect.

16   Okay.  So, Mr. Short, as you understand it -- I

17   understand where the 40 comes from.  The 40 I gather is the

18   part of the 78,000 that, as Mr. Mendeloff said before, is

19   still in -- or at least at the time of the hearing was still

20   in Mr. Cuppy's account.  Where do you understand that this

21   other 43 came from?

22   MR. SHORT:  Oh.  Do you know what, I apologize.  That

23   wasn't meant to be.  That was just an old markup.

24   THE COURT:  Fine.  Okay.

25   MR. SHORT:  I was just saying that the 40 of the 78

1  was -- when I read the transcript --

2         THE COURT:   That's what you understood to be the

3  issue.

4         MR. SHORT:   Yeah.  But now he's asking for the entire

5  78, which, again, you know, you're receiving and taking in

6  quite a tremendous amount of information in these hearings and

7  then trying to rule within a week, which we appreciate the

8  effort because, of course, Mr. Cuppy wanted you to rule as

9  quickly as possible so his accounts could be unfrozen, but I

10  don't understand Mr. Mendeloff if he asked for specifically 40

11  of the 78 at that last hearing --

12         THE COURT:   Well, talk to me about the 40, then.  I'd

13  rather stop talking about what we're going to talk about and

14  just talk about it.

15         MR. SHORT:   Okay.  My understanding at pages -- and I

16  can show you the pages at the earlier Cuppy hearing.

17  Mr. Cuppy on pages 37 and 54 of the -- I guess this is the

18  October 31st hearing.  He's asked about this 78,000

19  distribution, and at page 54 he says --

20         THE COURT:   This is which, the first day or the

21  second day?

22         MR. SHORT:   I'm sorry, Your Honor, the second day,

23  October 31st, 2008.

24             Mr. Mendeloff asks:

25             "And did you receive any money in 2008 from the RPP

1  Trust?

2        "Answer:  Yes.  I received that one distribution in

3  January for the income of '07 that the trustees gave me as a

4  distribution, although it wasn't enough to cover the tax.

5        "Question:  And that 78,000 distribution when it was

6  made, whose money was it?

7        "Answer:  It was mine.  It's been made to me as a

8  distribution of that trust."

9        So, now, when I read this in preparing for today and

10  the fact that Mr. Mendeloff specifically asked and requested

11  as part of his relief at that hearing the $78,000, in

12  preparing today I assumed, again, not being present at the

13  hearing, that when you issued your memorandum and opinion on

14  November 10th that you had considered Mr. Mendeloff's

15  arguments on the $78,000 and found that, no, that wasn't --

16  I'm not finding a reasonable likelihood of success on that

17  $78,000 claim, there was testimony that indicated that it was

18  distributed to pay taxes, that Mr. Cuppy testified to that.

19  So but now I hear Your Honor, if I'm correct in understanding,

20  that you may not have looked at it as closely as --

21        THE COURT:  I'm going to tell you something.  If you

22  would go back and parse the words that I said earlier in this,

23  I have not exactly told you that.  I haven't answered that

24  question yet.  I said that I did not deal with it specifically

25  in the order.

1          MR. SHORT:  Okay.

2          THE COURT:  I have not said one way or another as to

3    whether I dealt with it in my head.

4          MR. SHORT:  Okay.

5          THE COURT:  Because I certainly was aware that the

6    $78,000 was out there.

7          MR. SHORT:  So, I mean, I think our opinion is at

8    this point there was testimony to support your position in

9    your order which denied his request for the $78,000 to be

10   frozen, so I don't know if I need to reargue it other than

11   there was testimony --

12         THE COURT:  But let's talk about what

13   Mr. Mendeloff -- one of the things Mr. Mendeloff said here

14   this morning.  Still morning, right, yeah.  And that is, okay,

15   even if you buy Mr. Cuppy's story that the $78,000 was given

16   to him to offset a tax obligation that he incurred by reason

17   of his status as a beneficiary in the trust, that it doesn't

18   hold water because he's still got $40,000 of it.  And this

19   distribution was made in early 2007, if I'm recalling

20   correctly, over 18 months ago.  Whatever the tax obligation

21   was, it would have come due way before that, and so you can't

22   buy the story at least as to the 40,000 is concerned, and so

23   that 40,000, his story doesn't hold up.  Therefore, it's a

24   transfer without consideration.  For that reason and other

25   reasons he said at least grab the $40,000.

1    MR. SHORT:  Okay.

2    THE COURT:  Deal with that.  I mean, because that is,

3  I think, an accurate characterization of Mr. Cuppy's -- of the

4  evidence.  In other words, Mr. Cuppy said, and I kind of agree

5  with the way your memorandum characterizes this, is what he

6  was saying is not that he was paying a tax that the trust had

7  incurred, but rather that the tax obligation flows through the

8  trust to the beneficiaries.  He gets stuck with the tax

9  obligation as a result of being a beneficiary.  The trust is

10  making a distribution to him in order for him to take care of

11  that.  Okay, I get it so far.  But there's still $40,000 of

12  the 78 that he got that's still sitting there, so either he

13  owes Ms. Wawzenski's client some money in a completely

14  different way or the story is just completely wrong.

15    MR. SHORT:  Your Honor, I can't -- I would have to --

16  to address the merits of what the 40,000 was used for by

17  Mr. Cuppy, I have to rely on his testimony.  In other words, I

18  don't have him with me.  I can't say that I've specifically

19  discussed that.  It would be unfair of me --

20    THE COURT:  Okay.  So rely on his testimony.  What

21  does his testimony say?

22    MR. SHORT:  That he paid -- well, I think there were

23  two arguments that were made on that, number one, that he

24  utilized the money to pay taxes and, number two, that he is

25  entitled to distributions from the trust as a beneficiary

1  because of his initial investment into the RPP Trust, and that

2  was addressed in our brief.

3          THE COURT:  His initial investment?  He put money in

4  there at the beginning, and there's evidence of that at the

5  hearing?

6          MR. SHORT:  Yes.

7          THE COURT:  Okay.

8          MR. SHORT:  Yes.  And I can cite, at least in our

9  response brief, Your Honor, we cite to September 29, 2008,

10  hearing transcript, page 71 and 72.

11          MS. KREJCI:  It's the second page.

12          MR. SHORT:  It's lines, starting on line 19 on page

13  71.

14          THE COURT:  Mr. Cuppy is asked:  Isn't it a fact

15  that -- I'm just paraphrasing.  Isn't it a fact that Mr. Rogan

16  formed RPP by contributing his own funds?  Mr. Cuppy says he

17  contributed funds.  Did anyone else contribute?  I contributed

18  to the corporation -- I think he means the trust, RPP Limited.

19  I contributed to the corporation because it was set up

20  previous to Mr. Rogan contributing funds to the trust

21  agreement.

22          MR. MENDELOFF:  Your Honor, he doesn't mean the

23  trust.  The trust owns the corporation.

24          THE COURT:  The trust owns the corporation.  But the

25  corporation was created before the trust was, and so then the

1    trust -- the corporation was then contributed by somebody to
2    the trust to form part of the corpus of the trust.
3        MR. MENDELOFF:  By Rogan.  And that's in the trust
4    agreement, which is part of the record.
5        THE COURT:  Part of the record.
6        MR. MENDELOFF:  And also, to address that, in the
7    trust agreement, in that exhibit there is a deed of
8    appointment transferring the trustee's interest, changing
9    trustees to the other two gentlemen in the Bahamas we've
10   talked about, and in that agreement, which Mr. Cuppy signed,
11   Mr. Cuppy indicates -- the agreement indicates that the
12   property in the trust was provided by the settlor, Mr. Rogan.
13   It doesn't say anything about Mr. Cuppy providing anything.
14       THE COURT:  Go ahead, Mr. Short.
15       MR. SHORT:  Your Honor, if I may, and let me see if I
16   can -- since it is still morning, and perhaps I can save you
17   some time of what's left of the morning.  If I understand
18   where we're currently standing as we're talking right now, the
19   $305,000 that was said to be frozen as property and we're
20   working with counsel on that, that's not in issue this
21   morning.  What started this issue --
22       THE COURT:  Can I just ask -- I know I'm interrupting
23   you, so keep a mental note of where you are.
24       MR. SHORT:  Yes, sir.
25       THE COURT:  Just to ask a practical question about

1    this.  And I know Mr. Cuppy was testifying at the hearing.

2           MR. SHORT:  Yes.

3           THE COURT:  What do we think the value is of the

4    property that it is that he's going to try to sell and he said

5    he was going to try to sell to satisfy that obligation?

6           MR. SHORT:  He's got a sale of -- a contract for sale

7    at $290,000.

8           THE COURT:  That's just a little short of 305.

9           MR. SHORT:  It's going to be hopefully closing, I

10   heard, November 24th or 26th.  But what I was going to

11   suggest, you know, right now if what this has whittled down to

12   is that on top of the 305 that the court wants collateralized

13   or secured and we're at this $40,000 of the 78, we're at 345.

14   We started today at 325.

15          THE COURT:  25.

16          MR. SHORT:  Out of respect for Mr. Cuppy that he's

17   incurring fees by my continued participation in this, if

18   that's where we're at, I mean, without waiving any rights or

19   arguments that that $40,000 is not a fraudulent transfer and

20   it shouldn't be subject to attachment at the turnover, I think

21   I'm willing to just say that's fine.  If that's what he's

22   asking for is for us to secure the 305 in the effort that

23   we're doing on this with debating some ideas of how we

24   collateralize --

25          THE COURT:  In other words, you're telling me without

1  prejudice to you arguing that ultimately it shouldn't be
2  turned over, you're willing to swallow that 40 on top of the
3  305 at least for the time being?

4      MR. SHORT:  Yeah, for the grand total of 345, and we
5  started at 325.

6      THE COURT:  I'm ready to rule.

7      MR. SHORT:  Save you some time, save him some fees,
8  and let's move on.

9      THE COURT:  Here's my ruling on the motion to
10  reconsider.  It's granted in part.  And just to reiterate what
11  I said before and with -- understanding what Mr. Mendeloff
12  told me about how a court isn't limited by arguments, I think
13  I've explained why it is I think in this situation that it is
14  appropriate for me to limit the relief that I ordered to what
15  the person has argued for and asked for, for a variety of
16  reasons, and so I'm going to modify the decision in one
17  respect to eliminate the $20,000 transfer that I referred to
18  as a fraudulent transfer because it wasn't specifically asked
19  for.  And that, of course, is without prejudice to Dexia
20  coming back to me later at the turnover hearing and say we
21  should get that and plus more.

22      On the flip side of it, I think that there's been a
23  reasonable likelihood of success on a showing that 40,000 of
24  the 78,000 that was transferred from the RPP Trust to
25  Mr. Cuppy in early 2007 was a fraudulent transfer.  First of

1   all, I don't think the entirety -- I don't think that showing

2   has been made as to the entirety of the 78,000, the reason

3   being that when you have a situation here as it's been

4   described to me and I can't make a finding that Mr. Cuppy's

5   testimony in this particular respect was not credible, when

6   you have a situation that a trust beneficiary incurs a tax

7   obligation by reason of his status as a beneficiary, I don't

8   think I can call a transfer that's made from the trust to the

9   beneficiary to allow him to pay that tax obligation to be a

10  transfer without consideration.  Not consideration in the

11  normal sense, but he incurs an obligation as a result of his

12  status as a beneficiary.  And if he has to be given money so

13  that he doesn't have to satisfy that obligation out of his own

14  personal funds, then I'm not prepared to say that there's been

15  a showing that that part of the transfer is fraudulent.

16          On the other hand, the evidence at the hearing tends

17  to show and there's a reasonable likelihood of success on the

18  showing that 40,000 of the 78 wasn't transferred for that

19  purpose, basis being it wasn't used for that purpose, and so

20  without any other basis for that transfer, I think there's a

21  reasonable likelihood of success that the other 40 is a

22  fraudulent transfer.

23          So the order is modified to provide at the tail end

24  that -- and I'm talking here about -- well, let me just look

25  at the draft order that was given to me by the Dexia folks

1  back on the 12th of November.  So in paragraph two, adequate

2  protection, the number 325 should be changed to 345.  As far

3  as the rest of it is concerned, I'm not -- we need to get an

4  order entered, and so I need you to -- I need Mr. Cuppy's

5  lawyers to sort of deal with the rest of that order -- well, I

6  guess you gave me a version here.

7          Let me go through -- honestly, I tabled going through

8  these in detail, the one-page order versus the trust -- I mean

9  the ten-page order based on today, so let me go through those

10 now, and I will get word to you probably by some form of

11 e-mail as to what exactly I need in an order.  And if you all

12 could give me --

13         You know, for whatever reason, it's one of the screwy

14 things about the docket in this case because we've got all of

15 these people who weren't parties to the underlying case, I

16 don't think Ms. Krejci's appearance is on the docket, and I

17 know Mr. Gregory's isn't.

18         MS. KREJCI:  Mine is.

19         THE COURT:  It is?  Actually shows up at the front

20 part of the docket?

21         MS. KREJCI:  Yes.

22         THE COURT:  I mean, I know you filed it, but for

23 whatever reason I can't find it.

24         Mr. Gregory's should have gotten on there once I

25 granted pro hac vice, but it isn't.

1          Give me on a piece of paper the e-mail addresses for

2     all three of you.

3          MR. SHORT:  Yes.

4          THE COURT:  I know I've got them somewhere.

5          MR. SHORT:  I have a card.

6          THE COURT:  It's not going to be today.  It will be

7     tomorrow that I e-mail you and tell you what I need you to do

8     to the order, and then I'll sign it.  Okay?

9          MR. MENDELOFF:  Your Honor, and as to the order, the

10    only -- our only issue is that there was never any objection

11    to anything in the preliminary injunction except for the

12    freezing of assets, so the rest of it was unobjected to and --

13         THE COURT:  So the rest of what you've got in here is

14    essentially taking stuff that was in the TRO and carrying it

15    forward.

16         MR. MENDELOFF:  Just like all the other preliminary

17    injunctions.

18         THE COURT:  Okay.  So I'll look at it with that.

19         MS. KREJCI:  Your Honor, if I may respond to that.

20    All that was argued for was an asset freeze.  That's why we

21    didn't argue all the other components of the entire order.

22         THE COURT:  See, I have to tell you I don't agree

23    with that because the motion for a preliminary injunction

24    asked for all of the stuff that was in the TRO, and the

25    hearing is -- I think I said this in the order, the hearing

1  was based on the issues that were disputed, and what was

2  disputed was, you know, what part of Mr. Cuppy's assets and

3  those of Dynamic Alliance should be frozen.  But I'll look at

4  this and figure out -- I mean, the fact of the matter is, is

5  that the temporary restraining order that relates to

6  Mr. Cuppy, which has remained in effect for, you know, two and

7  half months now, based on governing Seventh Circuit law, it's

8  already a preliminary injunction under a case called Chicago

9  United Industries versus City of Chicago.

10         So, you know, I have to pull out the original order

11  and compare it with these two, but I'll send you an e-mail

12  tomorrow.

13         MR. MENDELOFF:  Thank you, Your Honor.

14         MR. SHORT:  And, Your Honor, just like you had

15  indicated that Mr. Mendeloff is right, I wanted to make sure

16  that my -- hopefully my practical approach there at the end

17  was understood as saying --

18         THE COURT:  This is a preliminary injunction.  It's

19  an interlocutory matter.  The findings that I've made are not

20  binding at any other stage of the case.  That's what

21  preliminary injunctions are.

22         And now I need you guys to deal -- I'm hoping you're

23  going to be able to resolve this immediate issue, you know, by

24  sale of this property and whatever else and that that's then

25  going to be put somewhere where it will be held, but then I

1  need Dexia's lawyers and Mr. Cuppy's lawyers to have the same

2  type of discussion that you had with the Rogan children's

3  lawyers to figure out what's next.

4  　　　　　MR. SHORT:  If there's going to be a motion for

5  formal turnover, a hearing?

6  　　　　　THE COURT:  Yes, which is already implicitly there,

7  but what I'm talking about is setting a schedule for whatever

8  else needs to be done to enable me to get to a point where I

9  can decide that.  Okay?

10  　　　　　I'm hoping you have nothing else because I'm tired.

11  　　　　　MR. MENDELOFF:  We have nothing else.  And we thank

12  you, Your Honor.

13  　　　　　MR. SHORT:  Thank you, Your Honor.

14  　　　　　THE COURT:  Thanks.

15

16  　　　　　　*　　*　　*　　*　　*　　*　　*

17  　　　　　　　C E R T I F I C A T E

18

19

20  　　　　　I hereby certify that the foregoing is a true and

21  correct transcript of the above-entitled matter.

22

23  /s/ Valarie M. Ramsey　　　　　　　　09-03-2009

24  　_____　　　　_____

25  　Court Reporter　　　　　　　　　　　Date